# EXHIBIT 5

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
Case No. _______________

JEFFERSON GRIFFIN,

Petitioner,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

Respondent.

**NOTICE OF APPEAL AND VERIFIED PETITION FOR JUDICIAL REVIEW**

**(Incomplete Voter Registrations)**

Pursuant to sections 150B-45 and 163-182.14(b) of the General Statutes, the Honorable Jefferson Griffin petitions this Court for judicial review of the Decision and Order entered against him by the State Board of Elections on 13 December 2024 regarding one categories of protests filed by Judge Griffin. A copy of the decision is attached as Exhibit A. Petitioner respectfully requests that the Court reverse the final decision, grant judgment to Petitioner, and stay the certificate of election for the race protested by Petitioner pending resolution through judicial review.

## INTRODUCTION

1. On 19 November 2024, Judge Griffin filed six categories of election protests with county boards of election in all 100 of North Carolina's counties. On 13 December 2024, the State Board issued a final decision dismissing three of those categories of protests. This petition seeks judicial review of one of those categories of the dismissed protests:


Electronically Filed Date: 12/20/2024 8:56 AM Wake County Clerk of Superior Court

protests challenging the ballots cast by individuals who were not lawfully registered to vote (Incomplete Voter Registrations).

## PARTIES AND NATURE OF THE ACTION

2. The Honorable Jefferson Griffin is a judge on the North Carolina Court of Appeals. He is the Republican candidate in the 2024 general election for Seat 6 of the Supreme Court of North Carolina. Judge Griffin's substantial rights were prejudiced by the decision on his election protests because it affected the outcome of the election.

3. The Honorable Allison Riggs currently holds the office of Seat 6 of the Supreme Court of North Carolina. Justice Riggs is the Democratic candidate for that office.

4. The State Board of Elections (the "Board" or "Respondent") is an administrative agency under Administrative Procedure Act. *See* N.C. Gen. Stat. § 150B-2(1b).

5. The North Carolina Democratic Party ("NCDP") is a state committee, as that term is defined by 52 U.S.C. § 30101. The NCDP's purpose is to elect Democratic candidates to public office in North Carolina, including Justice Riggs who is the Democratic nominee for associate justice of the North Carolina Supreme Court.

## JURISDICTION AND VENUE

6. For judicial review of a final decision of the State Board on an election protest, an "aggrieved party has the right to appeal the final decision to the Superior Court of Wake County within 10 days of the date of service." N.C. Gen. Stat. § 163-182.14.

7. The Board entered a final decision on the election protests at issue on 13 December 24 and the decision was placed in the mail for service on Judge Griffin via FedEx

on 13 December 2024. This appeal has been filed within 10 days of the date of service of that final decision.

8. The Court has personal jurisdiction over the Board, Justice Riggs, and the NCDP because this petition is being served on them pursuant to N.C. Gen. Stat. § 150B-46.

## BACKGROUND

9. On 19 November 2024, Judge Griffin filed election protests with county boards of election in all 100 of North Carolina's counties.

10. On 20 November 2024, the Board assumed jurisdiction of each of these three categories of protests and consolidated them for review. Ex. A, p. 1.

11. On 13 December 2024, the Board issued a final decision dismissing the three categories of protests.

### *Service of Protests on Affected Voters*

12. The State Board, before addressing the merits of the three categories of protests, considered whether Judge Griffin's service of the protests on voters satisfied the Board's expectations.

13. There is no statutory authority for the Board to demand that a protestor serve copies of protests on affected parties. Rather, N.C. Gen. Stat. § 163-182.10(b) clearly assigns that duty to the county boards.

14. Despite the lack of statutory authority for compelling a protester to serve affected parties, the State Board promulgated a protest form that included a demand that

protestors "must serve copies of all filings on every person with a direct stake in the outcome of this protest." 08 N.C. Admin. Code § 02.0111 (the protest-form template). The service could be accomplished by "transmittal through U.S. Mail" and had to "occur within one (1) business day" of filing materials. *Id.*

15. Even if such a rule is valid, Judge Griffin complied with the Board's service demand by mailing a postcard by U.S. First-Class Mail to over 60,000 voters at the voters' addresses of record. The postcard stated the following:

> *** * * NOTICE * * ***
> [[First Name]] [[Middle Name]] [[Last Name]], your vote may be affected by one of more protests filed in the 2024 general elections. **Please scan this QR code to view the protests filings.** Please check under the county in which you cast a ballot to see what protest may related to you.... For more information on when your County Board of Elections will hold a hearing on this matter, please visit the State Board of Elections' website link found on the Protest Cite (via the QR code).

16. The State Board voted 3-2 that Judge Griffin's service on the voters did not satisfy the service requirement imposed by the protest form.

*Incomplete Voter Registrations*

17. Judge Griffin challenged ballots cast by people who had not lawfully registered to vote because they did not provide their drivers license number or the last four digits of their social security number on their voter application.

18. State law requires a person to provide this information, or state that he lacks such information, before becoming lawfully registered to vote.

19. In the 2024 election, approximately 60,273 people cast ballots in the Supreme Court contest despite having never provided this statutorily required information.

20. These ballots were not statutorily authorized and should not have been counted in the election. Judge Griffin filed election protests challenging these ballots.

21. The State Board voted 3-2 that the protests challenging voters who did not provide their drivers license or social security numbers did not establish an irregularity, election law violation, or misconduct.

**EXCEPTIONS AND GROUNDS FOR RELIEF**

22. The final agency decision is in violation of constitutional provisions, in excess of the Board's statutory authority or jurisdiction, was made upon unlawful procedure, and is affected by other error of law.

23. Judge Griffin explicitly states the following exceptions to the decision of the Board subject to judicial review:

24. That Judge Griffin's election protests should have been filed as voter challenges.

25. That the State Board has statutory authority to impose a service obligation through rulemaking on election protestors such as Judge Griffin. *See* Ex. A, pp. 6-7.

26. That Judge Griffin's service of the protests failed to comply with the requirements in the protest-form template. *See* Ex. A, pp. 8-11.

27. That Judge Griffin's service of the protests did not satisfy procedural due process. *See* Ex. A, pp. 11-14.

28. That the protests challenging the votes in a state election of individuals who had not lawfully registered failed to provide sufficient allegations or substantial evidence of the identities of such voters. *See* Ex. A, pp. 15-17.

29. That individuals who voted in a state election remedied their registration defects pursuant to a statutory "cure" process. *See* Ex. A, pp. 17-20.

30. That the registration defect at issue was caused by the State Board and, because the defect was the State Board's fault, an individual with such a registration defect cannot have their vote discounted in a state election. *See* Ex. A, pp. 20-25.

31. That the relief requested by the protest regarding a state election violated the National Voter Registration Act (NVRA). *See* Ex. A, pp. 25-27.

32. That only a voter challenge can be used to challenge the eligibility of a voter and, therefore, Judge Griffin could not file an election protest to challenge a voter's eligibility in a state election. *See* Ex. A, pp. 27-29.

**RELIEF SOUGHT**

Judge Griffin respectfully requests that the Court grant the following relief:

1. Issue a temporary restraining order and preliminary injunction that, pursuant to N.C. Gen. Stat. § 163-184(b), that stays the State Board's certification of the election until this Court or an appellate court orders otherwise;

2. Reverse the decision of the Board;

3. Remand and instruct the Board to determine the winner of the Supreme Court contest without counting the ballots from the category of unlawful ballots identified in protest at issue in this petition; and

4. Grant such other and further relief as the Court deems appropriate.

This the 20th day of December, 2024.

/s/ Craig D. Schauer

Craig D. Schauer
N.C. Bar No. 41571
cschauer@dowlingfirm.com
Troy D. Shelton
N.C. Bar No. 48070
tshelton@dowlingfirm.com
W. Michael Dowling
N.C. Bar No. 42790
mike@dowlingfirm.com

**DOWLING PLLC**
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
Telephone: (919) 529-3351

Philip R. Thomas
N.C. State Bar No. 53751
Chalmers, Adams, Backer & Kaufman, PLLC
204 N Person St.
Raleigh, NC 27601
Telephone: (919) 670-5185
pthomas@chalmersadams.com

*Counsel for the Honorable Jefferson Griffin*

# <u>EXHIBIT A</u>

## Decision and Order

STATE OF NORTH CAROLINA
WAKE COUNTY

BEFORE THE STATE BOARD OF ELECTIONS

| | | |
|---|---|---|
| IN RE ELECTION PROTESTS OF JEFFERSON GRIFFIN, ASHLEE ADAMS, FRANK SOSSAMON, AND STACIE McGINN | ) ) ) ) ) ) ) ) | **DECISION AND ORDER** |

At a public meeting held on December 11, 2024, the State Board of Elections ("State Board") considered election protests filed by four candidates in the 2024 General Election: Jefferson Griffin, a Republican candidate for associate justice of the Supreme Court of North Carolina; Ashlee Adams, a Republican candidate for N.C. Senate District 18; Stacie McGinn, a Republican candidate for N.C. Senate District 42; and Frank Sossamon, a Republican candidate for N.C. House District 32 (collectively, the "Protesters"). The Board consolidated the protests filed by these candidates for its decision, because they all involve the same sets of legal issues.

Upon consideration of the protest materials submitted by the Protesters; the briefs submitted by the Protesters, opposing candidates, and other interested parties; the oral argument presented to the State Board by counsel for the candidates; and the matters upon which judicial notice was taken, the Board concluded that the protests did not substantially comply with the service requirements and did not establish probable cause to believe that a violation of election law or irregularity or misconduct occurred in the protested elections. The Board therefore dismisses these protests.

## I. BACKGROUND

On November 19, 2024, the Protesters filed over 300 protests across the state challenging the apparent results of their elections. After the county boards of elections conducted recounts in all of these contests, the final canvassed results are as follows:

| CONTEST | CANDIDATE | PARTY | BALLOT COUNT | PERCENT |
|---|---|---|---|---|
| Supreme Court Associate Justice | Allison Riggs | DEM | 2,770,412 | 50.01% |
| | Jefferson G. Griffin | REP | 2,769,678 | 49.99% |
| NC Senate District 18 | Terence Everitt | DEM | 59,667 | 48.47% |
| | Ashlee Bryan Adams | REP | 59,539 | 48.36% |
| | Brad Hessel | LIB | 3,906 | 3.17% |
| NC Senate District 42 | Mrs. Woodson Bradley | DEM | 62,260 | 50.08% |
| | Stacie McGinn | REP | 62,051 | 49.92% |
| NC House District 32 | Bryan Cohn | DEM | 21,215 | 48.95% |
| | Frank Sossamon | REP | 20,987 | 48.42% |
| | Ryan Brown | LIB | 1,140 | 2.63% |

Protests were filed in almost every county in the state.[1] Those protests are based on six categories of allegations that certain general election voters' ballots were invalid. Those six categories and the number of voters challenged per category are:

[1] The legislative candidates filed protests in only those counties within the jurisdiction of their legislative contests.

1. Ballots cast by registered voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number—60,273 voters challenged;
2. Ballots cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States—266 voters challenged;
3. Ballots cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form—1,409 voters challenged;[2]
4. Ballots cast by voters who were serving a felony sentence as of Election Day—240 voters challenged;
5. Ballots cast by voters who were deceased on Election Day—156 voters challenged; and
6. Ballots cast by voters who registration was denied or removed—572 voters challenged.[3]

Across all counties and among the four Protesters, the protests alleging the same category of allegedly ineligible voters are structured and pleaded in the same fashion. The only differences among county protests of the same category are the identities of the voters being

[2] Griffin has sought to add voters to the second and third protest categories in supplemental filings submitted after the deadline to file an election protest. *See* G.S. § 163-182.9(b)(4). Because the Board determines these protests are legally deficient, it need not determine whether such supplementations are allowable under the General Statutes and Administrative Code.

[3] Some challenged voters are included in multiple protests filed in the same county. For instance, voters removed after dying before Election Day may be in both the deceased and removed protests. Additionally, Griffin has withdrawn his protests in a few counties. Accordingly, while these last three types of protests together appear to total 968 voters, in actuality they involve a combined 817 voters.

challenged—i.e., only voters registered in the county receiving the protest are part of a protest that the county board received.

On Wednesday, November 20, 2024, the State Board held a meeting, noticed on an emergency basis under N.C.G.S. § 143-318.12, to consider whether to take jurisdiction over some of the protests, which the State Board may do under N.C.G.S. § 163-182.12. The Board voted unanimously to take jurisdiction over the first three categories of protests, which presented legal questions of statewide significance. The Board instructed the county boards of elections to retain jurisdiction to consider the remaining three categories of protests, which were focused on individual, fact-specific determinations of voter eligibility.

Currently, the last three categories of protests are at various stages in the election protest process, with some still pending with and yet to be finally decided by the county boards, some having been decided with no timely appeal, some that are subject to appeal, and some that have been withdrawn by the Protester.

This decision concerns the first three categories of election protests.

## II. STANDARD OF DECISION

The State Board assumed jurisdiction over these protests pursuant to its authority under N.C.G.S. § 163-182.12, which states, in relevant part:

> The State Board of Elections may consider protests that were not filed in compliance with G.S. 163-182.9, may initiate and consider complaints on its own motion, may intervene and take jurisdiction over protests pending before a county board, and may take any other action necessary to assure that an election is determined without taint of fraud or corruption and without irregularities that may have changed the result of an election.

When a protest is filed with a county board, the county board must first hold a "preliminary consideration" meeting. N.C.G.S. § 163-182.10(a). At that meeting, before a protest

may advance to an evidentiary hearing on the allegations, the county board must first "determine whether the protest substantially complies with G.S. 163-182.9 and whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred." *Id.* Only if a protest satisfies both of these requirements will it advance to an evidentiary hearing. *Id.*

The first preliminary consideration requirement considers whether the protest satisfied the filing requirements in N.C.G.S. § 163-182.9. These requirements include the deadline by which a protest must be filed, how the protest must be filed, and the use of the State Board's election protest form, which is promulgated in an administrative rule, 08 NCAC 02 .0111, pursuant to a statutory mandate for the State Board to "prescribe forms for filing protests." N.C.G.S. § 163-182.9.

The second preliminary consideration requirement considers whether the substance of the protest meets the pleading threshold to advance to a hearing—"whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred." N.C.G.S. § 163-182.10(a)(1). This standard involves both legal and factual questions. Legally, the Board must decide whether the claims made in the protest are actionable via a protest as a matter of law—whether the allegations even amount to a violation, irregularity, or misconduct in the conduct of the election. If so, the Board must decide whether the factual allegations and evidence attached to the protest establish probable cause to believe that the alleged violation, irregularity, or misconduct actually occurred.

Probable cause is a commonsense, practical standard: Is the material submitted by the protester sufficient for a reasonable and prudent person to believe that election law violations, irregularities, or misconduct occurred in the conduct of the election. It does not mean that such a

belief is necessarily correct or more likely true than false. A probability of an irregularity in the conduct of the election is sufficient. *See Adams v. City of Raleigh*, 245 N.C. App. 330, 336–37, 782 S.E.2d 108, 113–14 (2016).

The General Statutes are not clear whether the State Board must conduct preliminary consideration, which is prescribed for county board protest procedures in N.C.G.S. § 163-182.10, when the State Board exercises jurisdiction over a protest in the first instance under N.C.G.S. § 163-182.12. Nonetheless, the State Board adopts this established preliminary consideration procedure with regard to these protests, in the interest of the efficient administration of justice.

## III. ANALYSIS

The protests at issue were not served on affected voters in accordance with law. Additionally, each of the three categories of protests is legally deficient. The protests are therefore dismissed.

### A. Service of Protests on Challenged Voters[4]

The Board first concludes that the Protesters failed to serve the registered voters they seek to challenge in their protests in a manner that would comply with the North Carolina Administrative Code and be consistent with the requirements of constitutional due process.

When a board of elections conducts its preliminary consideration of a protest filing, it is tasked with first determining "whether the protest substantially complies with G.S. 163-182.9." N.C.G.S. § 163-182.10(a)(1). That statute requires certain information to be contained within the protest filing (*i.e.*, identification of the protestor, the basis of the protest, and the remedy

[4] A small number of the protests encompassed within this order may not have been timely filed under G.S. § 163-182.9(b)(4), including all of Adams's protests and the Griffin protests filed in Moore, Orange, and Richmond counties. Nonetheless, the Board does not need to decide whether they were timely or whether the Board would exercise its jurisdiction under G.S. § 163-182.12 to consider such untimely protests, as it is dismissing these protests for other reasons.

requested), while also stating the following: "The State Board of Elections shall prescribe forms for filing protests." N.C.G.S. § 163-182.9(c).

The State Board has promulgated such a form in the administrative code at 08 NCAC 02 .0111. This rule, which carries the force of law, makes clear the protestor's responsibilities in completing, filing, and serving the form. The Board promulgated this rule in 2020 under its specific statutory authority to do so under N.C.G.S. §§ 163-182.9(c) and 163-182.10(e), and under its general statutory authority for rulemaking under N.C.G.S. § 163-22(a).

Any voters whose right to vote is called into question by the protest are "affected parties" who must be served with copies of all protest filings, as follows:

> *You must serve copies of all filings* on every person with a direct stake in the outcome of this protest ("Affected Parties"). . . . *If a protest concerns the eligibility or ineligibility of particular voters, all such voters are Affected Parties and must be served.* Address information for registered voters is available from the county board of elections or using the Voter Lookup at www.ncsbe.gov.

08 NCAC 02 .0111 (emphasis added).

The rule provides the following instruction for how and when to serve the protest filings:

> *Materials may be served by personal delivery, transmittal through U.S. Mail or commercial carrier service to the Affected Party's mailing address of record on file with the county board of elections or the State Board, or by any other means affirmatively authorized by the Affected Party*. . . . Service must occur within one (1) business day of filing materials with the county board of elections. If service is by transmittal through the U.S. Mail or commercial carrier service, service will be complete when the properly addressed, postage-paid *parcel* is deposited into the care and custody of the U.S. Mail or commercial carrier service. It is [the protester's] responsibility to ensure service is made on all Affected Parties.

*Id.* (emphasis added).

The question at hand is whether the Protesters' method of service satisfies the requirement in 08 NCAC 02 .0111 to "serve" the voters with "copies of all filings."

*i. Method of service used by the Protesters*

The Protesters did not personally deliver physical copies of the filings to the voters or mail physical copies of the filings to the voters' address in their voter registration record. Instead, the Protesters mailed a postcard, with the sender identified as the North Carolina Republican Party, and this message: "your vote may be affected by one or more protests filed in relation to the 2024 General Election," and an instruction to scan a QR code[5] to view the protest filings. The postcard does not inform the voter that it is Griffin, Adams, McGinn, or Sossamon protesting, that they are challenging the voter's eligibility to vote, or include the text of the link that the QR code points to (https://www.nc.gop/griffin_protest). This means that the method of service used by Griffin requires a recipient to somehow know this postcard is intended to be a legal document, and to trust the card is not a scam[6] or junk mail. The voter must also have a smartphone and know how to scan a QR code.[7] There is no other way from the face of the postcard for the recipient voter to know what website to visit to obtain access to the information and materials necessary to know the nature of the proceeding and how the voter is affected by it.

[5] "QR codes (or Quick Response codes) are two-dimensional codes that you can scan with a smartphone. The code contains information, usually a site address, and once you scan it, the code connects you with a resource on the web." *Introduction to QR codes*, Digital.gov, available at https://digital.gov/resources/introduction-to-qr-codes/ (last visited December 9, 2024).

[6] While generally useful and increasingly more common, the federal government has made clear that there can be security issues with using QR codes, because "[c]ybercriminals can tamper with QR codes, replacing them altogether with QR code stickers or interfering with the link that's embedded in the code." *Introduction to QR codes*, Digital.gov (referring to guidance from the Federal Bureau of Investigations in 2022).

[7] *See Symbology Innovations, LLC v. Lego Sys.*, 158 F. Supp. 3d 916, 922 (E.D. Va. 2017) ("To access information stored in the QR code, a consumer must have a QR code reader application ("app") installed on the consumer's smart phone. When presented with a QR code, the consumer opens the app, which activates the smartphone's camera to scan the QR code. The app then processes the QR code, decodes its message, and uses the encoded URL to access the online content sought by the consumer." (citations omitted)).

If the voter has a smartphone and knows how to scan the QR code, then they will be taken to a website, on the browser app of their smartphone, hosted by the North Carolina Republican Party containing links to the hundreds of protests filed by all four of the Protesters.[8] Despite the postcard informing the voter to "check under the county in which you cast a ballot to see what protest may relate to you," only the Griffin protest is organized by county. The Adams protest filing links include names of counties that may clue in a voter that they must be registered to vote in that county to be subject to that particular protest, but the six McGinn protest filing links and five Sossamon protest filing links contain no such information. Again, the postcard does not inform the voter which candidate is challenging their eligibility, so a voter would need to review the Griffin, Adams, McGinn, and Sossamon protest filings to determine whether they are affected, and then choose from among the several categories of protests listed. All this must be done on the browser app of a voter's smartphone if they have one.

Once a voter has located which of the hundreds of protest filings linked on the website might include them, they must then peruse the filings, on their smartphone, to locate their name in printouts of spreadsheets attached to a protest filing. These attachments do not list voters alphabetically and, depending on the basis of the protest, may contain hundreds of names across numerous pages. Take for instance the Lee County protests filed by Griffin. The "Incomplete Voter" protest alone contains almost 200 voters' names across five pages,[9] with another 10

---

[8] Screenshots of the website as displayed on a smartphone are in Attachment A to this decision.

[9] A screenshot of the spreadsheet listing voters' names for this protest as displayed on a smartphone is in Attachment A to this decision.

voters challenged across three other protest filings.[10] A Lee County voter in receipt of Griffin's postcard would have to read through every line of text in the spreadsheets attached to these four protests to determine if their name is on one or more of the lists of voters challenged by Griffin, as well as the other protests listed on the website. And even if the voter finds their name, in most instances the only way to confirm the name listed refers to them would be to look up their NCID number or voter registration number (VRN) on their voter registration card (if they have ready access to it) or voter profile on the State Board's website.[11] This is because the only demographic information listed on the spreadsheet for most of the protests is the voter's name and those identifier numbers, which are only relevant for administrative election purposes and are generally not know by a voter. The face of the protest form likewise does not contain any challenged voter's demographic information.

*ii. Compliance with the service requirements*

The method of service employed here does not comport with the plain text of the rule or the constitutional due-process requirements to serve an affected party.

**First**, a straightforward reading of the instructions in 08 NCAC 02 .0111 make it clear that the "materials" to be served through personal delivery or as a "parcel" in the mail are *physical* "copies of all filings."

This plain reading of the rule makes even more sense when considering how service is typically made in other contexts. For example, service of process on a natural person (*i.e.*, a

[10] Copies of all protests filed by Griffin, including those that may have been late or not actually received by a county, are available on the State Board's website at: https://dl.ncsbe.gov/?prefix=Legal/Nov%202024%20Protests/Griffin/.

[11] Available at: https://vt.ncsbe.gov/RegLkup/.

person, not a corporation) in a civil lawsuit must be done by "*delivering a copy* of the summons and of the complaint" to person, or their agent, by "*leaving copies* thereof" at the person's home, by "*mailing a copy* of the summons and of the complaint" by certified mail or through a designated delivery service. N.C.G.S. § 1A-1, Rule 4(j)(1) (emphasis added). As another example, when documents other than the summons and complaint must be served directly on a party to a civil lawsuit, service must be done as provided in Rule 4, or by "*delivering a copy* to the party," which means physically "*handing it to* the party," or by "*mailing a copy* to the party at the party's last known address," or by email "if the party has consented to receive e-mail service in the case at a particular e-mail address, and a copy of the consent is filed with the court by any party." N.C.G.S. § 1A-1, Rule 5(b)(2) (emphasis added). There is no North Carolina statute or rule that authorizes service of a document to be made by directing a recipient to a website through a QR code located on a postcard mailed in lieu actually including the document required to be served. This is especially important here because the postcard never states clearly that the recipient's right to vote is being challenged.

**Second**, the method of service employed by the Protesters violates the constitutional due process rights of the affected voters.

Election protests are quasi-judicial proceedings. *Bouvier v. Porter*, 386 N.C. 1, 12, 900 S.E.2d 838, 848 (2024). When a board of elections proceeds in its quasi-judicial capacity, the due process rights of the participants must be protected. *See Rotruck v. Guilford Cty. Bd. of Elections*, 267 N.C. App. 260, 265, 833 S.E.2d 345, 349 (2019) (applying *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 265 S.E.2d 379 (1980), in reviewing a voter registration challenge heard before a county board of elections). This protection is particularly important when the election protest challenges the eligibility of voters to vote in the protested

contest, because a successful protest will mean the discarding of their votes. Voters have a constitutionally protected liberty interest in their right to vote. See *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020).

At a minimum, due process requires "notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 656-57 (1950); *see McMillan v. Robeson Cty.*, 262 N.C. 413, 417, 137 S.E.2d 105, 108 (1964) (incorporating these procedural due process requirements through the "law of the land" and "due process of law" provisions of the North Carolina Constitution.). "This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane*, 339 U.S. at 314, 70 S. Ct. at 657.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S. Ct. at 657 (cleaned up); see *In re Appeal of McElwee*, 304 N.C. 68, 81, 283 S.E.2d 115, 123 (1981) (applying *Mullane*). "[W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes." *Mullane*, 339 U.S. at 315, 70 S. Ct. at 657–58 (cleaned up).

The Protesters' chosen method of service is not reasonably calculated under the circumstances to inform the challenged voters as to what action is pending, nor does it provide enough information for the voters to determine what they can even do about it. Instead, the postcard with a QR code method can reasonably be described as a "mere gesture" at providing the voters with notice. After all, not every voter will even have a smartphone or the wherewithal for scanning the QR code, or be trusting enough of an unsolicited postcard mailing from a political party to even follow that QR code. And the wording of the postcard is so vague that it is unlikely to clearly inform the recipient that a legal proceeding has been filed against them. For those voters who happen to understand that the postcard is notifying them that a legal proceeding has been filed against them, and who are trusting and savvy enough to follow the QR code on their smartphone, they still have to engage in a needle-in-a-haystack effort to locate what has been alleged about them and by whom, and what is the authority underlying the legal proceeding which would perhaps give them an indication of how and whether they can respond. The method of service chosen here is substantially less likely to give the voters notice than any other customary alternatives.

As Griffin notes in his brief, the Supreme Court of North Carolina has observed that the election protest process is supposed to be "simple so that everyone, not just lawyers, can use it." *Bouvier v. Porter*, 386 N.C. 1, 4, 900 S.E.2d 838, 843 (2024).[12] The applicable rule is quite simple when it comes to service of the protest filings on affected parties. And following its direction would indeed ensure that the affected party receives adequate notice of the proceedings. Yet, instead of simply mailing to each voter a physical copy of the filing that is actually

[12] This notion should apply to not only the people bringing the protest, but obviously, for those who may have their votes stripped through the protest, as well.

applicable to the voter, the Protesters chose to have their political party send each of voters they have challenged on a journey that would likely leave many of the voters wishing they had a digital-age Lewis and Clark to lead the way. Accordingly, the Protesters have failed to meet this "elementary and fundamental requirement of due process" with their chosen method of service. *Mullane*, 339 U.S. at 314, 70 S. Ct. at 657.

In sum, the Protesters have failed to show substantial compliance with the requirement of 08 NCAC 02 .0111 to "serve" the voters they are challenging with "copies of all filings," and their decision to employ the postcard QR code method of service was not reasonably certain to inform the affected voters of the matter such that they could choose for themselves how to respond.

For these reasons, the State Board concludes, by a vote of 3 to 2, that the protests were not properly served on affected parties required to receive service of copies of the protest filings and therefore do not substantially comply with N.C.G.S. § 163-182.9. The Board will nonetheless address the remaining aspects of preliminary consideration review, because the General Statutes call for reviewing the protest for both procedural compliance and probable cause at the preliminary consideration stage. *See* N.C.G.S. § 163-182.10(a)(1) ("If the board determines that one *or both requirements* are not met, the board shall dismiss the protest." (emphasis added)).

**B. Alleged Incomplete Registrations**

The protests regarding allegedly incomplete voter registration forms fail to establish probable cause that a violation, irregularity, or misconduct in the election, that is actionable via a post-election protest, has occurred.

The Protesters filed a series of protests across the state which challenged the eligibility of over 60,000 voters who cast ballots in the November 2024 general election and whose electronic voter registration database records displayed neither a driver's license number nor the last four digits of a social security number. The Protesters conclude that these voters never submitted either of these numbers when registering to vote. Accordingly, the Protesters request that these voters' ballots be removed from the official count, or, if the voters submit the missing information in some post-canvass information-gathering procedure yet to be devised, their vote may count.

**i. Factual basis for the protests**

As an initial matter, the Protest filings include insufficient allegations and evidence to establish probable cause to believe that their challenged voters failed to provide one of these identification numbers on their voter registration application.

The Protesters and their affiant in support of their protest filings make the factual assumption that a list of voters who lack certain data in the voter registration database record never provided that data. As their affiant states, to produce their list, they requested a list of voters who "do not contain data in one or more of the following data fields: (1) Driver's License Number; or (2) Last Four Digits of Social Security Number." It requires a factual inference to then conclude that the absence of these data elements in a database means that a voter's registration application was incomplete when submitted. It would be an unwarranted inference, based on the language of our statutes and prior Board decisions on this issue.

First, a voter who submits a registration application without one of these identification numbers because they do not have one is nonetheless allowed to register to vote, despite their form lacking these numbers. *See* N.C.G.S. § 163-82.4(b) ("The State Board shall assign a unique

identifier number to an applicant for voter registration if the applicant has not been issued either a current and valid drivers license or a social security number."); *see also* 52 U.S.C. § 21083(a)(5)(ii) (similar).

Second, when a registrant provides one of these numbers but the number does not validate through a database match among different government databases, their voter registration database record will lack such a number. When a person submits a voter registration application with a driver's license number or the last four digits of a social security number, the county board must attempt to validate that number using N.C. Division of Motor Vehicles (NCDMV) and Social Security Administration databases. *See* N.C.G.S. § 163-82.12(6)–(9). If that number does not validate, then the person must be informed of that fact and offered an alternative means of confirming their identity before they first vote. *Id.* §§ 163-82.12(9), 163-166.12(d). They may do so by presenting a "current and valid photo identification," or a "copy of one of the following documents that shows the name and address of the voter: a current utility bill, bank statement, government check, paycheck, or other government document." *Id.* § 163-166.12(a), (d). Unvalidated identification numbers are not retained in a voter's registration record. *See In re: HAVA Complaint of Joanne Empie*, N.C. State Bd. of Elections, at 7 (Nov. 11, 2024) ("Once that happens, the database removes the unverified driver's license number or last four digits of a social security number from the electronic registration record, although the data is still retained elsewhere within the system.").[13]

---

[13] Available at https://s3.amazonaws.com/dl.ncsbe.gov/HAVA%20Administrative%20Complaints/2024-08-07%20Empie/ED%20Recommendation%20-%20HAVA%20Complaint%20Decision%20-%20Empie.pdf. The State Board takes judicial notice of its prior decisions on the issue of identification numbers on voter registration applications. Such notice was announced at the State

Accordingly, it would be an unwarranted inference to conclude that the lack of numbers in a voter registration database field for a driver's license number or last four digits of a social security number means that the person registered to vote without providing one of these numbers, despite having such a number. The Protesters offer no reason in their protest papers to conclude that any of the voters they are challenging fall outside these categories. The Protests therefore lack sufficient factual enhancement to establish probable cause to believe a violation of law, irregularity, or misconduct in the conduct of the election has occurred, even assuming what has been alleged is such a violation. N.C.G.S. § 163-182.10(a)(1).

**ii. Legal basis for the protests**

Even assuming the facts alleged and the affidavit accompanying the protests established probable cause to believe some voters registered without providing their identification numbers and they actually possessed such numbers, the fact that these registered voters cast ballots is not a violation, irregularity, or misconduct in the conduct of the election, for the following reasons.

*a. Previous decisions foreclose these protests.*

The legal requirement to require one of these identification numbers derives from federal law, and the complained-of issue has been remedied consistent with federal law.

No provision of North Carolina law clearly states that a county board may not process a registration application from a voter who does not provide one of these identification numbers. The General Statutes provide that the voter registration form must "request" this information. N.C.G.S. § 163-82.4(a). It requires an inference, based on the fact that specific other items are

---

Board's December 11, 2024, meeting where the Board received argument from Protesters' and Respondents' counsel, and counsel were offered an opportunity to object to such notice. No objection was raised.

referred to as "optional" in the statute, to conclude that the absence of such "request[ed]" information on a voter registration application requires a county board to reject a person's registration application as a matter of state law, as the Protesters contend. They perhaps draw that inference from another subsection of the same statute, subsection (f), which states, "If the voter fails to complete any *required item* on the voter registration form but provides enough information on the form to enable the county board of elections to identify and contact the voter, the voter shall be notified of the omission and given the opportunity to complete the form at least by 5:00 P.M. on the day before the county canvass as set in G.S. 163-182.5(b)." (Emphasis added.) But it's a question-begging argument to assert that the "request[ed]" identification numbers identified in subsection (a) of this statute is a "required item" under subsection (f), simply because subsection (f) refers indiscriminately to a "required item" on the form.

To be sure, the State Board considers this a required item, not because of state law, but because of federal law. Since 2004,[14] the federal Help America Vote Act (HAVA) has prohibited a state from processing a voter registration application without one of these numbers, if the voter has one. 52 U.S.C. § 21083(a)(5)(A). But this Board and a federal court, examining this very issue prior to and during this election, determined that any previous failure to implement this federal requirement cannot be held against already-registered voters casting ballots in this election, as explained below.

After receiving a HAVA administrative complaint in 2023 seeking a similar remedy based on the alleged registration of voters who did not provide these numbers despite having them, this Board determined that retroactively requiring this information of registered voters was

[14] Or 2006, depending on a federal waiver. *See* 52 U.S.C. § 21083(d)(1).

a remedy not authorized by HAVA. *In re: HAVA Complaint of Carol Snow*, N.C. State Bd. of Elections, at 4 (Dec. 6, 2023).[15] In its determination, the Board noted that "the law's purpose of identifying the registrant upon initial registration is already accomplished because any voter who did not provide a driver's license number or the last four digits of a Social Security number would have had to provide additional documentation to prove their identity before being allowed to vote, by operation of the separate provision of HAVA . . . . In other words, no one who lacked this information when registering since the enactment of HAVA would have been allowed to vote without proving their identity consistent with HAVA." *Id.* at 4–5.

That separate provision of HAVA states that a new voter registration applicant must provide an alternative form of identification before or upon voting for the first time, if the state did not have a system complying with the requirement to collect a driver's license number or last four digits of a social security number. *See* 52 U.S.C. § 21083(b)(1)–(3). Those alternative forms of identification, as discussed already, include "a current and valid photo identification," or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter." *Id.* § 21083(b)(2)(A)(i)–(ii). North Carolina's election officials refer to these alternative forms of identification as "HAVA ID." As

---

[15] *Available at* https://s3.amazonaws.com/dl.ncsbe.gov/HAVA%20Administrative%20Complaints/2023-10-06%20Snow/NCSBE%20HAVA%20Complaint%20Decision%20-%20Snow.pdf. The motion that the Board unanimously adopted at this hearing stated, "the State Board resolve[s] the HAVA complaint filed by Carol Snow by determining that a violation of Section 303 of HAVA could occur as a result of the voter registration application form failing to require an applicant to provide an identification number or indicate that they do not possess such a number, and that the appropriate remedy is the implementation of staff's recommended changes to the voter registration application form and any related materials." *See* Minutes of Meeting, N.C. State Bd. of Elections (Nov. 28, 2023), *available at* https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/State_Board_Meeting_Minutes/2023%20SBOE%20Minutes/SBE%20Open%20Session%20Minutes%2011.28.23.pdf.

noted in this prior Board decision on the HAVA complaint, the boards of elections require voters without these numbers in their database record to provide HAVA ID before they can first cast a ballot. *In re: HAVA Complaint of Carol Snow* at 4–5.

Prior to the General Election, the Republican National Committee and North Carolina Republican Party filed a lawsuit seeking the same relief sought by Protesters here. The federal district court for the Eastern District of North Carolina acknowledged the legal flaw in awarding such relief in the instant election, given that there had been no meaningful opportunity for the voters at issue to address any potential deficiency far enough in advance of the election to comply with the law. The court noted that it was a meritorious contention that equitable principles "prohibit[] granting Plaintiffs relief in connection with the most recent election." Order at 4, *Repub. Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-547 (Nov 22, 2024). The court further affirmed, when discussing the equitable doctrine of laches, that "Plaintiffs in this action are not going to obtain any relief in connection with the most recent election." *Id.*

Accordingly, to the extent there is a potential violation of HAVA involved in the registration of voters in the past, it was remedied consistent with a separate provision of HAVA, and a federal court has determined that no further remedy would be permissible for the current election.

*b. Protests cannot be used to remove ballots of eligible voters who did everything they were told to do to register.*

A violation, irregularity, or misconduct does not occur when a voter does everything the government requires of them to register, they possess the qualifications to vote, and they vote. Because the protests do not allege otherwise, they have failed to allege a protest that is actionable as a matter of law.

Assuming that the protests provide a sufficient basis to conclude that any of the challenged voters registered without providing an identification number and did not indicate that they lacked such numbers, the Protesters admit that it would not have been the voter's fault that they were able to nonetheless register. They explain, correctly, that for a number of years and spanning multiple Board administrations, the voter registration form in North Carolina did not fully inform voters that these identification numbers were required to be submitted with the form. As the State Board concluded when considering the aforementioned HAVA complaint, "a violation of [HAVA's requirement to gather these numbers during registration] could occur as a result of the current North Carolina voter registration application form failing to require an applicant to provide an identification number or indicate that they do not possess such a number." *In re: HAVA Complaint of Carol Snow*, N.C. State Bd. of Elections, at 4 (Dec. 6, 2023). The Board therefore ordered the form be changed in December 2023 and ordered that county boards be instructed that such numbers must be obtained before processing registrations going forward, unless the voter affirmed that they lacked these numbers. *Id.*

With regard to already-registered voters, the Board explained that any voters who were able to register without providing one of the identification numbers would have been required to use HAVA's alternative means of confirming their identity before voting: a current and valid photo identification, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. *See id.* at 4–5 (citing to 52 U.S.C. § 21083(b)(2)(A)). Moreover, in all elections since April 2023, all such voters, whether they had provided an identification number at registration or presented an alternative form of ID when they first voted, have be asked to provide a valid photo ID under state law to prove their identity during every election. N.C.G.S. § 163-166.16.

Accordingly, at best, the Protesters' argument is that the voters they challenge did everything that was asked of them to prove their identity to register and vote, yet through an administrative error in the processing of registration forms, the boards of elections did not collect these voters' driver's license or last four digits of the social security number. Importantly, the Protesters do not allege that any of the challenged voters in this category lack the substantive qualifications to vote. This category of protests hinges only on alleged noncompliance with voter registration procedures. Under North Carolina law, however, this sort of challenge to an election is forbidden.

In a directly applicable case from the North Carolina Supreme Court, the court concluded that an error by election officials in the processing of voter registration cannot be used to discount a voter's ballot. *Woodall v. W. Wake Highway Com.*, 176 N.C. 377, 388, 97 S.E. 226, 231 (1918). There, registrars failed to administer an oath to voters, which was a legal prerequisite to registration. The court held,

> A vote received and deposited by the judges of the election is presumed to be a legal vote, although the voter may not actually have complied entirely with the requirements of the registration law; and it then devolves upon the party contesting to show that it was an illegal vote, and this cannot be shown by proving merely that the registration law had not been complied with.

*Id.* at 389, 97 S.E. at 232. The court further explained,

> Where a voter has registered, but the registration books show that he had not complied with all the minutiae of the registration law, his vote will not be rejected. Such legislation is not to be regarded as hostile to the free exercise of the right of franchise, and should receive such construction by the courts as will be conclusive as to a full and fair expression of the will of the qualified voters.

*Id.*

The Supreme Court reaffirmed the holding in *Woodall* decades later in *Overton v. Mayor & City Comm'rs of Hendersonville*, 253 N.C. 306, 316, 116 S.E.2d 808, 815 (1960). The court stated,

> [A] statute prescribing the powers and duties of registration officers should not be so construed as to make the right to vote by registered voters depend upon a strict observance of the registrars of all the minute directions of the statute in preparing the voting list, and thus render the constitutional right of suffrage liable to be defeated, without the fault of the elector, by fraud, caprice, ignorance, or negligence of the registrars.

*Id.* (quoting *Gibson v. Bd. of Comm'rs*, 163 N.C. 510, 513, 79 S.E. 976, 977 (1913)).

Counsel for the Protesters offered no response to this directly applicable legal authority on which they had notice prior to the argument on these protests, even despite a Board member's request during argument for the Protesters to rebut it.

Not only does North Carolina law forbid this type of election protest, federal law also forbids it because it would violate substantive due process protections under the U.S. Constitution.

In *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), election officials in Rhode Island, believing the issuance of absentee ballots in party primaries was authorized, and acting in accordance with a practice that had existed for about seven years in the case of primaries, advertised and issued those ballots for use in a party primary. *Id.* at 1067. After the primary, the losing candidate for the first time questioned the statutory and constitutional authority of the election officials to issue and count the ballots. *Id.* After being denied relief by the state elections board, the Rhode Island Supreme Court invalidated those absentee ballots and quashed the certificate of nomination, finding "there is no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election." *Id.* at 1068. The prevailing

candidate then filed a lawsuit in federal court. The First Circuit found that the retroactive invalidation of the ballots cast constituted "broad-gauged unfairness" prohibited under substantive due process jurisprudence, because the "issuance of such ballots followed long-standing practice; and *in utilizing such ballots voters were doing no more than following the instructions of the officials charged with running the election*." *Id.* at 1075-76 (emphasis added).

The Fourth Circuit has adopted the Griffin framework as "settled" law. *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983); *see also Bennett v. Yoshina*, 140 F.3d 1218, 1226–27 (9th Cir. 1998) (adopting the *Griffin* framework and explaining, "a court will strike down an election on substantive due process grounds if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures.").

Here, the protests are premised on voters not supplying their driver's license or social security number when registering to vote, and the county boards of elections processing those forms. The grounds for the protest resulted from the State Board-produced voter registration form and past guidance from the State Board that would lead those counties to treat forms without such an identifier as requiring the voter to show a HAVA ID before voting rather than be considered incomplete. That is what the voters were informed to do to validly vote, and they relied on that information. Under these circumstances, to remove the ballots of any of these voters—whether automatically in resolution of the protest after hearing the evidence[16] or upon

---

[16] Even if the State Board agreed with the Protesters that should voters' ballots could be removed pursuant to the protest, before doing so, evidence would need to establish that each of these voters was actually registered after the effective date of HAVA without providing a driver's

some post-canvass notice procedure involving the voters, as the Protesters suggest would be permissible—would result in "the kind of 'broad-gauged unfairness' that renders an election patently and fundamentally unfair." *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 916 (E.D. Va. 2018). As Chief Judge Myers of the Federal District Court for the Eastern District of North Carolina stated during oral argument over this same class of voters, "We certainly can't be disenfranchising people who did what they were told to do who are eligible voters." Transcript at 64:7–9, Doc. 63, *Repub. Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-547 (Oct. 20, 2024). Accordingly, regardless of whether state law permits this election protest to proceed, the federal constitution does not.

*c. Removing these voters' ballots on this basis would violate the registration laws.*

To grant the Protesters the relief they request in these protests, moreover, would violate state and federal voter registration laws. Without question, these challenged voters are registered voters. State and federal statutes restrict the removal of voters from "the official list of eligible voters" in an election unless those voters do not meet the substantive qualifications to vote. 52 U.S.C. § 20507(a)(3); N.C.G.S. § 163-82.14(a).

---

license number or last four digits of their social security number on their voter registration application, if they had one. As noted in the previous section, voter records routinely lack these numbers for other permissible reasons. Any such evidentiary review would also need to factor in routine data entry errors where county workers do not enter all the data from a registration form into the database, situations when a voter supplied such a number in a previous application under a different registration record than the one challenged, and situations when a voter registered prior to the effective date of HAVA but a new registration was created for them that is not linked to that older registration, among other potential reasons that any of the challenged voters may have been registered consistent with HAVA but nonetheless their database record lacks these numbers.

Under state law, "[e]very person registered to vote by a county board of elections in accordance with this Article *shall remain registered* until: (1) The registrant requests in writing to the county board of elections to be removed from the list of registered voters; or (2) The registrant becomes disqualified through death, conviction of a felony, or removal out of the county; or (3) The county board of elections determines, through the procedure outlined in G.S. 163-82.14, that it can no longer confirm where the voter resides." N.C.G.S. § 163-82.1(c) (emphasis added). None of these provisions apply to permit the removal of the registrants challenged by the Protesters.

Under federal law, the National Voter Registration Act (NVRA), once a person is registered to vote, "a registrant may not be removed from the official list of eligible voters except" (A) at the request of the registrant; (B) by reason of criminal conviction or mental incapacity under state law; or (C) through list maintenance based on change of residency or death. 52 U.S.C. § 20507(a)(3), (a)(4), (c)(1). None of those reasons apply here. Another provision of the NVRA prohibits a state from conducting "any program" to "systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election. *Id.* § 20507(c)(2).[17]

[17] It cannot reasonably be contended that removing voters under such a program from the list of voters eligible to cast a ballot in an election would be permissible if done immediately after an election and that removal is retroactive to the election. The result is the same—the voter has been removed from the "official list of eligible voters" in *that election* in a manner that occurred too late under federal law. 52 U.S.C. § 20507(a). The Protesters sought to draw a distinction at oral argument between a voter being on the list of eligible voters in an election and that voter having their ballot removed from the count in that election yet remaining on the list of eligible voters. To describe that attempted distinction is to prove its lack of logic. It would completely undermine the purpose of having a list of voters who are eligible to vote in an election if a voter is on that list yet the government removes their ballot. *See Majority Forward v. Ben Hill Cty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021) (rejecting this same argument as

A separate federal law, HAVA, requires that any maintenance of the voter lists by a state be "conducted in a manner that ensures that—(i) the name of each registered voter appears in the computerized list; [and] (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list." 52 U.S.C. § 21083(a)(2)(B). Like the reasons set forth in the NVRA, those reasons for removal do not apply here either, by Protesters own admission.

Our state law directs that we maintain the voter rolls in compliance with the NVRA, N.C.G.S. § 163-82.14(a1), and this provision of HAVA, *id.* § 163-82.11(c). In other words, North Carolina has what is called a "unified" registration system, meaning that we have the same rules for registration for voters in state and federal elections, and there is one eligible voter list for both types of elections. *Republican Nat'l Comm. v. N.C. State Bd. of Elections,* 120 F.4th 390 (4th Cir. 2024).

Retroactively removing these voters from the list of voters eligible to cast a ballot in the election would violate all of these federal law provisions. Accordingly, this protest does not allege a violation, irregularity, or misconduct that is legally actionable via a post-election protest.

*d. The protests contravene the intent of North Carolina law.*

This category of protests is also unlawful under state law because it would undermine the clear intent of the legislature with regard to how a voter may have their eligibility to vote challenged in an election.

The General Statutes provide that the only basis to discount a registered voter's ballot is to properly allege and prove that such a voter lacks the substantive qualifications to vote in the

drawing "a distinction without a difference" because "[t]he effect of not appearing on the list of electors is the same as not being eligible to vote").

election, the voter has already voted or is being impersonated, or the voter failed to follow the photo ID law. *See* N.C.G.S. ch. 163, art. 8 (governing voter challenges). The voter challenge statutes of Chapter 163 provide that the only valid bases to challenge the right of someone's ballot to count in a general election are:

- the voter is not a resident of voting jurisdiction,
- the voter is not 18 years of age (or will not be by Election Day),
- the voter is serving a felony sentence,
- the voter is dead,
- the voter is not a citizen of the United States,
- the voter is not who he or she represents himself or herself to be,
- the voter already voted,
- the voter does not present photo identification in accordance with N.C.G.S. § 163-166.16.

N.C.G.S. §§ 163-85(c), -87, -89(c). The Protesters allege none of these disqualifications among the voters they challenge.

For the State Board to permit an election protest to seek to disqualify voters' ballots on bases that are not permitted by the voter challenge statutes would violate the clear intent of state law. The General Assembly has specifically provided the specific substantive grounds for challenging the eligibility of voters in an election. Allowing an election protest to expand on those grounds would work an end-run around that law. *DTH Media Corp. v. Folt*, 374 N.C. 292, 300, 841 S.E.2d 251, 257 (2020) ("When multiple statutes address a single matter or subject, they must be construed together, *in pari materia*, to determine the legislature's intent."); *Cooper v. Berger*, 371 N.C. 799, 810, 822 S.E.2d 286, 296 (2018) ("Under the doctrine of *expressio*

*unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list. . . . In other words, sometimes a provision is written (or a set of provisions are written) in such a way that a reasonable negative inference can and should be drawn.”).

For all these reasons, the State Board concluded, by a vote of 3 to 2, that this category of protests does not establish probable cause to believe a violation of law, irregularity, or misconduct occurred in the conduct of the general election. N.C.G.S. § 163-182.10(a)(1).

### C. U.S. Citizens Whose Parents Were North Carolina Residents but Who Have Never Resided in the United States

Next, the Board concludes that the protests regarding overseas-citizen voters who have never resided in the United States but whose parents resided in North Carolina before moving abroad fails to allege a violation, irregularity, or misconduct in the conduct of the election.

With regard to this category of protests, the Protesters are asking the State Board of Elections, an administrative agency, to ignore a statute of the General Assembly under the theory that the State Board should deem that statute unconstitutional. This, the Board cannot do.

In June 2011, the North Carolina General Assembly, while under the control of the Protesters’ political party, unanimously adopted Session Law 2011-182, entitled “An Act to Adopt Provisions of the Uniform Military and Overseas Voters Act Promulgated by the National Conference of Commissioners on Uniform State Law, While Retaining Existing North Carolina Law More Beneficial to Those Voters.”[18] The act referenced in the title of the session law is a federal law that extends certain absentee voting privileges to military members and their families

[18] https://www.ncleg.gov/Sessions/2011/Bills/House/PDF/H514v0.pdf.

and overseas citizens that are not available to civilians living in the United States. *See* 52 U.S.C. §§ 20301 – 20311.

Session Law 2011-182 specifically authorized U.S. citizens who have never lived in the United States to vote in North Carolina elections if they have a familial connection to this state. The session law enacted Article 21A of Chapter 163 of the General Statutes, or the Uniform Military and Overseas Voters Act. That Act allows "covered voters" to use unique procedures to register to vote, request an absentee ballot, and submit an absentee ballot, which are not available to civilian voters in the United States who may only vote absentee using procedures in Article 20 of Chapter 163. *See* N.C.G.S. §§ 163-258.6 through -258.15. Particularly relevant here, the Act defines "covered voters" to include the following:

> An overseas voter who was born outside the United States, is not described in sub-subdivision c. or d. of this subdivision, and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements, if:
>
> 1. The last place where a parent or legal guardian of the voter was, or under this Article would have been, eligible to vote before leaving the United States is within this State; and
>
> 2. The voter has not previously registered to vote in any other state.

*Id.* § 163-258.2(1)e.

The Act further reiterates the special procedures afforded such voters when it deems, for the purpose of voter registration, that the residence assigned to such voters shall be "the address of the last place of residence in this State of the parent or legal guardian of the voter. If that address is no longer a recognized residential address, the voter shall be assigned an address for voting purposes." *Id.* § 163-258.5. Such voters are authorized to use special forms, developed by

the United States Government for military and overseas-citizen voters, to register to vote and request an absentee ballot. *Id.* §§ 163-258.6, -258.7.

The Act is very clear that such voters are entitled to cast an absentee ballot under these procedures: "An application from a covered voter for a military-overseas ballot shall be considered a valid absentee ballot request for any election covered under G.S. 163-258.3 held during the calendar year in which the application was received." *Id.* § 163-258.8. The Act is also clear that a validly returned absentee ballot from such voters must be counted: "A valid military-overseas ballot cast in accordance with G.S. 163-258.10 shall be counted if it is delivered to the address that the appropriate State or local election office has specified by the end of business on the business day before the canvass conducted by the county board of elections held pursuant to G.S. 163-182.5 to determine the final official results." *Id.* § 163-258.12(a).

The foregoing statutes have been the law of North Carolina for thirteen years and have been faithfully implemented in 43 elections in this state since that time.[19]

In spite of the clear instructions from the General Assembly in the Act, the Protesters ask the State Board to invalidate the ballots of a specific category of "covered voters," thereby contravening the governing statutes. The State Board of Elections will not do this.

As an administrative agency, the State Board is bound to follow the law that governs it. The Protesters suggest that this law need not be followed because, in their view, it violates the North Carolina Constitution. The State Board does not have the authority to declare an act of the General Assembly to be unconstitutional and thereby ignore it. *In re Redmond*, 369 N.C. 490, 493, 797 S.E.2d 275, 277 (2017) ("[I]t is a well-settled rule that a statute's constitutionality shall

[19] See er.ncsbe.gov, showing in the "Election" dropdown menu each election that has occurred since the effective date of the Act, January 1, 2012.

be determined by the judiciary, not an administrative board." (internal quotations omitted)). Absent a judicial decision declaring the aforementioned laws unconstitutional, they are presumed to be valid and in compliance with the constitutional. *Hart v. State*, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015).

Additionally, for the reasons discussed above regarding the identification number protests, even if it were later determined that these statutes are unconstitutional, it would violate the federal constitution's guarantee of substantive due process to apply such a newly announced rule of law to remove voters' ballots after an election, when those voters participated in the election in reliance on the established law at the time of the election to properly cast their ballots.

The State Board therefore concludes, by a vote of 3 to 2, that this category of protests does not allege a violation of law, irregularity, or misconduct in the conduct of the general election. N.C.G.S. § 163-182.10(a)(1).

### D. Military and Overseas Citizen Absentee Voters Who Did Not Send Photo ID

Finally, the Board concludes that the protests regarding military and overseas-citizen voters who did not include a photocopy of photo identification or an ID Exception Form with their absentee ballots fails to allege a violation, irregularity, or misconduct in the conduct of the general election.

As with the prior category of protests, the body of law that applies to the voters challenged in this category of protests is Article 21A of Chapter 163 of the General Statutes. That article comprehensively addresses the requirements for voting by absentee ballot for "covered persons." By contrast, the provisions of Article 20 comprehensively address the requirements for civilian absentee voting. The requirements of one article do not apply to the class of individuals subject to the other article, unless otherwise stated in statute.

To request a ballot under Article 21A, a covered voter must apply for an absentee ballot, which typically involves the submission of a standard federal form, a federal postcard application (FPCA) or a federal write-in absentee ballot (FWAB).[20] N.C.G.S. § 163-258.7. The State Board also makes the FPCA available through a secure online portal that covered voters may use to request and submit their absentee ballots. *Id.* §§ 163-258.4(c), -258.7(c), -258.9(b), -258.10. To confirm the voter's identity, the standard federal forms require the voter to provide their name, birthdate, and their driver's license number or social security number. The voter must also attest under penalty of perjury that the information on the forms "is true, accurate, and complete to the best of my knowledge." Additionally, Article 21A requires covered voters to complete a declaration where they "swear or affirm specific representations pertaining to the voter's identity, eligibility to vote, status as a covered voter, and timely and proper completion of an overseas-military ballot." *Id.* § 163-258.4(e); *see id.* § 163-258.13.

These are the sole provisions applying to the authentication of a covered voter who uses the provisions of Article 21A to vote by absentee ballot. Nowhere in Article 21A is there any reference to a covered voter supplying a photocopy of a photo ID with their absentee ballot. To remove any doubt about whether a separate authentication is required, a provision in Article 21A spells this out plainly: "An authentication, other than the declaration specified in G.S. 163-258.13 or the declaration on the federal postcard application and federal write-in absentee ballot, *is not required for execution of a document under this Article*. The declaration and any

[20] These forms are available at https://www.fvap.gov/eo/overview/materials/forms and are provided by the Federal Voting Assistance Program, which is an agency of the United States Department of Defense.

information in the declaration may be compared against information on file to ascertain the validity of the document." *Id.* § 163-258.17(a) (emphasis added).

The requirement to provide a photocopy of photo ID with an absentee ballot appears in Article 20 of Chapter 163, which governs civilian absentee voters residing in the United States. The relevant statute reads, "Each container-return envelope returned to the county board with application and voted ballots *under this section* shall be accompanied by a photocopy of identification described in G.S. 163-166.16(a) or an affidavit as described in G.S. 163-166.16(d)(1), (d)(2), or (d)(3)." *Id.* § 163-230.1(f1) (emphasis added). When the statute refers to "this section," it is referring to N.C.G.S. § 163-230.1, which is a statute that provides requirements for requesting and completing absentee ballots for civilian voters under Article 20. Recall that the requirements for covered voters to request and complete absentee ballots appear in a completely different article of Chapter 163, at sections 163-258.7 and 163-258.12 of Article 21A. In addition to requiring photo ID from civilian absentee voters, Article 20 also requires two witnesses or a notary to authenticate a civilian absentee voter. *Id.* § 163-231. Article 20 also requires a civilian absentee voter, when they request an absentee ballot, to complete a request form created by the State Board (not the federal government) that includes their personal information, their birth date, and either an NCDMV identification number or the last four digits of the voter's social security number. *Id.* § 163-230.2(a).

Additionally, the methods and deadlines for submitting absentee ballot requests and absentee ballots for civilian voters are completely distinct from such provisions for military and overseas-citizen voters. *Compare id.* §§ 163-230.2, -230.3, -231 (civilian), *with id.* §§ 163-258.7, -258.8, -258.10, -258.12 (military and overseas).

As the foregoing shows, by setting forth two distinct sets of comprehensive regulations for requesting and casting absentee ballots for two distinct classes of voters, and separating those comprehensive regulations in different statutory articles, the General Assembly clearly did not intend for the State Board to pick and choose laws from one article and apply those laws to persons subject to the other article, as the Protesters would have the State Board do.

To be sure, "covered voters" subject to Article 21A are expressly authorized to decline to use the absentee voting procedures of that article, and may choose instead to vote using the procedures applicable to civilian voters in Article 20. A covered voter "may apply for a military-overseas ballot using either the regular application provided by Article 20 of this Chapter or the federal postcard application." *Id.* § 163-258.7(a). This just reiterates the distinction between the two application methods. If a covered voter chooses to submit an "application provided by Article 20," that application is required to be "accompanied by" a photocopy of a photo ID. *Id.* § 163-230.1(f1). But the federal postcard application has no such requirement. Similarly, Article 21A "does not preclude a covered voter from voting an absentee ballot under Article 20 of this Chapter." *Id.* § 163-258.7(f). This express authorization to vote by either method further proves that the legislature intended these methods of voting to be governed by different bodies of law.

The crux of Protesters' argument that the provisions of Article 20 apply to voters using the provisions of Article 21A is language from a section of Article 20, section 163-239. That section is entitled, "Article 21A relating to absentee voting by military and overseas voters *not applicable*." (Emphasis added.) It states, "[e]xcept as otherwise provided therein, Article 21A of this Chapter shall not apply to or modify the provisions of this Article." *Id.* § 163-239. This language, and especially the title of the statute, prove the point that the legislature intended to establish two distinct absentee voting schemes for these distinct classes of voters. This provision

merely highlights that the special provisions applicable to military and overseas-citizen voters "shall not apply to or modify" the provisions of Article 20, which apply to all other voters. The clear intent is to remove any doubt that only voters subject to Article 21A may use the procedures in Article 21A to vote by absentee ballot.

Even if the State Board were to adopt the Protesters' reading of this statute and assume that Article 20 applied to covered voters, it would still do so "[e]xcept as otherwise provided [in Article 21A]." *Id.* And, as explained, when it comes to voter identification requirements, Article 21A provides otherwise. It states that "the voter's identity" is affirmed by a specific declaration applicable only to covered voters. *Id.* § 163-258.4(e). And it confirms that "[a]n authentication, other than the declaration specified in G.S. 163-258.13 or the declaration on the federal postcard application and federal write-in absentee ballot, *is not required for execution of a document under this Article*." *Id.* § 163-258.17(a) (emphasis added). Accordingly, the statute the Protesters rely on for their argument actually undermines their reading of the law.

In recognition of the fact that Article 21A includes no requirement for covered voters to include a photocopy of their photo ID, the State Board has promulgated an administrative rule through permanent rulemaking that makes it clear that the county boards of elections may not impose the photo ID requirement on such voters. In a Rule entitled "Exception for Military and Overseas Voters," the Code provides that "A voter who is casting a ballot pursuant to G.S. 163, Article 21A, Part 1 is not required to submit a photocopy of acceptable photo identification under Paragraph (a) of this Rule or claim an exception under G.S. 163-166.16(d)." 08 NCAC 17

.0109(d). This Rule has been in effect, first as a temporary rule that became effective on August 1, 2023, and now as a permanent rule that became effective April 1, 2024.[21]

During the rulemaking process, none of the Protesters submitted comments on this Rule objecting to it. Nor did they seek to use administrative or judicial procedures to challenge the validity of this Rule prior to the election. The North Carolina Republican Party, which is participating in the prosecution of these protests, submitted thorough comments on this Rule but notably did *not* object to this aspect of the Rule, or seek to invalidate that aspect of the Rule using administrative or judicial procedures.[22] The Rule was approved unanimously by the Rules Review Commission,[23] an agency appointed by the leadership of the General Assembly that is required to object to rules proposed by an administrative agency if those rules exceed the authority of the agency to adopt them. G.S. § 150B-21.9(a)(1). This Rule is therefore directly applicable and enforceable.

Even if there was no such rule, it is questionable whether the State Board could have imposed a photo ID requirement on voters covered under the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA).

Federal law, specifically 52 U.S.C. §§ 20301 – 20311, as implemented through Article 21A of Chapter 163, governs the process for a covered voter to request and submit a ballot. Specifically, under 52 U.S.C. § 20302(a)(3) and (4), a state is required to permit such voters to

---

[21] This particular language in the rule was also in its original codification as a temporary rule that became effective on August 23, 2019, after the photo ID law was originally enacted.

[22] Available starting on pg. 38 at the following location: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-02-15/Photo%20ID%20Rules/Photo%20ID%20comments%20submitted%20by%20email.pdf.

[23] See meeting minutes: https://www.oah.nc.gov/minutes-march-meeting-2024-signedpdf/open.

use the federal write-in absentee ballot (FWAB) to vote in general elections for federal office and use the federal postcard application (FPCA) as both a registration application and absentee ballot application. These federally prescribed forms and their instructions, like Article 21A of our general statutes, do not include a requirement for covered voters to include a photocopy of photo identification. In fact, a review of the Federal Voting Assistance Program's (FVAP) comprehensive 2024-2025 Voting Assistance Guide reveals no instruction from any state to its UOCAVA voters stating that they must comply with a photo ID requirement when requesting or voting their ballot.[24] FVAP is an agency of the U.S. Department of Defense that is tasked with administering the federal responsibilities of UOCAVA, *see* 52 U.S.C. § 20301, and the Guide provides UOCAVA voters with instructions on how to register to vote, request a ballot, and transmit their ballot back to their local election office, including the use of an FWAB. There are only two instances where "photo ID" is even mentioned, neither of which apply a photo ID requirement for the submission and counting of a UOCAVA voter's ballot.[25]

Under the Supremacy Clause of the federal Constitution, and even under our state constitution, an effort to place additional, state-level requirements on UOCAVA voters casting a ballot by methods ultimately provided and governed by federal law would be of questionable validity. U.S. Const. art. VI, cl. 2; *see* N.C. Const. art. I, § 5 ("Every citizen of this State owes paramount allegiance to the Constitution and government of the United States, and no law or

[24] The Guide is available at: https://www.fvap.gov/uploads/FVAP/States/eVAG.pdf.

[25] Indiana permits a voter to provide a copy of their photo ID rather than write their ID number or Social Security Number on their ballot request form, and only if doing so must that ID meet the state's photo ID law. Wisconsin informs "temporary overseas voters" that they must include a copy of a photo ID with their ballot because that state does not consider them to be an overseas voter.

ordinance of the State in contravention or subversion thereof can have any binding force.”). Notably, FVAP has taken that view in the past, informing a state that applying a photo ID requirement to a UOCAVA voter using an FPCA “may likely be in conflict with federal statute.”[26]

In sum, as this Board has determined through rulemaking, military and overseas-citizen voters are not subject to the requirement to provide a photocopy of their photo ID with their absentee ballot when voting under the provisions of Article 21A. This has been the clear, established law in North Carolina ever since the photo ID law was given effect in April 2023, through six separate elections. In accordance with this established law, no voters using the Article 21A processes were ever informed that they were required to provide photo ID with their absentee ballots.

For these reasons, as with the prior two categories of protests, even if it were later determined that the state photo ID requirement actually applies to these voters, it would violate the federal constitution’s guarantee of substantive due process to apply such a newly announced rule of law to remove voters’ ballots after an election, when those voters participated in the election in reliance on the established law at the time of the election to properly cast their ballots.

For these reasons, the State Board concludes, by a 5 to 0 vote, that this category of protests fails to allege a violation, irregularity, or misconduct in the conduct of the general election.

---

[26] FVAP’s letter communicating this position is available at: https://www.fvap.gov/uploads/FVAP/EO/VaSEOLtrSB872_20170206_FINAL.pdf.

## IV. CONCLUSION

When a person challenges the results of an election by alleging that certain voters cast ineligible ballots, our law requires that person to provide adequate notice to these voters. That was not done here. These protests therefore fail to substantially comply with the requirements to initiate a protest under N.C.G.S. § 163-182.9. Even if the voters challenged in these protests had received adequate notice, the grounds for these protests are legally invalid for the reasons outlined in this decision.

The protests are DISMISSED.

This 13th day of December, 2024.

Alan Hirsch, Chair
STATE BOARD OF ELECTIONS

ATTACHMENT A








Sossamon
Sossamon Prostest 2
Sossamon Protest 3
Sossamon Protest 4
Sossamon Protest 5
Sossamon Protest 6
Griffin Protest
Alamance
FPCA
Deceased Voters
Amendment and Supplementation FPCA
Never Resident
Alexander
Incomplete Reg Protest
Alleghany
FPCA
SHARE
nc.gop




NC Incomplete Reg With Votes - LEE
NC Incomplete Reg With Votes - LEE
NC Incomplete Reg With Votes - LEE
assets.nationbuilder.com


42

CERTIFICATE OF SERVICE

I, Paul Cox, General Counsel for the State Board of Elections, today caused the forgoing document to be served on the following individuals via FedEx and email:

Craig D. Schauer
cschauer@dowlingfirm.com
Troy D. Shelton
tshelton@dowlingfirm.com
W. Michael Dowling
mike@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
*Counsel for Jefferson Griffin, Ashlee Adams, and Stacie McGinn*

Philip R. Thomas
pthomas@chalmersadams.com
Chalmers, Adams, Backer & Kaufman, PLLC
204 N Person St.
Raleigh, NC 27601
*Counsel for Jefferson Griffin*

Phillip J. Strach
phil.strach@nelsonmullins.com
Alyssa M. Riggins
alyssa.riggins@nelsonmullins.com
Cassie A. Holt
cassie.holt@nelsonmullins.com
Jordan A. Koonts
jordan.koonts@nelsonmullins.com
NELSON MULLINS RILEY & SCARBOROUGH, LLP
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
*Counsel for Frank Sossamon*

Raymond M. Bennett
ray.bennett@wbd-us.com
Samuel B. Hartzell
sam.hartzell@wbd-us.com
Womble Bond Dickinson (US) LLP
555 Fayetteville Street
Suite 1100
Raleigh, NC 27601
*Counsel for Allison Riggs*

Shana L. Fulton
sfulton@brookspierce.com
William A. Robertson
wrobertsone@brookspierce.com
James W. Whalen
jwhalen@brookspierce.com
BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, NC 27601
*Counsel for Woodson Bradley, Terence Everitt, and Bryan Cohn*

This 13th day of December, 2024.

/s/ Paul Cox