# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| JEFFERSON GRIFFIN,<br>    *Plaintiff*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF<br>ELECTIONS,<br>    *Defendant*,<br><br>and<br><br>ALLISON RIGGS, NORTH CAROLINA<br>ALLIANCE FOR RETIRED AMERICANS,<br>VOTEVETS ACTION FUND, SARAH SMITH,<br>and JUANITA ANDERSON,<br>    *Intervenor-Defendants*. | Case No. 5:24-cv-00731-M-RJ |
| NORTH CAROLINA DEMOCRATIC PARTY,<br>    *Plaintiff*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF<br>ELECTIONS et al.,<br>    *Defendants*. | Case No. 5:24-cv-00699-M-KS |
| CARRIE CONLEY et al.,<br>    *Plaintiffs*,<br><br>v.<br><br>ALAN HIRSCH et al.,<br>    *Defendants*. | Case No. 5:25-cv-00193-M-RJ |

**VOTEVETS ACTION FUND, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, SARAH SMITH, AND JUANITA ANDERSON'S MEMORANDUM IN SUPPORT OF EMERGENCY MOTION TO STAY PENDING APPEAL**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 3

I.    Judge Griffin challenges thousands of votes after falling short in the North Carolina Supreme Court election.................................................................................... 3

II.    The Board removes Judge Griffin's challenges to federal court. ........................... 4

     A.   This Court remands to state court. ..................................................................... 5

     B.   The Fourth Circuit directs this Court to modify its remand order to retain jurisdiction of federal issues. ...................................................................................... 5

III.    The state courts resolve the relevant questions of state law. .............................. 6

IV.    This Court reasserts jurisdiction and *sua sponte* orders the Board of Elections to commence with ballot curing. ................................................................................... 8

LEGAL STANDARD.................................................................................................. 9

ARGUMENT ............................................................................................................. 9

I.    Voter Intervenors are likely to prevail on the merits. ......................................... 9

     A.   This Court's *sua sponte* order violates substantive due process................... 10

     B.   This Court's order violates the Equal Protection Clause. .............................. 13

     C.   This Court's order violates the constitutional right to vote. .......................... 16

II.    Voter Intervenors will be irreparably harmed absent a stay and modification of the Court's order. .............................................................................................................. 17

III.    The balance of equities favors a stay and modification of the Court's order. ...................... 19

CONCLUSION.......................................................................................................... 19

i

## INTRODUCTION

Over five months ago, millions of North Carolina voters cast their ballots in accordance with longstanding and clear election rules. Each of those voters had every reason to expect their votes would count. None could have foretold that—nearly *half a year later*—they might have to "cure" their ballot due to the ongoing crusade of one disaffected candidate—Judge Jefferson Griffin—to reverse his defeat in the race for a seat on the Supreme Court of North Carolina. Yet that is precisely what thousands of North Carolina voters now face: mass, after-the-fact disenfranchisement despite having abided by every rule they were told to follow. The federal Constitution's guarantees of due process, equal protection, and the right to vote clearly bar this belated, judicially-mandated cure process, which selectively targets voters in only certain parts of North Carolina, many of whom are serving in our military overseas, and all of whom indisputably obeyed election rules as they existed on election day.

Respectfully, this Court therefore erred when it issued an order *compelling* the North Carolina State Board of Elections ("the Board") to begin undertaking a cure process as to some of these voters. *See* Text Order (Apr. 12, 2025). The Board should not be rushed to undertake an unconstitutional cure process that this Court's pending review stands to obviate, particularly when critical federal issues—including "obvious conflicts with federal law" in the North Carolina courts' rulings—must be resolved. *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at 4 n.2 (N.C. Apr. 11, 2025) (Earls, J., concurring in part and dissenting in part).

Once the federal issues in this case are reached, the superfluity—and unconstitutionality—of *any* cure process will be clear. At the end of the day, this case presents a straightforward question of federal law: Can a losing candidate change the rules of the election *after* it is clear that he lost? The answer is plainly no. *See Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir.

-1-

1983) (citing *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)). It is equally clear that North Carolina may not "by later arbitrary and disparate treatment, value one person's vote over that of another," which is precisely what this Court's order threatens. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (per curiam) (citation omitted). Moreover, discarding ballots that voters cast in good-faith reliance on the state's assurances unconstitutionally burdens the right to vote. The strong likelihood that Voter Intervenors will ultimately prevail on their still unresolved federal arguments warrants staying this Court's order to the Board and pausing any premature efforts to implement a cure process.[1]

The balance of equities overwhelmingly weighs in favor of a stay. Hastily commencing a cure process that restricts North Carolinians' fundamental voting rights—especially one that is likely to be found unconsittutional in the pending federal court proceedings—is itself irreparable harm. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Moreover, any premature cure effort will impose irreversible confusion and disruption on the Voter Intervenors, their constituents and supporters, and the public. The challenged voters all cast ballots in accordance with the rules as they existed at the time of the eleciton; nonetheless, they now stand to be forced to participate in a cure process that could soon be enjoined, injecting further confusion and chaos. Such arbitrary impositions on the right to vote will have lasting harm, creating the impression that voting is more like playing the lottery than a respected civic obligation and discouraging these voters from participating in future elections. Worse still, Griffin has handpicked only a subset of overseas voters to challenge, targeting those from racially diverse counties and those he believes supported Justice Riggs. These voters should not be subject to disparate treatment

---

[1] Voter Intervenors are VoteVets Action Fund ("VoteVets"), the North Carolina Alliance for Retired Americans ("Alliance"), and two individual Alliance members targeted by Judge Griffin's protests.

and forced to comply with an unconstitutional cure process while identically-situated voters are free from such burdens. The equities thus unquestionably favor fully and finally resolving federal questions before marching forward with any cure process.

Further still, prematurely commencing a cure process will require organizations to rapidly deploy scarce resources to help voters cure their ballots. Once spent, these resources cannot be recouped. The same is true for the Board—these efforts will be wasted by standing up a first-of-its-kind cure process, only to later chuck it out.

Voter Intervenors therefore respectfully ask this Court to stay its preliminary injunction requiring the State Board to proceed with cure efforts, and modify its injunction to prohibit the Board from enforcing the state courts' orders regarding cure until all outstanding federal questions have been resolved including, if necessary, through any appeals.

## BACKGROUND

I.      **Judge Griffin challenges thousands of votes after falling short in the North Carolina Supreme Court election.**

In the 2024 general election, millions of North Carolinians cast ballots under well-established voting rules and instructions. After voting ended and the ballots were counted, it became clear that incumbent Justice Allison Riggs prevailed over Judge Griffin in the contest to serve on the Supreme Court of North Carolina. Dissatisfied with his loss, Judge Griffin filed over 300 election protests in counties across the state which collectively sought to disenfranchise nearly 65,000 North Carolinians.

Griffin's protests broadly fell into three categories, two of which are most immediately at issue. First, Griffin filed a challenge targeting 1,409 overseas voters who voted under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), complying with all relevant federal and state laws for returning their absentee ballots. *Griffin v. N.C. State Bd. of*

*Elections*, No. 5:24-cv-00731 (E.D.N.C. Dec. 20, 2024), ECF No. 1-12 ("*Griffin II*"). Judge Griffin argues these voters should have provided photo identification with their ballots, *id.* at 5–6, notwithstanding that the Board prescribed rules expressly exempting UOCAVA voters from this requirement ("UOCAVA ID Challenge"). *See* 8 N.C. Admin. Code 17.0109. The Board's rules have exempted covered UOCAVA voters from such a requirement since at least 2020. *Id.*

Second, Griffin challenges the ballots of 266 citizens living abroad who are expressly entitled to vote under the Uniform Military and Overseas Voters Act ("UMOVA"), a law enacted unanimously by the General Assembly ("UMOVA Challenge"). *Griffin II* ECF No. 1-4; N.C.G.S. § 163-258.1, *et seq.* This law has been in effect for dozens of elections and for more than a decade. But Judge Griffin now insists these citizens should be disenfranchised because, in his view, they are not residents of North Carolina. *See Griffin II* ECF No. 1-4 at 4–5.

Finally, Griffin also challenged 60,273 absentee and early voters based on information allegedly missing in their registration files ("HAVA Challenge"). *See Griffin II* ECF No. 1-8. As explained below, the Supreme Court of North Carolina ultimately rejected this challenge under state law.

## II.   The Board removes Judge Griffin's challenges to federal court.

After the Board rejected each of his three challenges, Griffin filed a petition for a writ of prohibition in the North Carolina Supreme Court. He then filed three separate petitions for judicial review of the Board's decision in Wake County Superior Court. *See Griffin II* ECF Nos. 1-4, 1-8, 1-12. The Board removed these actions to federal court and noticed them as related cases. *See* Notice of Removal, *Griffin II*, ECF Nos. 1, 2; Notice of Removal, *Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-00724 (E.D.N.C. Dec. 19, 2024) ("*Griffin I*"), ECF No. 1. Voter Intervenors—VoteVets, the Alliance, and three Alliance members targeted by Judge Griffin's challenges—intervened in each case to protect their own interests, as well their members and

constituents' fundamental right to vote. *See* Text Order, *Griffin I* (E.D.N.C. Dec. 26, 2024); *see also* Order, *Griffin v. N.C. State Bd. Of Elections*, No. 25-1020 (4th Cir. Jan. 28, 2025), ECF No. 19.

### A.    This Court remands to state court.

On January 6, 2025, this Court remanded both *Griffin I* and *Griffin II* to state court. The Court found that it had subject matter jurisdiction over both cases, but abstained under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959). *See* Remand Order, *Griffin I* ECF No. 50; Remand Order, *Griffin II* ECF No. 24.

Voter Intervenors, the Board, and Justice Riggs (who was also granted intervention in both *Griffin I* and *Griffin II*); each timely appealed the remand order in *Griffin I. See Griffin v. N.C. State Bd. of Elections*, Nos. 25-1018 (lead), –1019, –1024 (4th Cir.) (concerning *Griffin I*); *Griffin v. N.C. State Bd. of Elections*, No. 25-1020 (4th Cir.) (concerning *Griffin II*). The Board timely appealed the remand order in *Griffin II*, and both Voter Intervenors and Justice Riggs were granted intervention in that appeal, which was ultimately consolidated with *Griffin I. Griffin II*, No. 25-1020 (4th Cir. Feb. 4, 2025), ECF Nos. 31, 32. While those appeals were pending, the Supreme Court of North Carolina stayed the Board's deadline to certify the election. In a separate order, it also dismissed Judge Griffin's remanded petition for a writ of prohibition and instructed the Wake County Superior Court to resolve the appeals Judge Griffin had filed in that court.

### B.    The Fourth Circuit directs this Court to modify its remand order to retain jurisdiction of federal issues.

After expediting briefing and oral argument, the Fourth Circuit consolidated *Griffin I* and *Griffin II*. The Fourth Circuit agreed this Court had subject matter jurisdiction over the removed cases but disagreed with this Court's decision to abstain under *Burford*, concluding that *Pullman* abstention was more appropriate. Order at 10–11, *Griffin II*, No. 25-1020 (4th Cir. Feb. 4, 2025),

ECF No. 33. As the Fourth Circuit's order explains, *Pullman* differs from *Burford* in that the "federal court retains jurisdiction of the federal constitutional claims while the state court issues are addressed in state court." *Id.* The Fourth Circuit therefore instructed this Court to "expressly retain jurisdiction of the federal issues identified in the Board's notice of removal should those issues remain after the resolution of the state court proceedings, including any appeals." *Id.* (citing *England v. Med. Exam'rs.*, 375 U.S. 411 (1964)).

The Fourth Circuit issued its mandate on February 14. Mandate, *Griffin I*, 25-1018 (4th Cir. Feb. 14, 2025), ECF No. 139; Mandate, *Griffin II*, No. 25-1020 (4th Cir. Feb. 14, 2025), ECF No. 40. On February 26, in accordance with the Fourth Circuit's order, this Court modified its remand order to expressly retain jurisdiction of the federal issues identified in the Board's removal notice. Order, *Griffin II* ECF No. 35.

## III. The state courts resolve the relevant questions of state law.

After the Fourth Circuit issued its mandate, the case returned to Wake County Superior Court, where that court swiftly affirmed the Board's dismissal of each of Griffin's three challenges. Griffin appealed the Superior Court's orders and, on April 4, 2025, a divided panel of the Court of Appeals of North Carolina reversed the Superior Court's decision in its entirety. The majority looked past Griffin's failure to provide meaningful notice to challenged voters, concluding it was the Board's responsibility to inform such voters. Order at 13–14, *Griffin v. N.C. State Bd. of Elections*, No. COA25-181 (N.C. Ct. App. Apr. 4, 2025).

On the merits, the majority concluded that all absentee voters in non-federal elections in North Carolina are obligated, under state law, to provide a copies of their photo ID when they return their ballots. *Id.* at 29. Because the challenged UOCAVA voters did not comply with this requirement, their votes were deemed presumptively invalid. *Id.* at 29–30. The court instructed the

-6-

Board to give these voters fifteen business days to cure the missing ID issue by submitting a copy of their identification to election officials. *Id.* at 30.

The majority also concluded that a voter born to North Carolina parents overseas, and who allegedly self-identified as never having resided in the state on their absentee ballot application materials, could not "make North Carolina their domicile of choice," notwithstanding that such voters have been permitted to vote by statute since 2011. *Id.* at 32. The majority directed that ballots from these individuals be discarded without any notice or opportunity to cure. *Id.* at 36.

Finally, as to the HAVA Challenge, the majority concluded that any voter challenged by Griffin who allegedly had an incomplete voter registration could not be lawfully registered to vote in North Carolina, despite any registration errors likely being the fault of election officials. *Id.* at 24–25. These voters were likewise to be given 15 business days to cure. *Id.* at 25.

At the request of the Board and Justice Riggs, the Supreme Court of North Carolina stayed the Court of Appeals' decision. Order at 1–2, *Griffin v. N.C. Bd. of Elections*, No. 320P24-3 (N.C. Apr. 11, 2025). Four days later, on April 11, the Supreme Court of North Carolina ruled on the parties' petitions for discretionary review. On the UOCAVA ID Challenge, the North Carolina Supreme Court "allow[ed] the petitions for the limited purpose of expanding the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business days to thirty calendar days after the mailing of notice." *Id.* at 6. On the UMOVA Challenge, the Supreme Court of North Carolina denied review of the Court of Appeals' decision, effectively affirming its order to discard these ballots entirely. *Id.*

Finally, on the HAVA Challenge, the Supreme Court of North Carolina granted review and reversed, concluding that the "the responsibility for the technical defects in the voters' registration rests with the Board and not the voters." *Id.* at 4–5. Thus, the Supreme Court of North Carolina

-7-

ruled that these ballots could not be discarded as a matter of state law and required nothing further to be counted. *Id.*

Two justices dissented in part, concluding that state law required rejecting all of Griffin's post-election challenges. *See generally Griffin v. N.C. Bd. of Elections*, No. 320P24-3 (N.C. Apr. 11, 2025) (Earls & Dietz, JJ., concurring in part and dissenting in part).

Consistent with the Fourth Circuit's February 4 order, the Supreme Court of North Carolina and North Carolina Court of Appeals' decisions addressed only matters of state law.

## IV. This Court reasserts jurisdiction and *sua sponte* orders the Board of Elections to commence with ballot curing.

Hours after the Supreme Court of North Carolina issued its ruling, Justice Riggs moved in *Griffin II* for a preliminary injunction barring the Board and Griffin "from taking any step to enforce or effectuate the state-law decision while these federal proceedings are pending." Mem. of Law at 2, *Griffin II* ECF No. 40. Moving forward with the Supreme Court of North Carolina's contemplated remedies would, as Justice Riggs argued, violate the Due Process and Equal Protection Clauses of the U.S. Constitution. *See id.* She stressed that these critical federal issues "remain unresolved" given the parties' reservation of federal issues. *Id.*

This Court issued two brief text orders the next morning, denying the motion in part and granting it in part. Text Orders, *Griffin II* (E.D.N.C. April. 12, 2025). The orders (1) denied the request to enjoin the Board from proceeding to cure; (2) *sua sponte* ordered the Board to "proceed in accordance with the North Carolina Court of Appeals opinion, . . . as modified by the North Carolina Supreme Court in its April 11 Order;" (3) enjoined the Board from certifying the election results "pending further order" from the Court; (4) adopted a briefing schedule "to facilitate prompt resolution of this matter;" and (5) *sua sponte* ordered the Board to "provide notice to the court of

-8-

the scope of its remedial efforts, including the number of potentially affected voters and the counties in which those voters cast ballots." *Id.*

## **LEGAL STANDARD**

"A party must ordinarily move first in the district court for . . . an order suspending . . . an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1).[2] "There are four factors relevant to the issuance of a stay pending appeal: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-0333-ABA, 2025 WL 675060, at *2 (D. Md. Mar. 3, 2025) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "The first two factors are 'the most critical.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see also Scott v. Metro. Health Corp.*, No. 5:12-CV-383-F, 2013 WL 6145541, at *1 (E.D.N.C. Nov. 21, 2013) (applying same framework).

## **ARGUMENT**

### I.     **Voter Intervenors are likely to prevail on the merits.**

A straightforward application of well-established constitutional principles confirms that Voter Intervenors are likely to prevail on the merits. The relief the Supreme Court of North Carolina ordered—subjecting voters to an unconstitutional cure process or outright disenfranchisement—plainly violates the U.S. Constitution's guarantees of due process, equal protection, and the right to vote.

---

[2] Where such relief in the district court proves "impracticable," a movant may immediately seek relief from the court of appeals. *See* Fed. R. App. P. 8(a)(2)(A)(i).

A.      **This Court's** *sua sponte* **order violates substantive due process.**

There is no dispute that the two outstanding groups of voters who Judge Griffin seeks to disenfranchise—(1) overseas and military voters who did not include IDs with their ballots and (2) overseas voters who marked themselves as never having resided in the state on their absentee ballot application materials—cast their ballots in compliance with election rules and instructions as they existed on November 5, 2024. The federal Constitution's guarantee of substantive due process prohibits disenfranchising these voters, regardless of whether they comply with a post hoc cure procedure.[3]

This doctrine was first clearly articulated in a factually analogous case, where the First Circuit found it unconstitutional to discard votes after an election was over where voters had reasonably relied upon election rules that were only later deemed unlawful by a state court. *See Griffin*, 570 F.2d at 1067, 1074. In *Griffin*, officials distributed absentee ballots for a primary election for a city council in Rhode Island. *Id.* at 1067. A losing primary candidate subsequently challenged the validity of these ballots on the theory that Rhode Island law did not permit absentee voting in primary elections, notwithstanding years of contrary practice. *See id.* at 1067–68. After a divided state supreme court agreed with the losing candidate's interpretation of state law and

---

[3] For similar reasons to those discussed here, any cure program created and imposed on voters at this juncture would also violate their procedural due process rights because there will not be sufficient procedural safeguards in place to ensure voters—especially deployed military voters and voters overseas—will receive proper notice and have an opportunity to cure their ballots on time. *See United States v. White*, 927 F.3d 257, 263 (4th Cir. 2019) (A due process analysis requires weighing "(1) [voters'] liberty interest; (2) the risk of an erroneous deprivation of that interest under current procedures; and (3) the government's interest and burden of providing any additional procedure that would be required" (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).Even worse, UMOVA voters will receive no notice or opportunity to be heard whatsoever before being disenfranchised. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (Voters suffer a procedural due process violation "if election officials reject their ballots" without being "notified or afforded any opportunity to respond").

-10-

invalidated the ballots, voters sued in federal court to enjoin the invalidation of their ballots. *See id.* at 1068.

The First Circuit ruled in favor of the voters, finding that "Rhode Island could not, constitutionally, invalidate the absentee . . . ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means rather than in person." *Id.* at 1074. The Court recognized that while ballots could sometimes be invalidated after an election, such as in cases of fraud, doing so where voters simply followed the rules given to them would be a "fundamental unfairness," resulting in a "flawed [electoral] process." *Id.* at 1076–77. The same is true here—because voters "were doing no more than following the instructions of the officials charged with running the election," it was unreasonable to expect individual voters to "at their peril, somehow . . . foresee" a future interpretation of state law that would invalidate their ballots after the fact. *Id.* at 1075–76. To disenfranchise law-abiding, good faith voters in such circumstances would "present[] a due process violation." *Id.* at 1078.

The Fourth Circuit has made clear that the principles set forth in *Griffin* are "settled" law within this Circuit. *Hendon*, 710 F.2d at 182 (citing *Griffin*, 570 F.2d at 1077). Many other courts of appeals have since agreed that due process prohibits rejecting ballots where "state actions . . . induce[d] voters to miscast their votes." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (citing *Griffin*, 570 F.2d at 1074, 1078–79); *see also Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005) (citing *Griffin*, 570 F.2d at 1077); *Roe v. Alabama*, 43 F.3d 574, 581 (11th Cir. 1995) (citing *Griffin*, 570 F.2d at 1075).

Distilling *Griffin*, the Ninth Circuit has explained that a due process violation occurs "if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2)

-11-

significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226–27 (9th Cir. 1998) (noting *Griffin*'s concern with "the massive ex post disenfranchisement" of voters who would have no reason to suspect any infirmity with their vote). Voter Intervenors are extremely likely to show these two factors are met.

Start with Judge Griffin's challenge to UOCAVA voters, whose votes are presumptively invalid under the Supreme Court of North Carolina's order. These voters cast ballots in accordance with a rule first promulgated by the State Board in 2020. *See* 8 N.C. Admin. Code 17.0109(d) (eff. Jan. 1, 2020) (exempting "covered voter[s]" casting ballots "pursuant to G.S. 163, Article 21A" from photo ID requirements). These voters plainly relied upon "an established election procedure and/or official pronouncement[]" as to how to vote from abroad. *Bennett*, 140 F.3d 1226–27; *see also* Decl. of Peter Mellman ¶¶ 12–13, *Griffin II*, ECF No. 13-6 (explaining VoteVets's constituents and supporters acted in reliance upon these longstanding rules). Any change in that procedure now will result in "significant disenfranchisement." *Bennett*, 140 F.3d at 1227.

That some of these voters may have a chance to stop their votes from being discarded by providing identification does not alter the due process analysis. These voters' ballots have been declared invalid, unlawfully "undo[ing] the ballot results in a court action." *Hendon*, 710 F.2d at 182 (citation omitted). Being subjected to a post hoc process requiring them to jump through new hoops and abide by new rules that did not exist at the time of the election is in itself a substantive due process violation. *Cf. League of Women Voters of N.C.*, 769 F.3d at 247 (concluding that requiring voters to vote pursuant to "[d]iscriminatory" voting procedures are precisely "the kind of serious violation of the Constitution" that courts will enjoin). Nor is this an ordinary cure process that these voters could have seen coming. It is an after-the-fact, judicially-created process that

changes the rules of the road nearly half a year after an election, forcing some voters to jump over new hurdles to have their previously validly-submitted ballots counted.

Those voters targeted by the UMOVA Challenge voted under an even longer-standing rule, enacted by the Legislature in 2011 without a single opposing vote. *See* N.C.G.S. § 163-258.2(1)(e). This rule has likewise been in effect for many elections. These voters—who lack any clear opportunity to cure under the state courts' rulings—also indisputably acted in reliance on an established election rule and will be completely disenfranchised. *Bennett*, 140 F.3d at 1226–27.

It would be a gross injustice to punish any of these voters—many of them servicemembers or their families—for "state actions" that "induce[d]" them to allegedly "miscast their votes." *Husted*, 696 F.3d at 597; *see also Hendon*, 710 F.2d at 182 (applying the "general rule that denies relief with respect to past elections" and rejecting challenge to long-existing election regulations). This Court's order compelling the Board to begin implementing a cure procedure that will invariably disenfranchise a significant number of these voters represents a "fundamental unfairness" that violates principles of due process. *Griffin*, 570 F.2d at 1077.

### B. This Court's order violates the Equal Protection Clause.

The U.S. Supreme Court has made clear "[h]aving once granted the right to vote on equal terms," a state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another. *Bush*, 531 U.S. at 104–05. That is because the right to vote is "protected in more than the initial allocation of the franchise"—"[e]qual protection applies as well to the *manner* of its exercise." *Id.* (emphasis added).

Specifically at issue in *Bush* was the "uneven treatment" of voters in different Florida counties due to "varying [post-election] standards to determine what was a legal vote." *Id.* at 107. The Court held that standards used to discern voter intent violated equal protection where they

"var[ied]" from "county to county." *Id.* at 106. A state's "arbitrary and disparate treatment to voters in its different counties," the Supreme Court noted, is "hostile to the one man, one vote basis of our representative government." *Id.* at 107 (citation omitted).

This case closely mirrors *Bush*, in that it concerns whether North Carolina can make it a requirement for UOCAVA voters registered in some, but not all, counties to provide a photo ID when voting absentee. Among the 32,033 UOCAVA voters in the election, Griffin's challenges concern 1,409 voters from just one of North Carolina's one-hundred counties—plainly amounting to "uneven treatment" that the "State Supreme Court ratified" by ruling for Griffin on his challenge to UOCAVA voters. *Id.* at 107. This Court's *sua sponte* order thus compels the Board to begin implementing a cure program that applies to only a subset of UOCAVA voters based on which county they are registered in, a mandate that clearly violates the "minimum requirement for nonarbitrary treatment of voters." *Id.* at 105. "Whether an individual's vote will be counted in this race, therefore, may depend in part on something completely arbitrary—their place of residence." *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 47 (S.D.N.Y. 2020). And the truth is far more troubling than "arbitrary." Griffin "discriminat[ed] by residence" by naming only counties that went for Justice Riggs "by significant margins," *Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *41 & n.23 (Hampson, J., dissenting).[4] As Justice Earls noted, this process creates "obvious conflicts" with "the principles relied upon in *Bush v. Gore*." *Griffin*, 2025 WL 1090903, at 4 n.2 (N.C. Apr. 11, 2025) (Earls, J., concurring in part and dissenting in part); *see also id.* at 18 (Dietz, J., concurring in part and dissenting in part) (contemplating "federal courts' ultimate[] revers[al]" of cure process over "conflict" with *Bush*).

---

[4] Judge Griffin timely challenged UOCAVA voters in only Guilford County. After the filing deadline, Judge Griffin later sought to add challenges to ballots cast in Durham, Forsyth, and Buncombe Counties.

-14-

*Bush*'s core holding—that elections carry with them "rudimentary requirements of equal treatment and fundamental fairness"—is well-established. *Bush*, 531 U.S. at 109. The Supreme Court recognized nearly four decades earlier in *Baker v. Carr* that a "citizen's right to a vote free of arbitrary impairment by state action" is offended when such impairment results from "a refusal to count votes from arbitrarily selected precincts." 369 U.S. 186, 208 (1962) (citing *United States v. Mosley*, 238 U.S. 383 (1915)); *cf. Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm."); *Hadley v. Junior Coll. Dist. of Metro. Kansas City*, 397 U.S. 50, 54 (1970) ("[I]n situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it is practicable, as any other person's."). These deep, historical roots explain why courts do "not hesitate to apply" the "general principle that *Bush* applied"—that "'the rudimentary requirements of equal treatment and fundamental fairness' prohibits states from engaging in wholly 'arbitrary and disparate treatment' of members of the public." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 (9th Cir. 2025) (citation omitted). And the "requirement that all citizens' votes be weighted equally, known as the one person, one vote principle, applies not just to the federal government but also to state and local governments." *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016) (citation omitted). In short, it would be a gross violation of equal protection to subject the voters Griffin disfavors to arbitrary and disparate treatment.

Finally, the cure process violates equal protection for a separate reason: the administration of any cure program will be dependent on arbitrary circumstances unrelated to voters' qualifications. Despite having followed the rules as they were prescribed last November, voters who do not receive notice from the Board due to change of address, or who are deployed or

-15-

traveling and thus unable to cure in time, will have their votes thrown away based on random chance. This process, under which "arbitrary factors" lead to the "valuing [of] one person's vote over that of another," is precisely "the kind of process specifically prohibited by the Supreme Court." *Gallagher*, 477 F. Supp. 3d at 48. Like in *Bush*, the "State Supreme Court ratified this uneven treatment." *Bush*, 531 U.S. at 107. This Court should not perpetuate it.

**C.** **This Court's order violates the constitutional right to vote.**

The requirement that voters who otherwise followed existing state law when they voted must retroactively "cure" an alleged defect with their absentee ballot constitutes a post-election change to the state's election laws and practices that severely burdens the right to vote in violation of the First and Fourteenth Amendments. Under the applicable *Anderson-Burdick* test, the Court must "weigh[] the severity of the burden the challenged [practice] imposes on a person's constitutional rights against the importance of the state's interests supporting that law." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 713 (4th Cir. 2016) (citations omitted). Where a challenged process severely burdens voters' rights, it can only survive if it is narrowly drawn to advance a compelling state interest. *See Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019).

Under the cure process this Court has now ordered into effect, military and overseas voters who cast their ballots nearly six months ago must now submit copies of their photo identification in order to prevent their ballots from being discarded. There are countless barriers which prevent UOCAVA voters from being able to properly cure their ballots. For example, (1) many UOCAVA voters may no longer live at the address they voted from abroad; (2) many servicemembers may be deployed or engaged in exercises that prevent them from receiving notice or curing; (3) many Americans living overseas engage in prolonged periods of travel that may prevent them from receiving notice or curing; (4) some voters may have passed or become seriously ill since Election

-16-

Day; (5) many voters may never receive notice due to unreliable foreign postal services; and (6) many servicemembers deployed abroad are unlikely to have access to the required photo identification, the technology to submit their identification to the election officials, or both. In contrast to the unexpected and severe burden on these voters, the state has no valid interest (never mind a compelling interest) in making voters—every one of whom abided by the rules as they existed on election day and none of whom anyone has suggested are unqualified to vote—comply with new requirements to have their ballots counted. *Alcorn*, 826 F.3d at 717.

The wholesale rejection of ballots cast by individuals entitled to vote under UMOVA— without any ability to cure—is also an undue burden on the right to vote; indeed, it is the complete revocation of that right. That revocation comes 13 years and 43 elections after the General Assembly enacted the UMOVA provision at issue, and months after voters cast their ballots, had those ballots processed and tabulated, and had a candidate identified as the winner of the election. There is no state interest, let alone a compelling one, in disenfranchising these voters long after they have already voted—especially where the longstanding legal basis for these voters to cast their ballots in the first place derives from laws properly enacted by North Carolina's General Assembly.

## II. Voter Intervenors will be irreparably harmed absent a stay and modification of the Court's order.

Commencing this unprecedented and burdensome cure process stands to irreparably harm Voter Intervenors and the voters they serve. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C.*, 769 F.3d at 247. "Discriminatory" voting procedures are precisely "the kind of serious violation of the Constitution . . . for which courts have granted immediate relief." *Id.* (quoting *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986)). That is precisely the case here. Only those

-17-

UOCAVA voters in Guilford will be subjected to an unconstitutional cure process, all while their neighbors and fellow-servicemembers in the rest of the state remain safe from Griffin's challenges.

Critically, beginning a cure process prematurely before it is clear that it is even necessary (let alone lawful) will necessarily skew its results. Under this Court's current orders, the 30-day cure process will almost certainly overlap with this Court's consideration of the merits. Voters will be less likely to participate in the cure while news outlets continue reporting on the unsettled status of the federal proceedings. Indeed, many voters—including both those who must cure and those not subject to Judge Griffin's arbitrary challenges—will likely be confused as to whether they even need to comply, and may, for this reason, also be less likely to vote in future elections. Moreover, it is foreseeable that some element of this Court's merits decision will become appealable during the cure window—layering even more uncertainty on voters and risking chaos if the Fourth Circuit subsequently reverses part or all of this Court's order. The sensible way to avoid such harmful confusion to voters is to fully resolve outstanding questions about the cure's lawfulness, before putting the onus on voters to comply.

Any hasty cure program will also require organizations to respond to help voters protect their ballots, taking away from other work. Worse still, any expended resources will likely be wasted, given the high probability that any belated cure program will be found unconstitutional. The irretrievable loss of such scarce resources is classic irreparable harm. *See Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 361 (4th Cir. 1991); *see also UBS Fin. Servs., Inc. v. Zimmerman*, No. 5:16-cv-155-FL, 2017 WL 2963445, at *2–3 (E.D.N.C. July 11, 2017) (irreparable injury where plaintiffs would be "forced to expend resources they cannot later recover" by "defending arbitration they [were] not legally obligated to participate in"); *Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 985 (2d Cir. 1997) (same).

### III. The balance of equities favors a stay and modification of the Court's order.

The balance of equities and public interest cut sharply in favor of staying the cure process until federal issues are resolved. "The public interest always lies with the vindication of constitutional rights." *Bernstein v. Sims*, 643 F. Supp. 3d 578, 588 (E.D.N.C. 2022) (citing *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). And the public interest, by definition, favors permitting as many qualified voters to have their votes counted as possible. *See League of Women Voters of N.C.*, 769 F.3d at 247–48; *id.* at 244 (observing that "even one disenfranchised voter—let alone several thousand—is too many"); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (The public has a "strong interest in exercising the 'fundamental political right' to vote." (citation omitted)).

Ultimately, staying the cure process will maintain the status quo. This will give the Court time to fully consider the federal issues that remain unresolved in this case as ordered by the Fourth Circuit—issues that may eliminate the need for any cure process—before the Board constructs and implements a novel and confusing cure process.

### <u>CONCLUSION</u>

For the reasons above, Voter Intervenors respectfully request that the Court stay its preliminary injunction pending appeal and modify its injunction to prohibit the Board from enforcing the state courts' orders regarding cure until all outstanding federal questions have been resolved including, if necessary, through any appeals.

-19-

Dated: April 15, 2025

Respectfully submitted,

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri*
Christopher D. Dodge*
Tina Meng Morrison*
James J. Pinchak*
Julie Zuckerbrod*
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
jpinchak@elias.law
jzuckerbrod@elias.law

Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*\* Participating via Notice of Special Appearance*

*Counsel for Intervenor-Defendants VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Sarah Smith, and Juanita Anderson*

-20-