UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| JEFFERSON GRIFFIN,<br>    *Plaintiff*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS,<br>    *Defendant*,<br><br>and<br><br>ALLISON RIGGS, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, SARAH SMITH, and JUANITA ANDERSON,<br><br>    *Intervenor-Defendants*. | Case No. 5:24-cv-00731-M-RJ |
| NORTH CAROLINA DEMOCRATIC PARTY,<br><br>    *Plaintiff*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS et al.,<br><br>    *Defendants*. | Case No. 5:24-cv-00699-M-KS |
| CARRIE CONLEY et al.,<br><br>    *Plaintiffs*,<br><br>v.<br><br>ALAN HIRSCH et al.,<br><br>    *Defendants*. | Case No. 5:25-cv-00193-M-RJ |

**DECLARATION OF MAJOR GENERAL (RET.) PAUL EATON, USA**

I, Major General (Ret.) Paul Eaton, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over the age of 18, have personal knowledge of the facts below, and can competently testify to their truth.

2. I am Chairman at VoteVets Action Fund ("VoteVets"), a national non-profit organization dedicated to elevating the voices of veterans and their families on issues that affect the lives of those who serve and have served in the Armed Forces, including on issues like veterans' care. In that position, I provide strategic leadership by overseeing the board of directors, ensuring effective governance, and guiding the organization's long-term vision. I also act as a bridge between the board and executive management, facilitating decision-making, accountability, and stakeholder engagement. I make this statement based on personal knowledge and if called as a witness could and would testify competently thereto.

3. Military voters and veterans often face challenges in exercising their right to vote. Many active duty servicemembers and their families are deployed away from home, which makes it physically impossible for them to vote in person. As a result, these voters are reliant on laws like the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and North Carolina's Uniform Military and Overseas Voters Act ("UMOVA") to participate in the franchise through absentee voting.

4. VoteVets would be unable to support their constituents in a reliable manner if election rules can be challenged, disrupted, or altered *after* an election has occurred. And such after-the-fact or last-minute changes to election rules are particularly prejudicial to military voters and their families, who often must cast their ballots far ahead of election day in order to ensure that their votes return stateside in time to be counted.

5. My understanding is that based on the existing state and federal court orders, thousands of ballots cast by military voters domiciled in North Carolina are now at risk of being thrown out, even though these voters followed existing law and the instructions of election officials when they cast their ballots, and thus had a rightful expectation that their ballots will be counted.

VoteVets is extremely disturbed at the prospect that military voters and their families—who obeyed every rule and did everything right—will nonetheless have their votes thrown out through no fault of their own, months after the election has already occurred.

6. VoteVets also has profound concerns about the cure process that is set to imminently go into effect. If North Carolina implements a cure process now, it will require VoteVets to rapidly deploy scarce resources to help its constituents and supporters ensure their ballots are counted. To protect its constituents and supporters from disenfranchisement, VoteVets will be forced to: (1) conduct outreach to its constituents and supporters deployed abroad who have been swept up in the election protests, (2) make sure they received notice about the cure process from election officials, and (3) educate those challenged constituents about the cure process and how to timely cure their ballots notwithstanding the pendancy of litigation that might ultimately render curing unnecessary.

7. Despite our best efforts, our voters stand to be disenfranchised by any new cure program at this point. First, it is unclear that these challenged voters can even be reached. Our constituents are often deployed or traveling for extended periods. They may have also relocated since the election, which occurred nearly half a year ago. Even if they can be contacted, many servicemembers deployed abroad are unlikely to have access to the required photo identification, the technology to submit their identification to the election officials, or both. These voters had no reason to have prepared themselves for complying with such a requirement given that the election was more than five months ago and the rules they voted under did not require sending copies of their photo identification. Even the voters who can be reached and possess the necessary documents and access to technology may be discouraged from jumping through these extra hoops, months after they complied with all of the existing election rules. I am therefore deeply concerned that no matter what we do, many of VoteVets constituents and supporters will be disenfranchised.

8. The cure process will also likely create huge confusion among VoteVets constituents, including both among those who must cure, as well as those who reside in counties that have not been subject to Judge Griffin's UOCAVA voter challenges. VoteVets will have to

-3-

Case 5:24-cv-00731-M-RJ    Document 58    Filed 04/15/25    Page 3 of 5

field questions from its constituents inquiring whether their votes are at risk and advise them how to proceed accordingly.

9. Undertaking these actions will require VoteVets to expend scarce resources that would have otherwise gone to other mission-critical activities. For example, VoteVets is currently spending significant resources educating our constituents and supporters by running advertisements on the devastating impact that Department of Government Efficiency's purge of federal workers is having on military members and their families. VoteVets planned to sustain these efforts, but if we must unexpectedly help ensure our North Carolina constituents are not disenfranchised, we will have less money and personnel resources available to do so.

10. This belated cure program is also likely to discourage our voters from voting in future elections. Military voters already vote at low rates compared to their civilian counterparts. Federal data shows that active military members are registered to vote, and actually successfully cast a ballot, at significantly lower rates than civilians. In the 2020 presidential election, only 47% of active military members voted, compared to the national rate of 74%.[1] And in the 2022 election, just 26% percent of active military members voted, compared to the national rate of 48%.[2] The gap is typically even starker when it comes to military members deployed overseas. These disparate rates in registration and turnout have been traced to unique obstacles that active military members face in accessing the voting system, including the difficulties these voters face in receiving mail ballots in time to vote them, and getting them returned to election officials in time for them to be counted.

11. The military and overseas voters who cast ballots in the 2024 general election and are now subject to Judge Griffin's challenges overcame these hurdles to vote. Even so, their votes have now been deemed presumptively invalid and will be discarded unless these voters are able to take additional, burdensome steps to ensure their otherwise lawfully cast ballot is counted by

---

[1] State of the Military Voter: The Military Voter in 2020: 35 Years of UOCAVA (Federal Voting Assistance Program), https://web.archive.org/web/20240118175103/https://www.fvap.gov/ info/reports-surveys/StateoftheMilitaryVoter.
[2] State of the Military Voter: The Military Voter in 2022 (Federal Voting Assistance Program), https://web.archive.org/web/20250211144813/https://www.fvap.gov/info/reports-surveys/ StateoftheMilitaryVoter.

submitting a copy of their identification. Many of VoteVet's core constituencies will likely struggle with completing this cure process, including for example actively deployed military voters who are currently stationed at distant and inaccessible locations with unreliable mail service or access to technology, and veterans over the age of 65 who may have physical disabilities or mobility issues.

12. Finally, adding confusing, after-the-fact requirements on just these voters, who already complied with all the rules, is likely to disillusion them, making it less likely they will vote in future elections. In all of these ways, this new court-ordered cure process directly threatens VoteVet's mission of ensuring that military and veteran voters are able to make their voices heard by participating in the franchise.

13. Disenfranchising VoteVets' constituents threatens our core mission to elevate the voices of military personnel, veterans, and their families on issues that affect their lives and ensure their civic engagement.

I declare under penalty of perjury that the foregoing is true and correct.

Date: April 15, 2025

By: _____

Major General Paul Eaton
Chairman
VoteVets Action Fund