# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NORTH CAROLINA
# WESTERN DIVISION

| | |
|---|---|
| North Carolina Democratic Party,<br><br>Plaintiff,<br><br>v.<br><br>North Carolina State Board of Elections, *et al.*,<br><br>Defendants. | Case No. 5:24-cv-699-M |
| Jefferson Griffin<br><br>Plaintiff,<br><br>v.<br><br>North Carolina State Board of Elections,<br><br>Defendants,<br><br>and<br><br>Allison Riggs, VoteVets Action Fund, North Carolina Alliance for Retired Americans, Sarah Smith, and Juanita Anderson,<br><br>Intervenor-Defendants | Case No. 5:24-cv-731-M |
| Carrie Conley, Lockhart Webb, and Ella Kromm, *individually and on behalf of all others similarly situated*; Gabriela Adler-Espino; and the League of Women Voters of North Carolina,<br><br>Plaintiffs,<br><br>v.<br><br>Alan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, *in their official capacities as members of the North Carolina State Board of Elections*, and Karen Brinson Bell, *in her official capacity as Executive Director of the North Carolina State Board of Elections*,<br><br>Defendants. | Case No. 5:25-cv-193-M |

## OPENING BRIEF OF PLAINTIFF NORTH CAROLINA DEMOCRATIC PARTY PURSUANT TO APRIL 14, 2025, ORDER

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1
BACKGROUND .....................................................................................................3
    A.    State-Court Proceedings.......................................................................3
    B.    The Voters Targeted ............................................................................6
    C.    NCDP's Lawsuit ..................................................................................6
    D.    The NCSBE's Proposed Cure Process And Judge Griffin's Mandamus Petition ...7

LEGAL STANDARD..............................................................................................8
ARGUMENT ..........................................................................................................8
I.     Both The Cure Process That The State Courts Ordered And Discarding Any Votes Based On Judge's Griffin's Challenges Would Violate The Constitution .........................8
    A.    Undue Burden ......................................................................................9
    B.    Procedural Due Process .....................................................................12
    C.    Equal Protection.................................................................................17

II.    The Post-Election Measures The North Carolina Courts Adopted Violate The National Voter Registration Act ...................................................................19
III.   Injunctive Relief Is Warranted..............................................................20
    A.    NCDP Will Suffer Irreparable Harm Absent Relief ...........................21
    B.    The Balance Of Hardships And Public Interest Favor An Injunction ...................22

CONCLUSION......................................................................................................24
CERTIFICATE OF SERVICE ..............................................................................26

i

# TABLE OF AUTHORITIES

**CASES**

Page(s)

*Aetna Casualty and Surety Co. v. Ind-Com Electric Co.*,
    139 F.3d 419 (4th Cir. 1998) ............................................................................9

*Amoco Production Co. v. Village of Gamble*,
    480 U.S. 531 (1987)...........................................................................................8

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)...........................................................................................9

*Arcia v. Florida Secretary of State*,
    772 F.3d 1335 (11th Cir. 2014) ......................................................................20

*Arizona Democratic Party v. Hobbs*,
    485 F.Supp.3d 1073 (D. Ariz. 2020), *vacated on other grounds*,
    18 F.4th 1179 (9th Cir. Dec. 8, 2021).............................................................13

*Bennett v. Yoshina*,
    140 F.3d 1218 (9th Cir. 1998) ........................................................................10

*Burdick v. Takushi*,
    504 U.S. 428 (1992).....................................................................................9, 10

*Bush v. Gore*,
    531 U.S. 98 (2000) (per curiam) ...............................................................18, 19

*Democracy North Carolina v. North Carolina State Board of Elections*,
    476 F.Supp.3d 158 (M.D.N.C. 2020) .............................................................13

*Dunn v. Blumstein*,
    405 U.S. 330 (1972).........................................................................................18

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006)...........................................................................................8

*Elrod v. Burns*,
    427 U.S. 347 (1976).........................................................................................22

*Fuentes v. Shevin*,
    407 U.S. 67 (1972)...........................................................................................16

*Griffin v. Burns*,
    570 F.2d 1065 (1st Cir. 1978)..........................................................................10

*Griffin v. North Carolina State Board of Elections*,
No. 25-1018 (4th Cir. Feb. 4, 2025) (per curiam)............................................................5

*Griffin v. North Carolina State Board of Elections*,
2025 WL 1090903 (N.C. Apr. 11, 2025)..................................................................5, 6, 12

*Griffin v. North Carolina State Board of Elections*,
2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025) ...............................................3, 5, 15, 18

*Griffin v. North Carolina State Board of Elections*,
No. 24CV040620-910 (Wake Cnty. Sup. Ct.)............................................................14, 24

*Harper v. Virginia State Board of Elections*,
383 U.S. 663 (1966)..................................................................................................9, 13

*Hendon v. North Carolina State Board of Elections*,
710 F.2d 177 (4th Cir. 1983) ..................................................................................10, 11

*Kendall v. Balcerzak*,
650 F.3d 515 (4th Cir. 2011) ........................................................................................13

*League of Women Voters of North Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ........................................................................................22

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir. 2011) ........................................................................................23

*Majority Forward v. Ben Hill County Board of Elections*,
512 F.Supp.3d 1354 (M.D. Ga. 2021) ...........................................................................20

*Mathews v. Eldridge*,
424 U.S. 319 (1976).....................................................................................................13

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) ..........................................................................................8

*McLaughlin v. North Carolina Board of Elections*,
65 F.3d 1215 (4th Cir. 1995) ........................................................................................10

*Merrill v. Milligan*,
142 S.Ct. 879 (2022)....................................................................................................12

*New York Times Co. v. United States*,
403 U.S. 713 (1971).....................................................................................................22

*Nken v. Holder,*
    556 U.S. 418 (2009)..................................................................................23

*North Carolina State Conference of NAACP v. Bipartisan Board of Elections and*
    *Ethics Enforcement,*
    2018 WL 3748172 (M.D.N.C. Aug. 7, 2018)...................................................20

*North Carolina State Conference of NAACP v. Cooper,*
    430 F.Supp.3d 15 (M.D.N.C. 2019) ...............................................................23

*North Carolina State Conference of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) .........................................................................14

*Northampton County Drainage District Number One v. Bailey,*
    326 N.C. 742, 392 S.E.2d 352 (1990)........................................................14, 18

*Obama for America v. Husted,*
    697 F.3d 423 (6th Cir. 2012) .........................................................................23

*Pisano v. Strach,*
    743 F.3d 927 (4th Cir. 2014) .......................................................................9, 11

*Pitrolo v. County of Buncombe,*
    589 F.App'x 619 (4th Cir. Oct. 20, 2014) .........................................................9

*Purcell v. Gonzales,*
    549 U.S. 1 (2006) (per curiam)..................................................................12, 23

*Reynolds v. Sims,*
    377 U.S. 533 (1964)....................................................................................9, 23

*Republican National Committee v. North Carolina State Board of Elections,*
    120 F.4th 390 (4th Cir. 2024) ........................................................................20

*Rum Creek Coal Sales, Inc. v. Caperton,*
    926 F.2d 353 (4th Cir. 1991) .........................................................................22

*United States v. Classic,*
    313 U.S. 299 (1941)......................................................................................14

*United States v. Klamath Drainage District,*
    2025 WL 262346 (9th Cir. Jan. 22, 2025) ......................................................23

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008)........................................................................................9

*Wolf v. Fauquier County Board of Supervisors*,
555 F.3d 311 (4th Cir. 2009) ......................................................................16

## CONSTITUTIONS, STATUTES, AND REGULATIONS

U.S. Const.
amend I..............................................................................................6, 9, 12
amend XIV....................................................................................6, 9, 12, 17

28 U.S.C. §2201 ......................................................................................................8

52 U.S.C. §20507 ..................................................................................................19

N.C. Gen. Stat.
§163-89 ..........................................................................................................4, 17
§163-166.16 ........................................................................................................14
§163-258.2 ........................................................................................................4, 5
§163-258.4 ..........................................................................................................14
§163-258.13 ........................................................................................................14
§163-258.17 ..........................................................................................................5
§163-258.26 ..........................................................................................................4

8 N.C. Admin. Code 17.0109(d) ..........................................................................5

## OTHER AUTHORITIES

Blake, *The Gravity of a GOP Election Challenge in N.C.: 'Invites Incredible
Mischief'*, Wash. Post (Jan. 8, 2025), https://www.washingtonpost.com/
politics/2025/01/08/gop-election-challenge-north-carolina/.............................24

Bonner, *A Republican-Led Group Is Running Ads in NC Opposing the GOP
Attempt to Throw out Ballots*, NC Newsline (Jan. 24, 2025),
https://tinyurl.com/47kkmmfw ..........................................................................24

Clark, *A North Carolina Supreme Court Candidate's Bid to Overturn His Loss Is
Based on Theory Election Deniers Deemed Extreme*, ProPublica (Dec. 23,
2024), https://www.propublica.org/article/jefferson-griffin-north-carolina-
supreme-court-challenge-election-integrity-network ......................................24

Doran, *'Our democracy is just a sham': NC lawmakers who served in the military
slam GOP-backed efforts to toss ballots*, WRAL News (Feb. 5, 2025),
https://tinyurl.com/e86uzz5e..............................................................................1

Holder, *The Courts Must Stop This Judge From Stealing an Election*, N.Y. Times
(Feb. 6, 2025), https://www.nytimes.com/2025/02/06/opinion/north-
carolina-supreme-court.html ............................................................................24

Letter to Judge Jefferson Griffin (Mar. 18, 2025), https://tinyurl.com/4xpk7ar7.........................24

## INTRODUCTION

Last fall, millions of eligible North Carolina voters—including thousands of members of our armed forces and overseas voters—exercised their fundamental right to vote in federal and state elections. One of those elections was for Associate Justice of the North Carolina Supreme Court, a race between incumbent Justice Allison Riggs and North Carolina Court of Appeals Judge Jefferson Griffin. Justice Riggs won that election by hundreds of votes, according to both the initial results and multiple recounts. But Judge Griffin has litigated ever since to overturn the will of the people by disenfranchising voters through retroactive changes to state election laws. And even though he has presented no evidence that even a *single* North Carolina voter was ineligible or voted improperly under the rules in place when they cast their ballots, the state appellate courts have approved his strategy by altering the rules *after* the election—and as a result ordering the state elections board to discard the votes of hundreds (and potentially thousands) of registered military servicepeople and overseas citizens who followed the state's rules for registering and voting in effect at the time.

The state courts, moreover, have denied some of those voters any opportunity to demonstrate their ballots should not be discarded (including because, as has been publicly reported, they were identified in error). And even as to those voters who have been given a short window in which to prove (five months after the election) that there is no basis to disenfranchise them, it will often be surpassingly difficult or outright impossible for them to do so. To take only one example, U.S. Army Captain Rebecca Lobach, whose vote Judge Griffin contends should be discarded unless she provides photo identification in the next month or so, died on duty in January when her army helicopter collided with a passenger jet over Washington, D.C. *See* Doran, *'Our Democracy Is Just a Sham': NC Lawmakers Who Served in the Military Slam GOP-Backed Efforts*

*to Toss Ballots*, WRAL News (Feb. 5, 2025), https://tinyurl.com/e86uzz5e.  Countless others may similarly be unable to defend the votes they cast last fall—and it is grossly unreasonable to demand that they do so.

It is also illegal.  Indeed,  such post-election disenfranchisement of voters who cast their ballots in reliance on, and in compliance with, the state's own election rules in place at the time, would brazenly violate federal law—particularly because Judge Griffin has strategically targeted only selected groups of voters (whom he assumes will skew Democratic), while sparing similarly situated voters who are not assumed to have the same leaning.   Specifically, the disenfranchisement would violate the Constitution three times over: imposing an undue burden on the right to vote, depriving people of that right without procedural due process, and violating equal protection by treating similarly situated voters differently for no good reason.  And if more were needed, the post-hoc widespread deprivation of North Carolinians' fundamental right to vote would also violate the National Voter Registration Act (NVRA), which bars states from last-minute (much less after-the-fact) mass denials of the franchise.  Consistent with the Fourth Circuit's express direction to this Court to retain jurisdiction over the relevant federal-law issues— and to decide them, to the extent necessary, upon conclusion of the state-court proceedings—the Court should safeguard North Carolinians' federal rights, vindicate federal law, and finally put an end to Judge Griffin's misguided efforts.  And it should do so now, rather than after any cure process takes place, because that process itself violates federal law.

In particular, the Court should grant declaratory relief as well as a permanent injunction against conducting any cure process or discarding any ballots based on Judge Griffin's challenges.  An injunction is warranted because plaintiff—the North Carolina Democratic Party (NCDP)—has shown that federal law prohibits either discarding votes based on Judge Griffin's remaining

challenges or subjecting select classes of voters to the post-election remedial process that state officials are poised to commence. Without an injunction, moreover, NCDP will be irreparably harmed, with its members disenfranchised and some forced to undergo an unduly burdensome and selectively targeted (i.e., discriminatory) "cure" process several months after the election. By contrast, neither Judge Griffin nor the North Carolina State Board of Elections (Board or NCSBE) would suffer any cognizable harm from an injunction, because there is no legitimate interest in altering the rules of the election months after it is over. Finally, the public has a strong interest in ensuring elections are fair and honest, which means not changing the rules after the fact in order to disenfranchise strategically targeted groups of North Carolinians who followed the rules in place.

This Court should declare that the post-election measures the state courts have ordered violate federal law and permanently enjoin state election officials from carrying out any "cure" process, discarding any votes, or certifying the election for Judge Griffin.

## BACKGROUND

### A. State-Court Proceedings

A state-wide canvass and several recounts showed that last fall, Justice Riggs won re-election as associate justice of the North Carolina Supreme Court, defeating Judge Griffin. *See Griffin v. NCSBE*, 2025 WL 1021724, at *1 (N.C. Ct. App. Apr. 4, 2025). Dissatisfied, Judge Griffin filed multiple election protests (the "Protests") claiming that the ballots of thousands of voters should not be counted—including (1) approximately 260 ballots "cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States," and (2) approximately 1,400 ballots cast in just one of North Carolina's 100 counties (Guilford) "by military or overseas citizens …, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form." *See* Ex.A to Second Am. Compl. at 2 (Dkt.5:24-cv-699, D.E.35-1). After the state-law deadline to file protests

had passed, Judge Griffin amended his protests to add, in the second of these two categories, several other Democratic-leaning counties, thereby targeting a total of more than 5,500 military or overseas voters. *See* Ex.1 (Lawson Supp. Decl.) ¶11; Exs.H, I, J to Second Am. Compl. (Dkt.5:24-cv-699, D.E.35-8, D.E.35-9, D.E.35-10).[1]

Judge Griffin did not bring either of these two categories of challenges before or during the election—even though under North Carolina law, if a private party believed that a military or overseas voter was not eligible to vote, the party was required to challenge the person's ballot by 5:00 pm on the business day after the deadline for receipt of absentee ballots. N.C. Gen. Stat. §163-258.26(d) (incorporating §163-89). Such a challenger must come forward with affirmative, individualized proof that the person is ineligible to cast a ballot at the relevant time, and the person must be afforded notice and an opportunity to be heard when challenged. *Id.* §§163-89, 163-90.1.

Voters targeted by the first category of challenges—again, U.S. citizens living overseas who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States—had the right to vote under a state statute, which expressly included them in the definition of "[c]overed voter." *See* N.C. Gen. Stat. §163-258.2(1)(e). And voters targeted by the second category—again, military or overseas voters who voted without providing photo identification with their absentee ballots—had the right to vote without providing photo identification, as state law provided that they were "not required to submit a photocopy of acceptable photo identification." 8 N.C. Admin. Code 17.0109(d); *see also* N.C. Gen. Stat. §§163-258.2, 163-258.17(b).

The NCSBE dismissed Judge Griffin's Protests based largely on federal law. *See Griffin v. NCSBE*, No. 25-1018 at 1 (4th Cir. Feb. 4, 2025) (per curiam) (D.E.30). But Judge Griffin

---

[1] Where it appears without a docket number, "D.E." refers to entries on docket 5:24-cv-731.

continued to press them, filing several state-court appeals, which were removed to this Court. *See id.* This Court remanded those appeals without retaining jurisdiction over the federal-law issues, but the Fourth Circuit reversed in part, ordering this Court to retain jurisdiction over Judge Griffin's removed direct appeal until final resolution in state court (including any appeals) to ensure federal resolution of the "federal constitutional issues" at stake. *Id.* at 9. Judge Griffin then proceeded against the NCSBE and Justice Riggs in state court, where the defendants reserved their right to a federal forum to adjudicate the federal issues. *See, e.g.*, Notice of Fourth Circuit Opinion and *England* Reservation By Justice Riggs (D.E.39-2). The trial court upheld the Board's rejection of Judge Griffin's challenges, but a divided panel of the Court of Appeals reversed, *see* 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025). Justice Riggs and the NCSBE then sought review by the state supreme court.

On April 11, the North Carolina Supreme Court issued its decision in the consolidated *Griffin* cases. It denied review as to the overseas voters who had registered based on their parents' state residence, i.e., the people—whom Judge Griffin calls "never residents"—targeted by the first category of Judge's Griffin's protests. *Griffin v. NCSBE*, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025). That denial left in place the North Carolina Court of Appeals ruling ordering the Board to identify and exclude those people's votes, 2025 WL 1021724, at *3. The state supreme court also largely denied review as to the targets of Judge Griffin's second category (military and overseas voters who did not provide photo identification with their ballots), agreeing that their votes should be excluded unless they promptly "cured" by providing photo identification five months after the election, but "expand[ing] the period to cure deficiencies" set by the state court of appeals "from fifteen business days to thirty calendar days after the mailing of notice." *Griffin*, 2025 WL 1090903, at *3. The state supreme court did not state whether its decision applies only to voters

in Guilford County or also to the nearly 4,000 voters from additional Democratic-leaning counties that Judge Griffin added after the protest deadline. *Id.*

## B. The Voters Targeted

As mentioned, Judge Griffin's protests seek to target more than 5,500 North Carolina voters. Lawson Supp. Decl. ¶¶11, 29. Despite the NCSBE's plan to carry out a verification or cure campaign as to only the approximately 1,660 votes that Judge Griffin *timely* challenged (D.E.61), he continues to protest more than around 5,500 votes (including those he protested after the relevant deadline) in the North Carolina state courts (D.E.76-1). His lists of targeted voters appear to contain numerous inaccuracies. Multiple voters on his "never residents" list have been reported or identified as having lived in or maintained a permanent residence in North Carolina. Lawson Supp. Decl. ¶¶26, 28-31. One such voter is Josiah Young, who was studying abroad during the 2024 general election but maintains a permanent residence in Jackson County. *Id.* ¶28b. Some other voters on Judge Griffin's list reside in, and may have resided in, North Carolina when they cast their ballots. *Id.* ¶¶28-31. Based on publicly available information NCDP has been able to obtain, at least 32 of the approximately 260 voters named by this category of protests—more than 10%—appear to have been wrongfully accused of being "never residents." *Id.* ¶29.

## C. NCDP's Lawsuit

NCDP sued the NCSBE and its members in December 2024, *see* Dkt.5:24-cv-699, D.E.1. The operative complaint alleges that selectively discarding votes and subjecting voters to a cure process more than five months after voters cast their ballots in accordance with the guidance they received from the state violates the First and Fourteenth Amendments, and the NVRA, *id.*, D.E.35.

Shortly after the North Carolina Supreme Court's April 11 ruling (discussed above), NCDP asked this Court to "temporarily restrain and preliminarily enjoin the NCSBE from carrying out

any 'cure' process, discarding any votes, or … certifying the election for Judge Griffin, so that federal courts can determine whether doing so violates federal law before the irreparable harm is inflicted." Dkt.5:24-cv-699, D.E.37 at 9. This Court granted NCDP's motion in part, stating that "Defendants are ORDERED to proceed in accordance with" the state-court rulings requiring NCSBE to begin discarding and/or curing votes "but SHALL NOT certify the results of the election, pending further order of this court." *Id.* Text Order (Apr. 14, 2025). The Court also consolidated NCDP's lawsuit with Judge Griffin's direct appeal from NCSBE's order denying his protests and with a lawsuit voters filed. *Id.*, Text Order (Apr. 14, 2025).

### D. The NCSBE's Proposed Cure Process And Judge Griffin's Mandamus Petition

As this Court ordered, NCSBE filed a notice of its proposal (D.E.61) to comply with the state supreme court opinion. According to the proposal, NCSBE has interpreted the state appellate courts' orders as applying only to ballots targeted by Judge Griffin's timely protests (i.e., the approximately 260 ballots cast in reliance on parental residence and the approximately 1,400 military and overseas ballots cast without photo identification in Guilford County). *Id.* at 2-3. The NCSBE explained that the voters who Judge Griffin says had to submit photo identification with their ballots could not have done so "[b]ecause the online portal" through which many of those voters cast their ballots "is not currently configured to accept attachments." *Id.* at 3 n.3. It also stated that Judge Griffin's protests listed certain names "several times," *id.* at 2 n.1, and named as "never residents" several voters who reportedly have lived in North Carolina, *id.* at 4 n.6 (citing sources).

The proposal states that the NCSBE "intends to instruct" county boards to take certain steps to confirm that the protests do not name anyone in error. D.E.61 at 3-4. The NCSBE then intends

to direct counties to notify voters that their votes will be discarded if they do not take certain enumerated steps. *Id.* at 6-7. It does not address ballots cast by voters who have died since voting.

Judge Griffin has sought mandamus from the North Carolina Court of Appeals (D.E.76-1), challenging NCSBE's plan as not compliant with the state-court decisions. The petition remains pending, so the ultimate scope and terms of the cure process the state courts ordered remain uncertain.

## LEGAL STANDARD

A permanent injunction is warranted if plaintiff has shown (1) "'actual success'" on the merits, (2) "'an irreparable injury'" that "'remedies available at law … are inadequate to compensate'" (3) that "'the balance of hardships between the plaintiff and defendant'" warrants "'a remedy in equity,'" and (4) that an injunction would not disserve the public interest. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020) (quoting *Amoco Production Co. v. Village of Gamble*, 480 U.S. 531, 546 n.12 (1987), and *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

This Court has considerable discretion under 28 U.S.C. §2201 to grant declaratory relief where it will "'clarify important issues of law'" or afford "'relief from uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Pitrolo v. County of Buncombe*, 589 F.App'x 619, 627-628 (4th Cir. Oct. 20, 2014) (quoting *Aetna Casualty and Surety Co. v. Ind-Com Electric Co.*, 139 F.3d 419, 422-424 (4th Cir. 1998)).

## ARGUMENT

I. **BOTH THE CURE PROCESS THAT THE STATE COURTS ORDERED AND DISCARDING ANY VOTES BASED ON JUDGE'S GRIFFIN'S CHALLENGES WOULD VIOLATE THE CONSTITUTION**

As this Court has explained, "state regulation of state and local elections remains subject to federal constitutional constraints." Order at 7 n.4 (Dkt.24-cv-724, D.E.50) (citing *Washington*

8

*State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008)). And federal law recognizes that the right to vote "'is a fundamental matter in a free and democratic society,'" a right "'preservative of other basic civil and political rights.'" *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964)). Deprivation of that right here, through the retroactive discounting of ballots pursuant to post-election rule changes—even if done after imposing post-election "cure" measures—would unduly burden the right to vote, violate procedural due process, and deny targeted voters equal protection of the laws. So would subjecting voters to the cure process itself. Both should be declared unlawful and enjoined.

### A. Undue Burden

State laws that burden the right to vote violate the First and Fourteenth Amendments unless relevant and legitimate state interests of sufficient weight justify the burden. *Anderson v. Celebrezze*, 460 U.S. 780, 788-790 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). "[E]lection laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are 'narrowly drawn to advance a state interest of compelling importance.'" *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (quoting *McLaughlin v. North Carolina Board of Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995)); *see also Burdick*, 504 U.S. at 434.

Case law shows that the post-election discarding of ballots that voters cast pursuant to the state law that was in place before and during an election unduly burdens the right to vote. For example, in a First Circuit case that the Fourth Circuit has described as reflecting "settled" law (*Hendon v. North Carolina State Board of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)), the court held that Rhode Island's after-the-fact discarding of ballots cast by voters who "were doing no

more than following the instructions of the officials charged with running the election" amounted "to a fraud upon the absent voters" that was unconstitutional, *Griffin v. Burns*, 570 F.2d 1065, 1074-1075 (1st Cir. 1978). In particular, the First Circuit held, the state could not invalidate absentee ballots already cast on the ground that such ballots were never constitutionally or statutorily authorized for party primaries, when the issuance of such ballots in party primaries had been a longstanding practice. *Id.* at 1066-1067. As the First Circuit recognized, when a state reneges on its promise that voters' ballots will count, due process is violated because the right "involves the appearance of fairness as well as actual fairness." *Id.* at 1079. Similarly, in *Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998), the Ninth Circuit explained that a substantive-due-process violation occurs if there is "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures," *id.* at 1226-1227. These cases are consistent with the Fourth Circuit's observation that "[c]ourts have imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication" because "failure to require pre-election adjudication would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon*, 710 F.2d at 182 (quotation marks omitted).

The principles all these cases embody apply here. Indeed, "undo[ing] the ballot results in a court action," *Hendon*, 710 F.2d at 182, is *exactly* what Judge Griffin seeks. And declining to count registered voters' ballots due to an administrative "error" that was induced by the state—not including a photocopy of a photo ID with an overseas mail-in ballot—unquestionably imposes a severe burden on the right to vote. So does not counting the vote of an overseas voter who, under

then-current state law, could vote based on her parents' North Carolina residence. The state cannot change the rules *after* an election to deny the fundamental right to vote to those who followed the rules in place before and during the election. North Carolina surely could not now decide, for example, that it is only going to count the votes of those who voted by absentee ballot rather than in person (or vice-versa).

That some voters may have a chance to prevent their votes from being discarded does not alter the undue-burden analysis. Being subjected to such a verification process five months after votes have been cast and counted (and recounted) is itself a "severe burden on ballot access," *Pisano*, 743 F.3d at 933. That is particularly true given that this is no ordinary "cure" procedure, a term that suggests a voter did something wrong. It is a demand that voters who were *told* that they were eligible to vote and could cast their ballots in a particular way (i.e., from overseas via a state-created system that relied on voter attestation and did not allow for—let alone require—them to submit photo identification, D.E.61 at 3 n.3) nonetheless provide supplemental proof of their identity to the state in order for their votes in one particular election to *actually* count.

Supreme Court cases cautioning federal courts against altering state election laws shortly before an election confirm the undue burden that would be imposed by changing election rules now. As the Court recognized in *Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam), "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase," *id.* at 4-5. "That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v.*

*Milligan*, 142 S.Ct. 879, 880-881 (2022) (Kavanaugh, J., concurring in grant of stay applications). Here, the rules are being changed more than five months *after* the election, far later than *Purcell* would kick in to prevent eve-of-election changes.

No sufficiently weighty state interest justifies changing the rules that govern the election after voters have cast their votes, whether those changes result in the wholesale discarding of votes or requiring voters to provide identification. While states have an interest in ensuring that only qualified and registered individuals vote in elections, that interest must be addressed through rules and procedures put in place before and during an election, not retroactively added months after so as to *change* who is qualified to vote. Moreover, North Carolina has no interest in—and in fact has a strong interest against—inflicting the significant harm that would flow from retroactively disenfranchising voters who registered and voted in reliance on the state's instructions. Common sense and basic fairness confirm that conclusion. Indeed, the North Carolina Supreme Court itself explained that under its "longstanding precedent, mistakes made by negligent election officials … 'will not deprive [citizens] of [their] right to vote or render [their] vote[s] void after [they have] been cast.'" *Griffin*, 2025 WL 1090903, at *2 (quotation marks omitted) (alterations in original). But now, absent federal-court intervention, the state will unduly burden the voting rights of NCDP members, in violation of the First and Fourteenth Amendments. Such conduct should be enjoined.

### B. Procedural Due Process

Even if it were ever permissible to retroactively change the rules after an election in order to discard ballots, it is not permissible here because the affected voters will not have been provided adequate process. That is an independent constitutional violation.

A procedural-due-process violation exists where state action deprives someone of "a cognizable liberty or property interest"—here, the undeniable interest in exercising one's

constitutionally protected right to cast a ballot that will be counted, *see Harper*, 383 U.S. at 667—

and "the procedures employed were constitutionally inadequate," *Kendall v. Balcerzak*, 650 F.3d

515, 528 (4th Cir. 2011) (quotation marks omitted).  To evaluate the latter question, i.e., whether

procedural protections were adequate, courts examine (1) "the private interest that will be

affected"; (2) "the risk of an erroneous deprivation of such interest through the procedures used,

and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the

Government's interest, including the function involved and the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424

U.S. 319, 335 (1976).  Applying those factors here confirms that the relief ordered by the state

courts violates procedural due process.[2]

        1.      The private interest at stake is extremely strong.  "No right is more precious in a

free country than that of having a voice in the election of those who make the laws."  *North*

*Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016).  The action

ordered by the state courts threatens that right, which encompasses voters' right both to "cast their

ballots" *and* to "have them counted."  *United States v. Classic*, 313 U.S. 299, 315 (1941).

        2.      Under the state appellate courts' decisions, there is a serious risk of erroneous

deprivations of the right to vote.  For starters, Judge Griffin has not claimed that even *one* of the

military and overseas voters who did not provide photo ID is not who the voter claimed to be.  *See*

N.C. Gen. Stat. §163-166.16(g) (explaining this to be the purpose of photo identification); Ex.2

---

[2] "Multiple district courts" have applied *Mathews* to "procedural due process challenges to election regulations."  *Arizona Democratic Party v. Hobbs*, 485 F.Supp.3d 1073, 1093 (D. Ariz. 2020) (collecting cases), *vacated on other grounds*, 18 F.4th 1179 (9th Cir. Dec. 8, 2021).  One court in this circuit, for example, did so with a procedural-due-process challenge to a North Carolina law governing absentee ballots.  *See Democracy North Carolina v. NCSBE*, 476 F.Supp.3d 158, 228-229 (M.D.N.C. 2020).  And even if such a challenge were properly analyzed under the undue-burden framework, there would still be a procedural-due-process violation for the reasons that follow (and those explained in the prior section).

13

at 43 (State Board's Opposition to Petition for Judicial Review, *Griffin*, No. 24CV040620-910 (Wake County Sup. Ct. Feb. 3, 2025)). And all of those voters were required, when casting their ballots, to sign a declaration under penalty of perjury attesting to their eligibility to vote and their identity. *See* N.C. Gen. Stat. §§163-258.4(e), 163-258.13. While the NCSBE's "intended" approach to the cure process could alleviate some (but certainly not all) of the risk of error, moreover, Judge Griffin's challenge to that approach remains pending in state court, *supra* p.8, so the ultimate terms of the remedial process remain unclear. Regardless, absent federal intervention, eligible voters may lose their right to cast a vote that will be counted unless all the stars happen to align.

In particular, under the Board's current proposal, voters targeted by the second category of Protests must—unless Guilford County independently determines they were listed in error— (1) actually receive a mailing the Board sends them, which will require not only that the Board have the correct mailing information but also that the likely-international mailing not be unduly delayed and the voter not be indisposed during the narrow cure period (e.g., because she is actively engaged in military operations); (2) have on hand the necessary proof of eligibility the Board is demanding (or be able to procure it very quickly); (3) be in a position to photocopy that information or fill out an exception form; and (4) be able to successfully return that information to the Board— all in just 30 days. *See* Lawson Supp. Decl. ¶¶21-22, 33-35.

That will be difficult or impossible for many voters. Some of these voters live at far-flung addresses, where there is no telling how long it will take the written notice from the NCSBE to arrive. Lawson Supp. Decl. ¶22. This is all the more concerning because the 30-calendar-day cure clock runs not from *receipt* of the notice but from when the notice is *mailed*. *Id.* ¶34. On military bases, for example, mail delivery is often delayed for security purposes. *Id.* And Plaintiff NCDP

has no way to door-to-door canvass voters stationed or living abroad, to easily phone bank international numbers, or to conduct targeted and systematic email outreach because the NCSBE's email database is not made publicly available under state law.  *Id.*  ¶22.

Some of these voters no longer reside at the same address they did in November 2024.  For example, many voters who cast an overseas ballot were students studying abroad during the fall semester and may no longer receive mail at their temporary overseas address.  Lawson Supp. Decl. ¶35.  And if these voters are registered to vote at their on-campus mailing address, they will not have access to that address when the spring semester ends and they leave campus for the summer (likely in April or May).  *Id.*

Some of these voters have passed away since casting their ballot in the 2024 election.  As discussed above, Captain Lobach, a Durham resident, cast her ballot in accordance with the laws in effect during the 2024 general election, but tragically died on January 29, 2025, aboard a military helicopter that collided with a passenger plane near Reagan Washington National Airport.  Lawson Supp. Decl. ¶21.  But the NCSBE has not put forth a plan to contact the families or estates of deceased voters about the need or method for a cure, and the state courts have not ordered it to do so.  *Id.* ¶33.

And even if all necessary steps happen for voters in the second category of Protests, the lack of any articulated process for voters to appeal a determination that the information submitted does not suffice to "cure" further heightens the risk of erroneous deprivations.

That risk is even higher for the hundreds of voters (the so-called never-residents) who are not guaranteed, under the state appellate courts' orders, to be sent *any* notice before their ballots are discarded, let alone afforded any opportunity to challenge the determination that they were properly named in that Protest.  *See Griffin*, 2025 WL 1021724, at *15.  Although the Board has

15

announced plans to determine whether any voters were placed on the list in error (as has been reported), *see* D.E.61 at 4 n.6, that is not guaranteed, especially in light of Judge Griffin's pending mandamus petition. And binding precedent establishes that procedures are typically inadequate where "notice and an opportunity to be heard" are not guaranteed. *Wolf v. Fauquier County Board of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009); *see also Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972). Even according to the NCSBE's current proposal, moreover, voters in this category can prevent removal of their ballots from the vote count only if they can timely receive, complete, and submit an affidavit attesting they were improperly named as "never residents" (unless a county board independently reviews historical records to determine that they were listed in error). *See* D.E.61 at 4. This, again, will be difficult or impossible for many voters, such as those who have died, moved, cannot be contacted, or cannot access a computer or postal services.

3.      As explained in the undue-burden argument, North Carolina has no valid interest either in disenfranchising eligible voters or in unfairly changing the rules after an election in order to do so. And while it has an interest in ensuring that only qualified and eligible people vote in its elections, that does not justify after-the-fact disenfranchisement, especially based on post-hoc changes in election law. Nor does it justify failing to provide adequate procedural protections (including sufficient notice and a meaningful opportunity to be heard) before denying people their right to vote.

Requiring additional or substitute process would also not unreasonably burden the state, because state law already establishes a system for providing notice and an opportunity to be heard: North Carolina's ordinary challenge and protest processes guarantee voters *meaningful* notice and an individualized hearing at which a voter whose eligibility or identification is challenged has an opportunity to attest that she is qualified to vote or to cast a valid vote *before* her ballot is counted.

*See* N.C. Gen. Stat. §163-89. There is no reason such a process could not have worked here, and voters should not have to undergo a constitutionally inadequate process because Judge Griffin failed to challenge these voters before the results were canvassed. Alternatively, the individualized process available pre-election could be used post-election. While that may be costly, the costs cannot be viewed as overly burdensome, since state law provides for such hearings pre-election. In any event, costs cannot control the analysis; surely if, for example, Republican candidates protested every Democratic voter's ballot, the strong interest in avoiding a partisan voter purge would justify additional processes to ensure no mistakes are made. Likewise, that individualized hearings may extend the process is not dispositive. The scale of the threatened disenfranchisement heightens the need for more process, even if the costs—in money and time—would be significant. At the very minimum, it would not unduly burden the state to allow voters more than 30 days to provide photo identification.

Balancing these three factors makes clear that the so-called remedial process is inadequate: A crucial right is at stake; the chances of erroneous denial of that right is high, and the burden on the state for a process that would reduce those chances is minimal and in any event warrants relatively little weight in the analysis. The balance thus tips sharply in favor of a due-process violation.

### C.    Equal Protection

The Fourteenth Amendment's Equal Protection Clause guarantees citizens "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). And "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105 (2000) (per curiam).

The selective application of new election rules that the state courts blessed violates this binding precedent. Indeed, the North Carolina Supreme Court itself has explained that "[t]he right to vote on equal terms is a fundamental right." *Northampton County Drainage District Number One v. Bailey*, 326 N.C. 742, 747, 392 S.E.2d 352, 356 (1990). But the Protests target only voters in certain counties (and only votes cast in Judge Griffin's race). In particular, his challenge to military and overseas voters who submitted absentee ballots without accompanying photo ID was limited to ballots cast in heavily Democratic Guilford County, even though there are military and overseas citizens in North Carolina's other 99 counties who also submitted absentee ballots without either a copy of a photo ID or an ID exception form. *See Griffin*, 2025 WL 1021724, at *40 (Hampson, J., dissenting). Unlike similarly situated voters from Guilford County (and, if Judge Griffin's mandamus petition succeeds, five other Democratic-leaning counties), the votes of citizens in other counties will be unaffected even if they do not provide photo identification within 30 days. Voters targeted by the Protests are thus now "at risk of being disenfranchised while similarly situated voters are not, simply because of the county in which they reside … or their physical location." *Id.* That is "arbitrary and disparate treatment" that impermissibly "value[s] one person's voter over that of another," *Bush*, 531 U.S. at 104-105.

The 30-day cure process confirms these equal-protection problems. Requiring voters from targeted counties to complete additional steps in order to have their votes counted—steps not required of any other voters in the 2024 North Carolina Supreme Court election or in any other race—violates the Equal Protection Clause by subjecting similarly-situated voters to drastically different voting rules based on the losing candidate's strategic decision to target (and thus burden) only voters registered in counties more likely to vote for his opponent.

## II. THE POST-ELECTION MEASURES THE NORTH CAROLINA COURTS ADOPTED VIOLATE THE NATIONAL VOTER REGISTRATION ACT

Like the Constitution, the NVRA prohibits North Carolina from discarding the votes of overseas voters who did not themselves live in North Carolina. Specifically, NVRA section 8 requires systematic (i.e., non-individualized) challenges to voters' registration to be brought at least 90 days before the relevant election, providing that: "A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. §20507(c)(2)(A). The purpose of this 90-day bar is to prohibit the systematic removal of voters "when the risk of disfranchising eligible voters is the greatest," and targeted voters cannot "correct the State's errors in time to vote." *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).[3]

Applying the 90-day bar, a judge in this district held in one case that North Carolina county boards of elections violated the NVRA when they systematically removed voters from the voting rolls within 90 days of a federal election, even though the efforts to remove the voters were motivated by evidence that the voters no longer lived at their address. *See North Carolina State Conference of NAACP v. Bipartisan Board of Elections and Ethics Enforcement*, 2018 WL 3748172, at *5-10 (M.D.N.C. Aug. 7, 2018). The judge enjoined state officials both from continuing to remove the voters "without individualized inquiry as to the circumstances of each voter in the 90 days preceding a federal election" and from "holding hearings or taking any other

---

[3] Although section 8 refers to elections for federal office, it applies here because "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions" of federal law. *Republican National Committee v. NCSBE*, 120 F.4th 390, 401-402 (4th Cir. 2024). Specifically, the NCSBE has acknowledged that it maintains "the same rules for registration for voters in state and federal elections," Ex.B to Second Am. Compl. (Dkt.5:24-cv-699, D.E.35-2 at 27). Indeed, this dispute concerns votes cast in the November 2024 elections during which voters elected federal as well as state officials.

action(s) to process challenges" designed to facilitate systematic removal. *Id.* at *12. Likewise here, retroactively declaring voters improperly registered—and discarding their votes—would violate the 90-day ban.

It is no answer to say that there is no violation because votes can be *discarded* without formally *removing* the voters from the rolls. The discarding of registered voters' ballots is tantamount to removal—"a distinction without a difference," *Majority Forward v. Ben Hill County Board of Elections*, 512 F.Supp.3d 1354, 1368 (M.D. Ga. 2021)—and Congress could not have intended to permit such an end-run around the NVRA's protections. Nor is it an answer to say that section 8 applies only to the 90 days *before* an election, whereas the election at issue here has now passed. That too would circumvent the statute's manifest purpose of preventing states from using last-minute removals from the rolls to deny people their right to vote. Systematic post-election discarding of ballots cast by voters on state voter rolls has precisely the same effect.

The NCSBE's proposed notice of remedial efforts fails to remedy the NVRA problem here: The Board intends to gather a list of "challenged overseas voters who are identified as having never resided in North Carolina" and "retrieve their ballots for further action." D.E.61 at 7. And unless this Court instructs the NCSBE otherwise, those ballots will be "discounted" pursuant to the North Carolina Supreme Court decision, *id.*, meaning these voters will effectively be retroactively removed from the voting rolls, in violation of the NVRA.

## III. INJUNCTIVE RELIEF IS WARRANTED

To prevent the flagrant federal-law violations just discussed, this Court should permanently enjoin the NCSBE from (1) excluding votes by based on any of Judge Griffin's Protests, (2) requiring any voter targeted by one or both Protests to "cure" a purportedly defective ballot in order to have it be counted, or (3) certifying the election insofar as the results are altered as a result of the Protests. Such an injunction is warranted because otherwise NCDP will suffer irreparable

harm that cannot be compensated through remedies available at law, and the balance of hardships and public interest overwhelmingly favor an injunction.

## A.     NCDP Will Suffer Irreparable Harm Absent Relief

As explained, the state appellate courts have directed the Board to identify and discard votes in the first category of Protests (which includes approximately 260 votes). *See* Lawson Supp. Decl. ¶¶23, 29. And approximately 1,400 additional military and overseas voters—more if Judge Griffin's mandamus petition is granted—will have their votes discarded unless they can provide photo identification within 30 calendar days from the date the notice is mailed (or unless Guilford county independently determines that they were listed in error). *Id.* ¶¶11, 36. The denial of a fundamental constitutional right—and certainly the denial of what is perhaps the most important and fundamental right of all, *see supra* p.9—"unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (lead opinion) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)). Indeed, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases).

This infringement on voting rights irreparably harms NCDP—a membership organization that aims to elect Democrats in North Carolina by supporting candidates and ensuring that all voters can cast ballots and have their votes counted. Second Am. Compl. ¶¶22-23 (Dkt.5:24-cv-699, D.E.35); Lawson Supp. Decl. ¶¶3, 24. NCDP members will suffer the harm of having their votes discarded and/or being subjected to an unlawful cure process (targeted at strategically selected Democratic counties), and NCDP's candidate for associate justice may have the election and seat she won stolen from her. These harms are irreparable because once an election comes and goes, "there can be no do-over and no redress." *League of Women Voters*, 769 F.3d at 247.

The injury to NCDP members—and hence to NCDP—is "real and completely irreparable if nothing is done to enjoin" unlawful state action. *Id.*

NCDP must also now devote limited time and resources to contact voters and help them participate in the cure process. Lawson Supp. Decl. ¶¶19, 22. That independently constitutes irreparable harm. *See Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 361 (4th Cir. 1991). That harm is especially pronounced because the voters reside abroad and/or on bases where NCDP cannot go door to door or easily phone bank, requiring NCDP to engage in non-traditional (and almost certainly more expensive) methods of research and outreach. Lawson Supp. Decl. ¶22.

None of these harms can be adequately compensated by any remedy at law; only injunctive relief can prevent voters from being subjected to the cure process and having their votes excluded, and ensure that NCDP's candidate is not deprived of the seat she won.

**B.    The Balance Of Hardships And Public Interest Favor An Injunction**

The balance of hardships and public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see United States v. Klamath Drainage Dist.*, 2025 WL 262346, at *2 (9th Cir. Jan. 22, 2025) (applying this element of *Nken* to permanent injunctions). That merged factor favors an injunction here.

As explained, granting an injunction would prevent the state from inflicting the harm of disenfranchising selectively-targeted voters (and/or burdening them with an unlawful cure process), including military servicemembers and their families. It would also prevent the state from depriving Justice Riggs of the seat she lawfully won, overriding the will of the voters. Nothing remotely balances, let alone outweighs, these harms. Indeed, as the Fourth Circuit has explained, the state "is in no way harmed by issuance of an injunction that prevents the state from

enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-303 (4th Cir. 2011).

The public, moreover, has a "strong interest in exercising the fundamental political right to vote," *Purcell*, 549 U.S. at 4 (quotation marks omitted)—which includes the right to have one's vote counted, *see Reynolds*, 377 U.S. at 554. That interest is best served by "permitting as many qualified voters to vote as possible" (and, again, to have their votes counted). *Obama for America v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). Indeed, the public's interest in "electoral integrity is enhanced, not diminished, when all eligible voters are allowed to exercise their right to vote free from interference and burden unnecessarily imposed by others." *North Carolina State Conference of NAACP v. Cooper*, 430 F.Supp.3d 15, 53 (M.D.N.C. 2019). Conversely, discarding votes cast in reliance on then-current state law long after an election (whether with or without first subjecting voters to an unlawful cure process)—and potentially reversing the results of that election—undermines the public's interest in election integrity and stability.

That conclusion is borne out by the public alarm over Judge Griffin's and the state courts' actions. Scores of public-interest groups, including at least one representing veterans and overseas U.S.-citizen families, have expressed the toll that this retroactive disenfranchisement would impose on both overseas voters and the public's trust in elections. *E.g.*, Brief of Secure Families Initiative and Certain Members of Count Every Hero, *Griffin*, No. 24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 3, 2025), https://tinyurl.com/4f8798pd. And a bipartisan group of over 200 North Carolina jurists—including former state supreme court justices—and senior state government officials and lawyers have publicly described the Protests as "a threat to the public's faith in" state government and accordingly urged Judge Griffin to abandon his attempt to thwart the will of the people. *See* Letter to Judge Jefferson Griffin (Mar. 18, 2025), https://tinyurl.com/4xpk7ar7. Other

commentators, meanwhile, have emphasized that overturning the election by changing the rules after the fact would embolden other candidates to adopt Judge Griffin's playbook, setting a dangerous precedent and imperiling the peaceful transition of power. *See, e.g.*, Bonner, *A Republican-Led Group Is Running Ads in NC Opposing the GOP Attempt to Throw out Ballots*, NC Newsline (Jan. 24, 2025), https://tinyurl.com/47kkmmfw; Holder, *The Courts Must Stop This Judge From Stealing an Election*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/opinion/north-carolina-supreme-court.html; Blake, *The Gravity of a GOP Election Challenge in N.C.: 'Invites Incredible Mischief'*, Wash. Post (Jan. 8, 2025), https://www.washingtonpost.com/politics/2025/01/08/gop-election-challenge-north-carolina/; Clark, *A North Carolina Supreme Court Candidate's Bid to Overturn His Loss Is Based on Theory Election Deniers Deemed Extreme*, ProPublica (Dec. 23, 2024), https://www.propublica.org/article/jefferson-griffin-north-carolina-supreme-court-challenge-election-integrity-network.  Preventing such a regime is assuredly in the public interest.

## CONCLUSION

The Court should issue a permanent injunction and declaratory relief as requested in NCDP's second amended complaint, or effect equivalent relief by exercising federal jurisdiction over and rejecting—on federal-law grounds—Judge Griffin's petitions for judicial review of the NCSBE's order denying the first and second categories of Protests.

April 21, 2025                                    Respectfully submitted,


                                                  /s/ Shana L. Fulton
SETH P. WAXMAN*                                   SHANA L. FULTON
DANIEL S. VOLCHOK*                                N.C. Bar No. 27836
CHRISTOPHER E. BABBITT*                           WILLIAM A. ROBERTSON
JANE E. KESSNER*                                  N.C. Bar No. 53589
NITISHA BARONIA*                                  JAMES W. WHALEN
ANN E. HIMES*                                     N.C. Bar No. 58477
WILMER CUTLER PICKERING                           BROOKS, PIERCE, MCLENDON,
    HALE AND DORR LLP                                 HUMPHREY & LEONARD, LLP
2100 Pennsylvania Avenue N.W.                     150 Fayetteville Street, Suite 1700
Washington, D.C. 20037                            Raleigh, N.C. 27601
Phone: (202) 663-6000                             Phone: (919) 839-0300
Fax: (202) 663-6363                               Fax: (919) 839-0304
seth.waxman@wilmerhale.com                        sfulton@brookspierce.com
daniel.volchok@wilmerhale.com                     wrobertson@brookspierce.com
christopher.babbitt@wilmerhale.com                jwhalen@brookspierce.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
annie.himes@wilmerhale.com


* Local Rule 83.1(e) special appearance

**CERTIFICATE OF SERVICE**

On this 21st day of April, 2025, I electronically filed the foregoing document using the court's CM/ECF system.

/s/ Shana L. Fulton
Shana L. Fulton