# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| JEFFERSON GRIFFIN, <br> *Plaintiff,* <br><br> v. <br><br> NORTH CAROLINA STATE <br> BOARD OF ELECTIONS, <br> *Defendant,* <br><br> and <br><br> ALLISON RIGGS, VOTEVETS AC- <br> TION FUND, NORTH CAROLINA <br> ALLIANCE FOR RETIRED AMER- <br> ICANS, SARAH SMITH, and <br> JUANITA ANDERSON, <br> *Intervenor-Defendants.* | Case No. 5:24-cv-00731-M |
| NORTH CAROLINA DEMOCRATIC <br> PARTY, <br> *Plaintiff,* <br><br> v. <br><br> NORTH CAROLINA STATE BOARD <br> OF ELECTIONS et al., <br> *Defendants.* | Case No. 5:24-cv-00699-M-KS |
| CARRIE CONLEY et al., <br> *Plaintiffs,* <br><br> v. <br><br> ALAN HIRSCH et al., <br> *Defendants.* | Case No. 5:25-cv-00193-M-RJ |

## JUDGE JEFFERSON GRIFFIN'S BRIEF
## IN RESPONSE TO THE COURT'S ORDER AND
## IN OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Background ......................................................................................................... 3

Argument ............................................................................................................ 5

    I.   The Court should abstain under Younger. ............................................ 5

    II.  Movants' federal claims fail on the merits. ........................................ 9

        A. There is no substantive due process violation. ............................... 9

            1.  At most, Movants allege a "garden variety" election issue................ 12

            2.  Movants don't prove "massive" disenfranchisement. ........................ 15

        B. There are no procedural due-process or right-to-vote violations. ............. 17

            1.  The Anderson-Burdick test applies to Movants' procedural due-process and right-to-vote claims............................................................. 17

            2.  Movants allege only de minimis burdens............................................ 19

            3.  Compelling state interests justify enforcement of North Carolina's election laws. ....................................................................................... 20

        C. There is no Equal Protection Clause violation. ............................... 21

        D. There is no National Voter Registration Act violation................................ 24

    III. Movants are not entitled to a preliminary injunction. ........................... 27

        A. Counting "unlawful ballots" would irreparably harm Judge Griffin. ........ 28

        B. The equities and public interest tilt against enjoining enforcement of the North Carolina Supreme Court's order......................................................... 29

Conclusion.......................................................................................................... 31

Certificate of Compliance.................................................................................. 32

# INTRODUCTION

Movants disagree with North Carolina courts about state law. They argue that North Carolina has changed the election rules after the election. But that's not what the courts said. They held that the "plain language" of the state constitution barred voters who had never resided in North Carolina from voting in state elections. *Griffin v. N.C. Bd. of Elections*, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025) ("*Griffin II*"); *accord Griffin v. NC. Bd. of Elections*, 2025 WL 1021724, at *13 (N.C. Ct. App. Apr. 4, 2025) ("*Griffin I*"). And the North Carolina Supreme Court found that the state election code required overseas voters to provide photo identification with their ballots. *Griffin II*, 2025 WL 1090903, at *3. As part of its remedy, the court provided a 30-day cure period for those voters to fix the defect. *Id.*

Movants primary argument is "a backhanded critique of the merits" of that decision. *Bennett v. Yoshina*, 140 F.3d 1218, 1225 (9th Cir. 1998). They oppose applying state law at the time of the election, arguing that it would violate the U.S. Constitution because the State Board of Elections had provided contrary guidance. Riggs Br.8-9; LWV Br.13-14; NCDP Br.12.[1] But they cannot justify this expansion of substantive due process. To begin, courts must adhere closely to history and tradition when assessing substantive due process, but Movants provide none.

---

[1] Movants are Justice Riggs (Doc.40), the group led by the League of Women Voters of North Carolina (Doc.12, No. 5:25-cv-193), and the group led by the North Carolina Democratic Party (Doc.37, No. 5:24-cv-699). Unless otherwise noted, all minute orders and "Doc." numbers refer to the lead docket, No. 5:24-cv-731.

Instead, Movants point to two out-of-circuit cases to derive a right to vote in accordance with executive guidance rather than state election law. But even those decisions fatally undermine Movants' claim. The decisions "reject" challenges based on a mere "clarification of the state's election laws." *Bennett*, 140 F.3d at 1227. Movants urge this Court to reject the state courts' clarification. The decisions recognize that even "official misconduct" is not unconstitutional "where adequate state corrective procedures exist." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978). Movants argue that a 30-day cure period is itself a constitutional violation. Riggs Br.10-11; LWV Br.13; NCDP Br.21. The decisions stop short of ordering a state to count ballots that didn't comply with state law even when they found a violation. *Burns*, 570 F.2d at 1079-80. Movants argue that even the ballots of unqualified voters must be counted. Riggs Br.9; NCDP Br.12.

Movants' other merits arguments fare no better. They argue that the state's cure process will burden voters. Riggs Br.9-10; LWV Br.13; NCDP Br.12. But filling out forms and providing documentation is an ordinary voting burden, and the State has a compelling interest in enforcing its election laws. *Democratic Party of Va. v. Brink*, 599 F. Supp. 3d 346, 363-64 (E.D. Va. 2022). Citing *Bush v. Gore*, Movants allege an equal-protection violation. Riggs Br.9; LWV Br.21; NCDP Br.20. But *Bush* addressed only "the special instance of a statewide recount under the authority of a single state judicial officer" with inadequate standards. 531 U.S. 98, 109 (2000). It did not prohibit States from implementing clear rules in a post-election challenge. One Movant points to the

National Voter Registration Act to argue that ballots of people who never resided in North Carolina must be counted. NCDP Br.21-22. But that statute governs registration of qualified voters, not ballot-casting by unqualified voters.

This Court need not even reach these merits issues. *Younger* abstention prevents this Court from engaging in review that would require it to second-guess the decision of the North Carolina courts. *See Moore v. City of Asheville*, 396 F.3d 385, 393 (4th Cir. 2005). After all, "[o]ur constitution does not contemplate that the federal judiciary routinely will pass judgment on particular elections" for "state" office. *Hutchinson v. Miller*, 797 F.2d 1279, 1280 (4th Cir. 1986).

The Court should deny the preliminary-injunction motions and dismiss the cases.

## BACKGROUND

The parties have been here before. When Judge Griffin was here the first time, he alleged there were illegal votes cast in the 2024 election for Seat 6 on the North Carolina Supreme Court. The State's highest court confirmed that Judge Griffin was right. *Griffin II*, 2025 WL 1090903, at *3.

On December 18, 2024, Judge Griffin moved in the North Carolina Supreme Court to stay certification of the election because of the State Board of Elections' violations of state law. The Board removed the case to this Court. But on January 6, 2025, this Court abstained under *Burford*, noting: "If our system of federalism is to exist in more than name only, it means that this court should abstain in this case, under these

3

circumstances." Doc.50 at 25, No. 5:24-cv-724. The Court thus remanded the cases to state court. *Id.* at 6.

On January 7, the North Carolina Supreme Court enjoined the State Board from certifying the election. And on January 22, after receiving extensive briefing about the same federal law issues Movants raise here, *see infra* Section I, the North Carolina Supreme Court held that the temporary stay of the election's certification will remain in place until the appeals concluded. In the meantime, the Board appealed this Court's remand order, demanding that the Fourth Circuit direct this Court to retrieve the action from the state court. Doc.7 at 4-5, No. 25-1020 (4th Cir.). On February 4, the Fourth Circuit affirmed this Court's abstention, but ordered the Court to retain "jurisdiction" over "the federal issues" under *Pullman.* Doc.132, No. 25-1018 (4th Cir.).

Litigation continued in state court. On April 4, the North Carolina Court of Appeals ruled that counting the challenged ballots would violate the North Carolina Constitution and election code. *Griffin I*, 2025 WL 1021724, at *14. On April 11, the North Carolina Supreme Court affirmed in part. *Griffin II*, 2025 WL 1090903, at *3. It held that the state constitution prohibits "never residents"—persons "who have never been domiciled or resided in North Carolina or expressed an intent to live in North Carolina"—from voting in "our state's non-federal elections." *Id.* It also held that North Carolina law requires overseas voters who submit absentee ballots to provide "photo identification." *Id.* Because the photo-ID is a curable deficiency, the Court gave those

voters "thirty calendar days after the mailing of notice" to "cure deficiencies arising from lack of photo identification." *Id.*

Movants believe this court-ordered remedy violates the U.S. Constitution. First, they argue that the North Carolina Supreme Court's judgment violates substantive due process because it's "unfair[]." Riggs Br.8; LWV Br.8; NCDP Br.14. Second, some Movants argue the court's judgment violates procedural due process and the federal right to vote. NCDP Br.15-19; LWV Br.19-21. Third, Movants argue the state supreme court's judgment is "arbitrary" and violates the Equal Protection Clause. Riggs Br.9; LWV Br.21; NCDP Br.20. Fourth, the North Carolina Democratic Party stands alone in arguing that the order violates the National Voter Registration Act. NCDP Br.21-22. Movants demand this Court "prohibit the parties from taking any action to enforce or effectuate" the "opinion" of "the North Carolina Supreme Court." Riggs Br.15; *accord* LWV Br.25; NCDP Br.2.

## ARGUMENT

### I. The Court should abstain under *Younger*.

*Younger* commands abstention "if the State's interests" are "so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 (1987). For at least four reasons, *Younger* applies here.

**First**, the four "core *Younger* concerns" are present: "the federal action" is "'duplicative,'" federal intervention casts "'direct aspersion on the capabilities and good

faith of state appellate courts,'" federal intervention "disrupts important state enforce-ment efforts," and federal intervention "is designed to annul a state proceeding." *Moore*, 396 F.3d at 394 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608-09 (1975)). Movants seek to "relitigate a dispute that has already been resolved" concerning their various federal arguments that have already been submitted to the state courts. *Id.* at 395. Mo-vants "seek[] to annul or trample on the results" of those state-court decisions. *Id.* Their arguments would require this Court "place a construction on a state statute different from the one rendered by the highest court of the State." *Johnson v. Fankell*, 520 U.S. 911, 916 (1997). At the very least, Movants seek to thwart the state court's application of state law to a state election, which would "offend the State's appellate processes," and "undo what the State has done." *Moore*, 396 F.3d at 395. This Court should "wisely and productively discharge its judicial duty by abstaining." Order, Doc.50 at 26, No. 5:24-cv-724 (cleaned up).

**Second**, "important state interests are involved." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). "The state's interest here—regulating its local elections—is [an] important state interest." *San Jose Silicon Valley Chamber of Com. PAC v. City of San Jose*, 546 F.3d 1087, 1094 (9th Cir. 2008). "No function is more es-sential to the separate and independent existence of the States" than "the power to determine within the limits of the Constitution" their own "machinery for filling local public offices." *Oregon v. Mitchell*, 400 U.S. 112, 125 (1970) (op. of Black, J.). The same "principles of federalism" that justify *Younger* abstention, *Pennzoil*, 481 U.S. at 10, also

"limit the power of federal courts to intervene in state elections," *Burton v. Georgia*, 953 F.2d 1266, 1268 (11th Cir. 1992).

**Third**, Movants had an opportunity to litigate the federal constitutional challenges. *Younger* requires only that the Movants had access to a procedure to "challenge" the action "in state court"—not that any state court "consider" the "federal constitutional questions." *San Jose*, 546 F.3d at 1095. All Movants had that opportunity. In fact, Justice Riggs, the Board, and VoteVets took it. In January 2025, those parties presented the same federal-law arguments Movants make here to the North Carolina Supreme Court. BOE Br.50-63, *Griffin I*, No. 320P24; Riggs Br.67-70, *id.*; VV Br.22-44, *id.* That the doors of North Carolina's courts were open to Movants is sufficient for *Younger* purposes. That the state courts heard those arguments and did not find them persuasive is even stronger reason to abstain. *See Middlesex*, 457 U.S. at 431 ("Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights.").

**Fourth**, the relief Movants seek would annul the state adjudication. The Supreme Court has "exten[ded]" *Younger* to "the context of completed state proceedings." *Moore*, 396 F.3d at 394. It has applied *Younger* to bar federal action, even when the state court proceedings have ended, so long as the federal complaint is designed "to annul the results of a state trial." *Huffman*, 420 U.S. at 609. Sometimes "it's difficult to determine if a plaintiff seeks review of a state-court decision." *RLR Invs. v. City of Pigeon Forge*, 4 F.4th 380, 387-88 (6th Cir. 2021) (applying *Rooker-Feldman*). "But there's no complexity

7

when the litigant directly asks a federal district court to declare a state-court order to be unconstitutional and enjoin its enforcement." *Id.* at 388 (cleaned up). That's what Movants demand here, asking this Court to enjoin the parties "from taking any action to enforce" the "opinion" of "the North Carolina Supreme Court." Riggs Br.15.

It's no answer to say that the Fourth Circuit ordered this Court to retain jurisdiction of federal claims under *Pullman*. To the extent Movants ever initiated a "properly invoked concurrent suit," they now seek relief only from the court-ordered *remedy*, not from generally applied "state law." *Nivens v. Gilchrist*, 444 F.3d 237, 245 (4th Cir. 2006). That is, Movants do not argue that North Carolina's ID and residency requirements are unconstitutional on their face. Indeed, they concede that those laws "may be binding moving forward." Riggs Br.9; *see also* LWV Br.18 (applicability to "*future elections*" is "not at issue"). Movants claim to challenge only whether "[t]hose state-law decisions" can "apply retroactively." Riggs Br.9. But that's another way of saying they challenge the "execution of state judgments." *Pennzoil*, 481 U.S. at 14. Their arguments rest on the notion that the "North Carolina Court of Appeals' opinion would, if implemented," violate federal law. Riggs Br.9-10. Movants thus "challenge[] … the processes by which the State compels compliance with the judgments of its courts." *Pennzoil*, 481 U.S. at 13-14.

"Abstention is particularly appropriate where the requested equitable relief would 'render the state court's orders or judgments nugatory'" in "an election contest." *Stein v. Cortes*, 223 F. Supp. 3d 423, 434-35 (E.D. Pa. 2016) (quoting *Schall v. Joyce*, 885

F.2d 101, 108 (3d Cir. 1989)). *Younger* applies, so the Court should "dismiss the case with prejudice." *Nivens*, 444 F.3d at 247.

## II. Movants' federal claims fail on the merits.

### A. There is no substantive due process violation.

Movants ask for the expansion of a substantive due process right never recognized by the Supreme Court. Courts must "'exercise the utmost care'" when expanding substantive due process, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), and keep within the limits of "history and tradition," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022). Movants rely instead on out-of-circuit caselaw that didn't perform that historical analysis. *See, e.g.*, Riggs Br.8-9 (citing *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978); *Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998)). From those cases, they invite this Court to grade the papers of state courts, creating a substantive right to vote according to the guidance of election officials, not state statutes and the state Constitution as interpreted by state courts.

But Movants' request goes far beyond what even those out-of-circuit decisions allowed. Where those decisions emphasized the *absence* of any cure process, Movants argue that North Carolina's cure process is *itself* a constitutional violation. And where those decisions concerned *qualified* voters who had been misinformed about election processes, Movants seek to compel North Carolina to count the ballots of *unqualified* voters.

Start with the Never Residents who, under state law, are not qualified voters. Movants' argument "proceeds from the assumption," now "shown to be erroneous," that non-residents "have a right to vote in [North Carolina] elections." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 75 (1978). North Carolina "has unquestioned power to impose reasonable residence restrictions of the availability of the ballot." *Carrington v. Rash*, 380 U.S. 89, 91 (1965). It may "restrict the vote" to "residents" who are "bona fide." *Dunn v. Blumstein*, 405 U.S. 330, 334 (1972). Eligible voters under North Carolina law are those who "make North Carolina their domicile of choice," which categorically excludes those who were "Never Resident[s]." *Griffin I*, 2025 WL 1021724, at *13. Were the Court to find that "removal" of the Never Residents' votes violates federal law, it "would effectively grant, and then protect, the franchise of persons not eligible to vote." *Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir. 2004). As to those "non-residents," there is "no due process violation." *Snead v. City of Albuquerque*, 663 F. Supp. 1084, 1089 (D.N.M.), *aff'd*, 841 F.2d 1131 (10th Cir. 1987).

As for the overseas voters, the state supreme court's expansion of the notice-and-cure process to a full month for voters to provide photo-ID is *enfranchising*. The First Circuit recognized that "election irregularities" aren't "usually" unconstitutional "where adequate state corrective procedures exist." *Burns*, 570 F.2d at 1077. The court found a violation where "the state court did not confront the questions that retroactive application of its ruling would create." *Id* at 1079. Here, the North Carolina Supreme Court expressly considered those "questions," *id.*, expanding the cure period to 30 days,

*Griffin II*, 2025 WL 1090903, at *3. Movants don't grapple with this shortcoming in their argument. Instead, they insist—contrary to their own authority—that the state remedial process itself is a substantive due-process violation. *E.g.*, NCDP Br.12-14.

Movants can't square their argument that a cure process is unconstitutional with the remedy in *Burns*—"a new primary" election. 570 F.2d at 1066. Movants ask for a remedy far more intrusive on the state courts' authority to decide state law. The North Carolina courts have ruled that the overseas voters cast invalid ballots under state law at the time. *Griffin I*, 2025 WL 1021724, at *13. Movants insist that those ballots must be counted anyway. But they provide no authority to support that remedy just because a voter relies on incorrect guidance from state officials.

Nor can Movants point to anything about the cure process here to show a constitutional violation. "[N]o case mandates any particular length of time that states must provide after Election Day for voters to cure ballot errors." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir. 2016). But federal courts have upheld much shorter notice-and-cure periods than the 30 day period set by the state supreme court. *See id.* (reducing cure period from ten to seven days presents no constitutional problem); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 607-08 (4th Cir. 2016) (three days); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 199 (2008) (ten days); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1323 (11th Cir. 2019) ("48 hours' notice" is "reasonable"). State election officials are working to contact voters by mail, phone, or email, and voters can correct any problems rapidly. Doc.61 at 4-5. That some voters might

choose not to cure their ballots cannot be attributed to the State. *Brink*, 599 F. Supp. 3d at 362.

The other substantive rights Movants propose make even less sense. There is no "right to vote" that "encompasses the right to have a ballot counted that is defective under state law." *Pa. State Conf. of NAACP Branches v. Sec'y Commw. of Pa.*, 97 F.4th 120, 133 (3d Cir. 2024). And no voter has a right to a "presumpt[ion]" that their ballot is valid. *Contra* LWV Br.19-21. The entire history of election contests shows there's no right to prevent a once-counted ballot from being excluded after it is deemed deficient.

Even if Movants had identified a substantive right at stake, they've not shown that the state court judgments infringe on that right. The cases they rely on prohibit federal courts from reviewing "garden variety" elections issues, and they require "massive" disenfranchisement before a federal court interferes with state election disputes. *Bennett*, 140 F.3d at 1226-27. Both are reasons Movants' claims fail.

### 1. At most, Movants allege a "garden variety" election issue.

"Fourth Circuit" precedent "requires" that this Court be "exquisitely sensitive" when considering Movants' substantive due process argument, as it demands "interfer[ence]" with North Carolina's election for state office. *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 915 (E.D. Va. 2018). The "circuit courts have uniformly declined" to intervene on substantive due process grounds in a state election "with respect to garden variety election irregularities." *Hutchinson*, 797 F.2d at 1283 (cleaned up). That's because of "the constitutional recognition" that States "'are primarily

responsible for their own elections,'" *id.*, and state supreme courts are "the final arbiter[s]" of their own State's laws, *Bennett*, 140 F.3d at 1225. Federal courts generally are "powerless to review" a state supreme court election decision, "even if" they think "it was wrong or contrary to general principles of election laws." *Id.*

"[O]nly the most extraordinary circumstances" involving an act that "'shocks the conscience'" justifies a federal court's intervention under the Due Process Clause. *Donald J. Trump for President v. Boockvar*, 493 F. Supp. 3d 331, 397 (W.D. Pa. 2020) (quoting *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999)). Examples include racial discrimination "against a discrete group of voters," officials "refus[ing] to hold an election though required by state law, resulting in a complete disenfranchisement, or when the willful and illegal conduct of election officials results in fraudulently obtained or fundamentally unfair voting results." *Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008) (internal citations omitted). By contrast, "irregularities, *ex post* changes in law or procedure, and fraud will not amount to a denial of due process if they are of the 'garden variety' sort," even if those changes "control the outcome" of the election. *Election Integrity Project Cal. v. Weber*, 113 F.4th 1072, 1097 (9th Cir. 2024).

Movants have "not made the requisite clear showing" of "the kind of broad gauged unfairness necessary to state a due process" claim. *Lecky*, 285 F. Supp. 3d at 916. When a state supreme court engages in merely "*ex post* clarification of the state's election laws," that order "possibly amounts, at worst, to a garden variety election irregularity" and is "hardly a pervasive error that undermines the integrity of the vote." *Bennett*, 140

F.3d at 1227 (holding Hawaii Supreme Court's *ex post* clarification of state law affecting 45,000 ballots didn't violate substantive due process). The North Carolina Constitution's bona fide residency requirement was not just "existing law" before the 2024 election, *contra* Riggs Br.11—it's been part of the state's constitution since 1776, *see* N.C. Const. of 1776, arts. VII-VIII. The same is true of the requirement for overseas voters to provide photo-ID, which the North Carolina courts held was required by the language of the state election code. *Griffin II*, 2025 WL 1090903, at *3.

By affirming that North Carolina's Constitution prohibits "individuals to vote in our state's non-federal elections who have never been domiciled or resided" in the State and that overseas voters must provide photo-ID, the North Carolina Supreme Court didn't change existing law. *Griffin II*, 2025 WL 1090903, at *3. And it didn't "retroactive[ly]" invalidate ballots. *Contra* Riggs Br.9. At most, Movants allege *ex post* clarification of North Carolina's election laws by the state supreme court. *E.g.*, Riggs Br.8-9. But a state board of elections misinterpreting a state's election code is about as garden-variety as it gets. *See Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024) (board of elections is "[o]ften" put in situations where it must choose whether to "forego" enforcement of the "policies" established by the Legislature).

"[T]he interpretation" of North Carolina law by the state courts is "binding on federal courts," as no "federal tribunal has any authority to place a construction on a state statute different from the one rendered by the highest court of the State." *Fankell*, 520 U.S. at 916. So "even if" federal courts believe the decision "was wrong or contrary

to general principles of election laws," they are "powerless to review" that decision. *Bennett*, 140 F.3d at 1225 (citing *Fankell*).

### 2. Movants don't prove "massive" disenfranchisement.

Under Movants' own standard, they must prove "significant disenfranchisement" to prevail on a substantive due process claim. Riggs Br.8 (quoting *Bennett*, 140 F.3d at 1226). But the cases they rely on impose a much higher standard. Only "massive" disenfranchisement can sustain a substantive due process claim, which is analogous to "10 percent of the total votes cast." *Bennett*, 140 F.3d at 1226 (citing *Burns*, 570 F.2d at 1068). And the problems must be so widespread that they "permeate[] an election," *Burns*, 570 F.2d at 1077, not just a handful of affected voters. No voter is disenfranchised: the overseas voters will have an opportunity to cure their ballots and have their votes counted, and the Never Residents were never qualified to vote in the first place.

Even assuming Movants' false premise that these groups will be "disenfranchised," Movants fall far short of the "massive" number of votes required to upset a settled state process. *Bennett*, 140 F.3d at 1226. Justice Riggs alleges "1,409 ballots" cast by voters without a photo-ID and "266 ballots" who have never "resided in North Carolina" are affected by the Court's order. Riggs Br.3. That's less than 0.03% of the total 5,540,090 votes cast. The high-water mark identified by the NCDP is "nearly 5,500 voters," NCDP Br.1, which is still orders of magnitude below the "10 percent of the

total votes cast" that is the kind of "massive" disenfranchisement Movants need to allege. *Bennett*, 140 F.3d at 1226.[2]

Moreover, the North Carolina Supreme Court's order requires the Board to notify voters who cast their ballots without a photo-ID and give them the opportunity to cure and have their votes counted. That fact further distinguishes *Burns*, which involved "the cancelling of the ballots" of 10% of voters with no opportunity to cure. 570 F.2d at 1074. Here, the North Carolina Supreme Court gave the affected voters thirty days to provide proof of photo-ID or file an exemption form. The notion that "the notice and cure process disenfranchises voters" is "in tension with longstanding Supreme Court precedent." *Brink*, 599 F. Supp. 3d at 362. The Supreme Court has "rejected the idea that a *voter's failure* to follow a regulation could be said to disenfranchise that voter." *Id.* (citing *Rosario v. Rockefeller*, 410 U.S. 752, 757-58 (1973)). That the cure opportunity comes after the election makes no difference: whether before or after an election, "if a voter follows instructions, their vote will be counted." *Id.* So "the notice and cure process in this case can never be said to disenfranchise a voter." *Id.*

Movants lack of support for their requested remedy to force the Board to count unlawful votes confirms that the issue here was not "massive." *Bennett*, 140 F.3d at 1226.

---

[2] Judge Griffin challenged over 5,500 overseas ballots in six counties that accepted overseas ballots without requiring photo identification. Under the state court judgment, all ballots submitted by Never Residents statewide are illegal and must be excluded from the vote count. So far, Judge Griffin has received records from counties indicating that more than 500 Never Residents voted in the election. *See* Doc.76-1 at 16-17.

When election problems "permeate[] an election," as Movants' best cases require them to show, courts have ordered "that a new [election] be held." *Burns*, 570 F.2d at 1077. That no Movant demands a new election undercuts their claims that the problems of unlawful voting were widespread. In contrast to the state court in *Burns*, which removed roughly 10% of the ballots from the count, *id.* at 1067, the state court judgment orders a modest solution to the limited problem: notify the qualified voters who cast unlawful ballots and permit them a reasonable time to cure the deficiency.

**B.** **There are no procedural due-process or right-to-vote violations.**

The Democratic Party and League of Women Voters bring procedural due-process and federal right-to-vote challenges against the court-ordered notice-and-cure period. Both claims misunderstand the law.

**1.** **The *Anderson-Burdick* test applies to Movants' procedural due-process and right-to-vote claims.**

Movants acknowledge that *Anderson-Burdick* applies to their right-to-vote claim, but they argue that *Mathews v. Eldridge* applies to their procedural due-process claim. While the Fourth Circuit "has not addressed this issue, all three circuits to consider the question have applied *Anderson/Burdick* instead of *Mathews*." *Brink*, 599 F. Supp. 3d at 361 (collecting cases). Movants cite one district court that has applied *Mathews*. But "the reasoning of the Fifth, Ninth, and Eleventh Circuits" is "more persuasive," and the "Supreme Court has affirmatively said that a Court considering a challenge to a state election law under the First and Fourteenth Amendments '*must* resolve such a challenge'

under the *Anderson/Burdick* balancing test." *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Even if *Mathews* applied, it's "conceptually duplicative" of *Anderson-Burdick* and requires the same outcome here. *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020).

Under *Anderson-Burdick*, Movants must satisfy a two-step test. They shoulder a heavy burden at each step, because rules that govern elections are "'inevitabl[e]'" and "necessar[y]" if elections are to "'honest'" and "'orderl[y].'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). First, Movants must provide "admissible and reliable evidence that quantifies the extent and scope" of the burden. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009). The "extent of the burden" is "a factual question" on which Movants bear "the burden of proof." *Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1124 (9th Cir. 2016). Second, Movants must show that the burden outweighs the State's proffered interests. *Timmons*, 520 U.S. at 358. Only when an election procedure "subject[s]" voting rights "to 'severe' restrictions" does a court apply strict scrutiny. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Election procedures that "impose[] only 'reasonable, nondiscriminatory restrictions'" are "'generally'" justified by "'the State's important regulatory interests.'" *Id.* Indeed, "articulating an interest is a low bar" and the State "is *not required* to support its legitimate interest with empirical evidence of any kind." *Brink*, 599 F. Supp. 3d at 363-64.

## 2. Movants allege only *de minimis* burdens.

There is no constitutional right to be free from "the usual burdens of voting." *Crawford*, 553 U.S. at 198 (op. of Stevens, J.). Contrary to Movants' rhetoric, no one is disenfranchised who fails to heed reasonable time, place, and manner rules on voting. *Rosario*, 410 U.S. at 758. Any inability to vote is "not caused by [the rules], but by [voters'] own failure to take timely steps to [comply]." *Id.* Even "the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph" to obtain an identification is not "a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198.

Movants don't allege anything close to that level of burden here. Rather, they "primarily argue that the notice and cure process disenfranchises voters" who may "fail to fill out the absentee ballot correctly." *Brink*, 599 F. Supp. 3d at 362. But "the notice and cure process in this case" is "at most, a minimal burden" on voters. *Id.* (cleaned up). "All a voter must do to comply with the process is act in a timely fashion." *Id.*

Movants argue the notice-and-cure deadline is too early. *E.g.*, NCDP Br.17. But this date is "reasonably related to the state's need to process absentee ballots in a timely fashion." *Brink*, 599 F. Supp. 3d at 362. They also argue that a voter could miss the cure deadline because of postal delays outside of their control. *E.g.*, NCDP Br.17. But the thirty-day notice-and-cure period is enough time to avoid any postal delay in most cases. In any event, "any postal delays would also be out of the state's control." *Brink*, 599 F. Supp. 3d at 362 n.20. "This Court cannot conclude that speculating about postal delays

for hypothetical absentee voters somehow renders [North Carolina's] absentee ballot system constitutionally flawed." *Id.* (cleaned up). Movants haven't "cited any authority suggesting that a State must afford every voter multiple infallible ways to vote" and "mail-in ballot rules that merely make casting a ballot more inconvenient for some voters are not constitutionally suspect." *Tex. LULAC v. Hughs*, 978 F.3d 136, 146 (5th Cir. 2020).

### 3. Compelling state interests justify enforcement of North Carolina's election laws.

Where the State's election procedures impose only a minimal burden, "'important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434. The state need only "articulate its asserted interests." *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 719 (4th Cir. 2016). Here, the North Carolina Supreme Court agreed the State had compelling interests in not counting unlawful ballots.

***First***, North Carolina has a compelling interest in protecting its citizens from "unlawful votes" which "disenfranchise[] those voters who cast legal ballots." *Griffin II*, 2025 WL 1090903, at *2 (cleaned up). "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (cleaned up).

***Second***, the State has a compelling interest in "a fair count" which must be "held inviolable to preserve our democracy." *Griffin II*, 2025 WL 1090903, at *2 (cleaned up).

"There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford*, 553 U.S. at 195-96. "[D]ue to the minimal burden placed on voters" and North Carolina's numerous "interests that multiple courts have upheld as important in the past," Movants "fail to state a claim for relief as a matter of law." *Brink*, 599 F. Supp. 3d at 364.

### C. There is no Equal Protection Clause violation.

Movants' equal-protection claims fail at the outset because the *Anderson-Burdick* test, not *Bush v. Gore*, applies to equal-protection challenges to state law. "The Supreme Court has addressed [Equal Protection] claims" against state election laws "using a single analytic framework." *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (citing *Anderson*, 460 U.S. at 787 n.7). So Movants' equal-protection claims fail for the same reason their due-process claims fail. *See supra* Section II.B. In any event, *Bush* was "limited to the present circumstances" of that case. 531 U.S. 98, 109 (2000). For at least four reasons, *Bush* doesn't apply.

**First**, "*Bush* is of limited precedential value." *Wise*, 978 F.3d at 100 n.7. Circuit courts have questioned whether *Bush* applies "to more than the one election to which the Court appears to have limited it." *E.g.*, *Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008). Even if it applied, Movants offer no reason to extend *Bush*'s rule—which involved a national federal presidential election—to a local state election. "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Anderson*, 460 U.S. at 794-95. But that uniquely national interest isn't

implicated here. Outside the context of "an election for the President of the United States," "comity and respect for federalism compel us to defer to the decisions of state courts on issues of state law." *Bush*, 531 U.S. at 112 (Rehnquist, C.J., concurring).

**Second**, "[a]t best, *Bush* applies only in 'special… circumstances' not present in this case." *Kim v. Bd. of Educ. of Howard Cnty.*, 641 F. Supp. 3d 223 (D. Md. 2022), *aff'd*, 93 F.4th 733 (4th Cir. 2024). *Bush*'s specific-standards test applied "only because it was a court-ordered recount." *Lemons*, 538 F.3d at 1106. *Bush* cabined its reasoning to "the special instance of a statewide recount under the authority of a single state judicial officer." 531 U.S. at 109. And that recount provided election officials with no standards by which to determine voter "intent" when examining ambiguously marked ballots, resulting in disparate treatment of similarly situated voters across counties. *Id.* at 105-06. Here, the ID and residency requirements are "sufficiently uniform and specific to ensure equal treatment of voters." *Cf. Lemons*, 538 F.3d at 1106. Voters either satisfy them, or they don't.

**Third**, *Bush* reaffirmed that, to address the "many complexities" of election processes, "local entities" may "develop different systems." *Id.* Indeed, under the Equal Protection Clause, "the methods by which a voter casts his vote may vary throughout the state." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 181 (4th Cir. 1983). "Even when boards of elections 'vary … considerably' in how they decide to reject ballots, those local differences in implementing statewide standards do not violate equal

protection." *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377, 388 (3d Cir. 2020) (quoting *Husted*, 837 F.3d at 635-36). That voters in some counties will take advantage of the notice-and-cure procedures under the state Supreme Court's order while others may not doesn't present a *Bush v. Gore* problem. *Cf. Boockvar*, 502 F. Supp. 3d at 922. Under Movants' theory, the Equal Protection Clause requires every candidate contesting an election to file in every county across the State. But candidates routinely file in only a handful of counties given various constraints on the process. *E.g.*, Joshua A. Douglas, *Procedural Fairness in Election Contests*, 88 Ind. L.J. 1, 18 (2013). Correcting election errors in one location doesn't require correcting all errors across the State.

**Fourth**, since "*Bush v. Gore* does not federalize every jot and tittle of state election law," stating "a violation of the Equal Protection Clause" requires "more than" allegations of "variation from county to county." *Trump for President*, 830 F. App'x at 388. It requires allegations that the State "place[d] an onerous burden on voters' exercise of their right to vote." *Hendon*, 710 F.2d at 181. But the North Carolina Supreme Court's order makes it easier to vote and have one's vote counted—not harder. North Carolina law allows a cure period of only three days following Election Day. N.C.G.S. §163-230.1(e1). The North Carolina Supreme Court's order extends that period for *thirty* days. While Movants argue that complying with the cure process is a "burden[]," Riggs Br.11, requiring a voter to cure a defective absentee ballot "only places a minimal burden on voters," *Brink*, 599 F. Supp. 3d at 361. "All a voter must do to comply" with the cure

process "is act in a timely fashion." *Id.* at 363. And a "[r]easonable regulation" of elections "*does* require [voters] to act in a timely fashion." *Burdick*, 504 U.S. at 438.

Finally, the thirty-day deadline established by the North Carolina Supreme Court is "reasonably related to the state's need to process absentee ballots." *Brink*, 599 F. Supp. 3d at 363. "Elections must end sometime." *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 28 (2020) (Gorsuch, J., concurring). And the notice-and-cure procedure furthers the State's weighty interest in ensuring that only lawful votes are counted. *Eu v. S.F. Cnty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989).

### D.    There is no National Voter Registration Act violation.

The North Carolina Democratic Party argues that the State's prohibition on Never Residents voting in the State's elections violates the NVRA. NCDP Br.21-22. For at least six reasons, the claim is meritless.

**First**, the NVRA applies to voter registration, not election procedure. "Congress did not intend the NVRA to regulate voting procedures in elections or election challenges." *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 722 (S.D. Miss. 2014). To the contrary, "States have enacted detailed election codes establishing procedures for voting and election contests" and "[i]n enacting the NVRA, Congress gave no indication that it intended" to "preempt State laws concerning the election process." *Id.* The NVRA establishes "a complex superstructure of federal regulation atop state *voter-registration* systems." *Arizona v. Inter-Tribal Council of Ariz. (ITCA)*, 570 U.S. 1, 5 (2013) (emphasis added). Since the NVRA concerns voter *registration*, it doesn't regulate state-specific

24

rules for *voting* absentee in state elections. The NCDP doesn't cite any case applying the NVRA to prohibit a State from refusing to count ballots submitted by non-residents. The two cases the NCDP does cite involved challenges to *voter registrations*, not *ballots*. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014); *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, 2018 WL 3748172, at *12 (M.D.N.C. Aug. 7, 2018).

**Second**, the NVRA doesn't apply to state elections. As this Court previously observed, "[t]he NVRA requires States to provide simplified systems for registering to vote in federal elections, i.e., elections for federal officials, such as the President, congressional Representatives, and United States Senators." Doc.50 at 8, No. 5:24-cv-724 (cleaned up). The Constitution "does not give Congress the power to directly regulate state voter registration procedures in state elections or state ballot issues." *Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000). And "[a]bsent the invocation by Congress of its authority under the Fourteenth [or Fifteenth] Amendment[s]," the States retain "the power to fix the time, place, and manner of the election of [their own] officials." *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995).

**Third**, the NCDP's reading of the NVRA raises "serious constitutional doubts." *ITCA*, 570 U.S. at 17. "Prescribing voting qualifications" forms "no part of the power" of "the national government." *Id.* (cleaned up). Rather, North Carolina alone has the "constitutional authority" to not only "establish qualifications" such as residency for voting but also "enforce" those qualifications by "obtaining the information necessary"

to verify a voter's residency. *Id.* at 16-17. Yet the NCDP's interpretation of the NVRA strips North Carolina of the "power to enforce" its residency qualification by forcing the State to count illegal votes submitted by Never Residents. *Id.* at 17. If adopted, this novel interpretation of the NVRA would "by degrees subvert the Constitution." *Id.* (cleaned up).

**Fourth**, even if the NVRA applied, the North Carolina Supreme Court's order isn't a systematic removal program. *Contra* 52 U.S.C. §20507(c)(2)(A). The term "program" in the NVRA refers to a procedure that is "systematically carried out in service of a specified end—maintenance of the voter rolls." *Cf. Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1338 (N.D. Ga. 2016). The Court's order isn't systematically carried out. It is a response to the episodic event of a candidate-initiated post-election contest. And the order doesn't call for voter-roll maintenance. Rather, it concerns the counting of illegal votes. The order isn't "systematic," and it isn't an NVRA "program." So the NVRA doesn't regulate it.

**Fifth**, the North Carolina Supreme Court's order authorizes the Board of Elections to act only based on individualized information. The NVRA's "90 Day Provision" does "not bar a state from investigating" potential non-residents and "removing them on the basis of individualized information, even within the 90–day window." *Arcia*, 772 F.3d at 1348. To the contrary, "[t]he 90 Day Provision by its terms only applies to programs which 'systematically' remove the names of ineligible voters." *Id.* Since the

Court's order allows removals only based on individualized information, it doesn't violate the NVRA.

**Sixth**, the NVRA "protects only 'eligible' voters from unauthorized removal." *Bell*, 367 F.3d at 592. It doesn't apply to Never Residents. *Id.* Under the NVRA, North Carolina is "free to take reasonable steps, as have other states, to see" that all registrants "actually fulfill the requirement of bona fide residence." *Id.* There is no "bar" in the NVRA that prevents "continuing consideration of a voter's residence." *Id.* at 591-92. Instead, the NVRA "encourages" North Carolina "to maintain accurate and reliable voting rolls." *Id.* at 592. Since the NVRA "protects only 'eligible' voters from unauthorized removal" and doesn't apply to Never Residents who were "improperly registered in the first place," the NVRA claim fails. *Id.*

## III. Movants are not entitled to a preliminary injunction.

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). The moving party must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Movants bear the burden of proving each prong. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). "For election cases in particular, preliminary injunctions are disfavored and require the movant to satisfy an even heavier burden of showing that the four factors listed above weigh

27

heavily and compellingly in movant's favor." *STOP Hillary PAC v. FEC*, 166 F. Supp. 3d 643, 647 (E.D. Va. 2015) (cleaned up).

As Sections I-II explain, this Court should abstain from addressing Movants' arguments, and those arguments fail on the merits. Their preliminary injunction motions also fail because they would cause Judge Griffin irreparable harm, and because the equities follow the merits.

### A. Counting "unlawful ballots" would irreparably harm Judge Griffin.

Throughout this litigation, Justice Riggs has claimed that not counting lawful votes would cause irreparable harm. Pet. for Writ of Supersedeas at 7, 10, *Griffin I*, No. 320P24-3 (N.C. Apr. 6, 2025). But now that the North Carolina courts have confirmed that those votes are *unlawful*, the argument doesn't hold water. "[T]he right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick*, 504 U.S. at 441. According to the North Carolina courts, ballots of Never Residents and overseas ballots submitted without ID are "unlawful ballots." *Griffin I*, 2025 WL 1021724, at *14. Counting those ballots violates state law. That "inaccurate vote tally" would injure Judge Griffin. *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020); *accord Bush*, 531 U.S. at 1047 (Scalia, J., concurring) ("The counting of votes that are of questionable legality … threaten[s] irreparable harm" to candidates.).

Counting those unlawful votes further injures Judge Griffin by potentially depriving him of an office to which he is lawfully entitled. There's no question that if the

recount breaks in Judge Griffin's favor, he will "be elected by the qualified voters" and constitutionally entitled to "hold office" as a North Carolina Supreme Court Justice. N.C. Const. art. IV, §16. Courts have recognized that similar "deprivation[s]" of a "statutory right" to an office constitute irreparable harm. *E.g.*, *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). The harm is not mere "job loss" or a claim for "lost earnings." *Dellinger v. Bessent*, 2025 WL 471022, at *13 (D.D.C. Feb. 12, 2025). "[T]he loss of the ability" to fulfill a statutory or constitutional duty "cannot be remediated with anything other than equitable relief." *Id.* at *11. Should he win, Judge Griffin would be "appointed for a fixed term" that ticks by each day this election contest remains unresolved. *Id.* Meanwhile, Justice Riggs continues to sit on the court, N.C. Const. art. IV, §16, which poses an "obviously disruptive effect" on the North Carolina Supreme Court's "activities," *Berry*, 1983 WL 538, at *5. The harms in this case "overlap[] considerably" with the parties' "argument[s] on the merits." *Dellinger*, 2025 WL 471022, at *13. But if Judge Griffin is deprived of a lawful office, there can be no doubt that harm is "indeed significant, impending, and irreparable." *Id.*

## B. The equities and public interest tilt against enjoining enforcement of the North Carolina Supreme Court's order.

The equities have only moved further in Judge Griffin's favor since this case was last here. Riggs asks the Court to require the Board to count ballots that the state courts have deemed "unlawful" under state law. *Griffin I*, 2025 WL 1021724, at *14. "To permit unlawful votes to be counted along with lawful ballots in contested elections effectively

'disenfranchises' those voters who cast legal ballots." *Griffin II*, 2025 WL 1090903, at *1 (cleaned up). The public has an interest in preserving the integrity of its elections. *See Purcell*, 549 U.S. at 4. And the equities favor ensuring that unlawful votes don't dilute lawful votes. *See Reynolds*, 377 U.S. at 555.

The public interest is also served by enforcing state law adopted by the North Carolina General Assembly and applied by the North Carolina courts. Justice Riggs would prefer to enforce executive regulations. Riggs Br.8-9. But "allow[ing] an executive branch official to negate the duly-enacted election laws of a state" is "toxic to the concepts of the rule of law and fair elections." *Carson*, 978 F.3d at 1061. "[I]t is in the public interest to maintain the integrity of elections by ensuring the ability to separate and count only those ballots cast according to law." *Id.*

Finally, the equities weigh against intruding on the state election contest. To enjoin enforcement of state court judgments would "intrude on the role of the states," "raise the possibility of inconsistent judgments concerning elections," "erode the finality of results," "give candidates incentives to bypass the procedures already established," and "involve federal courts in the details of state-run elections." *Hutchinson*, 797 F.2d at 1285. The "Fourth Circuit has emphasized" that courts must consider "the functional structure embodied in the Constitution," and "the nature of the federal court system" when deciding election cases. *Lecky*, 285 F. Supp. 3d at 921 (cleaned up). And "were an injunction granted in this case, it might also provide incentives for candidates and voters to ignore the principal routes established to challenge an election." *Id.* at 922.

30

"Inequity would result" if the Court were to enjoin election officials from following state law. *Hirsch*, 741 F. Supp. 3d at 345. For these reasons, "the balance of harms weighs in favor of preserving the ability to uphold the duly enacted election law of [North Carolina] and the rule of law." *Carson*, 978 F.3d at 1061.

## CONCLUSION

The Court should deny the motions and dismiss the cases.

This 21st day of April, 2025.

Respectfully submitted,

*/s/ Craig D. Schauer*

Thomas R. McCarthy*
Conor D. Woodfin*
William Bock IV*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
conor@consovoymccarthy.com
wbock@consovoymccarthy.com

*Local Rule 83.1(d) special appearances forthcoming*

Craig D. Schauer
41571 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
cschauer@dowlingfirm.com

Troy D. Shelton
48070 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
tshelton@dowlingfirm.com

W. Michael Dowling
42790 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
mike@dowlingfirm.com

*Counsel for Judge Griffin*

31

## CERTIFICATE OF COMPLIANCE

This document complies with Local Rule 7.2(f)(2) because it contains less than 8,400 words excluding the parts that can be excluded.

*/s/ Craig D. Schauer*

## CERTIFICATE OF SERVICE

I certify that I electronically filed this brief using the court's CM/ECF system and that I have electronically mailed the documents to all non-CM/ECF participants.

*/s/ Craig D. Schauer*