**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| CARRIE CONLEY et al., | |
| *Plaintiffs,* | |
| v. | |
| ALAN HIRSCH et al., | |
| *Defendants.* | |

| | |
|---|---|
| JEFFERSON GRIFFIN, | |
| *Plaintiff,* | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | |
| *Defendant,* | |
| and | |
| ALLISON RIGGS et al., | |
| *Intervenor-Defendants.* | |

Case Nos.   5:25-cv-00193-M
5:24-cv-00731-M (lead)
5:24-cv-00699-M

**VOTER PLAINTIFFS CARRIE CONLEY, LOCKHART WEBB, ELLA KROMM, GABRIELA ADLER-ESPINO, AND THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA'S OPENING BRIEF RE: APRIL 12, 2025 ORDER TO RESOLVE "REMAINING FEDERAL ISSUES" AND, IN THE ALTERNATIVE, SECOND MOTION FOR INJUNCTIVE RELIEF**

| | |
|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY, | |
| *Plaintiff,* | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS et al., | |
| *Defendants.* | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    I.    Plaintiffs and the putative Class are eligible, qualified voters who voted according to settled rules governing military and overseas voters. ........................................................ 2

    II.   The 2024 election rules were well-established and repeatedly communicated to voters. .. 4

    III.  North Carolina courts grant Griffin's unprecedented post-election request to change settled voting rules and subvert the democratic process. .................................................... 7

LEGAL STANDARD ........................................................................................................... 8

ARGUMENT ........................................................................................................................ 8

    I.    The retroactive, discriminatory disqualify-then-cure process is unconstitutional. ............ 8

        A.   The disqualify-then-cure process violates substantive due process by retroactively invalidating Plaintiffs' votes, based on *post hoc* rule changes and administrative error. .................................................................................................................... 9

        B.   The process violates Plaintiffs' Equal Protection rights by selectively targeting UMOVA voters in some counties, but not materially identical voters in others. ......... 13

        C.   The process violates Plaintiffs' fundamental right to vote. .......................................... 15

        D.   The process violates Plaintiffs' procedural due process rights because Plaintiffs received no predeprivation process, and postdeprivation process is inadequate. ......... 18

    II.   An injunction is warranted to preserve the status quo, avert irreparable harm, and protect the public interest. ........................................................................................................ 22

        A.   An injunction is necessary to avert four types of irreparable harm the Plaintiffs and the putative Class will suffer. ....................................................................................... 22

        B.   The balance of hardships favors Plaintiffs. ................................................................. 25

        C.   Protecting voters' rights serves the public interest. ..................................................... 25

CONCLUSION .................................................................................................................... 26

CERTIFICATE OF COMPLIANCE ................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983)......................................................................................................16

*Bennett v. Yoshina,*
    140 F.3d 1218 (9th Cir. 1998) .............................................................................10, 11

*Brakebill v. Jaeger,*
    905 F.3d 553 (8th Cir. 2018) ......................................................................................16

*Briscoe v. Kusper*,
    435 F.2d 1046 (7th Cir. 1970) ....................................................................................11

*Buckley v. Am. Const. L. Found., Inc.*,
    525 U.S. 182 (1999)......................................................................................................17

*Burdick v. Takushi.*,
    504 U.S. 428 (1992)......................................................................................................15

*Bush v. Gore,*
    531 U.S. 98 (2000)................................................................................................ *passim*

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985)......................................................................................................18

*Conley v. Hirsch,*
    No. 5:25-cv-00193 (NCED 2025)..................................................................................2

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) (opinion of Stevens, J.)........................................................15, 17

*Democracy N.C. v. NCSBE,*
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ...................................................................9, 18

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ......................................................................................25

*Donald J. Trump for President, Inc., v. Boockvar,*
    493 F. Supp. 3d 331 (W.D. Pa. 2020).........................................................................17

*Dunn v. Blumstein,*
    405 U.S. 330 (1972)..........................................................................................13, 15, 26

*E. Enterprises v. Apfel*,
  524 U.S. 498 (1998)............................................................................................10

*Elrod v. Burns*,
  427 U.S. 347 (1976)............................................................................................24

*Frank v. Walker*,
  819 F.3d 384 (7th Cir. 2016) ............................................................................16

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ............................................................................25

*Gray v. Sanders*,
  372 U.S. 368 (1963)......................................................................................14, 16

*Greidinger v. Davis*,
  988 F.2d 1344 (4th Cir. 1993) .....................................................................16, 17

*Griffin v. Burns*,
  570 F.2d 1065 (1st Cir. 1977)..............................................................................9

*Griffin v. NCSBE*,
  2025 WL 1021724 (Ct. of Appeals NC April 4, 2025) ..............................7, 20, 22

*Griffin v. NCSBE*,
  2025 WL 1090903 (Sup. Ct. NC April 11, 2025)........................................ *passim*

*Griffin v. NCSBE*,
  24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 7, 2025)..........................................7

*Hall v. Hall*,
  584 U.S. 59 (2018)................................................................................................8

*Harris v. McCrory*,
  2016 WL 6920368 (M.D.N.C. Feb. 9, 2016)......................................................23

*Hendon v. N.C. State Bd. of Elections*,
  710 F.2d 177 (4th Cir. 1983) ............................................................... *passim*

*Hoblock v. Albany Cnty. Bd. of Elections*,
  487 F. Supp. 2d 90 (N.D.N.Y. 2006)..................................................................12

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
  174 F.3d 411 (4th Cir. 1999) ............................................................................25

*Hunter v. Hamilton Cnty. Bd. of Elections*,
  635 F.3d 219 (6th Cir. 2011) ............................................................................13

*Kendall v. Balcerzak*,
    650 F.3d 515 (4th Cir. 2011) ....................................................................18

*Kim v. Bd. of Ed. of Howard Cnty.*,
    93 F.4th 733 (4th Cir. 2024) .....................................................................14

*Landgraf v. USI Film Prod.*,
    511 U.S. 244 (1994).....................................................................................9

*League of Women Voters of Fla., Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ....................................................16

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Circ. 2024)........................................................11, 23, 26

*League of Women Voters of S.C. v. Andino*,
    497 F. Supp. 3d 59 (D.S.C. 2020)........................................................18, 21

*In re Linkous*,
    990 F.2d 160 (4th Cir. 1993) ....................................................................19

*Mathews v. Eldridge*,
    424 U.S. 319 (1976).......................................................................18, 19, 20, 22

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ...................................................................13

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950).....................................................................................20

*N.C. State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ....................................................................15

*Ne. Ohio Coal. for Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) ..............................................................12, 16

*Pierce v. N.C. State Bd. of Elections*,
    97 F.4th 194 (4th Cir. 2024) ..............................................................18, 26

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006).........................................................................................26

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
    762 F. Supp. 1354 (D. Ariz. 1990) ..........................................................19

*Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*,
    827 F.3d 333 (4th Cir. 2016) ....................................................................13

*Ramirez v. Collier*,
595 U.S. 411 (2022)............................................................................................25

*Reynolds v. Sims*,
377 U.S. 533 (1964)..............................................................................................8

*Roe v. Alabama*,
43 F.3d 574 (11th Cir. 1995) ............................................................................9, 11

*Rum Creek Coal Sales, Inc. v. Caperton*,
926 F.2d 353 (4th Cir. 1991) ..............................................................................24

*Self Advoc. Sols. N.D. v. Jaeger*,
464 F. Supp. 3d 1039 (D.N.D. 2020)...................................................................19

*Sharma v. Hirsch*,
121 F.4th 1033 (4th Cir. 2024) ..............................................................................7

*Slochower v. Bd. of Educ.*,
350 U.S. 551 (1956)............................................................................................12

*Todman v. Mayor & City Council of Baltimore*,
104 F.4th 479 (4th Cir. 2024)..............................................................................19

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008)..................................................................................................8

*Wright v. North Carolina*,
787 F.3d 256 (4th Cir. 2015) ..............................................................................13

**Statutes**

N.C.G.S.
§ 143B-30.1 ...........................................................................................................5
§ 150B-21.9 ...........................................................................................................5
§ 163-230.1 ............................................................................................................5
§ 163-90.3 ..............................................................................................................5
§ 163-258.2 .........................................................................................................2, 5
§ 163-258.4 ............................................................................................................5
§ 163-258.10 ..........................................................................................................6
§ 163-258.13 ..........................................................................................................5
§ 163-258.17 ..........................................................................................................5

## INTRODUCTION

The U.S. Constitution forbids states from discarding votes cast by qualified voters based on the retroactive and selective application of new voting rules articulated after an election has occurred. This principle is foundational: "The Constitution protects the right of qualified citizens to vote and to have their votes *counted as cast*." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 180 (4th Cir. 1983) (emphasis added). And the government must respect "the equal dignity owed to each voter"—it cannot "accord[] arbitrary and disparate treatment to voters *in its different counties*." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (emphasis added).

The uncontested rules governing the 2024 North Carolina general election provided that military and overseas voters were not required to provide a copy of their photo ID when they voted absentee. Instead, they signed an affirmation of their identity under penalty of felony perjury. This rule was rooted in state and federal law, codified in unanimously approved state regulations, and repeatedly communicated to voters by election officials. Nevertheless, in the weeks after his loss in the election to Seat Six of the North Carolina Supreme Court, Judge Jefferson Griffin launched an unprecedented campaign in state court to overturn that status quo and discard enough votes to reverse the result. This Court previously exercised its discretion to forego deciding the important federal issues raised by Griffin's challenges because the state courts could obviate the need for federal review. They did not. Rather, the state courts partially ratified Griffin's efforts by ordering the state Board of Elections (NCSBE) to retroactively invalidate more than 1,000 military and overseas voters (a number that Griffin now tries to increase to disqualify *more voters*, despite his own prior representations and miscues).

Defendants, NCSBE's members and its executive director, are set to carry out the unconstitutional order to presumptively "omit" ballots cast and counted nearly half a year ago, unless and until voters "timely cure … deficiencies" first identified on April 11, 2025. Defendants

1

will retroactively apply a new rule requiring *some* overseas and military voters to submit a copy of photo ID to have their ballots counted, the opposite of the rule in place during the election. Defendants will then compound this unlawfulness by applying the retroactive changes only to the subset of voters whom Griffin challenged for partisan reasons. This deprivation of voters' fundamental rights will occur despite voters having no predeprivation notice and opportunity to be heard, and unless voters complete an inevitably defective postdeprivation process. These actions transgress bedrock constitutional guarantees and must be enjoined.

## BACKGROUND

Plaintiffs include three individuals representing a putative Class of military and overseas voters whose votes are set to be disqualified, and the League of Women Voters of North Carolina, whose members include members of the putative Class. Plaintiffs describe the procedural background in their initial preliminary injunction brief, which they incorporate here. *See Conley v. Hirsch*, No. 5:25-cv-00193, ECF 12. Below, Plaintiffs summarize key facts and their reliance interests in having their votes counted.

**I.      Plaintiffs and the putative Class are eligible, qualified voters who voted according to settled rules governing military and overseas voters.**

North Carolina's Uniform Military and Overseas Voter Act (UMOVA) covers Plaintiffs and the Class they represent. Specifically, Plaintiffs are eligible voters who were either living overseas and "last eligible to vote in this State and, except for a State residency requirement, otherwise satisf[y] this State's voter eligibility requirements," N.C.G.S. § 163-258.2(1)(c), or "a spouse or dependent of a" "uniformed-service voter" as described in UMOVA, *see id.* (1)(a), (2), (6), (7). They include longtime registered voters who, for years, have relied on instructions from election officials regarding how to vote absentee.

Plaintiff Carrie Conley is a Guilford County voter whose husband is an active-duty U.S. Army soldier stationed in Italy. Ex. 1, Conley Decl. ¶¶4, 6. Conley is a longtime voter who voted in 2024 using the UMOVA online portal, as she had previously. *Id.* ¶8. She learned that her vote was in jeopardy recently after seeing a social media post about Griffin's protests; she received no official notice. *Id.* ¶¶12-14. Conley knows "the struggle to extend voting rights to women and people of color has been long and hard-won," and "it makes [her] both sad and angry to feel as if we're going backwards – and that [her] own vote may fall victim to that backsliding." *Id.* ¶15.

Plaintiff Lockhart Webb is a Guilford County voter who voted from Switzerland, where her husband completed his PhD. Ex. 2, Webb Decl. ¶¶5-8. She voted absentee by submitting a Federal Post Card Application then voting through the online portal. *Id.* ¶10. The instructions she received from Guilford Country for requesting and submitting her ballot did not direct or prompt her to attach photo ID. *Id.* ¶¶11-13, 23-24, Exs. A-B. Since the 2024 election, Webb has moved and is in the process of returning to North Carolina. *Id.* ¶¶15-17. During this transitional time, she is "concerned about how elections officials will provide notification to [her] about any additional hurdles [sh]e must clear in order for [her] vote in that race to count and about whether [she] will be able to take newly imposed steps to secure [her] vote." *Id.* ¶17.

Plaintiff Ella Kromm is a Durham County voter who, during her ongoing one-year position teaching in Spain, voted via the online portal. Ex. 3, Kromm Decl. ¶¶7-8. She followed all instructions provided to her and received confirmation from Durham County that her vote was successfully cast and counted. *Id.* ¶¶9-12. Kromm is "deeply upset" about "being required to clear additional hurdles" and "being singled out to make it harder for [her] to vote for no valid reason, even though [she] ha[s] followed all the directions [she] ha[s] been given." *Id.* ¶¶15-17. The experience of being targeted has made her "distrustful" of the electoral process. *Id.* ¶18.

Plaintiff League of Women Voters of North Carolina is a nonpartisan, grassroots, membership organization that encourages informed and active participation in government and advocates for its members' rights to vote, many of whom Griffin has targeted. Ex. 4, Second Rubin Decl. ¶¶5-10. One such member is Alana Pierce, a Buncombe County overseas voter who, while completing her PhD in Montreal, voted via the online portal. Ex. 5, Pierce Decl. ¶¶3-4. Pierce followed all the voting instructions she received for the 2024 general election. *Id.* ¶11. Because of these instructions, and because the portal did not provide her with any way to upload a copy of her photo ID, she proceeded with confidence that no photo ID was required. *Id.* ¶¶12-14, 17-21.

Plaintiffs and other members of the putative Class each followed, and justifiably relied upon, election officials' instructions that they did not need to provide a copy of their photo ID when voting. They voted via an online portal that provided no prompt or opportunity to do so. None received adequate notice that their votes were threatened. Some have specific difficulties with navigating the impending disqualify-then-cure process. And many are distressed and losing confidence in the electoral process because of the *post hoc* targeting of their vote.

The voters at risk of disenfranchisement are unrepresentative of North Carolina voters overall and absentee voters specifically. As Plaintiffs' Expert Dr. Christopher Cooper found, targeted voters are nearly *five times more likely* to favor Democratic candidates than Republicans. Ex. 6, Cooper Rep. at 3, 7, 10. Moreover, Dr. Cooper explains that military and overseas voters are especially unlikely to successfully cure their ballot, even under ideal conditions and near elections, and this specific targeted subset, who skew younger, also historically complete cure processes at lower rates. Ex. 8, Cooper Supp. Rep. at 7-10.

## II. The 2024 election rules were well-established and repeatedly communicated to voters.

Plaintiffs voted under the well-established rules for UMOVA voters. Those rules were settled and widely communicated until Griffin sought to reverse his electoral defeat.

In March 2019, the General Assembly enacted a voter ID law. N.C.G.S. § 163-230.1(f1). This new requirement was codified in Article 20 of the state election laws, which applies to domestic civilian voters. *Id.* A separate part, Article 21A, establishes the UMOVA framework for overseas and military voters like Plaintiffs, consistent with related federal laws. *Id.* § 163-258.2(1). Article 21A does not include a photo ID requirement; UMOVA instead requires covered voters to submit an affirmation of their "identity, eligibility to vote, status as a covered voter, and timely and proper completion of an overseas-military ballot," which election officials verify. *Id.* §§ 163-258.4(e), 163-258.17(b). The affirmation form warns that any "material misstatement" risks "a conviction of perjury," a Class I felony. *Id.* §§ 163-258.13, 163-90.3; *see also Griffin*, ECF 1-4 at 34-36 (NCSBE explaining UMOVA requirements).

After the voter ID law was enacted, Defendants promulgated a temporary rule confirming that "[a] covered voter" under Article 21A "*is not required to submit a copy of acceptable photo identification*." Ex. 7, Second Johnson Decl. ¶22. After the voter ID law took effect, Defendants unanimously adopted another temporary rule confirming the same exemption. 08 N.C. Admin. Code 17.0109(d) (Aug. 2, 2023). In March 2024, the Rules Review Commission (appointed by legislative leaders to check agency rulemaking) unanimously approved this rule. Johnson Decl. ¶2; *see also* N.C.G.S. §§ 143B-30.1(a), 150B-21.9(a)(1). The General Assembly's Joint Oversight Committee, which reviews approved agency rules, did not object. *Id.* ¶3. The rule became permanent on April 1, 2024. 08 N.C. Admin. Code. 17.0109.

Consistent with this rule, election officials made it widely known that the photo ID requirement did not apply to UMOVA voters:

- On the NCSBE's FAQ page, officials responded to UMOVA voters asking whether "photo ID [is] required for military and overseas voters (aka, UOCAVA voters)" as follows: "***No. Photo ID is not required for military or overseas voters*** who vote using special absentee voting

procedures that federal law makes available for such voters." Johnson Decl. ¶4 (emphasis added).

▪ The NCSBE webpages about absentee voting made similar representations. *Id.* ¶¶5, 20.

▪ An August 25, 2024, email from the NCSBE counsel to all county elections directors explained that UMOVA voters did not need to provide photo ID. *Id.* ¶8.

▪ A September 4 email from NCSBE to county officials reiterated the same. *Id.* ¶7.

▪ Counties accordingly gave repeated instructions that UMOVA voters did not need to provide a copy of their photo ID and could vote using the Federal Write-in Absentee Ballot that does not require a photocopy of ID. They distinguished the UMOVA absentee voting process from the requirements applicable to the domestic civilian absentee voters, including the ID requirement. *Id.* ¶¶15-20, 25-30; *see also* Webb Decl. ¶¶24-25, Exs. A-B.

▪ For example, Forsyth County instructed: "**Photo ID is not required for military or overseas voters who vote using special absentee voting procedures that federal law makes available for such voters.**" Johnson Decl. ¶15.

Plaintiffs reasonably relied on these instructions. Conley Decl. ¶¶9-11; Webb Decl. ¶¶10-12; Kromm Decl. ¶¶8-12, 15, 21; Pierce Decl. ¶¶11-14. Even if they had tried to submit a photo ID, they lacked a mechanism to do so under the state or federal voting procedures. Approximately 92% of all UMOVA voters used the NCSBE's online portal, which did not prompt or facilitate including photo ID. Cooper Rep. at 5; Cooper Supp. Rep. at 6-7; Johnson Decl. ¶¶6, 24; *see also* N.C.G.S. §§ 163-258.10 ("electronic transmission" process); 163-258.15 (similar).  This includes Plaintiffs. Conley Decl. ¶¶10-11; Webb Decl. ¶¶11-13; Kromm Decl. ¶¶11-12; Pierce Decl. ¶¶13-14. Other voters in the putative Class who mail returned their state UMOVA ballot were not provided with the clear security sleeve that domestic civilian absentee voters use to provide voter ID. Johnson Decl. ¶23. And voters who mailed the Federal Write-in Absentee Ballot, available to vote in state elections, did not receive any instructions (or opportunity) to provide photo ID. *Id.* ¶¶13, 21.

In 2024, North Carolina was "flooded with dozens of challenges to the State's electoral regulations." *Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024). Yet there were no pre-election challenges to the longstanding, widely communicated, and unanimously approved rule that the photo ID requirement did not apply to UMOVA voters.

III.    **North Carolina courts grant Griffin's unprecedented post-election request to change settled voting rules and subvert the democratic process.**

The first time anyone contested the UMOVA-voter rule was when Griffin sought to overturn his election results in part on that basis. *Griffin*, ECF 13-3, at 39. The NCSBE voted unanimously to reject Griffin's protest. *Id*. The superior court then held a hearing—which surfaced no evidence that any targeted voter was ineligible or committed fraud of any sort—and promptly ruled against Griffin. *Griffin v. NCSBE*, 24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 7, 2025).

A state court of appeals majority reversed. *Griffin*, 2025 WL 1021724, at *12. It interpreted state law to conclude that the photo ID requirement for domestic civilian absentee voters also applied to UMOVA voters, despite the longstanding rules and instructions to the contrary. *Id.* While Plaintiffs do not contest that interpretation of state law as applied *prospectively*, the court of appeals went a step further, ruling that because the targeted UMOVA voters did not anticipate that this rule would retroactively apply to them, "their ballots have not been properly cast" and must presumptively be "omit[ted] from the final count," unless the voters re-engage with county officials to "timely cure their deficiencies" in a "verification" process unprecedented in American elections. *Id*. at *15. To carry out this disqualify-then-cure process, Defendants must require any affected counties to "expeditiously identify the military and overseas voters challenged under this protest," "notify said voters of their failure to abide by the photo ID requirement or equivalent," and then "omit from the final count the votes of those voters" unless they "timely cure their deficiencies" in an invented "cure" procedure within "fifteen (15) business days." *Id.*

The state supreme court briefly stayed the mandate. On April 11, however, a 4-2 majority largely upheld the court of appeals decision but "expand[ed] the period to cure deficiencies … to thirty calendar days after the mailing of notice." *Griffin*, 2025 WL 1090903 at *3. Justices Earls and Dietz separately dissented in relevant part, raising the significant federal constitutional problems that arise if Defendants do what the majority ordered them to do. *Id.* at *3-4 (Earls, J., dissenting in relevant part); *id.* at *17-18 (Dietz, J., dissenting in relevant part). Plaintiffs sued on April 14.

## LEGAL STANDARD

Plaintiffs were not involved in the earlier iteration of this dispute removed from state court. While the Court *sua sponte* consolidated that action with Plaintiffs' and a separate action filed by the North Carolina Democratic Party, the Supreme Court has clarified that "one of multiple cases consolidated under [Rule 42] retains its independent character … regardless of any ongoing proceedings in the other cases." *Hall v. Hall*, 584 U.S. 59, 66 (2018).

Thus, Plaintiffs submit this brief in accordance with the Court's April 12 Order in the *Riggs* matter. But Plaintiffs clarify that this brief also constitutes a second motion for preliminary injunctive relief, which is warranted because Plaintiffs are likely to "succeed on the merits" and "suffer irreparable harm in the absence of" relief, "the balance of equities tips in [their] favor," and "an injunction is in the public interest." *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). In the alternative, Plaintiffs move for permanent injunctive relief on the same grounds.

## ARGUMENT

### I. The retroactive, discriminatory disqualify-then-cure process is unconstitutional.

Plaintiffs are likely to succeed on their constitutional claims. Plaintiffs' "constitutionally protected right to vote … and to have their votes counted" is fundamental and "of the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964). The right is a

"constitutionally protected liberty interest" that the Due Process Clause guarantees and that the Equal Protection Clause affords heightened protection. *Democracy N.C. v. NCSBE*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020) (collecting cases). Implementing the disqualify-then-cure plan violates Plaintiffs' substantive due process, equal protection, voting, and procedural due process rights.

### A. The disqualify-then-cure process violates substantive due process by retroactively invalidating Plaintiffs' votes, based on *post hoc* rule changes and administrative error.

Retroactively invalidating Plaintiffs' votes—after they were cast in justifiable reliance on the instructions and rules in place for the election, and based solely on *administrative*, not voter, error—is a grave substantive due process violation. Due process forbids encumbering Plaintiffs' votes in a manner that takes "the election process [to] the point of 'patent and fundamental unfairness'" because doing so "erodes the democratic process." *Hendon*, 710 F.2d at 182 (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1977)). This prohibition applies even if the state actions are mandated by a post-election court order. *See Burns*, 570 F.2d at 1078-79; *Roe v. Alabama*, 43 F.3d 574, 580-81 (11th Cir. 1995). Federal courts are authorized (and required) to prevent states from violating due process rights, without regard to the merits of a state court's interpretation of state law and whatever the state may do to implement changes prospectively. *Burns*, 570 F.2d at 1073.

The disqualify-then-cure plan violates due process for two independent reasons.

First, it is "settled" law in this Circuit that due process forbids applying changes to voting rules that were in effect during an election to retroactively discard votes cast under those rules. *Hendon*, 710 F.2d at 182 (applying *Burns*, 570 F.2d at 1077). This prohibition is rooted in the Due Process Clause's "antiretroactivity principle": the government must "give[] people confidence about the legal consequences of their actions," and "settled expectations should not be lightly

disrupted," *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265-66 (1994). "Retroactivity is generally disfavored in the law … in accordance with fundamental notions of justice that have been recognized throughout history." *E. Enterprises v. Apfel*, 524 U.S. 498, 532 (1998). Applying these principles in the elections context, courts consider "(1) likely reliance by voters on an established election procedure and/or official pronouncements about" the rules; and whether "(2) significant disenfranchisement [will] result[]" from a departure from those rules. *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998) (distilling caselaw).

To start, it is not seriously disputed that Plaintiffs followed settled rules ahead of the election that UMOVA voters were *not* required to provide a photocopy of their ID when voting absentee. Election officials repeatedly told UMOVA voters prior to and during the 2024 election exactly that. *See supra*, Background Part II. Most notably, three consecutive NCSBE rules, approved by the General Assembly's oversight commission, explicitly exempted UMOVA voters from the photo ID requirement applicable to domestic civilian absentee voters. *Id*. Plaintiffs followed these rules, and election officials' repeated instructions, providing that they could vote after signing a sworn Affirmation of Military-Overseas Voter, without having to photocopy and transmit a voter ID. *Id.* The three main options for returning their ballot—online portal, state mailing, federal write-in mailing—did not even provide an opportunity to submit photo ID. *Id.* Yet now, nearly six months after the election, Defendants are ordered to retroactively apply new rules that directly contradict those that UMOVA voters justifiably relied on to vote.

These circumstances are reminiscent of the unconstitutional efforts to discard votes in *Griffin v. Burns*. There, a losing candidate challenged absentee votes cast by registered voters in a primary election and, after the election, the state supreme court reinterpreted state law and ordered the ballots retroactively invalidated. 570 F.2d at 1078-79. The voters sued, and the First Circuit

affirmed that this post-election disenfranchisement violated due process because the "issuance of [absentee] ballots followed long-standing practice; and in utilizing such ballots voters were doing no more than following the instructions" of election officials. *Id.* at 1075-77. The Court did not address the underlying issue of whether state law permitted such ballots; it simply confirmed that "the retroactive invalidation of ballots cast in an officially-endorsed [sic] manner amounted to a constitutional violation." *Id.* at 1073. Other courts have similarly held that due process forbids states from retroactively applying changes to settled election rules. *See, e.g.*, *Roe*, 43 F.3d at 580-81; *Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1970). The disqualify-then-cure process Defendants are implementing fits squarely in this framework of prohibited retroactive disenfranchisement.

Next, by any measure, presumptively invalidating 1,409 UMOVA votes in Guilford County (and up to over 8,600, if Defendants are ordered to apply the disqualify-then-cure process in five counties where Griffin filed untimely protests) is "significant disenfranchisement." *See Bennett*, 140 F.3d at 1226-27. The *Burns* Court found that negating 123 votes was a due process violation. 570 F.2d at 1068. The *Roe* Court did the same for "[b]etween 1000 and 2000 absentee voters." 68 F.3d at 578. The presumptive invalidation of votes here is similarly actionable.

The possibility that some of these voters may "cure" their newfound "deficiencies," *Griffin*, 2025 WL 1090903 at *3, does not alter the due-process analysis under *Burns* and *Hendon*. As the Fourth Circuit stated pointedly: "the basic truth [is] that even one disenfranchised voter—let alone several thousand—is too many." *LWVNC*, 769 F.3d at 244. And, if anything, the disqualify-then-cure process exacerbates the constitutional issue by imposing a new burden on voters who were repeatedly told they did not have to do *anything else* to cast their ballots in the 2024 election. Even if some targeted UMOVA voters do ultimately re-secure their votes, presumptively invalidating

votes cast by eligible voters the state already deemed qualified to vote—and then only counting their vote if they jump through additional hoops in an unprecedented and impromptu process over a rapid thirty-day timeframe—threatens precisely the type of arbitrariness and fundamental unfairness that the Due Process Clause forbids.

Second, due process prohibits election officials from punishing voters for officials' own administrative errors because doing so is "fundamentally unfair." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012); *accord Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 94-97 (N.D.N.Y. 2006). Election officials, not voters, created the circumstances causing UMOVA voters to not submit voter ID. *See supra*, Background Part II. Even if UMOVA voters tried to submit photo ID, as some reportedly did, they lacked any official mechanism to do so or were turned away. *Id*. If these instructions and mechanisms were erroneous, as the state courts concluded, due process still forbids Defendants from presumptively disqualifying qualified voters due to officials' own errors. *See Husted*, 696 F.3d at 591. Indeed, compounding the arbitrariness, the state supreme court recognized an analogous state law principle forbidding retroactive disenfranchisement based on administrative error and ordered Defendants to apply it to one group of voters Griffin targeted, but not to UMOVA voters. *See Griffin*, 2025 WL 1090903 at *2. Blaming voters for administrative errors—but only some voters, and only for some types of errors—is the definition of "arbitrary action" that offends "the very essence of due process." *Slochower v. Bd. of Educ.*, 350 U.S. 551, 559 (1956).

In these circumstances, "where the entire election process including … the state's administrative and judicial corrective process fails on its face to afford fundamental fairness," "federal judge[s] need not be timid, but may and should do what common sense and justice require." *Burns*, 570 F.2d at 1078. Here, this requires enjoining Defendants from undertaking the

disqualify-then-cure process. Any other rule would "permit, if not encourage" what *Griffin* has done here: "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon*, 710 F.2d at 182 (quotations omitted).

### B. The process violates Plaintiffs' Equal Protection rights by selectively targeting UMOVA voters in some counties, but not materially identical voters in others.

Defendants' retroactive application of new election rules to Plaintiffs' ballots because of the county where they voted, but not to tens of thousands of ballots cast by otherwise identically situated voters in other counties, epitomizes the "arbitrary and disparate treatment" of voters that the Equal Protection Clause prohibits. *Wright v. North Carolina*, 787 F.3d 256, 259 (4th Cir. 2015) (quoting *Bush*, 531 U.S. at 104-05). Equal protection guarantees every voter's right "to participate in elections on an equal basis with other citizens." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). The state cannot "value one person's vote over that of another." *Bush*, 531 U.S. at 104-05. These are "rudimentary requirements of equal treatment and fundamental fairness." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 729-30 (9th Cir. 2025); (applying *Bush v. Gore*); *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016) (similar). The "constitutional concern" is heightened in situations involving "discretion in areas 'relevant to the … counting of ballots,'" because when the initial vote tally is known, post-election targeting of *only some* ballots invites political mischief of the kind apparent here. *See Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 235 (6th Cir. 2011).

Defendants are required to unconstitutionally discriminate between Plaintiffs and otherwise identically situated voters solely because of *where* they are registered. Of the approximately 32,000 UMOVA votes that Defendants state have been cast in this contest, only the votes from populous, Democratic-favoring areas will be presumptively invalidated because Griffin

only targeted those areas. Cooper Rep. at 5-8; Johnson Decl. ¶30. Defendants *will* count ballots cast in the same manner in all other counties, without requiring voters there to satisfy the disqualify-then-cure process. This arbitrary differential treatment creates a "preferred class of voters" who happened to vote in counties Griffin left alone. *See Gray*, 372 U.S. at 379-80. But equal protection explicitly prohibits states from "according arbitrary and disparate treatment to voters *in its different counties*," regardless of how the differential treatment of voters originated. *Bush*, 531 U.S. at 107 (emphasis added).

If anything, the constitutional violation here is more egregious than *Bush v. Gore*. Florida's error was to allow "each of the counties [to] use[] varying standards to determine what was a legal vote." *Id*. Here, some votes will be counted and others rejected based on no standards at all and *solely* on which counties the losing candidate decided to target. At least in *Bush v. Gore*, the goal across counties was the same: recount the ballots to arrive at an accurate result. Here, the object is itself differential treatment, targeting some voters and not others, to manipulate the result.

No legitimate interest justifies this discrimination. "[D]isparately treat[ing] similarly situated people" in a manner that "involves a fundamental right" like voting "must survive *exacting* judicial scrutiny." *Kim v. Bd. of Ed. of Howard Cnty.*, 93 F.4th 733, 740-41 (4th Cir. 2024) (emphasis added). Treating Plaintiffs differently from other UMOVA voters, based solely on what county they voted in, serves no legitimate state interest; it only serves Griffin's personal, partisan interests in discarding votes thought to largely favor his opponent. As Dr. Cooper explains, based on the subset of votes Griffin targeted—whether only Guilford (the only timely protest) or also Durham, Forsyth, and Buncombe (the untimely protests)—Republican voters likely to have favored Griffin are nearly *five times less likely* to be subject to the unconstitutional disqualify-then-cure process. Cooper Rep. at 6-8. This fails even rational basis review because "'[f]encing out'

from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Dunn*, 405 U.S. at 355. *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 226 n.6 (4th Cir. 2016) (politicians cannot use state power to "impermissibly dilute or deny the votes of opponent political parties"); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 203 (2008) (opinion of Stevens, J.) (observing that partisan objectives for voting restrictions are not legitimate interests).

The invented disqualify-then-cure process only exacerbates the constitutional issue: presumptively invalidating votes cast by some voters and requiring only them (but not similarly situated voters) to "cure" their ballots is itself arbitrary and disparate treatment. And the success voters will have in this disqualify-then-cure process will vary widely across the Class, based on factors that have nothing to do with their qualifications or eligibility to vote. *See* Cooper Supp. Rep. at 7-11. The selective application of new rules and burdens to Plaintiffs unconstitutionally "value[s] one person's vote over that of another" and cannot stand. *Bush*, 531 U.S. at 104-05.

Thus, Defendants actions to effectuate the state court's order flouts the federal constitutional requirement that voting rules must apply "clear[ly] [and] uniform[ly]" to all voters, *Wise*, 978 F.3d at 100, and meet "the rudimentary requirements of equal treatment" across counties, *Bush*, 531 U.S. at 109. Because targeting UMOVA voters based on the county in which they are registered is arbitrary (and serves only partisan goals), implementing the disqualify-then-cure process violates the Equal Protection Clause and should be enjoined.

### C. The process violates Plaintiffs' fundamental right to vote.

Defendants' actions are unconstitutional under the *Griffin v. Burns* and *Bush v. Gore* frameworks, described above, which squarely apply here. But Plaintiffs also prevail even if the Court were to consider their claims under the *Anderson-Burdick* balancing framework that applies to "*non*discriminatory" and *ex ante* (rather than *ex post*) government infringements of the right of

"access to the ballot." *Burdick*, 504 U.S. at 434 (emphasis added). This is because the disqualify-then-cure process imposes "a burdensome condition on the exercise of the fundamental right to vote." *Greidinger v. Davis*, 988 F.2d 1344, 1350 (4th Cir. 1993). No overriding state interest justifies this burden.

Arbitrarily and presumptively disqualifying Plaintiffs' ballots, despite their reasonable reliance on settled rules and official instructions, is a severe burden on the right to vote that must satisfy—and certainly fails—strict scrutiny. *See Husted*, 696 F.3d at 592. Defendants are carrying out an order to move Plaintiffs' votes from the "include" column, where they belong under settled pre-election rules, to the "omit" column, solely because last fall, they did not comply with a voter ID law that did not apply to them until April 11. This is a complete denial of Plaintiffs' fundamental "right to cast their ballots and have them counted" as cast. *Gray*, 372 U.S. at 380.

For Plaintiffs and the Class to move their votes back to the include column, they must reengage with election officials and provide photo ID—approaching six months after the election, often from abroad—to satisfy this impromptu and rushed process. Even if some affected voters can clear these additional hurdles, many in the putative Class, including some Plaintiffs (*see* Webb Decl. ¶¶15-17), will face difficulties completing the cure process. *See* Cooper Supp. Rep. at 7-11; *cf. Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily."). The targeted voters in particular—military and overseas voters who skew younger—have more difficulty voting and curing than most. Cooper Supp. Rep. at 9-11. These "disparately impose[d] significant burdens on Plaintiffs' rights" warrant heightened scrutiny. *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)); *see also Brakebill v. Jaeger*, 905 F.3d 553, 558-59 (8th Cir. 2018)

("[A] plaintiff can show that an election statute imposes 'excessively burdensome requirements' on *some* voters" (citing *Crawford*, 553 U.S. at 199, 200, 202)).

On the other side of the balance, Defendants cannot show that retroactively targeting and encumbering voters in this manner "advance[s] a compelling state interest that justifies the" burden, or "is narrowly tailored to fulfill that state interest." *Greidinger*, 988 F.2d at 1354. Even if the Court views the burden in lesser terms, such burdens must still "be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (quotation omitted). No sufficiently legitimate or tailored interest supports the burdens here.

As this saga has continued for months, neither Griffin nor anyone else has given any reason to doubt that the targeted UMOVA voters are qualified and eligible to vote in North Carolina elections. Any interest in deterring "voter fraud" would, under these circumstances, be purely conjectural; it simply "does not follow like the night the day" that encumbering Plaintiffs and the Class serves any anti-fraud purposes. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 204 n.23 (1999). And, regardless, targeting Plaintiffs' votes is not sufficiently tailored. Absent *any* evidence of fraudulent voting, Defendants and Griffin each would entirely fail to "demonstrate[e] that fraud is a real, rather than a conjectural, problem" to justify the significant burdens on voters. *See id*. at 210 (Thomas, J., concurring); *see also Donald J. Trump for President, Inc., v. Boockvar*, 493 F. Supp. 3d 331, 406 (W.D. Pa. 2020) (placing burden on fraud proponents to establish factual basis for concern). Moreover, North Carolina already has robust anti-fraud measures that sufficiently deter and prevent even the vanishingly rare voter fraud from occurring. *See Conley*, ECF 12 at 9. UMOVA voters must also sign an affirmation, on threat of felony perjury, that they are following the rules. *See supra*, Background Part II. Defendants cannot show that these "less problematic measures" fall short in protecting election integrity. *Buckley*, 525 U.S. at 204.

Moreover, targeting these voters only undermines voter confidence. *See* Cooper Supp. Rep. at 5-6. Presumptively invalidating Plaintiffs' votes—drawn from a cherry-picked subset of the electorate, for only one race, nearly six months after the election, and despite these voters doing everything election officials told them to do—severely undermines voters' faith in the electoral process. Kromm Decl. ¶¶13-18; Conley Decl. ¶¶13-16; Webb Decl. ¶¶20-21; *see also Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 227 (4th Cir. 2024) (describing confidence and confusion concerns).

At bottom, targeted UMOVA voters will be presumptively disenfranchised based solely on a losing candidate's partisan considerations. *See supra*, Argument Part I.B. That arbitrary, illegitimate interest cannot outweigh the burdens imposed on Plaintiffs and the putative Class.

### D. The process violates Plaintiffs' procedural due process rights because Plaintiffs received no predeprivation process, and postdeprivation process is inadequate.

Finally, the way in which Plaintiffs have been targeted, and the disqualify-then-cure process they must now navigate, violates procedural due process because "the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011) (quotations omitted). "The essential requirements of due process are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). As noted, the right to have one's vote counted is a constitutionally protected liberty interest. *Democracy N.C.*, 476 F. Supp. 3d at 227.[1] To assess the adequacy of procedural protections for such interests, courts "balance the private interest, the risk of erroneous deprivation, and the government's interest." *Id.* (applying *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

---

[1] Numerous other cases, including in this Circuit, apply procedural due process protections to voting. *See League of Women Voters of S.C. v. Andino*, 497 F. Supp. 3d 59, 76 (D.S.C. 2020) (collecting cases).

When a ballot is challenged after it has been cast, the voter must have adequate notice and sufficient *predeprivation* opportunity to protect their rights—in other words, an opportunity that *precedes* resolution of the challenge. *See id.*; *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). Predeprivation process is critical in this context because "there is no possibility of meaningful postdeprivation process when a voter's ballot is rejected." *Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020). Such opportunity is required under *Mathews* because (1) "the private interest that will be affected," i.e., the fundamental right to vote, is substantial; (2) "the risk of an erroneous deprivation" is significant, as wrongful voting deprivations are not susceptible to easy do-overs or a compensable damages remedies; and (3) "the government's interest" in not providing predeprivation process, i.e., erroneously discarding lawful voters, is minimal. 424 U.S. at 335. On the last point, North Carolina itself has calibrated the proper predeprivation process by establishing *pre-canvass* voter challenge procedures to remove actually ineligible voters and those who fail to comply with extant election rules; neither Griffin nor anyone else contested a single UMOVA voter through these procedures. *Griffin*, 2025 WL 1090903, at *11 (Earls, J., dissenting in relevant part).

The predeprivation process here clearly fails federal constitutional standards. The postcard Griffin sent *some* voters fails because it did not provide any clarity about whose rights were at risk, why, the stakes, and how to protect those rights. Such vague, needle-in-a-haystack notice is inadequate. *Todman v. Mayor & City Council of Baltimore*, 104 F.4th 479, 488-89 (4th Cir. 2024); *In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993). But the Court need not reach those issues because the deficiencies are starker here: it is apparent that the overseas voters on Griffin's target list—a substantial portion of the voters—*received no mailing at all*. *See* Conley Decl. ¶¶12-14. For instance, Plaintiff Webb first learned her vote was at risk only days ago. Decl. ¶18. And the

postcard itself indicates that it was mailed only domestically, providing only "US Postage" paid, not international postage that would be required to notify the thousands of affected voters will foreign mailing addresses. *Griffin*, 2025 WL 1090903, at \*11 (Earls, J., dissenting) (providing copy of postcard); Cooper Supp. Rep. at 7 (noting the "thousands" of voters with foreign addresses in voter file). For the affected UMOVA voters, Griffin's postcard was "not "reasonably calculated … to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950).

The predeprivation process also failed to "afford" voters sufficient "opportunity to present their objections." *Id.* No voter was allowed to participate as a party at any stage in Griffin's state court campaign to discard votes. Not hearing from the actual affected voters at any stage is worse than "a mere gesture" at due process; it is flatly insufficient. *See id.* at 315.

The opportunity for further predeprivation notice has passed because the disqualify-then-cure order already adjudicates Plaintiffs' and the putative Class's ballots as having "not been properly cast" and thus, by default, "omit[ted] from the final count" *unless* the voters successfully complete a *post*-deprivation process. *See Griffin*, 2025 WL 1021724, at \*15. As explained, the *Mathews* factors require predeprivation process here. But even if the Court looks to the post-deprivation process to come, that is also constitutionally deficient.

To start, offering Plaintiffs an impromptu "cure" process that state and county election officials will have to invent from whole cloth is insufficient. Not only is this type of "cure" affecting thousands of ballots in a statewide contest nearly six months after the election foreign to North Carolina, but it is unprecedented in American elections. *See* Cooper Supp. Rep. at 4. There is no playbook for conducting this type of postdeprivation process to avoid erroneous deprivations

of the fundamental right to vote.[2] This is precisely the type of "examinations" of voters "without established standards and protocols" that courts warn "carries a very high risk of error." *Andino*, 497 F. Supp. 3d at 76 (collecting cases in the signature match context).

The marginal success that the postdeprivation process could produce is also highly dependent on the answers to critical questions that are thus far left unaddressed:

- How are counties supposed to reach voters who have moved residences since November (likely a non-trivial number, *see* Cooper Supp. Rep. at 8-9) but have not updated their address?

- The state supreme court instructed officials to *mail* a notice to start the thirty-day clock to cure, but what are voters abroad supposed to do about unreliable or delayed mail?

- How are election officials supposed to implement and administer such a "cure" process when they lack the volunteer and temporary staff manpower that is made available around the election?

- What are election officials to do about ballots lawfully cast in November by a UMOVA voter who has since passed away or has since become no longer eligible to vote in North Carolina?

- Can UMOVA voters submit their ID photocopy through the online portal they previously used to protect their privacy and security? Practically, can the NCSBE successfully adapt the portal for that purpose?

- Will voters be able to track their progress via BallotTrax? If they are rejected for some reason, will they be further notified and given another chance to ensure their vote is counted?

- Will affected counties all perform these processes the same way, or will the counties create further arbitrary differential treatment of voters by using dis-uniform procedures?

Uncertainties abound for a "cure" process invented on-the-fly. The fundamental constitutional rights of Plaintiffs and other military and overseas voters cannot be depend on such a capricious process.

Moreover, this subset of voters is particularly at risk of not successfully re-securing their votes through these procedures. Military and overseas voters already vote significantly below

---

[2] Notably, Griffin did not ask the NCSBE to do *anything* to avoid the erroneous deprivation of voting rights from alleged "never residents."

their share of the eligible voter population; they must overcome substantial barriers to vote even under ideal conditions. Cooper Supp. Rep. at 10-11. And the specific subset of targeted voters skews younger, and young voters are much less likely to cure their ballots. *Id.* at 9-10. All these difficulties are exacerbated by the timing, given that voters are generally less likely to be paying attention to the election six months after it occurred, so will generally not be on alert for correspondence from election officials about how to make sure their vote will count. *Id.* at 6-7. As Dr. Cooper summarizes, "the combination of the temporal and geographic remoteness of the voters to the election and the need to cure" makes the disqualify-then-cure process far from adequate to protect fundamental rights. *Id.* at 7.

In sum, the *pre*-deprivation process—required under the *Mathews* balancing involved here—was constitutionally deficient in numerous respects. And the proposed *post*-deprivation process of the invented disqualify-then-cure procedures will not fix the constitutional problems. Defendants are poised to violate Plaintiffs' procedural due process rights and should be enjoined.

## II. An injunction is warranted to preserve the status quo, avert irreparable harm, and protect the public interest.

### A. An injunction is necessary to avert four types of irreparable harm the Plaintiffs and the putative Class will suffer

Defendants are initiating a process that immediately impairs Plaintiffs' fundamental rights. Without an injunction, Defendants will inform Plaintiffs and the putative Class that their votes will be "omit[ted] from the final count" unless they "timely cure their deficiencies" in a short thirty-day process. *Griffin*, 2025 WL 1021724, at *15. This imposes four types of irreparable harm, none of which is relieved by this Court's prior order temporarily prohibiting certification of the election results.

First, the default rule that Defendants are poised to implement means that Plaintiffs' votes, previously *included* in the Seat Six tally based on the extant election rules, will now be

presumptively "*omit[ted]*" from the count based on the changed election rules, absent further action from the voter. *See id.* (emphasis added). This treatment itself abridges Plaintiffs' fundamental constitutional "right … to vote and to have their votes *counted as cast*." *Hendon*, 710 F.2d at 180 (emphasis added). And even if some voters later re-secure their rights, "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Beautiful Struggle*, 2 F.4th at 346, and "the basic truth [is] that even one disenfranchised voter—let alone several thousand—is too many," *LWVNC*, 769 F.3d at 244

Second, the encumbrances that the disqualify-then-cure process itself imposes on Plaintiffs and the putative Class are irreparable injury. The process imposes added "restrictions on fundamental voting rights" that "Courts routinely deem … irreparable injury." *Id.* at 247. Moreover, arbitrarily requiring *some* voters to "cure their" newfound "deficiencies," but not *other* similarly situated voters, represents discriminatory treatment that is itself irreparable injury. *See Harris v. McCrory*, 2016 WL 6920368, at *1 (M.D.N.C. Feb. 9, 2016) ("[L]imiting the right to vote in a manner that violates the Equal Protection Clause[] constitutes irreparable harm."). Plaintiffs describe the difficulties they face in having their votes put in jeopardy and being forced to undertake actions to save their votes. Webb Decl. ¶¶14, 16-20; Conley Decl. ¶¶15-16; Kromm Decl. ¶¶14-21; Pierce Decl. ¶¶18-20; ECF 12-7, Rubin Decl. ¶¶15-18 (summarizing organizational injuries). And the reality is that these are the UMOVA voters who had the resources and wherewithal to seek legal counsel to protect their rights; others in the putative Class have an even steeper hill to climb.

Third, the irreparable harm includes the confusion and cloud of doubt cast over the election and electoral process. The unequal and retroactive treatment of votes that will occur if the disqualify-then-cure process continues will, as Justice Scalia recognized in a related context,

"cast[] a cloud upon … the legitimacy of [t]his election." 531 U.S. at 1046-47. Under Justice Scalia's logic, permitting a disqualify-then-cure process "first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability requires." *Id.*

Fourth, LWVNC will soon expend significant resources in their efforts to serve their pro-voter mission by assisting as many affected UMOVA voters as possible to make sure their votes count. Rubin Decl. ¶¶8-17. For example, LWVNC will divert resources to standup a text- and phone-banking attempts to reach as many affected voters as possible, which imposes material costs that drains LWVNC's resources. *Id.* ¶10. It will also have to redirect its resources—including paying a contractor to facilitate the work—to engage its networks and membership chapters to generate further support for making sure affected votes will count. *Id.* ¶¶11-15. And the League will have to alter its ongoing educational campaign to now focus on informing the public and its members why these votes are legitimate and should count to maintain confidence in elections, including buying ads. *Id.* ¶16. These are irreparable injuries that are not fully compensable in damages. *See, e.g.*, *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 361 (4th Cir. 1991).

The notion that Court might later prohibit Defendants from certifying results after the disqualify-then-cure process does not obviate the ongoing harms. For one, it does not change the fact that Plaintiffs' rights are being violated now, as soon as their lawfully cast and counted ballot is jeopardized. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding irreparable injury where constitutional interests were "either threatened or in fact being impaired"). Regardless, the burdens that the disqualify-then-cure process imposes on Plaintiffs, the "cloud" of illegitimacy Justice Scalia described, and the resource diversion and drain to LWVNC represent irreparable injuries

sufficient to warrant Plaintiffs' requested relief, even if the Court later ultimately rejects this unconstitutional gambit.

**B.     The balance of hardships favors Plaintiffs.**

Issuing an injunction imposes no cognizable hardship on Defendants and effectively maintains the status quo: "the last uncontested status between the parties which preceded the controversy." *LWVNC*, 769 F.3d at 236. The election was conducted following settled rules. Defendants have already approved and counted these ballots, recounted them twice, and then canvassed the results following those rules. The new disqualify-then-cure process Defendants are developing materially *changes* the status quo. Plaintiffs' requested relief maintains the last-uncontested status.

Griffin also has no cognizable hardship. Given his lack of pre-election challenge, he "has not shown that he availed himself of opportunities to avoid the injuries of which he now complains." *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017). And he "can hardly complain about the inequities of delay when [his] own actions were a significant contributing factor." *Ramirez v. Collier*, 595 U.S. 411, 435 (2022).

Thus, the equities are best served by deciding the constitutional issues first to avert the irreparable injuries to Plaintiffs and the hardships imposed by Defendants highly burdensome disqualify-then-cure process. *See Riggs*, ECF 61.[3]

**C.     Protecting voters' rights serves the public interest.**

An injunction promotes the public interest because "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). Given that the most likely outcome of the disqualify-then-cure process will be the eventual

---

[3] The Court should require no bond under Federal Rule of Civil Procedure 65(c). *See, e.g.*, *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

disenfranchisement of at least some otherwise eligible and qualified voters, allowing Defendants to begin that process is necessarily against the public interest.

Moreover, these procedures will "result in voter confusion." *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006) (quoting *Dunn*, 405 U.S. at 336). The public has a "strong interest in exercising the fundamental political right to vote," equitable principles "counsel extreme caution" in changing rules in advance of elections, especially as the "election draws closer." *Id.* at 4-5. Even more so, changing the rules *after* an election, in a manner that would result in "discard[ing] completed ballots," is against the public interest and "would result in the voter confusion and disruptive consequences the *Purcell* principle is designed to avoid." *Pierce*, 97 F.4th at 227. Once an election begins, and especially after it is over, the public interest favors maintaining "the stability and sense of repose that engender trust and confidence in our elections." *Id.* at 229. Voters' confidence in elections is already shaken from being targeted six months after the election. Kromm Decl. ¶¶13-18; Conley Decl. ¶¶13-16; Webb Decl. ¶¶20-21. Further drawing out this process and contacting voters will only exacerbate the threats to the electorate's faith in elections. *See* Cooper Supp. Rep. at 5-6.

The risks of voter confusion and lost voter confidence in elections can be mitigated (or avoided) by first addressing whether Defendants can discard *any* ballots based on the retroactive, disparate application of changed election rules. The equities favor enjoining the disqualify-then-cure process now, not waiting until it is completed to then rule the entire enterprise was unconstitutional.

## CONCLUSION

For the foregoing reasons, the Court should rule for the voter Plaintiffs on each of the "remaining federal issues" as referenced in the April 14 Order. And most pressing here, it should

promptly grant Plaintiffs' motion for an injunction that vindicates their fundamental rights and promotes the important equities at stake.

Dated: April 21, 2025

Respectfully Submitted,

/s/ *Jessica A. Marsden*
Jessica A. Marsden

Jessica A. Marsden
Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
jess.marsden@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176
State Bar No. 50855

Anne Harden Tindall
Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
anne.tindall@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176
State Bar No. 31569

Samuel Jacob Davis
Election Law Clinic at Harvard Law School
6 Everett Street,
Cambridge, MA, 02138
Telephone: (631) 807-2327
State Bar No. 57289

Hayden Johnson*
Protect Democracy Project
2020 Pennsylvania Avenue NW, Suite #163
Washington, DC 20006
hayden.johnson@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176

John Paredes*
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
john.paredes@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176

Stacey Leyton*
Danielle Leonard*
Juhyung Harold Lee*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
dleonard@altber.com
hlee@altber.com

*By special appearance or notice of special
appearance forthcoming

## CERTIFICATE OF COMPLIANCE

As required by Local Civil Rule 7.2(3)(A), I hereby certify that the foregoing document contains 8,394 words, not including items that may be omitted from the word count pursuant to Local Civil Rule 7.2(f)(1).

Dated: April 21, 2025                /s/ *Jessica A. Marsden*
                                        Jessica A. Marsden