# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| CARRIE CONLEY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALAN HIRSCH, et al.,<br><br>Defendants. | Case Nos. 5:25-cv-00193-M<br>5:24-cv-00731-M (lead)<br>5:24-cv-00699-M |

### SECOND DECLARATION OF JENNIFER RUBIN, PRESIDENT OF THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA

I, Jennifer Rubin, hereby declare that the following is true and correct, is within my personal knowledge, and if called as a witness I am competent to testify thereto.

1. I am a United States citizen, over the age of eighteen, and I have never been convicted of a felony.

2. I am the current President of the League of Women Voters of North Carolina ("LWVNC" or "the League"). I have held this position for the past two years.

3. On April 13, 2025, I executed a declaration for the above-captioned matter. I hereby incorporate by reference all the statements in my April 13 declaration.

4. I understand that the North Carolina courts have presumptively invalidated ballots for overseas and military voters, cast using the absentee process in the select counties challenged by Judge Jefferson Griffin, because they did not provide photo identification even though the

State and County Boards of Elections provided these voters no opportunity to submit a copy of their photo identification.

5. I also understand that, in compliance with orders from the North Carolina Court of Appeals, the North Carolina Supreme Court, and this Court, the State Board of Elections has published guidance outlining a contemplated "verification" process the County Boards of Elections will be directed to implement that will allow affected voters to "cure" their ballots by submitting photo identification, thereby allowing their ballots to be counted.

6. Even if affected voters were offered a "verification" opportunity, it is our members' strong belief that they should not have to take these additional steps and that they have a right to have their already cast vote be counted.

7. There are also practical problems with the coming verification process that harm the League and our members. It is unclear that these voters, many of whom are working or are traveling overseas, can receive the cure instructions more than five months after the election. And even assuming these voters are successfully contacted and can take action within the time limit established by the North Carolina Supreme Court, having to take time out of their lives and take steps to "cure" a nonexistent deficiency at this late stage is an unacceptable burden on their right to vote. It will burden League members who are being challenged.

8. The presumptive invalidation of potentially thousands of ballots from eligible voters cast in compliance with the applicable rules at the time of the election, and the burden put upon voters to "cure" their ballots, frustrates the League's mission of protecting and expanding voting rights and ensuring that everyone is represented in our democracy.

9. Thus, to address the harm created by these presumptive invalidations to the League's mission, the League and our members will have to divert resources to engage in various

efforts to help our members and voters in our community try to preserve their right to vote that is under attack.

10. The League will engage in text or phone banking to attempt to reach as many affected voters as possible. Text or phone banking involves many hours of work generating a reliable outreach list by cross-referencing various data sources, and engaging many volunteers to actually send out the text messages. Phone banking would require extensive training of many more volunteers. The League will incur several hundred dollars to several thousand dollars in out-of-pocket costs, depending on the final number of voters who need to participate in a cure process. Additionally, the League does not have a phone banking tool. In order for LWVNC to reach impacted voters via phone bank, we will need to spend more time connecting with on-the-ground partners who have a phone bank tool and are willing to collaborate with us in this short time period.

11. The League will also have to educate its grassroots network regarding the verification process.

12. That involves paying a communications contractor to do outreach to local League chapters to inform them of the current situation—through special action alerts, newsletters, and direct person-to-person outreach.

13. In addition, two active League networks will have to divert their attention from their usual day-to-day work to responding to the presumptive invalidations and verification process.

14. The first of these groups, the County Board of Elections Monitoring Group, is a network of about 90 volunteers who stay abreast of county election administration in about 30 counties. Instead of focusing on their day-to-day issues such as precinct selection and early

3

voting administration, they will have to focus instead on monitoring how each affected County Board is implementing the verification process. Depending on the number of counties affected, monitoring of County Boards of Election would involve numerous volunteers who would require training on the cure process to be able to monitor meetings successfully.

15. The second group, the Voter Collaboration Team, is a network of about 44 volunteers covering 33 counties. That group is ordinarily focused on sharing strategies on voter outreach and promoting voter registration. Now, they will have to focus on reaching affected voters in the affected counties and educating them on the verification process

16. League Board and member time will also have to be devoted to responding to inquiries about the verification process, responding to related misinformation and disinformation, and crafting and delivering effective communications to the public. This may involve further outlays of funds for related expenses such as ad buys.

17. All of this League time and funds spent on the verification process will be effectively diverted away from the core League activities of voter outreach and education, conducting voter registration events, assisting voters to facilitate participation in the electoral process, and nonpartisan political advocacy related to voting, elections, political reforms, review and analysis of legislation, and other issues that are important to the League.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April, 2025, in Durham, North Carolina.

_____
Jennifer Rubin

4