# EXHIBIT 8

**Supplemental Report of Christopher A. Cooper, PhD**

*Conley et al. v. Hirsch et al.*

**In the U.S. District Court for the Eastern District of North Carolina**

April 21, 2025

Contents

| | | |
|---|---|---|
| I. | Introduction | 2 |
| II. | Summary of Findings | 2 |
| III. | Ballot Curing in the Days Leading up to and Following an Election is Normal; This Process is Not. | 3 |
| IV. | Most of These Voters Reside Out of the Country or State, and are Unlikely to Consume News About North Carolina State Politics | 6 |
| V. | Most of These Voters Are Out of the Country or State, and Therefore Do Not Have Access to Visit Their Local Board of Elections in Person | 8 |
| VI. | The Cure Process Does Not Account for Voters Who Have Moved Since the Election | 8 |
| VII. | The Affected Voters are More Likely to be Younger | 10 |
| VIII. | Military and Overseas Voters Already Face Significant Barriers to Voting and Vote at Much Lower Rates Than Domestic Civilian Voters | 10 |
| IX. | Conclusion | 11 |

## I. Introduction

**1**   As part of a court order, the North Carolina State Board of Elections has been directed to create and execute a curing process for the subset of UMOVA voters affected by Jefferson Griffin's challenges to their ballots in the Supreme Court election, based on the belief that they did not provide a photocopy of their voter ID, or a copy of the ID exception form, when casting their vote. Affected voters' ballots will be presumptively omitted from the count, unless they complete this curing process within 30 calendar days after the mailing of notice. This supplemental report contains my expert opinions on the likely lack of effectiveness of this curing process and the adverse effects on the subset of military and overseas voters. It is a supplement to my initial expert reported dated April 13, 2025, which I expressly incorporate as relevant in this report, including my background, qualifications, and curriculum vitae.

## II.   Summary of Findings

**2**   Based on my expertise studying elections and voter behavior, the established academic research on these subjects, and specific data on patterns in normal curing programs, I am confident that it is highly likely that the proposed curing process will impose a burden on the affected voters and not succeed in ensuring that all lawful voters who participated last fall will now have their votes counted. Further, the curing process is unlikely to ameliorate, and may even exacerbate, unequal patterns in the types of people who are having their votes put at risk based on the targeted subset of votes.

**3**   I draw these conclusions based on the following opinions:

(A) Ballot curing in the days leading up to and immediately following an election is normal, but this process is not. This process is taking place more than five months after the election

day. I am confident that ballot curing of this nature has never been applied to ballots submitted so long ago.

(B) Most of these voters reside out of the country, the vast majority reside outside of the state, and few are likely to be exposed to news about a North Carolina election that occurred more than five months ago.

(C) Because most of the challenged voters are out of the country or the state, they therefore do not have access to visit their local board of elections in person.

(D) It is likely that several of these voters have moved, without updating the elections boards given how long ago the past election was and how much time there is until the next election. They will likely be more difficult to reach.

(E) The affected voters are more likely to be younger and academic research shows that younger voters are less likely to successfully cure their ballots, even in normal cure processes.

(F) Overseas and military voters are already much less likely to vote than domestic civilian voters and will be less likely to overcome additional burdens to make their votes count.

4   Below, I explain my opinions, grounded in my expertise and the academic research and literature, that underscore each of these points.

### III. Ballot Curing in the Days Leading up to and Following an Election is Normal; This Process is Not.

5   Prevailing academic literature on ballot curing defines it as "a voter taking action to cast a counted ballot after initially submitting a mail ballot with a disqualifying deficiency."[1] When performed in the days before or just after an election, when voters are paying close attention and

---

[1] Meredith, Marc, and Lucy Kronenberg. 2023. "Who Cures Ballots? Evidence from North Carolina's 2020 General Election." *Election Law Journal*. 22(4): 306-326. Quote on pgs. 306-307.

election administrators have resources and reliable means to communicate with them, it can be a useful process for voters who made mistakes in completing their ballot to correct those mistakes in time to have their votes counted. This is a normal, voter-centric part of the mail voting process in 33 states, including North Carolina. But none of these states envision the possibility of disqualifying ballots and creating a cure process this long after an election.[2] Under the normal cure process rules in North Carolina, "the county board of elections shall promptly notify the voter and inform the voter how to cure the defect."[3] This cure must be completed no later than noon on the third business day after the election. The State Board here, however, is ordered to begin this process more than five months after the election.

6  In reviewing the history and academic literature on contested elections, and from my years of studying American elections, I have not found any instance—in North Carolina or elsewhere—where a statewide race has undergone a process like this, where voters who followed the instructions for the election now have to engage in a cure process and follow a new set of instructions to attempt to ensure that their vote will count.[4]

7  In the normal curing process, voters also have a number of tools at their disposal to track their ballots in real time and become aware of problems. Many states and counties, including North Carolina, use the popular BallotTrax system.[5] Prior to election day in 2024, more than 400,000 North Carolinians had signed up for the service.[6] Colorado uses BallotTrax to help voters follow

---

[2] The longest deadline is Oregon, which uses all mail voting and provides the voter 21 days after the election to complete their cure. https://www.ncsl.org/elections-and-campaigns/table-15-states-with-signature-cure-processes
[3] General Statute §163-230.1
[4] Professor Edward Foley has compiled the most comprehensive set of contested elections, and he lists no such example of cure process being performed five months after the election. Foley, Edwards. 2015. *Ballot Battles: The History of Disputed Elections in the United States*. New York: Oxford University Press. In my years of studying American elections, I do not recall any past example of a post-election disqualification of ballots and newly created cure process such as this situation.
[5] https://northcarolina.ballottrax.net/voter
[6] Michels, Sarah. "Where's by 2024 ballot? In NC you can Track it." *Carolina Public Press*. https://carolinapublicpress.org/66740/track-2024-nc-absentee-ballot-ballottrax/.

their ballot's journey and employs a text-message based TXT2CURE system to help voters cure their ballots.[7] It is not apparent that the court-ordered cure process being implemented here offers any of these standard tools that voters use to keep track of their ballots and make sure their vote will be counted.

8    North Carolinians are used to ballot curing as a way to rectify problems with their ballots before and in the few days after the election—not more than 5 months later. This will occur at a time when the media environment and political party operations have already turned their attention to the 2026 election, and the challenged voters' attention is on other matters, as explained further below.[8] Curing is, undoubtedly, a good thing for ensuring lawful votes are counted when it occurs in the days prior to, or just after an election. But even that type of curing "takes time and effort by election officials and the voter"[9] and is, as a recent white paper from the MIT election lab concluded, "no panacea" for fixing election problems because of the challenges that cure processes impose on voters and election officials.[10]

9    This kind of unusual cure process, required here because of the notion that the voters being contacted did something wrong with their ballots that has resulted in legal claims of improper or even illegal election outcomes, will also likely have negative consequences for trust in elections. For example, research in Orange County, California finds that voters who have negative experiences with the voting process are more likely to have diminished confidence in elections.[11] Evidence from across the United States reinforces the potential harm of spreading unfounded messages about fraud

---

[7] https://www.coloradosos.gov/pubs/elections/FAQs/TXT2Cure.html
[8] In addition to the 2026 elections, more than 1,000 local seats are up for election in November, 2025. https://www.ncsbe.gov/voting/upcoming-election/local-voter-tool
[9] McDonald, Michael P. 2022. *From Pandemic to Insurrection: Voting in the 2020 US Presidential Election.* Boston: DeGruyter. P. 65
[10] Gronke, Paul, Mindy S. Romero, Enrijeta Shino, and Daniel M. Thompson. 2023. "Vote by Mail in the United States: Best Practices and New Areas of Research." MIT Election Data and Scince. Lab. p. 14.
[11] Alvarez, R. Michael, Jian Cao, and Yimeng Li. 2021. "Voting Experiences, Perceptions of Fraud and Voter confidence." *Social Science Quarterly* 102(4): 1225-1238.

5

to the voting public. Specifically, the research finds, "allegations [of voter fraud] can undermine confidence in elections, particularly when the claims are politically congenial, and may not be effectively mitigated by fact-checking."[12] This finding that unfounded claims of fraud negatively affect confidence in elections has been reinforced in other recent studies in the United States[13] and elsewhere.[14]

### IV. Most of These Voters Reside Out of the Country or State, and are Unlikely to Consume News About North Carolina State Politics.

**10** It is well-understood that the information environment and level of voter outreach are extremely important in determining whether voters will successfully participate in elections. In particular, recent research finds that these contexts are highly important for ensuring mail ballot acceptance and effective curing processes in North Carolina specifically.[15] Indeed, "voters can learn how to navigate complex processes, such as voting by mail, if they are exposed to process-specific information."[16] The problem for the ordered curing process, however, is that the same research concludes that regular contact with the voter, rather than sporadic contact months after the election, is key. The regular, timely contact necessary for reaching voters and enabling them to participate will be more difficult to achieve given the timing of the proposed cure process and the location of where voters will need to be reached in order to secure their vote.

**11** My analysis of the voter data, described in more detail in my initial April 13 report, finds that fewer than 2 percent of the UMOVA voters being challenged in Buncombe, Durham, Forsyth, and

---

[12] Berlinski, Nicholas, Margaret Doyle, Andrew M. Guess, Gabrielle Levy, Benjamin Lyons, Jacob M. Montgomery, Brendan Nyhan, and Jason Reifler. 2023. "The Effects of Unsubstantiated Claims of Voter Fraud on Confidence in Elections." *Journal of Experimental Political Science* 10: 34-49.
[13] Justwan, Floridan, and Ryan J. Williamson. 2022. "Trust and Trust: Examining the Relationship between Claims of Fraud and Citizen Attitudes." *PS: Political Science and Politics*. 462-469.
[14] Kuk, John S., Don S. Lee, and Inbok Rhee. 2024. "Does Exposure to Election Fraud Research Undermine Confidence in Elections?" *Public Opinion Quarterly* 88: 656-680.
[15] Suttman-Lea, Mara, and Thessalia Merivaki. 2022. "Don't Drown the Message: The Effects of Voter Education on Mail Ballot Acceptance in North Carolina." J*ournal of Election Administration Research and Practice*. 1(2): 73-96.
[16] Suttman-Lea and Merivaki, p. 92.

Guilford counties voted by having their ballots mailed to an address in North Carolina and returning that ballot by mail. Approximately 92 percent used the online system available to military and overseas voters. Thousands of the affected voters in these counties, on the other hand, had an address abroad listed as their mailing address and would have received any mailed ballot there. For example, the challenged votes include at least nine ballots completed by voters in Indonesia, 87 in Japan, and two in Nepal.

**12** There has been a decline in state politics media coverage across the United States, making it difficult to follow the ins and outs of state politics even within North Carolina.[17] This court-ordered cure process requires affected voters to be aware of a North Carolina state election, in some cases on the opposite side of the globe, where North Carolina specific media coverage is less likely to reach them, and during a time when voters are not tuned into the happenings of elections that have already occurred over five months ago. For example, it is well-established in research on voter mobilization that the timing of voter turnout appeals is critical; to stand the greatest chance of being effective, they must take place close to the election, when voters are paying attention.[18] It is very likely that voters will not be paying attention months after an election has concluded. My opinion on the effects on voter behavior, grounded in the academic research and literature, is that the combination of the temporal and geographic remoteness of the voters to the election and the need to cure will make it more difficult to successfully ensure that affected voters are able to secure their votes in this process.

---

[17] Rogers, Steven. 2023. *Accountability in State Legislatures*. Chicago, IL: University of Chicago Press.
[18] See Green, Donald P., and Alan S. Geber. 2019. *Get out the Vote, 4th Edition*. Washington, DC: CQ Press.

### V. Most of These Voters Are Out of the Country or State, and Therefore Do Not Have Access to Visit Their Local Board of Elections in Person

**13** Extant research demonstrates that in-person curing is common. In the 2020 election in North Carolina, approximately 39 percent of successful ballot cures occurred in person.[19] That was during the height of a global pandemic, when many voters relied on mail options—in all likelihood, the number of voters taking advantage of the in person curing process would be even greater during an election conducted under more normal circumstances. Clearly, in-person curing options are an important part of making the effort successful. This option will not be available for the out of country challenged voters; indeed, many of them are in different time zones that also present remote communication challenges. It will also present a problem for the challenged UMOVA voters who live out of the county of their registration or out of state, like the 14 affected voters who cast their UMOVA ballot from Florida, the eight from Oklahoma, and the six from Louisiana. These voters are likely domestic military servicemembers or their dependents who are stationed in those locations, but who attest they maintain North Carolina domicile and are eligible vote via the UMOVA and UOCAVA process.

### VI. The Cure Process Does Not Account for Voters Who Have Moved Since the Election

**14** Voter populations are not static. The Census Bureau estimates that about 13 percent of Americans move each year. Of these, about half are within-county, while roughly 17 percent are between counties in a state, and another 14 percent are between states.[20] Thus, it is expected that a non-trivial number of the affected voters are likely no longer at the address where their ballot was initially sent.

---

[19] Meredith and Kronenberg (2023).
[20] See https://www.census.gov/library/stories/2023/04/fewer-people-moving-between-2019-and-2021.html and also, Joint Center for Housing Studies at Harvard University. https://www.jchs.harvard.edu/blog/who-is-moving-and-why-seven-questions-about-residential-mobility

**15**  This may be a particular problem for younger voters who may have been studying abroad for a semester and are now back at college. Again, my study of the data shows that challenged voters in the four counties I have been asked to analyzed—Guilford, Forsyth, Durham, and Buncombe—skew younger. In fact, Guilford County has the largest number of students living in university housing in the state.[21] These voters may, therefore, not be available at their home address and not available at the address when they voted.

**16**  The change of residence since November may also pose particular problems for military voters, who often live on military bases that are by definition temporary residences as they get reassigned to different places. This, too, can account for a voter moving from their residence on file from November that may mean the voter is no longer reachable, and likely not within the 30 allotted days from when the notice is initially mailed.

**17**  While phone numbers are on file for some voters in North Carolina, voters are not required to provide a contact number and many do not. For example, my analysis reveals that about 40 percent of the targeted voters in Buncombe, Durham, Forsyth and Guilford Counties do not have phone numbers associated with their record on the state voter registration file. Moreover, voters who did provide a phone number at some point are not required to maintain the accuracy of that number over time. Regardless, previous research in North Carolina also demonstrates that voters with phone numbers on file are no more likely to complete the cure process, meaning the possibility of reaching a voter by phone still does not mean that they will successfully complete a cure process.[22] Again, this is during the normal cure timeframe in the period close to the election; I

---

[21] Cline, Michael. 2023. "15 Things We Learned from the New 2020 Census Data." *Carolina Demography*. https://carolinademography.cpc.unc.edu/2023/05/30/15-things-we-learned-from-the-new-2020-census-data/.
[22] Meredith and Kronenberg (2024)

9

Case 5:24-cv-00731-M-RJ    Document 82-9    Filed 04/21/25    Page 11 of 14

expect that the affected voters here will be even more difficult to reach and enable to cure their ballots more than five months after the election.

### VII. The Affected Voters are More Likely to be Younger

**18**   As I demonstrated in my April 13 Report, the targeted UMOVA voters are, on average, younger than registered voters, all voters in 2024, and mail voters in 2024. Specifically, about 1/3 of all challenged UMOVA voters in Buncombe, Durham, Forsyth, and Guilford counties are between the ages of 18 and 30. This also presents a problem for the potential for cure. Research in North Carolina[23] and Florida[24] found that older Americans are more likely to complete the cure process than younger Americans. Given the younger skew of the challenged voters (only about 12.5 percent of challenged UMOVA voters are 65 or older), I expect this will create significant problems for voters to successfully complete the ordered cure process.

### VIII. Military and Overseas Voters Already Face Significant Barriers to Voting and Vote at Much Lower Rates Than Domestic Civilian Voters

**19**   The problems of reaching overseas and military voters and having them successfully vote are well-documented. A 2022 federal government report on the State of the Military Voter details difficulties such voters face, concluding: "Familiarity with the absentee voting process posed the biggest barrier to voting" for would-be military voters in 2022.[25] A recent publication from the National Conference of State Legislatures and the U.S. Election Assistance Commission reports that "Just 3.4% of eligible overseas citizens cast a ballot in 2022, compared to 62.5% of the voting-age population in the U.S. as a whole."[26] Even when they attempt to cast a vote, military and overseas

---

[23] Meredith and Kronenberg (2024).
[24] Smith, Daniel A. 2018. "Vote-By-Mail Ballots Cast in Florida." Report by ACLU Florida. September 19, 2018 and Smith, Daniel A. 2021. "Casting, Rejecting and Curing Vote-by-Mail Ballots in Florida's 2020 General Election. Technical Report All Voting is Local."
[25] State of the Military Voter, 2022. Prepared by the Federal Voting Assistance Program. https://web.archive.org/web/20241105210347/https://www.fvap.gov/info/reports-surveys/StateoftheMilitaryVoter.
[26] Helping America Vote: Election Administration in the United States, 2025. Prepared by the National Conference of States Legislatures and the U.S. Election Assistance Commission. https://www.eac.gov/sites/default/files/2025-04/Helping_America_Vote_Election_Admin_in_US_508.pdf. Pg. 150.

voters are "nearly four times" as likely to have their ballots rejected than "domestic civilian voters."[27] A major reason for this exceptionally high rejection rate is that overseas voters are more likely to miss normal deadlines "because of the time it takes for mail to travel to and from the states."[28] For this reason, the Military and Overseas Voter Empowerment "MOVE" Act required ballots to be sent "no later than 45 days before a federal election."[29] The current curing process, which occurs during a time when few voters are paying attention to the election that passed almost half a year ago, allows 15 days fewer than the typical amount of time given to overseas and military voters.

IX. Conclusion

**20** The curing process that election officials and voters are expected to undertake is unprecedented. It is not like the normal cure processes available to voters in the run up and the days shortly after an election to correct innocent mistakes they made. It is my opinion that many eligible voters will not be reached in time, and even if they are, will fail to timely complete this cure process and therefore fail to ensure that their ballot will count in this contest. This is because the timing of the cure is long after the election when it is well established that voters are much less engaged in the electoral process and the election news ecosystem. The composition of the targeted pool of voters as military, overseas, and disproportionately younger voters will also decrease the likely success of this cure. And a non-trivial number of these targeted voters likely moved since November without an updated address on file. Finally, cures are most effective when voters can be easily reached, either by phone or by person, to be encouraged to make necessary corrections, and these voters are by definition more difficult to reach. Thus, I conclude that based on my expertise in studying voter

---

[27] McDonald, p. 74.
[28] *Helping America Vote: Election Administration in the United States*, p. 151.
[29] *Helping America Vote: Election Administration in the United States*, p. 151.

11
Case 5:24-cv-00731-M-RJ    Document 82-9    Filed 04/21/25    Page 13 of 14

behavior, and the supporting research and data, the cure process will not be a practical full solution to address the problem of making sure that the affected eligible voters have their votes counted.

*Christopher A. Cooper*      4-21-2025

Christopher A. Cooper, PhD      Date