**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| JEFFERSON GRIFFIN,<br><br>  *Plaintiff*,<br><br>    v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS,<br><br>  *Defendant*,<br><br>    and<br><br>ALLISON RIGGS et al.,<br><br>  *Intervenor-Defendants*. | No. 5:24-cv-00731-M-RJ |
| NORTH CAROLINA DEMOCRATIC PARTY,<br><br>  *Plaintiff*,<br><br>    v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS et al.,<br><br>  *Defendants*. | No. 5:24-cv-00699-M-KS |
| CARRIE CONLEY et al.,<br><br>  *Plaintiffs*,<br><br>    v.<br><br>ALAN HIRSCH et al.,<br><br>  *Defendants*. | No. 5:25-cv-00193-M-RJ |

**OPENING BRIEF OF INTERVENOR-DEFENDANT ALLISON RIGGS**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.   Judge Griffin Challenges Justice Riggs's Decisive Victory in the November 2024 General Election. ..................................................................................... 3

    B.   The State Board Dismisses Judge Griffin's Protests. ................................... 4

    C.   Judge Griffin Sues to Overturn the State Board's Decision and Order. ..................... 6

    D.   The North Carolina Courts Resolve the State-Law Questions. .................................. 7

    E.   The Cure Process Begins While This Court Considers the Federal Issues Remaining in the Case. ................................................................................... 10

ARGUMENT ............................................................................................................ 12

   I.   The Due Process Clause Bars Post-Election Changes to the Election Rules. ................. 13

  II.  Arbitrary and Disparate Disenfranchisement of Military and Overseas Voters Violates the Equal Protection Clause. .............................................................. 15

 III.  Inadequate Notice and Opportunity to Be Heard Violate the Procedural Due Process Requirements of the Fourteenth Amendment. ............................................. 20

 IV. The Cure Process as Applied to Military and Overseas Voters Imposes an Undue Burden on the Right to Vote. ............................................................................ 25

  V.  The Systematic Post-Election Removal of Voter Registrations Would Violate the National Voter Registration Act. .......................................................... 27

 VI. The Cancelling of Votes Post-Election Violates the Voting Rights Act and Requiring Military and Overseas Voters to Provide Photo ID Violates UOCAVA .......................... 28

CONCLUSION ........................................................................................................ 29

Intervenor-Defendant Allison Riggs files this "opening brief addressing the remaining federal issues." Text Order (Apr. 12, 2025). The Court should enter judgment in favor of Justice Riggs (and Defendant North Carolina State Board of Elections) stating that federal law bars Judge Griffin's efforts to overturn the November 2024 general election for Seat 6 on the Supreme Court of North Carolina.

## INTRODUCTION

The right to vote is fundamental. It preserves all "other basic civil and political rights," and so "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

In November 2024, the North Carolina voters chose Justice Riggs over her opponent, Judge Griffin, to serve on the North Carolina Supreme Court. After a machine recount, a hand recount, and individualized evidentiary hearings in nearly every county in the State, that result was unchanged. The State Board of Elections certified the vote totals on December 11, 2024.

Rather than accept the people's mandate, Judge Griffin launched a five-month litigation campaign to overturn the results of the election. The goal of that campaign is a concept antithetical to a democratic electoral system: retroactive changes to the voting rules that will disenfranchise eligible voters. The challenged election rules have been applied, without controversy, for *years*. They applied without controversy *in this election* without any challenge from Judge Griffin—until it became clear that he had not prevailed.

The State Board properly rejected those protests because they threaten the stability and integrity of our elections. In recognition of these consequences, this Court reserved the right to rule on any issues of federal law remaining after the North Carolina state courts' disposition of the protests. The North Carolina Court of Appeals and Supreme Court both found two of Judge

Griffin's protests meritorious on state law grounds, struck down the election statutes and regulations that applied in November 2024, and ordered the State Board to undertake a novel "cure" process ostensibly intended to allow voters to correct any *post hoc* deficiencies with their ballots. But the ultimate effect is undeniable—those rulings, and the State Board's implementation of an unregulated remedial process, will disenfranchise North Carolina voters *six months* after the election concluded.

This result is unprecedented and flouts the protections of the U.S. Constitution. The effective disenfranchisement of voters who followed then-existing election rules violates the Due Process Clause. Judge Griffin's precision targeting of select counties where he lost by significant margins violates the Equal Protection Clause. His failure to furnish notice of his election protests to voters violates the Due Process Clause. Compounding these problems, the inconsistent and much belated administration of the State Board's remedial efforts will violate *both* the Equal Protection and Due Process Clauses and unduly burden the right to vote. And in addition to these issues, the removal of voters' ballots violates the National Voter Registration Act.

This matter "would be laughable were it not so dangerous." *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *10 (N.C. Apr. 11, 2025) (Earls, J., concurring in part and dissenting in part). If these constitutional violations are permitted to stand, the implications are staggering. Rather than suing *before* an election to challenge rules they do not believe are valid, candidates will have an incentive to say nothing and wait to see if they win. Then if they lose, they will drag out elections through litigation for months, seeking to throw out votes until they win—exactly as Judge Griffin has done here. Never again will North Carolina voters—or possibly, voters *anywhere in the United States*—walk out of the voting booths knowing their votes will count, and the court systems will be flooded with lawsuits after every election. That result is

untenable and should be rejected by this Court not only for the sake of this race, but to avoid undermining the public's confidence in every election going forward. For that reason, and for the reasons discussed below, Justice Riggs requests that this Court enter an order directing the State Board to end the cure process and certify her as the winner of the 2024 General Election.

## BACKGROUND

### A. Judge Griffin Challenges Justice Riggs's Decisive Victory in the November 2024 General Election.

The final canvassed results of the November 2024 General Election showed that Justice Riggs received 734 more votes than did Judge Griffin in the race for Associate Justice. *See* Pet. Judicial Review Ex. A ("Decision & Order") 2, ECF No. 1-4. Judge Griffin attempted to overturn that result by filing over three hundred election protests across North Carolina's hundred county boards of elections. Two categories of election protests remain relevant.[1]

First, Judge Griffin challenged 1,409 ballots "cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form." Decision & Order at 3. Judge Griffin requested information on these voters from six counties, brought a timely protest only to 1,409 ballots cast in Guilford County, and later sought to add challenges to ballots cast in Durham, Forsyth, and Buncombe Counties. *See* Judge Griffin's Br. Supp. Pet. Writ. Prohibition at 66 n.15, *Griffin v. N.C. State Bd. of Elections*, No. 320P24, 2025 WL 284665 (N.C. Jan. 14, 2025); *see also* Decision & Order 2 n.2 (noting Judge Griffin's effort to supplement his protests with "filings submitted after the deadline" and declining to "determine whether such supplementations are allowable").

---

[1] In a third category, Judge Griffin challenged more than 60,000 voters on the theory that their voting records were incomplete. The Supreme Court of North Carolina has since rejected this third category under North Carolina law. *Griffin*, 2025 WL 1090903, at *1–2.

Second, Judge Griffin challenged 266 ballots "cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States." Decision & Order 3. Judge Griffin identified these voters from a list of individuals who, in applying for absentee ballots using the Federal Post Card Application, purportedly checked the box—the last of several options—stating that they have never lived in the United States:



Standard Form 76, Federal Post Card Application (rev. Jan. 2023), https://www.fvap.gov/uploads/fvap/forms/fpca.pdf, archived at https://perma.cc/K6SV-YXQE.

## B. The State Board Dismisses Judge Griffin's Protests.

On December 13, 2024, the State Board served a Decision and Order dismissing Judge Griffin's protests on several overlapping federal grounds. *See* Decision & Order 31, 34.

First, the State Board dismissed all of Judge Griffin's protests because Judge Griffin "failed to serve the registered voters [he] seek[s] to challenge in [his] protests in a manner that would . . . be consistent with the requirements of constitutional due process." *Id.* at 6. Judge Griffin caused the North Carolina Republican Party to send postcards by non-forwardable bulk mail with an equivocal message: "your vote *may be affected by one or more protests* filed in relation to the 2024 General Election." *Id.* at 8 (emphasis added). These postcards included a QR code directing the voter to a Republican Party website with links to hundreds of protests filed by four candidates, requiring the voter to then sift through spreadsheet data to determine whether their vote had been challenged. *See id.* at 8–10. The State Board ruled that these postcards were "not reasonably

calculated under the circumstances to inform the challenged voters as to what action is pending" and fail to "provide enough information for the voters to determine what they can even do about it." Decision & Order 13. Judge Griffin thus failed to satisfy the "elementary and fundamental requirement of due process." *Id*. at 14 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

Second, the State Board held that federal law forbids Judge Griffin's protests because they "violate substantive due process protections under the U.S. Constitution." Decision & Order 23. For military and overseas voters, the State Board's regulations in effect during the November 2024 made "clear that the county boards of elections may not impose the photo ID requirement on such voters." *Id*. at 36 (citing 8 N.C. Admin. Code 17.0109(d)). This rule became effective as a temporary rule in August 2023, "was approved unanimously by the Rules Review Commission," and then became a permanent rule in April 2024. *Id*. at 37. Even "if it were later determined that the state photo ID requirement actually applies to these voters, it would violate the federal constitution's guarantee of substantive due process to apply such a newly announced rule of law to remove voters' ballots after an election, when those voters participated in the election in reliance on the established law at the time of the election to properly cast their ballots." *Id*. at 39.

A similar analysis applies to the children of North Carolinians living abroad. In 2011, the North Carolina General Assembly unanimously passed the Uniform Military and Overseas Voters Act (UMOVA), which "specifically authorized U.S. citizens who have never lived in the United States to vote in North Carolina elections if they have a familial connection to this state." *Id*. at 30. Once these children reach adulthood, they are entitled to vote in North Carolina elections. That has "been the law of North Carolina for thirteen years," and that law has "been faithfully implemented in 43 elections in this state since" the General Assembly enacted UMOVA. *Id*. at

31. The State Board held that "the federal constitution's guarantee of substantive due process" bars Judge Griffin's effort to throw out ballots cast in compliance with UMOVA. *Id.* at 32.

Third, the State Board questioned whether it could "impose[] a photo ID requirement on voters covered under the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)." *Id.* at 37. Federal law "governs the process for a covered voter to request and submit a ballot," *id.*, and "an effort to place additional, state-level requirements on UOCAVA voters casting a ballot by methods ultimately provided and governed by federal law would be of questionable validity," *id.* at 38.

### C. Judge Griffin Sues to Overturn the State Board's Decision and Order.

Once the State Board served its Decision and Order, Judge Griffin made a series of filings in North Carolina courts seeking to reverse that Decision and Order. Those filings included petitions for judicial review and motions for a preliminary injunction barring the State Board from certifying Justice Riggs as the winner. *See* ECF Nos. 1-4, 1-12 (petitions), 1-5, 1-13 (motions). The State Board removed those petitions and motions to this Court under 28 U.S.C. §§ 1331, 1441(a), 1443(2) and 1367(a). *See* ECF No. 1 (Notice of Removal). The State Board explained in its removal notice "that granting [Judge] Griffin the relief he sought might violate federal civil rights law, including the Help America Vote Act, 52 U.S.C. § 20901, *et seq.*; the National Voter Registration Act, 52 U.S.C. § 20501, *et seq.*; the Voting Rights Act, codified in relevant part at 52 U.S.C. § 10307; the Civil Rights Act, codified in relevant part at 52 U.S.C. § 10101, the Uniformed and Overseas Citizens Absentee Voting Act, codified in relevant part at 52 U.S.C. § 20302; and the Fourteenth Amendment to the United States Constitution." ECF No. 30 at 9.

On January 6, 2025, this Court "sua sponte remand[ed] this matter to the Superior Court for Wake County." ECF No. 24. The State Board appealed, *see* ECF No. 26, and the Fourth

Circuit granted Justice Riggs's motion to intervene in this action, *see* Order, *Griffin v. N.C. State Bd. of Elections*, No. 25-1020 (4th Cir. Jan. 28, 2025) (ECF No. 19).

On February 4, 2025, the Fourth Circuit entered an unpublished opinion affirming in part and modifying in part this Court's remand order. *See* ECF No. 30. The Fourth Circuit directed this Court "to modify its order to expressly retain jurisdiction of the federal issues identified in the State Board's notice of removal should those issues remain after the resolution of the state court proceedings, including any appeals." *Id*. at 11 (citing *England v. Med. Exam'rs.*, 375 U.S. 411 (1964)).

Two days later, Justice Riggs filed in Wake County Superior Court a Notice of Fourth Circuit Opinion and *England* Reservation. Justice Riggs made this reservation to "preserve her right to return to federal court for the resolution of federal issues" and explained that she "intends, should the state courts hold against her on questions of state law, to return to the Eastern District of North Carolina for disposition of her federal contentions." ECF 39-2 at ¶¶ 7, 8.

On February 26, 2025, this Court implemented the Fourth Circuit's mandate by modifying its remand order to retain jurisdiction over those federal issues. *See* ECF No. 35.

**D.  The North Carolina Courts Resolve the State-Law Questions.**

Over the next two months, the North Carolina courts resolved the "unsettled questions of state law" that justified abstention under *Pullman*. ECF No. 30 at 10. Consistent with Justice Riggs's *England* reservation, the North Carolina courts resolved only questions of state law; no North Carolina court purported to resolve the federal-law issues reserved for federal court.

**i.  Superior Court**

On February 7, 2025, the Wake County Superior Court affirmed the State Board's Order and Decision dismissing Judge Griffin's protests. *See Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *3 (N.C. Ct. App. Apr. 4, 2025).

### ii. Court of Appeals

On April 4, 2025, a divided panel of the Court of Appeals of North Carolina reversed. *See id.* at *15. The majority first held under North Carolina law that the State "Board erred by dismissing all three protests based on a failure to provide adequate notice." *Id*. at *6. The majority then struck down the State Board's regulation exempting military and overseas voters from the photographic identification requirement, *see id.* at *12, and overturned the decade-long practice of permitting their children to vote in North Carolina, *see id.* at *12–13. The Court of Appeals ordered the State Board to allow the military and overseas voters fifteen business days to "cure their failure to abide by the photo ID requirement." *Id*. at *15. As for the children who inherited their North Carolina residence, the Court of Appeals directed the county election boards to remove these votes "from the final count of the 2024 election for Supreme Court Seat 6." *Id*.

Judge Hampson dissented. He first explained why "expecting voters to scan an anonymous QR code on a bulk-mail postcard cannot reasonably constitute service in compliance with their due process rights." *Id*. at *17–20 (Hampson, J., dissenting) (cleaned up). Judge Hampson then argued that "basic concepts of equity" prevent a state from "changing the rules of an election during an election and after ballots are counted." *Id*. at *20–25 (cleaned up); *see also id.* at *30–40. Finally, Judge Hampson highlighted the "practical effect" of Judge Griffin's protests. *Id*. at *41. Judge Griffin's "challenge to only Guilford County's overseas and military absentee ballots discriminates by residence," and "his challenge to Inherited Residents leaves eligible voters with no venue in which to cast their vote simply because of where they live." *Id*.

The Court of Appeals entered its opinion on Friday, April 4, and directed that its mandate issue on Monday, April 7. *See id.* at *15 (majority opinion). On Sunday, April 6, Justice Riggs and the State Board petitioned the Supreme Court of North Carolina for discretionary review and

a stay pending appeal. The Supreme Court granted that temporary stay on April 7. *See Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1025107, at *1 (N.C. Apr. 7, 2025).

### iii. Supreme Court

On April 11, 2025, the Supreme Court issued a six-page special order (1) granting the petitions for discretionary review "for the limited purpose of expanding the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business days to thirty calendar days after the mailing of notice," (2) denying the petitions for discretionary review in all other relevant respects; and (3) dissolving "the temporary stay issued 7 April 2025." *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025).

Justices Earls and Dietz each issued separate opinions concurring in part and dissenting in part. Justice Earls' separate opinion was thirty-nine pages long and decried the lack of "proper deliberation" in the majority's decision. *Id.* at *4 (Earls, J., concurring in part and dissenting in part). Justice Earls criticized the retroactive invalidation of legally cast votes, arguing that it undermined democratic principles and set a dangerous precedent. *See id.* at *4, *12. She noted that the majority had reached this decision even though it did "not dispute that the votes it order[ed] canceled were cast consistent with the established election rules and procedures that were in place well before the 2024 general election." *Id.* at *4. Justice Earls also acknowledged that the potential difficulties in administering the cure process, as it was unclear which voters in which counties would be affected and that process required the State Board to act based on information the State Board did not have—"namely whether the individual intends to return to North Carolina." *Id.* Much like Judge Hampson, Justice Earls also noted how the Court of Appeals had shifted the burden for the election protest from Judge Griffin to the voters and the State Board, observing that such an approach "transform[ed] mere allegations of election irregularity and novel legal theories

into an expressway for the unilateral cancellation of votes and imposition of retroactive require-ments." *Id.* at *10.

Though Justice Earls confined her analysis to "state law issues," she noted "the obvious conflicts with federal law including the principles relied upon in *Bush v. Gore*." *Id*. at *4 n.2. To that point, Justice Earls highlighted state-law concerns about due process violations—both in Judge Griffin's use of a QR-code postcard and the retroactive changes to voting rules. *See id*. at *5, 11. Justice Earls also emphasized how the Supreme Court's special order unfairly targeted military and overseas voters who "registered in Guilford County"—"or maybe one of three or four other counties that vote heavily Democratic, the [majority's] special order is not clear"—and thus perpetuated an equal protection violation. *Id*. at *3.

For his part, Justice Dietz wrote that he was "wrong" to expect that "our state courts surely would embrace the universally accepted principle that courts cannot change election outcomes by retroactively rewriting the law." *Id*. at *17 (Dietz, J., concurring in part and dissenting in part). "The Court of Appeals has since issued an opinion that gets key state law issues wrong, may im-plicate a host of federal law issues, and invites all the mischief [Justice Dietz] imagined in the early days of this case." *Id*. Justice Dietz emphasized that this case "cries out" for "a decisive rejection of this sort of *post hoc* judicial tampering in election results." *Id*. Regardless of whether "the federal courts ultimately reverse the Court of Appeals' decision because of a conflict with UOCAVA, or *Bush v. Gore*, or whatever else," Justice Dietz wrote, "the door is open for losing candidates to try this sort of post-election meddling in state court in the future." *Id*. at *18.

### E. The Cure Process Begins While This Court Considers the Federal Issues Remaining in the Case.

On April 11, 2025—the same day that the Supreme Court issued its special order—Justice Riggs moved in this Court for an injunction to prohibits the parties from taking any action to

enforce or effectuate the state-law remedy while this Court considers the remaining federal issues. *See* ECF No. 37. The next day, this Court entered a text order directing the State Board to proceed, ordering the State Board not to certify the results, and setting a briefing schedule to resolve "the remaining federal issues." Text Order (Apr. 12, 2025). Justice Riggs then appealed from that text order to the Fourth Circuit, *see* ECF No. 44, and moved in this Court for a stay and injunction pending appeal, *see* ECF No. 47. After this Court denied that motion, *see* ECF No. 60, Justice Riggs moved in the Fourth Circuit for that same relief.

Meanwhile, on April 15, the State Board notified this Court of the "scope of its remedial efforts, including the number of potentially affected voters and the counties in which those voters cast ballots." ECF No. 61 at 2.

For the military and overseas voters, the State Board explained that "these protests affect potentially up to 1,409 voters in Guilford County." *Id.* The State Board intends (1) "to instruct the Guilford County Board of Elections to assemble and review the documentation submitted with the absentee ballots cast by each of these 1,409 voters, to confirm that these voters did not submit a copy of a photo ID or an exception form with their absentee ballots" and (2) to "instruct the county board to provide notice to these voters" who did not "submit a photo ID or exception form when they voted" that they must submit these materials within 30 days. *Id.* at 3. These voters "will be informed that copied IDs or exception forms can be submitted by mail, fax, or submitted electronically via an online portal or email." *Id.* at 6. The State Board had begun work on this online portal, and it reported that the portal could be ready within a week. *See id.*

For the 266 inherited-residence voters, the State Board intends to instruct the county boards (1) to review their record to confirm which voters "fit within the category of 'never residents' under the order of the Court of Appeals" and (2) to inform these voters "that their votes were

protested and North Carolina courts have ordered the State Board to discount their vote cast in the 2024 general election for North Carolina Supreme Court Associate Justice because state records indicate they informed the State that they never resided in North Carolina when they submitted their absentee ballot request form in the 2024 general election." *Id*. at 4–5. If these voters have lived in North Carolina, they will have "thirty days from the date of the mailing to submit a sworn affidavit stating that they have resided in the county and identifying their prior residence address." *Id*. at 5.

For both sets of voters, "the State Board will not instruct the county boards to send out the notice to these voters until this portal is ready." *Id*. at 6.

## ARGUMENT

North Carolina's control over its elections is "subject to the limitation that [it] may not be exercised in a way that violates . . . specific provisions of the Constitution." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008) (quoting *Williams v. Rhodes*, 393 U.S. 23, 29 (1968)). Accordingly, "where the entire election process including as part thereof the state's administrative and judicial corrective process fails on its face to afford fundamental fairness," a federal court "need not be timid, but may and should do what common sense and justice require." *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978).

The Court should hold that Judge Griffin's election protests must be dismissed because they violate federal law. The Fourteenth Amendment to the U.S. Constitution bars retroactive changes to the voting rules, prohibits arbitrary disenfranchisement of targeted military and over-seas voters, requires that voters be given notice and an opportunity to be heard before their votes are thrown out, and prohibits states from imposing undue burdens on voting rights. In addition,

the National Voter Registration Act prohibits Judge Griffin's request for systematic, retroactive removal of voters from North Carolina's list of eligible voters.

## I. The Due Process Clause Bars Post-Election Changes to the Election Rules.

"The Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). As a matter of federal constitutional law, it "is settled that if the election process reaches the point of 'patent and fundamental unfairness,' the due process clause may be violated." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Burns*, 570 F.2d at 1077); *see also Roe v. Alabama*, 43 F.3d 574, 581 (11th Cir. 1995). That level of unfairness exists—and "a court will strike down an election on substantive due process grounds"—if "two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998). Those elements are satisfied when, for example, "the losing candidate contest[s] the validity of the absentee ballots" cast in accordance with officially sponsored election procedure. *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 916 (E.D. Va. 2018). Even if that procedure turns out to have been flawed in hindsight, a "state's retroactive invalidation" of those absentee ballots "violate[s] the voters' rights under the fourteenth amendment." *Burns*, 570 F.2d at 1070.

The voters' reliance on the preexisting election rules is self-evident. North Carolina law permitted both categories of voters still at issue to vote in over *forty elections* since 2011. There was no indication in the time leading up to the November 2024 general election that these established procedures would suddenly be called into question. Rather, the challenged voters "were doing no more than following the instructions of the officials charged with running the election"

and could not be expected, "at their peril, somehow to foresee" a future interpretation of state law that would invalidate their ballots after the fact. *Burns*, 570 F.2d at 1075–76.

When military and overseas voters cast their ballots, the North Carolina Administrative Code was clear that these voters were "*not* required to submit a photocopy of acceptable photo identification." 8 N.C. Admin. Code 17.0109(d) (emphasis added). And these votes were counted in every other race in 2024. The fact that some of these voters could prevent the discarding of their votes by now providing photo identification does not mitigate the constitutional violation. Their votes have been declared *per se* invalid, unlawfully "undo[ing] the ballot results in a court action." *Hendon*, 710 F.2d at 182 (citation omitted).

Likewise, when the voters who inherited their North Carolina residence cast their ballots, the North Carolina statutes "plainly allow[ed] such individuals to vote in North Carolina." *Griffin*, 2025 WL 1021724, at *37 (Hampson, J., dissenting). The implementation of a "verification" procedure allowing these voters to affirm they have at one point resided in North Carolina will *increase*, rather than mitigate, the due process concerns. Even assuming some of these voters can successfully comply with the newly announced procedures, they are still being subjected to a novel and standardless process that did not exist when they cast their votes. *See infra* Part IV.

The facts of *Burns* are analogous to those presented here. In *Burns*, officials distributed absentee ballots for a city council primary election in Rhode Island in accordance with years of prior practice. *See Burns*, 570 F.2d at 1067. The losing candidate subsequently challenged that practice on the theory that Rhode Island law did not permit absentee voting in primary elections. *See id.* at 1067-68. A divided state supreme court adopted the losing candidate's interpretation and invalidated the ballots, which prompted a suit in federal court by the voters. *See id.* at 1068. The First Circuit then ruled in favor of the voters because the "ballots that state officials had offered

14

to the voters in this primary . . . induce[d] the voters to vote by this means rather than in person." *Id.* at 1074. Accordingly, Rhode Island then "could not, constitutionally, invalidate the . . . ballots," without inflicting "fundamental unfairness" upon those voters. *Id.* at 1076–77.

Much like the voters in *Burns*, the challenged voters here used the voting procedures in effect during the November 2024 general election to cast their ballots. These voters did everything asked of them to vote. But now, Judge Griffin argues that they should have done more—submitted photo identification or affirmatively established residency in North Carolina—even though official guidance made clear that none of these steps was necessary. It would therefore be a gross violation of due process to penalize these voters for "state actions" that "induce[d]" them to take steps that Griffin now claims caused them to "miscast their votes." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012); *see also Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005). The rules for the *next* election may be different, but Judge Griffin's arguments under North Carolina law cannot change the rules for the last election. *Cf. McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187, Cahokia, Ill.*, 373 U.S. 668, 674 (1963) ("It is immaterial whether respondents' conduct is legal or illegal as a matter of state law" when "petitioners assert that respondents have been and are depriving them of rights protected by the Fourteenth Amendment.").

## II. Arbitrary and Disparate Disenfranchisement of Military and Overseas Voters Violates the Equal Protection Clause.

"Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98,

104–05 (2000) (per curiam).[2]  This principle "applies not just to the federal government but also to state and local governments."  *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016) (citation omitted).  Judge Griffin's challenge to military and overseas voters violates equal protection principles by burdening and disenfranchising only those individuals who happened to cast their ballots in a county that Judge Griffin targeted.  Moreover, the State Board's "cure" process for the affected voters will compound this violation by inevitably fostering different treatment of identical voters based on arbitrary circumstances.

*Bush v. Gore* addressed the "uneven treatment" of voters in different Florida counties due to "varying [post-election] standards to determine what was a legal vote."  531 U.S. at 107.  The Court held that standards used to discern voter intent "var[ied]" from "county to county," and so would violate the Fourteenth Amendment's protections against disparate and arbitrary treatment of identically situated voters.  *Id.* at 106–07.  This holding stemmed from the recognition that a state's "arbitrary and disparate treatment to voters in its different counties" is "'hostile to the one man, one vote basis of our representative government.'"  *Id.* at 107 (quoting *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969)).

That hostility pervades Judge Griffin's election protests.  Judge Griffin attempted to challenge military and overseas voters in, at most, only six of North Carolina's one hundred counties.  The State Board has since clarified that it will apply Judge Griffin's challenge only to Guilford County.  Either way, Judge Griffin's selective targeting of military and overseas voters who cast

---

[2] "'The general principle that *Bush* applied—that the 'rudimentary requirements of equal treatment and fundamental fairness' prohibits states from engaging in 'wholly arbitrary and disparate treatment' of members of the public—is not unique to that case,' and [courts] should not hesitate to apply it when relevant."  *Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 (9th Cir. 2025) (quoting *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1090 n.15 (9th Cir. 2024)); *see also Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 741 (4th Cir. 2024); *Moore v. Circosta*, 494 F. Supp. 3d 289, 309–10 (M.D.N.C. 2020); *Lecky*, 285 F. Supp. 3d at 920.

their ballots in certain North Carolina counties has no constitutionally permissible justification. Only one potential basis for choosing those counties appears in the record: they "are each counties which [Judge Griffin] lost by significant margins," *Griffin*, 2025 WL 1021724, at *41 n.23 (Hampson, J., dissenting), or put another way, they are "counties that vote heavily Democratic," *Griffin*, 2025 WL 1090903, at *3 (Earls, J., concurring in part and dissenting in part).

Regardless of intent, Judge Griffin's protests violate the Equal Protection Clause by creating a "preferred class of voters"—those voters who happened to cast a ballot in a county that Judge Griffin chose not to target. *Gray v. Sanders*, 372 U.S. 368, 379–80 (1963). Such residential discrimination is unconstitutional. *See, e.g.*, *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 248 F. Supp. 3d 692, 703 (M.D.N.C. 2017) (concluding that law which "treat[ed] Greensboro citizens differently from citizens of all other cities in the state" likely violated equal protection); *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19 (S.D.N.Y. 2020); *Black v. McGuffage*, 209 F. Supp. 2d 889, 893 (N.D. Ill. 2002). As Justice Earls observed, "as a result of the action taken by [the N.C. Supreme Court], . . . the vote of an overseas or military voter who is registered in Guilford County is presumed to be fraudulent and will not count unless that voter provides proof of their identity within thirty business days." *Griffin*, 2025 WL 1090903, at *3 (Earls, J., concurring in part and dissenting in part). It is "impossible" to explain how that distinction "is fair, just, or consistent with fundamental legal principles." *Id.* The State Board's implementation of Judge Griffin's election challenge exclusively as to Guilford County only reinforces that inequality.

An election procedure also violates the Equal Protection Clause when "identically situated ballots" will be counted or invalidated "based on random chance." *Gallagher*, 477 F. Supp. 3d at 49; *see also Bryanton v. Johnson*, 902 F. Supp. 2d 983, 997 (E.D. Mich. 2012) ("inconsistent administration" of citizenship question). Beyond the selective challenge of only a handful of

counties' worth of military and overseas voters, the cure process itself guarantees that even these voters will be treated differently *among themselves* based on arbitrary circumstances.

The targeted voters will have their ballots count only if a series of conditions are met *six months after the election*, when voters are no longer paying attention or expecting to be contacted by election officials about their votes: (1) the voter must still be alive; (2) the voter must receive notice of their duty to cure; (3) the voter must be able to cure within a 30-day window; (4) the voter must be willing to take time out of their day to cure; and (5) the voter must choose to cure (and not, for example, have changed their mind in the intervening months about their preference for Associate Justice or believe that their vote will not change the outcome). None of these conditions has anything to do with the voters' eligibility to cast a ballot in November 2024; they are arbitrary distinctions created by a retroactive change in the election rules.

Courts routinely reject disparate treatment of the electorate, as such treatment "must survive *exacting* judicial scrutiny." *Kim v. Bd. of Ed. of Howard Cnty.*, 93 F.4th 733, 740–41 (4th Cir. 2024) (emphasis added). The Southern District of New York rejected a ballot-counting process dependent on the delivery date of the ballot when the question of "[w]hether an individual's vote will be counted . . . may depend in part on something completely arbitrary"—there, the voter's "place of residence and by extension, the mailbox or post office where they dropped off their ballot." *Gallagher*, 477 F. Supp. 3d at 47. This "voting process where arbitrary factors lead the state to valuing one person's vote over that of another" is the "kind of process specifically prohibited by the Supreme Court." *Id*. at 48 (citing *Bush*, 531 U.S. at 104–05); *see also Richardson v. Trump*, 496 F. Supp. 3d 165, 183–87 (D.D.C. 2020) (highlighting "policy changes [that] infringe upon [plaintiffs'] constitutional right to vote and violate the Equal Protection Clause"); *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 125–28 (D.D.C. 2020) (same); *Doe v. Walker*, 746 F. Supp.

2d 667, 679–80 (D. Md. 2010) ("By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote.").

The potential for disparate treatment is uniquely fraught given the types of voters implicated here. These voters are "[a]ctive servicemembers and their families, missionaries, exchange students, corporate officers, doctors, lawyers, teachers, [and] diplomats"—all of whom, by the nature of their overseas location and/or the demands of their occupations, may face significant hurdles to receiving notice of, and complying with, the cure process. *Griffin*, 2025 WL 1090903, at *3 (Earls, J., concurring in part and dissenting in part). A member of the U.S. armed forces may be unable to extricate themselves from an active combat zone to check their mail regarding an election that ended six months ago. A missionary may be serving in too remote a location to send their photo identification back in a timely fashion. A doctor providing medical help in an impoverished region without regular access to their mail may be unaware that their vote has been challenged. These people made plans to vote in or before November 2024 in accordance with the then-existing rules. Understandably, they did *not* make plans to continue defending their votes in six months.

Similarly, voters who checked the "never lived in the United States" box on the Federal Post Card Application had no reason to believe that they would be at risk of having their votes tossed out six months after the election. This box "says nothing of intent or domicile," *Griffin*, 2025 WL 1090903, at *8 n.9 (Earls, J., concurring in part and dissenting in part), and no one "has any idea whatsoever how many of these voters would have selected an option indicating they also intend to live in North Carolina had it been presented," *Griffin*, 2025 WL 1021724, at *38

(Hampson, J., dissenting). In fact, it is not even clear that all these challenged voters checked that box. As the State Board acknowledges, recent "news reports and *a sample internal review of the voter history of these voters* indicates that some have resided in the state previously." ECF No. 61 at 4 n.6 (emphasis added). These individuals appear to include former students at North Carolina educational institutions, a retired Duke University professor, an army mechanic at Fort Bragg, and a postal worker in Jacksonville, North Carolina. *See* Judd Legum et al., *North Carolina Supreme Court throws out hundreds of ballots based on flawed data*, Popular Information (Apr. 15, 2025), https://popular.info/p/north-carolina-supreme-court-throws, archived at https://perma.cc/7RZJ-DDJ8. Regardless of how these voters ended up on Judge Griffin's list—because they were "incorrectly identified as never residents," "inadvertently indicated that they never lived in the United States," or for some other reason, ECF No. 61 at 4 n.6—they are being subjected to disparate treatment in violation of the Equal Protection Clause.

Ultimately, "even the nuts and bolts of election administration must comport with equal protection." *Jones v. United States Postal Serv.*, 488 F. Supp. 3d 103, 130 (S.D.N.Y. 2020). "*Bush v. Gore* stands for the proposition that an equal protection violation occurs when *arbitrary disparities in voting mechanisms* make it less likely that voters in certain areas will cast votes that count." *Id.* (emphasis added). Judge Griffin's protests—and especially his selective targeting of military and overseas voters—all but ensure these arbitrary, unconstitutional disparities.

## III. Inadequate Notice and Opportunity to Be Heard Violate the Procedural Due Process Requirements of the Fourteenth Amendment.

"Multiple district courts . . . have considered procedural due process challenges to election regulations under ordinary procedural due process principles." *Arizona Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1093 (D. Ariz. 2020) (collecting cases); *see also Democracy North Carolina v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 228-29 (M.D.N.C. 2020) (applying

the factors for a due process claim against a North Carolina law governing absentee ballots). To succeed on a procedural due process claim, a plaintiff must show: "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011) (quotation marks omitted). To assess the adequacy of procedural protections, courts examine three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

First, the liberty interest here is obvious. "[N]o right is more precious in a free country than that of having a voice in the election of those who make the laws." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016) (citation omitted). That right necessarily includes the rights of voters both to "cast their ballots" and to "have them counted." *Gray*, 372 U.S. at 380. Judge Griffin's election challenges are squarely aimed at compromising those rights.

Second, deprivation of the voters' interest has transpired through their potential disenfranchisement without adequate notice either of Judge Griffin's challenges or of the cure process. North Carolina voters have a due process right to notice that their ballots are being challenged. *See, e.g.*, *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 674 (M.D.N.C. 2024); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 228 (M.D.N.C. 2020). At a minimum, the method of service must amount to "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their

objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see also Wolf v. Fauquier Cnty. Bd. of Superv.*, 555 F.3d 311, 323 (4th Cir. 2009) (procedures are typically inadequate if they do not provide "notice and an opportunity to be heard").

Third, the procedures employed to protect that due process right are constitutionally inadequate. The importance of the private interest is indisputable. The election challenges and subsequent cure process are also rife with opportunities for error. Judge Griffin never identified a "*single* voter" who "was, in fact, ineligible to vote in the 2024 General Election under the statutes, rules, and regulations in place in November 2024 governing that election." *Griffin*, 2025 WL 1021724, at *15 (Hampson, J., dissenting) (emphasis in original). Judge Griffin has not claimed that any of the voters used a false identity. All military and overseas voters were required to sign declarations under penalty of perjury attesting to their eligibility to vote and identity. *See* N.C. Gen. Stat. §§163-258.4(e), 163-258.13. Nevertheless, these voters will have their ballots cancelled if they now fail to abide by a cure process six months after the election, seemingly with no subsequent opportunity to appeal an erroneous determination. And that risk of error is even starker for voters who never received the initial notice of Judge Griffin's protest.

Judge Griffin's chosen form of notice—a non-forwardable bulk mail postcard—was not reasonably calculated to notify voters of his election protest. The notice did not even specify Judge Griffin as the challenger (it was "paid for" by the North Carolina Republican Party). Nor did it definitively address the voter implicated (using a bulk-mail address line directed to the voter or "current resident"). The postcards equivocally stated that the recipient's vote "*may*" be affected by a pending election protest. Recipients were directed to a QR code that led to a N.C. Republican Party website with links to *hundreds* of protests filed by four candidates. Not every challenged voter received the postcard. And those successful recipients who did not discard the postcard as

election season junk-mail and were able to navigate the QR code, would then have to sift through spreadsheet printouts, not organized alphabetically, to determine whether and why their votes "may be affected" by the various protests.

When notice is a person's due, "process which is a mere gesture is not due process" at all. *Mullane*, 339 U.S. at 315. Judge Griffin's postcard was a mere gesture. The mailing "forc[ed] voters to have the technological means, ability, or trust to not only scan a QR code—sent anonymously through the mail— but to then be directed to a partisan website in order to sift through dozens of challenges and thousands of names, which were not even listed in alphabetical order." *Griffin*, 2025 WL 1021724, at *20 (Hampson, J., dissenting). This does not pass constitutional muster.

The court-ordered implementation of a novel cure process will only compound those deficiencies. No matter how the State Board implements that process, there will once again be insufficient procedural safeguards in place to ensure that voters—including deployed active-duty servicemembers deployed abroad—will receive the notice and have the sufficient time and resources to comply. *See, e.g.*, *Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1342 (N.D. Ga. 2019) (recognizing that unconstitutional burdens on the right to vote may be "exacerbated when voters are faced with a constrained timeframe for absentee voting").

The nature of these voters' locations and occupations means that many may not have regular access to their mail, may not receive the remedial notice in a timely fashion, or may not be able to provide the requested materials before the 30-day window has closed. *See supra* Part II. And since not all implicated voters received the initial notice of Judge Griffin's challenges, voters who also do not receive the State Board's mailing will be disenfranchised with no notice. Thus, the execution of the cure process, despite the State Board's best efforts, will not adequately protect

the procedural due process rights of challenged voters. *See, e.g.*, *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (Voters suffer a procedural due process violation "if election officials reject their ballots" without being "notified or afforded any opportunity to respond").

Finally, there is no compelling government interest in disenfranchising voters without adequate notice and opportunity to be heard. State law provides a challenge and protest process in which a voter is given the opportunity—before their ballot is counted—to attest that they are qualified to vote. *See* N.C. Gen. Stat. §§163-85 to 163-88. These procedures—as well as the election laws and regulations Griffin now contests—were on the books well before the election. There is no reason that process could not have addressed the concerns Judge Griffin now raises. Judge Griffin chose to do nothing. Only *after* the canvassed results made it apparent that Judge Griffin had lost did he resort to a belated challenge process with inadequate notice.

Rather than serve a governmental interest, this course of action will only undermine public confidence in the voting system. And any hypothetical state interest is further undermined by the fact that, again, there has been *no evidence* submitted by Judge Griffin—or uncovered *at any point* in the last six months—that any of the challenged voters were ineligible to cast ballots. Rather, any pronouncements of ineligibility have derived solely from retroactive invalidation of then-applicable voting laws and regulations.

"Absentee voting is a privilege and a convenience to voters, [but] this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) (citation and quotation omitted). That privilege has been infringed by the inadequate notice and opportunity to be heard endemic to Judge Griffin's election protests.

**IV. The Cure Process as Applied to Military and Overseas Voters Imposes an Undue Burden on the Right to Vote.**

The North Carolina appellate courts' imposition of a cure process requiring military and overseas voters to take additional steps to have their ballots counted six months after the election constitutes an undue burden on their right to vote.

An election rule which places a "severe burden on the right to vote . . . must be 'narrowly drawn to advance a state interest of compelling importance.'" *Voto Latino*, 712 F. Supp. 3d at 664 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). An election rule which places a "[n]on-severe burden" on voting rights nevertheless remains subject to the *Anderson-Burdick* test's "balancing standard," whereby the court must weigh "'the character and magnitude of the asserted injury . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id.* (quoting *Burdick*, 504 U.S. at 434). The balancing of interests required by the *Anderson-Burdick* test therefore "operates on a sliding scale: the greater the burden imposed, the more important a state's justification must be." *Id.*

The Court's cure process requires military and overseas voters "to clear additional hurdles to have their vote counted" that were not in place during the November 2024 election. *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *7 (N.C. Apr. 11, 2025) (Earls, J., concurring in part and dissenting in part). The imposition of these significant hurdles nearly half a year after the election constitutes a "severe burden" under the *Anderson-Burdick* test and so must be narrowly drawn to accommodate a compelling state interest. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring) ("Burdens are severe if they go beyond the merely inconvenient" and extend beyond "those requiring 'nominal effort' of everyone."); *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) ("election laws that impose a severe burden on ballot access are subject to strict scrutiny.").

No such compelling interest is present here. The justification for the cure process appears to be "minimiz[ing] the risk of voter fraud." *Griffin*, 2025 WL 1021724, at *12. But Judge Griffin "has yet to identify a single voter" who fraudulently cast a ballot under Article 21A, *id.* at *15 (Hampson, J., dissenting), and there is "no[] dispute" that the votes purportedly needing to be cured "were cast consistent with the established election rules and procedures that were in place well before the 2024 general election," *Griffin*, 2025 WL 1090903, at *4 (Earls, J., concurring in part and dissenting in part). There is no evidence of fraud whatsoever. And these votes were counted in every other race in 2024 (and in counties where Judge Griffin filed no challenges). Thus, rather than resolving the validity of a *limited* number of votes for which presented evidence suggests were fraudulently cast, the cure process "presume[s] to be fraudulent" *all* votes cast by military and overseas voters without photographic identification "unless they can prove otherwise within thirty calendar days." *Griffin*, 2025 WL 1090903, at *3 (Earls, J., concurring in part and dissenting in part). Such an overexpansive requirement fails to be narrowly drawn to the purported interest of the Court's cure process. *See Gallagher*, 477 F. Supp. 3d at 44 ("State action is not narrowly drawn if it is 'overinclusive,' meaning that it regulates conduct that does not meaningfully advance the state interest at issue." (citing *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991)).

Thus, the severe burden placed on affected voters by the cure process is unenforceable under the *Anderson-Burdick* test. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1324–25 (11th Cir. 2019) (holding Florida's signature-match scheme constituted a "serious burden on voters [that] outweighs Florida's identified interests," in part because the cure provision did "not guarantee that [voters] would be notified of any signature mismatch until it was too late to do anything to remedy the problem"); *Obama for Am. v. Husted*, No. 2:12-cv-636, 2014 WL 2611316,

at \*4 (S.D. Ohio June 11, 2014) (holding that election law imposing on non-military voters an in-person voting deadline of the Friday before election day was unenforceable because it created a "great . . . burden" on voter rights and the "State fail[ed] to articulate a precise, compelling interest" justifying this burden).[3]

## V. The Systematic Post-Election Removal of Voter Registrations Would Violate the National Voter Registration Act.

Judge Griffin seeks the mass removal of voters he challenged as "Never Residents" from the North Carolina voter rolls. This request violates the National Voter Registration Act, which provides that "a State shall complete, *not later than 90 days prior to the date of a primary or general election for Federal office*, any program the purpose of which is to *systematically remove* the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added).

According to Judge Griffin, all the voters who checked a box indicating that they never lived in the United States should be removed without further inquiry from North Carolina's "unified registration system for both state and federal elections." *Republican Nat'l Comm. v. N.C. State Bd. Elections*, 120 F.4th 390, 401 (4th Cir. 2024). This removal would come after the 90-day deadline and it would be systematic within the meaning of the National Voter Registration Act because it "does not require communication with or particularized investigation into any specific individual." *Virginia Coal. for Immigrant Rts. v. Beals*, No. 24-2071, 2024 WL 4601052, at \*1 (4th Cir. Oct. 27, 2024) (order on motion for stay). "Rather, the inclusion of a person's name on

---

[3] Even if it constitutes a "non-severe burden" on voting rights (which it does not), the court-mandated cure process is still unenforceable under the *Anderson-Burdick* test. Election laws "fail the *Anderson*[-*Burdick*] balancing test when the interests that it serves are minor" in comparison to the "moderate burdens" it places on voters. *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (1995); *Lee*, 915 F.3d at 1318–19 ("And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden."). Such a scenario is presented here.

a list electronically compared to other agency databases is enough for removal from the voter rolls." *Id.*

## VI. The Cancelling of Votes Post-Election Violates the Voting Rights Act and Requiring Military and Overseas Voters to Provide Photo ID Violates UOCAVA

Judge Griffin's protests violate two additional federal laws.  First, the Voting Rights Act prohibits state officials from "willfully fail[ing] or refus[ing] to tabulate, count, and report" the votes of individuals who were "qualified to vote" in the election. 52 U.S.C. § 10307(a).  Judge Griffin has offered no evidence that any of the voters he challenges were not "qualified to vote" under North Carolina law.  Therefore, the imposition of additional requirements post-election to count votes in *this race only*, as Judge Griffins seeks to do here, violates the Voting Rights Act.

Second, military and overseas voters who are covered by UOCAVA are exempt under federal law, *see* 52 U.S.C. § 21083(b)(3)(C), from state requirements that they provide a copy of a photo ID or other documentation of their name and address when voting by mail, *see* 52 U.S.C. § 21083(b)(1).  *See also* Decision & Order 37-38 (federal law "governs the process for a covered voter to request and submit a ballot" and "an effort to place additional, state-level requirements on UOCAVA voters casting a ballot by methods ultimately provided and governed by federal law" is of "questionable validity").  Accordingly, the federally prescribed forms created for these voters to vote in both federal and state elections, and their corresponding instructions, do not include a requirement for voters covered by UOCAVA to include a photocopy of their photo ID.  And no other state has required photo ID of these voters to vote in their state elections.  Indeed, when states tried, the Department of Defense under the first Trump Administration specifically took the position that states *may not* apply an independent photo ID requirement to our military, their families and other overseas voters.  *See* Letter from Director Beirne to Commissioner Cortes, Virginia Department of Election (Feb. 6, 2017) (cited in Board's Decision & Order at n.26), available at

fvap.gov and archived at https://perma.cc/2BSZ-VUJ4; *see also* Letter from Director Beirne to Director Robert A. Brehm and Director Todd Valentine, New York State Board of Elections (Mar. 1, 2017), available at fvap.gov and archived at https://perma.cc/K4XU-44V6.

## CONCLUSION

The Court should enter judgment in favor of Justice Riggs (and the State Board) stating that federal law bars Judge Griffin's efforts to overturn the November 2024 general election for Seat 6 on the Supreme Court of North Carolina.

Dated: April 21, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

  /s/ *Raymond M. Bennett*
Raymond M. Bennett
N.C. State Bar No. 36341
Samuel B. Hartzell
N.C. State Bar No. 49256
Zachary N. Bernstein
N.C. State Bar No. 61681
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
(919) 755-2112
ray.bennett@wbd-us.com
sam.hartzell@wbd-us.com
zachary.bernstein@wbd-us.com

*Counsel for Intervenor-Defendant Allison Riggs*