# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| JEFFERSON GRIFFIN, | |
| *Plaintiff,* | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | |
| *Defendant,* | Case No. 5:24-cv-00731-M-RJ (lead) |
| and | |
| ALLISON RIGGS, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, JUANITA ANDERSON, | |
| *Intervenor-Defendants.* | |
| NORTH CAROLINA DEMOCRATIC PARTY, | |
| *Plaintiff,* | |
| v. | Case No. 5:24-cv-00699-M-KS |
| NORTH CAROLINA STATE BOARD OF ELECTIONS et al., | |
| *Defendants.* | |
| CARRIE CONLEY et al., | |
| *Plaintiffs,* | |
| v. | Case No. 5:25-cv-00193-M-RJ |
| ALAN HIRSCH et al., | |
| *Defendants.* | |

## VOTEVETS ACTION FUND, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, TANYA WEBSTER-DURHAM, SARAH SMITH, AND JUANITA ANDERSON'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

I.      Griffin's challenges and federal and state court proceedings. ........................... 3

II.     UOCAVA and UMOVA voters have been presumptively disenfranchised....................... 3

III.    The state courts' cure order burdens and disenfranchies the VoteVets Intervenors'
        members and constituents. ............................................................................ 4

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT .................................................................................................................. 6

I.      The cure process ordered by the North Carolina courts violates the U.S. Constitution. .... 6

        A.      The federal guarantee of substantive due process bars post-election
                disenfranchisement of law-abiding voters. ............................................ 6

        B.      The Equal Protection Clause prohibits subjecting similarly-situated voters to
                varying voting rules applied arbitrarily ............................................... 10

        C.      The cure process ordered by the North Carolina courts unconstitutionally
                burdens the federal right to vote. ..................................................... 12

        D.      The cure process ordered by the North Carolina courts violates the procedural
                due process rights of military and overseas voters. ................................. 14

II.     The state court orders violate federal voting and civil rights laws. ................................... 16

        A.      The National Voter Registration Act prohibits Griffin's post-election effort to
                challenge the registration status of UMOVA voters. ................................ 16

        B.      The materiality provision of the Civil Rights Act bars disenfranchising North
                Carolina residents .......................................................................... 18

CONCLUSION ............................................................................................................... 22

CERTIFICATE OF COMPLIANCE ...................................................................................... 23

CERTIFICATE OF SERVICE ............................................................................................ 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Jackson*,
No. 5:20-CT-3231-M, 2025 WL 981855 (E.D.N.C. Apr. 1, 2025) ...................................... 6

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .................................................................... 16, 17

*Ass'n of Cmty. Orgs. For Reform Now v. Edgar*,
56 F.3d 791, 793 (7th Cir. 1995) ............................................................................ 18

*Bennett v. Yoshina*,
140 F.3d 1218 (9th Cir. 1998) ............................................................................ 8, 9

*Bush v. Gore*,
531 U.S. 98 (2000) .......................................................................... 1, 2, 10, 11, 12

*Democracy N.C. v. N.C. State Bd. of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020) ............................................................ 14, 15

*Elderberry of Weber City, LLC v. Living Centers-Se., Inc.*,
794 F.3d 406 (4th Cir. 2015) ................................................................................ 6

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) .............................................................................. 12

*Gallagher v. N.Y. State Bd. of Elections*,
477 F. Supp. 3d 19 (S.D.N.Y. 2020) .............................................................. 10, 11

*Griffin v. Burns*,
570 F.2d 1065 (1st Cir. 1978) ............................................................................ 7, 13

*Griffin v. N.C. State Bd. of Elections*,
No. 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025) ...................................... 3, 8, 8, 9

*Griffin v. N.C. State Bd. of Elections*,
No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025) ............... 4, 7, 11, 10, 11

Order, *Griffin v. N.C. State Bd. of Elections*,
No. 25-1018 (4th Cir. Feb. 4, 2025) .................................................................... 1

*Hendon v. N.C. State Bd. of Elections*,
710 F.2d 177 (4th Cir. 1983) .............................................................. 1, 2, 7, 9, 13

ii

*Hoblock v. Albany Cnty. Bd. of Elections*,
422 F.3d 77 (2d Cir. 2005) ................................................................. 8

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019) ......................................................................... 17

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ........................................................ 2, 9

*Libertarian Party of Va. v. Alcorn*,
826 F.3d 708 (4th Cir. 2016) ...................................................... 12, 13

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*,
512 F. Supp. 3d 1354 (M.D. Ga. 2021) .............................................. 18

*Martin v. Kemp*,
341 F. Supp. 3d 1326 (N.D. Ga. 2018) ......................................... 15, 16

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) .............................................. 18, 21, 22

*N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*,
No. 1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ...................... 16

*Ne. Ohio Coal. for Homeless v. Husted*,
696 F.3d 580 (6th Cir. 2012) ........................................................ 8, 9

*Project Vote/Voting for Am., Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) .......................................................... 18

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
762 F. Supp. 1354 (D. Ariz. 1990) .................................................... 14

*Roe v. Alabama*,
43 F.3d 574 (11th Cir. 1995) ............................................................ 8

*United States v. Alabama*,
998 F. Supp. 2d 1283 (M.D. Ala. 2014) .............................................. 16

*United States v. White*,
927 F.3d 257 (4th Cir. 2019) ...................................................... 14, 15

*Voto Latino v. Hirsch*,
712 F. Supp. 3d 637 (M.D.N.C. 2024) ................................................ 13

iii

**Statutes and Rules**

52 U.S.C.
  § 10101(a)(2)(B) .................................................................. 20, 22
  § 20501(a)(1) ......................................................................... 18
  § 20507(c)(2)(A) .................................................................... 16

8 N.C. Admin. Code 17.0109 .................................................................. 3

8 N.C. Admin. Code 17.0109(d) ............................................................. 8

N.C. Gen. Stat.
  § 163-230.1 ........................................................................... 13
  § 163-258.1 ............................................................................. 4
  § 163-258.2 ............................................................................. 9

Fed. R. Civ. P. Rule 56(a) ...................................................................... 6

**Other Authorities**

156 Cong. Rec. S4514 (2010) (Statement of Sen. Schumer) .................................. 5, 15

Federal Voting Assistance Program, *FPCA: Registering and requesting your absentee ballot* (North Carolina), https://www.fvap.gov/guide/chapter2/north-carolina (last visited Apr. 21, 2025) .......................................................................... 20

N.C. State Bd. of Elections, State Board Will Not Order Full Recount in NC Supreme Court Contest (Dec. 10, 2024), https://www.ncsbe.gov/news/press-releases/2024/12/10/state-board-will-not-order-full-recount-nc-supreme-court-contest .............................................. 2

Pet. for Writ of Mandamus, *Griffin v. N.C. State Bd. of Elections*, No. COA25-181 (N.C. Ct. App. Apr. 16, 2025) ......................................................... 4, 11, 20

Voter Registration and Absentee Ballot Request: Federal Post Card Application (FPCA), https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited Apr. 21, 2025) ............... 19

## INTRODUCTION

Over five months ago, millions of North Carolina voters cast their ballots in accordance with longstanding and clear election rules. Each of those voters had every reason to expect their vote would count. None could have foretold that—nearly *half a year later*—their ballots would be deemed invalid, all due to the ongoing crusade of one disaffected candidate—Judge Jefferson Griffin—to reverse his defeat at the ballot box. Worse yet, many of the targeted voters are serving in our military, and it is undisputed that all of them obeyed the rules as they existed on election day. The Constitution's guarantees of due process, equal protection, and the right to vote, as well as the National Voter Registration Act ("NVRA") and the Civil Rights Act of 1964 ("CRA"), clearly bar Griffin's demand to toss out the ballots of thousands of rule-following voters based on novel, post-election interpretations of state law, which Griffin only seeks to apply to some voters, in hopes of obtaining an electoral advantage.

The Fourth Circuit reserved these issues for the federal courts and the North Carolina courts appropriately did not adjudicate these critical federal questions. Order, *Griffin v. N.C. State Bd. of Elections*, No. 25-1018 (4th Cir. Feb. 4, 2025) (ECF No. 132). The case now presents several extremely clearcut questions of federal law. For instance, can a losing candidate change the rules of the election *after* he loses it? The answer is no; such sandbagging of the electoral process violates substantive due process. *See Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (citing *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)). Similarly, can a losing candidate exploit post-election state court rulings to retroactively impose new requirements on voters in handpicked counties that heavily supported his opponent? Again, the answer is no— equal protection prohibits such "arbitrary and disparate treatment" of voters. *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam). That Griffin's challenge now targets only military voters,

1

their families, and other overseas citizens adds yet more constitutional violations; the relief he seeks unduly burdens the right to vote, offends procedural due process, and runs headlong into the protections guaranteed by federal laws like the NVRA and the CRA. These clear conclusions are not altered by the imposition of a discriminatory "cure" process, under which some (but not all) voters targeted by Griffin can try to salvage their now presumptively invalid ballots. The imposition of this cure process—solely on voters cynically targeted by Griffin based on their perceived political affiliation—itself offends the federal constitution. *See Bush*, 531 U.S. at 104; *cf. League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("*LWV*").

Simply put, our federal Constitution and this Circuit's precedents prohibit Griffin's effort to "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon*, 710 F.2d at 182 (citation omitted). Any other conclusion would incentivize *every* losing candidate to behave as Griffin has, launching an endless effort to retroactively change election rules in the hope that *some* court, *somewhere* will reward his gamble. This Court has any number of federal grounds upon which to end this ongoing legal saga and to give long overdue voice to the will of North Carolina voters. It should permanently enjoin the Board from engaging in the discriminatory and unconstitutional cure process ordered by the North Carolina courts; permanently enjoin the Board from discarding any votes cast by voters who have been challenged by Griffin; and order the Board to certify the results of the election as they stood at the time of its final formal count on December 10, 2024.[1]

---

[1] *See* N.C. State Bd. of Elections, *State Board Will Not Order Full Recount in NC Supreme Court Contest* (Dec. 10, 2024), https://www.ncsbe.gov/news/press-releases/2024/12/10/state-board-will-not-order-full-recount-nc-supreme-court-contest.

# BACKGROUND

## I. Griffin's challenges and federal and state court proceedings.

VoteVets Action Fund, North Carolina Alliance For Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (collectively, "VoteVets Intervenors") join and incorporate by reference the Background section in Justice Riggs's Opening Brief, ECF No. 84, with respect to the procedural history of the case.

## II. UOCAVA and UMOVA voters have been presumptively disenfranchised.

The state courts ordered the presumptive disenfranchisement of two groups of voters. First, Griffin challenged 1,409 voters in Guilford County who voted under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and complied with all applicable rules for returning their absentee ballots. After those voters had already cast those ballots, Griffin argued that they should have also submitted photo identification with those ballots—notwithstanding that the Board has expressly exempted UOCAVA voters from this requirement since at least 2020 ("UOCAVA ID Challenge"). *See* 8 N.C. Admin. Code 17.0109. In post-election proceedings, the Supreme Court of North Carolina granted Griffin's request to change the rules after the fact, and ordered that these voters be given 30 calendar days from the time the Board issues notice to them of their need to cure their absentee ballot to provide proof of their identification. *See Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025).[2]

Griffin also challenged the ballots of 266 citizens living abroad who are entitled to vote under North Carolina's Uniform Military and Overseas Voters Act ("UMOVA"), a law enacted *unanimously* by the Legislature and implemented without incident in dozens of elections over more

---

[2] As noted in the Board's Notice, Griffin timely challenged UOCAVA voters in only Guilford County. After the filing deadline, Griffin sought to add challenges to ballots cast in Durham, Forsyth, and Buncombe Counties. *See* State Board's Notice of Remedial Efforts in Response to the Court's April 12, 2025 Text Only Order 2 n.2, ECF No. 61 ("Board Notice").

than a decade ("UMOVA Challenge"). N.C. Gen. Stat. § 163-258.1, *et seq*. In adjudicating Griffin's post-election challenges, the North Carolina Court of Appeals concluded that voters who purportedly selected a checkbox on their absentee ballot application that they have never resided in North Carolina are ineligible to vote in the state and their ballots must be thrown out. *Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *15 (N.C. Ct. App. Apr. 4, 2025). The Supreme Court of North Carolina declined to disturb that determination. *See Griffin*, No. 320P24-3, 2025 WL 1090903 at *3. Griffin now insists these orders require the Board to reject ballots cast by every voter in the state that purportedly selected that checkbox—without any inquiry into whether he properly identified those voters as having never lived in North Carolina. *See* Pet. for Writ of Mandamus at 14, *Griffin v. N.C. State Bd. of Elections*, No. COA25-181 (N.C. Ct. App. Apr. 16, 2025) ("Griffin Mandamus Pet.").

### III. The state courts' cure order burdens and disenfranchies the VoteVets Intervenors' members and constituents.

The unprecedented, post hoc disenfranchisement ordered by the North Carolina courts subjects VoteVets Intervenors' members and constituents to new voting requirements and unequal treatment, even though they cast their ballots in accordance with long-established procedures for voting in the 2024 election. In particular, the groups of voters served by VoteVets—servicemembers, their families, and other retired veterans—who participated in the 2024 election under UOCAVA, UMOVA, and related procedures, had the rightful expectation that their ballots would be counted under established law and practice. *See* Decl. of Peter Mellman ¶ 13, ECF No. 13-6 ("Mellman Decl."); Decl. of Major General Paul Eaton ¶¶ 4–5, ECF No. 58 ("Eaton Decl."). The invalidation of their votes subjects these voters to unnecessary burdens to protect their lawful ballots and discriminates against them based on their home county. Many of these voters are likely to be disenfranchised. Eaton Decl. ¶ 7. The resulting harm will be particularly acute for VoteVets'

constituents because these voters already face unique obstacles when casting a ballot, and "adding after the fact requirements on just these voters" that make voting even more burdensome will likely "disillusion them" from participating in future elections. *Id.* ¶¶ 10, 12.

The belated cure process, created purportedly to protect voters who played by the rules as they were written only to have them altered after the election, is of little comfort for VoteVets Intervenors members and constituents. For one, it is "likely [to] create huge confusion among VoteVets constituents." *Id*. ¶ 8. Furthermore, there are several hurdles VoteVets' constituents must clear in order to successfully cure their ballot under this post hoc process. First, they must be contacted and made aware of the need to cure and the process for curing. But military voters and their families are often difficult to contact due to deployment (including on ships and submarines), delayed mail delivery on military bases, and their remote locations. *Id.* ¶ 7. Since the election took place nearly half a year ago, many military voters may have relocated for any number of reasons, including redeployment. *Id.* And even if they can be contacted, many military voters will lack ready access to the required photo identification or technology to submit what they need to cure their ballot. *Id.* Even voters who can be reached and have the necessary paperwork and access to technology may be discouraged from jumping through extra hoops for their validly-cast ballot to count. *Id.* Many of these voters will likely end up disenfranchised. *Id.*

The damage does not stop there. Military voters already vote at lower rates than the civilian population, due in part to the added hurdles they must overcome to make their ballots count, particularly if they are stationed overseas. *Id.* ¶¶ 10, 12. Because of such barriers, Congress has provided special processes and protections to these voters to help facilitate their ability to cast and timely submit a ballot. *See* 156 Cong. Rec. S4514 (2010) (Statement of Sen. Schumer) (amending UOCAVA). Imposing this brand new and additional cure process selectively on military and

overseas voters flies in the face of these federal protections and will lead many of the voters served by VoteVets to be less likely to vote in future elections. *Id.*

## LEGAL STANDARD

The Court's briefing order indicates a desire to "facilitate prompt resolution of this matter," suggesting the Court views these briefs as cross-motions for summary judgment. *See* Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Elderberry of Weber City, LLC v. Living Centers-Se., Inc.*, 794 F.3d 406, 411 (4th Cir. 2015) (quotation omitted). "For cross-motions for summary judgment, the court 'consider[s] each motion separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law.'" *Abrams v. Jackson*, No. 5:20-CT-3231-M, 2025 WL 981855, at *6 (E.D.N.C. Apr. 1, 2025) (quoting *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014)).

## ARGUMENT

## I.     The cure process ordered by the North Carolina courts violates the U.S. Constitution.

### A.     The federal guarantee of substantive due process bars post-election disenfranchisement of law-abiding voters.

There is no dispute that the two outstanding groups of voters who Griffin seeks to disenfranchise—UOCAVA voters and UMOVA voters—followed applicable election rules and instructions as they existed on Election Day 2024. The federal Constitution's guarantee of substantive due process prohibits disenfranchising these voters, regardless of any post hoc cure procedure.

This doctrine was first articulated in a factually analogous case, where the First Circuit held it was unconstitutional to discard votes after the conclusion of an election in which voters had reasonably relied upon election rules that were only *later* deemed unlawful by a state court after

the election concluded. *See Griffin v. Burns*, 570 F.2d 1065, 1067, 1074 (1st Cir. 1978). In *Griffin*, officials distributed absentee ballots for a primary election in Rhode Island. *Id.* at 1067. A losing candidate later challenged these ballots on the theory that Rhode Island law did not permit absentee voting in primary elections, notwithstanding years of contrary practice. *Id.* at 1067-68. After a divided state supreme court agreed with the losing candidate's interpretation of state law and invalidated the ballots, voters sued in federal court to protect their right to vote. *Id.* at 1068.

The First Circuit ruled for the voters, finding "Rhode Island could not, constitutionally, invalidate the absentee . . . ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means[.]" *Id.* at 1074. The court recognized that discarding ballots where voters simply followed the rules given to them would be a "fundamental unfairness," resulting in a "flawed [electoral] process." *Id.* at 1076-77. As here, voters "were doing no more than following the instructions of the officials charged with running the election," and it was unreasonable to expect individual voters to, "at their peril, somehow . . . foresee" a future interpretation of state law that would invalidate their ballots after-the-fact. *Id.* at 1075-76. To disenfranchise such law-abiding, good faith voters would "present[] a due process violation." *Id.* at 1078.

These due process principles are "settled" law within this Circuit, *Hendon*, 710 F.2d at 182 (citing *Griffin*, 570 F.2d at 1077), which has sensibly recognized that "parties having grievances based on election laws" have a "duty" to "bring their complaints forward for pre-election adjudication when possible," *id.* at 182. Rarely, if ever, should courts "depart from the general rule that denies relief with respect to past elections." *Id.* Yet that is precisely what the North Carolina courts have ordered here—a backwards looking remedy that punishes an arbitrary subset of voters who obeyed every instruction and followed every rule. *See Griffin*, No. COA25-181, 2025 WL

7

1021724, at *15; *Griffin*, No. 320P24-3, 2025 WL 1090903, at *3. Time and time again, federal

courts have echoed *Griffin* and *Hendon* in holding that substantive due process prohibits after-the-

fact changes to election law. *See, e.g.*, *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98

(2d Cir. 2005) (affirming order to enjoin officials from tossing out ballots cast by voters mistakenly

sent absentee ballots (citing *Griffin*, 570 F.2d at 1077)); *Roe v. Alabama*, 43 F.3d 574, 581 (11th

Cir. 1995) (holding post-election state court ruling could not impose "a retroactive change in the

election laws" (citing *Griffin*, 570 F.2d at 1075)). Due process prohibits rejecting ballots where

"state actions . . . induce[d] voters to miscast their votes." *Ne. Ohio Coal. for Homeless v. Husted*,

696 F.3d 580, 597 (6th Cir. 2012) (citing *Griffin*, 570 F.2d at 1074, 1078-79).

    The Ninth Circuit has distilled these cases to hold that a due process violation occurs where

there is "(1) likely reliance by voters on an established election procedure and/or official

pronouncements about what the procedure will be in the coming election; and (2) significant

disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140

F.3d 1218, 1226-27 (9th Cir. 1998) (noting *Griffin's* concern with "the massive ex post

disenfranchisement" of voters who would have no reason to suspect any infirmity with their vote).

These factors are met as to *all* of the outstanding voters challenged by Griffin.

    Voters subject to Griffin's UOCAVA ID Challenge—not one of whom anyone suggests is

unqualified to vote—cast ballots in accordance with a rule first promulgated by the Board in 2020.

*See* 8 N.C. Admin. Code 17.0109(d). These voters plainly relied upon "an established election

procedure and/or official pronouncement[]" as to how to vote from abroad. *Bennett*, 140 F.3d

1226-27. And any change in that procedure *now* will result in "significant disenfranchisement."

*Id.* at 1227; *see generally* Eaton Decl.

That some of these voters may have a chance to rehabilitate their ballots does not cure the constitutional infirmities. These voters' ballots have all been declared presumptively invalid, unlawfully "undo[ing] the ballot results in a court action." *Hendon*, 710 F.2d at 182 (citation omitted). Being subjected to a post hoc process requiring them to jump through new hoops and abide by rules that did not exist at the time of the election is itself unconstitutional. *Cf. LWV*, 769 F.3d at 247 (concluding that requiring voters to vote pursuant to "[d]iscriminatory" voting procedures are precisely "the kind of serious violation of the Constitution" that courts will enjoin. (citation omitted)). The voters needing to cure, moreover, are Americans serving in the military or located overseas, compounding the unprecedented risk of widespread disenfranchisement. *See* Eaton Decl. ¶ 10.

Those voters targeted by the UMOVA Challenge cast ballots under an even longer-standing rule, enacted by the Legislature in 2011 without a single opposing vote. *See* N.C. Gen. Stat. § 163-258.2(1)(e). These voters also indisputably acted in reliance on an established election rule and will be disenfranchised. *Bennett*, 140 F.3d at 1226-27.[3] And the underlying state court orders have cast doubt on whether this group of voters will have *any* opportunity to cure, potentially ensuring their total disenfranchisement. *See Griffin*, No. COA25-181, 2025 WL 1021724, at *15; *Griffin*, No. 320P24-3, 2025 WL 1090903, at *3 .

It would be a gross injustice to punish any of these voters—many of them servicemembers or their families—for "state actions" that "induce[d]" them to allegedly "miscast their votes." *Husted*, 696 F.3d at 597; *see also Hendon*, 710 F.2d at 182 (applying the "general rule that denies relief with respect to past elections" and rejecting challenge to long-existing election regulations).

---

[3] It is not even clear these voters are ineligible to vote under North Carolina law as the state courts have interpreted it. Recent analysis shows that many individuals in this category have previously lived in the state. *See* Board Notice at 4 n.6.

The federal Constitution thus requires this Court to enjoin the Board from rejecting their ballots or subjecting them to additional requirements before their votes can count.

### B. The Equal Protection Clause prohibits subjecting similarly-situated voters to varying voting rules applied arbitrarily.

In *Bush v. Gore*¸ the Supreme Court reaffirmed the longstanding principle that, "[h]aving once granted the right to vote on equal terms," a state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." 531 U.S. at 104-05 (collecting authority). At issue there was the "uneven treatment" of voters in different Florida counties due to "varying [post-election] standards to determine what was a legal vote." *Id.* at 107. As a result, counties with "more forgiving" standards reported a higher number of legal votes than other counties. *Id*. Though the Florida Supreme Court had "the power to assure uniformity" when it ordered a statewide hand recount, it instead "ratified this unequal treatment" by failing to impose uniform standards. *Id.* at 107, 109. That remedy violated the equal protection clause.

This case mirrors *Bush* to a tee. It asks whether North Carolina courts can—after concluding that a statewide rule used in this and other past elections was done so in error—force *some* overseas absentee voters, but not all, to correct that error by providing photo ID, based solely on their county of residence. *Bush* makes clear they cannot. Among the 32,033 UOCAVA voters in the 2024 general election, the state courts' orders affect only the 1,409 UOCAVA voters from Guilford County—plainly amounting to "uneven treatment," violating the "minimum requirement for nonarbitrary treatment of voters." *Bush*, 531 U.S. at 105, 107; Board Notice at 2. Whether an individual's vote will be counted now depends "on something completely arbitrary—their place of residence." *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 47 (S.D.N.Y. 2020) (applying *Bush*). And the reality is far more troubling than "arbitrary." Griffin "discriminate[d] by residence" by naming counties that went for Justice Riggs "by significant margins." *Griffin*, No.

COA25-181, 2025 WL 1021724, at *41 & n.23 (Hampson, J., dissenting).[4] Singling out these voters for discriminatory treatment violates the "[r]udimentary requirements of equal treatment and fundamental fairness" mandated by the Constitution. *Bush*, 531 U.S. at 109.

The cure process also violates equal protection for a separate reason: the results of any cure program will turn on arbitrary circumstances unrelated to voters' qualifications. Despite having followed the rules prescribed, voters who do not receive notice from election officials due to change of address, deployment, travel, death, mail delays, or some other reason will have their votes thrown away based on nothing more than random chance and bad luck. This process, under which "arbitrary factors" lead to the "valuing [of] one person's vote over that of another," is precisely "the kind of process specifically prohibited by the Supreme Court." *Gallagher*, 477 F. Supp. 3d at 48; *see Griffin*, No. COA25-181, 2025 WL 1021724, at *42 (listing numerous arbitrary factors undermining voters' opportunities to cure) (Hampson, J., dissenting).

To be sure, these bedrock equal protection principles do not preclude "local entities, in the exercise of their expertise," from "develop[ing] different systems for implementing elections." *Bush*, 531 U.S. at 109. Nor do they stop candidates from challenging votes in some, but not all, counties. But when a state court, as here, decides *after* an election that the rules in place did not conform to state statutes, the court cannot retroactively apply its "remedial process[]"

---

[4] As noted in the Board's Notice, Griffin timely challenged UOCAVA voters in only Guilford County and subsequently added challenges to ballots cast in Durham, Forsyth, and Buncombe Counties. *See* Board Notice at 2 n.2. Griffin has now challenged the Board's notice in a writ of mandamus filed with the North Carolina Court of Appeals, seeking to expand the number of counties subject to the cure. *See generally* Griffin Mandamus Pet. The outcome of those proceedings has no bearing on the proceedings currently before this Court. Griffin's tardy effort to expand the universe of challenged voters does nothing to remedy the cure process's obvious conflict with *Bush*. Under any proposed cure scenario—whether one county or six counties are singled out—the state courts' order will be selectively applied only to voters from some counties, arbitrarily subjecting them to different, more burdensome rules than similarly situated voters in most of North Carolina's counties.

"uneven[ly]." *Id.* at 107, 108. Because Griffin did not target all counties in his administrative challenges, he left the state courts with two options: (1) reject Griffin's county-specific challenges and apply its new interpretation of state law to all counties prospectively, or (2) unconstitutionally apply its remedy to some counties prospectively, but to others retrospectively. In choosing the second, the state courts "ratified" unconstitutional treatment, *id.* at 107, and pursuant to the Fourth Circuit's order, left these issues for the federal courts to decide in the first instance.

### C. The cure process ordered by the North Carolina courts unconstitutionally burdens the federal right to vote.

The requirement that rule-abiding voters are disenfranchised unless they retroactively "cure" an alleged defect with their ballot constitutes a post-election change to the state's election laws and practices that severely burdens the right to vote. Under the applicable *Anderson-Burdick* test, the Court must "weigh[] the severity of the burden the challenged [practice] imposes on a person's constitutional rights against the importance of the state's interests supporting that law." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 713 (4th Cir. 2016) (citations omitted). Where a challenged process severely burdens voters' rights, it can only survive if it is narrowly drawn to advance a compelling state interest. *See Fusaro v. Cogan*, 930 F.3d 241, 257-58 (4th Cir. 2019).

Some UOCAVA voters' ballots are now invalid unless they submit proof of identification, notwithstanding being told otherwise that there was no need for them to do so by election officials. Compounding the burdens, there are several reasons why these military and overseas voters will be unable to cure their ballots nearly six months after casting them. *See* Eaton Decl. ¶ 7. For example, voters may have relocated; servicemembers are often deployed or traveling for extended periods of time (which can prevent them from receiving notices or curing); and even if they can be contacted, deployed servicemembers and other overseas voters may not have access to the required photo ID or technology needed to submit documentation to election officials. *Id.* In

contrast to the disenfranchising burdens on these voters, the state has no valid—much less compelling—interest in changing the rules after an election and making eligible voters jump through extra hoops months after they complied with existing rules in casting their ballots. *Alcorn*, 826 F.3d at 717.[5]

The wholesale rejection of ballots cast by individuals expressly entitled to vote under UMOVA also imposes an undue burden on the right to vote; indeed, in many instances, it is the complete revocation of that right. That revocation comes 13 years and 43 elections after the General Assembly enacted the UMOVA provision at issue, and months after voters cast their ballots, had those ballots processed and tabulated, and had a candidate identified as the winner of the election. There is no state interest, let alone a compelling one, in retroactively disenfranchising hundreds of voters the North Carolina General Assembly purposefully enfranchised, particularly when such voters have long relied on this law to participate in elections for years and where Griffin insists the underlying state court orders deprive them of *any* opportunity to show their qualification to vote. *See, e.g.*, *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 672–74 (M.D.N.C. 2024) (concluding plaintiffs were likely to succeed in showing that North Carolina's provision allowing

---

[5] The post-election court-ordered "cure" process at issue here—which forces voters to remedy their originally-properly cast ballot months after the election has taken place based on a new interpretation of state law made *after* the election—is nothing like the limited, pre-existing statutory cure processes that the Legislature created to remedy issues with ballot envelopes immediately after election day. *See* N.C. Gen. Stat. § 163-230.1 (requiring county boards to "promptly notify" voters of deficiencies on a voter's absentee container-return envelope as well as the manner in which the voter may cure the deficiency, and providing that ballots are timely cured if received by noon on the third business day after the election). That procedure permits voters to remedy ballots that did not comply with *known, pre-existing rules* at the time they cast their ballots through a similarly *pre-existing* procedure. In contrast, the cure process here springs new voting requirements on voters nearly half a year *after* they already cast their ballots in accordance with existing rules. Courts have made clear that imposing such after-the-fact rules and requirements on voters is unconstitutional. *See, e.g.*, *Griffin*, 570 F.2d at 1074; *Hendon*, 710 F.2d at 182.

rejection of same-day voter registrations and votes without notice to the voter and an opportunity to be heard imposes a substantial burden on affected individuals' right to vote).

### D. The cure process ordered by the North Carolina courts violates the procedural due process rights of military and overseas voters.

A procedural due process analysis requires weighing "(1) [voters'] liberty interest; (2) the risk of an erroneous deprivation of that interest under current procedures; and (3) the government's interest and burden of providing any additional procedure that would be required." *United States v. White*, 927 F.3d 257, 263 (4th Cir. 2019) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Voters suffer a procedural due process violation "if election officials reject their ballots" without being "notified or afforded any opportunity to respond." *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020). The cure process ordered by the North Carolina courts violates the procedural due process rights of military and overseas voters for two reasons.

*First*, to the extent the orders deprive UMOVA voters of *any* cure opportunity—as Griffin insists is the case—they will be unconstitutionally deprived of their liberty interest in having their votes counted. *See Democracy N.C.*, 476 F. Supp. 3d at 226 (citation omitted). If Griffin has his way, the Board will be required to discard ballots cast by challenged UMOVA voters without *any* "form of post-deprivation notice . . . so that any defect in eligibility can be cured and [such voters are] not continually and repeatedly denied so fundamental a right." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). This total lack of notice or opportunity to cure risks wrongful disenfranchisement of eligible North Carolina voters. As the State Board explained in its Notice of Remedial Efforts, some voters Griffin has glibly labeled "never residents" *have in fact* previously resided within North Carolina and "were either incorrectly identified as never residents or inadvertently indicated that they never lived in the

United States." Board Notice at 4 n.6. Given these known errors, a cure process that excludes UMOVA voters runs the risk of depriving voters of their fundamental right to vote and does "not comport with the constitutional requirements of due process." *Raetzel*, F. Supp. at 1358; *see also Democracy N.C.*, 476 F. Supp. 3d at 226 (citing *Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020)).

*Second*, the 30-day cure process ordered by the state court will prove illusory for many UOCAVA voters considering the unique circumstances those voters find themselves in. *See Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2018). Compliance with the procedural due process owed to these voters will prove near impossible because there cannot be sufficient procedural safeguards in place to ensure that these voters—especially deployed military voters— will receive proper notice and have a meaningful opportunity to cure their ballots on time. *See White*, 927 F.3d at 263. Many of the voters who will be subject to this cure process are among the least likely to receive any notice that is sent to them: voters living overseas or on military bases, often in remote areas without access to reliable mail service or internet. Eaton Decl. ¶ 7. And for the same reasons, even if these voters do receive notice within the 30-day window to cure, many will lack a meaningful opportunity to do so. *Id.* Voters living in remote areas in other parts of the world often do not have the ability to photocopy their identification and may be unable to timely return any required paperwork due to the lack of reliable mail service in their areas. *Id.* These challenges—and the practical difficulty of affording these voters a meaningful cure process— highlight the litany of constitutional deficiencies in the cure process that Griffin seeks.

It was also for these precise reasons that Congress amended UOCAVA in 2009 to provide sufficient time for military and overseas voters to receive and complete their absentee ballots and return them to election officials. 156 Cong. Rec. S4514 (2010) (Statement of Sen. Schumer)

("Sending absentee ballots too late to have the opportunity to actually vote is an unacceptable situation for military and overseas Americans."). The burdensome post hoc cure process ordered by the state courts runs headlong into the very purpose of UOCAVA and its amendments, which were meant "to ensure that every single military and overseas vote be counted." *Id.*; *see also United States v. Alabama*, 998 F. Supp. 2d 1283, 1289 (M.D. Ala. 2014) (observing that UOCAVA's legislative history is "replete with references to evidence of barriers UOCAVA voters face . . . and Congress's desire" to overcome these barriers), *aff'd*, 778 F.3d 926 (11th Cir. 2015). As a practical matter, a cure process that requires overseas and military voters to receive notice and return a form of identification within 30 days will prove impossible to complete for many affected voters, resulting in their disenfranchisement, and violating their due process rights. *See Martin*, 341 F. Supp. 3d at 1339 (finding procedural due process violation where cure process was "illusory" for certain voters).

## II. The state court orders violate federal voting and civil rights laws.

### A. The National Voter Registration Act prohibits Griffin's post-election effort to challenge the registration status of UMOVA voters.

The NVRA prohibits efforts to systematically remove voters from the voter rolls within close proximity of an election. *See* 52 U.S.C. § 20507(c)(2)(A) (requiring states to complete systematic removals from voter rolls 90 days before an election). Systematic removals under the NVRA include attempts to remove voters *en masse* without any "individualized inquiry into the circumstances of each voter," as the state courts' orders require here. *See N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *8 (M.D.N.C. Aug. 7, 2018). The purpose of this election season buffer around removals is to ensure that voters are not "removed [from the rolls] days or weeks before Election Day" because they "will likely not be able to correct" any erroneous removals "in time to vote." *Arcia v. Fla. Sec'y*

*of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Yet that is precisely what occurred here—Griffin made an untimely, systematic challenge to the registration status of the entire category of voters casting ballots under a *decade-old* law, waiting until *after* the election to ask whether their registrations were in fact sound. The entire purpose of the NVRA is to avoid such mass disruption to the rolls close in time to an election, requiring systematic challenges to be made well in advance of the election. *See id.* (explaining that "the 90 Day Provision strikes a careful balance: It permits systematic removal programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest").

The fact that Griffin raised his challenge immediately after the election does not save it. The congressional protection mandated by the NVRA's 90-day provision would be gutted if losing candidates could simply convert what should be pre-election registration challenges made far ahead of an election into post-election ballot challenges. *Cf. Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019) (explaining state law is preempted to the extent it serves as an obstacle to the accomplishment of federal legislation). Carving such a mile-wide loophole into the NVRA would eviscerate the 90-day provision entirely, ensuring that dissatisfied candidates in future elections wait until the day *after* the election to challenge voters after they cast ballots and after the results of the election are known. And the result for voters, including VoteVets Intervenors and their constituents is the same either way—they will not be able to participate in the 2024 general election due to untimely and non-individualized challenges to their registration status. Such voters are profoundly prejudiced by this kind of post-election sandbagging, especially given that many of the challenged UMOVA voters *are* in fact demonstrable North Carolina residents. Board Notice at 4 n.6. Had Griffin not blindsided these voters with tardy, post-election challenges, they could have

established as much *before* the election; his delay should not be permitted to rob them of that chance.

It is also of no consequence that the state court's order targets the *ballots* cast by these registered voters, rather than their registration status; that is a "distinction without a difference." *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021) (rejecting this argument). After all, the entire purpose of the NVRA is to ensure that the "right to exercise the[] *franchise* … not be sacrificed." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (emphasis added); *see also* 52 U.S.C. § 20501(a)(1)–(2); (b)(2). That purpose is unquestionably defeated if a voter's ballot can be tossed out after an election based on perceived registration errors, even while nominally leaving the voter on the registration rolls. Simply put, Griffin cannot end-run around the NVRA's protections "by separating registration from voting"—"[r]egistration is indivisible from election." *Ass'n of Cmty. Orgs. For Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995).

**B.** **The materiality provision of the Civil Rights Act bars disenfranchising North Carolina residents.**

Under the materiality provision of the Civil Rights Act, election officials "cannot deny an individual the right to vote because of an 'error or omission [that] is not material in determining' an applicant's eligibility to vote." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 720 (9th Cir. 2025) ("*MFV*") (quoting 52 U.S.C. § 10101(a)(2)(B)). That is precisely what Griffin asks here, however, demanding that the Board disenfranchise voters who are demonstrably North Carolina residents who happened to check a particular box on the Federal Postcard Application (FPCA) to request an absentee ballot that is irrelevant to determining residency. Such an "error" is "not material" to determining whether a person conclusively known to be a North Carolina resident satisfies the

18

residency qualification. Griffin's UMOVA Challenge must be denied to the extent it seeks to disenfranchise such voters.

The FPCA permits UOCAVA voters to apply for an absentee ballot application. It asks the voter to complete several fields, including a box (Box 1) indicating the basis on which they are "request[ing] an absentee ballot for all elections in which [the voter is] eligible to vote." Voter Registration and Absentee Ballot Request: Federal Post Card Application (FPCA), https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited Apr. 21, 2025); *see also* Image 1.



**Image 1: FPCA Form Box 1**

Griffin's challenge of UMOVA voters is premised solely on the fact that under Box 1, a voter has selected that they are "a U.S. Citizen living outside of the country, [and has] never lived in the United States." *See* Image 1. However, his challenge assumes that every voter who has selected this checkbox did so accurately and has never in fact resided in North Carolina. But as the Board's notice explains, many of the challenged UMOVA voters *have* in fact resided in North Carolina, as reflected by their prior registrations and voting history. *See* Board Notice at 4–5. State and local election officials therefore may possess independent and conclusive evidence of a voter's prior North Carolina residence, but these voters may have "inadvertently indicated that they never lived in the United States" in Box 1. *Id.* at 4 n.6. Griffin's UMOVA Challenge nonetheless seeks

to disenfranchise *bona fide* North Carolina residents for an immaterial error they made when completing their FPCA form, without any opportunity to cure or present evidence of North Carolina residence. *See* Griffin Mandamus Pet. at 15–19.

The Civil Rights Act bars disenfranchising lawful voters in this manner. Its materiality provision commands that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an *error or omission* on any record or paper relating to any application, registration, *or other act requisite to voting*, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). But putting a checkmark next to the fourth box in Box 1 of the FPCA is necessarily an immaterial error where the applicant has demonstrated residing, registering, or voting in North Carolina for prior elections. In fact, nothing about the checkbox in Box 1 is even intended to provide election officials with information about a voter's eligibility to vote in a particular state; it concerns what basis permits them to vote under UOCAVA. Guidance from the Federal Voting Assistance Program confirms this, making clear the checkbox is not even *required*. *See* Federal Voting Assistance Program, *FPCA: Registering and requesting your absentee ballot (North Carolina)*, https://www.fvap.gov/guide/chapter2/north-carolina (last visited Apr. 21, 2025) (specifying instructions for filling out Section 1 of the FPCA form). The checkboxes in Box 1 are therefore immaterial to determining an applicant's North Carolina residency and eligibility to participate in the election where election officials have in hand information that *confirms* that same voter's North Carolina residence.

Recently, the Ninth Circuit rejected a similar challenge in *Mi Familia Vota v. Fontes*. That case held that regardless of whether or how a voter completed a citizenship checkbox field on their voter registration form—including by indicating they are not a citizen—Arizona election officials

could not reject their application if the voter independently provided documentary proof of citizenship, as defined elsewhere in state law. *See MFV*, 129 F.4th at 720–21. Because such documentation "is sufficient to show citizenship—a requirement to vote in Arizona—. . . the state form's checkbox requirement has no probable impact in determining applicant's eligibility to vote when [proof of citizenship] has been provided." *Id.* at 721. On this point, the court was unanimous. Even Judge Bumatay, who dissented from much of the majority's decision, agreed the materiality provision prohibited officials from "rejecting applicants for failing to check the citizenship box when those officials have already verified the applicant's citizenship." *Id.* at 761 (Bumatay, J., dissenting in part). The Ninth Circuit's unanimous ruling on this point makes complete sense: a voter should not be rejected based on how they checked a box when it is conclusively *known* the voter is a U.S. citizen.

The reasoning in *Fontes* applies here with equal force. Where election officials *know* that a citizen has previously lived and voted in North Carolina, and have documentation or conclusive evidence to that effect, the FPCA checkbox becomes wholly irrelevant. That is particularly so since the FPCA checkbox is not even intended to confirm a voter's residency status to begin with. The Board here has made clear that it is well aware that many so-called "never residents" in fact resided in North Carolina based on (1) a voter's past voter registration form, official document, or voter history showing the person lived in North Carolina at some point, *see* Board Notice at 4–5, or (2) a sworn statement from the voter attesting that they have previously lived in North Carolina and identifying their previous address, *id.* at 5. If election officials can confirm residence from any of these sources, they cannot then bury their heads in the sand and penalize the voter based on the FPCA checkbox. For one, if the voter has in fact previously lived in North Carolina, they are not properly within the scope of Griffin's UMOVA Challenge. And, most importantly, the materiality

provision prohibits state officials from "denying the right . . . to vote" based on what is plainly an "error . . . not material in determining whether such individual is qualified" to vote. 52 U.S.C. § 10101(a)(2)(B); *see also MFV*, 129 F.4th at 721-21; *id.* at 760-61 (Bumatay, J., dissenting).

## CONCLUSION

VoteVets Intervenors respectfully request that this Court (1) permanently enjoin the Board from engaging in any cure process; (2) permanently enjoin the Board from discarding any votes cast by voters who have been challenged by Griffin; and (3) order the Board to certify the results of the election as they stood at the time of its final formal count on December 10, 2024.

Date: April 21, 2025

Respectfully submitted,

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri
Christopher D. Dodge
Tina Meng Morrison
James J. Pinchak
Julie Zuckerbrod
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
jpinchak@elias.law
jzuckerbrod@elias.law

Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*Counsel for Intervenor-Appellants VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*

## CERTIFICATE OF COMPLIANCE

1.       This document complies with the type-volume limit of Local Rule 7.2(f)(3) because, excluding the parts of the document exempted by Local Rule 7.2(f)(1), this document contains 7,150 words.

2.       This document complies with the typeface requirements of Local Rule 10.1(a) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 12-point Times New Roman.


Dated: April 21, 2025                         */s/ Lalitha D. Madduri*
                                                Lalitha D. Madduri

                                                *Counsel for Intervenor-Appellants VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*

**CERTIFICATE OF SERVICE**

On this 21st day of April, 2025, I electronically filed the foregoing using the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by that system.

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri

*Counsel for Intervenor-Appellants VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*