# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

JEFFERSON GRIFFIN,

        *Plaintiff*,

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS,

        *Defendant*,

   and

ALLISON RIGGS et al.,

        *Intervenor-Defendants*.

Case No. 5:24-cv-00731-M-RJ

NORTH CAROLINA DEMOCRATIC
PARTY,

        *Plaintiff*,

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS et al.,

        *Defendants*.

Case No. 5:24-cv-00699-M-KS

CARRIE CONLEY et al.,

        *Plaintiffs*,

    v.

ALAN HIRSCH et al.,

        *Defendants*.

Case No. 5:25-cv-00193-M-RJ

## BRIEF OF *AMICUS CURIAE* SECURE FAMILIES INITIATIVE IN SUPPORT OF INJUNCTIVE RELIEF

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .............................................................................................. iii

INTEREST OF *AMICUS* .................................................................................................1

INTRODUCTION ............................................................................................................2

PROCEDURAL HISTORY................................................................................................3

ARGUMENT ...................................................................................................................5

    I.    THE NORTH CAROLINA COURTS' DECISIONS ARE INCONSISTENT WITH
          CONGRESS'S AND THE NORTH CAROLINA GENERAL ASSEMBLY'S IN-
          TENT TO PROTECT MILITARY AND OVERSEAS VOTERS................................5

    II.   A NOTICE AND CURE PROCESS WOULD BE FUNCTIONALLY IMPOSSIBLE
          TO EFFECTUATE AT THIS POINT AND WILL DISENFRANCHISE ELIGIBLE
          NORTH CAROLINANS. ...........................................................................................10

CONCLUSION................................................................................................................17

**TABLE OF AUTHORITIES**

**Cases**                                                       **Page**

*Doe v. Walker*, 746 F. Supp. 2d 667 (D. Md. 2010) .................................................................10

*Griffin v. North Carolina State Board of Elections*, No. 320P24-3,
    2025 WL 1090903 (N.C. Apr. 11, 2025) ...............................................................2, 4

*Griffin v. North Carolina State Board of Elections*, No. COA25-181,
    2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025) ...............................................3, 4, 8

*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012) ....................................................10

*United States v. Alabama*, 778 F.3d 926 (11th Cir. 2015)...........................................................7

*United States v. Alabama*, 857 F. Supp. 2d 1236 (M.D. Ala. 2012) ...........................................11

*United States v. Georgia*, 892 F. Supp. 2d 1367 (N.D. Ga. 2012) ...........................................11

*United States v. North Carolina*, No. 5:06-cv-00118-H (E.D.N.C. 2006) ...................................11

**Statutes**

08 N.C. Admin. Code 17.0109(d)...........................................................................................2, 4, 9

52 U.S.C.A. § 20302(a)(8)(A) ..............................................................................................4, 11

N.C.G.S. § 163-258.4...................................................................................................................6

N.C.G.S. § 163-258.9...............................................................................................................4, 11

**Other Authorities**

132 Cong. Rec. S7183-04 ..........................................................................................................10

147 Cong. Rec. S9956-03 ............................................................................................................7

155 Cong. Rec. S7947-03 ............................................................................................................5

156 Cong. Rec. S4513-02 .........................................................................................................7, 8

*Absentee Ballots Go Out to Military and Overseas Voters on Sept. 20, All Other Voters Who
    Requested Them on Sept. 24*, North Carolina State Board of Elections (Sept. 13, 2024)
    https://www.ncsbe.gov/news/press-releases/2024/09/13/absentee-ballots-go-out-military-and-
    overseas-voters-sept-20-all-other-voters-who-requested-them. .............................................13

Fed. Voting Assistance Program, 2020 Overseas Citizen
    Population Analysis Report (2021),
    https://www.fvap.gov/uploads/FVAP/Reports/OCPA-2020-Final-Report_20220805.pdf. ......8

Fed. Voting Assistance Program, 2020 Post-Election Voting
    Survey: Active Duty Military (2021),
    https://www.fvap.gov/uploads/FVAP/Reports/FVAP_ADM-
    Technical-Report-2020_FINAL_20210831.pdf. ...............................................................8, 9

Fed. Voting Assistance Program, 2020 Report to Congress (2021),
    https://www.fvap.gov/uploads/FVAP/Reports/FVAP-2020-Report-to-
    Congress_20210916_FINAL.pdf...............................................................................................9

Fed. Voting Assistance Program, 2022 Report to Congress (2023), https://www.fvap.gov/uploads/FVAP/Reports/rtc _20231113_V10_FINAL.pdf...................................................................................9

Fed. Voting Assistance Program, 2023 Post-Election Voting Survey: Active Duty Military (ADM) (2023), https://www.fvap.gov/uploads/FVAP/Reports/2022-PEVS- ADM-Tech-Report-Final-20230823.pdf. ..............................................................8

H.R. Rep. No. 99-765 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009 ...................................6, 7

*Miliary and Overseas Voters Act*, Uniform Law Commission, https://www.uniformlaws.org/committees/community-home?CommunityKey=6acb3a89- 34a9-4df0-a4bc-42f1b35581d8 (last visited Jan. 30, 2025). ....................................6

*Military and Civilian Personnel by Service/Agency by State/Country*, Defense Manpower Data Center (June 2024), https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/ workforce-reports...........................................................................................6

Pub. L. No. 111-84..........................................................................................................7

Rachael Fisher, *PCS Military Move in 2025: Complete PCS Guide with Tips*, AHRN (Apr. 17, 2025), https://blog.ahrn.com/military-pcs- process/#:~:text=When%20Do%20You%20Receive%20PCS,the%20time%20comes%2C%2 0the%20better. ..............................................................................................14

*State of the Military Voter*, Fed. Voting Assistance Program, https://www.fvap.gov/info/reports-surveys/StateoftheMilitaryVoter (last visited Jan. 30, 2025). ....................................................................................8

Steve Wilborn & Steve Huefner, Uniform Law Commissioners, Uniform Military and Overseas Voters Act (June 10, 2010) ......................................................................6

The Pew Center on the States, Democracy from Afar (Jan. 2012), https://web.mit.edu/supportthevoter/www/files/2013/08/Pew-2012-Progress-on-Military-and- Overseas-Voting.pdf. .......................................................................................6

Uniform Military and Overseas Voters Act, H.B. 514 (N.C. 2011)...............................................................................................5

Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, 100 Stat. 924 (1986).........................................................................................1

## INTEREST OF *AMICUS*

Proposed *Amicus* Secure Families Initiative ("SFI") is a nonpartisan 501(c)(4) not-for-profit organization comprising military spouses and family members that advocates for federal and state policies to increase accessibility for military-affiliated and overseas voters. Because voting remains less accessible for its members and the broader military and overseas community, SFI educates those voters and engages in non-partisan "get-out-the-vote" efforts for military voters in all elections. SFI has North Carolinian members and a strong interest in ensuring that the right to vote is protected for its members and the military community it serves.

*Amicus* submits this brief not to favor one political party or another but rather to safeguard the voices of the broad coalition of voters it represents. Military and overseas voters protected by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Pub. L. No. 99-410, 100 Stat. 924 (1986), are U.S. citizens who are active members of the Uniformed Services, the Merchant Marines, the commissioned corps of the Public Health Service and the National Oceanic and Atmospheric Administration, as well as their eligible family members and any other U.S. citizens residing outside the United States. *Amicus* has a strong interest in ensuring that military and overseas Americans are not unduly burdened in exercising their right to vote. Drawing on the experiences of their members, *Amicus* seeks to draw on its expertise to aid the Court in understanding how the relief granted by the North Carolina Court of Appeals as modified by the North Carolina Supreme Court—requiring a cure or discarding the ballots of military and overseas voters who dutifully followed the rules of every North Carolina government authority—risks the disenfranchisement of at least fourteen hundred military and overseas voters.

## INTRODUCTION

Months after an election has occurred and ballots have been counted (and recounted), Judge Jefferson Griffin seeks to reverse the outcome of that election by changing the election rules and disqualifying the ballots of voters who faithfully followed state procedures. The North Carolina Supreme Court allowed this retroactive change by requiring some of Judge Griffin's challenged voters to face disenfranchisement unless they "cure" their ballots for the 2024 North Carolina Supreme Court election—even though there is no dispute these voters followed all directions, instructions and legal interpretations existing at the time of the 2024 General Election. *Griffin v. N. Carolina State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025).

These challenged ballots were cast by North Carolinians living and working abroad, including North Carolinians serving honorably in the United States Armed Forces and their family members, who followed the rules set by the North Carolina State Board of Elections. *See* 08 N.C. Admin. Code 17.0109(d).

SFI agrees with several parties in this matter that Judge Griffin's request to alter the rules after an election has been completed, and to do so only in select counties,[1] violates the Constitution's bedrock commands of fairness and equal treatment, *see* ECF Nos. 82 ("LWV Opening Br.") at 7-28; 83 ("State Bd. Opening Br.") at 11-18; 84 ("Riggs Opening Br.") at 12-29; 85 ("Cobb Amici Br.") at 7-16; 87 ("VoteVets Mot. for Sum. Judg.") at 6-21. Here, SFI emphasizes that—because military and overseas voters face unique obstacles, such as frequent deployments—there is at this juncture *no* cure process that could adequately protect the rights of the voters subject to

---

[1] Judge Griffin argues that voters in multiple counties are subject to the North Carolina Court of Appeals' Order, while the Board has stated that only his challenge in Guilford County was timely filed. *Compare* Bd. Notice at 2, *with*, Petition for Writ of Mandamus and Alternative Motion to Clarify Mandate, No. 25-181 at 7-11.

Judge Griffin's challenge. Indeed, the North Carolina Court of Appeals' Order, even as amended by the North Carolina Supreme Court, fails to account for the already substantial barriers North Carolina military and overseas voters face and risks disenfranchising the very voters that North Carolina and Congress have sought to specially protect through legislation.

While putatively targeting a discrete number of ballots, Judge Griffin's legal theories would make it almost impossible for certain overseas North Carolinians to vote and have their votes counted.

## PROCEDURAL HISTORY

After the conclusion of 2024 General Election, Judge Griffin challenged the ballots of more than 65,000 voters, which the North Carolina State Board of Elections ("Board") dismissed. *Griffin v. N. Carolina State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *3 (N.C. Ct. App. Apr. 4, 2025), *review allowed in part, denied in part*, No. 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025). Judge Griffin then petitioned for judicial review of the Board's decision in Wake County Superior Court, which again dismissed his challenges and affirmed the Board's decision. *Id*.

The North Carolina Court of Appeals reversed the Wake County Superior Court, ordering that some of the challenged ballots were presumptively invalid and should not be counted (the 266 "Never Residents"[2]), and that the remaining over 65,000 challenged ballots ("UOCAVA no-ID"[3]

---

[2] Ballots from overseas voters who allegedly checked the fourth box on question 1 of their federal Voter Registration and Absentee Ballot Request/Federal Post Card Application ("FPCA") stating "I am a U.S. citizen living outside the country, I have never lived in the United States." Bd. Notice at 3.
[3] Absentee ballots cast by military and overseas voters who allegedly did not submit a copy of a photo identification or an exception form with their ballots. Bd. Notice at 2.

- 3 -

and "Incomplete Registrations"[4]) were also presumptively invalid but should be subject to a cure process. *Id*. at *14-15.

The North Carolina Supreme Court reversed the Court of Appeals' decision regarding the voters Judge Griffin challenged for purportedly having incomplete voter registrations, stating that "[b]ecause the responsibility for the technical defects in the voters' registrations rests with the Board and not the voters, the wholesale voiding of ballots cast by individuals who subsequently proved their identity to the Board by complying with the voter identification law would undermine the principle that 'this is a government of the people, in which the will of the people—the majority—legally expressed, must govern.'" *Griffin v. N. Carolina State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *2 (N.C. Apr. 11, 2025). But the Court declined to apply the same logic to the challenged military and overseas voters who did not provide identification with their ballot, even though the Board had expressly and unequivocally directed that military and overseas were exempt from North Carolina's identification requirement, 08 N.C. Admin. Code 17.0109(d), and voters reasonably relied on this rule. *Griffin*, No. 320P24-3, 2025 WL 1090903, at *3; s*ee also* LWV Opening Br. at 18. The Court affirmed the Court of Appeals' holding that military and overseas voters' ballots would be discounted unless they later provided identification, but extended the cure period from 15 to 30 days—a period far less than what UOCAVA and UMOVA require for those voters to cast their ballots in the first place. *Griffin*, No. 320P24-3, 2025 WL 1090903, at *3; 52 U.S.C.A. § 20302(a)(8)(A); N.C.G.S. § 163-258.9. The North Carolina Supreme Court also denied review of the Court of Appeals' decision that the voters Judge Griffin challenged as "Never Residents" were ineligible and should have their ballots discarded. *Id.*

---

[4] Ballots cast by voters who purportedly did not provide either their driver's license numbers or the last four digits of their social security numbers with their registration. Order, Court of Appeals of North Carolina, No. COA25-181 at 3.

Throughout North Carolina's state court adjudication process, SFI argued that Judge Griffin's requested relief would disenfranchise eligible military and overseas voters and violate the U.S. Constitution. *See* Brief of *Amici Curiae* Secure Families Initiative and Count Every Hero, *Griffin v. North Carolina Board of Elections*, No. 24CV040620-910 (N.C. Feb. 3, 2025) *and* Brief of *Amici Curiae* Secure Families Initiative and Count Every Hero, *Griffin v. North Carolina Board of Elections*, No. COA 25-181 (N.C. Feb. 27, 2025).

Now, at least 1,409 military and overseas voters are required to undergo an unconstitutional cure process or have their votes discarded. State Board's Notice of Remedial Efforts, at 2 Case No. 5:24-cv-00731-M (Bd. Notice).

## ARGUMENT

### I. THE NORTH CAROLINA COURTS' DECISIONS ARE INCONSISTENT WITH CONGRESS'S AND THE NORTH CAROLINA GENERAL ASSEMBLY'S INTENT TO PROTECT MILITARY AND OVERSEAS VOTERS.

North Carolinians abroad, including SFI members and other military service members and their families, face extraordinary logistical and procedural challenges when attempting to participate in the electoral process. Indeed, when passing the National Defense Authorization Act in 2010, Congress found the "military is one of the most disenfranchised voting blocks [*sic*]" in the country, despite serving our country to protect the very freedoms they are blocked from exercising. 155 Cong. Rec. S7947-03, S7966.

Recognizing this injustice, the North Carolina General Assembly *unanimously* passed UMOVA 14 years ago to make voting more accessible for voters abroad. *See* Uniform Military and Overseas Voters Act, H.B. 514 (N.C. 2011). UMOVA was intended to build on the foundation of the federal, bipartisan UOCAVA, a law passed by Congress to help ensure that service members and other Americans living abroad can participate in our democracy.

With over 138,000 military personnel—the fifth-largest population of military personnel in the country—calling North Carolina home,[5] the State enacted UMOVA to "simplif[y] the process of absentee voting for military and overseas citizens by making the process more uniform, convenient, secure and efficient."[6] In passing UMOVA, lawmakers sought to make "North Carolina law *more* beneficial to those voters." *Id.* (emphasis added). It was meant to "both track[] and expand[] upon the protections of UOCAVA" specifically by "expand[ing]" UOCAVA's protections "beyond federal elections to all state and local elections."[7] This included ensuring that the spouses and dependents of military and overseas North Carolina voters could exercise their right to vote and reducing the barriers to casting absentee ballots, such as removing requirements unrelated to voter eligibility like witness and notarization requirements.[8]

Recognizing that the absentee voting process is opaque and difficult for military and overseas voters, UMOVA requires the Board to "make available to covered voters information regarding . . . procedures for casting military-overseas ballots" to ensure military and overseas voters are able to navigate the voting process. N.C.G.S. § 163-258.4.

Likewise, in passing UOCAVA, Congress sought "to facilitate absentee voting by United States citizens, both military and civilian, who are overseas," H.R. REP. NO. 99-765, at 5 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009, 2012, and provide additional benefits and protections to

---

[5] *Military and Civilian Personnel by Service/Agency by State/Country*, DEFENSE MANPOWER DATA CENTER (June 2024), https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports.

[6] *Miliary and Overseas Voters Act*, UNIFORM LAW COMMISSION, https://www.uniformlaws.org/committees/community-home?CommunityKey=6acb3a89-34a9-4df0-a4bc-42f1b35581d8 (last visited Jan. 30, 2025).

[7] Steve Wilborn & Steve Huefner, UNIFORM LAW COMMISSIONERS, UNIFORM MILITARY AND OVERSEAS VOTERS ACT (JUNE 10, 2010).

[8] *Id.*; THE PEW CENTER ON THE STATES, DEMOCRACY FROM AFAR 6 (Jan. 2012), https://web.mit.edu/supportthevoter/www/files/2013/08/Pew-2012-Progress-on-Military-and-Overseas-Voting.pdf.

- 6 -

the military and overseas "absentee voting process that . . . might not extend to other absentee voters as a matter of state law." *United States v. Alabama*, 778 F.3d 926, 929 (11th Cir. 2015). When enacting UOCAVA, Congress found that one reason military and overseas citizens faced difficulties voting was because States had enacted legal and administrative obstacles that "discourage[d] or confuse[d] overseas citizens." H.R. REP. NO. 99-765, at 9 (1986); *see infra*.

Despite the enactment of UOCAVA, legal and administrative obstacles erected by States persisted and military and overseas voters still faced problems having their ballots cast and counted. Indeed, Congress was appalled that in 2008, "a quarter of ballots requested by U.S. troops [were] missing," and that "insufficient information about military and overseas voting procedures" and "endemic bureaucratic obstacles…prevent[ed] these voters from having their votes counted." 156 Cong. Rec. S4513-02, S4513-S4514. Congress found it patently "unacceptable" that "these citizens put themselves on the line and [] at risk every day to protect our Nation. Yet, in some cases, when they cast their votes, those votes [are] not [] counted." 147 Cong. Rec. S9956-03, S9963. As a result, Congress passed additional federal legislation to protect military and overseas voters, including the Military and Overseas Voter Empowerment ("MOVE") Act, which amended UOCAVA. *See* 155 Cong. Rec. S7947-03, S7967; 147 Cong. Rec. S9956-03, S9962. While not exhaustive, the MOVE Act requires States to provide at least one means of electronic communication for citizens to request and receive voter registration and absentee ballot applications; requires transmittal of absentee ballot by a certain date; and promotes the use of the federal write-in absentee ballot. Pub. L. No. 111-84, §§ 577-583(a).

Whether "voting for a local office or the Presidency of the United States," Congress found it imperative to "mandate" upon states that timely submitted and otherwise validly cast ballots by military and overseas voters must be counted. 147 Cong. Rec. S9956-03, S9963. Specifically, in

the MOVE Act, Congress sought to "prevent[] election officials from rejecting overseas absentee ballots for reasons not related to voter eligibility, like paper weight and notarization requirements," or, like here, transmission of a copy of photo identification.[9] 156 Cong. Rec. S4513-02, S4514.

Despite federal and state legislative protections, military and overseas voters still face major barriers to participating in our democracy: they find it difficult to register to vote and to request and return absentee ballots, and they often do not know about key absentee ballot deadlines.[10] Indeed, only 35%, 41%, and 32% of active-duty military members in 2018, 2020 and 2022, respectively, knew how to "[r]equest [an] absentee ballot."[11] And in 2020, 14% of overseas citizens reported difficulties requesting a ballot.[12] If a military or overseas voter knows how to request a ballot, doing so may still require internet access, but as of 2020, 11% of active-duty military members did not have reliable access to the internet,[13] and 14% of overseas voters more generally characterized their internet connection as "very unreliable" or "unreliable."[14]

According to one survey, 67% of active-duty service members were interested in voting in the 2020 presidential election,[15] but only 47% voted, compared to 74% of the civilian non-military

---

[9] The only stated purpose for the photo identification requirement has been fraud prevention, the same purpose that presumably underlies notarization requirements disallowed by the MOVE Act. *Griffin v. N. Carolina State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *12. Judge Griffin has not, however, put forward *any* evidence that the challenged votes were fraudulent or were not cast by eligible North Carolinians.

[10] FED. VOTING ASSISTANCE PROGRAM, 2023 POST-ELECTION VOTING SURVEY: ACTIVE DUTY MILITARY (ADM) 50 (2023), https://perma.cc/FJ8B-NNSC.

[11] *Id.*

[12] FED. VOTING ASSISTANCE PROGRAM, 2020 OVERSEAS CITIZEN POPULATION ANALYSIS REPORT 35 (2021), https://perma.cc/RLL9-EC5R.

[13] FED. VOTING ASSISTANCE PROGRAM, 2020 POST-ELECTION VOTING SURVEY: ACTIVE DUTY MILITARY 21, 28 (2021), https://perma.cc/A8FT-97R7.

[14] 2020 OVERSEAS CITIZEN POPULATION ANALYSIS REPORT, *supra* note 12, at 101.

[15] *State of the Military Voter*, FED. VOTING ASSISTANCE PROGRAM, https://perma.cc/3526-AZ9N (last visited April 25, 2025).

- 8 -

population.[16] In fact, over 20% of active-duty military members in 2020 reported that they wanted to vote but were unable.[17] About four in ten of those service members who tried or wanted to vote but did not do so cited "difficulty registering to vote" and voting process complications as reasons they were deterred from voting.[18] Regarding overseas voters more generally, 82% who did not return a requested and received ballot in 2020 did not vote because they "couldn't complete [the] process."[19] And when the youngest military and overseas eligible citizens were asked why they did not vote, they were 19 times more likely to cite trouble completing the voting process than to say that they did not want to vote.[20] To try to combat these issues and abide by UMOVA's mandate to provide instructions and guidance on the military and overseas absentee voting process, the Board expressly dictated that an ID was not required for UOCAVA ballots. 08 N.C. Admin. Code 17 .0109(d). Indeed, it was not even physically possible for voters who cast their ballots electronically as a covered UOCAVA voter to provide such identification because the state's electronic voting portal was not designed to allow copies of identification to be submitted. *See* State Bd. Opening Br. at 14.

By adding a requirement to the military and overseas voting process, almost *six months after* the election, the North Carolina courts' decisions conflict with UMOVA's express intent to ensure that military and overseas voters are informed of the procedures to cast their ballots ahead of time and to eliminate imposition of unnecessary requirements and unconstitutionally adds enormous obstacles for military and overseas voters to have their ballots counted. S*ee* LWV

---

[16] 2020 POST-ELECTION VOTING SURVEY, *supra* note 13, at 12.
[17] *Id*. at 38.
[18] *Id*. at 39.
[19] FED. VOTING ASSISTANCE PROGRAM, 2020 REPORT TO CONGRESS 17 (2021), https://perma.cc/Z55J-5BTV.
[20] FED. VOTING ASSISTANCE PROGRAM, 2022 REPORT TO CONGRESS 15 (2023), https://perma.cc/WHQ4-T5DP.

Opening Br. at 8-13, 15-22; State Bd. Opening Br. at 11-15; Riggs Opening Br. at 13-15, 20-27; Cobb Amici Br. at 8-11; VoteVets Mot. for Sum. Judg. at 6-10, 12-16. Additionally, the Order directly contradicts Congress' intent to remedy the repeated pattern of States depriving the voters who fight to protect our democracy of the fundamental right to have their ballots counted. It also exacerbates the issues military and overseas voters face in completing the voting process, further deterring these voters from trying to vote in future elections.

## II. A NOTICE AND CURE PROCESS WOULD BE FUNCTIONALLY IMPOSSIBLE TO EFFECTUATE AT THIS POINT AND WILL DISENFRANCHISE ELIGIBLE NORTH CAROLINIANS.

Forcing challenged voters to comply with a cure process—whether 15 days, 30 days, or some other period—approximately six months after the 2024 General Election has concluded will inevitably result in those voters' disenfranchisement and is especially egregious given the utter absence of evidence that these voters are ineligible and that military and overseas voters already face numerous barriers in exercising their right to vote. *See supra* Part I. As U.S. Senator John Warner noted when introducing UOCAVA, "soldiers and airmen stationed overseas are generally assigned to fixed bases, yet they are often away from those bases for weeks or even months at a time while on maneuvers or temporary duty assignments," and some may be on submarines or smaller vessels wholly without access to the mail or the internet. 132 Cong. Rec. S7183-04. The cure process will be unavailable to those voters.

First, it is well-documented that mail service is often unreliable for military and overseas voters, complicating the timely receipt and return of election materials. *See Doe v. Walker*, 746 F. Supp. 2d 667, 678 (D. Md. 2010); *Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012).[21]

---

[21] Notably, in *Obama for America*, the court found the unique nature of military and overseas voting was relevant to an Equal Protection challenge to an Ohio election law regarding voters similarly situated to military and overseas voters. 697 F.3d at 435.

Indeed, UOCAVA, as amended by the MOVE Act, requires states to transmit ballots to military and overseas voters *at least* 45 days before an election. 52 U.S.C.A. § 20302(a)(8)(A). When States have failed to abide by this mandate, the Department of Justice has intervened to protect the right to vote for military and overseas voters. *E.g.*, *United States v. Alabama*, 857 F. Supp. 2d 1236 (M.D. Ala. 2012); *United States v. Georgia*, 892 F. Supp. 2d 1367 (N.D. Ga. 2012). Prior to the MOVE Act, the Department of Justice intervened in North Carolina to ensure its military and overseas voters were provided sufficient time to receive and cast their ballots. *United States v. North Carolina*, No. 5:06-cv-00118-H (E.D.N.C. 2006).

When enacting UMOVA, the North Carolina General Assembly sought to provide even more protection than UOCAVA, requiring county boards of elections to send ballots *no later than 60 days* before a statewide general election. N.C.G.S. § 163-258.9. As both the North Carolina General Assembly and Congress have recognized, the unique position of military and overseas voters means that they require additional time to access the electoral process on a level playing field to other voters. These significantly advanced mailing periods are necessary *even when* military voters have notice well in advance of an upcoming election. Here, where overseas and absent military voters are highly unlikely to be both well-attuned to the complex procedural history of this litigation and aware that they are subject to a challenge and a cure requirement (especially given the substantial uncertainty about who is in that group), an even longer cure period will not be sufficient for the vast majority of military voters.

Contrary to Judge Griffin's bare assertion that a 30-day period is "enough time to avoid any postal delays," the notice and cure process ordered by North Carolina's courts is plainly inadequate for military and overseas voters. Griffin Response at 21. Many voters may not even *receive* the notice within the 30-day time period prescribed for curing their ballot—a timeframe that falls

- 11 -

far short of what UOCAVA and UMOVA require for North Carolina military and overseas voters casting their ballots. The Board has indicated that notice would be provided primarily by mail, Bd. Notice at 5 (explaining State Board will direct county to provide notice to voters via a mailing and "if possible" by email and phone), and that the 30-day cure period will begin the day the notice is *mailed*, regardless of if and when it is received by the affected voter. *Id.* at 6. The voter must respond with the required documentation within 30 days of the notice being sent or risk their ballot being discounted. *Id.* at 7. In the experience of SFI members and the community SFI serves, mail sent abroad, even if through the Military Postal Service Agency, takes a significant period of time to arrive. In fact, it is possible that a mailed notice may take the full 30 days to even arrive in the mailbox of a military voter.

Even if a mailed notice does arrive with time remaining in the cure window, it is unlikely that many military service members or family members will be able to act on the notice in time to cure their ballot. In SFI's experience, military voters abroad generally use their Army/Air Post Office ("APO") or Fleet Office Address ("FPO")[22] on a military base or installation for U.S. mail, including election-related materials, which allows their mail to be sent through the Military Postal Service Agency and avoid international mailing fees. Mail sent to these addresses is routed to a separate facility on a military base and does not adjoin on-base military residences. In other words, mail does not arrive at the doorstep of military service members and their families, even if they reside on base. Those who live off-base must make a special trip to the military base or installation just to check their mail. This inconvenience means that it is common for military voters abroad to check their mail no more than once a week or every other week, especially when—as is the case

---

[22] This address is similar to a U.S. P.O. Box. More information on these types of addresses is available here: https://veteran.com/apo-fpo-dpo-mail/.

here—they are not anticipating urgent incoming mail. The confluence of mail delays and the practicalities of receiving mail as a military voter mean that military service members and family members may simply never receive timely notice that their ballot is challenged. And of course, challenged voters with an international mailing address, rather than an APO or FPO, would be subject to further mail delays.

Even military voters abroad who *do* receive notice from the Board that they are required to cure their ballot before the expiration of any cure window are unlikely to have time to mail back the required documentation. If the notice is received by the military service member or family member within two weeks from the date it is sent (itself an often doubtful scenario), the voter would need to understand the notice and take action to mail required documentation back almost immediately to have any chance of it being received by election officials in time for their ballot to count.

Second, military service is transient and remote. Some military and overseas voters no longer live in the same place they did when they voted in the November 2024 General Election—which may have been as early as September 2024.[23] Many military voters will have been stationed elsewhere or deployed since they cast their ballots in an election held six months ago. SFI members' experience shows that deployments typically last for at least six months, and service members will not return to their last mailing address before the end of any cure window, if they return at all. And any mail forwarding to a new APO or FPO for a servicemember on deployment is inconsistent at best, and it is certainly not quick or automatic. Judge Griffin's suggestion that Movants are

---

[23] *Absentee Ballots Go Out to Military and Overseas Voters on Sept. 20, All Other Voters Who Requested Them on Sept. 24*, North Carolina State Board of Elections (Sept. 13, 2024) https://www.ncsbe.gov/news/press-releases/2024/09/13/absentee-ballots-go-out-military-and-overseas-voters-sept-20-all-other-voters-who-requested-them.

"speculating about postal delays," Griffin Response Br. at 21, reflects a fundamental misunder-standing of the well-established nature of military service. These challenges, too, will make it virtually impossible for deployed servicemembers to receive mailed notice that their ballot is subject to disqualification and must be cured. Furthermore, some military voters, including those deployed to Navy submarines, will have absolutely no opportunity to receive notice of a cure process because there is no mail system that accommodates them.

Service members and their families are also entering the peak move season for Permanent Change of Station ("PCS") orders.[24] These moves to different longer-term duty stations typically happen during the summer months. This means that military voters who are subject to PCS orders are likely to move soon, and they may have already begun the process of relocating and may be living in temporary lodging. These voters would not receive mail sent to the address from which they voted in the November 2024 election and would be similarly unlikely to receive any mailed notice that manages to be forwarded to their new mailing address in time to cure their ballot.

Third, while the cure process articulated by the Board leaves open the possibility for voters to receive notice via email or telephone and/or submit required documentation to cure their ballots electronically, this process is unlikely to accommodate many military voters. On top of physical mail delays, many military voters also lack internet access. *See supra* Part I. It is also likely that election officials do not have phone numbers or email addresses for many challenged military voters. If a challenged voter did supply an email address and the election official attempts to use this method of communication, it is possible that email security screening would prevent messages

---

[24] Rachael Fisher, *PCS Military Move in 2025: Complete PCS Guide with Tips*, AHRN (Apr. 17, 2025), https://blog.ahrn.com/military-pcs-process/#:~:text=When%20Do%20You%20Receive%20PCS,the%20time%20comes%2C%20the%20better.

- 14 -

from being delivered. Barriers to international phone calls—including extreme time zone differences—also make it highly likely that North Carolina election officials would be unable to successfully contact voters abroad via phone, even if the voter did happen to provide a phone number when submitting the Federal Post Card Application or the North Carolina voter registration form.

Fourth, no matter how notice is effectuated, it is likely that military voters will view with skepticism any request to provide a copy of sensitive personal documents six months after they cast their ballots. Military service members and their families are accustomed to taking the protection of sensitive personally identifiable information very seriously. Unless they are aware of the intricacies of the litigation surrounding last year's North Carolina State Supreme Court election and understand what is being asked of them and why it is being asked, military voters abroad are unlikely to respond to a letter or email requesting sensitive personal documents—especially on the rapid timeline that would be required in a cure process. Additionally, depending on the method employed by the Board to solicit the virtual transmission of documents, the electronic transmission of these documents (e.g., through fax) likely raises similar privacy concerns.[25]

Finally, military and overseas voters may not have ready access to the identification Judge Griffin claims is required, especially in light of the rushed, post-hoc process that would deprive those voters time to plan. Many of those voters have lived overseas for years and move often, meaning they are more likely to have expired driver's licenses, to have lost their driver's licenses

---

[25] For example, a secure transmission portal would likely mitigate the most serious privacy concerns that many military voters are likely to have, but it would not mitigate the other harmful disenfranchising effects of a notice and cure process, including the negative effect on voter confidence of requiring eligible voters to submit sensitive documents over the internet—which they have never been required to do before—six months after an election was held, when there is no dispute about their eligibility.

or social security cards, or to have identification buried in storage, possibly even back in the United States.

Taken together, these factors ensure that many voters will not receive notice they are an affected voter and will be unable to comply in time if they do.

These well-established barriers—which both the North Carolina legislature and Congress have legislated to mitigate—demonstrate that the challenged eligible voters will have exceptional difficulty complying with an unnecessary and unjustifiable cure process. Judge Griffin fails to acknowledge the myriad barriers faced by the specific category of voters he singles out to challenge, or how the relief granted by the North Carolina courts threatens to disenfranchise the very voters the North Carolina General Assembly and U.S. Congress intended to protect. By erecting even more barriers to the political participation of military and overseas voters—who already overcame significant hurdles to cast their ballots—the North Carolina courts' cure mandate offends the very rights that servicemembers fight and die to protect.

*　　*　　*

*Amicus* agrees with Justice Riggs, the North Carolina State Board of Elections, the Conley Plaintiffs, the North Carolina Democratic Party, and the VoteVet Intervenors that the cure process creates an unconstitutional burden on military and overseas' voters right to vote and a severe risk of disenfranchisement. Additionally, for all the reasons set forth in the submissions from the aforementioned parties, the North Carolina Court of Appeals' Order as modified by the North Carolina Supreme Court violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. As explained herein, no cure process would justify the high risk of widespread disenfranchisement of voters whom no one disputes are eligible to vote.

- 16 -

## CONCLUSION

This Court should enjoin Defendant North Carolina State Board of Elections from requiring additional verification of lawfully cast ballots and invalidating or discarding those ballots, with or without verification.

Respectfully submitted this the 25th day of April, 2025.

/s/ *Lucy Inman*

Lucy Inman
NC Bar No.: 17462
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
900 W. Morgan St.
Raleigh, NC 27603
Tel : 919-600-5000
Fax : 919-600-5035
linman@milberg.com

*Local Civil Rule 83.1(d) Attorney for Amicus Curiae*

/s/ *Danielle Lang*
Danielle Lang*
Brent Ferguson*
Valencia Richardson*
Heather Szilagyi*
Rachel Appel*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: 202-736-2200
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
rappel@campaignlegalcenter.org

*Attorneys for Amici Curiae Secure Families Initiative*

**Special Admission* Applications Forthcoming

- 17 -

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 25, 2025, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will automatically serve electronic copies on all counsel of record.

*/s/ Lucy Inman*

Lucy Inman
NC Bar No.: 17462
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
900 W. Morgan St.
Raleigh, NC 27603
Tel : 919-600-5000
Fax : 919-600-5035
linman@milberg.com