**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| JEFFERSON GRIFFIN, | |
| *Plaintiff*, | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | No. 5:24-cv-00731-M-RJ |
| *Defendant*, | |
| and | |
| ALLISON RIGGS et al., | |
| *Intervenor-Defendants*. | |
| NORTH CAROLINA DEMOCRATIC PARTY, | |
| *Plaintiff*, | |
| v. | No. 5:24-cv-00699-M-KS |
| NORTH CAROLINA STATE BOARD OF ELECTIONS et al., | |
| *Defendants*. | |
| CARRIE CONLEY et al., | |
| *Plaintiffs*, | |
| v. | No. 5:25-cv-00193-M-RJ |
| ALAN HIRSCH et al., | |
| *Defendants*. | |

**RESPONSE BRIEF OF INTERVENOR-DEFENDANT ALLISON RIGGS**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 1

   I.  Judge Griffin's Arguments for *Younger* Abstention Are Wrong and Violate the
Mandate Rule. ........................................................................................................... 1

  II.  Judge Griffin's Protests Fail on the Merits. ............................................................. 6

      A. Settled Due Process Law Prohibits Judge Griffin's Retroactive Challenges. ............... 6

         i.  Judge Griffin Ignores "Settled" Due Process Law. ................................................. 6

         ii.  The Disenfranchisement Judge Griffin Seeks Is Not "Garden Variety." ............. 10

         iii.  Judge Griffin's Emphasis on "Massive" Disenfranchisement Neither Gets the
Law Correct nor Helps His Claim. ....................................................................... 13

      B. The *Anderson-Burdick* Test Provides No Support for the Retroactive Enforcement
of a Post-Election Photo Identification Requirement on UOCAVA Voters. ............... 14

         i.  The *Anderson-Burdick* Test Is Inapplicable to Post-Election Rule Changes. ...... 14

         ii.  If Applied, the *Anderson-Burdick* Test Establishes the Corresponding Cure
Process Is Unconstitutional. ................................................................................. 16

      C. Judge Griffin's Procedural Due Process Arguments Are Unpersuasive. ..................... 17

         i.  Judge Griffin's Election Challenges Should Be Analyzed Under Ordinary
Procedural Due Process Principles. ...................................................................... 17

         ii.  Judge Griffin Does Not Defend His Failure to Provide Adequate Notice to
Voters. .................................................................................................................. 18

      D. Judge Griffin's Selective Targeting of Counties That Voted Significantly for
Justice Riggs Violates the Equal Protection Clause. .................................................... 19

      E. Judge Griffin's Attempts to Circumvent the NVRA Should Be Rejected. .................. 23

  III.  The Court Should Resolve This Matter by Entering Judgment That Federal Law Bars
Judge Griffin's Protests. ........................................................................................... 25

CONCLUSION .................................................................................................................... 26

Intervenor-Defendant Allison Riggs files this brief in response to the opening brief filed by Plaintiff Jefferson Griffin, ECF No. 81.

## INTRODUCTION

The opening briefs lay bare the unprecedented, unconstitutional nature of Judge Griffin's protests. In his brief, Judge Griffin ignores settled due process law and takes critical language from other courts out of context. He imposes the wrong legal framework upon the undue burden and procedural due process analyses. He distorts the facts bearing on this Court's equal protection inquiry and disregards the realities facing those individuals hurt by his election challenges. And most surprisingly, after this Court expressly reserved jurisdiction of the federal issues, he now argues once again that this Court should abstain from considering them.

More than five months after the election, this dispute is ripe for a final resolution. The Fourth Circuit has maintained the status quo, this Court has consolidated these proceedings, and the parties will file their final briefs on Monday, April 28, 2025. The Court should soon put an end to Judge Griffin's months-long effort to overturn his election loss by disenfranchising voters.

## ARGUMENT

### I. Judge Griffin's Arguments for *Younger* Abstention Are Wrong and Violate the Mandate Rule.

At the threshold, Judge Griffin urges this Court to flout the Fourth Circuit's mandate and abandon its "virtually unflagging obligation" to exercise its jurisdiction. *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988). This Court and the Fourth Circuit already expended considerable effort striking a balance between comity to state courts and the "strict duty" of federal courts "to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins.*, 517 U.S. 706, 716 (1996). The Fourth Circuit held that *Pullman* abstention was the "appropriate theory for abstaining from federal jurisdiction." ECF No. 30 at 10. Accordingly, the Fourth Circuit directed

1

this Court to "retain jurisdiction of the federal issues identified in the Board's notice of removal" while "the state court issues are addressed in state court." *Id.* at 10, 11.

The state courts have now addressed the state law issues, while avoiding any federal-law issues in accordance with the preservation of those federal issues and with reservations filed by Justice Riggs and the State Board under *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411 (1964). Yet Judge Griffin now wants this Court to "dismiss the case with prejudice" under *Younger*, Griffin Opening Br. 9, rather than taking up the federal-law issues that "remain after the resolution of the state court proceedings," ECF No. 30 at 11. This Court should decline that invitation to abandon its duty to exercise its jurisdiction because, among other reasons, it has no discretion to entertain it. *See United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) ("Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'") (citation omitted).

In any event, *Younger* abstention does not apply. Judge Griffin overlooks the reframing of *Younger* by the Supreme Court and the Fourth Circuit over the last dozen years. Judge Griffin fails to cite *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013) or any other case applying *Younger* that postdates *Sprint* (except for a single out-of-circuit district court case that itself failed to apply the *Sprint* analysis, *see* Griffin Opening Br. 8). That is an important omission. As the Fourth Circuit recognized, the Supreme Court's unanimous decision in *Sprint* "recast the earlier cases" decided under *Younger*, including many of the pre-*Sprint* authorities relied upon by Judge Griffin. *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 329 (4th Cir. 2022).

After *Sprint*, there are three steps "to determine whether *Younger* abstention applies." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022). This case fails the test at every level.

2

*First*, the Court must determine whether the case falls within any of "three 'exceptional categories" that potentially justify *Younger* abstention. *Sprint*, 571 U.S. at 78. Judge Griffin skips over this step altogether and proceeds to the so-called *Middlesex* factors (which is now step two in the analysis). But if a case "does not" fall "into one of the three settled categories," then a court "need go no further." *Jonathan R.*, 41 F.4th at 329. Those three categories that comprise "*Younger*'s heartland" are "criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 329 (quoting *Sprint*, 571 U.S. at 78). The Supreme Court "held those three categories 'define *Younger*'s scope,'" "capping abstention to those 'exceptional circumstances.'" *Id.* (quoting *Sprint*, 571 U.S. at 77–78).

None of these three settled categories applies here. There is no criminal prosecution. Nor is there a "civil enforcement proceeding," which *Sprint* characterized as proceedings "brought by the State in its sovereign capacity" following an "investigation" and upon the "filing of a formal complaint or charges." *Id.* (quoting *Sprint*, 571 U.S. at 79–80). Judge Griffin initiated this action; there is no "investigation" or formal "charges." The third category is extremely "rare"; "in *Younger*'s entire history, the Court has invoked this category just twice," *Jonathan R.*, 41 F.4th at 331, once to refrain from interference with a state court contempt proceeding and in the other to reject a challenge to the constitutionality of a state court's appeal-bond regime, both involving "*the processes*" by which a State "compels compliance" with its orders. *Id.* at 330 (emphasis added). This action, by contrast, does not involve a state court contempt proceeding or seek to enjoin state court *processes* by which the state courts might enforce their orders. Judge Griffin "points to no specific pending contempt orders" this proceeding "would undermine." *Id.* at 331.

3

*Second*, falling within one of the three exceptional categories is necessary but not sufficient for abstention under *Younger*. *Id.* at 329. If the case fits one of those categories, courts must still "go on to determine if federal involvement will in fact put comity at risk." *Id.* at 329. The three "*Middlesex*" factors guide this inquiry: "(1) whether there is 'an ongoing state judicial proceeding'; (2) whether that state proceeding 'implicate[s] important state interests'; and (3) whether that state proceeding provides 'an adequate opportunity . . . to raise constitutional challenges." *Air Evac EMS*, 37 F.4th at 96 (alterations in original) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

The first and third factors make clear that abstention is unwarranted. As an initial matter, there is no "ongoing state judicial proceeding" in favor of which to defer. The mandate from the Court of Appeals issued. *See* Certification of Judgment, *Griffin v. N.C. State Bd. of Elections*, No. 25-181 (N.C. Ct. App. Apr. 16, 2025) (attached as Exhibit A). The "judicial proceeding" in state court is over. And this Court is now proceeding in accordance with the jurisdiction it *retained* over the federal law issues. Taking up those issues now will not "render the state court's orders or judgments nugatory," nor will it "thwart the state court's application of state law" as Judge Griffin contends. Griffin Opening Br. 6, 8. To the contrary, the state courts understood that this Court retained jurisdiction over the federal issues, which is why they did not purport to resolve questions of federal law. It is time for this Court—as always contemplated—to decide the remaining federal-law issues and to determine the ultimate relief.

Given this Court's retention of the federal-law issues, Judge Griffin cannot seriously contend there was an adequate "opportunity" to raise "constitutional challenges" or other federal issues in the state court. Griffin Opening Br. 7. If Justice Riggs had urged the state courts to rule on her federal claims, rather than reserving them consistent with *England* as indicated in the Fourth

4

Circuit's decision, Judge Griffin would no doubt have argued that Justice Riggs *waived* the right to return to federal court and to have those claims decided here. "If a party freely and without reservation submits [her] federal claims for decision by the state courts, litigates them there, and has them decided there" then "[she] has elected to forgo [her] right to return to the District Court." *England*, 375 U.S. at 419. The *whole point* of making an *England* reservation is to make clear that a litigant *does not* intend to submit reserved federal issues to the state court so that they may be later decided by the federal court post-remand. To listen to Judge Griffin, Justice Riggs either (a) had to make her federal arguments in state court and waive the right to return to federal court or (b) had to avoid making those arguments in state court only to have this Court abstain because she could have raised those issues in state court. That specious argument for avoiding federal court warrants rejection of Judge Griffin's misguided *Younger* argument all by itself.[1]

*Third*, if the first two steps of the *Younger* analysis are satisfied, the Court *still must consider* whether any of the "three exceptions" applies: "(1) 'bad faith or harassment' by state officials responsible for the prosecution; (2) a statute that is 'flagrantly and patently violative of express constitutional prohibitions'; and (3) other 'extraordinary circumstances' or 'unusual situations.'" *Air Evac EMS*, 37 F.4th at 96 (quoting *Younger*, 401 U.S. at 49–54). This case fits the last two of these three exceptions. Throwing out the ballots of North Carolina voters in this race who complied with every instruction given to them or who happened to be targeted by the losing candidate for retroactive disenfranchisement would flagrantly violate the Fourteenth Amendment. In

---

[1] Judge Griffin contends that Justice Riggs and others presented their federal arguments to the North Carolina Supreme Court when they opposed Judge Griffin's Petition for Writ of Prohibition. *See* Griffin Opening Br. at 7. This argument is unpersuasive because (1) the Supreme Court dismissed that petition as procedurally improper, *see Griffin v. N.C. Bd. of Elections*, 910 S.E.2d 348, 349 (N.C. 2025); (2) those Supreme Court proceedings predated the Fourth Circuit's decision that *Pullman* abstention was the appropriate remedy; and (3) there is no dispute that Justice Riggs filed an *England* reservation in this action and repeatedly reserved her right to return to federal court.

addition, if nothing else, this case presents the sort of "extraordinary" or "unusual" circumstances that warrant an exception to *Younger* abstention even if it applied. The Fourth Circuit has not "provided a definitive or exhaustive set of criteria as to what constitutes an extraordinary circumstance" but the caselaw suggests there must be "actual impediments to the state's ability to address the federal issues." *Air Evac EMS*, 37 F.4th at 100. Such an exception applies to the unusual circumstances here—where the *federal court itself* remanded for the limited purpose of obtaining a ruling from the state courts on state-law issues, reserving the federal issues for itself.

Accordingly, even if the Court had discretion to consider *Younger* abstention at this late stage (which it does not), abstention would not be warranted for the above reasons.

## II. Judge Griffin's Protests Fail on the Merits.

### A. Settled Due Process Law Prohibits Judge Griffin's Retroactive Challenges.

#### i. Judge Griffin Ignores "Settled" Due Process Law.

From the outset, Judge Griffin ignores controlling precedent. It is "settled" law in the Fourth Circuit that "if the election process reaches the point of 'patent and fundamental unfairness,' the due process clause may be violated." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)). Thus, the Fourth Circuit has expressly endorsed the *Burns* court's litmus test for how due process concerns figure into election challenges: when voters follow the voting procedures set out by the state, the state "could not, constitutionally, invalidate the . . . ballots" without "a due process violation." *Burns*, 570 F.2d at 1074, 1078.[2] This is especially true when election challengers disregard their

---

[2] Judge Griffin's preoccupation with the *Burns* court's remedy of a new primary election is irrelevant. Judge Griffin has never sought this remedy and Justice Riggs has sought to foreclose Judge Griffin's challenges on federal grounds. Moreover, Judge Griffin ignores how the remedy in *Burns* was tailored to the facts of that case concerning a primary election in a single city council ward, 570 F.2d at 1066, and not a statewide election involving challenges to retrievable ballots.

"duty" to "bring their complaints forward for pre-election adjudication when possible." *Hendon*, 710 F.2d at 182. Otherwise, candidates will be incentivized "'to lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action." *Id.* (quoting *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)).

Judge Griffin gambled and did not receive a favorable decision from the electorate. Much like Judge Griffin, the disappointed electoral candidate in *Hendon* claimed after the election that two procedures governing the proper marking of ballots that North Carolina election officials used for years violated the Constitution. *Id.* at 182. The Fourth Circuit found one of the procedures unconstitutional but denied the plaintiffs' request for a recount because of their failure to challenge the rule before the election. *See id.* Prospective relief was the proper recourse. The same principle applies here. Judge Griffin offers "no reason to depart from the general rule that denies relief with respect to past elections." *Id.* The state laws and regulations that Judge Griffin challenged have been in place for years—and in the case of voters who inherited their North Carolina residence, for over a decade. There is no reason Judge Griffin could not have raised these issues earlier. *See id.* ("The appellants introduced no evidence of any reason why they could not have challenged the constitutionality of these laws before the 1982 general election."). Judge Griffin cannot avoid *Hendon*, and he fails even to address it.

This same head-in-the-sand approach permeates Judge Griffin's opening brief. The First and Fourth Circuits are far from alone in recognizing the constitutional problem with retroactive disenfranchisement. *See, e.g.*, *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (holding that due process prohibits discarding ballots where "state actions . . . induce[d] voters to miscast their votes"); *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005) (affirming order enjoining officials from tossing out ballots cast by voters mistakenly sent

absentee ballots); *Roe v. Alabama*, 43 F.3d 574, 581 (11th Cir. 1995) (holding post-election state court ruling regarding witness and affidavit requirements for ballots could not impose a "retroactive change in the election laws"); *Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1970) (state could not "deviate from such prior rules of decision on the applicability of a fundamental directive without announcing in advance its change in policy").[3]

Rather than grapple with this wall of authority, Judge Griffin contends that there is no due process issue because the challenged voters' ballots have now—months after the election—been recognized as illegitimate, or "unqualified," as of election day. Griffin Opening Br. 9. This argument just restates the due process violation. These individuals' votes have continued to count— and have remained unchallenged—in *every other state and federal race* in the November 2024 general election. And voters have been casting ballots in reliance on these rules for at least "six separate elections." Pet. Judicial Review Ex. A ("State Board Decision & Order") 39, ECF No. 1-4; *see also id.* at 31 ("faithfully implemented in 43 elections in this state"). Accordingly, these votes were not, as Judge Griffin claims, "defective under state law" when they were cast. Griffin Opening Br. 12 (quoting *Pa. State Conf. of NAACP Branches v. Sec'y Commw. of Pa.*, 97 F.4th 120, 133 (3d Cir. 2024) (finding voters' failure to comply with requirement to date an absentee ballot return envelope—which was already part of Pennsylvania election law before the election— would result in discarding of their votes)). Judge Griffin is seeking to change the election rules after the election—to throw out votes cast by eligible voters who followed all the rules in effect when they cast their ballots.

---

[3] Judge Griffin's suggestion that Justice Riggs' argument should be evaluated as one seeking to expand the bounds of substantive due process to create new rights is a red herring. Griffin Opening Br. 9. The "substantive right" implicated here is the most fundamental right of all—the right to vote—which has been recognized as uncontestable across *centuries* of United States Supreme Court precedent.

Indeed, Judge Griffin's efforts here are *worse* than the fundamentally unfair practices that other courts have found present a due process violation. This is not, as Judge Griffin claims, a situation where individuals cast votes "according to the guidance of election officials, not state statutes and the state Constitution as interpreted by state courts." Griffin Opening Br. 9. Judge Griffin posits a universe in which these voters knew they could not vote, cast ballots anyway, and election workers let them or directed them to do so. That is not what happened. Rather, the entire apparatus of the state electoral system—UMOVA, State Board-promulgated regulations, related federal legislation such as UOCAVA, the conduct of candidates and election officials, and the applicability of these laws and regulations to dozens of prior elections—communicated to these voters that their ballots would be counted. A voter cannot be reasonably expected to disregard the weight of all that authority to ferret out (alleged) latent deficiencies in their ballot that no one— not least of all Judge Griffin—had ever raised. *See, e.g.*, *Roe*, 43 F.3d at 581 (finding it "unreasonable to expect average voters and candidates to question the Secretary [of State's], the Attorney General's, and the election officials' interpretation and application of the statute, especially in light of its plain language"). In fact, the very notion of placing that expectation on voters is dangerous and would undermine the electoral system.

Read in context, Judge Griffin's claim that a cure process would be "*enfranchising*" to military and overseas voters is astounding. Griffin Opening Br. at 10. These voters—every single one of them—were entitled to vote in November 2024. Judge Griffin's suggestion that his protests may not ultimately disenfranchise every single voter he targeted does not "enfranchise" the remainder. A thief who stole from 1,409 servicemembers and then set up a process under which some of the victims could get their property back would not have "enriched" the servicemembers.

The potential that some of the voters Judge Griffin targets would be able to cure their ballots does not make his protests constitutional. The cure process is inadequate for all the reasons outlined in Justice Riggs' opening brief and discussed below. Judge Griffin relies on the 30-day window for military and overseas voters to submit their photo identification as proof of the cure process's adequacy, but thirty days for voters to restore a right taken from them is cold, inadequate comfort. And none of the cases cited by Judge Griffin concerned remedial measures commenced any significant amount of time—let alone six months—after an election.[4]

### ii. The Disenfranchisement Judge Griffin Seeks Is Not "Garden Variety."

Judge Griffin attempts to dismiss his challenges' impact on voters as a "garden variety" election irregularity unworthy of this Court's attention. *See* Griffin Opening Br. at 12–15. But it "is no small thing to overturn the results of an election in a democracy by throwing out ballots that were legally cast consistent with all election laws in effect on the day of the election." *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025) (Earls, J., concurring in part and dissenting in part). Retroactive, mass disenfranchisement cannot be fairly characterized as a "garden variety" election issue.

Judge Griffin makes no attempt to situate the facts here in the context of other "garden variety" election issues in prior cases. Justice Riggs is not seeking relief because of a "failure to divide the ballots into parallel columns separated by distinct black lines," *Hendon*, 710 F.2d at 182, a "voting machine malfunction," *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005), allegations of "[m]ere fraud or mistake," *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1988),

---

[4] *See Ne. Ohio Coal.*, 837 F.3d at 635 (between election and canvass); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 594 (2016) (three days following election); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 185 (2008) (ten days following election); *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d 1312, 1323 (11th Cir. 2019) (48-hour cure period "as the counting of votes was already underway").

"claims of lax security," *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1184 (9th Cir. 1988), absentee ballots delivered by a person other than the voter, *see id.*, human or mechanical error, *see Bennett*, 140 F.3d at 1226, or the mistaken allowance of non-party member votes in a primary election, *see id*. The facts here "go well beyond the ordinary dispute over the counting and marking of ballots" to the point of "fundamental unfairness." *Burns*, 570 F.2d at 1077.

The case Judge Griffin relies on most heavily, *Bennett*, does not, as he suggests, stand for the proposition that "*ex post* clarification[s]" of election laws are *per se* a "garden variety" electoral issue. 140 F.3d at 1227. In *Bennett*, a group of voters left blank their answer on a ballot measure regarding the decision to convene a constitutional convention. *See id.* at 1222. Prior to the 1996 election, blank answers had been ignored in computing whether the convention question had passed; "yes" votes were counted against "no" votes, and the majority prevailed. *See id.* Following the 1996 election, the Hawaii Supreme Court "clarifi[ed]" that blank ballots would count against the convention question—effectively as a "no" vote. *See id.* at 1222–23. The ensuing litigation challenged whether the Hawaii Supreme Court's decision denied substantive due process to voters who had left their ballots blank. The Ninth Circuit reasoned that the Hawaii Supreme Court's "*ex post* clarification" of the state's election laws did not amount to a due process violation because: (1) the voters could not have reasonably relied on any understanding that blank ballots would not be counted, and if they had wished to vote for a constitutional convention, they could have done so; and (2) there was no disenfranchisement because every ballot submitted was counted. *See id.* at 1227. The clarification thus did not undermine the integrity of the vote. *See id.*

Judge Griffin's challenges could not be more different. He sought substantive alterations of the election laws. N.C. Gen. Stat. § 163-258.2(1)(e) had been a valid state law until April 11, 2025. Now it is not. Article 21A (as interpreted by a duly promulgated regulation without objection from any political party or the General Assembly's Rules Review Commission) did not include a requirement that eligible voters submit a photo identification before April 11, 2025. Now it evidently does. The voters affected here had every reasonable expectation that their ballots would be counted based on then-existing laws and a decade's worth of unchallenged election procedure. Moreover, their disenfranchisement is obvious, either through the inevitable inability of some overseas and military voters to cure their ballots in time, or the wholesale exclusion of voters who inherited their North Carolina residency. And Judge Griffin's suggestion that voters should have looked to the North Carolina state constitution's "residency" language and Article 20 of Chapter 163 strains credulity. *See* Griffin Opening Br. 13-14. The North Carolina state courts required months of briefing and arguments to decide, ultimately in split decisions with vigorous dissents, that the election laws and regulations did not in fact apply as they had in previous elections (and in this election for every other race).

Judge Griffin insists that this Court must ignore these concerns because the state appellate courts' decisions on North Carolina state law are binding. As with his plea for *Younger* abstention, Judge Griffin misses the point. There is no inherent conflict in allowing this Court to rule that the retroactive application of a new interpretation of state law violates due process, while leaving that interpretation standing for future application. Indeed, in *Bennett*, the very case Judge Griffin cites as rendering this Court "powerless" to review the state courts' decisions, the Ninth Circuit expressly took up the issue of whether the departure from past election practices constituted a federal due process violation. *See Bennett*, 140 F.3d at 1225 ("[T]he Hawaii Supreme Court is by

definition the final arbiter of Hawaii law. . . . We are powerless to review that court's decision in *Yoshina I*, even if we thought it was wrong or contrary to general principles of election laws. . . . With these general principles in mind, we now turn to Bennett's constitutional claims."). Justice Riggs' disagreement is not with the North Carolina appellate courts' ability to construe *North Carolina law* as applied prospectively to future elections. Rather, the issue here is the application of federal law. That analysis is well within this Court's purview, especially now that it has reserved jurisdiction over those federal-law issues.

### iii. Judge Griffin's Emphasis on "Massive" Disenfranchisement Neither Gets the Law Correct nor Helps His Claim.

Judge Griffin further urges this Court to ignore due process concerns because "[o]nly 'massive' disenfranchisement" justifies federal relief. Griffin Opening Br. 15 (quoting *Bennett*, 140 F.3d at 1226). This argument gets the law wrong: "whether the number is thirty or thirty-thousand," the "injury to these voters is real and completely irreparable if nothing is done to enjoin" the federal constitutional violations here. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). More importantly, none of Judge Griffin's authorities imposes a "massiveness" requirement on substantive due process claims. The *Bennett* court used the word "massive" to describe the "*ex post* disenfranchisement that the Rhode Island Supreme Court's ruling created" in *Burns*. *Bennett*, 140 F.3d at 1226. Neither case conditioned a claim on "massiveness."

Even if Judge Griffin were right that only "massive" disenfranchisement violates the U.S. Constitution, that argument would still be no help to him. The disenfranchisement in *Burns* characterized as "massive" by the *Bennett* court was "123 absentee and shut-in voters." *Burns*, 570 F.2d at 1079. Judge Griffin's challenges here are orders of magnitude larger than that decision, affecting *at least* 1,409 voters. Griffin Opening Br. 15.

13

There is considerable irony in Judge Griffin touting his decision to challenge only some military and overseas voters. While that argument does nothing to help his position under the Due Process Clause, it highlights the Equal Protection Clause violation here. The reason "only" 1,409 ballots are at issue is that Judge Griffin targeted only a handful of counties where he lost by significant margins. Judge Griffin is wrong to suggest that one constitutional violation cures another.

### B. The *Anderson-Burdick* Test Provides No Support for the Retroactive Enforcement of a Post-Election Photo Identification Requirement on UOCAVA Voters.

#### i. The *Anderson-Burdick* Test Is Inapplicable to Post-Election Rule Changes.

Judge Griffin relies on the *Anderson-Burdick* test to vindicate his desired post-election rule changes. That line of cases does not support his argument. The *Anderson-Burdick* test evaluates the validity of laws which impact the rights of voters to "act in a timely fashion . . . to express their views" by casting a ballot on or before election day. *Burdick v. Takushi*, 504 U.S. 428, 438 (1992); *see also Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) ("precedents recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled" (collecting cases)). It is therefore axiomatic that the *Anderson-Burdick* test applies exclusively to pre-election challenges to election laws, as due process protections allow voters to rely on election rules in place at the time of an election.

Nevertheless, Judge Griffin argues that requiring military and overseas voters to comply with a new photographic identification requirement nearly six months *after* the election is authorized by application of the *Anderson-Burdick* test. Judge Griffin fails to present a single case in which the *Anderson-Burdick* test was applied to even evaluate—let alone uphold—retroactive application of a post-election rule change. This failure is unsurprising given that "voters' rights under the fourteenth amendment" guard against "retroactive invalidation" of lawfully cast ballots.

14

*Burns*, 570 F.2d at 1070. In accordance with this principle and basic tenets of law, the *Anderson-Burdick* test has no bearing on the retroactive enforcement of a post-election photographic identification requirement on military and overseas voters. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) ("The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation."). The cases cited by Judge Griffin in reliance on the *Anderson-Burdick* test underscore this point.

Judge Griffin relies on *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) to argue that, when analyzed under the *Anderson-Burdick* test, the post-election cure process places a "de minimis burden" on voting rights. Griffin Opening Br. 19. But *Crawford* only applied the *Anderson-Burdick* test to determine that a settled state law that placed a photo identification requirement on *all* in-person voters was not "excessively burdensome." 553 U.S. at 202. This decision was based substantially on the fact that the settled state law required "*everyone*" seeking to vote in-person to "present a photo identification" which *before* the election could "be obtained for free." *Id.* at 205 (Scalia, J., concurring). Such justifications are not applicable to Judge Griffin's request to "retroactively . . . create new requirements" on "only some voters in only some counties" in just one specific election. *Compare Griffin*, 2025 WL 1090903, at *12 (Earls, J., concurring in part and dissenting in part), *with Crawford*, 553 U.S. at 205 (Scalia, J., concurring) (providing pre-election photo identification requirement was not overly burdensome because it was "generally applicable" and "uniformly impose[d] on all voters"). Rather than bless Judge Griffin's protests, *Crawford* confirms that the *Anderson-Burdick* test applies only to resolving "the dos and don'ts [that] need to be known *in advance* of the election." *Id.* at 208 (emphasis added).

Judge Griffin also relies on *Democratic Party of Virginia. v. Brink*, 599 F. Supp. 3d 346 (E.D. Va. 2022), but that case is similarly irrelevant to the facts here. The *Brink* court determined

a "notice and cure process" applicable to absentee ballots was constitutional under the *Anderson-Burdick* test nearly seven months *before* the election. *Id*. at 353, 363. This determination was based in part on the state's interest in "reducing the administrative burden on election staff around election day" and ensuring an "efficient" and "quick" certification of final election results. *Id.* at 364. Those same interests are not elicited by a post-election rule change, as that application would only create post-hoc administrative burdens and delay election certification.

### ii. If Applied, the *Anderson-Burdick* Test Establishes the Corresponding Cure Process Is Unconstitutional.

While the *Anderson-Burdick* test is inapplicable here, it confirms that the cure process unduly burdens constitutional voting rights. Under that test, a court's "inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens" the right to vote. *Burdick*, 504 U.S. at 434. Judge Griffin insists that gathering documents and including photo identification with a ballot are *de minimis* burdens. Even if that were true *as applied to future elections*, the burden here is imposing those requirements *six months after the election concluded* on a limited subset of military and overseas voters. It is *that* burden of timing and modified goalposts that "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 664 (M.D.N.C. 2024) (quoting *Burdick*, 504 U.S. at 434).

Judge Griffin maintains that the state's "compelling interest" in enforcing the cure process is "protecting its citizens from 'unlawful votes.'" Griffin Opening Br. 20. This argument relies on the unjustified premise that because the state appellate courts have announced a new interpretation of state law, that new understanding has always been the law. Judge Griffin "has yet to identify a single voter" who fraudulently cast a vote under Article 21A, *Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *15 (N.C. Ct. App. Apr. 4, 2025) (Hampson,

J., dissenting), and there is "no[] dispute" that the votes subject to the cure process "were cast consistent with the established election rules and procedures that were in place well before the 2024 general election," *Griffin*, 2025 WL 1090903, at *4 (Earls, concurring in part and dissenting in part). *See also* 8 N.C. Admin. Code 17.0109(d). Accordingly, the cure process cannot be narrowly drawn to protect against "unlawful votes," as these votes were not unlawful *when they were cast*.

This same logical deficiency undermines Judge Griffin's argument for the state's interest in ensuring a "fair count" of votes cast by "eligible voters." Griffin Opening Br. 20–21. Notwithstanding how the appellate courts' rulings may be applied to future elections, these voters fairly believed—based on all indications from state law and regulations, prior elections, and the guidance of all election officials—that they were eligible to vote. Ensuring a fair count of the votes counsels in favor of *counting* these ballots, as the State Board did.

### C. Judge Griffin's Procedural Due Process Arguments Are Unpersuasive.

#### i. Judge Griffin's Election Challenges Should Be Analyzed Under Ordinary Procedural Due Process Principles.

Judge Griffin also claims that any procedural due process challenges stemming from his election protests must be analyzed under the *Anderson-Burdick* framework. This contention remains incorrect, as Judge Griffin does not cite a single case showing that test's application to *post-*election procedural due process issues, when a voter is having her constitutional right to vote *challenged* by a candidate.

In any event, even in the pre-election context, district courts in and out of the Fourth Circuit have regularly applied the test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to procedural due process violations. *See, e.g.*, *Democracy North Carolina v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 228-29 (M.D.N.C. 2020) (applying the factors for a procedural due process

claim against a North Carolina law governing absentee ballots); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1337-40 (N.D. Ga. 2018); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *6-9 (N.D. Ill. Mar. 13, 2006). That test requires the Court to consider (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

For many of the same reasons enumerated above and already argued in Justice Riggs' opening brief, the cure process does not pass muster under the *Mathews* analysis. The cure process is rife with opportunities for error, including the accidents of the mail system and the disenfranchisement of so-called "Never Residents," who have, in fact, previously lived in North Carolina. *See, e.g.*, *Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1342 (N.D. Ga. 2019) (recognizing that unconstitutional burdens on the right to vote may be "exacerbated when voters are faced with a constrained timeframe for absentee voting"). Rather than serve a governmental interest, this cure process will only undermine public confidence in the voting system. And any hypothetical state interest is also undermined because, again, there has been *no evidence* submitted by Judge Griffin—or uncovered *at any point* in the last five months—that any of the challenged voters were ineligible to cast ballots at the time.

### ii. Judge Griffin Does Not Defend His Failure to Provide Adequate Notice to Voters.

Judge Griffin's decision to alert voters to his election challenges via a non-forwardable bulk mail postcard has been a central issue here. At every step of the litigation, Justice Riggs has maintained—and the State Board agreed—that this postcard directing the recipient to a QR code

link to hundreds of unorganized election protests was insufficient to afford adequate notice to those whose votes might be affected. Judge Griffin makes no attempt to defend his notice in his opening brief. This is telling. As Justice Riggs has argued in her opening brief, the QR code postcard fails the *Mathews* test, as it was a "mere gesture" that was not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

The due process deficiencies in Judge Griffin's chosen form of communication, among them the dependency on a QR code, the lack of identification for the voter, and the scattered organization of hundreds of potentially applicable protests, are manifest with respect to every challenged voter. These deficiencies are particularly concerning for voters who never received the postcard at all. These individuals, especially those who inherited their North Carolina residence, are set to have their ballots discarded with *no* notice or opportunity to be heard. Indeed, the publicity surrounding Judge Griffin's challenges is indirectly alerting some of the challenged voters, and individuals are coming forward to protest that they were included in the "Never Residents" protest in error, as they have lived in North Carolina. *See* Judd Legum et al., *North Carolina Supreme Court throws out hundreds of ballots based on flawed data*, Popular Information (Apr. 15, 2025), https://popular.info/p/north-carolina-supreme-court-throws, archived at https://perma.cc/7RZJ-DDJ8.

### D. Judge Griffin's Selective Targeting of Counties That Voted Significantly for Justice Riggs Violates the Equal Protection Clause.

Federal courts across the country have applied *Bush v. Gore*, 531 U.S. 98 (2000), for twenty-five years to curb arbitrary and disparate treatment of voters. Judge Griffin ignores that quarter-century of precedent—including this Court's own rulings—as well as the foundational

constitutional principles *Bush v. Gore* espouses. None of his arguments negate the fact that he has selectively—and unconstitutionally—targeted some military and overseas voters.

Judge Griffin contends that the Fourth Circuit has recognized *Bush v. Gore* as being "of limited precedential value," Griffin Opening Br. 21 (quoting *Wise v. Circosta*, 978 F.3d 93, 100 n.7 (4th Cir. 2020)), but that contention omits the *next sentence* from that footnote, in which the Fourth Circuit stated "[t]his analysis treats [*Bush v. Gore*] as binding for present purposes," *Wise*, 978 F.3d at 100 n.7 (emphasis added). To that point, federal courts in North Carolina have consistently applied *Bush v. Gore*'s "arbitrary and disparate treatment" analysis to changes in election rules. *See, e.g.*, *Moore v. Circosta*, 494 F. Supp. 3d 289, 315 (M.D.N.C. 2020) ("This court agrees with the parties that an Equal Protection violation occurs where there is both arbitrary *and* disparate treatment." (citing *Bush*, 531 U.S. at 105)); *see also Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016); *Wright v. North Carolina*, 787 F.3d 256, 263–64 (4th Cir. 2015). And North Carolina is hardly the outlier—indeed, courts across the country have applied *Bush v. Gore* and its principles as valid precedent for decades. *See, e.g.*, *Mi Familia Vota v. Fontes*, 129 F.4th 691, 729–730 (9th Cir. 2025); *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1090 n.15 (9th Cir. 2024); *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234, 241 (6th Cir. 2011); *Young v. Hosemann*, 598 F.3d 184, 189 (5th Cir. 2010); *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 46–49 (S.D.N.Y. 2020); *Richardson v. Trump*, 496 F. Supp. 3d 165, 183-87 (D.D.C. 2020).

Moreover, the principles undergirding the decision in *Bush v. Gore* were rooted in decades of jurisprudence. *See, e.g.*, *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 56 (1970) (The "Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in [a state] election."); *Moore v. Ogilvie*, 394 U.S. 814, 818 (1969)

(invalidating a county-based procedure that diluted the influence of citizens in larger counties); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."); *Gray v. Sanders*, 372 U.S. 368, 381 (1963) (finding constitutional violation where state accorded arbitrary and disparate treatment to voters in different counties). Judge Griffin's insistence then that *Bush* only applies to procedures such as a court-ordered recount ignores the fact that its larger constitutional principles are far more broadly applicable— and fundamental—to our democratic electoral system.

Judge Griffin targeted only a handful of counties—Guilford, Durham, Forsyth, and Buncombe—for overseas and military voters. He has offered no rationale for this decision. *See, e.g.*, *Hendon*, 710 F.2d at 181 ("[T]here must be a rational explanation when it is manifest that a greater burden may be placed upon the voter depending upon the method of voting employed."). Instead, dissenting opinions in the North Carolina courts observed two such possible motivations—these counties are ones Judge Griffin "lost by significant margins," *Griffin*, 2025 WL 1021724, at *41 n.23 (Hampson, J., dissenting), or, more directly, "counties that vote heavily Democratic," *Griffin*, 2025 WL 1090903, at *3 (Earls, J., concurring in part and dissenting in part). And now, expert statistical research submitted in these proceedings has confirmed that "[t]he UMOVA List voters in the four challenged counties . . . are significantly more likely to include Democratic voters compared to the voters in the rest of North Carolina's 96 counties who are not contested." ECF No. 82-7 at 5.

Judge Griffin's approach suggests the "worrisome" possibility that he is seeking "to pick and choose among groups of similarly situated voters to dole out special voting [burdens]." *Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012). That makes these circumstances entirely

different from those presented in *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 F. App'x 377 (3d Cir. 2020), in which the Third Circuit said that the "county-to-county variations [in that case] do not show discrimination," *id*. at 388. The Third Circuit recognized no equal protection violation had taken place where the plaintiff pointed to regional variations in how polling places were monitored but made no effort to plead that those differences resulted in his votes being treated differently. *See id.* That is not the case here, where the variation is not a difference in poll worker conduct, but rather a wholesale disenfranchisement of certain voters, and only in select counties.

Even so, Judge Griffin asserts that the newly enacted voting requirements are "sufficiently uniform and specific to ensure equal treatment of voters." Griffin Opening Br. 22. But those new state-law requirements cannot be uniform when they are applied only to some voters (and only to one race). Judge Griffin chose the voters he wanted to target after he found out that he lost the election. This disparate treatment is not the product of "local differences" in the administration of state elections, or a permissible variation in counties' "different systems" for tallying ballots. Griffin Opening Br. 22 (citations omitted).

Finally, Judge Griffin's minimization of the burdens faced by military and overseas voters—who he says must simply "act in a timely fashion," Griffin Opening Br. 24—should give the Court pause. This is not, as Judge Griffin contends, a question of whether "voters in some counties will take advantage of the notice-and-cure procedures . . . while others may not." Griffin Opening Br. 23. Soldiers serving in war zones, doctors treating the ill in impoverished regions, missionaries counseling the destitute—all of these groups, by accidents of the mail system, poor access to the internet, or the inability to suspend their duties, may not have the opportunity to comply with a cure process that they could not reasonably expect *six months* after they cast their ballots. The

disqualify-then-cure process itself imposes arbitrary and disparate treatment by invalidating some ballots and then requiring those individuals to submit themselves to belated extra steps to reinstate their franchise. And then, whether their vote will count depends on a remedial process subjecting them to random chance. That amounts to yet another equal protection violation. *See Gallagher*, 477 F. Supp. 3d at 49 (election procedures will violate the Equal Protection clause when "identically situated ballots" will be counted or invalidated "based on random chance").

### E. Judge Griffin's Attempts to Circumvent the NVRA Should Be Rejected.

The *per se* disenfranchisement of UOCAVA voters with inherited residence violates the NVRA, which provides that "a State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added). Judge Griffin attempts several arguments to get around this unequivocal prohibition, but none are persuasive.

First, Judge Griffin argues that the mass removal of voters, including "Never Residents," is merely a change in election procedure rather than voter registration. Griffin Opening Br. 24. This argument presents a "distinction without a difference," because the effect of having one's vote disregarded by way of a post-election change in procedure "is the same as not being eligible to vote." *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021). The main case cited by Judge Griffin, *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, (S.D. Miss. 2014), is not on point. In *Hosemann*, the plaintiffs attempted to invoke the NVRA as a "a post-election discovery device for detecting voter fraud"—not an attempt to remove votes. *Hosemann*, 43 F. Supp. 3d at 722. As noted in *Hosemann*, "[t]he NVRA establishes a uniform code for voter registration and removal." *Id*.

23

Second, Judge Griffin's argument that the NVRA is limited to "registration" and does not apply to "ballots," Griffin Opening Br. 24, should also be rejected. *See Mi Familia Vota*, 129 F.4th at 711 ("Such a narrow view of the NVRA's purpose is contrary to the text of the NVRA which declares the right 'to vote' is a fundamental right and establishes purposes beyond registration." (quoting 52 U.S.C. § 20501)). Judge Griffin's attempt to discard the ballots of registered voters––regardless of whether the attempt is through undermining their registration or throwing out their ballots—is covered and prohibited by the NVRA.

Third, Judge Griffin's contention that the NVRA "doesn't apply to state elections," Griffin Opening Br. 25, contradicts Fourth Circuit precedent and North Carolina law. The Fourth Circuit recently held that "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions of the NVRA." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 401 (4th Cir. 2024).

Fourth, Judge Griffin further contends that his protests, as narrowed under state law, would not effectuate a systematic removal program and would be based on individualized information. *See* Griffin Opening Br. 26. But the removal of purported "Never Residents" would inherently be systematic because it "does not require communication with or particularized investigation into any specific individual" and instead relies on "name[s] on a list electronically compared to other agency databases." *Virginia Coal. for Immigrant Rights v. Beals*, No. 24-2071, 2024 WL 4601052, at *1 (4th Cir. Oct. 27, 2024) (order on motion for stay). Rather, the voter's removal will be premised solely on the State Board's database.

Finally, Judge Griffin argues that the NVRA only protects "eligible" voters and not purported "Never Residents." Griffin Opening Br. 27. Similar arguments, which ignore the plain language of the NVRA, have been rejected. Where, in *Beals*, the appellants argued that the 90-

day quiet period "does not cover noncitizens at all," the Court rejected the argument and pointed to the language of the NVRA. *See Beals*, 2024 WL 4601052, at *1 (citing 52 U.S.C. § 20507(c)(2)(A) (preventing post 90-day attempts to "systematically remove the names of ineligible voters from the official lists of eligible voters"). This proposed reading of the NVRA, which would render the distinction between "ineligible" and "eligible" voters superfluous, should be rejected. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 (1993) ("We will not read the statute to render the modifier superfluous."). And as with Judge Griffin's substantive due process arguments, this contention rests on the wrongheaded assertion the voters he challenges were never allowed to vote—a claim contradicted by the fact that their ballots have continued to count in every other November 2024 General Election race.

### III. The Court Should Resolve This Matter by Entering Judgment That Federal Law Bars Judge Griffin's Protests.

The Court was right to direct briefing on "the remaining federal issues" because these consolidated proceedings turn on a common question: does federal law bar Judge Griffin's efforts to overturn the election through his two remaining protests? Text Order (Apr. 12, 2025). That question of law resolves every potential claim, defense, and motion before this Court. If federal law bars Judge Griffin's protests, then Justice Riggs should be certified the winner of the election. If federal law permits those protests, then the cure process outlined by the State Board should proceed. *See* ECF No. 61.

At the end of this "briefing schedule to facilitate prompt resolution of this matter," Text Order (Apr. 12, 2025), the Court should enter one final ruling that establishes the parties' rights and responsibilities under federal law. Now that the Fourth Circuit has "enjoin[ed] the North Carolina State Board of Elections from mailing any notice to any potentially affected voter pending the district court's resolution of Riggs' motion for a preliminary injunction," ECF No. 92 at 4,

there is no longer a need for this Court to maintain the status quo while it considers the remaining federal issues. For that reason, it would be inefficient for the Court to issue a separate order on any "preliminary injunction motions." Griffin Opening Br. at 28. That preliminary order would almost certainly lead to yet another interlocutory appeal. The better course—and the one Justice Riggs understands the Court to have charted—is to enter a prompt, final judgment resolving this matter.

That judgment should state whether federal law bars Judge Griffin's protests. In the ordinary course, an order dismissing Judge Griffin's petitions for judicial review—as Judge Griffin appears to request here, *see* Griffin Opening Br. at 31—would be enough to end the controversy and would entitle Justice Riggs to certification. But here, this Court's order remanding the state-law issues while retaining jurisdiction of the federal-law issues necessitates a judgment that defines the parties' rights and obligations under federal law. Without that clarity, there is some risk that Judge Griffin or others will argue that the state-law remedy should go into effect despite its conflict with federal law. This Court should make clear that, regardless of whether that remedy is appropriate as a matter of state law, federal law bars Judge Griffin's efforts to overturn the State Board's Decision and Order. Accordingly, the Court should rule that Judge Griffin's petitions for judicial review fail as a matter of federal law and lift its stay of certification so that the State Board may certify the election in favor of Justice Riggs.

## CONCLUSION

The Court should enter judgment in favor of Justice Riggs (and the State Board) stating that federal law bars Judge Griffin's efforts to overturn the November 2024 general election for Seat 6 on the Supreme Court of North Carolina.

Dated: April 25, 2025     Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

 /s/ *Raymond M. Bennett*
Raymond M. Bennett
N.C. State Bar No. 36341
Samuel B. Hartzell
N.C. State Bar No. 49256
Zachary N. Bernstein
N.C. State Bar No. 61681
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
(919) 755-2112
ray.bennett@wbd-us.com
sam.hartzell@wbd-us.com
zachary.bernstein@wbd-us.com

*Counsel for Intervenor-Defendant Allison Riggs*

27