# EXHIBIT A

FILED
DATE: April 16, 2025
TIME: 1:31:08 PM
WAKE COUNTY
CLERK OF SUPERIOR COURT
BY: T. ONeal



# North Carolina Court of Appeals

Phone: (919) 831-3600
Fax: (919) 831-3615
https://www.nccourts.gov

Eugene H. Soar, Clerk
Court of Appeals Building
One West Morgan Street
Raleigh, NC 27601

Mailing Address:
P. O. Box 2779
Raleigh, NC 27602

From Wake County
( 24CV040619-910, 24CV040620-910, 24CV040622-910 )

No. 25-181

**JEFFERSON GRIFFIN,**
        **Petitioner,**

        **v.**

**NORTH CAROLINA STATE
BOARD OF ELECTIONS,**
        **Respondent,**

        **and**

**ALLISON RIGGS,**
        **Intervenor-Respondent.**

## CERTIFICATION OF JUDGMENT

The following order was entered:

On 11 April 2025, the Supreme Court of North Carolina filed an Order, copy of which is hereto attached, reversing in part, modifying in part, and otherwise denying review of the opinion of this Court filed on 4 April 2025.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the certification of the opinion of this Court concerning the Superior Court's orders is as follows:

The result reached in the Superior Court's order in 24CV040620-910 concerning the "Incomplete Voter Registrations" category remains undisturbed for the reasons stated in the Supreme Court's Order. The North Carolina State Board of Elections and the county boards of election remain statutorily mandated to review, correct, update, and maintain the roll of lawfully registered voters. N.C. Gen. Stat. §§ 163-82.4(f); 163-2.14 (2023).

The Superior Court's order in 24CV040622-910 concerning the "Lack of Photo Identification for Overseas Voters" category is reversed. This Court's opinion remains in full force and effect for this category of voters, except as modified by the Supreme Court's Order, which expanded "the period to cure deficiencies . . . from fifteen business days to thirty calendar days after the mailing of notice."

The Superior Court's order in 24CV040619-910 concerning the "Never Resident" category is reversed.

IT IS FURTHER ORDERED that the Clerk of this Court certify this action to the trial tribunal for immediate further remand to the North Carolina State Board of Elections.

And it is considered and adjudged further, that each party shall bear its own costs; to wit, the Intervenor Riggs, Allison shall pay the sum of One Hundred and Thirty-Three and 81/100 ($133.81), the Respondent North Carolina State Board of Elections shall pay the sum of One Hundred and Thirty-Three and 81/100 ($133.81), and the Petitioner Griffin, Jefferson shall pay the sum of Four and 50/100 ($4.50), to wit, the sum of Two Hundred and Seventy-Two and 12/100 ($272.12), and execution issue therefor.

By order of the Court, sitting as a three-judge panel, this the 16th of April 2025.

HAMPSON, Judge, concurring in result.

The Supreme Court remanded this matter to this Court "for further remand and actions not inconsistent with this order." This Court is bound by the mandate of the state Supreme Court. However, what actions are "not inconsistent" with that mandate bear some fleshing out in order to provide guidance to the Superior Court and, ultimately, the Board as to the scope of its authority on remand to prevent the discounting of votes that were lawfully cast. *Cf. James v. Bartlett*, 359 N.C. 260, 271, 607 S.E.2d 638, 645 (2005) (reversing orders of the superior court and remanding the case to that court for "further proceedings consistent with this opinion."). Failing to provide further guidance to the Board creates confusion and public doubt in the process and will lead to delay resulting from yet further litigation.

The problem, ultimately, is that the majority Opinion in this Court—and, in turn, the Supreme Court—relies on assumptions that are not borne out by any actual evidence in the Record.[1] These assumptions only serve to create more litigation—both state and federal—and invite further post-election mischief. *See Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *17 (N.C. Apr. 11, 2025) (Dietz, J. concurring in part and dissenting in part) (noting our Court's majority decision "gets key state law issues wrong, may implicate a host of federal law issues, and invites all the mischief I imagined in the early days of this case.").

As I wrote in dissent in our Court: "At best, the majority's decision and completely unworkable remedy will lead to even more litigation—both state and federal. Tying this matter up in interminable litigation with no end in sight only results in delay, confusion, and sowing further doubt that every valid vote will be counted." *Griffin v. N. Carolina State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *42 (N.C. Ct. App. Apr. 4, 2025) (Hampson, J. dissenting), *reversed in part, modified in part, rev. den. in part*, 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025). Until there is some *evidence* presented by Petitioner that any of the voters he purports to challenge were, in fact, ineligible to vote—even, or perhaps especially, under the rules judicially created months after the election—it is impossible to move forward with any hope of accuracy to ensure all valid votes are counted and not undercounted. At some point, evidence and reason must control over conjecture and surmise.

---

[1] For example, our Courts assume every voter on Petitioner's lists, in fact, falls into the challenged categories of voters. Our Courts further assume that all so-called "Never Residents" have established residency elsewhere, never set foot in North Carolina, maintain an intent to remain overseas, and have never demonstrated any intent to return to North Carolina at any point. Moreover, our Courts make assumptions about how military voters and overseas voters actually vote in our elections—simply assuming their ballots and submissions are no different from absentee or early-voters—and, now, months after the election have the ability to easily "cure" their ballot, which was accepted as valid and counted for every other race, in what is—functionally—a matter of days.

Both this Court's majority Opinion and the Supreme Court's modifying Order leave open the question of exactly to which voters Petitioner's challenges apply. The question remains, for example, whether our Courts' decisions imposing brand new ID requirements for military members and overseas voters apply only to those voters in Guilford County or in other counties as well—a determination that could impact thousands of voters. And what happens to voters on Petitioner's list blithely dismissed by our Courts as "Never Residents" who do not, in fact, fall into this category newly defined by this Court as persons who are the children and wards of North Carolina residents but who themselves never resided in North Carolina (or elsewhere in the U.S.) and have not publicly declared an express intent to return to North Carolina? Surely, these individual voters are entitled to notice and an opportunity to defend against Petitioner's allegations they were not residents or that their ballots were not otherwise validly cast.

Prior to initiating any "cure" period or enacting this Court's judicial disenfranchisement of voters, the Board should retain discretion and authority to undertake quasi-judicial proceedings, including any evidentiary hearing it deems necessary. *See Matter of S.M.M.*, 374 N.C. 911, 914, 845 S.E.2d 8, 11–12 (2020) (where an opinion was silent as to whether the trial court should take new evidence on remand the decision to take new evidence is left to the trial court's sound discretion). Of course, under the reasoning of the majority of this Court, the Board will also bear the burden of now having to provide notice and an opportunity to be heard to challenged voters before undertaking any such hearing. *See Griffin, No. COA25-181, 2025 WL 1021724, at *5.*

In such proceedings, Petitioner should be made to bear his burden of proving the voters he purports to challenge were timely challenged, actually fall in the categories he challenges, and, in fact, did not comply with the additional requirements newly imposed by this Court and the Supreme Court on their otherwise validly cast ballots—and that votes retroactively deemed invalid would have changed the outcome of the election. *See Appeal of Harper*, 118 N.C. App. 698, 702, 456 S.E.2d 878, 880 (1995). Prior to discounting votes validly cast as of election day or imposing a "cure" period on military and overseas voters, the Board will have to make determinations as to which of the protests are timely or validly filed, the scope of those protests, and which voter challenges are proven by Petitioner under the new judicially created election rules.

Approaching the remand in this way complies with the Supreme Court's mandate while also staying true to statutory election protest/voter challenge procedures. It provides a process to identify exactly what votes are challenged and in need of "curing" and an opportunity for those deemed potentially ineligible as so-called "Never Residents" a chance to prove eligibility. It might just also serve to protect what is yet left of the constitutional rights of the impacted voters.

WITNESS my hand and the official seal of the North Carolina Court of Appeals, this the 16th day of April 2025.

Eugene H. Soar
Clerk, North Carolina Court of Appeals

SUPREME COURT OF NORTH CAROLINA

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| JEFFERSON GRIFFIN | From N.C. Court of Appeals<br>25-181 P25-104 |
| v. | |
| NORTH CAROLINA STATE<br>BOARD OF ELECTIONS | From Wake<br>24CV040619-910 24CV040620-<br>910 24CV040622-910 |
| and | |
| ALLISON RIGGS, Intervenor | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORDER

In its opinion filed on 4 April 2025, the Court of Appeals reversed orders entered by the Superior Court, Wake County, affirming dismissal of election protests filed by Petitioner Jefferson Griffin. The protests concern ballots cast by three categories of voters in the 2024 general election for Seat 6 on this Court: (1) voters with incomplete voter registration data, (2) military and overseas ballots cast under Article 21A of the North Carolina General Statutes but which failed to comply with the voter identification requirements in N.C.G.S. § 163-230.1, and (3) overseas voters who have never lived in North Carolina and have never expressed an intent to live in North Carolina.

On 6 April 2025, Respondent State Board of Elections and Intervenor-Respondent Allison Riggs filed motions for temporary stay, petitions for writs of supersedeas, and petitions for discretionary review with this Court. We allowed the

motions for temporary stay on 7 April 2025.

This Court is aware of the valid competing interests in this case – the need for an expeditious resolution of an election that occurred more than five months ago and the importance of ensuring that only lawful votes are counted. *See James v. Bartlett,* 359 N.C. 260, 270 (2005) ("To permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots[.]"). Bearing in mind these competing interests, we dispose of the petitions for discretionary review as explained below.

The Court of Appeals summarized the legal background of the first category of challenged voters as follows:

> To enable eligible voters to lawfully register, [respondent State Board of Elections] is statutorily tasked to develop a voter registration application form. [N.C.G.S.] § 163-82.3 (2023). The voter registration application form shall contain certain information to be provided by the voter applicant to lawfully register, including the applicant's "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number[.]" [N.C.G.S.] § 163-82.4(a)(11) (2023).
>
> If the voter applicant has neither a current and valid driver's license, nor a social security number, the Board must assign the applicant a "unique identifier number" which "shall serve to identify that applicant for voter registration purposes." [N.C.G.S.] § 163-82.4(b) (2023).
>
> The General Assembly enacted this requirement in 2004 to comply with the federal Help America Vote Act ("HAVA"), 52 U.S.C. § 21083 (2024), and to provide a corresponding state mandate. N.C. Sess. Law 2003-226, § 9 (amending [N.C.G.S.] § 163-82.4), § 22 (amendment effective 1 January 2004).

-2-

*Griffin v. N.C. State Bd. of Elections*, No.COA25-181, slip op. at 21 (N.C. Ct. App. April 4, 2025).

As to the more than 60,000 challenged voters for whom Petitioner asserts that registrations were accepted without obtaining statutorily required information, this Court allows the petitions for discretionary review for the limited purpose of reversing the decision of the Court of Appeals.

Under this Court's longstanding precedent, mistakes made by negligent election officials in registering citizens who are otherwise eligible to vote "will not deprive the [citizens] of [their] right to vote or render [their] vote[s] void after [they have] been cast." *Overton v. Mayor & City Comm'rs of City of Hendersonville*, 253 N.C. 306, 315 (1960); *see also State ex rel. Quinn v. Lattimore*, 120 N.C. 426, 433 (1897). ("[W]here a voter has registered, but the registration books show that he had not complied with all the minutiæ of the registration law, his vote will not be rejected."). Generally, absent fraud, negligence on the part of the government official charged with properly registering and entering voters onto the voter rolls should not negate the vote of an otherwise lawful voter. *See Woodall v. W. Wake Highway Comm'n*, 176 N.C. 377, 389 (1918) ("[W]hat may be a good reason for not allowing a party to register is not always a good reason for rejecting his vote after it has been cast.").

To the extent that the registrations of voters in the first category are incomplete, the Board is primarily, if not totally, responsible. Since 2004, state law

has required election officials to collect voter registration applicants' "[d]rivers license number[s], or if the applicant[s] do[ ] not have . . . driver license number[s], the last four digits of the applicant[s'] social security number[s]" or, "assign [the applicant] a unique identifier number" if the applicant has no such information.   N.C.G.S. § 163-82.4(a) and (b) (2023).[1]   In 2023, however, the Board became aware and admitted that it had not been in compliance with these requirements since they were initially imposed.  *See* Order at 4, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6, 2023) (acknowledging that "the [then-]current North Carolina voter registration application form fail[ed] to require an applicant to provide an identification number or indicate that they do not possess such a number").   The Board took action by updating the voter registration application form going forward; it did nothing, however, to ensure that any past violations were remedied.   These issues were brought to the Board's attention again in August 2024, when litigation was commenced regarding registration applicants using the previous form. *See generally Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 398– 99 (4th Cir. 2024).  That litigation remains pending in federal court.

The Board's inattention and failure to dutifully conform its conduct to the law's requirements is deeply troubling.   Nevertheless, our precedent on this issue is clear. Because the responsibility for the technical defects in the voters' registrations rests

---

[1] Federal law imposes an identical burden on state election officials when accepting or processing "application[s] for voter registration for an election for Federal office." 52 U.S.C. § 21083(a)(5)(A).

with the Board and not the voters, the wholesale voiding of ballots cast by individuals who subsequently proved their identity to the Board by complying with the voter identification law would undermine the principle that "this is a government of the people, in which the will of the people—the majority—legally expressed, must govern." *Lattimore*, 120 N.C. 428-429. Accordingly, we cannot agree with the Court of Appeals that the Board erred by counting their ballots.

We stress that this would be a very different case if the record provided grounds for believing that a significant number of the roughly 60,000 ballots in the first category were cast by individuals whose identity was not verified by voter identification or who were not otherwise qualified to vote.

Our case law regarding registration mistakes by elections officials does not apply to petitioner's remaining challenges because each presents questions unrelated to "proving merely that *the registration law* had not been complied with." *Woodall* 176 N.C. at 389 (emphasis added). "[T]he ultimate purpose of [an election] is to ascertain and give expression to the will of the majority, as expressed through the ballot box and *according to law*." *Id.* at 388 (emphasis added). We have, therefore, stated that "[t]o permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots[.]" *James* 359 N.C. at 270.

For the second category—military or overseas ballots cast under Article 21A for whom the Board of Elections failed to follow the express requirements of N.C.G.S.

§ 163-230.1 — we allow the petitions for the limited purpose of expanding the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business days to thirty calendar days after the mailing of notice.

As to the "never residents" in the third category, the Court of Appeals held that allowing individuals to vote in our state's non-federal elections who have never been domiciled or resided in North Carolina or expressed an intent to live in North Carolina violated the plain language of Article VI, Section 2(1) of the North Carolina Constitution, and we deny review.

Except as provided above, the petitions for discretionary review are denied. In addition, the temporary stay issued 7 April 2025 is dissolved, and the petitions for writs of supersedeas are denied. Petitioner's conditional petition for discretionary review is denied. This matter is remanded to the Court of Appeals for further remand and actions not inconsistent with this order.

By order of the Court in Conference, this the 11th day of April 2025.

/s/ Allen, J.
For the Court

Riggs, J., recused

-6-

WITNESS my hand and the seal of the Supreme Court of North Carolina, this

the 11th day of April 2025.



Grant E. Buckner
Clerk of the Supreme Court

Copy to:
North Carolina Court of Appeals
Mr. Troy D. Shelton, Attorney at Law, For Griffin, Jefferson - (By Email)
Mr. Terence Steed, Special Deputy Attorney General, For State Board of Elections - (By Email)
Mr. Craig D. Schauer, Attorney at Law, For Griffin, Jefferson - (By Email)
Mr. Philip R. Thomas, Attorney at Law, For Griffin, Jefferson - (By Email)
Mr. Raymond M. Bennett, Attorney at Law, For Riggs, Allison - (By Email)
Mr. Samuel B. Hartzell, Attorney at Law, For Riggs, Allison - (By Email)
Mr. Ryan Y. Park, Solicitor General, For State Board of Elections - (By Email)
Mr. Nicholas S. Brod, Assistant Solicitor General, For State Board of Elections - (By Email)
Mr. James W. Doggett, Deputy Solicitor General, For State Board of Elections - (By Email)
West Publishing - (By Email)
Lexis-Nexis - (By Email)

Justice EARLS concurring in part in the result only, dissenting in part.

It is no small thing to overturn the results of an election in a democracy by throwing out ballots that were legally cast consistent with all election laws in effect on the day of the election. Some would call it stealing the election, others might call it a bloodless coup, but by whatever name, no amount of smoke and mirrors makes it legitimate. The Court of Appeals took a shock-and-awe approach to the task, ruling that over 67,000 lawfully cast ballots were ineligible and could only be counted if voters took the initiative to correct errors not of their own making. This Court's special order instead employs a surgical strike, targeting some unknown in the record but possibly at least 2,000 to 7,000 votes of military and overseas voters, all of whom are now presumed to be fraudulent unless they can prove otherwise within thirty calendar days. What is worse, these targeted voters are only those who happened to have registered in Guilford County, or maybe one of three or four other counties that vote heavily Democratic, the special order is not clear, but in any case, not every such voter in the state. Therefore, as a result of the action taken by this Court in this matter, the vote of an overseas or military voter who is registered in Wake County and who voted pursuant to the laws applicable at the time is counted. However, the vote of an overseas or military voter who is registered in Guilford County is presumed to be fraudulent and will not count unless that voter provides proof of their identity within thirty business days. Explaining how that is fair, just, or consistent with

fundamental legal principles is impossible, so the majority does not try. Who are these voters? Active servicemembers and their families, missionaries, exchange students, corporate officers, doctors, lawyers, teachers, diplomats and so many other loyal North Carolinians who deserve to have their votes count.[1]

Whether by overkill or surgically targeted, the attack on democratic principles is equally fatal. And even if, defying all odds, sufficient numbers of those voters are contacted and do provide photocopies of their passports or other acceptable identification documents by email or mail within the deadline such that the ultimate outcome of the election is not altered, the precedent for the complete disruption of the election process by losing candidates has been set.

Apart from its illegitimacy, this special order is impossible to administer. The instruction to require overseas voters to provide photo identification or have their votes tossed out fails to identify which voters in exactly which counties must do so. The instruction to throw out the votes of overseas U.S. citizens domiciled in North Carolina but who have not physically lived here purports to require the Board of Elections to base that action on information the Board simply does not have, namely whether the individual intends to return to North Carolina. The special order has been hastily drawn without the benefit of proper deliberation. It is no small thing to

---

[1] Military voters are not necessarily overseas voters, either, and could include military members working domestically, for example on relief from Hurricane Helene. Griffin's protests explicitly challenge votes cast by military voters.

overturn the results of an election, results confirmed by two recounts as provided for by state law. Apparently, this Court believes it is something that needs to be done quickly, preferably in the equivalent of the dark of night, without debate or discussion.

The majority does not dispute that the votes it orders canceled were cast consistent with the established election rules and procedures that were in place well before the 2024 general election. The Court of Appeals majority cited general concerns of voter fraud to justify its extraordinary intervention in the democratic process, reasoning that unqualified voters dilute the voting strength of qualified ones. But its concerns ironically run in only one direction. The majority is willfully blind to the equally fraudulent effect of throwing out the ballots of qualified voters, made even more pernicious when done under color of law and by order of court.

Along the theme that the majority has things completely backwards, this opinion proceeds in logically reverse order. First, I explain the multiple and independent state constitutional grounds that bar the majority's remedial order. Second, I explain how the majority has rewritten the election protest statute to reach its decision based on mere allegations and novel legal theories, moving the burden of proof from Griffin to the eligible voters. Third, I explain why Griffin's legal challenges fail on their own terms—the Board correctly applied state law as it is written. Fourth, I note this Court's alarming practice of affecting sweeping changes to election law via

special order at the request of a Republican-aligned candidate and without merits briefing or public oral argument.

Should it stand, this order compels unequal treatment of North Carolina voters and infringes on their state constitutional right to vote.[2] It rewrites and inverts the election protest process, privileging allegations over evidence, and burdening voters rather than the candidate seeking to protest the election outcome with the requirement to put forward proof of their claims. It also contravenes the will of the people who enacted a constitutional amendment requiring the production of a voter ID only for voters who vote in person, and the express provision by the General Assembly that military and overseas voters in this state may vote without producing a photo ID. It threatens to make courts, not voters, the arbiter of which candidate wins an election in North Carolina. It betrays public trust in our elections process and our courts. From the majority's disrespect for the will of the people, its blatant legislating from the bench, and its deliberate effort to substitute its choice for that of the voters regarding who sits on our Court, I dissent.

## I.  Independent State Constitutional Limits on Retroactive Voter Requirements

---

[2] Parties have expressly asserted *England* reservations of rights so that their federal law defenses may be adjudicated by federal court. *See England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411 (1964). Accordingly, despite the obvious conflicts with federal law including the principles relied upon in *Bush v. Gore*, 531 U.S. 98 (2000), I address only state law issues.

*Earls, J., concurring in part in the result only, dissenting in part*

The majority is blatantly changing the rules of an election that has already happened and applying that change retroactively to only some voters, understanding that it will change the outcome of a democratic election. That decision is unlawful for many reasons, including because: 1) it is inconsistent with this Court's longstanding precedent, 2) contrary to equitable principles that require parties to bring their claims in a timely manner, 3) contrary to equal protection concerns, 4) violative of due process requirements, and 5) contrary to state constitutional provisions vesting the right to elect judges in the qualified voters of this state, not the judge's colleagues.

I agree fully with Justice Dietz that our precedent requiring that courts "minimize disruption" to elections compels that courts not intervene after an election to change the rules, including to impose new retroactive requirements on voters. *See infra* (Dietz, J., concurring in part and dissenting in part); *Pender County v. Bartlett*, 361 N.C. 491, 510 (2007), *aff'd sub nom. Bartlett v. Strickland*, 556 U.S. 1 (2009). *Pender County* bars today's decision, because there is nothing more "disruptive" to an election than changing its rules retroactively to alter the election outcome. 361 N.C. at 510.

Our Court has embraced this fundamental principle time and again, as the dissent below ably noted. *See Griffin v. N.C. State Bd. of Elections*, No. 25-181 (N.C. Ct. App. Apr. 4, 2025), slip op. 18–19 (Hampson, J., dissenting) (first citing *Burgin v. N.C. State Bd. of Elections*, 214 N.C. 140, 145 (1938) ("Nor will the courts undertake to control the State Board in the exercise of its duty of general supervision so long as

such supervision conforms to the rudiments of fair play and the statutes on the subject."); and then citing *Gardner v. City of Reidsville*, 269 N.C. 581, 585 (1967) ("Every reasonable presumption will be indulged in favor of the validity of an election." (citation omitted))). Of course we have. This principle is foundational to our constitutional guarantee of "[f]ree elections" to effectuate the mandate that "[a]ll political power is vested in and derived from the people; all government of right originates from the people [and] is founded upon their will only." N.C. const. art. I, sec. 2, 10. That all political power resides with the people means courts cannot change the established rules to cancel votes after an election in order to change the election outcome.

And make no mistake, these longstanding rules were established well before the election. The majority does not dispute that. The Board clearly announced, before the 2024 general election, that military and overseas voters were "not required to submit a photocopy of acceptable photo identification" with their absentee ballots. 08 N.C. Admin. Code 17 .0109(d). The Rules Review Commission, whose members are appointed by the General Assembly, approved of this procedure three separate times, and it applied in five different elections before the 2024 general election. *See* N.C.G.S. § 143B-30.1(a).[3] The Board thus gave all candidates and the public clear and advance

---

[3] The guidance was first effective in August of 2019. 08 N.C. Admin. Cod 17 .0109(d) (2019). It expired when enjoined by a previous court order but was readopted as a substantively identical temporary rule on 2 August 2023 and was made permanent on 1 April 2024. *See* 08 N.C. Admin. Code 17 .0109. Nothing in the record suggests that Griffin ever

notice that military and overseas voters would not be required to submit a photocopy of their identification to cast a ballot.

Similarly, Griffin's challenge to the votes of U.S. citizens who inherited their North Carolina residency from their parents is a challenge to the constitutionality of a statute passed unanimously by the General Assembly more than thirteen years ago.[4] It has applied in over forty elections since then. This rule was well-established and preexisting by any measure. No one disputes that the votes tossed under today's order were cast consistent with these longstanding rules—the only contention is that the rules have changed.

Our precedent *James v. Bartlett* is consistent with this *Pender County* principle and further contradicts the majority's decision. 359 N.C. 260 (2005). There, the State Board counted provisional ballots that were cast out of precinct. This was a surprise to the public and to the candidates. Before the election, the State Board's "general counsel failed to indicate that the State Board of Elections would count out-of-precinct

---

objected to this rule during notice and comment for formal rulemaking, when the rule went into effect, or at any point before the 2024 general election.

[4] *See* An Act to Adopt Provisions of the Uniform Military and Overseas Voters Act Promulgated by the National Conference of Commissioners on Uniform State Law, While Retaining Existing North Carolina Law More Beneficial to Those Voters, S.L. 2011-182, 2021 N.C. Sess. Laws 182, https://www.ncleg.gov/Sessions/2011/Bills/House/PDF/H514v0.pdf; N.C.G.S. § 163-258.2(1)(e) (defining a "covered voter" for the purposes of the military and overseas voter act as "[a]n overseas voter who was born outside the United States . . . and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements, [and] . . . [t]he last place where a parent or legal guardian of the voter was, or under this Article would have been, eligible to vote before leaving the United States is within this State").

provisional ballots." *Id.* at 265. We specifically concluded that "with the absence of any clear statutory or regulatory directive that such action would be taken, [the Board's actions] failed to provide plaintiffs with adequate notice that election officials would count the 11,310 ballots now at issue." *Id.* Only then did we consider the merits of the protestor's challenges. There could not be more daylight between that case and the challenges here, where Griffin and the public had ample, advance notice of the very election rules he now challenges.

Moreover, the successful challenge in *James* did not result in the retroactive cancellation of any votes cast consistent with the State Board's instructions. This Court ultimately remanded to the trial court for further consideration. *Id.* at 271. Subsequently the General Assembly intervened to clarify that "[i]t would be fundamentally unfair to discount the provisional official ballots cast by properly registered and duly qualified voters voting and acting in reliance on the statutes adopted by the General Assembly and administered by the State Board of Elections."[5] As the dissent below noted, "The fact the General Assembly felt obliged to step in and remedy the potential result in *James* should only underscore the need for judicial restraint in election matters concerning the counting of ballots." *Griffin*, slip op. 21 n.4 (Hampson, J., dissenting).

---

[5] An Act to Restate and Reconfirm the Intent of the General Assembly with Regard to Provisional Voting in 2004; And to Seek the Recommendations of the State Board of Elections on Future Administration of Out-of-Precinct Provisional Voting, S.L. 2005-2, § 1, 2005 N.C. Sess. Laws 13, 15, https://webservices.ncleg.gov/ViewDocSiteFile/55900.

*Earls, J., concurring in part in the result only, dissenting in part*

This distinction based on notice—that the appropriateness of post-election protests should depend on whether the challenged rules were known in advance to parties who could have objected to them before the election and chose not to—is the essence of our equitable doctrine of laches. This doctrine incentivizes parties to bring their claims in a timely manner. Most basically, those who sleep on their rights cannot later cry foul at great disruption to everyone else who followed the established rules. *E.g., Taylor v. City of Raleigh*, 290 N.C. 608, 622 (1976) ("In equity, where lapse of time has resulted in some change in . . . the relations of the parties which would make it unjust to permit the prosecution of the claim, the doctrine of laches will be applied. Hence, what delay will constitute laches depends upon the facts and circumstances of each case." (cleaned up)); *Teachey v. Gurley*, 214 N.C. 288 (1938) ("Whenever the delay is mere neglect to seek a known remedy or to assert a known right, which the defendant has denied, and is without reasonable excuse, the courts are strongly inclined to treat it as fatal to the plaintiff's remedy in equity, even though much less than the statutory period of limitations, if an injury would otherwise be done to the defendant by reason of the plaintiff's delay."). This doctrine has particular purchase in the election law context: allowing challenges to preexisting rules after a candidate knows the outcome makes courts, not voters, the deciders of election outcomes. *See Trump v. Biden*, 2020 WI 91, ¶¶ 30–31, 394 Wis. 2d 629, 645–46 ("Unreasonable delay in the election context poses a particular danger—not just to

-9-

municipalities, candidates, and voters, but to the entire administration of justice. . . . Striking [challenged] votes now—after the election, and in only two of Wisconsin's 72 counties when the disputed practices were followed by hundreds of thousands of absentee voters statewide—would be an extraordinary step for this court to take. We will not do so." (cleaned up)).

That point relates to another independent constitutional ground barring the majority's outcome-determinative decision, specific to protests that rely on novel legal theories to cancel votes in an election between two sitting judicial officials in a contest for a seat on the state Supreme Court. Namely, our Constitution vests the right to elect Supreme Court justices with the people. N.C. const. art. IV, sec. 16 ("Justices of the Supreme Court and Judges of the Court of Appeals shall be elected by the qualified voters of the State."). North Carolinians so deeply value the right to choose who serves on our bench that they previously rejected a constitutional amendment which would have undermined that right.[6] But a system of public accountability through popular elections for statewide judicial officials cannot work when state judges can change past state election rules to change the outcomes of state judicial elections. In that system, it is not the people who choose their judges, but the judges

---

[6] Michael Crowell, Univ. of N.C. Sch. of Gov't, *History of North Carolina Judicial Elections*, at 7 (Aug. 2020), https://www.sog.unc.edu/sites/default/files/additional_files/Judicial%20election%20history%20Aug%202020.pdf (describing a proposed constitutional amendment "to require the governor to fill judicial vacancies from names submitted by the General Assembly" which "appeared on the ballot in November 2018 but was defeated by a two to one margin").

who choose their colleagues. That is not the system the people of North Carolina established in our Constitution, and it independently bars the majority's decision today.

This judicial coup is further exacerbated by the selective nature of the voters Griffin challenges. For military and overseas ballot challenges, he only challenges one or some small number of North Carolina's 100 hundred counties. (More on that later.) He does not challenge the more than 25,000 identically situated voters across the state who voted under the same preexisting rules, who are not required to clear additional hurdles to have their vote counted, in the same exact race for state Supreme Court. To give him the relief he requests, this Court is ordering the state to violate the voter's rights to equal protection under our laws. *See* N.C. const. art. I, sec. 19; *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747 (1990) ("The right to vote on equal terms is a fundamental right."). Griffin's failure to challenge *all* of the voters who should be disqualified under his novel legal theories is another threshold reason that his two remaining protest claims fail.[7] The Court's acceptance of these selective challenges compels the Board to cancel the votes of some but not all identically situated voters, and thus violate state constitutional guarantees of equal protection under law.

---

[7] This is yet another difference between this case and *James*. The protestor there challenged all of the ballots cast in the contested manner. *See James v. Bartlett*, 359 N.C. 260, 263 n.3 (2005). This Court did not indulge protestor cherry picking to change the election outcome.

*Earls, J., concurring in part in the result only, dissenting in part*

Related to which voters and counties Griffin challenges, the Court's order conflicts with due process rights by failing to specify which voters are affected by its order and must take some action or else have their vote canceled. Only the 1,409 voters Griffin challenged in Guilford County were protested by the statutory deadline. *See* N.C.G.S. § 163-182.9(b)(4). Griffin sought to protest voters in five more counties: Buncombe, Forsyth, Durham, Cumberland, and New Hanover. But Griffin acknowledged in briefing below that he has only additionally submitted the names of voters in Durham, Forsyth, and Buncombe to the judicial record at some point. I do not know, and the court orders do not clarify, which of these counties' voters are affected. I do not know whether all or only some of these voters received any kind of notice that their votes have been challenged. The profound uncertainty with this selective and destabilizing order further underscores that it does not comport with due process requirements under our state constitution.[8] *See* N.C. const. art. I, sec. 19 (prohibiting deprivations of liberties unless by "law of the land"); *Halikierra Cmty. Servs. LLC v. N.C. Dep't of Health & Hum. Servs.*, 385 N.C. 660, 663 (2024) ("The

---

[8] Judge Griffin asserted in briefing below that he was unable to timely file protests for at least some counties because those counties did not provide responses to his public records requests by the statutory deadline. The Board in its order did not reach the issue. It noted in a footnote that Griffin sought to add voters to each of his protest categories after the deadline, but it didn't reach "whether such supplementations are allowable" under statute and the administrative code because it decided the protests were otherwise legally deficient.

Although the Court's action here is wrong for the significant reasons outlined in this opinion, since it has decided to proceed in this way, it errs again by not remanding the issue for a fact finder to determine whether any of "supplements" to his challenges were timely filed or whether any reasonable barrier existed to his timely filing of other county protests.

*Earls, J., concurring in part in the result only, dissenting in part*

Law of the Land Clause in Article 1, Section 19 of the North Carolina Constitution . . . serves 'to secure the individual from the arbitrary exercise of the powers of the government, unrestrained by the principles of private rights and distributive justice.' " (quoting *Gunter v. Sanford*, 186 N.C. 452, 456 (1923))).

A distinct due process problem arises from the special order's treatment of U.S. citizens who inherited their North Carolina voting rights from their parents. The special order interprets the Court of Appeals as holding that "allowing individuals to vote in our state's non-federal elections who have never been *domiciled* or *resided in* North Carolina or *expressed an intent* to live in North Carolina" violates our Constitution. (Emphasis added.) Accordingly, it denies review of the Court of Appeals' decision, which itself held that voters challenged by Griffin in this category must have their votes canceled without further opportunity to prove their eligibility. *See Griffin*, slip op. 36 (concluding that for Griffin's challenges in this category, "these purported voters are not eligible to vote in North Carolina . . . [and] are not to be included in the final count in the 2024 election for Seat 6").

This maneuver is bewildering. The special order's recitation of the holding is in the conjunctive—so a voter who meets any one of the three qualifying criteria (residency, domicile, intent to live in North Carolina) can vote under the Constitution's new construction. But Griffin has presented no evidence or made any allegations that any of the voters he challenges in this category lack an intent to live

-13-

in North Carolina.[9] In effect, the two orders announce a new interpretation of state constitutional law, and then categorically disqualify voters under it, without any showing that the disqualified voters do not meet the new standard. That is a due process violation in its most elemental form. *See Peace v. Emp. Sec. Comm'n*, 349 N.C. 315, 322 (1998) ("The fundamental premise of procedural due process protection is notice and the opportunity to be heard."). As the dissent below put it, "the majority effectively invents a new requirement for this group to fit its own agenda and gives them no opportunity to satisfy it." *Griffin*, slip op. 54 (Hampson, J., dissenting).

Related to opportunities to satisfy the court's new, retroactive requirement, the order purports to offer an opportunity to "cure deficiencies" for the military and overseas voters who did not provide a photocopy of identification, which this Court extends from fifteen business days to thirty calendar days. To be clear, this is not a "cure process" anything like the routine statutory procedures for correcting minor ballot deficiencies in the days immediately following an election. *See Griffin*, slip op. 22 (citing N.C.G.S. § 163-82.4(f) (2023) (providing a procedure for curing minor registration deficiencies)); *e.g.*, N.C.G.S. § 163-182.2(a)(4) (2023) (providing for circumstances in which a provisional ballot may be counted ahead of the canvass); N.C.G.S. § 163-230.1(e1) (2025) (delineating narrow "[c]urable deficiencies" that can

---

[9] The voters he challenges in this category have only expressed that "I am a U.S. citizen living outside the country, I have never lived in the United States." This representation says nothing of intent or domicile.

be made by "supplemental documentation or attestation provided by the voter," including a missing photocopy of identification, that must be received "no later than 12:00 P.M. on the third business day after the election:"). There is no statutory analog for the Court of Appeals' decision to rewrite the rules of an election, impose new hurdles on only certain voters to comply with those retroactive requirements, and to cancel their votes should they fail to do so.

In any event, the majority fails to explain why our precedent protecting voters from being penalized for any negligence by elections officials in the registration process should not also protect voters who relied on elections officials when casting their ballots. Our caselaw makes clear that voters cannot have their votes cancelled due to any technical errors in the in the mechanics of voting, when they acted in reliance on guidance from election officials, even when that guidance is later determined to be incorrect. *See, e.g., Owens v. Chaplin*, 228 N.C. 705, 711 (1948) ("We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake, or even the willful misconduct, of election officials in performing the duty cast upon them. The object of elections is to ascertain the popular will, and not to thwart it." (cleaned up)); *Overton v. Mayor of Hendersonville*, 253 N.C. 306, 315 (1960) ("[I]n the absence of actual fraud participated in by an election official or officials and the voter, voters are not to be denied the right to vote by reason of ignorance, negligence or misconduct of the election officials.").

Similarly, there was no way for voters to have complied with the majority's new requirements at the time of the 2024 election. The record suggests that it was not possible for some military and overseas voters to submit a photocopy of their identification if they wanted to, because they voted through an electronic system that did not have a mechanism to send that information. There was no way for inherited residents to indicate an intent to return to North Carolina, because the federal post card checkboxes that form the basis of Griffin's challenge did not ask the question. Just as cancelling the votes of more than 60,000 challenged voters based on alleged issues with their registrations is inappropriate, retroactively canceling the votes of any one of the voters in these other two categories based on their failure to satisfy a requirement they could not possibly meet is contrary to our precedent and fundamentally unfair.

In sum, there are multiple, independent reasons why the Court of Appeals' decision below and the majority's special order "are directly counter to law, equity, and the Constitution." *Griffin*, slip op. 1 (Hampson, J., dissenting). I agree with the superior court's decision to affirm the Board's dismissal of these protests. I concur in the result only on the special order's summary reversal of the Court of Appeals decision. I strongly dissent from the retroactive cancellation of eligible votes.

## II. Rewriting the Election Protest Statute to Shift Griffin's Burden to Eligible Voters

Case 5:24-cv-00731-M-RJ    Document 100-1    Filed 04/25/25    Page 27 of 54

*Earls, J., concurring in part in the result only, dissenting in part*

The Court of Appeals' decision refashions the procedures for bringing election protests. It shifts the burden for an election protest from Judge Griffin to the voters he challenges and places the requirement to notify those challenged voters on boards of elections rather than the petitioner bringing the challenge, contrary the statutes. This is a textbook act of "legislating from the bench." *Griffin*, slip op. 63 (Hampson, J., dissenting).

Under statute, an elections protest has three steps.[10] The first step starts after the party bringing the challenge files the protest, notifies the challenged voter(s), and offers probable cause that an election irregularity or misconduct has occurred. *See* N.C.G.S. §§ 163-182.9(a)–(b), -182.10(a) (2023). At the first step, the Board makes a "[p]reliminary [c]onsideration" of the protest's allegations. N.C.G.S. § 163-182.10(a). It must answer two questions: was the protest properly filed under § 163-182.9, and does it "establish[ ] probable cause to believe that a violation of election law or irregularity or misconduct has occurred?" N.C.G.S. § 163-182.10(a)(1). If the answer to either is "no," the protest must be dismissed. *Id.* Only if the Board answers "yes" to both questions at step one can it proceed to step two.

At step two, the Board proceeds to an evidentiary hearing. N.C.G.S. § 163-182.10(c). The board may receive evidence about the allegations and may question

---

[10] These procedures that apply to the county boards apply similarly to the state board when, as here, it takes jurisdiction for resolving the election protest. *See* N.C.G.S. §§ 163-182.10, -182.11(b), -182.12.

any witnesses. *Id.* Following the hearing, the Board must issue a "written decision" with findings of fact and conclusions of law. N.C.G.S. § 163-182.10(d)(1). The findings must be "based exclusively on the evidence" presented at the hearing "and on matters officially noticed." *Id.* Only if there is "substantial evidence of any violation, irregularity, or misconduct sufficient to cast doubt on the results of an election" can the Board move to step three, where it can correct vote totals, order a recount or take "[a]ny other action within [its] authority." *See* N.C.G.S. § 163-182.10(d)(2)(e); *see also* N.C.G.S. § 163-182.12.

In bringing his protests to more than 60,000 voters, Griffin had the burden to show "probable cause" to even clear the preliminary consideration hurdle at step one. N.C.G.S. § 163-182.10(a). He was also responsible for notifying voters of his challenges to their legal rights. 08 N.C. Admin. Code 2 .0111. Yet the Board determined that Judge Griffin failed to notify the challenged voters of his protest of their legal rights. It further determined that Griffin failed to identify a single voter in these three categories who was in fact ineligible to vote in the 2024 general election under the statutes, rules, and regulations in place for that election and thus had not shown probable cause. The Board rightfully dismissed the three categories of protests in light of those determinations. The Superior Court rightfully affirmed.

Note that even if Griffin succeeded at step one, he still would only have made out an initial showing of probable cause based solely on his allegations. The statutes still call for the Board to proceed to step two and to hold an evidentiary hearing on

the merits of Griffin's claims. Such a hearing would produce evidence, including from witnesses providing testimony under oath, as to whether the challenged voters were actually ineligible to cast a ballot, say because they were not eighteen years old, not United States citizens, not who they represent themselves to be, or not residents of the jurisdiction where they voted. *E.g.*, N.C.G.S. §§ 163-85(c), -87, -89(c). Only after Griffin produced "substantial evidence" of outcome-determinative irregularities or misconduct would any step three remedy or additional action by challenged voters be appropriate. N.C.G.S. § 163-182.10(d)(2). Under this statutory process, substantial evidence of actual irregularity or misconduct is required before any new hurdles can be erected before voters or any vote totals can be corrected. Mere allegations are not enough.

The Court of Appeals, however, recast the step one probable cause inquiry to leapfrog any evaluation of actual evidence at step two to order a sweeping cancellation of votes at step three. Specifically, it determined that Judge Griffin had shown probable cause, because this Court had stayed certification of Griffin's contest at his request, and because the Fourth Circuit has made banal observations about high stakes elections in our state. *See Griffin*, slip op. 19 ("These observations and statements by the Fourth Circuit [including that "North Carolina has been flooded with dozens of challenges to the State's electoral regulations"], combined with the Supreme Court's decision to issue a stay of certification, are evidence of probable cause to warrant review on the merits." (citing *Sharma v. Hirsch*, 121 F.4th 1033,

1043 (4th Cir. 2024))). In essence, the Court of Appeals concluded that "Judge Griffin has shown probable cause that the voters he challenged were ineligible to vote, because the North Carolina Supreme Court suggests he has." And, "the Fourth Circuit says some North Carolina elections challenges are valid, so this one is minimally meritorious." No matter that the only officials to actually weigh Griffin's probable cause showing, the State Board and the Superior Court, did not find probable cause. And no matter that this Court's stay was issued *after* the Board's decision, so could not very well justify the Board's decision in the first place. This reasoning from a court of law would be laughable were it not so dangerous.[11]

This Court compounds that mistake. It again collapses steps one and two to leap over to step three and order a remedy—not even the one desired by Judge Griffin or other parties, but one proposed by an unrepresented voting rights activist in an amicus brief below. And because Griffin still has not identified any individuals who

---

[11] The Court of Appeals' maneuver to skip step two, the evidentiary hearing, is ironic given its multiple, foundational misrepresentations of the facts at issue. *See, e.g.,* slip op. 21 ("The Board failed to amend the voter registration application form to obtain this information required by the 2004 law from new voter applicants until 2023."); slip op. 30 (indicating that none of the challenged overseas North Carolina voters who have checked a box indicating that they have never resided in North Carolina have an intent of physical residence in this state in the future, and suggesting they have somehow failed to demonstrate such intent for a requirement that has never before existed). It is worth repeating that public records confirm that the voter registration form expressly required this information until 2009 and was only changed to imply that the information was not required in 2013, the last time Republican-appointees had a majority on the State Board of Elections. The challenged overseas voters who are children of North Carolinians only checked a box indicating that "I am a U.S. citizen living outside the country, I have never lived in the United States," a statement that says nothing of such voters' intent.

cast ballots who were otherwise ineligible to vote under existing rules in these protests, the majority changes the rules retroactive to an election five months ago. It transforms mere allegations of election irregularity and novel legal theories into an expressway for the unilateral cancellation of votes and imposition of retroactive requirements. This is a judicial "advance to go, cancel 200 votes" straight out of a game of Monopoly, not our statutes.

This conclusion is extreme because of the lower court's holding that the State Board has no authority to compel petitioners to notify voters and that Griffin *did* properly notify the voters whose rights he challenges. Collapsing all three election protest steps into one inquiry, as the majority did, would presumably make it all the more important that voters receive notice that their rights have been challenged at step one. Under the majority's rewriting of the statute, step one is the whole ball game. Yet the majority eliminated any obligation for protestors to actually notify those voters whose rights they challenge, and it so substantially lowered what counts as "notice" that confusing, misleading, unlabeled mail with a generalized threat that "your vote may be affected by one or more protests" and a QR code qualifies.

*Earls, J., concurring in part in the result only, dissenting in part*



Should the voter have a smartphone, assume the risk of scanning a QR code, including one from a piece of spam-inspired mail addressed to them "OR CURRENT RESIDENT," the voter is then treated to an inscrutable webpage of spreadsheets, akin to some internet relic from the 1990s:

In my view, the State Board does have authority to compel petitioners to notify voters that their vote is being challenged, and Griffin's postcard fails to provide such notice. Under statute the Board has authority to "make such reasonable rules and regulations with respect to the conduct of primaries and elections as it may deem

advisable so long as they do not conflict with any provisions of this Chapter." N.C.G.S. § 163-22(a). Specifically, the Board "shall promulgate rules providing for adequate notice to parties." N.C.G.S. § 163-182.10(e). A rule that sets forth notice requirements consistent with Chapter 163 is therefore valid. The Board's notice requirements in 08 N.C. Admin. Code 2 .0111 are just that.

Below, the majority contended that the Board's "Election Protest Form instructions directly conflict with" N.C.G.S. § 163-182.10(b)'s requirement that the Board "shall give notice of the protest hearing." *Griffin*, slip op. 14. But the majority confuses the Board's obligation to notice the *protest hearing* with its duty to provide adequate notice *of the action*. The statute expressly requires the Board to notice a hearing on meritorious protests; it is also required to "prescribe forms for filing protests," and to make rules for providing adequate notice to parties, which it did here. N.C.G.S. § 163-182.9(c), -182.10(e).

The majority below further contended that, because "notice does not need to be given to any affected party until after it has been established an evidentiary hearing is set to take place," then the Board's rule requiring earlier notice "directly conflict[s]" with the statute. *Griffin*, slip op. 14. But this assertion again conflates the statute's notice of the hearing with notice of the challenge. Even if the statute was about notice in general, it does not follow that because earlier notice is not required under the statute, the Board is prohibited from requiring protestors to provide adequate notice.

-24-

In short, there is no conflict, and Griffin was therefore required to comply with 08 N.C. Admin. Code 2 .0111.

He did not do so. The rule required Griffin to serve "copies" of the actual "filings," including the protest petition, to notify voters that their votes are being challenged. Griffin instead sent a postcard with the message "your vote *may* be affected by one or more protests filed in relation to the 2024 General Election" and a quick response or "QR" code to view his protest filings. (Emphasis added.) This is insufficient to put voters on guard that their legal rights are being challenged in a quasi-judicial proceeding.

Even if that rule did not apply, Griffin was still required to provide notice of the action that provided affected voters with constitutional due process. Election protests are quasi-judicial proceedings. *Bouvier v. Porter*, 386 N.C. 1, 12 (2024). As an "essential element of a fair trial," notice of the action may not be dispensed with in a quasi-judicial proceeding. *Humble Oil & Refining Co. v. Bd. Of Aldermen of the Town of Chapel Hill*, 284 N.C. 458, 470 (1974); *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620 (1980). This requires at least "notice and an opportunity to be heard" before a deprivation of rights. *McMillan v. Robeson Cnty.*, 262 N.C. 413, 417 (1964). Griffin's mailing falls far short of that standard, because it failed to inform voters that their rights were *in fact* being challenged let alone the precise grounds for the challenge. Indeed, nothing on the mailing identified Griffin as the challenger. The postcard form and the use of QR codes may be permissible in other contexts in which

-25-

voters' constitutional rights are not at stake, but they were inadequate to provide notice to affected voters here.

In sum, the majority's decision to deny review effectively refashions the protest process to devise judicial authority to cancel votes based on mere allegations, not substantial evidence. This is contrary to the statutes and sets dangerous precedent. The Court of Appeals' decision is affected with legal error, and I would allow review to address these issues.[12]

## III. The Majority's Novel Restrictions on Military and Overseas Voting

## A. Military and Overseas Voters Challenged for Lacking Photocopies of Identification

Military and overseas voters are not required to submit photocopies of their identification when they cast their ballots, as a permanent rule promulgated by the Board explained, as the Rules Review Commission approved three distinct times, and as all five, bipartisan members of the Board of Elections agreed when it unanimously rejected Judge Griffin's challenges.

Yet the majority decided that those charged with administering our elections misapprehended the law on military and overseas requirements, and applied its new interpretation retroactively to create new requirements for only some voters in only

---

[12] To the extent that the majority purports not to rewrite the statute, it is necessarily then ordering that Judge Griffin alone is to receive special treatment. Such a "good for one time only" ruling is antithetical to rule of law principles for obvious reasons.

some counties. Those who fail to jump through the majority's new hoops will have their votes thrown out.

Those retroactive requirements should fail for the reasons set forth above. Here I explain why the Board's interpretation of the law was consistent with the General Statutes.

The General Assembly has enacted two separate processes for distributing and collecting absentee ballots. The first is Article 20 of Chapter 163 of our General Statutes. It applies to the general public and authorizes "[a]ny qualified voter" to request an absentee ballot. N.C.G.S. § 163-226(a). The second is Article 21A of the same chapter, known as the Uniform Military and Overseas Voters Act (UMOVA). N.C.G.S. § 163-258.1. It covers military and overseas voters specifically. It was a specific response to the substantial barriers our servicemembers and their families have historically faced while voting, which lowered servicemember civic participation even as those individuals served our country. Unif. Mil. and Oversees Voter Act Refs. & Annos, U.L.A (2023), Prefatory Note 1 (noting that, prior to new reforms, military personnel were more likely than the general public to be registered but less likely to vote). Drafted by the National Conference of Commissioners on Uniform State Laws in 2010, and codified by the General Assembly in 2011, UMOVA functions to (1) "extend to state elections the assistance and protections for military and overseas voters currently found in federal law," and (2) "bring greater uniformity to the military and overseas voting processes." UMOVA, Prefatory Note 2. Like other state

legislatures, our General Assembly unanimously enacted UMOVA to mitigate many of those barriers.

The below chart shows the a few of the differences between these two articles:

| Requirement | Article 20 – General Public | Article 21A – Military and Overseas |
|---|---|---|
| Submission process[13] | Physical delivery | Option for electronic delivery |
| Authentication process[14] | Notary or two witnesses | Option to sign a declaration under penalty of perjury |
| Deadline[15] | Ballots must reach the county board by 7:30 p.m. on election day | Ballots must be sent by 12:01 a.m. on election day and received on the business day before canvass |

Because they are distinct statutory procedures, Article 20 explicitly states when its processes extend to the military and overseas process in Article 21A. *See, e.g.*, N.C.G.S. § 163-231(b)(1) ("All ballots issued under the provisions of this Article *and Article 21A* of this Chapter shall be transmitted by one of the following means . . . ." (emphasis added)). Otherwise, the sections are separate and distinct. The statutes make that distinction express by clarifying that the special procedures in the military and overseas voter provision "shall not apply to or modify the provisions" of the procedures of the general public absentee process in Article 20. To the extent

---

[13] *Compare* N.C.G.S. § 163-258.10, *with* N.C.G.S. § 163-231(b).
[14] *Compare* N.C.G.S. § 163-231(a)(6), *with* N.C.G.S. § 258.13.
[15] *Compare* N.C.G.S. § 163-231(b)(2), *with* N.C.G.S. §§ 163-258.10, 163-258.12.

there is a gap that needs to be filled in Article 21A, that statute instructs that its provisions should be applied and interpreted in ways that "promote uniformity" across peer states. N.C.G.S. § 163-258.19. North Carolina's military and overseas voters are to be treated similar to other state's military and overseas voters following the same uniform law.

So in 2019, when the General Assembly amended *only* Article 20 to require an absentee voter under that section to submit a photocopy of her identification with her ballot, it sensibly was understood to apply only to the general public voters following the Article 20 procedures.[16] The statute even made that point expressly: Article 20 states that only "ballots [voted] under this section [in Article 20] shall be accompanied by a photocopy of identification." N.C.G.S. § 163-230.1(f1). The procedures for military and overseas voters in Article 21A were not likewise amended. That makes sense, because as the dissent below noted, requiring photocopies likely would have caused a conflict with federal law, and would have made North Carolina an outlier among all other states. *See also* N.C.G.S. § 163-258.4(d) (ordering the State Board of Elections to "develop standardized absentee voting materials" for military and overseas voters, and to do so "in coördination with other states").[17] This intent is further apparent

---

[16] I use shorthands like "general public" and "military and overseas" for ease of reading, but I note that voters who would qualify for military and overseas voting also have the choice of voting through Article 20's procedures. Of course, only eligible voters can use the generally applicable absentee voting procedures.

[17] In 2017, for example, Virginia's legislature considered a photo ID requirement for absentee ballots. See Senate Bill 872 (2017 Va.). But after the Director of the Federal Voting

because North Carolina just passed a constitutional amendment requiring photo identification for *in-person* voting *only*. *See* N.C. const. art. VI, §§ 2(4), 3(2). Whatever the policy wisdom, the General Assembly and the voters were apparently not concerned with overhauling the military and overseas voting process to require photocopies of identifications.

In the face of this straightforward question of statutory interpretation, the Court of Appeals buried its head, ostrich-like, in the sand. It draws a negative inference that because the special, military and overseas article "shall not apply to or modify" the general public article, all of the requirements in the general public article expressly apply to the special military and overseas article. To state the point is to refute it.

Given that our Court denies review of this issue, and indeed seemingly blesses its reasoning by extending the order below, dire questions arise. Do all of Article 20's requirements supersede Article 21A's? Will future candidates object after the fact to electronic submission of military and overseas voters' ballots? Their authentication? The date by which they must be received? The majority is opening Pandora's Box. Tomorrow's losing candidates for elected office can litigate and relitigate their losses

---

Assistance Program raised concerns that the state law would conflict with the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), the legislature created an exception for military and overseas voters. *See* Letter from Director David Beirne to Comm'r Edgardo Cortes, Va. Dep't of Elections, 6 Feb. 2017, https://www.fvap.gov/uploads/FVAP/EO/VaSEOLtrSB872_20170206_FINAL.pdf.

after the election along the same lines as Judge Griffin does today. The right to vote for military and overseas voters is conditional on the whims of losing candidates and the limits of their lawyers' creativity.[18]

## B. U.S. Citizens Who Inherit North Carolina Residency From Their Parents

Equally flawed is the refusal to review the Court of Appeals' conclusion that certain United States citizens born abroad—many to military families serving our country—are constitutionally barred from voting in North Carolina's elections. This Court declines to intervene. In doing so, it leaves standing a decision that disenfranchises a class of voters without proof of ineligibility and nullifies a statute passed unanimously by the legislature. That is a grave mistake. These citizens were entitled to vote—by statute and under the Constitution. Their ballots should count, and this Court errs in blessing their retroactive disenfranchisement.

From the outset, it matters enormously for this challenge that the Court of Appeals ignored the settled framework for voter challenges. A voter is presumed "properly registered," and that presumption stands unless the challenger offers "affirmative proof" to rebut it. N.C.G.S. § 163-90.1(b) (2023). Griffin's third challenge is against a group of American citizens born overseas, many into military families. Though these voters have never lived in North Carolina, they are legally tied to it.

---

[18] Indeed, the precedent set today means that a losing candidate can use the election protest process to challenge any election law after the election in order to toss out their opponent's ballots and change the outcome of the election.

They are registered here alone and may vote nowhere else. *See* N.C.G.S. § 163-258.2(1)(e)(2) (2023). And critically, they swore—under penalty of perjury—that North Carolina was the "last place" where their parent (or guardian) was eligible to vote before moving abroad. *See* N.C.G.S. §§ 163-258.2(1)(e)(1), 163-258.4(e), 163-258.13 (2023). That sworn statement establishes that these voters' parent(s) were domiciled in this State, as discussed below.

The Court of Appeals dismissed these voters as "never residents," casting them as strangers to North Carolina's elections. But there is nothing illegitimate about their participation. The General Assembly recognized as much when it unanimously passed UMOVA to give these voters the right to register and vote in this State. *See* N.C.G.S. §§ 163-258.6, 163-258.7, 163-258.10 (2023).

Despite that legislative approval, Griffin asserts—and the Court of Appeals implicitly held—that these citizens are constitutionally ineligible to vote in North Carolina because they have not lived here. The Constitution, however, makes no such demand. Article VI, § 2 provides that a person is "entitled to vote at any election held in this State" if they have "resided" in North Carolina for one year before an election. This Court has long held that "residence," in the voting context, is "synonymous with domicile." *Hall v. Wake Cnty. Bd. of Elections*, 280 N.C. 600, 605 (1972) (quoting *Owens*, 228 N.C. at 708); *see also Hall*, 280 N.C. at 606 ("It is quite clear that residence, when used in the election law, means domicile."). Domicile does not require physical presence—it is a legal status that "denotes one's permanent, established

home" in the eyes of the law. *Id.* at 605; *see also Baker v. Vaser*, 240 N.C. 260, 269 (1954) ("One may be a resident of one state, although having a domicile in another."). And "once established," this Court has explained, "a domicile is never lost until a new one is acquired." *Owens*, 228 N.C. at 709.

Domicile may be fixed in several ways. For the voters challenged here, the relevant path is domicile by origin, which attaches at birth. *Thayer v. Thayer*, 187 N.C. 573, 574 (1924); *In re Blalock*, 233 N.C. 493, 510 (1951). That domicile is inherited—a child "takes the domicile of the person upon whom he is legally dependent," usually their parents. *Hall*, 280 N.C. at 605. That birth-right domicile endures unless and until a new one takes its place. *See Reynolds v. Lloyd Cotton Mills*, 177 N.C. 412, 415 (1919) (describing as a "presumption of law" that a person's "domicil of origin subsists until a change of domicil is proved"). The burden to prove such a change lies with the person alleging it. *Id.*; *see also In re Blalock*, 233 N.C. at 510.

Griffin does not meet that burden. His only contention is that these "inherited resident" voters have never lived in North Carolina. But that is not the test. The law has never required physical presence to retain a domicile by origin in this State. To the contrary, our cases confirm that inherited domicile is not defeated "by merely proving residence in another place." *Reynolds*, 177 N.C. at 415; *see also In re Ellis' Will*, 187 N.C. 840, 843 (1921); *Plummer v. Brandon*, 40 N.C. 190, 192–93 (1848) (holding that a decedent remained domiciled in North Carolina despite "resid[ing] in

Tennessee a year before his death," and stating that acquiring a new domicile requires more than residence elsewhere).

The Court of Appeals ignored these settled principles. First, it made a collective—and unfounded—determination about these voters' domicile. That approach contradicts our precedent. Domicile, this Court has made plain, is "necessarily a matter that must be determined on an individual basis," depending on the facts unique to each case. *Lloyd v. Babb*, 296 N.C. 416, 428 (1972). There is therefore "no appropriate way to make a group determination." *Id.* at 428–29. Yet a group determination is precisely what the Court of Appeals rendered—and without the process or proof such a pronouncement requires. *See id.*

The court also erred in its reading of the law. It reasoned that even if the challenged voters inherited a North Carolina domicile, they lost it when they turned eighteen and became legally independent from their parents. That is incorrect. Legal dependence matters at birth, because an infant "takes the domicile of the person upon whom they are legally dependent." *Hall*, 280 N.C. at 605. But once fixed, that domicile does not vanish with legal adulthood; it remains until affirmatively replaced. *Reynolds*, 177 N.C. at 420 (cleaned up); *see also id.* at 417 ("The original domicile . . . is to prevail until the party has not only acquired another but has manifested and carried into execution an intention of abandoning his former domicile and taking another as his sole domicile." (cleaned up)). Griffin offers no evidence—none—that the overseas-citizen voters abandoned their North Carolina domicile and secured

another. *Cf. id.* at 421 ("To effect a change of domicile there must be an actual abandonment of the first domicile, coupled with an intention not to return to it, and there must be a new domicile acquired by actual residence within another jurisdiction, coupled with the intention of making the last acquired residence a permanent home." (internal citations omitted)). And without that "affirmative proof," he cannot defeat the presumption that the challenged voters were "properly registered" residents in this State, constitutionally eligible to vote here. *See* N.C.G.S. § 163-90.1(b). The Court of Appeals was wrong to indulge his fact-free claim, and wrong again to invalidate hundreds of ballots in one stroke, without hearing from a single voter.

The consequences of those errors are grave. The Court of Appeals has, in effect, declared subsection (1)(e) of UMOVA facially unconstitutional. It did so by engrafting a physical presence requirement onto the constitutional definition of "resident." That interpretation cannot be squared with N.C.G.S. § 163-258.2(1)(e) of UMOVA, which allows certain overseas citizens to vote even if they have never lived in North Carolina. The Court of Appeals holds that the Constitution forbids the General Assembly's act. So applying that logic, the entire class of voters covered by subsection (1)(e) is categorically ineligible. Meaning the General Assembly has enacted a law that is unlawful in every application.

That is the essence of a facial constitutional challenge. *See Singleton v. N.C. Dep't of Health & Hum. Servs.*, 386 N.C. 597, 599 (2024) (defining a facial challenge

as one in which the "claim and the relief that would follow could reach beyond the particular circumstances" of the case (cleaned up)). A facial challenge is no small matter. It carries unique "jurisdictional and procedural criteria," and demands a showing—beyond a reasonable doubt—that the challenged law is invalid across the board. *Id.* That bar is a high one. And the Court of Appeals did not meet it; it did not even try. Without serious analysis or explanation, it imposed a novel constitutional limit on the legislature, swept aside a duly enacted statute, and redefined the franchise. Gone apparently is the rigorous presumption of constitutionality for acts of the legislature not explicitly barred by the Constitution's text, and the requirement that violations of the same be proved beyond a reasonable doubt. *McKinney v. Goins*, 387 N.C. 35, 42 (2025) (Newby, C.J.). That kind of decision calls for this Court's review. It is wrong to look away.

## IV. The Majority's Alarming Practice of Affecting Sweeping Changes to State Election Law via Special Order Without Merits Briefing or Argument

I conclude where opinions usually start, with a note about the procedural posture of this case. The Board and Justice Riggs have petitioned this Court for discretionary review. The majority allowed and summarily reversed the Court of Appeals on one issue, thus reaching the merits. As to the other two issues, it reiterated what it sees as the core holdings from the Court of Appeals' decision and then extended the underlying remedy by nine more days. Yet it purports to deny merits review of those issues. The signal is clear: the Court believes the Court of

*Earls, J., concurring in part in the result only, dissenting in part*

Appeals decision was correct with regard to those claims, but it declines to go on record justifying its conclusion. The consequence is to deny parties the opportunity to fully brief the issues and further to sidestep the public oral arguments.

Make no mistake, this is a textbook case for discretionary review. *E.g.*, D. Martin Warf & Lorin J. Lapidus, *Discretion's Day—How To Prepare an Attractive Petition for Discretionary Review at the North Carolina Supreme Court*, N.C. State Bar J. (Spring 2025), at 8 (advising practitioners of the criteria for discretionary review by citing as an example "whether a statewide election can be conducted in a certain manner"). The Court of Appeals' decision affected sweeping changes to state law. It involved 1) a novel interpretation of the Constitution that facially invalidates a bipartisan act of the General Assembly and the right to vote for hundreds of North Carolinians and U.S. citizens, 2) stripped the elections boards of the power to compel petitioners to notify the voters they are challenging, 3) concluded that more than 60,000 votes were unlawfully cast in the 2024 general election, undermining public confidence in the accuracy and validity of our democratic system and inviting other destabilizing litigation from unsuccessful candidates in close races, 4) shifted the burden of proving an election protest from the protestor to the challenged voter, 5) invented whole cloth a judicial power to cancel the counting of ballots in some races but not others, in some counties but not others, contrary to equitable and equal protection principles, 6) contradicted constitutional limitations on changing the rules of an election after the election to invalidate votes that were lawfully cast under

*Earls, J., concurring in part in the result only, dissenting in part*

existing rules, 7) contradicted this Court's precedent that prevents votes from being invalidated where eligible voters did everything asked of them and any errors were on the part of the elections administrator. Denying review while leaving any part of the underlying decision intact is especially egregious given the multiple statements from multiple members of this Court contemplating that the Court would eventually and finally resolve the critical issues litigated here.[19]

Although expeditious resolution of these issues is important, and I fully agree that summary reversal was warranted in this circumstance, special orders without merits briefing are not the way the Court should resolve these issues. This is the second time in the same election cycle that this Court has executed a sweeping re-write of state law via special order, without full briefing on the merits, at the request

---

[19] The Court previously ordered briefing on the merits of the protestor's challenges, only to dismiss the extraordinary writ in favor of having Griffin follow the statutory process. *Griffin v. N.C. Bd. of Elections*, 909 S.E.2d 867 (N.C. Jan. 7, 2025); *Griffin v. N.C. Bd. of Elections*, 910 S.E.2d 348 (N.C. Jan. 22, 2025). Yet it signaled it would still resolve the critically important issues litigated here. *See Griffin*, 910 S.E.2d at 353 (Barringer, J., concurring in part) (objecting to having this matter "twist in the jurisprudential winds . . . before landing before this Court for the requisite de novo review"); *Griffin v. N.C. State Bd. of Elections*, 911 S.E.2d 365 (N.C. Feb. 20, 2025) (Barringer, J., concurring) ("Given the complexity and quantity of the issues presented in this case, this Court and our State will benefit from a well-reasoned, thoughtful, and deliberative analysis by the Court of Appeals."); *id.* at 366 (Allen, J., concurring) (supporting denial of the bypass petition because "I think that this Court could benefit from a well-reasoned and thorough evaluation of the parties' arguments").

Other members of this Court have expressed that this matter meets our criteria for review. *Griffin*, 910 S.E.2d at 349 (Newby, C.J., concurring) (noting that the case presented issues such as "preserving the public's trust and confidence in our elections through the rule of law"); *id.* at 352 (Berger, J., concurring) (noting that the case presented issues such as whether an "[a]genc[y] . . . operat[ed] outside the bounds of established rules").

*Earls, J., concurring in part in the result only, dissenting in part*

of a Republican-aligned candidate for office. *See generally Kennedy v. N.C. State Bd. of Elections*, 386 N.C. 620 (2024). I fear this practice is becoming too routine. We have developed a state analogue to the "shadow docket" which plagues the U.S. Supreme Court and threatens its legitimacy in the eyes of many.

Until other practices are adopted, litigants should take this Court at its word. It denied review of many of the important issues at stake in the Court of Appeals' opinion and therefore could not reach the underlying merits. The Court of Appeals' decision stands, but that body is not the highest authority on North Carolina law.

I have no doubt that this special order, upending years of precedent, violating due process, resulting in the discarding of thousands of legitimate votes, and issued with unseemly haste as though quickly ripping the bandage off the deep wound to our democracy will hurt less, marks one of the lowest points of illegitimacy in this Court's 205 year history. I look forward to the day when our Court will return to the rule of law and act to resolve the critical issues implicated in matters such as this with clarity, transparency, and even treatment for all voters and candidates. Until then, I dissent in the decision to deny review of two issues, and concur in the result only as to the summary reversal on the voters challenged based on their voter registration.

Justice DIETZ concurring in part and dissenting in part.

When these election claims first arrived at this Court three months ago, I urged the Court to summarily reject them. The election protest process cannot be used "to remove the legal right to vote from people who lawfully voted under the laws and regulations that existed during the voting process." *See Griffin v. N.C. State Bd. of Elections (Griffin I)*, 909 S.E.2d 867, 871 (N.C. 2025) (Mem.) (Dietz, J., dissenting). Endorsing this sort of post-election litigation, I warned, "invites incredible mischief." *Id.* at 872. "It will lead to doubts about the finality of vote counts following an election, encourage novel legal challenges that greatly delay certification of the results, and fuel an already troubling decline in public faith in our elections." *Id.*

The Court declined to put an end to these claims back then. But I remained hopeful that this was simply because the case was too important to warrant summary disposition. I expected that, when the time came, our state courts surely would embrace the universally accepted principle that courts cannot change election outcomes by retroactively rewriting the law.

I was wrong. The Court of Appeals has since issued an opinion that gets key state law issues wrong, may implicate a host of federal law issues, and invites all the mischief I imagined in the early days of this case. By every measure, this is the most impactful election-related court decision our state has seen in decades. It cries out for our full review and for a decisive rejection of this sort of *post hoc* judicial tampering in election results.

We should hear this case. I could spend pages laying out why the Court's failure to do so is a mistake—the origins of the so-called "*Purcell* principle," why it is so important to apply it here, and how it protects the public's faith in our elections. But I've already done that in this case, twice. *See Griffin I*, 909 S.E.2d at 871–72 (Dietz, J., dissenting); *Griffin v. N.C. State Bd. of Elections (Griffin II)*, 910 S.E.2d 348, 353–54 (N.C. 2025) (Mem.) (Dietz, J., concurring). Doing so again is not a helpful exercise.

This is not to downplay the majority's concerns about the State Board of Elections. I agree that the agency displayed a troubling lack of competence in its maintenance of the voter rolls. And, as I have explained before, there may be merit to Griffin's other arguments had they been brought in a suit seeking relief in future elections. *Griffin I*, 909 S.E.2d at 871–72 (Dietz, J., dissenting).

The voter ID claim, for example, makes sense to me based on the interplay of the applicable statutes and the likely intent of the legislature. But implementing that voter ID requirement consistent with the federal Uniformed and Overseas Citizens Absentee Voting Act would require careful planning by state election staff, likely with input from federal officials. It is not something that can be retroactively enacted by judicial edict.

Similarly, the so-called "never resident" issue is legitimate—although not for the reasons articulated by the Court of Appeals. Only residents of North Carolina can vote in our state elections. When not physically present in North Carolina, a person

is a resident of our state for voting purposes only if "that person has the intention of returning." N.C.G.S. § 163-57. This applies whether the voter is an hour north in Norfolk or across the world in Beijing. The record in this case indicates that there is a category of overseas voters who checked a box on their ballots indicating that "I am a U.S. citizen living outside the country, and my intent to return is uncertain." It is this clash with our state's residency requirement that concerns me. But on the record before this Court, it is not even clear that any of these voters are among those Griffin challenged, or that simply tossing their votes—without permitting the opportunity to clarify the uncertainty—is a constitutionally permissible remedy.

All of this reinforces why we should allow review in this case and hold that, under our state version of *Purcell*, these claims are not justiciable in a backward-looking challenge to a past election. These are questions that should be resolved in a declaratory judgment action seeking prospective relief that would apply in future elections.

Whatever happens next in this case, it won't fix the Court of Appeals' implied rejection of a state *Purcell* doctrine. Even if the federal courts ultimately reverse the Court of Appeals' decision because of a conflict with UOCAVA, or *Bush v. Gore*, or whatever else, the door is open for losing candidates to try this sort of post-election meddling in state court in the future. We should not allow that.

So, with apologies for repeating myself for a third time, I believe our state version of the *Purcell* principle precludes the relief sought in this election protest.

-3-

*Dietz, J., concurring in part and dissenting in part*

Election protests must be based on the failure to *follow* our election laws; they are not vehicles to bring challenges *to* our election laws. *See* N.C.G.S. § 163-182.10.

I would formally adopt a state analogue to *Purcell*—one that has always been lurking in our precedent—as part of our state election jurisprudence and uphold the decision of the State Board of Elections on that basis. *See Pender Cnty. v. Bartlett*, 361 N.C. 491, 510 (2007); *James v. Bartlett*, 359 N.C. 260, 265 (2005).

Accordingly, I concur in the Court's decision with respect to the voter registration challenge but respectfully dissent from the Court's decision on the remaining two grounds raised in the petitions.