# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NORTH CAROLINA
# WESTERN DIVISION

| | |
|---|---|
| North Carolina Democratic Party,<br><br>Plaintiff,<br><br>v.<br><br>North Carolina State Board of Elections, *et al.*,<br><br>Defendants. | Case No. 5:24-cv-699-M |
| Jefferson Griffin<br><br>Plaintiff,<br><br>v.<br><br>North Carolina State Board of Elections,<br><br>Defendants,<br><br>and<br><br>Allison Riggs, VoteVets Action Fund, North Carolina Alliance for Retired Americans, Sarah Smith, and Juanita Anderson,<br><br>Intervenor-Defendants | Case No. 5:24-cv-731-M |
| Carrie Conley, Lockhart Webb, and Ella Kromm, *individually and on behalf of all others similarly situated*; Gabriela Adler-Espino; and the League of Women Voters of North Carolina,<br><br>Plaintiffs,<br><br>v.<br><br>Alan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, *in their official capacities as members of the North Carolina State Board of Elections*, and Karen Brinson Bell, *in her official capacity as Executive Director of the North Carolina State Board of Elections*,<br><br>Defendants. | Case No. 5:25-cv-193-M |

# RESPONSE BRIEF OF PLAINTIFF NORTH CAROLINA DEMOCRATIC PARTY PURSUANT TO APRIL 14, 2025 ORDER

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................1

I.     The Remedial Process The State Courts Ordered And Discarding Any Votes Based On Judge Griffin's Challenges Would Each Violate The Constitution..................................1

       A.    Undue Burden .....................................................................................1
       B.    Procedural Due Process ......................................................................8
       C.    Equal Protection.................................................................................10

II.    The Post-Election Measures The North Carolina Courts Adopted Violate The National Voter Registration Act ....................................................................................12

III.   Injunctive Relief Is Warranted.....................................................................15

       A.    NCDP Will Suffer Irreparable Harm Absent Relief .............................15
       B.    The Balance Of Hardships And Public Interest Favor An Injunction ......16

IV.    Abstention Is Not Appropriate.....................................................................17

CONCLUSION.......................................................................................................21

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)...........................................................................................................8

*Arcia v. Florida Secretary of State*,
  772 F.2d 1335 (11th Cir. 2014) ........................................................................12, 14, 15

*Bell v. Marinko*,
  367 F.3d 588 (6th Cir. 2004) ...........................................................................................2

*Bennett v. Yoshina*,
  140 F.3d 1218 (9th Cir. 1998) .........................................................................1, 2, 3, 4, 6, 7

*Berry v. Reagan*,
  1983 WL 538 (D.D.C. Nov. 14, 1983) ...........................................................................17

*Burdick v. Takushi*,
  504 U.S. 428 (1992)...........................................................................................................8

*Bush v. Gore*,
  531 U.S. 98 (2000)..............................................................................................10, 11, 12

*Dellinger v. Bessent*,
  2025 WL 471022 (D.D.C. Feb. 12, 2025) .....................................................................17

*Democracy North Carolina v. North Carolina State Board of Elections*,
  476 F.Supp.3d 158 (M.D.N.C. 2020) ..............................................................................8

*Democratic Party of Virginia v. Brink*,
  599 F.Supp.3d 346 (E.D. Va. 2022) .............................................................................8, 9

*Dudum v. Arntz*,
  640 F.3d 1098 (9th Cir. 2011) .......................................................................................11

*Dunn v. Blumstein*,
  405 U.S. 330 (1972)........................................................................................................10

*Election Integrity Project California, Inc. v. Weber*,
  113 F.4th 1072 (9th Cir. 2024) .......................................................................................6

*Griffin v. Burns*,
  570 F.2d 1065 (1st Cir. 1978)........................................................................1, 2, 3, 4, 6, 7

*Griffin v. North Carolina State Board of Elections*,
  No. 25-1018 (4th Cir. Feb. 4, 2025) (per curiam)........................................................18

*Griffin v. North Carolina State Board of Elections*,
    2025 WL 1090903 (N.C. Apr. 11, 2025) ................................................................3, 4

*Griffin v. North Carolina State Board of Elections*,
    2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025) ...........................................................10

*Hendon v. North Carolina State Board of Elections*,
    710 F.2d 177 (4th Cir. 1983) ..................................................................................1, 2, 4

*Lance v. Dennis*,
    546 U.S. 459 (2006) (per curiam) ..............................................................................19

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ..................................................................................7, 15

*League of Women Voters of South Carolina v. Andino*,
    497 F.Supp.3d 59 (D.S.C. 2020) ..................................................................................8

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ......................................................................................16

*Majority Forward v. Ben Hill County Board of Elections*,
    512 F.Supp.3d 1354 (M.D. Ga. 2021) .......................................................................13

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ..............................................................................................8, 10

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) .....................................................................................11

*Middlesex County Ethics Committee v. Garden State Bar Association*,
    457 U.S. 423 (1982) ...................................................................................................20

*Moore v. City of Asheville*,
    396 F.3d 385 (4th Cir. 2005) ......................................................................................19

*NAACP v. Bipartisan Board of Elections & Ethics Enforcement*,
    2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) .......................................................14, 15

*New Orleans Public Service, Inc. v. Council of City of New Orleans*,
    491 U.S. 350 (1989) .........................................................................................18, 19, 20

*Ohio Civil Rights Commission v. Dayton Christian Schools*,
    477 U.S. 619 (1986) ...................................................................................................18

*Pennzoil Co. v. Texaco, Inc.*,
    481 U.S. 1 (1987) .......................................................................................................20

*Purcell v. Gonzales*,
    549 U.S. 1 (2006) (per curiam) ..................................................................4

*Raleigh Wake Citizens Association v. Wake County Board of Elections*,
    827 F.3d 333 (4th Cir. 2016) ...................................................................11

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................................................9

*Republican National Committee v. North Carolina State Board of Elections*,
    120 F.4th 390 (4th Cir. 2024) .................................................................13

*Richardson v. Texas Secretary of State*,
    978 F.3d 220 (5th Cir. 2020) ....................................................................8

*Rum Creek Coal Sales, Inc. v. Caperton*,
    926 F.2d 353 (4th Cir. 1991) ...................................................................16

*Snead v. City of Albuquerque*,
    663 F.Supp. 1084 (D.N.M. 1987) .............................................................2

*Sprint Communications, Inc. v. Jacobs*,
    571 U.S. 69 (2013) ...............................................................17, 18, 19, 20, 21

*Wise v. Circosta*,
    978 F.3d 93 (4th Cir. 2020) (en banc) ....................................................11

*Younger v. Harris*,
    401 U.S. 37 (1971) ................................................................17, 18, 19, 20, 21

## STATUTES AND REGULATIONS

N.C. Gen. Stat.
    §150B-21.9.................................................................................................5, 6
    §163-82.14 .................................................................................................13
    §163-258.2 ..............................................................................................2, 5
    §163-258.3 .................................................................................................13
    §163-258.4 ...................................................................................................4
    §163-258.13 .................................................................................................4

8 N.C. Admin. Code §17.0109(d).......................................................................5

Uniform Military and Overseas Voters Act,
    N.C. Sess. Law No. 2011-182, bit.ly/4czpr5j ......................................5

## OTHER AUTHORITIES

Letter to Judge Jefferson Griffin (Mar. 18, 2025), https://tinyurl.com/4xpk7ar7.........................17

## INTRODUCTION

Defendants in this consolidated litigation agree with the North Carolina Democratic Party that it would violate federal law to discard ballots cast in reliance on the rules in place before and during last fall's elections—particularly if targeted at voters in a few strategically selected counties rather than done uniformly across the state. And while Judge Jefferson Griffin disagrees, he does so largely by invoking *state* law. Under fundamental supremacy principles, state law cannot justify violations of federal law. Nor is there merit to Judge Griffin's plea for another abstention doctrine; the Fourth Circuit has held that NCDP and the other parties in these consolidated cases are entitled to a federal forum on their federal claims. Finally, whether or not any preliminary-injunction motion remains pending in any of the consolidated cases, this Court is free to rule now on NCDP's (and other parties') requests for final relief. With nearly half a year having already passed since election day, the Court should do so.

## ARGUMENT

I. **THE REMEDIAL PROCESS THE STATE COURTS ORDERED AND DISCARDING ANY VOTES BASED ON JUDGE GRIFFIN'S CHALLENGES WOULD EACH VIOLATE THE CONSTITUTION**

    A. **Undue Burden**

As NCDP's opening brief explained (pp.9-12), discarding votes by retroactively changing the rules of an election that has already taken place—as the state appellate courts have directed the North Carolina State Board of Elections to do here—unduly burdens the right to vote. Judge Griffin's contrary arguments fail.

First, Judge Griffin suggests (Br.9) that the bar on disenfranchising voters based on after-the-election changes is not binding law, accusing NCDP of relying solely on out-of-circuit cases: *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978) and *Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998). That ignores NCDP's discussion (Br.9) of *Hendon v. North Carolina State Board of*

*Elections*, 710 F.2d 177 (4th Cir. 1983), which establishes that the principles set forth in *Griffin* are "settled" law in *this* Circuit as well, *id.* at 182. Those principles prevent candidates from doing exactly what Judge Griffin did here: "gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (quotation marks omitted). Likewise infirm is Judge Griffin's charge (Br.9) that NCDP is "invit[ing] this Court to grade the papers of state courts." NCDP does not ask this Court to revisit the (exclusively state-law) questions the state courts decided, but rather to determine whether the relief those courts ordered violates *federal* law.

Judge Griffin next attempts (Br.9-10) to distinguish *Griffin* and *Bennett* on the ground that they concerned "qualified" voters whereas the voters he labels "never residents" are (he says) "not qualified voters" under recent state appellate-court decisions. But for starters, that ignores the fact that many voters on his "never residents" list appear to have lived in North Carolina and therefore *are* qualified voters. *See* NCDP Br.6 (D.E.78); Lawson Supp. Decl. (D.E.78-1) ¶29. More fundamentally, the fact that states may, *in advance*, "restrict the vote to residents," Griffin Br.10 (D.E.81) (quotation marks omitted), does not mean that states can *retroactively* discard the votes of voters who were eligible to vote under a state statute in place before and during the election (*see* N.C. Gen. Stat. §163-258.2(1)(e)). Judge Griffin's out-of-circuit cases are not to the contrary. *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004), upheld the *pre-election* removal of non-residents from the rolls based on timely challenges, while *Snead v. City of Albuquerque*, 663 F.Supp. 1084 (D.N.M. 1987), *aff'd*, 841 F.2d 1131 (10th Cir. 1987), rejected a challenge to residency requirements brought by non-residents whom the state never permitted to vote in the first place, *id.* at 1089.

Judge Griffin combines with the argument just discussed a separate supposed basis to distinguish *Griffin* and *Bennett*, namely that they "emphasized the *absence* of any cure process," whereas here the state courts ordered a cure process (for some challenged voters). Griffin Br.9-10. But *Bennett* does not discuss the absence of a cure process at all, and *Griffin* says there are "some cases where a federal role is appropriate" even where "state corrective procedures exist, because '[t]he right to vote remains, at bottom, a federally protected right,'" 570 F.2d at 1077. That the state appellate courts "considered" the fact that retroactive rule changes would disenfranchise eligible voters and thus ordered *some* post-election "cure" process, *see* Griffin Br.10, does not automatically render the process sufficient to prevent the "patent and fundamental unfairness" that would constitute "a violation of the due process clause." *Griffin*, 570 F.2d at 1077. That remains a federal question for the federal courts to resolve.[1]

Judge Griffin's related suggestion (Br.11, 17) that applying *Griffin* would require a new election is unavailing. Judge Griffin has never asked for a new election, either in administrative proceedings or before any court (state or federal). In any event, there is no need for a new election. Either federal law requires the votes at issue to be counted or it doesn't. If it does then they will be counted; if it doesn't then they won't be (save to the extent a voter cures in accordance with the state-ordered process or is otherwise entitled to relief under state law). Either way, the election outcome can be determined without imposing the enormous costs and other burdens on the state of a new election.

---

[1] Judge Griffin mischaracterizes the proceedings in the state courts. Griffin Br.4-5. The North Carolina Supreme Court denied review of the North Carolina Court of Appeals' rulings with respect to both groups of military and overseas voters, except "for the limited purpose of expanding the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business days to thirty calendar days after the mailing of notice." *Griffin v. NCSBE*, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025).

Likewise infirm is Judge Griffin's observation (Br.11) that federal courts have upheld notice-and-cure periods shorter than 30 days. None of those cases involved a situation like the one here, where voters were *told* by the state that they were eligible to vote and could cast their ballots in a particular way (i.e., from overseas via a state-created system that did not allow for them to submit photo identification, D.E.61 at 3 n.3), only to be told five months after those votes were cast and counted that they would be discarded (in one race only) absent the prompt provision of supplemental proof of identity. And Judge Griffin's related assertion (Br.12) that "[t]he entire history of election contests shows there's no right to prevent a once-counted ballot from being excluded after it is deemed deficient" ignores both the *Hendon/Griffin/Bennett* line of cases and the line of cases starting with *Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam), which NCDP discussed at some length (Br.11-12) but about which Judge Griffin says nothing.[2]

Next, Judge Griffin argues (Br.12-15) that this case involves only "garden variety" election irregularities, which he says do not merit federal intervention. That argument cannot be taken seriously. It "is no small thing to overturn the results of an election in a democracy by throwing out ballots that were legally cast consistent with all election laws in effect on the day of the election." *Griffin v. NCSBE*, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025) (Earls, J., concurring in part and dissenting in part). This case thus goes "well beyond the ordinary dispute over the counting and marking of ballots." *Griffin*, 570 F.2d at 1077. NCDP is not, for example, seeking relief because the state "fail[ed] to divide the ballots into parallel columns separated by distinct black lines," *Hendon*, 710 F.2d at 182. This case involves the largest set of election protests in North Carolina history—protests that were targeted at a subset of voters (presumed to favor one

---

[2] As noted in NCDP's opening brief (p.14), every one of the voters subject to Judge Griffin's photo identification protest already provided a declaration required specifically of military and overseas voters swearing to both their eligibility and identity. N.C. Gen. Stat. §§163-258.4(e), 163-258.13. And Judge Griffin has not offered evidence that any of those declarations were false.

political party and candidate) and that have engendered months of litigation in five courts. And a statewide race for a seat on the highest court in the state hangs in the balance—which is why Judge Griffin's efforts have not only received widespread media attention but also been roundly criticized as a threat to the public's faith in the integrity of North Carolina's elections and judicial systems. *See infra* p.17. All of that belies the notion that mere "garden variety" irregularities are at issue.

Resisting this conclusion, Judge Griffin argues (Br.13) that the state appellate courts did not "change existing law" but instead engaged in "*ex post* clarification of the state's election laws." That is false.

As explained in NCDP's opening brief (p.4), voters targeted by the first category of challenges—U.S. citizens living overseas who allegedly have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States—had the right both before and during the November elections to vote under a state statute that expressly included them in the definition of "[c]overed voter." N.C. Gen. Stat. §163-258.2(1)(e). The state legislature unanimously passed this law in 2011, *see* Uniform Military and Overseas Voters Act, N.C. Sess. Law No. 2011-182, bit.ly/4czpr5j, and it has been applied in more than 40 prior elections, *see* D.E.1-4 at 40. The North Carolina Court of Appeals changed existing law by determining months after the election that this statute violates the state constitution.

Similarly, at the time of the November elections, voters targeted by the second category—military or overseas voters who voted without providing photo identification with their absentee ballots—had the right to vote that way, 8 N.C. Admin. Code §17.0109(d), *quoted in* NCDP Br.11. The North Carolina Rules Review Commission (a body appointed by the state legislature to review agency rulemaking) unanimously voted that this rule was "within the authority delegated to the [North Carolina State Board of Elections] by the General Assembly." N.C. Gen. Stat. §150B-

5

21.9(a)(1); D.E.1-4 at 46. And during the rulemaking process, no one—not Judge Griffin, his political party, any member of the bipartisan Board, or any member of the General Assembly— objected that the rule was inconsistent with state statutes. D.E.1-4 at 46. Accordingly, the rule has been applied in five prior elections. *See id.* The North Carolina Court of Appeals changed existing law by determining months after the election that this rule is inconsistent with state statutory law. Before this ruling (i.e., before and during the elections), the law was as stated in the rule; after the elections, the law is different.

The post-election rule changes here, in fact, are similar to those in *Griffin*, where the First Circuit held that the state could not invalidate already-cast absentee ballots on the ground that such ballots were never constitutionally or statutorily authorized for party primaries, when the issuance of such ballots in party primaries had been a longstanding practice. *See* 570 F.2d at 1066-1067. By contrast, the circumstances in the cases Judge Griffin cites for the proposition that *ex post* clarification of state election laws is a "garden variety" irregularity were meaningfully different. *Bennett*, for example, held that a clarification of Hawaii's election laws was only a garden-variety election irregularity because "there was no disenfranchisement or meaningful vote dilution in [that] case," and "[e]very ballot submitted was counted." 140 F.3d at 1227. That is assuredly not the case here. *Bennett*, in fact, distinguished *Griffin*, which—like this case—did involve "disenfranchisement of absentee voters." *Id.* As for Judge Griffin's other case on this point, *Election Integrity Project California, Inc. v. Weber*, 113 F.4th 1072 (9th Cir. 2024), it relies entirely on *Bennett* for the proposition that *ex post* changes in law, if of the garden-variety sort, do not deny due process even if they change the outcome of the election, *id.* at 1096. It is therefore inapposite for the same reason as *Bennett*.

In yet another variation on the same point, Judge Griffin argues (Br.15-17) that NCDP has not shown the sort of "massive disenfranchisement" he claims is required to establish a due-process violation. But the cases he cites, *Bennett* and *Griffin*, impose no "massiveness" requirement. *Bennett* merely observed that in *Griffin*, ten percent of voters would have been disenfranchised, which *Bennett* described as "massive disenfranchisement;" it did not hold either that "massive disenfranchisement" was required or that ten percent was a dispositive threshold. *See* 140 F.3d at 1226-1227. Similarly, *Griffin* stated that federal relief is appropriate where "unfairness permeates an election," but did not say that such permeation can only occur where a certain number or percentage of voters are disenfranchised. 570 F.2d at 1078. Indeed, the Fourth Circuit has held the opposite, explaining that "whether the number is thirty or thirty-thousand," the "injury to these voters is real and completely irreparable if nothing is done to enjoin" federal constitutional violations. *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Applying a number-of-voters or percentage-of-voters requirement here makes particularly little sense, because the margin of Justice Riggs's victory was small, and Judge Griffin selectively targeted fewer voters than he could have because his goal is to overturn the election.

Finally, Judge Griffin resorts to the implausible contention (Br.15) that the state appellate courts' decisions will disenfranchise *zero* voters because "the overseas voters will have an opportunity to cure their ballots and have their votes counted, and the Never Residents were never qualified to vote in the first place." As explained, many of the so-called "never residents" have apparently resided in North Carolina (a point Judge Griffin ignores), but regardless, they were qualified to vote under then-current state statutory law. *See supra* p.5. And the notion that the existence of a post-election cure process prevents all disenfranchisement is similarly flawed.

7

Many eligible voters, including those who have died, will not be able to cure (another point Judge Griffin ignores). Judge Griffin does not point to any example of a similar post-election cure requirement, instead relying on a case *permitting* voters to cure ballots that did *not* comply with pre-existing rules. *See Democratic Party of Virginia v. Brink*, 599 F.Supp.3d 346, 363 (E.D. Va. 2022), *cited at* Griffin Br.16.

### B. Procedural Due Process

Judge Griffin's arguments regarding NCDP's procedural-due-process claim are likewise meritless. Instead of addressing the *Mathews* factors (an implicit concession that, as NCDP argued, those factors show a violation), Judge Griffin argues (Br.17-18) that *Mathews* does not apply, and that *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), supply the appropriate test. But this collapses undue burden and procedural due process, which involve two separate constitutional protections. Indeed, neither *Anderson* nor *Burdick* "dealt with procedural due process claims." *Richardson v. Texas Secretary of State*, 978 F.3d 220, 233-234 (5th Cir. 2020). And whatever the approach in other circuits (*see* Griffin Br.17), courts in *this* circuit have applied *Mathews* to procedural due process challenges in election-law cases. *See Democracy North Carolina v. NCSBE*, 476 F.Supp.3d 158, 228-229 (M.D.N.C. 2020); *League of Women Voters of South Carolina v. Andino*, 497 F.Supp.3d 59, 76-77 (D.S.C. 2020). Those courts have described contrary cases as "outlie[rs]" that, by not applying *Mathews*, adopt "an extremely constricted view of liberty," *League of Women Voters*, 497 F.Supp.3d at 77.

Equally flawed is Judge Griffin's claim (Br.19) that discarding ballots would impose a "de minimis" burden (and again, that framing underscores Judge Griffin's conflation of undue burden and procedural due process). It is not a "de minimis" burden to be wrongly denied one of our most precious rights—and Judge Griffin ignores the serious risk of such erroneous deprivation without

notice or a meaningful opportunity to be heard. At least several dozen voters have likely been incorrectly identified by Judge Griffin as "never residents." Lawson Supp. Decl. ¶¶26, 28-29 & Ex. A. Under the North Carolina Court of Appeals' ruling, those voters may lose their right to vote with no pre-deprivation process whatsoever—an indisputable constitutional violation. And at least one voter subject to the cure process (possibly more) cannot participate in it because she has died. Lawson Supp. Decl. ¶21. In the face of all this, Judge Griffin baselessly (and without elaboration) describes all the voters he has identified as having cast "illegal votes" (Br.16 n.2) and even suggests that his challenge be *expanded*.

Moreover, in response to NCDP's argument (Br.11-15) that mail necessarily takes longer to deliver and return to overseas or military voters, Judge Griffin cites only cases that address delays in *domestic* mail (Br.11). He says nothing about the ability of *international* mail to deliver and return a voter's photo ID within 30 days. And as pointed out even by a case Judge Griffin leans on (Br.18), the procedure a state provides "may be more problematic where it places a particular burden on an identifiable segment of voters" (here, overseas and military voters from target counties), *Brink*, 599 F.Supp.3d at 363 n.23 (quotation marks omitted).

Lastly, Judge Griffin's assertions (Br.19) that the state has an interest in excluding "unlawful votes" and providing "a fair count" likewise have no import here. Again, there is no dispute that each targeted voter cast a lawful ballot under the rules in place on election day. Hence, while Judge Griffin invokes (Br.19) states' authority to impose the "usual burdens of voting," there is nothing remotely "usual" about having one's vote discarded after the election based on a post-hoc changing of the rules. In any event, since Judge Griffin's cherry-picked challenges are "hopelessly underinclusive," *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015), *see* NCDP Br.18, any state interest in selectively targeting this subset of voters cannot be genuine—let alone

compelling. The unnecessary "risk of an erroneous deprivation," *Mathews v. Eldridge*, 424 U.S. 319, 333-334 (1976)—and again it is *Mathews*, about which Judge Griffin says nothing, that supplies the test—further undermines any legitimate state interest in a "fair count" here.

### C. Equal Protection

Judge Griffin does not dispute that his challenge to military and overseas voters who submitted absentee ballots without accompanying photo ID was limited to heavily Democratic Guilford County (and expanded after the protest-filing deadline to other Democratic-leaning counties). Nor does he dispute that there are similarly situated citizens in other counties (i.e. military and overseas voters who submitted absentee ballots without photo ID), whose votes will be unaffected even if they do not provide photo ID within 30 days. Targeted voters are therefore "at risk of being disenfranchised while similarly situated voters are not, simply because of the county in which they reside." *Griffin v. NCSBE*, 2025 WL 1021724, at *40 (N.C. Ct. App. Apr. 4, 2025) (Hampson, J., dissenting). That violates the Equal Protection Clause, which guarantees "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction," *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see also* NCDP Br.17-18.

Judge Griffin's only response is that a Supreme Court case NCDP's equal-protection argument cites—*Bush v. Gore*, 531 U.S. 98 (2000)—is inapposite. That would not help Judge Griffin even if it were true, as the equal-protection violation here is plain under myriad other binding cases. But it is not true.

First, Judge Griffin asserts (Br.21) that *Bush*—which was an equal-protection challenge to state (Florida) law—categorically does not apply to "equal protection challenges to state law." In support, he cites a single out-of-circuit case (in which no one raised *Bush*), a case that noted in applying *Anderson-Burdick* that it did "not engage in a separate Equal Protection Clause analysis,"

without suggesting that a separate analysis—under *Bush* or otherwise—would be inappropriate, *see Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (quotation marks omitted). Many other cases, by contrast, including from the Fourth Circuit, have expressly cited *Bush* in assessing equal-protection challenges. *See*, *e.g.*, *Raleigh Wake Citizens Association v. Wake County Board of Elections*, 827 F.3d 333, 340 (4th Cir. 2016); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 (9th Cir. 2025).

Second, Judge Griffin argues (Br.21) that "*Bush* is of limited precedential value." But the case he relies on for this argument, *Wise v. Circosta*, 978 F.3d 93 (4th Cir. 2020) (en banc), not only treated *Bush* "as binding," *id.* at 100 n.7, but also noted that *Bush* "prohibits arbitrary and disparate treatment in the valuation of one person's vote in relation to another's," *id.* at 100. The Fourth Circuit has also held elsewhere that *Bush*'s "one person, one vote principle, applies not just to the federal government but also to state and local governments." *Raleigh Wake Citizens*, 827 F.3d at 340.

Third, and relatedly, *Bush* is not "cabined" to the factual circumstances of a "statewide recount under the authority of a single state judicial officer," Griffin Br.22 (quotation marks omitted). For example, *Wise* did not involve a recount at all, yet as noted it treated *Bush* as "binding." 978 F.3d at 100 n.7. The purpose of *Bush*'s reference to a "single state judicial officer" was to contrast it with situations involving disparate treatment attributable to independent decisionmakers across multiple localities. *See* 531 U.S. at 109. But this case does not present the latter situation. Indeed, the "single state judicial officer" in *Bush* was the state supreme court, which—like here—had the "power to assure uniformity" but instead "ratified [] uneven treatment." *Id.* at 107, 109.

Fourth, Judge Griffin is wrong (for the same reason) that NCDP's reading of *Bush* would "requir[e] every candidate contesting an election to file in every county across the state." Griffin Br.23. Rather, NCDP contends only that *Bush* provides that where, as here, a single state court decides after an election that the administrative rules in place before and during the election did not comply with state statutory law, the state court cannot apply its "remedial process[]" "uneven[ly]" to certain counties retrospectively and to others prospectively, 531 U.S. at 107, 108.

Finally, Judge Griffin is wrong that this case involves only administrative "variation from county to county," and not an "onerous burden" on the right to vote. Griffin Br.23 (quotation marks omitted). The state appellate courts, at Judge Griffin's behest, have ordered the disparate application of the same statewide rule to similarly-situated voters based on county of residence— an arbitrary classification in this context. That is not organic "variation" between counties. And Judge Griffin's assertion (Br.24) that the court-ordered cure process is a minimal burden because voters simply need to "act in a timely fashion" (quotation marks omitted), once again is unsupported by cases concerning any similar cure requirement and ignores that many voters will be unable to comply—for example, it is impossible for a deceased person to "act in a timely fashion." *See supra* pp.8, 9.

## II. THE POST-ELECTION MEASURES THE NORTH CAROLINA COURTS ADOPTED VIOLATE THE NATIONAL VOTER REGISTRATION ACT

The NVRA prohibits systematic disenfranchisement late in the election cycle "when the risk of disenfranchising eligible voters is the greatest" and voters "will likely not be able to correct the State's errors in time to vote." *Arcia v. Florida Secretary of State*, 772 F.2d 1335, 1346 (11th Cir. 2014). This case presents exactly the risk the NVRA is designed to prevent: NCSBE, NCDP, and local reporting have already identified *dozens* of voters on Judge Griffin's list who were

12

incorrectly named. *See* Lawson Supp. Decl. ¶¶28-31. The NVRA squarely prohibits that type of systematic disenfranchisement when it is too late for voters to effectively defend their ballot.

Judge Griffin's six overlapping counterarguments are unpersuasive.

First, Judge Griffin tries (Br.24-25) to distinguish between voter registration (which he concedes the NVRA governs) and an allegedly distinct category he calls "election procedure" (which he argues the NVRA does not touch). That is a "distinction without a difference," because the "effect" of being removed from the list of voters (by having one's ballot discarded) "is the same as not being eligible to vote." *Majority Forward v. Ben Hill County Board of Elections*, 512 F.Supp.3d 1354, 1368 (M.D. Ga. 2021). Indeed, Judge Griffin gives the game away just three pages later when he argues (Br.27) that the "never resident" votes should be discarded because those voters "were improperly registered."

Judge Griffin next tries (Br.25) to separate state from federal elections. In North Carolina, that distinction is practically meaningless. The Fourth Circuit has recognized that by adopting a "unified registration system," North Carolina has elected to be "bound by the provisions" of the NVRA in both federal and state contests. *Republican National Committee v. NCSBE*, 120 F.4th 390, 101-102 (4th Cir. 2024); *see also* N.C. Gen. Stat. §163-82.14(a1) (requiring compliance with the NVRA). As a result, the "never residents" who Judge Griffin argues were "improperly registered in the first place" (Br.27) would, by their removal from the state rolls, necessarily be made ineligible to vote in federal elections. *See* N.C. Gen. Stat. §163-258.3(1). It strains credulity to argue that what was forbidden prior to the election (a systematic removal of voters from the rolls) may be permitted *after* the votes are tabulated and the results announced because the candidate seeking systematic disenfranchisement happens to be a candidate for state, rather than federal, office.

Third (and sixth), Judge Griffin insists (Br.25-27) that the NVRA does not protect ineligible voters. But that is irrelevant because the NVRA's 90-day rule is designed to ensure that *eligible* voters are not erroneously swept up in systemic disenfranchisement efforts, *Arcia*, 772 F.2d at 1346—as, again seems certain to happen here given the evidence that many of the supposedly ineligible voters Judge Griffin has targeted are in fact eligible.

Fourth, Judge Griffin argues (Br.26) that systematic disenfranchisement is not a "program" if it is part of a candidate-initiated post-election contest. But the phrase "any program" as used in the NVRA "has a broad meaning," applying (just as the plain text suggests) to "programs of any kind." *Arcia*, 772 F.2d at 1346. That includes programs initiated by private parties. The NVRA is violated, for example, where voters are removed based on a mass mailing sent to them not by the state, but by a local campaign. *See NAACP v. Bipartisan Board of Elections & Ethics Enforcement*, 2018 WL 3748172, at *7 (M.D.N.C. Aug. 7, 2018). Judge Griffin's effort to disenfranchise hundreds of voters based on whether they (might have) checked a particular box on a registration form—which the state has now adopted and developed a program for implementing—fits comfortably within this broad definition.

Fifth, and most incredulously, Judge Griffin asserts (Br.26) that "the North Carolina Supreme Court's order authorizes [NCSBE] to act … based on individualized information." That would be news to the state courts, where Judge Griffin asserts the opposite: that NCSBE is *prohibited* from collecting individual information about each voter, either by reviewing NCSBE's own records or by contacting any voter. *See* Mandamus Application at 15-19, No. 25-181 (N.C. Ct. App. Apr. 16, 2025) (D.E. 76-1). Judge Griffin thus seeks to discard the vote of each voter who checked a box indicating that she has not lived in the country, regardless of that voter's individual circumstance. *Id.* The NVRA prohibits such disenfranchisement based on "generic

evidence." *NAACP*, 2018 WL 3748172, at *7. Even NCSBE's proposed cure process (which Judge Griffin is challenging as too voter-friendly) is a systematic program of disenfranchisement; rather than remove votes based on individualized information, it would remove votes based on generic information unless individuals produce individualized evidence to rebut the systematic assumption. *See* D.E.61. Since the NVRA requires "individualized inquiry to function as a condition precedent to removal rather than a condition subsequent," NCSBE's proposed process cannot save the NVRA violation. *NAACP*, 2018 WL 3748172, at *9 (citing *Arcia*, 772 F.3d at 1346).

## III.  INJUNCTIVE RELIEF IS WARRANTED

Absent injunctive relief, NCDP will suffer irreparable harm that cannot be adequately remedied at law, and the balance of hardships and public interest overwhelmingly favor an injunction. Judge Griffin's counterarguments fail.

### A.  NCDP Will Suffer Irreparable Harm Absent Relief

Judge Griffin tellingly does not address NCDP's argument of irreparable harm. He argues only (Br.28) that "now that the North Carolina courts have confirmed that [the targeted] votes are *unlawful*," Justice Riggs's argument that "not counting lawful votes would cause irreparable harm" "doesn't hold water." That is incorrect. Even granting that some of the challenged ballots would be unlawful under state law as announced months after the election (while many would not be, because Judge Griffin has targeted many people erroneously), what would be "unlawful" under federal law is not the ballots but the retroactive, selective application of new state-law rules announced after the election in order to invalidate ballots that were indisputably lawful (including under state law) when cast. And the harm from that federal-law violation—denying the fundamental right to vote and have that vote counted—is clearly irreparable harm. *See League of Women Voters*, 769 F.3d at 247 (collecting cases).

15

That irreparable harm to NCDP's members extends to the organization itself. And NCDP will be separately harmed by having to divert time and other resources toward educating voters on how to cure by submitting proof of ID or an exception form, and how to ensure they are not erroneously included in Judge Griffin's "never resident" list. Lawson Supp. Decl. ¶¶19, 34-35. Such diversion of resources is irreparable harm. *See Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 361 (4th Cir. 1991).

### B. The Balance Of Hardships And Public Interest Favor An Injunction

Judge Griffin is correct that the public "has an interest in preserving the integrity of elections" (Br.30). But election integrity is not preserved by voter suppression. Judge Griffin demands the state discard what he calls "unlawful votes" (*id.*) but are actually votes that were indisputably lawful under the law at the time they were cast (just as no one would say that it constitutes protecting the integrity of a sporting event to penalize a player for making a play that was legal at the time of the event but newly declared a "foul" long after the event was over). Nor is it preserved by raising challenges only to a carefully selected subset of voters but not to other identically situated voters (just as, to continue the analogy, it would not preserve sporting integrity to punish players on one team who had committed the newly declared "foul" in the long-ended game while not punishing those on the other team who made the same play in the same game). And integrity is surely not preserved by doing all this to overturn the outcome of the election (any more than it would be if punishing just a few "foulers" in the sporting event led to flipping the result). All this is instead exactly what it would be called in sports: cheating to steal the victory.

Nothing can come close to outweighing these harms to the public's interest in election integrity because Judge Griffin cannot be harmed by an injunction that "prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-303 (4th

Cir. 2011). Judge Griffin cites (Br.29) *Berry v. Reagan*, 1983 WL 538 (D.D.C. Nov. 14, 1983), and *Dellinger v. Bessent*, 2025 WL 471022 (D.D.C. Feb. 12, 2025), for the proposition that "'deprivation[s]' of a 'statutory right' to an office constitute irreparable harm." But Judge Griffin is not being *removed* from an office he has ever had the right to occupy, as occurred in those cases. He has no lawful entitlement to serve as a North Carolina Supreme Court Justice when, following multiple counts, he lost the election. Relatedly, Justice Riggs's continued service on the Supreme Court poses no "disruptive effect." Griffin Br.29 (quoting *Berry*, 1983 WL 538, at *5). Under state law, she continues to serve as the incumbent until the November 2024 election is certified.

Finally, the public has a strong interest in avoiding a regime of chaos, in which every losing candidate has a roadmap to turn defeat into victory by selectively targeting just enough supporters of the real winner and getting courts to change state laws after the fact to deny those people their fundamental right to vote. Recognizing this interest, North Carolinians from across the political spectrum have expressed alarm over Judge Griffin's efforts; for example, a bipartisan group of over 200 North Carolina jurists described the protests as "a threat to the public's faith in" state Government. *See* Letter to Judge Jefferson Griffin (Mar. 18, 2025), https://tinyurl.com/4xpk7ar7.

## IV.    ABSTENTION IS NOT APPROPRIATE

Judge Griffin argues that the Court should again abstain from resolving the federal issues in this case, this time supposedly pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). But Judge Griffin cannot invoke *Younger* because he is not a state actor, and NCSBE has waived this defense. In any event, *Younger* does not apply because this case does not challenge a "pending state-court proceeding," let alone undermine the state's criminal or civil enforcement authority. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).

1.    Even if *Younger* were otherwise relevant, Judge Griffin cannot invoke *Younger*. The purpose of *Younger* is to protect state proceedings from federal intervention. But a "State may

of course voluntarily submit to federal jurisdiction even though it might have had a tenable claim for abstention." *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 626 (1986). Accordingly, where "the State expressly urge[s] th[e] [Supreme] Court or the District Court to proceed to an adjudication of the constitutional merits," that constitutes "consent or waiver." *Id.* at 626. The only state actor in this case (NCSBE) has not invoked *Younger*, thereby forfeiting the defense, and, in fact, has urged federal courts to reach the federal issues here, thereby affirmatively waiving *Younger*. *See* NCSBE Br. (D.E.83).

2. *Younger* cannot apply because these consolidated cases do not challenge any pending state-court proceeding. *Younger* "held that absent extraordinary circumstances federal courts should not enjoin pending state *criminal* prosecutions." *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 364 (1989) (NOPSI) (emphasis added). And the Supreme Court has since expanded the doctrine to block federal injunctions of three types of state-court proceedings: (1) "ongoing state criminal prosecutions," (2) "certain 'civil enforcement proceedings,'" and (3) "pending 'civil proceedings involving certain orders … uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Sprint*, 571 U.S. at 78 (citations omitted). Those categories "define *Younger*'s scope." *Id. Younger* thus implicates only *pending* state proceedings. *See id.* It has nothing to say about *final* state-court judgments. It therefore has no application here, where the state proceedings have concluded (with no state-court ruling on any federal-law issue, no less) and where the Fourth Circuit has already squarely held that the litigants have the right to have the federal claims here resolved by the federal courts, *see Griffin v. NCSBE*, No. 25-1018 at 1 (4th Cir. Feb. 4, 2025) (per curiam) (D.E.30).[3]

_____

[3] Judge Griffin makes a passing reference to the *Rooker-Feldman* doctrine (which dictates *which* federal court—a district court or the Supreme Court—may review constitutional challenges to final

Although the Fourth Circuit has recognized a narrow exception to the requirement that there be an "ongoing state judicial proceeding," that applies only when the target of a state's civil-enforcement proceeding "failed to exhaust state administrative remedies and defaulted on his opportunity to do so" before filing in federal court. *Moore v. City of Asheville*, 396 F.3d 385, 390 (4th Cir. 2005). These consolidated cases do not seek to "annul" a state-issued enforcement proceeding or otherwise evade state-court review, *id.* at 387-388; as just mentioned, all state-court appeals have now been exhausted, and as Judge Griffin acknowledges (Br.7), the parties have presented the federal issues to the state courts.

3.      Even if the Court looked past the pending-proceeding requirement, this case does not fit into any of the three *Younger* categories. This is not a criminal or civil enforcement proceeding, *Sprint*, 571 U.S. at 78. And the third category (challenges to certain pending civil proceedings, *see id.*) comprise only challenges to state courts' "ability to perform [their] judicial function" where federal courts have interfered with state courts' enforcement of civil contempt or bond requirements pending appeal. *Id.* at 79. The Supreme Court has "addressed and rejected an argument that a federal court should" expand that category by "refus[ing] to exercise jurisdiction to review a state [agency's]" adjudications, including "the subsequent state court's review of it." *Id.* (citing *NOPSI*, 491 U.S. at 368-369). To allow federal courts to abstain from adjudicating federal-law challenges to state orders "would make a mockery of the rule that only exceptional

---

state-court judgments). *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (per curiam). But that doctrine calls for abstention only from "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered" against them. *Id.* It cannot apply here in part because several parties in this consolidated action (including NCDP) were not party to any state-court judgment concerning Judge Griffin's protests, and the federal courts expressly reserved federal jurisdiction subject to appropriate *England* reservations made by other parties.

circumstances justify a federal court's refusal to decide a case in deference to the States." *NOPSI*, 491 U.S. at 368.

The decisions Judge Griffin cites (Br.5-6, 8) do not show that this case falls into the third *Younger* category. For example, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987), concerned whether a federal court may "enjoin a plaintiff who has prevailed in a trial in state court from executing the judgment in its favor *pending appeal* of that judgment to a state appellate court," *id.* at 3 (1987) (emphasis added). That challenge to the state's "requirement for posting bond pending appeal" uniquely interfered with the "state court's ability to perform its judicial function," *Sprint*, 571 U.S. at 79, because it "challenge[d] the very process by which those judgments were obtained," *Pennzoil*, 481 U.S. at 13. These cases cannot be analogized to such a procedural challenge to state courts' enforcement authority. And even if they could be, the fact that state-court proceedings have concluded obviates *Pennzoil*'s core concern: "avoid[ing] unwarranted determination of federal constitutional questions" that the state appellate courts might address in due course, 481 U.S. at 13.

4.      Unable to fit this litigation into any of the *Younger* categories, Judge Griffin tries to expand them by offering (Br.5-8) four reasons why *Younger* should nonetheless apply. But these reasons rest on nearly the same reading of *Younger* that the Supreme Court rejected in *Sprint*: that, based on *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982), any "ongoing state judicial proceeding" (a factor Judge Griffin omits) that "implicates important state interests, and … provide[s] an adequate opportunity to raise [federal] challenges" is subject to *Younger* abstention, 571 U.S. at 81 (alterations in *Sprint*) (quotation marks omitted). *Sprint* unanimously held that that reading would impermissibly extend *Younger* beyond the "quasi-criminal context" and to "virtually all parallel state and federal proceedings, at least where a party

could identify a plausibly important state interest." *Id.* In short, *Sprint* requires rejection of Judge Griffin's effort to expand *Younger*.

## CONCLUSION

The Court should issue a permanent injunction and declaratory relief as requested in NCDP's second amended complaint, or effect equivalent relief by exercising federal jurisdiction over and rejecting—on federal-law grounds—Judge Griffin's petitions for judicial review of NCSBE's order denying the first and second categories of Protests.

April 25, 2025 Respectfully submitted,

/s/ Shana L. Fulton
_____

SETH P. WAXMAN[*]
DANIEL S. VOLCHOK[*]
CHRISTOPHER E. BABBITT[*]
JANE E. KESSNER[*]
NITISHA BARONIA[*]
ANN E. HIMES[*]
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
jane.kessner@wilmerhale.com
nitisha.baronia@wilmerhale.com
annie.himes@wilmerhale.com

SHANA L. FULTON
N.C. Bar No. 27836
WILLIAM A. ROBERTSON
N.C. Bar No. 53589
JAMES W. WHALEN
N.C. Bar No. 58477
BROOKS, PIERCE, MCLENDON,
    HUMPHREY & LEONARD, LLP
150 Fayetteville Street, Suite 1700
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

[*] Local Rule 83.1(e) special appearance

**CERTIFICATE OF SERVICE**

On this 25th day of April, 2025, I electronically filed the foregoing document using the court's CM/ECF system.

/s/ Shana L. Fulton
Shana L. Fulton