# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| JEFFERSON GRIFFIN, | |
| *Plaintiff*, | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | |
| *Defendant*, | Case No. 5:24-cv-00731-M-RJ (lead) |
| and | |
| ALLISON RIGGS, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, JUANITA ANDERSON, | |
| *Intervenor-Defendants*. | |
| NORTH CAROLINA DEMOCRATIC PARTY, | |
| *Plaintiff*, | |
| v. | Case No. 5:24-cv-00699-M-KS |
| NORTH CAROLINA STATE BOARD OF ELECTIONS et al., | |
| *Defendants*. | |
| CARRIE CONLEY et al., | |
| *Plaintiffs*, | |
| v. | Case No. 5:25-cv-00193-M-RJ |
| ALAN HIRSCH et al., | |
| *Defendants*. | |

## VOTEVETS ACTION FUND, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, TANYA WEBSTER-DURHAM, SARAH SMITH, AND JUANITA ANDERSON'S RESPONSE TO JUDGE GRIFFIN'S BRIEF IN RESPONSE TO COURT'S ORDER

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 3

   I.   Griffin's belated invocation of *Younger* is meritless ............................................... 3

   II.   Griffin's demands to disenfranchise voters violate the Constitution and federal law ....... 7

         A.    Substantive due process forecloses disenfranchising voters who followed the rules on election day ............................................................................................. 7

         B.    Selective disenfranchisement of voters based on county of residence violates the Equal Protection Clause. ........................................................................... 12

         C.    Presumptively disenfranchising voters unduly burdens the right to vote. ............. 15

         D.    Presumptively invalidating the ballots of military and overseas voters, subject to a confusing cure requirement, violates procedural due process .............................. 17

         E.    The National Voter Registration Act prohibits the systematic removal of UMOVA voters. ........................................................................................................ 18

   III.   All other factors weigh in favor of an injunction against Griffin's requested relief. ...... 22

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Arcia v. Fla. Sec'y of State,*
   772 F.3d 1335 (11th Cir. 2014) ............................................................. 18, 19, 22

*Ass'n of Cmty. Orgs. For Reform Now (ACORN) v. Edgar,*
   56 F.3d 791 (7th Cir. 1995) ................................................................... 19

*Baker v. Carr,*
   369 U.S. 186 (1962).............................................................................. 8

*Bell v. Marinko,*
   367 F.3d 588 (6th Cir. 2004) ................................................................ 22

*Bennett v. Yoshina,*
   140 F.3d 1218 (9th Cir. 1998) .............................................................. 8, 11

*Burdick v. Takushi,*
   504 U.S. 428 (1992).............................................................................. 9

*Burford v. Sun Oil Co.,*
   319 U.S. 315 (1943).............................................................................. 3

*Bush v. Gore,*
   531 U.S. 98 (2000)............................................................ 12, 13, 14, 15

*Christopher Phelps & Assocs., LLC v. Galloway,*
   492 F.3d 532 (4th Cir. 2007) ................................................................ 23

*Crawford v. Marion Cnty. Election Bd.,*
   553 U.S. 181 (2008).............................................................................. 16, 17

*Democracy N.C. v. N.C. State Bd. of Elections,*
   476 F. Supp. 3d 158 (M.D.N.C. 2020) .................................................. 17

*Democratic Party of Va. v. Brink,*
   599 F. Supp. 3d 346 (E.D. Va. 2022) .................................................... 16

*Disability Rights N.C. v. N.C. State Bd. of Elections,*
   No. 5:21-cv-361-BO, 2022 WL 2678884 (E.D.N.C. July 11, 2022)................... 23

*Election Integrity Project Cal., Inc. v. Weber,*
   113 F.4th 1096 (9th Cir. 2024) ............................................................. 10

*England v. Med. Exam'rs*,
    375 U.S. 411 (1964)........................................................................................... 3

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ......................................................................... 23

*Gray v. Sanders*,
    372 U.S. 368 (1963)................................................................................... 12, 13

*Griffin v. Burns*,
    570 F.2d 1065 (1st Cir. 1978)................................................... 7, 8, 11, 16, 24

*Hendon v. N.C. State Bd. of Elections*,
    710 F.2d 177 (4th Cir. 1983) ......................................................... 1, 8, 9, 10, 25

*Huffman v. Pursue, Ltd.*,
    420 U.S. 592 (1975)....................................................................................... 4, 6

*Hunter v. Hamilton Cnty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011) ............................................................................ 12

*Ill. Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979)............................................................................................ 9

*Jonathan R. by Dixon v. Justice*,
    41 F.4th 316 (4th Cir. 2022) ......................................................................... 4, 5

*Jordan v. Hutcheson*,
    323 F.2d 597 (4th Cir. 1963) ............................................................................. 8

*Kim v. Board of Education of Howard County*,
    641 F. Supp. 3d 223 (D. Md. 2022) ................................................................ 13

*Lake v. Hobbs*,
    643 F. Supp. 3d 989 (D. Ariz. 2022) ............................................................... 24

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ........................................................... 9, 11, 23, 25

*Lee v. Va. State Bd. of Elections*,
    843 F.3d 592 (4th Cir. 2016) ............................................................................. 9

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ........................................................................... 24

iii

*Majority Forward v. Ben Hill Cnty. Bd. of Elections,*
    512 F. Supp. 3d 1354 (M.D. Ga. 2021) ............................................................. 19

*Mi Familia Vota v. Fontes,*
    129 F.4th 691 (9th Cir. 2025) ............................................................. 12, 20, 22

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
    457 U.S. 423 (1982) ............................................................................. 4, 6

*Moore v. City of Asheville,*
    396 F.3d 385 (4th Cir. 2005) ..................................................................... 6

*N.C. ex rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.,*
    989 F. Supp. 2d 479 (E.D.N.C. 2013) ............................................................ 6

*N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't,*
    No. 1:16-cv-1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ...................................... 20

*Ne. Ohio Coal. for Homeless v. Husted,*
    696 F.3d 580 (6th Cir. 2012) ................................................................. 7, 16

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,*
    491 U.S. 350 (1989) ............................................................................. 5

*Nivens v. Gilchrist,*
    444 F.3d 237 (4th Cir. 2006) ................................................................. 6, 7

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) .................................................................... 23

*Pennhurst State Sch. v. Halderman,*
    465 U.S. 89 (1984) ............................................................................. 6

*Pennzoil Co. v. Texaco, Inc.,*
    481 U.S. 1 (1987) ............................................................................. 6

*Project Vote, Inc., v. Kemp,*
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) ........................................................... 21

*Project Vote/Voting for Am., Inc. v. Long,*
    682 F.3d 331 (4th Cir. 2012) ................................................................... 19

*R.R. Comm'n of Tex. v. Pullman Co.,*
    312 U.S. 496 (1941) ............................................................................. 3

*Raetzel v. Parks/Bellemont Absentee Election Bd.,*
    762 F. Supp. 1354 (D. Ariz. 1990) .............................................................. 18

iv

*Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections,*
    827 F.3d 333 (4th Cir. 2016) .................................................................. 13

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*
    397 F.3d 56 (1st Cir. 2005) ..................................................................... 5

*RNC v. N.C. State Bd. of Elections,*
    120 F.4th 390 (4th Cir. 2024) ................................................................ 19

*San Jose Silicon Valley Chamber of Com. PAC v. City of San Jose,*
    546 F.3d 1087 (9th Cir. 2008) ............................................................. 5, 6

*Seattle Pac. Univ. v. Ferguson,*
    104 F.4th 50 (9th Cir. 2024) .................................................................... 5

*Sprint Commc'ns, Inc. v. Jacobs,*
    571 U.S. 69 (2013) .............................................................................. 2, 4

*Stein v. Cortes,*
    223 F. Supp. 3d 423 (E.D. Pa. 2016) ...................................................... 4

*United Church of the Med. Ctr. v. Med. Ctr. Comm'n,*
    689 F.2d 693 (7th Cir. 1982) ................................................................ 23

*United States v. Hill,*
    776 F.3d 243 (4th Cir. 2015) .................................................................. 8

*Voto Latino v. Hirsch,*
    712 F. Supp. 3d 637 (M.D.N.C. 2024) ............................................. 15, 17

*Walker v. City Calhoun,*
    901 F.3d 1245 (11th Cir. 2018) ............................................................... 4

*Wise v. Circosta,*
    978 F.3d 93 (4th Cir. 2020) ......................................................... 1, 12, 13

*Younger v. Harris,*
    401 U.S. 37 (1971) .................................................................................. 3

**STATUTES**

28 U.S.C. § 1443 ............................................................................... 2, 3

52 U.S.C. § 20501 ................................................................................. 19

52 U.S.C. § 20502 ................................................................................. 21

v

52 U.S.C. § 20507 ................................................................................................. 18, 22

N.C. Gen. Stat. § 163-82.11 ........................................................................................ 19

N.C. Gen. Stat. § 163-258.2 ........................................................................................... 7

**REGULATIONS**

8 N.C. Admin. Code 17.0109 .......................................................................................... 7

**OTHER AUTHORITIES**

Open Letter to Judge Jefferson Griffin (Mar. 18, 2025),
    https://www.commoncause.org/north-carolina/wp-content/uploads/2025/03/NC-Legal-
    Community-Open-Letter-to-Griffin-3.18.25.pdf .............................................................. 10

# INTRODUCTION

Judge Griffin's opening brief gets one thing right: "Elections must end sometime." ECF No. 81 ("Griffin Br.") at 30 (citation omitted). That moment came and went nearly five months ago when a final recount reconfirmed Griffin's defeat in the race for a seat on the Supreme Court of North Carolina. Yet in a desperate bid to escape his loss at the ballot box, Griffin has dragged North Carolina voters—especially military and overseas voters—through a half-year ordeal designed to throw out their votes. Only now is Griffin finally confronting the federal laws and constitutional guarantees that have barred him from relief all along. And when he does, he has remarkably little to offer.

On the merits, Griffin says substantive due process principles have no pedigree here. Wrong—they are "settled" law in the Fourth Circuit. *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983). He claims his opponents seek to supplant state court rulings on state law issues. Wrong again—they merely seek review of reserved *federal* issues that no court has yet addressed. *See* ECF No. 35; *see also* Order at 3–4, *Griffin v. Riggs*, No. 25-1397 (4th Cir. Apr. 22, 2025), Doc. 25. He says *Bush v. Gore* has no precedential value. Wrong thrice—the Fourth Circuit has treated *Bush* as "binding." *Wise v. Circosta*, 978 F.3d 93, 100 n.7 (4th Cir. 2020) (en banc). This pattern repeats across Griffin's arguments on procedural due process, the federal right to vote, and the National Voter Registration Act: he searches for escape hatches from the strictures of the Constitution and federal law that bar his challenges and finds none.

Determined to avoid these unresolved federal issues, Griffin attempts to invoke his *third* abstention doctrine of the case. Having failed with *Burford* abstention, and now on the wrong end of *Pullman* abstention, Griffin conjures *Younger* abstention. But that narrow, disfavored doctrine does not apply for several reasons. Most importantly, Griffin simply ignores the Supreme Court's

controlling decision in *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 76 (2013), which sharply limits *Younger*'s application and makes clear it warrants abstaining only in the face of three specific kinds of state actions—all of which are clearly absent here. Tellingly, Griffin cites no post-*Sprint* authority, leaning instead on outdated cases curtailed or outright abrogated by *Sprint*. If that were not enough, Griffin's renewed plea for abstention is directly at odds with the Fourth Circuit's order that this Court "expressly retain jurisdiction of the federal issues" in this case "should the issues remain[.]" Order at 11, *Griffin v. N.C. State Bd. of Elections*, No. 24-1018 (4th Cir. Feb. 4, 2025), ECF No. 132 ("*Pullman* Order"). To now abstain would defy the Fourth Circuit's order, erase the distinguishing feature of *Pullman* abstention, and undermine the Board's lawful removal under 28 U.S.C. § 1443(2). No principle of comity allows Griffin to avoid resolution of the critical federal issues in this case.

Amid Griffin's legal maneuvering, the real stakes risk being forgotten—the thousands of voters he seeks to disenfranchise, including the military and overseas voters represented by VoteVets Intervenors. It has been said many times in this litigation, but it bears repeated emphasis: *these voters did nothing wrong.* They followed a longstanding statute passed by the North Carolina Legislature and a photo ID rule adopted by the State Board of Elections ("Board")—both with bipartisan support. Yet Griffin accuses these voters—repeatedly—of negligence, arguing they should have known better than the Legislature, the Board, and multiple North Carolina judges. That claim is both brazen and flatly wrong. Federal law forbids Griffin's effort to punish law-abiding voters for following the rules their government set. The Court should reject Griffin's efforts to disenfranchise voters, enter judgment against him, and grant the relief sought by VoteVets Intervenors.

I. **Griffin's belated invocation of *Younger* is meritless.**

Griffin's efforts to avoid federal court review of federal law disputes have devolved to incoherence. Griffin has already advanced three separate theories for why a federal forum was inappropriate, challenging the propriety of removal and requesting abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). His objections to removal were soundly rejected—both by this Court, *see* ECF No. 24; *Griffin v. N.C. State Bd. of Elections*, No. 5:24-CV-00724-M (E.D.N.C. Jan. 6, 2025), ECF No. 50; and by a unanimous panel of the Fourth Circuit, *see Pullman* Order—thereby vindicating Congress's command that federal courthouse doors remain open to defendants in civil rights actions like this one, *see* 28 U.S.C. § 1443(2). Having also deemed *Burford* abstention inappropriate, the Fourth Circuit ordered *Pullman* abstention, but it did so according to that doctrine's crucial caveat—"with instructions directing the district court to modify its order ***to expressly retain jurisdiction of the federal issues*** identified in the Board's notice of removal should those issues remain after the resolution of the state court proceedings, including any appeals." *Pullman* Order at 11 (emphasis added) (citing *England v. Med. Exam'rs*, 375 U.S. 411 (1964)). But now that those federal issues have remained after the state proceedings, Griffin has contrived an altogether new basis for abstention, arguing that *Younger v. Harris*, 401 U.S. 37 (1971), condemns the federal questions to forever echo in the void. He is wrong, and his funhouse-mirror version of abstention—whereby *Pullman* is a trap, and its promise of future federal proceedings illusory—distorts the doctrine beyond recognition. As the Supreme Court has emphasized, federal courts have a "virtually unflagging" obligation to decide cases within their

jurisdiction. *Sprint*, 571 U.S. at 76. This Court's jurisdiction is not disputable, *see Pullman* Order at 11, and further abstention is not permitted.

*Younger* abstention, which "has become disfavored in recent Supreme Court decisions," *Walker v. City Calhoun*, 901 F.3d 1245, 1254 (11th Cir. 2018), is a narrow, judge-made exception to federal courts' duties to hear cases within their jurisdiction. To support an exception here, Griffin relies almost exclusively on pre-*Sprint* decisions like *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975), and *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982), where courts considered "anew in each case whether federal proceedings [i] threaten important state interests or [ii] may interfere with state proceedings or [iii] whether litigants could have easily raised their federals claims in those state proceedings." *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 329 (4th Cir. 2022). But those "so-called *Middlesex* factors," upon which Griffin stakes his latest abstention claim, "exemplify [an] early era" of *Younger* abstention that no longer supplies the operative test. *Id.* In *Sprint*, the Supreme Court unanimously "recast the earlier cases," *Justice*, 41 F.4th at 329, and identified the three categories of "exceptional" circumstances that now define *Younger*'s scope: (1) "state criminal prosecutions," (2) certain "civil enforcement proceedings" akin to criminal prosecutions, and (3) civil proceedings involving certain orders that are "uniquely in furtherance of the state courts' ability to perform their judicial functions," *Sprint*, 571 U.S. at 78—an unusual category thus far limited to civil contempt orders and requirements for the posting of bond pending appeal, *see Justice*, 41 F.4th at 330.

Griffin ignores this doctrinal evolution. He does not cite *Sprint*. He does not even cite any precedential *Younger* case decided after *Sprint*.[1] And he relies on a red-flagged Ninth Circuit case,

---

[1] His lone post-*Sprint* authority is from a Pennsylvania district court that enjoined a federal court plaintiff who had already initiated multiple parallel state actions, "six or seven" of which remained pending. *See Stein v. Cortes*, 223 F. Supp. 3d 423, 435 (E.D. Pa. 2016).

*San Jose Silicon Valley Chamber of Com. PAC v. City of San Jose*, 546 F.3d 1087, 1094 (9th Cir. 2008), *see* Griffin Br. 6–7, without noting that the Ninth Circuit recognized that decision as abrogated by *Sprint. See Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 65 (9th Cir. 2024). But whatever the source of Griffin's oversight or omission, it is indisputable that this case does not fall within "one of the three settled [*Younger*] categories"—it is not a (1) criminal or (2) quasi-criminal enforcement action, nor does it involve (3) contempt orders, bonds, or anything analogous. *Justice*, 41 F.4th at 329. Accordingly, this Court "need go no further" in the abstention analysis. *Id*.

Even if one were to indulge Griffin's detour through obsolete analysis, the dead ends arrive quickly. For example, he requests abstention in deference to the North Carolina courts' review of state laws about voter eligibility and of the Board's regulation of ID requirements for overseas voters. He thus demands abstention "in deference to a state judicial proceeding reviewing legislative or executive action"—*precisely* what the Supreme Court warned "would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989); *accord Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 70 (1st Cir. 2005) (holding abstention improper where lawsuits challenged state officials' failure to implement statewide system as federal law requires).

His argument that these proceedings are now meant to "relitigate a dispute that has already been resolved," and to "annul or trample on the results" of state-court decisions, Griffin Br. 6 (citation omitted), is wrong on both counts. *First*, because the state-court proceedings hewed exclusively to questions of state law, the federal issues raised here are (finally) being litigated in the first instance. Regardless of what arguments the parties previewed in prior briefing, it is indisputable that the federal issues raised here remain unresolved. *Second*, nothing about this

action would disturb—let alone "annul"—the state courts' definitive interpretation of state laws. *Contra id.* Griffin's accusation that his opponents seek to "place a construction on a state statute different from the one rendered by the highest court of the State," *id.* (citation omitted), is a flagrant misrepresentation. VoteVets Intervenors are not asking this Court to enjoin state officials based on this Court's independent construction of *state law*; rather, taking the state courts' construction of the relevant laws as definitive, they seek to enjoin a violation of *federal law*. The difference between those two tasks is elementary. *Cf. Pennhurst State Sch. v. Halderman*, 465 U.S. 89 (1984).

Finally, in a revealing slip, Griffin questions whether this federal litigation even constitutes a "properly invoked concurrent suit." Griffin Br. 8 (citation omitted). The presence of a "concurrent suit" in federal court is, of course, a necessary predicate for *Younger* abstention, which safeguards certain state actions from collateral federal attack. Thus, all of Griffin's citations concern where the federal action was genuinely "duplicative" of a distinct state court action. *See id.* at 5–9. In each case he cites, the plaintiff filed a *new suit* in federal court seeking to enjoin the application of laws that were being enforced against the plaintiff in state proceedings.[2] Griffin cannot identify a single case where *Younger* was applied in a case, like this one, that was removed by defendants. Removed actions are not subject to *Younger* because removal deprives state courts of jurisdiction over the federal issues. *See N.C. ex rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, 989 F. Supp. 2d 479, 483 (E.D.N.C. 2013), *aff'd*, 853 F.3d 140 (4th Cir. 2017).

---

[2] *See Middlesex*, 457 U.S. at 425–29 (seeking to enjoin pending state bar disciplinary hearings); *Huffman*, 420 U.S. at 595 (challenging constitutionality of nuisance statute that was being applied against plaintiffs in state court); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 4–6 (1987) (challenging constitutionality of lien and bond provisions that were being applied against plaintiff in state court); *Nivens v. Gilchrist*, 444 F.3d 237, 239 (4th Cir. 2006) (seeking to enjoin pending state-court criminal prosecution); *Moore v. City of Asheville*, 396 F.3d 385, 387 (4th Cir. 2005) (challenging constitutionality of noise ordinance that plaintiff had been cited in state court for violating); *San Jose Silicon Valley Chamber*, 546 F.3d at 1089 (challenging constitutionality of campaign finance laws that plaintiffs had been reprimanded in state proceedings for violating).

Removed cases may be subject to *Pullman* abstention, but *Pullman* requires federal courts to "retain jurisdiction over the case, but stay the proceedings so that state courts can rule on the state law question." *Nivens*, 444 F.3d at 245–46. "If the state court fails to resolve the issue, however, the parties may then return to federal court for a ruling on the constitutional issue." *Id.* at 246.

One need not canvass the caselaw to derive these doctrinal details. They are all apparent from the face of the Fourth Circuit order that, applying *Pullman* in the ordinary course, required this Court "to expressly retain jurisdiction of the federal issues." *Pullman* Order at 11. Griffin has not identified any basis to defy that order.

## II. Griffin's demands to disenfranchise voters violate the Constitution and federal law.

### A. Substantive due process forecloses disenfranchising voters who followed the rules on election day.

Longstanding and well-established substantive due process principles resolve this case. *See* VV Mem. 6–10, ECF No. 87 (discussing *Griffin v. Burns*, 570 F.2d 1065, 1067, 1074 (1st Cir. 1978) and similar cases). This line of cases stands for the commonsense proposition that voters cannot be disenfranchised for "state actions that induce [them] to miscast their votes." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012). That is precisely what occurred here. The UOCAVA ID voters challenged by Griffin cast ballots based on instructions adopted *unanimously* by the Board *years* before the November 2024 election. *See* 8 N.C. Admin. Code 17.0109. The same is true of the UMOVA voters who cast their ballots in line with *express* statutory language passed *unanimously* by the North Carolina legislature. *See* N.C. Gen. Stat. § 163-258.2(1)(e). That statutory provision was in effect for thirteen years and over 43 general elections. *See id.* (eff. Jan. 1, 2012). Only in April 2025 did North Carolina's (closely divided) appellate courts determine these rules ran contrary to other North Carolina laws. It is patently "unreasonable[]" to "expect[] a voter to have questioned" these rules through some divination of

7

future rulings that divided North Carolina's appellate courts. *Griffin*, 570 F.2d at 1076.

Griffin claims these due process principles are unrecognized in this Circuit. *See* Griffin Br. 9. Not so. The Fourth Circuit has held that these principles are "settled" law here, *Hendon*, 710 F.2d at 182 (citing *Griffin*, 570 F.2d at 1077), and they are widely recognized elsewhere too, *see* VV Mem. 8 (collecting cases). Griffin has no answer to *Hendon*, so he ignores it. That settled law "controls" absent clear Supreme Court abrogation. *United States v. Hill*, 776 F.3d 243, 247–49 (4th Cir. 2015). Griffin does not even try to identify such a case, and there is none.

Unable to avoid the application of *federal* substantive due process, Griffin pretends these proceedings "invite this Court to grade the papers of state courts." Griffin Br. 9. That is not correct. Under the Fourth Circuit's *Pullman* order, this Court "expressly retain[ed] jurisdiction of the federal issues" raised here, including the applicability of substantive due process. *Pullman* Order at 11. Thus, "[t]he question here is the consistency of state action with the Federal Constitution." *Baker v. Carr*, 369 U.S. 186, 226 (1962). To answer that question is not to doubt or second-guess how the North Carolina courts resolved questions of *state* law. It is simply to engage in the core "duty of the federal courts to protect . . . constitutional rights from invasion either by state action or under color thereof." *Jordan v. Hutcheson*, 323 F.2d 597, 601 (4th Cir. 1963). That duty is particularly critical here given that the North Carolina courts purposefully reserved these federal questions for this Court in keeping with the Fourth Circuit's *Pullman* order. Griffin, in effect, asks that no court ever address these questions, for the obvious reason that doing so requires rejecting his challenges.[3]

---

[3] Nor is anyone asking this Court to supplant state courts as "'the final arbiter[s]' of their own State's laws." Griffin Br. 13 (quoting *Bennett v. Yoshina*, 140 F.3d 1218, 1225 (9th Cir. 1998)). This case now concerns questions of *federal* law left unaddressed by state courts in deference to the Fourth Circuit's *Pullman* order.

Griffin's next tack is to insist that there is no clear substantive right at stake, even though this case plainly concerns "fundamental voting rights." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("*LWV*"). That federal right has a lengthy pedigree. *See Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184–85 (1979). And courts have made clear that voters have a liberty interest in their right to vote, both when it is unduly burdened or destroyed entirely. *E.g.*, *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Griffin nonetheless insists that there is nothing to see here because federal courts have previously upheld cure periods of less than 30 days. *See* Griffin Br. 11. But he omits a crucial detail: every single case he cites concerns a cure period in the immediate aftermath of an election intended to permit voters to fix errors based on the rules that existed *at the time they cast their ballots*. *E.g.*, *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 599 (4th Cir. 2016). None involved springing a *new* requirement on rule-abiding voters nearly half a year *after* they cast their ballots and then punishing them for failure to cure. Nor are VoteVets Intervenors claiming any right to cast ballots that are defective under state law *on election day*. *Contra* Griffin Br. 12. They merely contend that, when state courts later determine that an election rule is inconsistent with state law, that ruling should apply *prospectively* rather than *ex post facto*. The Fourth Circuit has said precisely the same. *See Hendon*, 710 F.2d at 182 (noting the "general rule that denies relief with respect to past elections").[4]

Griffin next makes the astounding claim that retroactively changing election rules to

---

[4] Griffin's brief suggests that the cure process for UOCAVA voters must be constitutional because the remedy in *Griffin v. Burns* was a new election. *See* Griffin Br. 11. But *Hendon* makes clear that the proper outcome here is applying any post-election rulings only *prospectively*. *See Hendon*, 710 F.2d at 182. Further still, the losing primary candidate in *Griffin* did not pick-and-choose which voters would have to vote a second time, as Griffin seeks to do here. Accordingly, the First Circuit's decision offers no support for his claim that a discriminatory cure process is proper. Most importantly, *no one* (including Griffin) has suggested a new election is a proper remedy.

9

presumptively disenfranchise thousands of voters months after an election presents only "garden variety" election issues that warrant no federal review. *See* Griffin Br. 12–15. But Griffin seeks nothing less than to reverse the will of the voters, disenfranchising overseas and military voters—*not one of whom* he has shown to be ineligible to vote—based on a court's interpretation of state law first made half a year *after the election*. As hundreds of North Carolina officials (of all partisan stripes) have stated, Griffin's demand that "thousands of voters [] lose their voice after they voted" is "a threat to the public's faith in our judicial system."[5]

Unsurprisingly, none of Griffin's cases about "garden variety" disputes reflect facts like those here. He cannot point to a *single* instance where a state agency or court has imposed a new voting requirement *retroactively* on voters—cure or otherwise. His reliance on *Election Integrity Project California, Inc. v. Weber*, Griffin Br. 13, only confirms the impropriety of the relief Griffin seeks here. *See* 113 F.4th 1096 (9th Cir. 2024). That decision's reference to "*ex post* changes in law or procedure," *id.*, nowhere implies such changes should apply retroactively. To the contrary, it explained that the "the counting of some votes" later found to be invalid did *not* warrant revisiting past election results—precisely what Griffin demands here. *Id.* That decision thus confirms that applying post-election changes in the law *prospectively* casts no doubt on *past* results. *See id.* at 1096–97. Once more, that is precisely in keeping with this Circuit's own rule. *See Hendon*, 710 F.2d at 182. Griffin's only retort is to imply the voters are at fault for failing to preordain changes in the law. *See* Griffin Br. 14. That stunning claim ignores that the Board, numerous North Carolina judges, the North Carolina legislature (as to the UMOVA voters), and thousands of past voters shared their same understanding of the legal landscape. And plenty of

---

[5] *See* Open Letter to Judge Jefferson Griffin (Mar. 18, 2025), https://www.commoncause.org/north-carolina/wp-content/uploads/2025/03/NC-Legal-Community-Open-Letter-to-Griffin-3.18.25.pdf.

past cases have quickly dispatched the notion that voters must scour the legal code before entering the voting booth. *E.g., Griffin*, 570 F.2d at 1076. Most critically, it would plainly be a "fundamental unfair[ness]" if Griffin could—through cynically targeted and untimely challenges—reverse the outcome of an election he is confirmed to have lost. *See Bennett*, 140 F.3d at 1226; *Griffin*, 570 F.2d at 1077; *LWV*, 769 F.3d at 247 (noting the irreparable harm of such discriminatory election procedures); *infra* §§ II.B, III.A.

Griffin's last gambit is to suggest VoteVets Intervenors have not shown sufficiently "massive" disenfranchisement to warrant relief. *See* Griffin Br. 15–17. But this purported "massiveness" element is an illusory requirement of Griffin's own self-serving creation. Griffin attempts to manufacture this additional element from *Bennett*, *id.*, but that decision merely observed that *Griffin v. Burns* concerned a situation where ten percent of voters would have been disenfranchised—neither case conditioned a claim on that fact. *See Bennett*, 140 F.3d at 1226–27. *Griffin* instead stressed that the "right to vote remains, at bottom, a federally protected right." 570 F.2d at 1077.[6] None of Griffin's other cases support granting him leeway to disenfranchise a "non-massive" number of voters. Our federal constitution instead recognizes a "basic truth that even one disenfranchised voter—let alone several thousand—is too many." *LWV*, 769 F.3d at 244. Griffin's effort to trample the voting rights of thousands of voters *after* an election—in service only of reversing its outcome in his own favor—plainly constitutes "significant" disenfranchisement. *Bennett*, 140 F.3d at 1226.

---

[6] The number of voters impacted here is also far greater than in *Griffin*, which impacted approximately 120 voters. 570 F.2d at 1079. This dispute impacts at least *ten times* that number and, if Griffin has his way, a far greater number still. He altogether omits mention of the fact that he is presently trying to *expand* the universe of challenged voters and that his earlier request for far broader disenfranchisement has been winnowed solely on separate state grounds. *See* Pet. Mandamus at 3–4, *Griffin v. N.C. State Bd. of Elections*, No. COA25-181 (N.C. Ct. App. Apr. 16, 2025) ("Griffin Pet.").

**B.     Selective disenfranchisement of voters based on county of residence violates the Equal Protection Clause.**

The Supreme Court's decision in *Bush* also resolves this case. The Supreme Court of North Carolina had "the power to assure" equal treatment for its citizens, by rejecting Griffin's challenges and applying its interpretation of state law prospectively. *Bush v. Gore*, 531 U.S. 98, 109 (2000). Its decision to instead apply it retroactively, and only selectively as to specific voters, violates the Equal Protection Clause. *See* VV Mem. 10–12. None of Griffin's arguments overcome the simple fact that only some voters—based solely on their county of residence—must jump through additional hoops to save their votes.

To start, Griffin's view that *Bush* does not "appl[y] to equal-protection challenges to state law" contradicts every court to have applied it to state law challenges it the last quarter-century— including the Fourth Circuit. Griffin Br. 21; *e.g.*, *Wise*, 978 F.3d at 100 n.7 (applying *Bush*); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 ("*MFV*") (9th Cir. 2025) (same); *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219 (6th Cir. 2011) (same). It also contradicts *Bush* itself, which traced its proscription of "arbitrary and disparate treatment to voters in [] different counties" to its earlier decision in *Gray v. Sanders*, 372 U.S. 368 (1963). *Bush*, 531 U.S. at 107. "The general principle that *Bush* applied—that 'the rudimentary requirements of equal treatment and fundamental fairness' prohibits states from engaging in wholly 'arbitrary and disparate treatment' of members of the public—*is not unique to that case*,'" and courts "*should not hesitate to apply it when relevant*." *MFV*, 129 F.4th at 730 (emphases added) (citation omitted). The longstanding

principles at issue in *Bush* plainly apply here, where a state court's determination of what constitutes a "legal vote" will hinge on which county it was cast in. *Bush*, 531 U.S. at 107.[7]

Griffin's attempt to exempt "local state election[s]" from the Equal Protection Clause also fails. Griffin Br. 21. The Fourth Circuit has already held that *Bush*'s "one person, one vote principle, applies not just to the federal government *but also to state and local governments*." *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016) ("*RWCA*") (citing *Bush*) (emphasis added); *accord Gray*, 372 U.S. at 379 (applying *Bush*'s founding principles to statewide election system). Similarly, Griffin is wrong to suggest that *Bush* only applies to court-ordered recounts. Griffin Br. 22. In the very case Griffin relies upon, the Fourth Circuit "treat[ed]" *Bush* "as binding" in a case about absentee voting rules. *Wise*, 978 F.3d at 100 n.7.

Griffin next attempts to differentiate *Bush* on the facts by suggesting that UOCAVA ID requirements are "sufficiently uniform" and that any inequity will be the result of the fact that "voters in some counties will take advantage of the notice-and-cure procedures," "while others may not." Griffin Br. 22. That oversimplification grossly misrepresents what is happening here. There are 32,033 "similarly situated [UOCAVA] voters," *id.*, yet the state courts' retroactive orders only mandate that 1,409 UOCAVA voters from Guilford County cure their ballots to avoid

---

[7] None of the cases cited by Griffin concerned a statewide judicial officer's ratification of uneven treatment across multiple jurisdictions. *See* Griffin Br. 21. *Dudum v. Arntz* applied the *Anderson-Burdick* framework and not *Bush*, but it did so in analyzing burdens on voters in a *single* jurisdiction; there was no differential treatment of voters across jurisdictions. *See* 640 F.3d 1098, 1106 (9th Cir. 2011). *Lemons v. Bradbury* applied *Bush* but rejected the plaintiff's equal protection arguments because "all counties" applied similar processes and there were "uniform standards" throughout the state. *See* 538 F.3d 1098, 1106 (9th Cir. 2008). And *Kim v. Board of Education of Howard County* concerned a *single* locality's decision to "implement[] a different [election] system." 641 F. Supp. 3d 223, 236 (D. Md. 2022).

disenfranchisement.[8] In other words, the voters who "take advantage," *id.*, of the cure will do so only under the threat of disenfranchisement, and voters in other counties that "may not," *id.*, do not need to cure because they have not been threatened with disenfranchisement at all. That is neither "uniform" nor "equal." *Id.*

Griffin next attempts to escape *Bush* by observing that it "reaffirmed" that local entities can "develop different systems" in crafting election processes. *Id.* (quoting *Bush*, 531 U.S. at 109). True or not, that is simply not what happened here. Instead, state courts with statewide jurisdiction—not local entities—decided to apply the UOCAVA photo ID requirement unevenly. That mirrors *Bush* exactly.[9]

For the same reasons, Griffin is also wrong that applying *Bush* here would require every "candidate contesting an election to file in every county across the State." Griffin Br. 22. The point of *Bush*'s focus on a "single state judicial officer" was to distinguish it from those situations in which different localities and independent decision makers employ varying election procedures. 531 U.S. at 109. As in *Bush*, the "single state judicial officer" here is the state's highest court, which had the "power to assure uniformity" but instead "ratified [] uneven treatment." *Id.* at 107, 109. When a state's highest court decides *after* an election that the rules in place did not conform to state statutes, they cannot apply their "remedial process[]" "uneven[ly]" to some counties

---

[8] Griffin timely challenged UOCAVA voters in only Guilford County. He now seeks to add challenges to ballots cast in Durham, Forsyth, and Buncombe Counties. *See* Board Notice at 2 n.2, ECF No. 61. The state court orders run afoul of the Equal Protection Clause regardless of whether the state court orders also apply retroactively to voters in these additional counties.

[9] This fact also undermines Griffin's reliance on *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, which distinguished *Bush* on the basis that the "Florida Supreme Court had ratified treating ballots unequally," whereas individual counties in Pennsylvania merely "vari[ed] in implementing" uniform statewide guidance. 830 F. App'x 377, 388 (3d Cir. 2020).

prospectively, and others retrospectively. *See id.* Yet that is exactly what happened here, in violation of the Equal Protection Clause.

### C.    Presumptively disenfranchising voters unduly burdens the right to vote.

Griffin seeks to revoke UMOVA voters' right to vote thirteen years and 43 elections after the North Carolina legislature explicitly enfranchised them. He further seeks to subject rule-abiding UOCAVA voters to new requirements nearly half a year after they voted. Such *ex post facto* efforts severely burden these voters' fundamental voting rights. *See* VV Mem. 12–14. In arguing otherwise, Griffin (1) ignores that UMOVA voters may be entirely disenfranchised, (2) mischaracterizes the nature of the cure requirement he seeks to impose on UOCAVA voters, and (3) fails to identify any state interest that justifies tossing out qualified voters' ballots.

*First*, Griffin has no answer to VoteVets Intervenors' argument that the wholesale rejection of ballots cast by individuals entitled to vote under UMOVA places a severe burden on the right to vote. *See* VV Mem. 13–14. Courts have made clear that the "systemic disqualification" of voters' ballots "without any notice" amounts to a substantial burden on the right to vote. *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 668, 670 (M.D.N.C. 2024) (collecting cases) (citation omitted). Yet Griffin fails to explain how any valid state interest could justify retroactively disenfranchising hundreds of voters the North Carolina General Assembly purposefully enfranchised without *any* opportunity to show their qualifications to vote.

*Second*, Griffin suggests the burden imposed by the novel cure requirement he seeks to inflict on UOCAVA voters is nothing more than the "usual" "inconvenience" of voting. Griffin Br. 19. But there is nothing "usual" about deeming select voters' ballots invalid half a year later and then requiring those voters to "remedy" their ballots for failure to comply with an election rule that *did not exist* at the time those ballots were cast. Springing such a requirement on voters months

after they voted in accordance with existing rules severely burdens those voters' right to vote. *Cf. Ne. Ohio Coal. for Homeless*, 696 F.3d at 597.

Tellingly, while Griffin repeatedly claims that the cure requirement imposes only a minimal burden, he cannot point to a single past example of a similar cure requirement. Instead, he relies on fundamentally distinguishable cases where courts have found that requiring compliance with *known, pre-existing* requirements did not run afoul the Constitution. *E.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008); *Democratic Party of Va. v. Brink*, 599 F. Supp. 3d 346, 363–64 (E.D. Va. 2022). But that is not this case—Griffin asks the Court to require voters who *followed the law as it existed* to jump through extra hoops, months later, or else be robbed of their vote. Worse yet, the retroactive nature of this requirement will uniquely burden military and overseas voters in ways that complying with a known, pre-existing rule would not. *See* VV Mem. 12.

Griffin further suggests that any burdens the cure requirement imposes on UOCAVA voters are self-inflicted because they "fail[ed] to heed reasonable . . . rules on voting." Griffin Br. 19. Griffin again wrongly suggests that the voters are at fault here. But these voters "were doing no more than following the instructions of the officials charged with running the election;" their only sin is not having "somehow . . . foresee[n]" a future interpretation of state law that would invalidate their ballots after-the-fact. *Griffin*, 570 F.2d at 1075–76. There is no dispute that these voters complied with the election rules that existed at the time they cast their ballots. This Court should not entertain Griffin's attempt to warp the facts or shift blame to rule-abiding voters.

*Third*, Griffin identifies no valid state interest—let alone a compelling one—that justifies retroactively imposing new ID rules on qualified voters. He relies only on cases where courts have recognized a state's interest in ensuring *prospectively* that only eligible voters' ballots are counted.

16

*E.g.*, *Crawford*, 553 U.S. at 196. Any purported state interests are doubly irrelevant for the voters targeted by his UOCAVA ID Challenge because (despite having months to look) Griffin has presented no evidence that *any* of these voters is unqualified to vote. He thus cannot identify *any* state interest in tossing out their ballots for failure to comply with a rule that post-dates the election.

### D. Presumptively invalidating the ballots of military and overseas voters, subject to a confusing cure requirement, violates procedural due process.

Griffin ignores that it violates due process to retroactively deem a voter's ballot invalid, without offering *any* notice to some of them and subjecting the remainder to a belated cure requirement that burdens military and overseas voters. *See* VV Mem. 14–16. He instead suggests that this constitutional deficiency is "conceptually duplicative" of the cure process's undue burden on the right to vote. Griffin Br. 17 (citation omitted). Even accepting that as true, the state courts' decision to presumptively invalidate military and overseas ballots violates the procedural due process rights of such voters, who are VoteVets's core constituents. *Supra* II.B.[10]

Regardless of what standard applies, violations of due process occur "if election officials reject . . . ballots" without the voter being "notified or afforded any opportunity to respond." *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (reaching this conclusion applying *Eldridge*). Depriving voters of any "notice and opportunity to be heard before removing . . . a cast ballot from the count" is a classic due process violation. *Voto Latino*, 712 F. Supp. 3d at 670 (reaching this conclusion applying *Anderson-Burdick*). That is the effect Griffin's challenges and the state court orders will have on challenged UMOVA voters, even though the Board has shown that many of them *do* have claims to North Carolina residency. *See*

---

[10] Recognizing that courts are split on the proper framework, VoteVets Intervenors maintain that *Eldridge* is appropriate here because this case is most analogous to *Democracy N.C.*, where voters had no opportunity to be heard before their possible disenfranchisement. 476 F. Supp. 3d at 226.

VV Mem. 14–15; Board Notice at 4–5. While Griffin claims that curing is a *de minimis* burden, Griffin Br. 19–20, he maintains that UMOVA voters should not have any opportunity for notice and cure. He fails to explain what possible interest could warrant depriving these voters of *any* opportunity to confirm their eligibility to vote. Such total deprivation of notice or process does "not comport with the constitutional requirements of due process." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990).

Nor does Griffin address the unique challenges facing military and overseas voters who will be disenfranchised unless they complete an onerous cure requirement. Curing will prove illusory for many of these voters, particularly those on military bases, ships and submarines, and on active deployment. *See* VV Mem. 15–16; *see also generally* Decl. of Major General Paul Eaton ("Eaton Decl."), ECF No. 58. Griffin's glib dismissal of the burden as "*de minimis*" is certainly not true for these voters. He nowhere shows otherwise.

E. **The National Voter Registration Act prohibits the systematic removal of UMOVA voters.**

The NVRA prohibits disenfranchisement of voters through systematic registration challenges close in time to elections. *See* 52 U.S.C. § 20507(c)(2)(A). This is because voters are unlikely to have time to correct erroneous removals in time to vote. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). That is doubly true here, where Griffin attempts to smuggle registration challenges to UMOVA voters through post-election ballot challenges. *See* VV Mem. 16–18. Griffin attempts to avoid the NVRA's protections for voters by pushing a patchwork of arguments, but upon inspection, each of his arguments quickly unravel.

*First*, Griffin tries to insulate his challenges from the NVRA's restrictions by claiming he contests only "election procedure[s]." Griffin Br. 24–25. But Griffin fundamentally challenges registration status, namely the residency status of UMOVA voters. The NVRA does not permit

candidates like Griffin to recast such post-election registration challenges as challenges to "election procedures." *See* VV Mem. 18 (collecting cases). Permitting such transparent gamesmanship would undermine the NVRA's purpose in ensuring that the "right to exercise the[] franchise . . . not be sacrificed." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (emphasis added); *see also* 52 U.S.C. § 20501(a)(1)-(2), (b)(2). Griffin cannot defeat that purpose by pretending his tardy registration challenges are only directed at voters' ballots and not their place on the rolls. *Arcia*, 772 F.3d at 1346 (explaining how tardy registration challenges frustrate the ability to cast ballots). In other words, he cannot evade the NVRA's protections "by separating registration from voting." *Ass'n of Cmty. Orgs. For Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995). Griffin's untimely effort to use a registration qualification to discard ballots—rather than to purge the rolls—is fundamentally a "distinction without a difference." *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021).

*Second*, Griffin argues that that the NVRA does not apply to state elections. Griffin Br. 25. That argument fails to grapple with the reality that, under state law, North Carolina must use a "single system for storing and managing the official list of registered voters in the State," and that system "shall serve as the official voter registration list for the conduct of *all elections* in the State." N.C. Gen. Stat. § 163-82.11(a) (emphasis added). In the maintenance of this singular system, the Fourth Circuit has required that North Carolina be "bound by the provisions of the NVRA for the registrants at issue," *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 401 (4th Cir. 2024), regardless of whether disenfranchisement is sought for an election for federal or state office. Accordingly, the NVRA is not intruding upon state law; North Carolina has simply adopted a voter registration system that functionally requires NVRA compliance for state elections.

19

*Third*, Griffin claims the NVRA's bar against untimely systematic voter removals amounts to the federal government regulating voting qualifications in North Carolina. Griffin Br. 25–26. But that argument is a red herring. No one disputes the state's authority to make laws regarding residency requirements. This case raises the question of whether Griffin can, consistent with the NVRA, raise systematic *post-election challenges* to the registration status of voters who were properly registered on election day under a statute adopted by the state legislature. The answer to that timing question is no—under the NVRA, Griffin's mass challenge came too late for *this* election. *See* VV Mem. 17. The NVRA's prophylactic requirement that systematic registration removals be completed well ahead of an election does not at all displace a state's authority to set registration requirements. And the fact that the NVRA's timing requirements govern *this* election is, as explained above, a function of the North Carolina legislature's own choice to adopt an integrated voter registration list.

*Fourth*, Griffin argues that discarding, in one fell swoop, hundreds of ballots based on a single state law ruling does not constitute a "systematic removal program" under the NVRA. *See* Griffin Br. 26–27. As to the term "systematic," that claim fails on its face—*nowhere* did the North Carolina courts make an individualized assessment of any voter's residency. That is precisely what the NVRA's 90-day provision seeks to prevent: "Cancellation of batches of registered voters based on a set procedure is systematic as opposed to individualized." *MFV*, 129 F.4th at 716; *see also N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16-cv-1274, 2018 WL 3748172, at *8 (M.D.N.C. Aug. 7, 2018) (noting that attempts to remove voters without any "individualized inquiry into the circumstances of each voter" is systematic under the NVRA).

As a result, voters who have valid claims of North Carolina residency are now at imminent risk of disenfranchisement, as the Board confirmed. *See* Board Notice at 4. Far from applauding

this individualized assessment and desire for accuracy on the Board's part, Griffin has run back to state court to *prohibit* the Board from engaging in any voter-specific probes before ballots are tossed. *See generally* Griffin Pet.. He goes so far as to demand an order stating that the Board "is not to contact these voters and not to offer them an opportunity to cure." *Id.* at 19. Griffin conspicuously omits this fact throughout his brief, which is inconsistent with his claim that North Carolina is free to "investigate" individual voters in compliance with the NVRA. *See* Griffin Br. 26–27. Griffin's view apparently is that the state may investigate voters far enough to raise a question as to whether they are ineligible to vote, but not so far as to confirm that they *are* eligible.

Griffin's related attempt to cabin the term "program" also fails. Griffin Br. 26. In Griffin's telling, the term "program" is limited to the "maintenance of the voter rolls," *id.*, and not state court-ordered purges in response to systematic challenges like his own. But the NVRA nowhere adopts such a narrow definition. *See* 52 U.S.C. § 20502. Neither does the lone case Griffin cites for support. *See Project Vote, Inc., v. Kemp*, 208 F. Supp. 3d 1320, 1338 (N.D. Ga. 2016). And Griffin's mass challenge is certainly "a plan of action to accomplish a specified end." *Id.* (citing definition of "program" in Webster's Encyclopedic Unabridged Dictionary 1546 (2001)). Accepting Griffin's baseless redefining of the term "program" would blow a wide hole in the NVRA, permitting losing candidates to regularly seek state court or agency orders to purge the ballots of voters based on untimely registration challenges.

Finally, Griffin argues the NVRA's protections do not reach challenged UMOVA voters because they are not "eligible" voters. Griffin Br. 27. Setting aside that many of the challenged UMOVA voters *are* eligible, *supra* II.A, this argument still misses the mark. The text of the 90-day provision broadly says that a state must complete at least 90 days before an election "*any program* the purpose of which is to systematically remove the names of *ineligible voters* from the

official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphases added). This text—which Griffin ignores—renders his argument circular. The 90-day provision bars *all* systematic removal programs performed too close to an election. That this may result in a few "ineligible voters" remaining on the rolls was a policy choice made by Congress, recognizing that last minute purges also often remove *eligible* voters. *See Arcia*, 772 F.3d at 1346 (noting the NVRA prohibits removal of voters 90 days before an election because "that is when the risk of disfranchising eligible voters is the greatest"). To temper any concern, Congress left undisturbed the authority of states to make *individualized* assessments at any time—precisely what Griffin now wishes to stop the Board from doing. If the text was not plain enough, Griffin also fails to explain how *any* "of the NVRA's enumerated exceptions to the 90-day Provision applies." *MFV*, 129 F.4th at 716. None does.[11]

In short, the NVRA prohibits sandbagging voters, including the challenged UMOVA voters, with a systematic registration challenge after an election.

## III. All other factors weigh in favor of an injunction against Griffin's requested relief.[12]

A permanent injunction should issue where a party shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

---

[11] Griffin's citation to *Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir. 2004) is of no help to him. *See* Griffin Br. 27. That case concerned a *separate* rule governing routine list maintenance based on death and change in residence—52 U.S.C. § 20507(a)(4). Griffin offers no explanation as to how that case pertains to the provision at issue here, which is motivated by a distinct purpose.

[12] Pursuant to this Court's request for briefs to "facilitate prompt resolution of this matter," VoteVets Intervenors address the standard for permanent injunctive relief in response to Griffin's opening brief. *See* Text Order (Apr. 12, 2025). The Court need not consider these issues to grant VoteVets Intervenors' Motion for Summary Judgment. ECF No. 87.

by a permanent injunction." *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (citation omitted).

Voters, including those served by VoteVets Intervenors, will be irreparably injured if their votes are tossed out or they are subjected to an unconstitutional cure process. "Courts routinely deem restrictions on fundamental voting rights irreparable." *LWV*, 769 F.3d at 247. Relief is warranted to protect against the "deprivation" of voting rights. *Disability Rights N.C. v. N.C. State Bd. of Elections*, No. 5:21-cv-361-BO, 2022 WL 2678884, at *7 (E.D.N.C. July 11, 2022). If the Board is compelled to disenfranchise all challenged UMOVA voters and Griffin's handpicked UOCAVA voters, hundreds if not thousands of voters will have their ballots tossed. "[O]nce [an] election occurs, there can be no do-over and no redress." *Id.* (citing *LWV*, 769 F.3d at 247). Apart from disenfranchisement, being *subjected* to an unconstitutional cure process constitutes irreparable harm to the voters Griffin handpicked for his challenges. *See United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) (holding that "submission" to an unconstitutional process "is in itself a constitutional injury to warrant injunctive relief").

The balance of equities and public interest also cut sharply in favor of voters. "[U]pholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). Griffin's requests would violate the fundamental constitutional rights of thousands of North Carolina voters, including military and overseas voters who are among the core constituents of VoteVets Intervenors. Moreover, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *LWV*, 769 F.3d at 247 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)); *id.* at 244 (observing that "even one disenfranchised voter—let alone several thousand—is too many").

The harm does not stop there. Griffin's reckless pursuit of victory through judicial fiat poses "a threat to the public's faith in our judicial system," as prominent North Carolina leaders have put it. *Supra* n.5; *see also* Eaton Decl. ¶¶ 10, 12. This disenchantment will be particularly acute for VoteVets's constituents because "[m]ilitary voters already vote at low rates compared to their civilian counterparts," *id.* ¶ 10, and "adding confusing, after-the-fact requirements on just these voters" will likely "disillusion them," *id.* ¶ 12.

As Griffin acknowledges, his equities arguments "overlap [] considerably" with the merits. Griffin Br. 30 (alteration in original). As the foregoing merits discussion makes clear, it is ultimately the voters and the public who will be irreparably harmed should their votes—cast in reliance of existing registrations and longstanding election rules—be tossed aside after the administration of a lawful election. *See Griffin*, 570 F.2d at 1067, 1074. And though Griffin professes concern about "intruding on the state election contest," Griffin Br. 30, neither the public nor the state is "harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011).

All Griffin offers in response is the proposition that counting "unlawful votes [shouldn't] dilute lawful votes." Griffin Br. 30. But Griffin's cynical and targeted challenges of voters he believes supported his opponent make crystal clear that he only cares about purported vote dilution to the extent it ensures him a seat on the Supreme Court of North Carolina. This case is a perfect example of a candidate's attempt to "misuse [] the judicial system to baselessly cast doubt on the electoral process in a manner that is conspicuously consistent with the [candidate's] political ends." *Lake v. Hobbs*, 643 F. Supp. 3d 989, 1010 (D. Ariz. 2022). Griffin's gamesmanship, at the expense of North Carolina voters, should not be rewarded.

The gravity of the harm Griffin's tactics pose to our democracy cannot be overstated. Griffin waited until after an election to challenge the validity of procedures that were well-established beforehand. This sort of after-the-fact attack on the will of the voters runs afoul of the very foundations of the democratic process. For precisely that reason, courts have repeatedly rejected similar challenges: "[F]ailure to require pre-election adjudication would 'permit, if not encourage, parties who could raise a claim 'to lay by and gamble upon receiving a favorable decision of the electorate" and then, upon losing, seek to undo the ballot results in a court action.'" *Hendon*, 710 F.2d at 182 (citations omitted). The "public interest [] weighs heavily" against "strip[ping] [] away" the rights of voters to have their ballots counted. *LWV*, 769 F.3d at 248.

## CONCLUSION

For the foregoing reason, the Court should reject Griffin's efforts to disenfranchise voters, enter judgment against him, and grant the relief sought by VoteVets Intervenors.

Date: April 25, 2025

Respectfully submitted,

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri
Christopher D. Dodge
Tina Meng Morrison
James J. Pinchak
Julie Zuckerbrod
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W.
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
jpinchak@elias.law
jzuckerbrod@elias.law

Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*Counsel for Voter Intervenors VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*

26

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Local Rule 7.2(f)(3), because, excluding the parts of the document exempted by Local Rule 7.2(f)(1), this document contains 8,357 words.

2.     This document complies with the typeface requirements of Local Rule 10.1(a) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 12-point Times New Roman.

Dated: April 25, 2025                   /s/ *Lalitha D. Madduri*
                                        Lalitha D. Madduri

                                        *Counsel for Voter Intervenors VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*

**CERTIFICATE OF SERVICE**

On this 25th day of April, 2025, I electronically filed the foregoing using the Court's appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by that system.

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri

*Counsel for Voter Intervenors VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*