# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| CARRIE CONLEY et al., | |
| *Plaintiffs*, | |
| v. | |
| ALAN HIRSCH et al., | |
| *Defendants*. | |
| | Case Nos.    5:25-cv-00193-M |
| JEFFERSON GRIFFIN, |                   5:24-cv-00731-M (lead) |
| *Plaintiff*, |                   5:24-cv-00699-M |
| v. | **VOTER PLAINTIFFS CARRIE** |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | **CONLEY, LOCKHART WEBB, ELLA KROMM, GABRIELA ADLER-ESPINO, AND THE LEAGUE OF WOMEN** |
| *Defendant*, | **VOTERS OF NORTH CAROLINA'S RESPONSE BRIEF RE: APRIL 12, 2025** |
| and | **ORDER TO RESOLVE "REMAINING FEDERAL ISSUES" AND, IN THE** |
| ALLISON RIGGS et al., | **ALTERNATIVE, SECOND MOTION** |
| *Intervenor-Defendants*. | **FOR INJUNCTIVE RELIEF** |
| NORTH CAROLINA DEMOCRATIC PARTY, | |
| *Plaintiff*, | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS et al., | |
| *Defendants*. | |

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.    The retroactive, discriminatory disqualify-then-cure process is unconstitutional. ............. 2

        A.    Retroactively invalidating Plaintiffs' votes, based on post hoc rule changes and administrative errors, violates their substantive due process rights................................ 2

        B.    Selectively targeting military and overseas voters in some counties, but not materially identical voters in others, violates Equal Protection rights............................ 9

        C.    Providing zero predeprivation process, and inevitably flawed postdeprivation process, violates Plaintiffs' procedural due process rights. ........................................... 11

        D.    Even if *Anderson-Burdick* applies, Plaintiffs prevail. .................................................. 12

    II.    *Younger* abstention is inappropriate.................................................................................. 16

    III.  An injunction is warranted to preserve the status quo, avert irreparable harm, and protect the public interest.................................................................................................. 20

CONCLUSION................................................................................................................. 21

CERTIFICATE OF COMPLIANCE ................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. McVey,*
    37 F.4th 89 (4th Cir. 2022) ....................................................................................17, 18

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ..............................................................................................13, 14

*Andino v. Middleton,*
    141 S. Ct. 9 (2020) ......................................................................................................4

*Benavidez v. Eu,*
    34 F.3d 825 (9th Cir. 1994) ........................................................................................18

*Bennett v. Yoshina,*
    140 F.3d 1218 (9th Cir. 1998) ..................................................................................5, 6

*Brakebill v. Jaeger,*
    905 F.3d 553 (8th Cir. 2018) ......................................................................................15

*Buckley v. Am. Const. L. Found., Inc.,*
    525 U.S. 182 (1999) ....................................................................................................16

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ....................................................................................................13

*Bush v. Gore,*
    531 U.S. 98 (2000) ..........................................................................................9, 10, 14

*Carson v. Simon,*
    978 F.3d 1051 (8th Cir. 2020) ....................................................................................21

*Caterpillar Inc. v. Williams,*
    482 U.S. 386 (1987) ....................................................................................................13

*City of Phoenix, Ariz. v. Kolodziejski,*
    399 U.S. 204 (1970) ......................................................................................................4

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ..............................................................................13, 14, 15, 16

*Democracy N.C v. N.C. State Bd. of Elections,*
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ....................................................................11, 12

*E. Enters. v. Apfel,*
    524 U.S. 498 (1998)........................................................................................3

*Election Integrity Project California, Inc. v. Weber,*
    113 F.4th 1072 (9th Cir. 2024) .................................................................5, 6

*Elrod v. Burns,*
    427 U.S. 347 (1976)..................................................................................6, 20

*England v. La. Bd. of Medical Examiners,*
    375 U.S. 411 (1971)......................................................................................19

*Erie Ins. Exch. v. Md. Ins. Admin.,*
    105 F.4th 145 (4th Cir. 2024) ...............................................................17, 18

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
    544 U.S. 280 (2005)......................................................................................19

*Fusaro v. Cogan,*
    930 F.3d 241 (4th Cir. 2019) .......................................................................14

*Ganza v. Aguirre,*
    619 F.2d 449 (5th Cir. 1980) .........................................................................9

*Gray v. Sanders,*
    372 U.S. 368 (1963)..................................................................................8, 10

*Greidinger v. Davis,*
    988 F.2d 1344 (4th Cir. 1993) .....................................................................15

*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir. 1978) ............................................................ *passim*

*Griffin v. N.C. State Bd. of Elecs.,*
    No. 25-1018, slip op. (4th Cir. Feb. 4, 2025).............................................18

*Griffin v. N.C. State Bd. of Elections,*
    No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025)...................7, 19

*Hendon v. N.C. State Bd. of Elections,*
    710 F.2d 177 (4th Cir. 1983) ............................................................. *passim*

*Hill v. Stone,*
    421 U.S. 289 (1975)........................................................................................4

*Hutchinson v. Miller*
    797 F.2d 1279, 1279, 1280, 1282 (4th Cir. 1986) ...................................5, 21

iii

*Huffman v. Pursue, Ltd.*,
   420 U.S. 592 (1975) ............................................................................................... 20

*Juidice v. Vail*,
   430 U.S. 327 (1977) ............................................................................................... 17

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
   494 U.S. 827 (1990) ................................................................................................. 3

*Karcher v. Daggett*,
   462 U.S. 725 (1983) ............................................................................................... 10

*Kim v. Hanlon*,
   99 F.4th 140 (3d Cir. 2024) ................................................................................... 13

*Kramer v. Union Free Sch. Dist. No. 15*,
   395 U.S. 621 (1969) ............................................................................................... 16

*Landgraf v. USI Film Products*,
   511 U.S. 244 (1994) ................................................................................................. 3

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ................................................................................... 7

*League of Women Voters of Ohio v. Brunner*,
   548 F.3d 463 (6th Cir. 2008) ................................................................................. 11

*Lichtenstein v. Hargett*,
   83 F.4th 575 (6th Cir. 2023) ........................................................................... 13, 14

*Marks v. Stinson*,
   19 F.3d 873 (3d Cir. 1994) ..................................................................................... 17

*McLaughlin v. N.C. Bd. of Elections*,
   65 F.3d 1215 (4th Cir. 1995) ................................................................................. 14

*Mi Familia Vota v. Fontes*,
   129 F.4th 691 (9th Cir. 2025) ................................................................................ 10

*Moore v. City of Asheville, N.C.*,
   396 F.3d 385 (4th Cir. 2005) ................................................................................. 20

*Moore v. Ogilvie*,
   394 U.S. 814 (1969) ............................................................................................... 10

*Ne. Ohio Coal. for Homeless v. Husted*,
   696 F.3d 580 (6th Cir. 2012) ............................................................................. 2, 3

*Partido Nuevo Progresista v. Perez*,
   639 F.2d 825 (1st Cir. 1980) ........................................................................6

*Pennzoil Co. v. Texaco Inc.*,
   481 U.S. 1 (1987) ........................................................................................17

*Pierce v. N.C. State Bd. of Elections*,
   97 F.4th 194 (4th Cir. 2024) ........................................................................7

*Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*,
   827 F.3d 333 (4th Cir. 2016) ......................................................................9

*Reed v. Goertz*,
   598 U.S. 230 (2023) ...................................................................................19

*Reynolds v. Sims*
   377 U.S. 533, 563 (1964) .....................................................................10, 12

*Richmond Tenants Org., Inc. v. Kemp*,
   956 F.2d 1300 (4th Cir. 1992) ....................................................................7

*Roe v. Alabama*,
   43 F.3d 574 (11th Cir. 1995) ..............................................................5, 9, 18

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020) (per curiam) ...............................................................20

*Rosario v. Rockefeller*,
   410 U.S. 752 (1873) ..............................................................................15, 16

*Seigel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ................................................................17

*Shaughnessy v. United States ex rel. Mezei*,
   345 U.S. 206 (1953) ...................................................................................12

*Skinner v. Switzer*,
   562 U.S. 521 (2011) ...................................................................................19

*Sprint Commc'ns, Inc. v. Jacobs*,
   571 U.S. 69 (2013) .....................................................................................17

*Sterling v. Constantin*,
   287 U.S. 378 (1932) .....................................................................................7

*United States v. Raines*,
   362 U.S. 17 (1960) .....................................................................................21

*United States v. Texas*,
    252 F. Supp. 234 (W.D. Tex. 1966), *summarily aff'd*, 384 U.S. 155 (1966) .........................12

*VoteAmerica v. Schwab*,
    121 F.4th 822 (10th Cir. 2024) ...............................................................................13

*Wexler v. Lepore*,
    385 F.3d 1336 (11th Cir. 2004) ..............................................................................17

*Wise v. Circosta*,
    978 F.3d 93 (4th Cir. 2020) (en banc) ......................................................................9

*Wright v. North Carolina*,
    787 F.3d 256 (4th Cir. 2015) ...............................................................................9, 10

*Younger v. Harris*,
    401 U.S. 37 (1971)........................................................................................ *passim*

**Statutes**

N.C.G.S.
    § 163-258.13 ..............................................................................................................8
    § 163-90.3 ..................................................................................................................8

## INTRODUCTION

In Judge Griffin's pages of misdirection and non-sequiturs, he fails to do anything to support his basic argument in this case: that the retroactive, discriminatory, and process-less invalidation of Plaintiffs' votes—based on rules applied to these voters for the first time *six months after the election*—is permissible under the U.S. Constitution. Instead, his arguments boil down to two unfounded assertions.

First, Griffin makes the baseless claim that this unprecedented situation is akin to the regular notice-and-cure processes that states provide voters to make sure their ballots count in the days near the election. Regular notice-and-cure processes are available for voters who make innocent mistakes under the settled rules of the election, *not* to allow for the retroactive application of newly reinterpreted rules. They occur in the days near an election when voters are paying closer attention and under an already-established legal framework where election officials have the resources needed to administer the process, *not* six months after an election when voters and officials alike must scramble to figure out what to do under extraordinary circumstances. The ex post disqualify-then-cure process at issue here—which will inevitably result in the *dis*enfranchisement of qualified voters whose votes were already counted—is far afield from the voter-centric notice-and-cure processes that states use to help *en*franchise qualified voters.

Second, Griffin claims that because some voters may be able to overcome the hurdles of the disqualify-then-cure order to re-secure their vote, the Court should waive off concerns about those hurdles being manufactured and discriminatorily applied in the first place. But a state cannot impose an unconstitutionally retroactive and discriminatory requirement so long as it allows voters thirty days to comply. North Carolina could not now require some voters to pass a literacy test to have their vote counted in the 2024 elections, even if some voters will eventually be able to pass it. This disqualify-then-cure process, applied only to some voters, coming six months after the

1

election, is unlawful for the same reason. The basic point that Griffin fails to address is that states cannot impose new, backdated requirements months after an election on a subset of voters.

Griffin has not confronted the reality of this case: that to turn his electoral loss into a win, the State Board of Elections must discard the votes of qualified military and overseas voters, based solely on the retroactively applied change to the uncontested election rules, absent any indication that a single one of these voters was ineligible. In fact, Griffin evades even acknowledging the military voters he seeks to disenfranchise a single time in his brief. But the Court cannot ignore the grave constitutional violations of their rights and the rights of the thousands of others whom Griffin targeted. It is past time to put an end to this unconstitutional gambit.

## ARGUMENT

### I. The retroactive, discriminatory disqualify-then-cure process is unconstitutional.

#### A. Retroactively invalidating Plaintiffs' votes, based on post hoc rule changes and administrative errors, violates their substantive due process rights.

The Due Process Clause protects the rights of voters "to have their votes counted as cast" by preventing arbitrary, post hoc actions that devolve "the election process [to] the point of 'patent and fundamental unfairness.'" *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 180-82 (4th Cir. 1983) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)). Defendants' actions violate this principle for two independent reasons. First, "the retroactive invalidation of ballots cast in an officially-endorsed manner," after the voters "d[id] no more than follow[] the instructions of the officials charged with running the election" and "long-standing practice," is the type of fundamental unfairness that "amounts to a constitutional violation." *Burns*, 570 F.2d at 1073-75. Second, "the invalidation of votes cast in" a manner deemed incorrect "due solely to [election officials'] error" violates due process. *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (quotation omitted).

Among the shortcomings of Griffin's arguments, most glaring is that he does not address—and effectively concedes—that Plaintiffs meet both of these standards: (1) Plaintiffs and the putative Class followed the uncontested, extant rules to vote and have their votes counted; (2) their votes are now in jeopardy only because North Carolina *changed* those rules on April 11, and is applying the changed rules *retroactively* six months after the election; (3) even if affected voters had somehow anticipated these rule changes and tried to supply a photocopy of their ID, they could not because of elections officials' apparent error in not providing them any opportunity, prompt, or means to do so; and (4) absent this Court's intervention, these votes are now deemed "not properly cast"—and presumptively invalid—unless and until they re-engage in a rushed, invented "cure" process of these newfound "deficiencies" to their vote. ECF 82 at 9-13 (Voter Plaintiffs Opening Br.). These circumstances fit squarely under the framework articulated in *Hendon*, *Burns*, *Husted*, and similar cases. Griffin's failure to rebut any of these points is fatal.

Griffin is also wrong that Plaintiffs' Due Process Clause claim does not "adhere" to "history and tradition." ECF 81 at 1 (Griffin Opening Br.). As Plaintiffs explained in their opening brief, ECF 82 at 9-10, *Hendon*, *Burns*, and like cases represent election law applications of the foundational Due Process antiretroactivity principles that have "been recognized throughout history." *E. Enters. v. Apfel*, 524 U.S. 498, 532 (1998) (plurality op.). They apply the "[e]lementary considerations of fairness" at the heart of the Due Process Clause, which "dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994). This basic "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)

(recounting history). Foundational and centuries-old due process guarantees do not fall away simply because Griffin pursued his unlawful campaign to retroactively change the settled, uncontested rules through an election contest.

Indeed, specifically in the elections context, the Supreme Court has acknowledged that votes cannot be retroactively discarded when cast in reliance on the rules as understood at the time. *See Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (ruling that "any ballots cast before this stay issues and received within two days of this order may not be rejected for failing to comply with the witness requirement" that a lower court had enjoined). And the Court has reiterated the need to "decline[] to give retroactive effect to its judgment" in circumstances where voters were wrongfully *excluded* from the franchise to "avoid the possibility of upsetting" the reliance interest from an already decided election. *Hill v. Stone*, 421 U.S. 289, 301 (1975). This is because giving effect to a retroactive order that voters were found to be wrongfully disenfranchised "would be unjustifiably disruptive" of settled expectations that due process guarantees. *See City of Phoenix, Ariz. v. Kolodziejski*, 399 U.S. 204, 213-14 (1970). It would be a remarkable perversion of the Due Process Clause to hold that retroactive application of changed voting rules is allowed to *disenfranchise* voters, when courts have relied on anti-retroactively principles to decline *enfranchising* voters who were wrongfully excluded in a prior election.

Griffin claims that "the entire history of election contests shows there's no right to prevent a once-counted ballot from being excluded after it is deemed deficient." ECF 81 at 12. But Griffin fails to identify a single historical election contest that even remotely resembles the instant matter. That is because what Defendants have been ordered to do is far outside the norm of contested elections in American history. *See* ECF 82-9 at 4 (Cooper Supp. Rep.). The retroactive reevaluation of thousands of votes, cast by voters who everyone agrees followed the rules

4

articulated during the election, is preceded only by cases like *Burns* and *Roe*, where federal appellate courts enjoined similarly stark due process violations. *Burns*, 570 F.2d at 1075-76; *Roe v. Alabama*, 43 F.3d 574, 580-81 (11th Cir. 1995) (holding that "a post-election departure from previous practice" violates due process).

The facts here also do not resemble any of the cases Griffin stretches to recast this matter as a "garden variety" election dispute. ECF 81 at 11-12. The lone Fourth Circuit case he cites is *Hutchinson v. Miller*, which rejected a sprawling RICO conspiracy and state common law *damages* suit asserting a "right to candidacy" by candidates who sought "approximately $9 million in damages" for election conspiracies they did not prove. 797 F.2d 1279, 1279, 1280, 1282 (4th Cir. 1986). The reasoning denying those far-fetched claims in *Hutchinson* is simply not relevant to resolving Plaintiffs' well-grounded constitutional claims seeking to enjoin the retroactive invalidation of their votes. And, if anything, the *dicta* in *Hutchinson* supports Plaintiffs: the Fourth Circuit went out of its way to "acknowledge and affirm the significant duty of federal courts to preserve constitutional rights in the electoral process," *id*. at 1283, and reaffirm the *Hendon* Court's "patent and fundamental unfairness" analysis, *id.* at 1287.

Griffin's other proffered cases also do not support his position. In *Election Integrity Project California, Inc. v. Weber*, 113 F.4th 1072, 1096 (9th Cir. 2024) and *Bennett v. Yoshina*, 140 F.3d 1218, 1227 (9th Cir. 1998), the Ninth Circuit summarized examples of "garden variety" post-election disputes. These include issues like human error in miscounting votes, delays in the arrival of voting machines, technical ballot printing deficiencies, and malfunctioning voting machines. *Bennett*, 140 F.3d at 1227. None of these come close to what is happening here: attempting to overturn an election by retroactively disenfranchising voters for not following a rule last fall that did not apply to them until two weeks ago. Unlike the broadscale disenfranchisement here, the

*Weber* plaintiffs did little more than raise general concerns about the "*potential* for irregularity" in various parts of the election, without any credible allegation that a vote was unlawfully denied. 113 F.4th at 1097. Likewise, the rejection of due process claims in cases like *Bennett*, concerning a state court ruling that "[e]very ballot submitted was counted"—not invalidated—do not guide the analysis here. 140 F.3d 1218, 1227 (9th Cir. 1998). "Unlike *Griffin* [*v. Burns*]" those "case[s] do[] not involve a state court order that dis enfranchises voters; rather it involves a Commonwealth decision that en franchises them." *Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 828 (1st Cir. 1980).

Griffin also claims that because he only timely protested Guilford County's subset of 1,409 military and overseas voters, there are not enough votes at stake to warrant federal due process protection. ECF 81 at 15-17. He notably obscures that he has now asked the state courts to also *expand the scope* of his protests to include six counties, totaling approximately 8,600 voters. *See* ECF 76 (Griffin Response to NCSBE's Notice of Remedial Efforts); ECF 82-8 at ¶31 (Johnson Decl.). Regardless, Griffin's contrived "10 percent of the total votes cast" rule (at 15-16) is hostile to safeguarding federal constitutional rights. Close elections, where a smaller margin makes the difference, is where future candidates will have incentives to attempt what Griffin does here: "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon*, 710 F.2d at 182 (quotations omitted). Under Griffin's theory, if such candidates can convince a state administrative or judicial body to retroactively invalidate an outcome-determinative subset of votes, even if 9.9% of the electorate, federal due process rights are meaningless. Such an arbitrary rule invites partisan gamesmanship at the cost of voters' fundamental rights and the foundational commitment to popular sovereignty.

It violates "the basic truth that even one disenfranchised voter—let alone several thousand—is too many." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).

Griffin next suggests that Plaintiffs cannot rely on *Burns* because there the court ordered a new primary election to resolve the due process violation. ECF 81 at 11. But that argument falters by "confus[ing] the question of judicial power with that of judicial remedy." *Sterling v. Constantin*, 287 U.S. 378, 403 (1932). While the *Burns* court exercised its remedial discretion to order a new election in significantly distinct circumstances—a primary, in a contest that had already been certified, for city council, involving 1356 total votes, before the general election occurred—that does not dictate the scope of relief here. *See* 570 F.2d at 1067. The "court has wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992). Ordering a new statewide election here—in a contest already confirmed in two recounts, where over 5 million people voted, and where the state supreme court's term is ongoing but overcast with doubt—would represent the type of disfavored injunction that "disrupt[s] the orderly election process and sow[s] voter confusion." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 229 (4th Cir. 2024). That remedy would be infeasible and problematic for resolving the injuries to the Class of affected military and overseas voters here. *See* ECF 82-4 ¶¶13-18 (Kromm Decl.); ECF 82-2 ¶¶13-16 (Conley Decl.); ECF 82-3 ¶¶20-21 (Webb Decl.); ECF 82-9 at 5-6, 8-11 (Cooper Supp. Rep.). Instead, the Court can order effective relief by stopping the disqualify-then-cure procedures and simply retaining the targeted military and overseas votes in the count column instead of allowing them moved to the "omit" column. *See Griffin*, 2025 WL 1021724, at *15.

The remainder of Griffin's arguments distract from the core due process analysis by building strawman arguments for him to knock down. But his arguments fail even on those terms.

To start, Griffin mischaracterizes Plaintiffs' argument to claim that "no voter has a right to 'a presumpt[ion]' that their ballot is valid." ECF 81 at 12. But Plaintiffs' actual argument is that voters have a due process right to have their properly cast and *already validated* vote not now be presumptively *invalidated*, based on changes to the rules made long after the election. ECF 82 at 12-15. Plaintiffs also do not "seek to compel North Carolina to count the ballots of unqualified voters." ECF 81 at 9. Griffin has had six months to bring forward any evidence that a single targeted voter is not qualified to vote. He has not, because he attempts to discard the votes of *qualified* military and overseas voters who followed the preexisting rules directing that, unlike domestic absentee voters, they need not provide a photocopy of their ID. ECF 82 at 2-7. These voters instead signed an affirmation swearing to their identity and qualifications, where they are twice warned that any "material misstatement" risks "a conviction of perjury," a Class I felony. N.C.G.S. §§ 163-258.13, 163-90.3; *see also* ECF 82-3 at 13 (Webb Decl., Ex B). Griffin offers not one indication that the military and overseas voters he targets committed felony perjury and are in fact "unqualified voters," *cf.* ECF 81 at 9; they simply voted under the settled preexisting understanding of the voting rules, not the new reinterpretation of those rules. Indeed, he sees no problem with allowing the votes from materially identical overseas and military voters in the ninety-some other counties that he did not selectively target. But *all* of these voters have a fundamental constitutional right "to vote and to have their votes *counted as cast*," without being encumbered by retroactive applications of changed rules. *Hendon*, 710 F.2d at 180 (emphasis added); *accord Gray v. Sanders*, 372 U.S. 368, 380 (1963).

Next, Griffin claims that Plaintiffs ask this Court to "grade the papers of state courts." ECF 81 at 9. Quite the opposite—Plaintiffs make clear they do not here contest the state court's reinterpretation of the state photo-ID law and its application to military and absentee voters

*prospectively.* ECF 82 at 7. Regardless of the state court's authority to use an election protest to reinterpret the voting rules in that manner, the U.S. Constitution forbids applying that reinterpretation retroactively to discard thousands of votes because doing so "erodes the democratic process." *Hendon*, 710 F.2d at 182 (citing *Ganza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980)). These due process protections do not implicate the state court's reinterpretation of state law: instead, they form the basis of Plaintiffs as-applied constitutionality challenge to the unlawful retroactive application of that reinterpretation to determine already cast and counted votes. *See Burns*, 570 F.2d at 1078-79; *Roe*, 43 F.3d at 580-81. Rather than stand back in circumstances "where the entire election process including … the state's administrative and judicial corrective process fails on its face to afford fundamental fairness," "federal judge[s] need not be timid, but may and should do what common sense and justice require": enjoin the unlawful "retroactive invalidation" of votes. *Burns*, 570 F.2d at 1073, 1078.

**B.   Selectively targeting military and overseas voters in some counties, but not materially identical voters in others, violates Equal Protection rights.**

Defendants' actions encumbering only a subset of military and overseas voters, based on Griffin's selective targeting of areas that favored his opponent, violate the core equal protection prohibitions against arbitrary and disparate treatment. ECF 82 at 13-15. Griffin sidesteps these foundational equal protection guarantees by attempting to cabin one case that applies them, *Bush v. Gore*, 531 U.S. 98 (2000). *See* ECF 81 at 21-24. Griffin's efforts to artificially limit *Bush v. Gore* to only a presidential election or only a statewide recount administered by a judge is strained, wrong, and belied by Fourth Circuit precedent applying *Bush v. Gore*'s straightforward principles outside those contexts. *See Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020) (en banc); *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 337-38 (4th Cir. 2016); *Wright v. North Carolina*, 787 F.3d 256, 259 (4th Cir. 2015).

Moreover, Plaintiffs' equal protection claim does not depend on *Bush v. Gore* in isolation, but instead on "the rudimentary requirements of equal treatment and fundamental fairness" that underlie decades of equal protection doctrine. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 (9th Cir. 2025). The Supreme Court in *Reynolds v. Sims* held that treating the "votes of citizens differently, by any method or means, merely because of where they happen to reside" violates equal protection. 377 U.S. 533, 563 (1964). And it has specifically applied this principle to prohibit unequal treatment of votes base on the county where voters are registered. *Gray*, 372 U.S. at, 379-81; *Moore v. Ogilvie*, 394 U.S. 814, 818-19 (1969). *Bush v. Gore* did no more than apply these longstanding rules against a state "accord[ing] arbitrary and disparate treatment to voters in its different counties" in a recount process. 531 U.S. at 107 (applying *Gray* and *Moore*). These protections are "firmly grounded," and "provide[] protection against more than one form of discrimination." *See Karcher v. Daggett*, 462 U.S. 725, 747 & n.6 (1983) (Stevens, J., concurring).

Griffin's arguments based on *Hendon* also fail. *See* ECF 81 at 22-23. The *Hendon* Court permitted a practice of some counties using "mechanical voting machines," and some using "traditional paper ballots," which had implications for split-ticket voters. 710 F.2d at 181. The Court held that such "diverse methods of voting" did not "facially" violate equal protection. *Id.* But it reasoned that if the application of those systems imposed "a greater burden" on some voters' rights than others, for no legitimate reason, then that would be unconstitutional. *Id.* That is exactly what is happening here: North Carolina will presumptively invalidate and encumber the votes of only the military and absentee voters Griffin singled out in some areas, but entirely leave alone identically situated voters in other areas, *for partisan reasons*. ECF 82 at 16-17. That is the epitome of "later arbitrary and disparate treatment, valu[ing] one person's vote over that of another" that the Equal Protection Clause forbids. *Wright*, 787 F.3d at 259.

The assumption that some targeted voters will be able to overcome the disqualify-then-cure hurdle and move their vote from the "omit" column back to the "count" column does not alter the analysis. It is the imposition of a cure requirement only on these discriminatorily selected voters *in the first place* that is a constitutionally cognizable disparate treatment harm, even if they are ultimately notified and able to timely re-secure their vote. The basic promise of equal protection in the elections context is that "[t]he right to vote includes the right to have one's vote counted on equal terms with others." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008). Plaintiffs cannot be forced to clear additional hurdles not imposed on their fellow similarly situated North Carolinians to have their votes counted.

### C. Providing zero predeprivation process, and inevitably flawed postdeprivation process, violates Plaintiffs' procedural due process rights.

When the fundamental right to vote is at stake, "sufficient predeprivation process is the constitutional imperative." *Democracy N.C v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (quotation omitted). Here, Plaintiffs received *zero* adequate predeprivation notice and opportunity to be heard, flouting that constitutional prerequisite. That lack of constitutionally required predeprivation process alone warrants ruling for Plaintiffs. *See* ECF 82 at 18-20. But in addition, Plaintiffs and the Class now face an inevitably defective postdeprivation process that cannot be constitutionally adequate to protect their fundamental rights. *See id.* at 20-22.

Griffin confronts none of this; he only pursues the misguided argument that the *Anderson-Burdick* balancing test applies to essentially any constitutional claim concerning elections. ECF 81 at 17-18. Rather than the *Mathews* test that evaluates *procedural* fairness, Griffin demands that Plaintiffs' claims be examined through the *Anderson-Burdick* test that makes a *substantive* cost-benefit analysis. That is wrong, as further described *infra*. Plaintiffs procedural due process rights

11

cannot be ignored when they protect the fundamental right to vote, which "it cannot be doubted … is one of the fundamental personal rights included within the concept of liberty as protected by the due process clause." *United States v. Texas*, 252 F. Supp. 234, 250 (W.D. Tex. 1966) (three-judge district court), *summarily aff'd*, 384 U.S. 155 (1966); *accord Reynolds*, 377 U.S. at 561-62.

This case highlights why collapsing procedural due process rights into the *Anderson-Burdick* framework is misguided. Even if one accepts the premise that a photo-ID law imposes is a burden on the right to vote that many can overcome, it still must be applied in an evenhanded and fair manner, such as timely notifying voters of the requirement and the consequences of noncompliance, and then affording the voter a real opportunity to fix any issues, show that they did in fact comply, or that they are subject to a valid exception. *See Democracy N.C.*, 476 F. Supp. 3d at 228 (describing process values apart from substantive restraints). Asking a *different* question—whether the requirement's burdens on voting rights are outweighed by the purported benefits in election administration—simply misses the point that "[p]rocedural fairness and regularity are of the indispensable essence of liberty" and serves as critical "insurance for the Government itself against those blunders which leave lasting stains on a system of justice." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 224-25 (1953) (Jackson, J., dissenting).

Defendants are poised to put Plaintiffs and the putative Class in this flawed disqualify-then-cure cycle despite *zero* notice provided to overseas voters, a faulty postcard mailed to *some* domestic voters, no predeprivation opportunity to be heard, and far from adequate postdeprivation procedures. In addition to the many substantive violations, those processes fall short of what the Constitution demands when it comes to avoiding wrongful denials of the fundamental right to vote.

### D.     Even if *Anderson-Burdick* applies, Plaintiffs prevail.

Griffin's attempts to funnel all constitutional claims concerning elections into the *Anderson-Burdick* framework should be rejected. Plaintiffs get to decide which claims to pursue,

not Griffin. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 395 (1987). And Griffin cites not one case—binding or otherwise—to support his broad argument that *Anderson-Burdick* applies across the board to Plaintiffs' claims. In fact, numerous courts have recognized the troubling trend of expanding that analysis beyond its design reach. *See, e.g.*, *VoteAmerica v. Schwab*, 121 F.4th 822, 840 (10th Cir. 2024); *Kim v. Hanlon*, 99 F.4th 140, 159 (3d Cir. 2024); *Lichtenstein v. Hargett*, 83 F.4th 575, 591 (6th Cir. 2023). Regardless, while the disqualify-then-cure mandate also violate Plaintiffs' rights to vote, that does not prevent them from vindicating their other constitutional rights implicated by this unprecedented retroactive, discriminatory, and process-deficient effort to overturn an election.

To start, the Supreme Court devised this balancing test to permit more flexible scrutiny specifically to statutes that represent (1) ex ante (rather than ex post) government regulation of the right of "access to the ballot," and (2) "nondiscriminatory" broadly applicable regulation. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *accord Anderson v. Celebrezze*, 460 U.S. 780, 788 & n.9 (1983) (addressing "reasonable, nondiscriminatory restrictions" that regulate "ballot access"). This case falls outside that framework for at least three reasons.

First, the burdens here are *discriminatory* and not stemming from a broadly applied regulations: they disparately apply only to the voters Griffin has targeted, not identically situated others. *See supra* I.B.; ECF 82 at 13-15. *Anderson-Burdick* only covers "generally-applicable and evenhanded restrictions" on ballot access. *Anderson*, 460 U.S. at 788; *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 203 (2008) (framework applies to "evaluating a neutral, nondiscriminatory regulation of voting procedure"). Discarding and encumbering the votes of military and overseas voters only in some areas that the losing candidate targeted is neither generally applicable nor evenhanded, and thus outside the *Anderson-Burdick* scope.

Second, Plaintiffs, in this matter concerning the 2024 state supreme court election, do not challenge the photo-ID law as an ex ante regulation applied to military and overseas voters in state elections going forward. They contest the retroactive application of that new rule to their votes that they cast under the rules as widely understood and communicated at the time of the election. In other words, Plaintiffs here do not challenge the facial constitutionality of the photo-ID law, but challenge it *as-applied* to them that, it bears repeating, is being done retroactively, selectively, without adequate process, and nearly half a year after the election. Such a case does not belong in *Anderson-Burdick* territory, which "has generally been applied to claims concerning ballot access" before an election. *Fusaro v. Cogan*, 930 F.3d 241, 258 (4th Cir. 2019); *see id.* (only "borrowing" the analysis as a framework for applying First Amendment intermediate scrutiny); *see also McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995) (describing application to "ballot access restrictions"). Indeed, the *Anderson* case established its framework *before* the Fourth Circuit decided *Hendon*, the Supreme Court decided *Bush v. Gore*, and before other cases on which Plaintiffs rely, yet none thought that the balancing framework should apply in a case like this one.

Third, this retroactive application of the photo-ID law to Plaintiffs and other military and overseas voters is "unrelated to voter qualifications," as there is no reason to doubt that these affected voters are in fact qualified to vote. *See Crawford*, 553 U.S. at 189.

Despite these differences, Griffin cites not one case applying *Anderson-Burdick* to similar circumstances as this case. The Court should reject his invitation to "expand *Anderson-Burdick*'s balancing test into uncharted territory." *Lichtenstein*, 83 F.4th at 591. It should instead apply the well-established frameworks to protect substantive due process, equal protection, and procedural due process that Plaintiffs invoke.

14

But even if this case is examined under the *Anderson-Burdick* balancing framework, Plaintiffs still prevail. ECF 82 at 15-18. First, the burdens of the disqualify-then-cure process far exceed *de minimis*, *cf.* ECF 81 at 19; Plaintiffs votes are retroactively deemed "not … properly cast" and will thus be presumptively "omit[ted] from the final count." ECF 82 at 7. That default complete denial of Plaintiffs' and the Class's votes is a severe burden. *See Greidinger v. Davis*, 988 F.2d 1344, 1350 (4th Cir. 1993). They can only re-secure their vote if they are successfully contacted (in some cases across the globe), re-engage in the electoral process over six months after it completed, and then timely provide a photocopy of their photo-ID within thirty days after their notice was *mailed* (not received). For the many affected voters living abroad, or who are focused on other things than the election that occurred half a year ago, this is no easy task. *See Brakebill v. Jaeger*, 905 F.3d 553, 558-59 (8th Cir. 2018) (noting that the "'excessively burdensome requirements' on some voters," even if easily met by others, is consequential under *Anderson-Burdick* (citing *Crawford*, 553 U.S. at 202)). The significant and unequal encumbrances impose "a burdensome condition on the exercise of the fundamental right to vote" and warrant heightened scrutiny. *See Greidinger*, 988 F.2d at 1350.

Griffin claims that these burdens are *de minimis* because he only asks voters "to heed reasonable time, place, and manner rules on voting." ECF 82 at 19. He argues that "if a voter follows instructions, their vote will be counted." *Id.* at 16. But, again, Griffin *does not and cannot dispute* that Plaintiffs and the Class followed the uncontested and settled rules that their election officials provided, and they had no means or opportunity to do anything else. *See* ECF 81 at 2-7. His heavy reliance (at 18, 21) on *Rosario v. Rockefeller*, 410 U.S. 752 (1873), to support his points exposes their flaws. There, the Supreme Court upheld a "cutoff date" for registering in a political party to vote in a presidential primary election. *Id.* at 755. The Court emphasized that the cutoff

date, and its related rules, were well-known and settled long *before* the election. *Id.* Yet the voter plaintiffs there "waited until" after the cutoff date to act and then sued, despite *admitting* that they failed to comply with the known cutoff date and rules. *Id.* at 755 & n.4. This case, where the affected voters are faulted for not complying with a rule that no one said applied to them until nearly six months after the election, looks nothing like *Rosario.*

Even if the burden on Plaintiffs and the Class is viewed in lesser terms, it must still "be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191. Griffin points to abstract state interests, but fails to connect them in any way to *these circumstances* and *these voters*. *Cf.* ECF 81 at 20-21. Again, there is no reason to think that any one of these military and overseas voters is unqualified—they swore under penalty of felony perjury to their identity and eligibility, which has been the standard for this group of voters for years. Griffin's asserted interest in "a fair count" is no replacement for any actual evidence that their votes are unlawful. *Cf.* ECF 81 at 20. They are not, and Griffin cannot carry the burden of demonstrating any real concern with counting these votes. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 204 & n.23 (1999); *id.* at 210 (Thomas, J., concurring).

Instead, the real interest Griffin pursues is his partisan interests in targeting just enough voters, in just the right places, to skew the election in his favor. Such partisan interests in abusing the electoral process to discard lawful votes warrants no constitutional credence. ECF 82 at 14-15. Rather, the "unjustified discrimination in determining who may participate … in the selection of public officials" that Griffin demands "undermines the legitimacy of representative government." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969).

## II.  *Younger* abstention is inappropriate.

Griffin's argument for abstention under *Younger v. Harris*, 401 U.S. 37 (1971), is also unavailing. "[A]bstention is an exception to the general rule that federal courts must decide cases

16

over which they have jurisdiction." *Erie Ins. Exch. v. Md. Ins. Admin.*, 105 F.4th 145, 149 (4th Cir. 2024) (quoting *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022)). This Court has jurisdiction over the federal questions presented here to, as the Court stated, "resolve" this matter "as soon as practicable." Apr. 14, 2025, Text Order. The way to do so is ruling that this entire enterprise has been a violation of federal law, no matter any state court proceedings that have occurred or are hypothetically yet to come.

*Younger* abstention applies only in three narrow categories: (1) "ongoing state criminal prosecutions," (2) "certain civil enforcement proceedings" and (3) "civil proceedings involving certain orders ... uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (internal quotation marks omitted). The *Sprint* Court emphasized that *Younger* abstention is narrow and "extends … no further" than the strict contours of these "three 'exceptional circumstances.'" *Id.* at 82. Griffin fails to fit these cases into one of the three exclusive categories described in *Sprint*, the Supreme Court's binding narrowing interpretation of the scope of *Younger* abstention. In fact, Griffin fails to cite or address *Sprint* at all.

That is because none of the three narrow categories fit here. This case is clearly not a criminal proceeding, nor the type of "quasi-criminal" proceeding that makes up the second category. *See Erie Ins. Exch.*, 105 F.4th at 149. The third category covers only a limited set of civil orders like civil contempt, *see Juidice v. Vail*, 430 U.S. 327 (1977), and requirements to post bonds pending appeal, *see Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1 (1987), not actions by state officials being compelled to retroactively and discriminatorily apply a new state requirement to discard votes. *Younger* simply does not apply here. Indeed, as a general matter, "voting rights cases are particularly inappropriate for abstention." *Seigel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000); *see also Marks v. Stinson*, 19 F.3d 873, 884–85 (3d Cir. 1994); *Wexler v. Lepore*, 385 F.3d 1336, 1340

(11th Cir. 2004); *Benavidez v. Eu*, 34 F.3d 825, 832 (9th Cir. 1994). And where the state court processes have already failed to protect fundamental federal rights, "leaving the plaintiffs to their state remedies is neither workable nor appropriate." *Roe*, 43 F.3d at 582.

Even if the instant circumstances could be stretched to fall within an expanded third *Younger* category, abstention is still inappropriate because an exception applies. *See Erie Ins. Exch.*, 105 F.4th at 151 (internal quotation marks omitted). Defendants' actions are "flagrantly and patently violative of express constitutional prohibitions," and this is an "extraordinary circumstance[] or unusual situation[.]" *Air Evac EMS*, 37 F.4th at 96. Plaintiffs demonstrate that Defendants actions will violate numerous of their constitutional rights and in a way that threatens the foundational principle of popular sovereignty. If the constitutional stakes are not enough, Griffin's request that this Court use *Younger* to pull the rug out from the Fourth Circuit's promise of a federal forum via *Pullman* certainly qualifies as an "unusual circumstance."

Griffin's assertion that "Movants had an opportunity to litigate the federal constitutional challenges" in state court obscures the history of this dispute. ECF 81 at 7. The *Conley* plaintiffs were not parties to *any* state court case involving this election. Indeed, because of the defective notice not mailed to overseas voters at all, Plaintiffs and many in the affected Class did not even know that their vote was in jeopardy until just recently. *See, e.g.*, ECF 82-3 ¶18; ECF 82-2 ¶¶12-14. Regardless, no military or overseas voters were allowed to protect their federal constitutional rights at any stage of the state court process; the only voters who tried to participate as parties in the state court proceedings (concerning the other list of approximately 60,000 voters whom Griffin targeted) *were denied intervention*.

Further, by ordering this Court to retain jurisdiction despite abstaining under *Pullman*, the Fourth Circuit secured a federal forum for the federal claims at issue here, while allowing North Carolina courts to determine the relevant questions of North Carolina law. *See Griffin v. N.C. State*

*Bd. of Elecs.*, No. 25-1018, slip op. at 9-11 (4th Cir. Feb. 4, 2025) (citing *England v. La. Bd. of Medical Examiners*, 375 U.S. 411, 417 (1971)). These movants, as the state courts acknowledged, properly reserved their federal questions for consideration in federal court under *England. See Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *3 (N.C. Ct. App. Apr. 4, 2025). Under Griffin's theory, the only way that these movants could have litigated their federal claims would have been to ignore the Fourth Circuit's express instructions and seek to vindicate their federal constitutional rights in state court. This would make federal review of these movants' federal claims (distinct in nature from the ones Plaintiffs pursue here) entirely dependent on the U.S. Supreme Court's discretionary review, which *England* forbids. *See* 375 U.S. at 417 ("The possibility of appellate review by [the Supreme] Court of a state court determination may not be substituted, against a party's wishes, for his right to litigate his federal claims fully in the federal courts.").

Griffin also gestures toward, without invoking, a mishmash of abstention-related arguments that have nothing to do with *Younger*. He hints at the *Rooker-Feldman* doctrine, but the *Conley* plaintiffs were not parties to the state court proceedings in question, so *Rooker-Feldman* does not apply. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (*Rooker-Feldman* doctrine confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments"). Regardless, Plaintiffs in this matter do not "challenge the adverse state-court decisions themselves"—*i.e.*, the state courts' reinterpretation of North Carolina's voter-ID law in the abstract—but rather the NCSBE's retroactive application of the voter ID law to the targeted military and overseas voters. *See Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (quotation omitted); *accord Reed v. Goertz*, 598 U.S. 230, 235 (2023).

19

Griffin also invokes general federalism and comity interests, but here the state courts have already decided the state law questions that this Court exercised discretion to wait for resolution, unlike in the cases on which Griffin relies. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 610 (1975) ("At the time appellee filed its action in the United States District Court, it had available the remedy of appeal to the Ohio appellate courts."); *Moore v. City of Asheville, N.C.*, 396 F.3d 385, 396 (4th Cir. 2005) (abstention appropriate due to "plaintiff's failure to exhaust his administrative appellate remedies"). Deciding the federal law questions at this stage of proceedings runs no risk of "short-circuit[ing] [] the [state court's] ability to interpret its own statutes." *Id.* Because this Court abstained under *Pullman*, it already gave the state courts a chance to resolve the state law questions in a way that did not violate federal rights; the state courts took a different path. *See Griffin*, No. 25-1018, slip op. at 9-11. The state high court finally resolved the state law questions, the state court proceedings have concluded in all material respects, and now this Court should resolve the federal questions, as the Fourth Circuit prescribed.[1]

## III.     An injunction is warranted to preserve the status quo, avert irreparable harm, and protect the public interest.

Griffin gives short shift to the significant equity concerns in this matter, which cut decisively against him. *Cf.* ECF 81 at 29-30. He does not contest Plaintiffs' core assertion that the deprivation of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)). Nor does he provide any reason to second-guess the irreparable harms Plaintiffs describe. ECF 82 at 22-24. For the

---

[1] The potential that the North Carolina court of appeals grants Griffin's mandamus petition to expand the scope of his protests, *see* ECF 76, does not alter the analysis. Griffin's effort to retroactively and selectively violate the rights of military and overseas voters, whether in one county of six counties, threaten grave constitutional violations that this Court is empowered to prevent.

public interest equities, Griffin cannot dispute that "there is the highest public interest in the due observance of all the constitutional guarantees." *United States v. Raines*, 362 U.S. 17, 27 (1960).

Instead, he relies on *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020), an out-of-circuit Electors Clause decision with no bearing on this case. And he makes the remarkable claim that Plaintiffs' efforts to protect their fundamental rights is what will "erode the finality of results," and "give candidates incentives to bypass the procedures already established." ECF 81 at 30 (quoting *Hutchinson*, 797 F.2d at 1285). To state the obvious, it is Griffin's unrelenting campaign to retroactively and discriminatorily invalidate military and overseas votes that erodes the finality of results. If left unchecked, his efforts will provide a dangerous playbook for losing candidates to overturn election losses if they can persuade their state courts to retroactively apply changed voting rules to target their opponents' voters.

## CONCLUSION

For the foregoing reasons, the Court should uphold Plaintiffs' fundamental constitutional rights, grant effective injunctive relief to stop the disqualify-then-cure process from taking place, and enter judgment against Griffin.

Dated: April 25, 2025

Respectfully Submitted,

/s/ *Jessica A. Marsden*
Jessica A. Marsden

Jessica A. Marsden
Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
jess.marsden@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176
State Bar No. 50855

Anne Harden Tindall
Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
anne.tindall@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176
State Bar No. 31569

Samuel Jacob Davis
Election Law Clinic at Harvard Law School
6 Everett Street,
Cambridge, MA, 02138
Telephone: (631) 807-2327
State Bar No. 57289

Hayden Johnson*
Protect Democracy Project
2020 Pennsylvania Avenue NW, Suite #163
Washington, DC 20006
hayden.johnson@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176

John Paredes*
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
john.paredes@protectdemocracy.org
Telephone: (202) 579-4582
Fax: (202) 769-3176

Stacey Leyton*
Danielle Leonard*
Juhyung Harold Lee*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
dleonard@altber.com
hlee@altber.com

*By special appearance or notice of special
appearance forthcoming

**CERTIFICATE OF COMPLIANCE**

As required by Local Civil Rule 7.2(3)(A), I hereby certify that the foregoing document contains 6,906 words, not including items that may be omitted from the word count pursuant to Local Civil Rule 7.2(f)(1).

Dated: April 25, 2025             /s/ *Jessica A. Marsden*

                                          Jessica A. Marsden