# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | |
|---|---|
| JEFFERSON GRIFFIN,<br>    *Plaintiff*,<br><br>v.<br><br>NORTH CAROLINA STATE<br>BOARD OF ELECTIONS,<br>    *Defendant*,<br><br>and<br><br>ALLISON RIGGS, VOTEVETS<br>ACTION FUND, NORTH<br>CAROLINA ALLIANCE FOR<br>RETIRED AMERICANS, SARAH<br>SMITH, and JUANITA ANDERSON,<br>    *Intervenor-Defendants*. | Case No. 5:24-cv-00731-M |
| NORTH CAROLINA DEMOCRATIC<br>PARTY,<br>    *Plaintiff*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD<br>OF ELECTIONS et al.,<br>    *Defendants*. | Case No. 5:24-cv-00699-M-KS |
| CARRIE CONLEY et al.,<br>    *Plaintiffs*,<br><br>v.<br><br>ALAN HIRSCH et al.,<br>    *Defendants*. | Case No. 5:25-cv-00193-M-RJ |

# JUDGE JEFFERSON GRIFFIN'S SECOND BRIEF
# ON FEDERAL CLAIMS

# TABLE OF CONTENTS

Introduction .................................................................................................. 1

Argument ...................................................................................................... 2

   I.   No case supports Movants' substantive-due-process claims. ........................... 2

      A.  Movants do not identify a specific liberty interest that could require North Carolina to count invalid ballots. ........................................... 2

      B.  Movants' best cases undermine their substantive-due-process claims. ........ 6

  II.  Movants cannot explain why additional court-ordered process violates the Constitution. ............................................................................................. 10

      A.  No voter is burdened by being provided additional process. ..................... 11

      B.  Any burden is outweighed by the State's compelling interests. .................. 15

 III.  This case is not *Bush v. Gore* and doesn't concern standardless recounts. ........ 16

 IV.  Movants admit that the NVRA's text doesn't "technically" cover the conduct here. ........................................................................................... 19

  V.  UOCAVA doesn't apply to state elections. ............................................... 21

 VI.  The Voting Rights Act doesn't require counting the ballots of unqualified voters. ................................................................................................... 22

 VII.  Accepting a person's sworn statement that they're not a resident does not violate the Civil Rights Act. ................................................................... 24

VIII. Movants don't carry their burden on summary judgment, and dismissal is appropriate. ......................................................................................... 29

Conclusion .................................................................................................. 31

Certificate of Compliance ............................................................................. 33

Certificate of Service .................................................................................... 33

# INTRODUCTION

Movants claim a novel right to exempt voters from a court-ordered cure process because they relied on executive guidance instead of state law. No case supports that right. Their best case is a 1978 out-of-circuit opinion that rested on the absence of "adequate state corrective procedures." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978). The North Carolina Supreme Court considered those issues and "expand[ed] the period to cure deficiencies" to 30 days. *Griffin v. N.C. State Bd. of Elections*, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025) ("*Griffin II*").

In any other case, those extra days and mandatory notice provisions would foreclose any due-process challenge. But Movants argue that those cure opportunities are *themselves* a constitutional violation because they burden voters. Again, no case supports their position. The opportunity to cure ballots is a frequent remedy in election-contest cases; it balances the right to vote with the State's interest in counting only legal votes.

Movants' new arguments fare no better. Their UOCAVA claims fail because "UOCAVA's requirements apply only to absentee ballots used to elect candidates for federal office." *Doe v. Walker*, 746 F. Supp. 2d 667, 671 (D. Md. 2010). This case concerns election to state office, so UOCAVA doesn't apply. This Court said the same of their NVRA claim, recognizing that the NVRA does not preclude a State from "acting in the context of a state election." Doc.50 at 19, No. 5:24-cv-724.

1

Movants' Voting Rights Act claim fails because the law reaches only state officials who "willfully fail or refuse to tabulate, count, and report" a qualified "person's vote." 52 U.S.C. §10307(a). It doesn't prohibit States from enforcing ballot-casting rules such as witness requirements, deadlines, or photo-ID.

Finally, Movants' Civil Rights Act claim fails because a sworn statement that a voter is not a resident is "material" to determining whether they're a resident. 52 U.S.C. §10101(a)(2)(B). Movants would prefer that election officials search around for evidence to contradict an applicant's sworn statement. But the statute doesn't support their policy preference.

Movants make no attempt to reconcile their bold request for federal intervention with a respect for the state judiciary. "[T]he federal judiciary should proceed with great caution when asked to consider disputed elections…." *Hutchinson v. Miller*, 797 F.2d 1279, 1287 (4th Cir. 1986). The Court should deny the motions and dismiss the cases.

## ARGUMENT

### I. No case supports Movants' substantive-due-process claims.

#### A. Movants do not identify a specific liberty interest that could require North Carolina to count invalid ballots.

Movants claim a right to rely on administrative guidance instead of state law. LWV 1st Br.82 (Doc.82); Riggs 1st Br.14 (Doc.84); BOE 1st Br.14 (Doc.83). Even Movants' best out-of-circuit precedent doesn't support that right, and no Movant has carried their burden to show that their proposed right to rely on administrative voting

2

guidance is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Their failure to carry their burden on that "essential" and "[h]istorical inquir[y]" is sufficient reason itself to dismiss their substantive-due-process claims. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239 (2022).

Movants must identify the specific right "not mentioned anywhere in the Constitution" that they claim is protected by the Due Process Clause. *Id.* at 237. "[S]ubstantive-due-process cases" require "a 'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721. The right "cannot be framed too broadly," *Elhady v. Kable*, 993 F.3d 208, 220 (4th Cir. 2021), "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court," *Glucksberg*, 521 U.S. at 720. Movants try their hand at describing the liberty interest—"unfairness," "'antiretroactivity,'" and a right to rely on "administrative errors." *E.g.*, LWV 1st Br.9-12. But none of those asserted interests describe the right Movants seek to vindicate with any "precision." *Elhady*, 993 F.3d at 220. Rather, the liberty interest Movants request is found in their demands for relief: the right to have invalid ballots that complied with administrative guidance counted without "engaging in any cure process" notwithstanding a state court judgment that their ballots failed to comply with state law. VV 1st Br.22 (Doc.87).

Most of Movants' arguments revolve around vague claims of "unfair" changes. *E.g.*, BOE 1st Br.14. They read *Hendon*'s admonition that "'patent and fundamental

unfairness' … may" violate the Constitution as authorizing federal courts to engage in a freewheeling fairness inquiry completely detached from history and tradition. *E.g.*, Riggs 1st Br.13 (citing *Hendon v. N.C. Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)). But like "the term 'liberty,'" 'unfairness' is "a capacious term" that "provides little guidance." *Dobbs*, 597 U.S. at 239. Vague notions of 'fairness' divorced from the Constitution's text and unsupported by "history and tradition" invite "the freewheeling judicial policymaking" that the Supreme Court has rebuked. *Id.* at 240. The Court need not credit those standardless "policy preferences." *Id.*

Movants' invocation of an "antiretroactivity principle" confuses judicial and legislative power. *E.g.*, LWV 1st Br.9. The North Carolina Court of Appeals "conclude[d] that Articles 20 and 21A" of the election code "require all voters voting absentee in a non-federal election in North Carolina to comply with the photo ID requirement." *Griffin v. N.C. State Bd. of Elections*, 2025 WL 1021724, at *12 (N.C. Ct. App. Apr. 4, 2025) ("*Griffin I*"). That holding describes what the law is, and—like virtually every court judgment—applies that pronouncement to past conduct. "The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982).

Movants confuse the two, selectively quoting (LWV 1st Br.9-10) from cases applying the "presumption against *statutory* retroactivity." *Landgraf v. USI Film Prods.* 511 U.S. 244, 270 (1994) (emphasis added) (statutory amendments didn't apply to "a Title

4

VII case that was pending on appeal when the statute was enacted"); *E. Enters. v. Apfel*, 524 U.S. 498, 528-29, 537 (1998) (statute imposing "retroactive liability" was an "unconstitutional taking"). But the General Assembly didn't enact a new law that applied retroactively to the election. And the North Carolina courts didn't change the law. At most, they "clarif[ied] … the state's election laws" after the Board of Elections failed to comply with the statutes as written. *Bennett v. Yoshina*, 140 F.3d 1218, 1227 (9th Cir. 1998).

Nor do "administrative errors" pose constitutional concerns. *Contra* LWB 1st Br.12-13. "Elections are, regrettably, not always free from error." *Hutchinson*, 797 F.2d at 1286-87. But "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss" of "liberty." *Daniels v. Williams*, 474 U.S. 327, 328 (1986). The Fourth Circuit has thus recognized that the "failure of the ballots to comply fully with the statutory requirements does not constitute a violation of the due process clause," even when the failure is attributable to "negligence on the part of election officials." *Hendon*, 710 F.2d at 182. If Movants' theory were correct, every "administrative error" that results in a ballot not being counted would present a constitutional violation.

Movants don't address the core problem of their substantive-due-process argument: all qualified voters still have the opportunity to vote. Because "'Never Resident' voters are ineligible to vote in non-federal North Carolina elections," *Griffin I*, 2025 WL 1021724, at *13, they can't have a *derivative* right to vote in accordance with

administrative guidance. Meanwhile, qualified overseas voters still have the opportunity to vote. Movants assert nothing more than a right to be free from the court-ordered cure process. But the Fourth Circuit has "doubt[ed] that due process is implicated by mere subjective deterrence." *Elhady*, 993 F.3d at 222. And even if "these inconveniences have actually deterred" some of those voters from voting, *id.*, "a *voter's failure* to follow a regulation" cannot "be said to disenfranchise that voter," *Democratic Party of Va. v. Brink*, 599 F. Supp. 3d 346, 362 (E.D. Va. 2022) (citing *Rosario v. Rockefeller*, 410 U.S. 752, 757-58 (1973)).

### B. Movants' best cases undermine their substantive-due-process claims.

Movants' "seminal case" is *Griffin v. Burns*. BOE 1st Br.12. They note that the Fourth Circuit has cited *Burns* twice, in 1983 and 1986. NCDP 1st Br.9. But neither citation endorsed *Burns'* application of due process to find a violation from a post-election judicial decision. Indeed, both cases support Judge Griffin. *Hendon* cited *Burns* for the broad position that "patent and fundamental unfairness" in an election "may" violate due process, while finding that "the failure of the ballots to comply fully with the statutory requirements *does not* constitute a violation of the due process clause." *Hendon*, 710 F.2d at 182 (emphasis added). *Hutchinson* cited *Burns* while cautioning that the "role" of "federal courts" does not extend to "the particulars of election disputes." 797 F.2d at 1283. And it explained that courts have "'uniformly declined'" to intervene over "'garden variety election irregularities'" where "alternative remedies"—such as the

cure process ordered by the North Carolina Courts—"are adequate to guarantee the integrity of the democratic process." *Id.* (quoting *Burns*).

In any event, *Burns* is "considerably narrower than plaintiffs depict." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). For at least four reasons, Movants' substantive-due-process claims fail even under their preferred 1970s out-of-circuit caselaw.

**First**, Movants ignore the absence of "adequate state corrective procedures" in *Burns*. 570 F.2d at 1077. *Burns* recognized that "usually" corrective procedures mean that "election irregularities" don't violate the Constitution. *Id.* There, "the state court did not confront the questions that retroactive application of its ruling would create." *Id.* at 1079. But here, the North Carolina Supreme Court considered those questions and provided a 30-day cure period. *Griffin II*, 2025 WL 1090903, at *3.

**Second**, the Fourth Circuit has read *Burns* to require both "'fundamental unfairness'" in the election process and a finding of "intentional" state conduct directed at impairing a citizen's right to vote. *Hendon*, 710 F.2d at 182 (citing *Burns*). Movants must point to "wilful conduct" that "undermines the organic processes by which candidates are elected." *Gamza v. Aguirre*, 619 F.2d 449, 452 (5th Cir. 1980) (cleaned up); *accord Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005); *see also Hendon*, 710 F.2d at 182 (citing *Gamza* approvingly). No Movant alleges that the Board's misreading of North Carolina's election code was discriminatory or intentionally subversive. They've

alleged only "[t]he unlawful administration by state officers of a non-discriminatory state law." *Gamza*, 619 F.2d at 453.

**Third**, *Burns* relied in part on a large "percent of the qualified and voting electorate" being "denied its vote." 570 F.2d at 1078. The *percentage* of the "electorate" is important, because that's the measure of "patent and fundamental unfairness" for "the election process itself." *Id.* at 1077. If the *relative* number of disputed votes "is lacking in 'enormity,'" that's good evidence of "garden variety election irregularities," not "broad-gauged unfairness." *Id.* at 1077-78. Movants don't dispute that the number of ballots disputed here is miniscule as a "percent of the qualified and voting electorate." *Id.* at 1078.

**Fourth**, in *Burns* the First Circuit was not faced with a situation where "[t]he district court" was "asked to examine the validity of individual ballots or to supervise the administrative details of a local election." *Id.* at 1078. If it had been asked to do that—as Movants ask here—the First Circuit would have "declined" to correct such a "garden variety" election irregularity. *Id.* at 1076-77. Instead, *Burns* affirmed a district court's decision to "invalidate" an election and "schedule a new primary and election in which the ground rules were clear." *Id.* at 1069.

Movants don't ask for anything like that here. By failing to ask for the election to be invalidated, Movants admit this isn't the type of situation where "broad-gauged unfairness permeates [the] election." *Id.* at 1077. Movants don't want a new election where "the ground rules" are clear. *Contra id.* at 1069. They want this Court to order

8

North Carolina to "count and validate ballots" based on their favored version of "the ground rules" that the North Carolina Court of Appeals held are illegal. *Id.* at 1078-79. But "[t]he federal court is not equipped nor empowered to supervise the administration of a local election." *Id.* at 1077. In short, *Burns* does not authorize, much less compel, a state to count votes that are unlawful under state law.

In any event, Fourth Circuit precedents are even further from supporting a right to rely on administrative guidance instead of state law as interpreted by state courts. To begin, *Hendon* outright rejected another argument Movants raise here, that "negligence on the part of election officials" can amount to a constitutional violation. 710 F.2d at 182. But no Movant argues that the Board intentionally misinterpreted state law. The Board points out that *Hendon* "denie[d] relief" for "past elections" to claim authority to issue rules that govern elections even if contrary to state law. BOE 1st Br.13. But *Hendon* reached that conclusion as a matter of "equitable" discretion, not constitutional mandate. 710 F.2d at 182. *Hendon* cannot support interfering with a settled state-court judgment on the grounds that a federal court might have preferred a different remedy.

*Hutchinson* confirms that "great caution" is required when "the federal judiciary" is "asked to consider disputed elections." 797 F.2d at 1287. The court held that a defeated candidate did not have a claim for "post-election damages" allegedly caused by "irregularities in the 1980 general election." *Id.* at 1279, 1287. And the court observed that "[e]quitable relief, though theoretically available, has properly been called a 'drastic, if not staggering' intrusion of the federal courts, and 'therefore a form of relief guardedly

exercised.'" *Id.* at 1287 (cleaned up). "[T]he resolution of particular electoral disputes has been primarily committed to others in our system." *Id.* at 1284. This Court would err by interfering with those state processes.

## II. Movants cannot explain why additional court-ordered process violates the Constitution.

The *Anderson-Burdick* test applies when plaintiffs bring "fundamental fairness" due-process claims. *Wexler v. Anderson*, 452 F.3d 1226, 1233 (11th Cir. 2006). This Court should "not engage in a separate" constitutional "analysis." *Anderson v. Celebrezze*, 460 U.S. 780, 786 n.7 (1983) *contra* LWV 1st Br.19. Under *Anderson-Burdick*, Movants must first identify the right that is implicated. 460 U.S. at 786-88. But they flunk that first step.

Start with the Never Residents. Movants argue that the Never Residents have a right to vote in North Carolina's elections, NCDP 1st Br.15, despite the North Carolina Supreme Court's ruling that they don't, *Griffin II*, 2025 WL 1090903, at *3. "[A] government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68-69 (1978). Movants argue that Never Residents are being denied due process and should be notified that their ballot is not going to be counted before it is disallowed. NCDP. 1st Br.15-16. The Supreme Court has dispensed with that argument. It "proceeds from the assumption, earlier shown to be erroneous, that they have a right

to vote in [North Carolina] elections. Their conclusion falls with their premise." *Holt*, 439 U.S. at 75.

Never Residents don't have the right to be notified that their illegally cast ballot is not going to be counted. They never had the right to cast the ballot to begin with. So there is no burden on any right for the Court to weigh in relation to Never Residents because those individuals lack the right to vote in North Carolina elections. Movants speculate that some of those Never Residents might have testified to their non-residency by mistake. But as Section VII explains, election officials must rely on contemporaneous, sworn statements provided by the voter—not seek correction each time a voter might have erred.

## A. No voter is burdened by being provided additional process.

Only eligible overseas voters have a right to vote in North Carolina elections—a right the North Carolina courts preserved through the mandatory notice-and-cure process. Movants make three crucial errors in evaluating that process under *Anderson-Burdick*.

**First**, Movants ignore that the North Carolina courts provided *additional* process. They suggest a "total lack of notice or opportunity to cure." VV 1st Br.14. But the North Carolina Supreme Court "expand[ed] the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business days to thirty calendar days after the mailing of notice." *Griffin II*, 2025 WL 1090903, at *3. Movants prefer wordplay to substantive arguments, calling the order a "disqualify-then-cure process."

LWV 1st Br.8-21. But each voter will have the opportunity to cure *before* their vote is excluded from the final count. The right to vote is the right to have a valid vote "included in the final tally of votes cast." *Holder v. Hall*, 512 U.S. 874, 919 (1994) (Thomas, J., concurring in the judgment). Movants make up a right to be included in a non-final count. Movants also complain about the notice that Judge Griffin provided in his initial challenges. *E.g.*, LWV 1st Br.18-21. But the relevant notice is the pre-deprivation notice-and-cure procedures the North Carolina Supreme Court has ordered the State Elections Board to adopt for voters who cast defective absentee ballots. *Cf. Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020) (due process violation only because "election officials" rejected ballots *without* notice-and-cure process).

Movants complain that the 30-day cure period is too short. But the caselaw they cite belies that assertion. *See* LWV 1st Br.19; VV 1st Br.15. One case did "not find that plaintiffs are entitled to equitable relief of a unique nature for their singular benefit." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). Another approved a notice-and-cure period that was "three days" following Election Day "or three days after receiving pre-rejection notice, whichever is later." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1332, 1341 (N.D. Ga. 2018). Movants cite no case where a federal court established a notice-and-cure process for longer than 30 days for voters who cast defective absentee ballots. And "no case mandates any particular length of time." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir. 2016).

12

**Second**, Movants "neglect meaningfully to analyze" relevant precedent. *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 234 (5th Cir. 2020). The Supreme Court held that a photo-ID requirement was not a severe burden, even where "a somewhat heavier burden may be placed on a limited number of persons." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 199 (2008). Even if some voters might find it "difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification," that difficulty is "neither so serious nor so frequent as to raise any question about the constitutionality" of requiring photo-ID. *Id.* at 197, 199. Movants mischaracterize *Crawford* by arguing that mere "inconvenien[ce]" is a constitutional standard. Riggs 1st Br.25. *Crawford* recognizes that even if photo-ID laws impose a "somewhat heavier burden" on some voters, those laws are constitutional. 553 U.S. at 199. "Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others." *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016). *Crawford* "controls [the Court's] resolution of the issue here." *Id.* at 606.

Other cases confirm that "the notice and cure process only places a minimal burden on voters." *Brink*, 599 F. Supp. 3d at 363. *Brink* dispels the notion that notice-and-cure procedures could ever amount to "a complete denial" of the right to vote. *Contra* LWV 1st Br.16. The notice-and-cure process "can never be said to disenfranchise a voter because, if a voter follows instructions, their vote will be counted." *Brink*, 599 F. Supp. at 362 (citing *Rosario*, 410 U.S. at 757-58). And the burden of having to comply

13

with a notice-and-cure process is "no more than the burdens that the Fourth Circuit found to be minimal in various other cases under *Anderson/Burdick.*" *Id.* at 363 n.22 (collecting cases).

Movants cite no case holding that a notice-and-cure process imposes a severe burden on the right to vote. That's because notice-and-cure procedures make it *easier* to vote. Indeed, federal courts have required notice-and-cure opportunities in equity, just as the North Carolina courts did here. *E.g.*, *Frederick v. Lawson*, 481 F. Supp. 3d 774, 799 (S.D. Ind. 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 237 (M.D.N.C. 2020); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 684 (M.D.N.C. 2024).

***Third***, States are not "constitutionally mandated" to afford every voter an infallible way to vote. *Richardson*, 978 F.3d at 237-38 (cleaned up). Movants argue that the cure process "constitute[s] a severe burden" because North Carolina may provide "untimely notice of rejection and no *meaningful* opportunity to cure." *Cf. id.* at 237. But "no authority" suggests "that a State must afford" every voter "infallible ways to vote." *Id.* at 238 (cleaned up). That a voter "may lose his photo identification" or suffer some other setback are not burdens caused by the state procedure. *Crawford*, 553 U.S. at 197. "If the burden imposed by a challenged law were measured by the consequence of noncompliance, then every voting prerequisite would impose the same burden and therefore would be subject to the same degree" of strict scrutiny that Movants demand here. *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021) (cleaned up). That "cannot be true." *Id.* If courts were "to deem ordinary and widespread burdens

14

like these severe based solely on their impact on a small number of voters," it "would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Richardson*, 978 F.3d at 236 (cleaned up).

### B. Any burden is outweighed by the State's compelling interests.

Because any burden is "slight," the State's interests need not be "compelling" to "tip the constitutional scales in its direction." *Burdick v. Takushi*, 504 U.S. 428, 439 (1992). Rather, "the State's important regulatory interests are generally sufficient to justify" its election laws. *Anderson*, 460 U.S. at 788. Here, numerous compelling interests justify the notice-and-cure process: protecting citizens from "unlawful votes" which "disenfranchise[] those voters who cast legal ballots," *Griffin II*, 2025 WL 1090903, at *2 (cleaned up); preserving "public confidence in the integrity and legitimacy of representative government," *Crawford*, 553 U.S. at 197 (cleaned up); and "counting only the votes of eligible voters," *id.* at 195-96. Even if there were "no evidence" of illegal voting actually occurring in North Carolina "at any time in its history," these interests would still be compelling. *Id.* at 194.

Movants dispute these compelling interests by demanding "evidence." Riggs 1st Br.26. They argue that Judge Griffin has "never identified" a "single voter" who "was, in fact, ineligible to vote." Riggs 1st Br.22 (cleaned up). But North Carolina's appellate courts identified as many as 5,500 "unlawful ballots." *Griffin I*, 2025 WL 1021724, at *14; *Griffin v. N.C. Bd. of Elections*, 910 S.E.2d 348, 348 (N.C. 2025); *see* Pls.' 1st Br.16

n.2. Regardless, Movants bear the burden to demonstrate that the ballots they demand this Court order the State to count are legal votes. *See STOP Hillary PAC v. FEC*, 166 F. Supp. 3d 643, 647 (E.D. Va. 2015). And as a matter of law Never Residents are not qualified voters. *Griffin I*, 2025 WL 1021724, at \*14. Movants admit that numerous overseas voters did not submit photo-ID as required by North Carolina law. Riggs 1st Br.15,24. Contrary to Movants' rhetoric, counting these illegal votes is what would breed "distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "The electoral system cannot inspire public confidence if no safeguards exist" to "confirm the identity of voters. Photo identification cards currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important." *Crawford*, 553 U.S. at 194 (cleaned up). Movants' constitutional claims fail the *Anderson-Burdick* test.

## III.   This case is not *Bush v. Gore* and doesn't concern standardless recounts.

Movants argue that this "case mirrors *Bush* to a tee." VV 1st Br.10. It doesn't. *Bush v. Gore* concerned the "unique[]" election for the President, not a state election where "comity and respect for federalism compel us to defer to the decisions of state courts on issues of state law." 531 U.S. 98, 112 (2000) (Rehnquist, C.J., concurring) (cleaned up). Justice Riggs argues *Bush* applies to "state" elections. Riggs 1st Br.15-16. But the one case she cites in support discussed the one-person-one-vote principle of *Reynolds v. Sims*, not *Bush v. Gore*. Riggs 1st Br.15-16 (citing *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016)).

16

Even if *Bush* applies to state elections, the case concerned a "standardless" recount. 531 U.S. at 103. The North Carolina Supreme Court ordered a notice-and-cure period of 30 days to allow overseas voters to "cure deficiencies arising from lack of photo identification or its equivalent." *Griffin II*, 2025 WL 1090903, at *3. The standard is clear: provide photo-ID or its equivalent as required under "N.C.G.S. §163-230.1." *Id.* The North Carolina Supreme Court's order isn't "arbitrary," and it can't be said to contain "no standards at all." *Contra* NCDP 1st Br.18; LWV 1st Br.14. It merely requires the photo-ID standard in state law be followed. *Griffin II*, 2025 WL 1090903, at *3 (citing N.C.G.S. §163-230.1). Movants admit those same laws can apply prospectively, Riggs 1st Br.15, which concedes that the laws have sufficient standards to pass *Bush v. Gore*. They are also the same standards that applied to everyone voting on Election Day or casting absentee ballots domestically in the 2024 election. The North Carolina Supreme Court merely clarified the application to all voters.

Movants argue that because the Court's order may apply only to "certain counties," it violates *Bush v. Gore*. NCDP 1st Br.18. But Movants misunderstand that decision. The Supreme Court intervened to address "whether the use of standardless manual recounts" violates the Equal Protection Clause. *Bush*, 531 U.S. at 103. When conducting the manual recount, the counting teams had to determine whether to count as legal votes instances where the vote was ambiguous. *Id.* at 106. The county canvassing boards disagreed how to interpret the ambiguous votes, resulting in "the unequal evaluation of ballots in various respects" throughout the affected counties. *Id.* "[T]he

standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." *Id.* at 530-31.

Here, "there is no allegation or evidence of different standards being applied by election officials to accept or reject contested ballots. Instead, it appears that election officials [will] appl[y] the same statutory standard." *Taft v. Cuyahoga Cty. Bd. of Elections*, 854 N.E.2d 472, 477-78 (Ohio 2006) (ordering recount of "only one precinct" doesn't violate equal protection under *Bush v. Gore*). The photo-ID standard is uniform under state law and will not vary in its implementation from official to official. N.C.G.S. §163-230.1. There are no hanging chads here.

The North Carolina Supreme Court "did not need to order a recount of all of the precincts" because the "election contest was specifically limited" to certain "precinct[s]." *Taft*, 854 N.E.2d at 478. To the extent "other counties" experienced problems, "they may be resolved in separate litigation." *Cf. Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011). But the North Carolina Supreme Court's order does "not, through arbitrary and disparate treatment, 'value one person's vote over that of another.'" *Taft*, 854 N.E.2d at 478 (quoting *Bush*); *see also Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 386 (W.D. Pa. 2020) (Pennsylvania's use of unmanned drop boxes for mail-in ballots by some counties, but not others, did not violate equal protection under *Bush v. Gore*); *Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F. Supp. 2d 684, 699 (W.D. Pa. 2003) ("[T]his is not a situation like the manual

recount process in *Bush v. Gore*, where different county canvassing election board members were applying different standards *at the same time* in defining a legal vote.").

Even where a court's order applies to "only one jurisdictional entity," there is no *Bush v. Gore* claim because it is "not a situation in which a court is announcing a standard to be interpreted differently by multiple jurisdictions, resulting in the unequal counting of votes across counties." *Cf. Hunter*, 635 F.3d at 241. When a court orders review of "all deficient" ballots "within the county under the same standard," that order, unlike the one in *Bush*, "does not give rise to inter-jurisdictional differences in how the order is implemented." *Id.* In this case, North Carolina's Supreme Court ordered review of the deficient absentee ballots in certain counties "under the same standard" established by state law. *Id.*; *Griffin II*, 2025 WL 1090903, at *3 (citing N.C.G.S. §163-230.1). So there is no *Bush v. Gore* claim.

## IV. Movants admit that the NVRA's text doesn't "technically" cover the conduct here.

When this case first came before it, the Court "[did] not agree" that "the NVRA precludes" a State from "acting in the context of a state election." Doc.50 at 19, No. 5:24-cv-724. The Court dismissed the case on jurisdictional grounds, but the merits of Movants' NVRA claims are now before the Court. And as this Court observed in January, the NVRA "govern[s] *only* federal elections." Doc.50 at 7-8, No. 5:24-cv-724 (citing *Young v. Fordice*, 520 U.S. 273, 275 (1997)).

Movants ask the Court to backtrack, arguing that the NVRA applies to state elections because North Carolina has a "unified registration system for both state and federal elections." NCDP 1st Br.19n.3. This Court dispensed with that argument, noting that North Carolina's "unified system is a choice" and "nothing in federal law compels North Carolina to adopt" such "procedures for state and local elections." Doc.50 at 8, No. 5:24-cv-724 (cleaned up). Congress doesn't have constitutional authority to regulate state elections; the NVRA can no more preempt conduct of state elections than can UOCAVA or HAVA, as Section V explains. *Id.* So "to the extent North Carolina election law for state and local elections mirrors or parallels federal law, that symmetry is state-created, not federal." *Id.*

Even if the NVRA did apply to State elections, Movants admit the statute's plain text isn't violated by the North Carolina Supreme Court's order. BOE 1st Br.19. After all, the NVRA applies only to removals from official registration "lists"—not to counting ballots. 52 U.S.C. §20507(c)(2)(A). It applies to "election[s] for Federal office"—not State office. *Id.* It applies "90 days prior" to an election—not after. *Id.* And it applies to "program[s]" that "systematically remove names" from the rolls—not episodic election contests. *Id.* Movants admit that "technically" the NVRA's text doesn't apply, asking the Court to look instead to the "purpose" of the NVRA's 90-day provision, which they believe is to prevent "discriminatory" removals. BOE 1st Br.18. But "[i]t is the statutory text … that best reflects Congress's intent," and Movants'

"policy concerns … cannot surmount the plain language of the statute." *Republic of Hungary v. Simon*, 145 S. Ct. 480, 497 (2025) (cleaned up).

Even if the Court were inclined to consider policy arguments, Movants ignore that Congress enacted the NVRA "to protect the integrity of the electoral process." 52 U.S.C. §20501(b)(3). Congress didn't "intend to bar the removal" of persons who were "improperly registered to vote in the first place." *Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir. 2004).

## V. UOCAVA doesn't apply to state elections.

The Uniformed and Overseas Citizens Absentee Voting Act refutes Justice Riggs' assertion that "overseas voters who are covered by UOCAVA are exempt … from state requirements that they provide a copy of a photo ID." Riggs 1st Br.28. UOCAVA "appl[ies] only to absentee ballots used to elect candidates for federal office." *Doe*, 746 F. Supp. at 671. It sets rules for overseas voters who vote "in general elections for *Federal office*." 52 U.S.C. §20302(a)(3) (emphasis added). And "UOCAVA defines precisely which elections are elections for 'Federal office.'" *United States v. Alabama*, 778 F.3d 926, 932 (11th Cir. 2015). They are "the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress." 52 U.S.C. §20310(3). That definition does not include the office of North Carolina Supreme Court Justice.

In any event, the provision Justice Riggs relies on (§21083) is part of the Help America Vote Act, not UOCAVA. Riggs 1st Br.28. But HAVA, too, establishes

requirements for "voting system[s] used in an election for *Federal* office." 52 U.S.C. §21081(a) (emphasis added). Like UOCAVA, Congress passed HAVA under its "constitutional authority to regulate federal elections." *Reschenthaler v. Schmidt*, 2024 WL 4608582, at *1 (M.D. Pa. Oct. 29, 2024). But that authority does not extend to state elections. U.S. Const. art. I, §4. That's why "HAVA applies" only to "election[s] to federal offices." *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1325 (10th Cir. 2008); *Broyles v. Texas*, 618 F. Supp. 2d 661, 692-93 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010) (dismissing claim under 52 U.S.C. §21082). Even the 2017 opinion letter from the director of the Federal Voting Assistance Program cited by Justice Riggs acknowledges that the program enforces UOCAVA's requirements for "federal elections," *Letter from Director Beirne to Comm'r Cortes* (Feb. 6, 2017), perma.cc/2BSZ-VUJ4, and it addressed a law that applied to federal elections, *see* Va. Code §24.2-701. It does not support overruling a state court decision about ballot-casting in state elections.

## VI. The Voting Rights Act doesn't require counting the ballots of unqualified voters.

Justice Riggs and the Board of Elections spend a couple sentences each arguing that the state court judgment violates the Voting Rights Act. *See* Riggs 1st Br.28; BOE 1st Br.18. They point out that the Voting Rights Act prohibits state officials from "willfully fail[ing] or refus[ing] to tabulate, count, and report" the votes of individuals who are "qualified to vote." 52 U.S.C. §10307(a). But voters who have never resided in

North Carolina "are not eligible to vote in North Carolina, non-federal elections." *Griffin I*, 2025 WL 1021724, at *15. They are, in other words, not "qualified to vote." 52 U.S.C. §10307(a). As for the overseas voters, each one will have the opportunity to have their vote counted by complying with the state photo-ID requirement.

In any event, the VRA doesn't prohibit States from enforcing ballot-casting rules. Section 10307(a) reaches only state officials who "willfully fail or refuse to tabulate, count, and report" a qualified "person's vote." *Id.* A state official rejecting noncompliant ballots does not "willfully fail or refuse" to count a vote. An official who excludes an absentee ballot because it arrives after election day couldn't be said to "willfully fail or refuse" to count the ballot—state law *requires* the ballot's exclusion. *See* N.C.G.S. §163-231(b)(1). That understanding is bolstered by the fact that §10307(a) applies to "person[s] acting under color of law," not to States generally. Section 10307(a) thus doesn't preempt law—it forbids state officials from "willfully fail[ing] or refus[ing]" to abide by state law. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 249 (1996) (Kennedy, J., dissenting) ("Congress demonstrated its ability to distinguish between the State and other actors.").

Movants cite no authority applying the VRA to require States to count invalid ballots. But their argument would require the counting of ballots even if an absentee voter doesn't mark her ballot in front of a "notary public" or two witnesses, N.C.G.S. §163-231, or an absentee voter doesn't place the ballot in the "container-return envelope," accompanied by the witness certificate, *id.*, or an absentee ballot arrives after

"7:30 P.M. on the day of the … election," *id.*, or a voter writes in "a candidate who has failed to qualify … as a write-in candidate," *id.* §163-182.1(a)(6). The Third Circuit recently rejected a similarly expansive interpretation of the Civil Rights Act, "find[ing] it implausible that federal law bars a State from enforcing vote-casting rules that it has deemed necessary to administer its elections." *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 135 (3d Cir. 2024), *cert. denied*, __ S.Ct. __, 2025 WL 247452 (Jan. 21, 2025). Movants' two-sentence VRA argument fails for the same reason.

Movants' VRA claim fails for yet another reason: neither the Board nor Justice Riggs have standing to obtain relief under the VRA. Only the Attorney General or an "aggrieved person" may institute a proceeding under the VRA. 52 U.S.C. §10302. "It is well-settled that unsuccessful candidates lack standing to sue under the Voting Rights Act of 1965." *White-Battle v. Democratic Party of Va.*, 323 F. Supp. 2d 696, 702 (E.D. Va. 2004), *aff'd*, 134 F. App'x 641 (4th Cir. 2005).

## VII. Accepting a person's sworn statement that they're not a resident does not violate the Civil Rights Act.

VoteVets alone alleges that the North Carolina Supreme Court's decision violates the materiality provision of the Civil Rights Act. *See* VV 1st Br.18. "Until recently, the Materiality Provision received little attention from federal appellate courts." *Pa. State Conf. of NAACP*, 97 F.4th at 127. The text prohibits state officials "acting under color of law" from "deny[ing] the right of any individual to vote" due to "an error or omission" on a voting record "if such error or omission is not material in determining

whether such individual is qualified under State law to vote in such election." 52 U.S.C. §10101(a)(2)(B). The provision outlaws disqualifying voters for "hyper-technical errors" that were used "to disqualify African Americans from voting in federal elections." *Pa. State Conf. of NAACP*, 97 F.4th at 126 (cleaned up) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966)). Early cases, for example, concerned registrars who rejected voter-registration applicants "for failing to calculate their age to the day, misspelling 'Louisiana,' [or] underlining 'Mr.' when it should have been circled." *Id.* (cleaned up).

The term "material" in the Civil Rights Act is broad. The materiality provision doesn't define "material," so the word takes on its "ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). Material means "relevant," "pertinent," or "requiring serious consideration by reason of having a certain or probable bearing on the proper determination of a law case." *Material*, Webster's Third New Int'l Dictionary (1976); *see also Material*, The Oxford English Dictionary (1961) ("[o]f serious or substantial import," or, as to legal matters, "likely to influence the determination of a cause"). The Fifth Circuit "reject[ed] 'essential' as a reasonable meaning." *Vote.Org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023). And the Ninth Circuit requires merely "a probability of affecting an election official's eligibility determination." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 720 (9th Cir. 2025). VoteVets offers no alternative definition.

Under these definitions, North Carolina's residency requirement is "material" to a voter's qualifications. VoteVets doesn't dispute that residency is a basic requirement

to vote in North Carolina elections. *See* N.C. Const. art. VI, §2. VoteVets acknowledges that each Never Resident signed a "Voter Registration and Absentee Ballot Request" form that requested residency information. *See* VV 1st Br.19. And each Never Resident affirmed "under penalty of perjury" that they are "a U.S. citizen living outside the country," and "have never lived in the United States." *Voter Registration and Absentee Ballot Request*, perma.cc/ZE3N-C4V6. A voter's sworn testimony that they have never lived in the United States is at least "relevant" to—if not entirely dispositive of—whether they have lived in North Carolina. *Material*, Webster's, *supra*. In fact, the Board of Elections uses that same "sworn declaration" as dispositive proof "affirming [the] voter's identity and eligibility to vote." BOE Resp. Br. at 63-64, *Griffin I*, No. COA25-181 (N.C. Ct. App. Feb. 27, 2025), *available at* perma.cc/UB5A-3ASE.

VoteVets speculates that some of those voters might have *accidentally* affirmed that they "have never lived in the United States," and therefore made an "error" that's not material. *See* VV 1st Br.18-20. "The mistaken premise in this argument is that the materiality provision refers to the nature of the error rather than the nature of the underlying information requested." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1174-75 (11th Cir. 2008). By making the error about whether the voter "happened to check a particular box," VoteVets divorces the error from the information it conveys. VV 1st Br.18. If VoteVets "were correct and materiality refers to the fact of the error itself, then no error would ever be material because an error by definition mistakenly and *incorrectly* represents the underlying substantive element of eligibility." *Browning*, 522

F.3d at 1174-75. A voter who "happened to check" the box for the wrong candidate, VV 1st Br.18, for example, doesn't get a chance to change her vote even if that mark was an "error" on a piece of "paper," 52 U.S.C. §10101(a)(2)(B). VoteVets' interpretation would require election officials to divine each voter's secret intent behind each mark, not accepting any of those marks as true on their face. "A more sound interpretation" of the materiality provision "asks whether, accepting the error as *true and correct*, the information contained in the error is material to determining the eligibility of the applicant." *Browning*, 522 F.3d at 1175. And accepting the "error as true and correct," *id.*, the Never Residents all testified that "they have never resided in North Carolina," *Griffin I*, 2025 WL 1021724, at *13.

VoteVets would turn the materiality provision into a hypothetical-evidence provision. They argue that "local election officials ... may possess independent and conclusive evidence of a voter's prior North Carolina residence." VV 1st Br.19. But the materiality provision doesn't prohibit election officials from relying on a voter's sworn statement just because they "may" have access to other information. *Contra* VV 1st Br.19. Much less does it *oblige* election officials to search for other evidence just because they find a voter not qualified. Nor does VoteVets provide any reason why election officials should prefer other evidence—which could itself contain "errors" or "omissions"—to the voter's contemporaneous sworn statement. At a minimum, that sworn statement "tends to make it more likely that the applicant is not a qualified voter," even considering other evidence to the contrary. *Browning*, 522 F.3d at 1174;

*accord Mi Familia Vota*, 129 F.4th at 720 (the statement "has a probability of affecting an election official's eligibility determination"). The statement is thus "material." 52 U.S.C. §10101(a)(2)(B).

*Mi Familia Vota* doesn't support VoteVets' preferred-evidence test. There, the Ninth Circuit held that requiring voters to check a box indicating citizenship violated the materiality provision when a voter had "already provided [documentary proof of citizenship]." 129 F.4th at 720-21. It reached that conclusion only because documentary proof was "sufficient to show citizenship" under state law. *Id.* at 721. The citizenship checkbox had "no probable impact in determining applicant's eligibility to vote" when the voter provided documentary proof of citizenship. *Id.* Other courts have rejected the notion that a requirement is not "material" just because it's "duplicative." *E.g.*, *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1212-13 (S.D. Fla. 2006). But VoteVets has not identified contemporaneous evidence "already provided" by the voter that North Carolina deems "sufficient" to prove residency. *Mi Familia Vota*, 129 F.4th at 721. A "past registration form" or "voter history" show that the voter *has* voted—not that he was *qualified* to vote in those elections. *Contra* VV 1st Br.21. And documents or "sworn statement[s]" provided after the fact, VV 1st Br.21, are not evidence "already provided" to the State, *Mi Familia Vota*, 129 F.4th at 720-21. VoteVets' view would transform a materiality requirement into a mandate to search for evidence to contradict material, disqualifying information that a voter has submitted under penalty of perjury.

## VIII. Movants don't carry their burden on summary judgment, and dismissal is appropriate.

Each group of Movants appears to request a final judgment on the merits. VoteVets understands this Court's order as requesting "cross-motions for summary judgment," and thus demands that the Court "permanently enjoin" the Board of Elections from complying with the North Carolina courts' judgments. VV 1st Br.6. The League of Women Voters, Democratic Party, and Board of Elections each request "permanent injunctive relief," with some minor differences in how to tailor the injunction. LWV 1st Br.8; NCDP 1st Br.24; BOE 1st Br.19. Justice Riggs does not say whether she seeks a permanent injunction, preliminary injunction, declaratory relief, or some other remedy, but requests that the Court "enter judgment in [her] favor … stating that federal law bars Judge Griffin's efforts to overturn the November 2024 general election for Seat 6 on the Supreme Court of North Carolina." Riggs 1st Br.29. If the Court were to rule in Movants' favor on any claims, deciphering the appropriate relief would prove tricky. Dismissing them is easy: the Court should enter a final judgment dismissing all claims and close the cases.

Construing the briefs as requests for final judgments, all Movants accept their heightened burden. "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Elderberry of Weber City, LLC v. Living Centers-Se., Inc.*, 794 F.3d 406, 411 (4th Cir. 2015) (quotation omitted). And to obtain a permanent injunction, Movants must both prevail

on the merits, and show that they will suffer "an irreparable injury" absent relief, "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury," that "the balance of hardships" tilts in their favor, and "that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Even if Movants prevail "upon this showing, whether to grant the injunction still remains in the 'equitable discretion' of the court." *Christopher Phelps & Assocs. v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (quoting *eBay*, 547 U.S. at 391).

Justice Riggs, the Board of Elections, and VoteVets make no argument on the equitable factors, which is reason enough to deny their requests for relief. The League of Women Voters quotes Justice Scalia's *Bush v. Gore* concurrence out-of-context to suggest that the "cure process" will cause irreparable harm by "'cast[ing] a cloud'" upon the "'legitimacy of [t]his election.'" LWV 1st Br.23-24. But Justice Scalia's opinion underscores the irreparable harm to Judge Griffin and the rest of the voters of North Carolina who cast their votes legally: "The counting of votes" of "questionable legality" is what "threaten[s] irreparable harm" to "the country, by casting a cloud upon" the "legitimacy" of the election. *Bush*, 531 U.S. at 1046-47 (Scalia, J., concurring).

The balance of equities and public interest are best served by allowing the North Carolina courts to enforce the law adopted by the North Carolina General Assembly. Movants worry about voter confusion. LWV 1st Br.26; NCDP 1st Br.11. But "this die was cast long ago." *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020). "Voter

30

confusion was inevitable" once the State Board of Elections "issued guidance to voters that was directly in contradiction to [North Carolina] election law. An orderly process was hopelessly compromised when [the Board] usurped the authority of the Legislature." *Id.* In the end, "it is in the public interest" to "separate and count only those ballots cast according to law." *Id.*

## CONCLUSION

The Court should deny the motions and dismiss the cases.

This 25th day of April, 2025.

Respectfully submitted,

*/s/ Thomas R. McCarthy*

Craig D. Schauer
41571 (NC)
Dowling PLLC
3801 Lake Boone Trial
Suite 260
(919) 529-3351
cschauer@dowlingfirm.com

Troy D. Shelton
48070 (NC)
Dowling PLLC
3801 Lake Boone Trial
Suite 260
(919) 529-3351
tshelton@dowlingfirm.com

W. Michael Dowling
42790 (NC)
Dowling PLLC
3801 Lake Boone Trial
Suite 260
(919) 529-3351
mike@dowlingfirm.com

Thomas R. McCarthy*
Conor D. Woodfin*
William Bock IV*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
conor@consovoymccarthy.com
wbock@consovoymccarthy.com

*Appearing under Local Rule 83.1(d)*

*Counsel for Judge Griffin*

## CERTIFICATE OF COMPLIANCE

This document complies with Local Rule 7.2(f)(2) because it contains less than 8,400 words excluding the parts that can be excluded.

*/s/Thomas R. McCarthy*

## CERTIFICATE OF SERVICE

I certify that I electronically filed this brief using the court's CM/ECF system and that I have electronically mailed the documents to all non-CM/ECF participants.

*/s/Thomas R. McCarthy*