# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| JEFFERSON GRIFFIN,<br>    *Plaintiff*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS,<br>    *Defendant*,<br><br>and<br><br>ALLISON RIGGS, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, and JUANITA ANDERSON,<br>    *Intervenor-Defendants*. | Case No. 5:24-cv-00731-M-RJ<br><br>**AMENDED ANSWER AND CROSSCLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF (Lack of Photo Identification for Overseas Voters Petition)** |
| NORTH CAROLINA DEMOCRATIC PARTY,<br>    *Plaintiff*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS et al.,<br>    *Defendants*. | Case No. 5:24-cv-00699-M-KS |
| CARRIE CONLEY et al.,<br>    *Plaintiffs*,<br><br>v.<br><br>ALAN HIRSCH et al.,<br>    *Defendants*. | Case No. 5:25-cv-00193-M-RJ |

## VOTEVETS ACTION FUND, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, TANYA WEBSTER DURHAM, SARAH SMITH, AND JUANITA ANDERSON'S AMENDED ANSWER TO PLAINTIFF'S VERIFIED PETITION FOR JUDICIAL REVIEW (LACK OF PHOTO IDENTIFICATION FOR OVERSEAS VOTERS PETITION) AND CROSSCLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF

Intervenor-Defendants the North Carolina Alliance for Retired Americans ("the Alliance"), VoteVets Action Fund ("VoteVets"), Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (together, "VoteVets Intervenors") answer Plaintiff's Verified Petition for Judicial Review ("Lack of Photo Identification for Overseas Voters Petition"),[1] *see* ECF No. 1-12, as follows:

The Petition begins with an unnumbered paragraph to which no response is required. To the extent a response is required, VoteVets Intervenors incorporate by reference the below paragraphs as their response, deny the allegations, and deny that Plaintiff is entitled to any relief.

## INTRODUCTION

1.      VoteVets Intervenors admit that on December 13, 2024, the State Board of Elections dismissed three categories of election protests and that Plaintiff's Lack of Photo Identification for Overseas Voters Petition, ECF No. 1-12, seeks judicial review of the State Board's dismissal of one of those protests. VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 1 and therefore deny them. The remainder of Paragraph 1 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny the allegations.

## PARTIES AND NATURE OF THE ACTION

2.      VoteVets Intervenors admit that Plaintiff is a judge on the North Carolina Court of Appeals, and that he was the Republican candidate in the 2024 general election for Seat 6 of the Supreme Court of North Carolina. The remainder of Paragraph 2 contains legal contentions,

---

[1] This challenge is sometimes referred to elsewhere as the UOCAVA ID Challenge. VoteVets Intervenors refer to it in this Answer as the Lack of Photo Identification for Overseas Voters challenge —as Judge Griffin does in his petition. VoteVets Intervenors do not agree, however, that any of the challenged voters were required to submit photo identification to vote in North Carolina.

characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny the allegations.

3.      Admitted.

4.      Paragraph 4 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, admitted.

5.      Paragraph 5 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors admit that Allison Riggs is the Democratic nominee for associate justice of the North Carolina Supreme Court. VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 5 and therefore deny them.

## JURISDICTION AND VENUE

6.      Paragraph 6 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors admit that the cited statute contains the quoted text and deny the remaining allegations in Paragraph 6.

7.      VoteVets Intervenors admit that on December 13, 2024, the State Board of Elections entered a final decision dismissing three categories of election protests. VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 7 that "the decision was placed in the mail for service on Judge Griffin via FedEx on 13 December 2024," and therefore deny them. The remainder of Paragraph 7 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny the allegations.

8. Paragraph 8 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 8 and therefore deny them.

## BACKGROUND

9. VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 9 and therefore deny them.

10. The cited document speaks for itself. Further, Paragraph 10 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors admit that the State Board of Elections assumed jurisdiction over three categories of protests, and deny the remaining allegations in Paragraph 10.

11. Admitted.

12. Paragraph 12 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors admit the Board considered the adequacy of Judge Griffin's service of the protests on voters, but otherwise deny the remaining allegations in Paragraph 12.

13. Paragraph 13 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny the allegations.

14. Paragraph 14 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets

Intervenors admit that the cited code contains the quoted text and deny the remaining allegations in Paragraph 14.

15.     Paragraph 15 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 15 and therefore deny them.

16.     Paragraph 16 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors admit that the State Board of Elections concluded, "by a vote of 3 to 2, that the protests were not properly served on affected parties required to receive service of copies of the protest filings and therefore do not substantially comply with N.C.G.S. § 163-182.9," Ex. A, Decision & Order 14, ECF No. 1-12, and deny the remaining allegations in Paragraph 16.

17.     Paragraph 17 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors admit that county election boards accepted ballots from overseas absentee voters pursuant to the rules and requirements issued by the Legislature and State Board. VoteVets Intervenors otherwise lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 17 and therefore deny them.

18.     Paragraph 18 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny the allegations.

19.     Paragraph 19 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny the allegations.

20.     VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 20 and therefore deny them. The remainder of Paragraph 20 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny the allegations.

21.     Paragraph 21 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors admit that the State Board of Elections concluded "by a 5 to 0 vote, that this category of protests fails to allege a violation, irregularity, or misconduct in the conduct of the general election," Ex. A, Decision & Order 39, ECF No. 1-12, and deny the remaining allegations in Paragraph 21.

### EXCEPTIONS AND GROUNDS FOR RELIEF

22.     Paragraph 22 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny the allegations.

23.     VoteVets Intervenors deny Plaintiff's "exceptions to the decision" of the State Board of Elections.

24.     Paragraph 24 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny Plaintiff's "exception."

25.     The cited document speaks for itself. Further, Paragraph 25 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny Plaintiff's "exception."

26.     The cited document speaks for itself. Further, Paragraph 26 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny Plaintiff's "exception."

27.     The cited document speaks for itself. Further, Paragraph 27 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny Plaintiff's "exception."

28.     The cited document speaks for itself. Further, Paragraph 28 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny Plaintiff's "exception."

29.     The cited document speaks for itself. Further, Paragraph 29 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny Plaintiff's "exception."

30.     Paragraph 30 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, VoteVets Intervenors deny Plaintiff's "exception."

## RELIEF SOUGHT

VoteVets Intervenors deny that Plaintiff is entitled to any relief.

## GENERAL DENIAL

VoteVets Intervenors deny every allegation in Plaintiff's Verified Petition for Judicial Review that is not expressly admitted herein.

## AFFIRMATIVE DEFENSES

1. Plaintiff's claims are barred because they seek relief inconsistent with the United States Constitution.

2. Plaintiff's claims are barred because Plaintiff seeks relief inconsistent with federal and state law.

3. Plaintiff's claims are equitably barred, including (but not limited to) because of laches.

4. Plaintiff has waived the right to bring some or all of his claims.

5. Plaintiff has failed to state an adequate claim for relief.

6. VoteVets Intervenors reserve the right to amend this Answer at a later time.

WHEREFORE, having fully answered Plaintiff's Verified Petition for Judicial Review, VoteVets Intervenors pray for judgment as follows:

A. That judgment be entered in favor of VoteVets Intervenors and against Plaintiff on Plaintiff's Verified Petition for Judicial Review and that Plaintiff takes nothing thereby;

B. That VoteVets Intervenors be awarded reasonable attorneys' fees and costs under any applicable statute or equitable doctrine; and

C. For such other and further relief as the Court deems appropriate.

## VOTEVETS INTEVENORS' CROSSCLAIMS AGAINST THE NORTH CAROLINA BOARD OF ELECTIONS

1. VoteVets Intervenors assert their crossclaims against defendant North Carolina State Board of Elections ("State Board" or "Board") as follows:

## INTRODUCTION

2. Before voting began in the November 2024 general election, North Carolina's rules of the road for casting and counting ballots were set and clear. Pursuant to those rules, millions of eligible voters exercised their fundamental right to vote in last year's general election, including in the contest for Associate Justice of the North Carolina Supreme Court.

3. After voting ended and the votes were tallied, it became evident that Judge Jefferson Griffin lost the race for Associate Supreme Court Justice to incumbent Justice Allison Riggs by over seven hundred votes.

4. Instead of accepting his loss, Judge Griffin filed hundreds of challenges in virtually every county in the state. These challenges demanded retroactive changes to election rules that would result in the disenfranchisement of thousands of voters who had already cast their ballots in the general election.

5. Each of the challenged voters had every reason to expect their vote would count. None could have foretold that—nearly half a year later—they would be disenfranchised. Worse yet, many of the targeted voters are serving in our military, and it is undisputed that all of them obeyed the rules as they existed on election day.

6. As relevant here, Judge Griffin challenges the votes of 1,409 overseas voters who voted under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"). Judge Griffin argues these voters should have provided copies of their photo identification with

their ballots, notwithstanding that the Board's rules have exempted UOCAVA voters from this requirement since at least 2020.

7. This brazen attempt to rob these voters of their validly cast ballots is astounding. It is a bedrock principle that the right to vote "is a fundamental matter in a free and democratic society," and is "preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964). The U.S. Supreme Court has thus "repeatedly recognized that all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Id.* at 554.

8. If the State Board is ordered to remove these votes from the ballot count, unsuspecting voters across the State who followed the law as it existed at the time of the election will suddenly be disenfranchised.

9. The Constitution's guarantees of due process, equal protection, and the right to vote, clearly bar Griffin's demand to toss out the ballots of thousands of rule-following voters based on novel, post-election interpretations of state law, which Griffin only seeks to apply to some voters, in hopes of obtaining an electoral advantage.

10. Our federal Constitution and this Circuit's precedents prohibit Griffin's effort to "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon v. N. Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (citation omitted). Any other conclusion would incentivize *every* losing candidate to behave as Griffin has, launching an endless effort to retroactively change election rules.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over the crossclaims of VoteVets Intervenors under 28 U.S.C. § 1331, as they arise under the First and Fourteenth Amendments of the U.S. Constitution.

12.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a) and 42 U.S.C. § 1983, as Plaintiffs seek equitable and declaratory relief to protect the right to vote.

13.     This Court has personal jurisdiction over the State Board, which is a state agency of North Carolina located within the state.

14.     Venue in this Court is proper under 28 U.S.C. § 1391(b). The North Carolina Board of Elections, which assumed jurisdiction over Judge Griffin's protests giving rise to these claims, is located in this district. A substantial portion of the violations of federal law at issue occurred and will occur in this district because some voters Judge Griffin claims to have challenged are registered and cast their votes in this district. These voters' ballots were tallied by their respective county boards of elections in this district as well.

15.     Crossclaims are appropriate because VoteVets Intervenors' claims arise out of the same transaction or occurrence that is the subject matter of Judge Griffin's petition here.

16.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202. The Court also has authority to enter a declaratory judgment and provide injunctive relief under Federal Rules of Civil Procedure 57 and 65.

## FACTUAL BACKGROUND

17.     In November 2024, millions of voters across North Carolina cast ballots in the election for Associate Justice on the North Carolina Supreme Court. After the votes were counted, Justice Riggs prevailed over Judge Griffin by over 700 votes.

18.     Judge Griffin requested a recount, which was completed on December 3, 2024. The recount again confirmed Justice Riggs's victory.

19.     Dissatisfied with these results, Judge Griffin filed over 300 election protests in almost every county across the state. These sweeping protests collectively sought to disenfranchise over 60,000 North Carolinians who cast ballots in the Supreme Court race.

20.     As relevant here, Judge Griffin challenges the votes of 1,409 overseas voters registered in Guilford County who voted under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"). Judge Griffin challenges these voters because they did not provide copies of their photo identification with their ballots, notwithstanding that the Board has prescribed rules that exempted UOCAVA voters from this requirement since at least 2020. *See* 8 N.C. Admin. Code 17.0109.

21.     Judge Griffin purported to notify each challenged voter by sending them a postcard which was addressed to the voter "or current resident," and contained a QR code that mobile smartphone users could scan and then be redirected to the North Carolina Republican Party webpage. Even if a voter received the postcard, recipients without internet access, smartphones, or familiarity with QR Code technology could not access additional information, including any of the protest filings made against their ballots.

22.     The Board unanimously rejected Judge Griffin's UOCAVA ID Challenge, concluding that state law and relevant regulations explicitly exempt military and overseas voters from providing identification when returning their absentee ballots. Ex. A, Decision & Order 14, ECF No. 1-4 at 32-37.

23.     Nonetheless, the state courts ordered the presumptive disenfranchisement of these voters. The North Carolina Court of Appeals concluded that all absentee voters in non-federal

elections in North Carolina are obligated, under state law, to provide copies of their photo ID when returning their ballots. *Griffin v. N. Carolina State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *12 (N.C. Ct. App. Apr. 4, 2025). Because the challenged UOCAVA voters did not comply with this requirement, their votes were deemed presumptively invalid. *Id.* at *15. The court instructed the Board to give these voters 15 business days to cure by submitting copies of their identification to election officials. *Id.*

24.     After various parties sought discretionary review of the Court of Appeals order, the Supreme Court of North Carolina ruled on the parties' petitions for discretionary review. *See generally Griffin v. N. Carolina State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025). The Supreme Court of North Carolina affirmed the order of the North Carolina Court of Appeals with the modification that voters should have 30 calendar days instead of 15 business days to cure deficiencies. *Id.* at *3.

## PARTIES

25.     VoteVets is a national non-profit organization dedicated to elevating the voices of veterans and their families on issues that affect the lives of those who serve and have served in the Armed Forces, including on issues like veterans' care. VoteVets serves all active servicemembers, including those North Carolinians deployed away from home, as well as veterans. Over 1.5 million subscribers receive VoteVets' communications, including thousands of North Carolinians. Increasing voter turnout among military and veteran voters, along with their families, especially those who are overseas, is critical to VoteVets' mission. Furthermore, VoteVets believes that turning out the veteran vote benefits all Americans by engaging citizens who have served their country in the civic process, and aims to promote turnout among all veterans, regardless of their political beliefs.

26.     Many of VoteVets' constituents are servicemembers and their family members who reside outside of North Carolina and are fully reliant on laws like UOCAVA and UMOVA to exercise the franchise. VoteVets dedicates significant resources, including funding, personnel time, and volunteer effort, to ensure these voters can participate in the franchise.

27.     Working with its partners, VoteVets has developed a first-of-its kind military voter file containing approximately 14 million records of veterans and military family members, including records for thousands of voters in North Carolina. VoteVets uses this voter file to contact military voters and ensure they cast valid ballots. In the 2024 general election, VoteVets sent over 2.5 million texts to 1.5 million military voters, including those overseas, and saw a substantial increase in turnout participation among contacted voters. Given the importance of laws like UOCAVA and UMOVA to VoteVets' constituencies, these efforts often focused on educating military voters about how to properly submit their ballots under these laws, such that their votes will be counted.

28.     Judge Griffin's challenges threaten to disenfranchise VoteVets' voters who participated in the 2024 election according to UOCAVA and UMOVA with the rightful expectation that their ballots would be counted. In turn, Griffin's challenges also frustrate VoteVets' mission to increase political participation among servicemembers, veterans, and their families. Moreover, by seeking to change the rules of the game after the election concluded, Judge Griffin's challenges frustrate VoteVets' ability to reliably provide military voters and their families with accurate information about to how to vote. VoteVets cannot reliably educate military voters and their families about how to vote if those rules are subject to challenges after-the-fact.

29.     If North Carolina implements a cure process now, it will require VoteVets to rapidly deploy scarce resources to help its constituents and supporters ensure their ballots are

counted. To protect its constituents and supporters from disenfranchisement, VoteVets will be forced to: (1) conduct outreach to its constituents and supporters deployed abroad who have been swept up in the election protests, (2) make sure they received notice about the cure process from election officials, and (3) educate those challenged constituents about the cure process and how to timely cure their ballots.

30.     These resources would otherwise have gone to other mission-critical efforts that will suffer as a result because VoteVets will have less money and personnel resources available to spend in these efforts.

31.     Despite VoteVets' best efforts, their military voters stand to be disenfranchised by any new cure program at this point. First, it is unclear that these challenged voters can even be reached. Servicemembers and their families are often deployed or traveling for extended periods. They may have also relocated since the election, which occurred nearly half a year ago. Even if they can be contacted, many servicemembers deployed abroad are unlikely to have access to the required photo identification, the technology to submit their identification to the election officials, or both. These voters had no reason to have prepared themselves for complying with such a requirement given that the election was more than five months ago and the rules they voted under did not require sending copies of their photo identification. Even the voters who can be reached and possess the necessary documents and access to technology may be discouraged from jumping through these extra hoops, months after they complied with all of the existing election rules.

32.     This belated cure program is also likely to discourage these voters from voting in future elections. Military voters already vote at low rates compared to their civilian counterparts. Federal data shows that active military members are registered to vote, and actually successfully cast ballots, at significantly lower rates than civilians. These disparate rates in registration and

turnout have been traced to unique obstacles that active military members face in accessing the voting system, including the difficulties these voters face in receiving mail ballots in time to vote them, and getting them returned to election officials in time for them to be counted. If VoteVets' voters are subjected to a belated cure targeted at only select military voters, they will be less likely to vote in future elections, further frustrating VoteVets' mission to civically engage military voters and their families.

33.     The North Carolina Alliance for Retired Americans (the "Alliance") is a 501(c)(4) nonprofit social welfare organization incorporated in North Carolina. It is a chartered state affiliate of the Alliance for Retired Americans, a nationwide grassroots organization with more than 4.3 million members. The Alliance has approximately 58,000 members across North Carolina, most of whom are retirees over the age of 65. The Alliance's mission is to ensure social and economic justice and full civil rights for retirees. To further that mission, the Alliance works to protect the rights of its members to vote and to have their votes counted. The Alliance has strong interests in ensuring that the greatest number of its members are allowed to vote and have their votes counted and in advocating for policies that make voting safe, easy, and reliable for its members.

34.     The Alliance undertakes a broad range of initiatives to protect its members' voting rights. As the Alliance engages members and the larger community of retired North Carolinians, it answers questions regarding voting requirements and procedures. During Alliance meetings, members discuss and learn about key issues affecting retirees—such as Social Security and Medicare—as well as candidates' positions on those issues. The Alliance also develops and circulates a newsletter to educate its members on changes to the voting process and how older and retired Americans might be affected by such changes. Alliance members tend to be civically engaged and tend to vote at higher rates than the general public. The Alliance has previously

initiated and intervened in litigation in North Carolina courts to protect the ability of its members—and the ability of all retirees—to vote and have their votes counted.

35.     Because of Judge Griffin's shoddy effort to inform challenged voters that their votes may not count, the Alliance had to dedicate its own limited time and resources to identifying potentially impacted members.

36.     The Alliance's members in particular were likely to face acute difficulties responding to Judge Griffin's protests. Because the Alliance is an organization of retirees, its members are generally older individuals, with an average age between 60 and 70 years of age. As such, many Alliance members have limited familiarity and fluency with new technology, including QR codes like those included on Judge Griffin's postcards. Indeed, many Alliance members, including the individual intervenors, do not have the mobile smartphones necessary to access QR codes. Alliance members therefore faced a heightened risk of never even learning whether—or on what basis—their votes were being challenged.

37.     Juanita Anderson is an Alliance member whose vote was challenged by Judge Griffin's HAVA protests. She has been registered to vote at her current residence in North Carolina since at least 2014 and has voted in nearly every state and federal election for which she was eligible. Ms. Anderson was not aware of Judge Griffin's challenge until she was made aware by the Alliance itself. Ms. Anderson does not recall receiving any correspondence from the North Carolina Republican Party or Judge Griffin informing her that her ballot was being challenged. Even if she had received such correspondence, she would not have been able to use the QR code on Judge Griffin's postcard to learn more about the protests because Ms. Anderson does not own a smartphone and is unfamiliar with QR codes.

38.     Sarah Smith is an Alliance member whose vote was challenged by Judge Griffin's HAVA protests. She has been registered to vote at her current residence in North Carolina since 2009 and has voted in every state and federal election for which she was eligible. Ms. Smith was not aware of Judge Griffin's effort to toss out her vote until she was made aware by the Alliance itself. Ms. Smith does not recall receiving any correspondence from the North Carolina Republican Party or Judge Griffin informing her that her ballot was being challenged. Even if she had received such correspondence, she would not have been able to use the QR code on Judge Griffin's postcard to learn more about the protests because Ms. Smith is unfamiliar with QR codes and has never used one.

39.     Tanya Webster-Durham is an Alliance member whose vote was challenged by Judge Griffin's HAVA protests. She has been registered to vote at her current residence in North Carolina since 2020 and has voted in every state and federal election for which she was eligible. Ms. Webster-Durham was not aware of Judge Griffin's effort to toss out her vote until she was made aware by the Alliance itself. Ms. Webster-Durham does not recall receiving any correspondence from the North Carolina Republican Party or Judge Griffin informing her that her ballot was being challenged. Even if she had received such correspondence, she would not have been able to use the QR code on Judge Griffin's postcard to learn more about the protests because Ms. Smith is unfamiliar with QR codes and has never used one.

40.     Defendant The North Carolina State Board of Elections is the state agency with "general supervision over the primaries and elections in the State." N.C. Gen. Stat. § 163-22. The NCSBE "works in conjunction with county boards of elections" across the state "to ensure that elections are conducted lawfully and fairly." North Carolina State Board of Elections, *About*, https://www.ncsbe.gov/about (last visited May 1, 2025); *see also* N.C. Gen. Stat. §§ 163-182.12,

163-182.11. This includes regulating and addressing election protests filed with the county boards of elections. *Id.* § 163-182.12. The NCSBE is located in Raleigh, North Carolina.

### Count I
**Violation of the Fourteenth Amendment**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Substantive Due Process**

41.     VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

42.     Invalidating the ballots of voters subject to Judge Griffin's challenges would violate substantive due process.

43.     Substantive due process prohibits the post-election disenfranchisement of voters who reasonably relied on established voting procedures to exercise their most "fundamental political right." *United States v. Anderson*, 481 F.2d 685, 699 (4th Cir. 1973), *aff'd,* 417 U.S. 211 (1974). This doctrine was first articulated in a factually analogous case, where the First Circuit held it was unconstitutional to discard votes after the conclusion of an election in which voters had reasonably relied upon election rules that were only *later* deemed unlawful by a state court after the election concluded. *See Griffin v. Burns*, 570 F.2d 1065, 1067, 1074 (1st Cir. 1978).

44.     As such, states may not throw away votes where "state actions . . . induce[d] voters to miscast their votes." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012); *see also Griffin*, 570 F.2d at 1067, 1074; *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005); *Hendon*, 710 F.2d at 182 (citing *Griffin*, 570 F.2d at 1077).

45.     Voters subject to Griffin's UOCAVA ID Challenge—not one of whom anyone suggests is unqualified to vote—cast ballots in accordance with a rule first promulgated by the Board in 2020. *See* 8 N.C. Admin. Code 17.0109(d). These voters plainly relied upon "an established election procedure and/or official pronouncement[]" as to how to vote from abroad.

*Bennett*, 140 F.3d 1226-27. And any change in that procedure *now* will result in "significant disenfranchisement." *Id.* at 1227.

46.     That some of these voters may have a chance to rehabilitate their votes does not cure the constitutional infirmities. These voters' ballots have all been declared presumptively invalid, unlawfully "undo[ing] the ballot results in a court action." *Hendon*, 710 F.2d at 182 (citation omitted). Being subjected to a post hoc process requiring these voters to jump through new hoops and abide by rules that did not exist at the time of the election is itself unconstitutional. *Cf. League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (concluding that requiring voters to vote pursuant to "[d]iscriminatory" voting procedures is precisely "the kind of serious violation of the Constitution" that courts will enjoin. (citation omitted)). The voters needing to cure, moreover, are Americans serving in the military or located overseas, compounding the unprecedented risk of widespread disenfranchisement.

47.     It would be a gross injustice to punish these voters—many of them servicemembers or their families—for "state actions" that "induce[d]" them to allegedly "miscast their votes." *Husted*, 696 F.3d at 597; *see also Hendon*, 710 F.2d at 182 (applying the "general rule that denies relief with respect to past elections" and rejecting challenge to long-existing election regulations).

48.     The federal constitution thus requires this Court to enjoin the Board from rejecting their ballots or subjecting them to additional requirements before their votes can count.

## Count II
### Violation of the Fourteenth Amendment
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
### Procedural Due Process

49.     VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

50.     Judge Griffin's petition, if successful, would also violate procedural due process.

51.     A due process analysis requires weighing "(1) [voters'] liberty interest; (2) the risk of an erroneous deprivation of that interest under current procedures; and (3) the government's interest and burden of providing any additional procedure that would be required." *United States v. White*, 927 F.3d 257, 263 (4th Cir. 2019) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Voters suffer a procedural due process violation "if election officials reject their ballots" without being "notified or afforded any opportunity to respond." *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (citation omitted).

52.     The 30-day cure process ordered by the state court will prove illusory for many UOCAVA voters considering the unique circumstances those voters find themselves in.

53.     Compliance with the procedural due process owed to these voters will prove near impossible because there cannot be sufficient procedural safeguards in place to ensure that these voters—especially deployed military voters—will receive proper notice and have meaningful opportunities to cure their ballots in time. Many of the voters who will be subject to this cure process are among the least likely to receive any notice that is sent to them: voters living overseas or on military bases, often in remote areas without access to reliable mail service or internet.

54.     Even if these voters do receive notice within the 30-day window to cure, many will lack a meaningful opportunity to do so. Voters living in remote areas in other parts of the world often do not have the ability to photocopy their identification and may be unable to timely return any required paperwork due to the lack of reliable mail service in their areas. These challenges— and the practical difficulty of affording these voters a meaningful cure process—highlight the litany of constitutional deficiencies in the cure process that Griffin seeks.

55.      It was also for these precise reasons that Congress amended UOCAVA in 2009 to provide sufficient time for military and overseas voters to receive and complete their absentee

ballots and return them to election officials. 156 Cong. Rec. S4513-02, S4514 ("Sending absentee ballots too late to have the opportunity to actually vote is an unacceptable situation for military and overseas Americans.").

56.     The burdensome post hoc cure process ordered by the state courts runs headlong into the very purpose of UOCAVA and its amendments, which were meant "to ensure that every single military and overseas vote be counted." *Id.*

57.     As a practical matter, a cure process that requires overseas and military voters to receive notice and return a form of identification within 30 days will prove impossible to complete for many affected voters, resulting in their disenfranchisement and violating their due process rights. *See Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2018) (finding procedural due process violation where cure process was "illusory" for certain voters).

## Count III
### Violation of the Equal Protection Clause
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202

58.     VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

59.     The U.S. Supreme Court has made clear "[h]aving once granted the right to vote on equal terms," a state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (per curiam). A state's "arbitrary and disparate treatment to voters in its different counties," is "hostile to the one man, one vote basis of our representative government." *Id.* at 107 (citation omitted).

60.     It is well established that elections carry with them "rudimentary requirements of equal treatment and fundamental fairness." *Bush*, 531 U.S. at 109. The Supreme Court recognized nearly four decades prior to *Bush* that a "citizen's right to a vote free of arbitrary impairment by state action" is offended when such impairment results from "a refusal to count votes from

arbitrarily selected precincts." *Baker v. Carr*, 369 U.S. 186, 208 (1962); *cf. Reynolds*, 377 U.S. at 568 ("A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm."); *Hadley v. Junior Coll. Dist. of Metro. Kansas City*, Mo., 397 U.S. 50, 54 (1970) ("[I]n situations involving elections, the States are required to ensure that each person's vote counts as much, insofar as it as practicable, as any other person's.").

61.     Among the 32,033 UOCAVA voters in the election, the state courts' orders affect only the 1,409 UOCAVA voters from Guilford County—plainly amounting to "uneven treatment," violating the "minimum requirement for nonarbitrary treatment of voters." *Bush*, 531 U.S. at 105, 107.[2] "Whether an individual's vote will be counted in this race, therefore, may depend in part on something completely arbitrary—their place of residence." *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 47 (S.D.N.Y. 2020).

62.     The reality is far more troubling than "arbitrary." Griffin "discriminat[ed] by residence" by naming counties that went for Justice Riggs "by significant margins." *Griffin*, 2025 WL 1021724, at *41 & n.23 (Hampson, J., dissenting).

63.     Any cure program will also be dependent on arbitrary circumstances unrelated to voters' qualifications. Despite having followed the rules as they were prescribed last November,

---

[2] As noted in the Board's Notice, Griffin timely challenged UOCAVA voters in only Guilford County and subsequently added challenges to ballots cast in Durham, Forsyth, and Buncombe Counties. *See* State Board's Notice of Remedial Efforts in Response to the Court's April 12, 2025 Text Only Order 2 n.2, ECF No. 61. Griffin has now challenged the Board's notice in a writ of mandamus filed with the North Carolina Court of Appeals, seeking to expand the number of counties subject to the cure. *See generally* Pet. for Writ of Mandamus at 14, *Griffin v. N.C. State Bd. of Elections*, No. COA25-181 (N.C. Ct. App. Apr. 16, 2025) ("Griffin Mandamus Pet."). The outcome of those proceedings has no bearing on the proceedings currently before this Court. Griffin's tardy effort to expand the universe of challenged voters does nothing to remedy the cure process's obvious conflict with *Bush*. Under any proposed cure scenario—whether one county or six counties are singled out—the state courts' order will be selectively applied only to voters from some counties, arbitrarily subjecting them to different, more burdensome rules than similarly situated voters in most of North Carolina's counties.

voters who do not receive notice from election officials due to change of address, or who are deployed or traveling and thus unable to cure in time, will have their votes thrown away based on random chance.

64. This process, under which "arbitrary factors" lead to the "valuing [of] one person's vote over that of another," is precisely "the kind of process specifically prohibited by the Supreme Court." *Gallagher*, 477 F. Supp. 3d at 48.

## Count IV
### Violation of the First and Fourteenth Amendments
### U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
### Unconstitutional Burden on the Right to Vote

65. VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

66. Any post-election changes to a state's election laws and practices that result in the disenfranchisement of tens of thousands of voters also severely burden the right to vote in violation of the First and Fourteenth Amendments.

67. Under the applicable *Anderson-Burdick* test, the Court must "weigh[] the severity of the burden the challenged [practice] imposes on a person's constitutional rights against the importance of the state's interests supporting that law." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 713 (4th Cir. 2016) (first citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); then citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Where a challenged process severely burdens voters' rights, it can only survive if it is narrowly drawn to advance a compelling state interest. *See Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019).

68. It is unquestionable that Judge Griffin's attempt to discard thousands of ballots severely burdens each of the affected voters' fundamental right to the franchise. Rejecting these voters' ballots after they have already been cast in accordance with law and practice would not just substantially burden their right to vote—it would revoke it entirely.

69.     Under the state court orders, some UOCAVA voters' ballots are now invalid unless they submit proof of identification, notwithstanding being told otherwise by election officials.

70.     Compounding the burdens, there are several reasons why these military and overseas voters will be unable to cure their ballots nearly six months after casting them. For example, voters may have relocated; servicemembers are often deployed or traveling for extended periods of time (which can prevent them from receiving notices or curing); and even if they can be contacted, deployed servicemembers and other overseas voters may not have access to the required photo ID or technology needed to submit documentation to election officials.

71.     In contrast to the disenfranchising burdens on these voters, the state has no valid—much less compelling—interest in changing the rules after an election and making eligible voters jump through extra hoops months after they complied with existing rules in casting their ballots. *Alcorn*, 826 F.3d at 717.

72.     Judge Griffin's belated desire to change the rules governing an election he lost is not the sort of "compelling" state interest that warrants disenfranchising thousands of unassuming North Carolinians. *Alcorn*, 826 F.3d at 717.

## PRAYER FOR RELIEF

WHEREFORE, VoteVets Intervenors respectfully request that the Court enter a judgment in their favor providing the following relief:

(1) Declare that removing votes cast by voters targeted by Griffin's challenges violates those voters' substantive due process rights;

(2) Declare that removing votes cast by voters targeted by Griffin's challenges violates those voters' fundamental right to vote;

(3) Declare that removing votes cast by voters targeted by Griffin's challenges violates those voters' procedural due process rights;

(4) Declare that removing votes cast by voters targeted by Griffin's UOCAVA challenges violates those voters' rights under the Equal Protection Clause;

(5) Permanently enjoin the State Board from discarding any votes cast by voters who have been challenged by Griffin's UOCAVA ID Challenges;

(6) Order the Board to certify the results of the election as they stood at the time of its final formal count on December 10, 2024; and

(7) Grant VoteVets Intervenors such additional and further relief as this Court deems just and proper.

Dated: May 1, 2025                    Respectfully submitted,

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri
Christopher D. Dodge
Tina Meng Morrison
James J. Pinchak
Julie Zuckerbrod
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W.
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
jpinchak@elias.law
jzuckerbrod@elias.law

Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*Counsel for VoteVets Intervenors VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*