JEFFERSON GRIFFIN,

       Plaintiff,

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS,

       Defendant.

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH
CAROLINA
WESTERN DIVISION**
Case No. 5:24-cv-00731-BO

**PROPOSED ANSWER (Never Residents
Petition)**

---

**NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION
FUND**

JEFFERSON GRIFFIN,
    *Plaintiff,*

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS,
    *Defendant*,

    and

ALLISON RIGGS, NORTH CAROLINA
ALLIANCE FOR RETIRED AMERICANS,
VOTEVETS ACTION FUND, TANYA
WEBSTER-DURHAM, SARAH SMITH, and
JUANITA ANDERSON,
    *Intervenor-Defendants*.

Case No. 5:24-cv-00731-M-RJ

**AMENDED ANSWER AND
CROSSCLAIMS FOR
DECLARATORY AND INJUNCTIVE
RELIEF (Never Residents Petition)**

NORTH CAROLINA DEMOCRATIC PARTY,
    *Plaintiff,*

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS et al.,
    *Defendants*.

Case No. 5:24-cv-00699-M-KS

CARRIE CONLEY et al.,
    *Plaintiffs,*

Case No. 5:25-cv-00193-M-RJ

|  |
|---|
| v. |
| ALAN HIRSCH et al., |
| *Defendants.* |

**VOTEVETS ACTION FUND, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, TANYA WEBSTER-DURHAM, SARAH SMITH, AND JUANITA ANDERSON'S ~~PROPOSED~~AMENDED ANSWER TO PLAINTIFF'S VERIFIED PETITION FOR JUDICIAL REVIEW (NEVER RESIDENTS PETITION) AND CROSSCLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF**
~~Proposed~~

_____Intervenor-Defendants the North Carolina Alliance for Retired Americans ("the Alliance"), VoteVets Action Fund ("VoteVets"), Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (together,

"~~Proposed~~"VoteVets Intervenors") answer Plaintiff's Verified Petition for Judicial Review ("Never Residents Petition"),[1] *see* ECF No. 1-4, as follows:

The Petition begins with an unnumbered paragraph to which no response is required. To the extent a response is required, ~~the Proposed~~VoteVets Intervenors incorporate by reference the below paragraphs as their response, deny the allegations, and deny that Plaintiff is entitled to any relief.

**INTRODUCTION**

_____1.    ~~Proposed~~VoteVets Intervenors admit that on December 13, 2024, the State Board of

1.    _____Elections dismissed three categories of election protests and that Plaintiff's Never Residents Petition, ECF No. 1-4, seeks judicial review of the State Board's dismissal of one of those protests. ~~Proposed~~VoteVets Intervenors lack sufficient knowledge or information to form a

---

[1] This challenge is sometimes referred to elsewhere as the Non-Resident Challenge. ~~Proposed~~VoteVets Intervenors refer to it in this Answer as the Never Residents challenge—as Judge Griffin does in his petition. ~~Proposed~~VoteVets Intervenors do not agree, however, that any of the challenged voters do not satisfy the applicable residency requirements to vote in North Carolina.

belief as to the truth or falsity of the allegations in the first sentence of Paragraph 1 and therefore deny them. The remainder of Paragraph 1 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors deny the allegations.

**PARTIES AND NATURE OF THE ACTION**

~~2.~~ ~~Proposed~~VoteVets Intervenors admit that Plaintiff is a judge on the North Carolina Court of

2. Appeals, and that he was the Republican candidate in the 2024 general election for Seat 6 of the Supreme Court of North Carolina. The remainder of Paragraph 2 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors deny the allegations.

3. Admitted.

4. Paragraph 4 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed Intervenors deny the allegations.~~ admitted.

~~5.~~ Paragraph 5 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~

5. VoteVets Intervenors admit that Allison Riggs is the Democratic nominee for associate justice of the North Carolina Supreme Court. ~~Proposed~~VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 5 and therefore deny them.

## JURISDICTION AND VENUE

6.    Paragraph 6 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors admit that the cited statute contains the quoted text and deny the remaining allegations in Paragraph 6.

~~7.    Proposed~~VoteVets Intervenors admit that on December 13, 2024, the State Board of Elections entered a final decision dismissing three categories of election protests. ~~Proposed~~VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 7 that "the decision was placed in the mail for service on Judge Griffin 7.    via FedEx on 13 December 2024," and therefore deny them. The remainder of Paragraph 7 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors deny the allegations.

8.    Paragraph 8 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 8 and therefore deny them.

## BACKGROUND

9.    ~~Proposed~~VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 9 and therefore deny them.

10.    The cited document speaks for itself. Further, Paragraph 10 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors admit that the State Board of

Elections assumed jurisdiction over three categories of protests, and deny the remaining allegations in Paragraph 10.

11.     Admitted.

~~12.~~ Paragraph 12 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~

12.     VoteVets Intervenors admit the Board considered the adequacy of Judge Griffin's service of the protests on voters, but otherwise deny the remaining allegations in Paragraph 12.

13.     Paragraph 13 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors deny the allegations.

14.     Paragraph 14 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors admit that the cited code contains the quoted text and deny the remaining allegations in Paragraph 14.

15.     Paragraph 15 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 15 and therefore deny them.

16.     Paragraph 16 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors admit that the State Board of Elections concluded, "by a vote of 3 to 2, that the protests were not properly served on affected parties required to receive service of copies of the protest

filings and therefore do not substantially comply with N.C.G.S. § 163-182.9," Ex. A, Decision &

Order 14, ECF No. 1-4, and deny the remaining allegations in Paragraph 16.

Order 14, ECF No. 1-4, and deny the remaining allegations in Paragraph 16.

17.     Paragraph 17 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ProposedVoteVets Intervenors deny the allegations.

18.     Paragraph 18 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ProposedVoteVets Intervenors deny the allegations.

19.     Paragraph 19 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ProposedVoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 19 and therefore deny them.

20.     Paragraph 20 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ProposedVoteVets Intervenors deny the allegations.

21.     Paragraph 21 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ProposedVoteVets Intervenors lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 21 and therefore deny them.

22.     Paragraph 22 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ProposedVoteVets Intervenors admit that the State Board of Elections concluded "by a vote of 3 to 2, that this category of protests does not allege a violation of law, irregularity, or misconduct in the conduct of the

general election," Ex. A, Decision & Order 32, ECF No. 1-4, and deny the remaining allegations

in Paragraph 22.

**EXCEPTIONS AND GROUNDS FOR RELIEF**

23.     Paragraph 23 contains legal contentions, characterizations, conclusions, and

opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets

Intervenors deny the allegations.

~~24.~~      ~~Proposed~~VoteVets Intervenors deny Plaintiff's "exceptions to the decision" of the

State

24.      Board of Elections.

25.     Paragraph 25 contains legal contentions, characterizations, conclusions, and

opinions to which no response is required. To the extent a response is required, ~~Proposed~~ VoteVets

Intervenors deny Plaintiff's "exception."

~~Intervenors deny Plaintiff's "exception."~~

26.     The cited document speaks for itself. Further, Paragraph 26 contains legal

contentions, characterizations, conclusions, and opinions to which no response is required. To the

extent a response is required, ~~Proposed~~VoteVets Intervenors deny Plaintiff's "exception."

27.     The cited document speaks for itself. Further, Paragraph 27 contains legal

contentions, characterizations, conclusions, and opinions to which no response is required. To the

extent a response is required, ~~Proposed~~VoteVets Intervenors deny Plaintiff's "exception."

28.     The cited document speaks for itself. Further, Paragraph 28 contains legal

contentions, characterizations, conclusions, and opinions to which no response is required. To the

extent a response is required, ~~Proposed~~VoteVets Intervenors deny Plaintiff's "exception."

29.     The cited document speaks for itself. Further, Paragraph 29 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors deny Plaintiff's "exception."

30.     The cited document speaks for itself. Further, Paragraph 30 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors deny Plaintiff's "exception."

31.     The cited document speaks for itself. Further, Paragraph 31 contains legal contentions, characterizations, conclusions, and opinions to which no response is required. To the extent a response is required, ~~Proposed~~VoteVets Intervenors deny Plaintiff's "exception."

## RELIEF SOUGHT

~~Proposed~~VoteVets Intervenors deny that Plaintiff is entitled to any relief.

## GENERAL DENIAL

~~Proposed~~VoteVets Intervenors deny every allegation in Plaintiff's Verified Petition for Judicial

Review that is not expressly admitted herein.

## AFFIRMATIVE DEFENSES

1.     Plaintiff's claims are barred because they seek relief inconsistent with the United States Constitution.

2.     Plaintiff's claims are barred because Plaintiff seeks relief inconsistent with federal and state law.

3.     Plaintiff's claims are equitably barred, including (but not limited to) because of laches.

4.     Plaintiff has waived the right to bring some or all of his claims.

5.     Plaintiff has failed to state an adequate claim for relief.

6. Proposed Intervenors reserve the right to amend this Answer at a later time.

WHEREFORE, having fully answered Plaintiff's Verified Petition for Judicial Review, ProposedVoteVets Intervenors pray for judgment as follows:

A. ~~That the Court dismiss Plaintiff's Verified Petition for Judicial Review;~~

~~B.~~ That judgment be entered in favor of ~~Proposed~~VoteVets Intervenors and against Plaintiff on

 Plaintiff's Verified Petition for Judicial Review and that Plaintiff takes nothing

A.    thereby;

~~C.~~B.  That ~~Proposed~~VoteVets Intervenors be awarded reasonable attorneys' fees and costs

under any applicable statute or equitable doctrine; and

~~D.~~C.  For such other and further relief as the Court deems appropriate.

~~8~~

~~Dated:~~

## VOTEVETS INTEVENORS' CROSSCLAIMS AGAINST THE NORTH CAROLINA BOARD OF ELECTIONS

1.      VoteVets Intervenors assert their crossclaims against defendant North Carolina State Board of Elections ("State Board" or "Board") as follows:

## INTRODUCTION

2.      Before voting began in the November 2024 general election, North Carolina's rules of the road for casting and counting ballots were set and clear. Pursuant to those rules, millions of eligible voters exercised their fundamental right to vote in last year's general election, including in the contest for Associate Justice of the North Carolina Supreme Court.

3.      After voting ended and the votes were tallied, it became evident that Judge Jefferson Griffin lost the race for Associate Supreme Court Justice to incumbent Justice Allison Riggs by over seven hundred votes.

4.      Instead of accepting his loss, Judge Griffin filed hundreds of challenges in virtually every county in the state. These challenges demanded retroactive changes to election rules that would result in the disenfranchisement of thousands of voters who had already cast their ballots in the general election.

5.      Each of the challenged voters had every reason to expect their vote would count. None could have foretold that—nearly half a year later—they would be disenfranchised. Worse yet, many of the targeted voters are serving in our military, and it is undisputed that all of them obeyed the rules as they existed on election day.

6.      As relevant here, Judge Griffin challenges the votes of overseas voters who lawfully obtained North Carolina residency through their parents or guardians. The North Carolina legislature enfranchised these voters through unanimously-passed legislation thirteen years ago, but Griffin now argues they should no longer be permitted to vote in the State.

7. This brazen attempt to rob these voters of their validly cast ballots is astounding. It is a bedrock principle that the right to vote "is a fundamental matter in a free and democratic society," and is "preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964). The U.S. Supreme Court has thus "repeatedly recognized that all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Id.* at 554.

8. If the State Board is ordered to remove these votes from the ballot count, unsuspecting voters across the State who followed the law as it existed at the time of the election will suddenly be disenfranchised.

9. The Constitution's guarantees of due process, the right to vote, as well as the National Voter Registration Act ("NVRA") and the Civil Rights Act of 1964 ("CRA"), clearly bar Griffin's demand to toss out the ballots of hundreds of rule-following voters based on novel, post-election interpretations of state law, which Griffin only seeks to apply to some voters, in hopes of obtaining an electoral advantage.

10. Our federal Constitution and this Circuit's precedents prohibit Griffin's effort to "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon v. N. Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (citation omitted). Any other conclusion would incentivize *every* losing candidate to behave as Griffin has, launching an endless effort to retroactively change election rules.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over the crossclaims of VoteVets Intervenors under 28 U.S.C. § 1331, as they arise under the First and Fourteenth Amendments of

the U.S. Constitution, the National Voter Registration Act ("NVRA"), and the Civil Rights Act of 1964 ("CRA").

12.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a) and 42 U.S.C. § 1983, as Plaintiffs seek equitable and declaratory relief to protect the right to vote.

13.     This Court has personal jurisdiction over the State Board, which is a state agency of North Carolina located within the state.

14.     Venue in this Court is proper under 28 U.S.C. § 1391(b). The North Carolina Board of Elections, which assumed jurisdiction over Judge Griffin's protests giving rise to these claims, is located in this district. A substantial portion of the violations of federal law at issue occurred and will occur in this district because some challenged voters are registered and cast their votes in this district. These voters' ballots were tallied by their respective county boards of elections in this district as well.

15.     Crossclaims are appropriate because VoteVets Intervenors' claims arise out of the same transaction or occurrence that is the subject matter of Judge Griffin's petition here.

16.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202. The Court also has authority to enter a declaratory judgment and provide injunctive relief under Federal Rules of Civil Procedure 57 and 65.

**FACTUAL BACKGROUND**

17.     In November 2024, millions of voters across North Carolina cast ballots in the election for Associate Justice on the North Carolina Supreme Court. After the votes were counted, Justice Riggs prevailed over Judge Griffin by over 700 votes.

18.     Judge Griffin requested a recount, which was completed on December 30, 2024 3, 2024. The recount again confirmed Justice Riggs's victory.

- 13 -

19.     Dissatisfied with these results, Judge Griffin filed over 300 election protests in almost every county across the state. These sweeping protests collectively sought to disenfranchise over 60,000 North Carolinians who cast ballots in the Supreme Court race.

20.     As relevant here, Judge Griffin targets ballots cast by 266 citizens living overseas ("the UMOVA Challenge"). These voters are expressly entitled to vote under the plain terms of North Carolina's Uniform Military and Overseas Voters Act ("UMOVA"), enacted by the General Assembly in 2011. *See* N.C. Gen. Stat. § 163-258.1, *et seq*. UMOVA guarantees dependents and children of North Carolinians living overseas, including those serving in the Armed Forces, the right to vote in North Carolina elections under the circumstances described in the Act. *Id.* § 163-258.2(1)(e).

21.     Voters who fall into this category have participated in dozens of past elections without issue, but Judge Griffin now challenges these citizens as not being residents of North Carolina.

22.     Judge Griffin purported to notify each challenged voter by sending them a postcard which was addressed to the voter "or current resident," and contained a QR code that mobile smartphone users could scan and then be redirected to the North Carolina Republican Party webpage. Even if a voter received the postcard, recipients without internet access, smartphones, or familiarity with QR Code technology could not access additional information, including any of the protest filings made against their ballots.

23.     The Board rejected Judge Griffin's UMOVA Challenge, concluding that the General Assembly explicitly authorized these individuals to vote in state elections. Ex. A, Decision & Order 14, ECF No. 1-4 at 29–31 (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S.

306, 314 (1950)). The State Board further noted that such voters had previously been permitted to vote for 13 years and in 43 elections. *Id.* at 31.

24. Nonetheless, the North Carolina state courts ordered the disenfranchisement of these voters. A divided panel of the Court of Appeals of North Carolina concluded that an absentee voter who allegedly noted on their ballot application form that they live outside the country and have never lived in the United States "cannot make North Carolina their domicile of choice," notwithstanding that such voters have been permitted to vote in North Carolina by statute since 2011. *Griffin v. N. Carolina State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *13 (N.C. Ct. App. Apr. 4, 2025). The majority directed these ballots to be discarded without any opportunity for notice or cure. *Id.* at *15.

25. After various parties sought discretionary review of the Court of Appeals order, the Supreme Court of North Carolina declined to disturb the determination of the North Carolina Court of Appeals. *See generally Griffin v. N. Carolina State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025). As a result, the North Carolina courts ordered that these voters' ballots be tossed out of the count. *See id.* at *3.

## PARTIES

26. VoteVets is a national non-profit organization dedicated to elevating the voices of veterans and their families on issues that affect the lives of those who serve and have served in the Armed Forces, including on issues like veterans' care. VoteVets serves all active servicemembers, including those North Carolinians deployed away from home, as well as veterans. Over 1.5 million subscribers receive VoteVets' communications, including thousands of North Carolinians. Increasing voter turnout among military and veteran voters, along with their families, especially those who are overseas, is critical to VoteVets' mission. Furthermore, VoteVets believes that

turning out the veteran vote benefits all Americans by engaging citizens who have served their country in the civic process, and aims to promote turnout among all veterans, regardless of their political beliefs.

27. Many of VoteVets' constituents are servicemembers and their family members who reside outside of North Carolina and are fully reliant on laws like UOCAVA and UMOVA to exercise the franchise. VoteVets dedicates significant resources, including funding, personnel time, and volunteer effort, to ensure these voters can participate in the franchise.

28. Working with its partners, VoteVets has developed a first-of-its kind military voter file containing approximately 14 million records of veterans and military family members, including records for thousands of voters in North Carolina. VoteVets uses this voter file to contact military voters and ensure they cast valid ballots. In the 2024 general election, VoteVets sent over 2.5 million texts to 1.5 million military voters, including those overseas, and saw a substantial increase in turnout participation among contacted voters. Given the importance of laws like UOCAVA and UMOVA to VoteVets' constituencies, these efforts often focused on educating military voters about how to properly submit their ballots under these laws, such that their votes will be counted.

29. Judge Griffin's challenges threaten to disenfranchise VoteVets' voters who participated in the 2024 election according to UOCAVA and UMOVA with the rightful expectation that their ballots would be counted. In turn, Griffin's challenges also frustrate VoteVets' mission to increase political participation among servicemembers, veterans, and their families. Moreover, by seeking to change the rules of the game after the election concluded, Judge Griffin's challenges frustrate VoteVets' ability to reliably provide military voters and their families

with accurate information about to how to vote. VoteVets cannot reliably educate military voters and their families about how to vote if those rules are subject to challenges after-the-fact.

30.     If North Carolina implements a cure process now, it will require VoteVets to rapidly deploy scarce resources to help its constituents and supporters ensure their ballots are counted. To protect its constituents and supporters from disenfranchisement, VoteVets will be forced to: (1) conduct outreach to its constituents and supporters deployed abroad who have been swept up in the election protests, (2) make sure they received notice about the cure process from election officials, and (3) educate those challenged constituents about the cure process and how to timely cure their ballots.

31.     These resources would otherwise have gone to other mission-critical efforts that will suffer as a result because VoteVets will have less money and personnel resources available to spend in these efforts.

32.     Despite VoteVets' best efforts, their voters stand to be disenfranchised by any new cure program at this point. First, it is unclear that these challenged voters can even be reached. Voters often travel for extended periods. They may have also relocated since the election, which occurred nearly half a year ago. Even if they can be contacted, many are unlikely to the technology to submit additional identification to the election officials. These voters had no reason to have prepared themselves for complying with such a requirement given that the election was more than five months ago and the rules they voted under did not require them to provide additional information about their residences. Even the voters who can be reached and possess the necessary documents and access to technology may be discouraged from jumping through these extra hoops, months after they complied with all of the existing election rules. This belated cure program is also likely to discourage voters from voting in future elections.

33. The North Carolina Alliance for Retired Americans (the "Alliance") is a 501(c)(4) nonprofit social welfare organization incorporated in North Carolina. It is a chartered state affiliate of the Alliance for Retired Americans, a nationwide grassroots organization with more than 4.3 million members. The Alliance has approximately 58,000 members across North Carolina, most of whom are retirees over the age of 65. The Alliance's mission is to ensure social and economic justice and full civil rights for retirees. To further that mission, the Alliance works to protect the rights of its members to vote and to have their votes counted. The Alliance has strong interests in ensuring that the greatest number of its members are allowed to vote and have their votes counted and in advocating for policies that make voting safe, easy, and reliable for its members.

34. The Alliance undertakes a broad range of initiatives to protect its members' voting rights. As the Alliance engages members and the larger community of retired North Carolinians, it answers questions regarding voting requirements and procedures. During Alliance meetings, members discuss and learn about key issues affecting retirees—such as Social Security and Medicare—as well as candidates' positions on those issues. The Alliance also develops and circulates a newsletter to educate its members on changes to the voting process and how older and retired Americans might be affected by such changes. Alliance members tend to be civically engaged and tend to vote at higher rates than the general public. The Alliance has previously initiated and intervened in litigation in North Carolina courts to protect the ability of its members—and the ability of all retirees—to vote and have their votes counted.

35. Because of Judge Griffin's shoddy effort to inform challenged voters that their votes may not count, the Alliance had to dedicate its own limited time and resources to identifying potentially impacted members.

36.     The Alliance's members in particular were likely to face acute difficulties responding to Judge Griffin's protests. Because the Alliance is an organization of retirees, its members are generally older individuals, with an average age between 60 and 70 years of age. As such, many Alliance members have limited familiarity and fluency with new technology, including QR codes like those included on Judge Griffin's postcards. Indeed, many Alliance members, including the individual intervenors, do not have the mobile smartphones necessary to access QR codes. Alliance members therefore faced a heightened risk of never even learning whether—or on what basis—their votes were being challenged.

37.     Juanita Anderson is an Alliance member whose vote was challenged by Judge Griffin's HAVA protests. She has been registered to vote at her current residence in North Carolina since at least 2014 and has voted in nearly every state and federal election for which she was eligible. Ms. Anderson was not aware of Judge Griffin's challenge until she was made aware by the Alliance itself. Ms. Anderson does not recall receiving any correspondence from the North Carolina Republican Party or Judge Griffin informing her that her ballot was being challenged. Even if she had received such correspondence, she would not have been able to use the QR code on Judge Griffin's postcard to learn more about the protests because Ms. Anderson does not own a smartphone and is unfamiliar with QR codes.

38.     Sarah Smith is an Alliance member whose vote was challenged by Judge Griffin's HAVA protests. She has been registered to vote at her current residence in North Carolina since 2009 and has voted in every state and federal election for which she was eligible. Ms. Smith was not aware of Judge Griffin's effort to toss out her vote until she was made aware by the Alliance itself. Ms. Smith does not recall receiving any correspondence from the North Carolina Republican Party or Judge Griffin informing her that her ballot was being challenged. Even if she had received

such correspondence, she would not have been able to use the QR code on Judge Griffin's postcard to learn more about the protests because Ms. Smith is unfamiliar with QR codes and has never used one.

39.     Tanya Webster-Durham is an Alliance member whose vote was challenged by Judge Griffin's HAVA protests. She has been registered to vote at her current residence in North Carolina since 2020 and has voted in every state and federal election for which she was eligible. Ms. Webster-Durham was not aware of Judge Griffin's effort to toss out her vote until she was made aware by the Alliance itself. Ms. Webster-Durham does not recall receiving any correspondence from the North Carolina Republican Party or Judge Griffin informing her that her ballot was being challenged. Even if she had received such correspondence, she would not have been able to use the QR code on Judge Griffin's postcard to learn more about the protests because Ms. Smith is unfamiliar with QR codes and has never used one.

40.     Defendant The North Carolina State Board of Elections is the state agency with "general supervision over the primaries and elections in the State." N.C. Gen. Stat. § 163-22. The NCSBE "works in conjunction with county boards of elections" across the state "to ensure that elections are conducted lawfully and fairly." North Carolina State Board of Elections, *About*, https://www.ncsbe.gov/about (last visited May 1, 2025); *see also* N.C. Gen. Stat. §§ 163-182.12, 163-182.11. This includes regulating and addressing election protests filed with the county boards of elections. *Id.* § 163-182.12. The NCSBE is located in Raleigh, North Carolina.

**Count I**
**Violation of the Fourteenth Amendment**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Substantive Due Process**

41.     VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

42.     Invalidating the ballots of voters subject to Judge Griffin's challenges would violate substantive due process.

43.     Substantive due process prohibits the post-election disenfranchisement of voters who reasonably relied on established voting procedures to exercise their most "fundamental political right." *United States v. Anderson*, 481 F.2d 685, 699 (4th Cir. 1973), *aff'd,* 417 U.S. 211 (1974). This doctrine was first articulated in a factually analogous case, where the First Circuit held it was unconstitutional to discard votes after the conclusion of an election in which voters had reasonably relied upon election rules that were only *later* deemed unlawful by a state court after the election concluded. *See Griffin v. Burns*, 570 F.2d 1065, 1067, 1074 (1st Cir. 1978).

44.     As such, states may not throw away votes where "state actions . . . induce[d] voters to miscast their votes." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012); *see also Griffin*, 570 F.2d at 1067, 1074; *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005); *Hendon*, 710 F.2d at 182 (citing *Griffin*, 570 F.2d at 1077).

45.     North Carolina has permitted UMOVA voters to cast ballots under UMOVA for the past 13 years—nearly twice as long as the "long-standing practice" at issue in the leading case in this area of jurisprudence, *Griffin v. Burns.* 570 F.2d at 1075. These voters had no reason to think that, after such sustained and unchallenged practice under the plain text of UMOVA, their ballots would suddenly be called into doubt.

46.     There is no dispute that these voters followed election rules and instructions as they existed on election day 2024. These rules were enacted by the Legislature in 2011 without a single opposing vote. *See* N.C. Gen. Stat. § 163-258.2(1)(e).

47.     These voters—who lack any clear opportunity to contest the disposal of their votes under the state courts' orders—indisputably acted in reliance on these established election rules

when they cast their votes in November 2024. Deducting their votes now will leave them completely disenfranchised. *See Bennett v. Yoshina*, 140 F.3d 1218, 1226–27 (9th Cir. 1998).

48.     Moreover, it is not even certain that voters being challenged by Judge Griffin are ineligible to vote under North Carolina law as the state courts have interpreted it. Initial analysis shows that at least two dozen of the individuals in this category—who purportedly never resided in North Carolina—appear to currently live or have previously lived in the state.[2]

49.     That some of these voters may have a chance to rehabilitate their votes does not cure the constitutional infirmities. These voters' ballots have all been declared presumptively invalid, unlawfully "undo[ing] the ballot results in a court action." *Hendon*, 710 F.2d at 182 (citation omitted). Being subjected to a post hoc process requiring these voters to jump through new hoops and abide by rules that did not exist at the time of the election is itself unconstitutional. *Cf. League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (concluding that requiring voters to vote pursuant to "[d]iscriminatory" voting procedures is precisely "the kind of serious violation of the Constitution" that courts will enjoin. (citation omitted)). The voters needing to cure, moreover, are Americans serving in the military or located overseas, compounding the unprecedented risk of widespread disenfranchisement.

50.     It would be a gross injustice to punish these voters—many of them servicemembers or their families—for "state actions" that "induce[d]" them to allegedly "miscast their votes." *Husted*, 696 F.3d at 597; *see also Hendon*, 710 F.2d at 182 (applying the "general rule that denies relief with respect to past elections" and rejecting challenge to long-existing election regulations).

---

[2] *See* Judd Legum, Rebecca Crosby, and Noel Sims, North Carolina Supreme Court Throws Out Hundreds of Ballots Based on Flawed Data (Apr. 15, 2025), https://popular.info/p/north-carolina-supreme-court-throws?r=21vp1p&triedRedirect=true. Disenfranchising voters based on a theory that is factually incorrect is precisely the type of arbitrary disenfranchisement that is unconstitutional.

51.     The federal constitution thus requires this Court to enjoin the Board from rejecting their ballots or subjecting them to additional requirements before their votes can count.

### Count II
### Violation of the Fourteenth Amendment
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
### Procedural Due Process

52.     VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

53.     Judge Griffin's petition, if successful, would also violate procedural due process.

54.     A due process analysis requires weighing "(1) [voters'] liberty interest; (2) the risk of an erroneous deprivation of that interest under current procedures; and (3) the government's interest and burden of providing any additional procedure that would be required." *United States v. White*, 927 F.3d 257, 263 (4th Cir. 2019) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Voters suffer a procedural due process violation "if election officials reject their ballots" without being "notified or afforded any opportunity to respond." *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (citation omitted).

55.     To the extent UMOVA voters are deprived of *any* cure opportunity, they will be unconstitutionally deprived of their liberty interests in having their votes counted. *See Democracy N.C.*, 476 F. Supp. 3d at 226.

56.     Under this situation, the Board will be required to discard ballots cast by challenged UMOVA voters without *any* "form of post-deprivation notice . . . so that any defect in eligibility can be cured and [such voters are] not continually and repeatedly denied so fundamental a right." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). This total lack of notice or opportunity to cure risks wrongful disenfranchisement of eligible North Carolina voters.

57.     As the State Board explained in its Notice of Remedial Efforts, some voters Griffin has labeled "never residents" *have in fact* previously resided within North Carolina and "were either incorrectly identified as never residents or inadvertently indicated that they never lived in the United States." ECF No. 61 at 4 n.6. Given these known errors, a cure process that excludes UMOVA voters runs the risk of depriving voters of their fundamental right to vote and does "not comport with the constitutional requirements of due process." *Raetzel*, F. Supp. at 1358.

## Count III
### Violation of the First and Fourteenth Amendments
### U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
### Unconstitutional Burden on the Right to Vote

58.     VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

59.     Any post-election changes to a state's election laws and practices that result in the disenfranchisement of tens of thousands of voters also severely burden the right to vote in violation of the First and Fourteenth Amendments.

60.     Under the applicable *Anderson-Burdick* test, the Court must "weigh[] the severity of the burden the challenged [practice] imposes on a person's constitutional rights against the importance of the state's interests supporting that law." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 713 (4th Cir. 2016) (first citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); then citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Where a challenged process severely burdens voters' rights, it can only survive if it is narrowly drawn to advance a compelling state interest. *See Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019).

61.     It is unquestionable that Judge Griffin's attempt to discard thousands of ballots severely burdens each of the affected voters' fundamental right to the franchise. Rejecting these voters' ballots after they have already been cast in accordance with law and practice would not just substantially burden their right to vote—it would revoke it entirely.

62.    The wholesale rejection of ballots cast by individuals expressly entitled to vote under UMOVA imposes an undue burden on the right to vote.

63.    That revocation comes 13 years and 43 elections after the General Assembly enacted the UMOVA provision at issue, and months after voters cast their ballots, had those ballots processed and tabulated, and had a candidate identified as the winner of the election.

64.    To be an eligible voter, North Carolina requires only that an individual is a United States citizen who is over the age of 18 and meets the state's residency requirement. *See* N.C. Const. art. VI, §§ 1, 2; N.C. Gen. Stat. § 163-55.

65.    There is no state interest, let alone a compelling one, in retroactively disenfranchising hundreds of voters the North Carolina General Assembly purposefully enfranchised, particularly when such voters have long relied on this law to participate in elections for years and where Griffin insists the underlying state court orders deprive them of *any* opportunity to show their qualification to vote. *See, e.g.*, *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 672–74 (M.D.N.C. 2024) (concluding plaintiffs were likely to succeed in showing that North Carolina's provision allowing rejection of same-day voter registrations and votes without notice to the voter and an opportunity to be heard imposes a substantial burden on affected individuals' right to vote).

66.    Judge Griffin's belated desire to change the rules governing an election he lost is not the sort of "compelling" state interest that warrants disenfranchising thousands of unassuming North Carolinians. *Alcorn*, 826 F.3d at 717.

**Count IV**
**Violation of the National Voter Registration Act**
**52 U.S.C. §§ 20507(c)(2)(A), 20507(b)(1), 28 U.S.C. §§ 2201, 2202**

67.    VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

68.     The National Voter Registration Act ("NVRA") prohibits efforts to systematically remove voters from the voter rolls within close proximity of an election. *See* 52 U.S.C. § 20507(c)(2)(A) (requiring states to complete systematic removals from voter rolls 90 days before an election).

69.     Under North Carolina law, the state's list maintenance activities "shall comply" with "the provisions of the National Voter Registration Act." N.C. Gen. Stat. § 163-82.14(a1). And "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions" of federal law. *RNC v. NCSBE*, 120 F.4th 390, 401-02 (4th Cir. 2024).

70.     Systematic removals under the NVRA include attempts to remove voters *en masse* without any "individualized inquiry as to the circumstances of each voter." *See N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *8 (M.D.N.C. Aug. 7, 2018).

71.     The purpose of this election buffer around removals is to ensure that voters are not "removed [from the rolls] days or weeks before Election Day" because they "will likely not be able to correct" any erroneous removals "in time to vote." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).

72.     Yet that is precisely what occurred here—Griffin made an untimely, systematic challenge to the registration status of the entire category of voters casting ballots under a *decade's old* law, waiting until *after* the election to ask whether their registrations were in fact sound.

73.     The NVRA was enacted to avoid such mass disruption to the rolls close in time to an election, requiring systematic challenges to be made well in advance of the election. *See id.* (explaining that "the 90 Day Provision strikes a careful balance: It permits systematic removal

programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest").

74.    The fact that Griffin raised his challenge immediately after the election does not save it. The congressional protection mandated by the NVRA's 90-day provision would be gutted if losing candidates could simply convert what should be pre-election registration challenges made far ahead of an election into post-election ballot challenges. *Cf. Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019) (explaining state law is preempted to the extent it serves as an obstacle to the accomplishment of federal legislation).

75.    Carving such a mile-wide loophole into the NVRA would eviscerate the 90-day provision entirely, ensuring that dissatisfied candidates in future elections wait until the day *after* the election to challenge voters' registrations after they cast ballots and after the results of the election are known.

76.    And the result to voters, including VoteVets Intervenors and their constituents, is the same either way—they will not be able to participate in the 2024 general election due to untimely and non-individualized challenges to their registration status. Such voters are profoundly prejudiced by this kind of post-election sandbagging, especially given that many of the challenged UMOVA voters *are* in fact demonstrable North Carolina residents. ECF No. 61 at 4 n.6. Had Griffin not blindsided these voters with tardy, post-election challenges, they could have established as much *before* the election; his delay should not be permitted to rob them of that chance.

**Count V**
**Violation of the Civil Rights Act**
**52 U.S.C. § 10101(a)(2)(B), 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**

77.    VoteVets Intervenors reallege all preceding paragraphs as if fully set forth herein.

78.    Under the materiality provision of the Civil Rights Act, election officials "cannot deny an individual the right to vote because of an 'error or omission [that] is not material in determining' an applicant's eligibility to vote." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 720 (9th Cir. 2025) (quoting 52 U.S.C. § 10101(a)(2)(B)).

79.    The Federal Post Card Application ("FPCA") permits UOCAVA voters to apply for an absentee ballot application. It asks the voter to complete several fields, including a box (Box 1) indicating the basis on which they are "request[ing] an absentee ballot for all elections in which [the voter is] eligible to vote." *See* Voter Registration and Absentee Ballot Request: Federal Post Card Application (FPCA), https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited May 1, 2025).

80.    That is precisely what Griffin asks here by demanding that the Board disenfranchise voters who are demonstrably North Carolina residents who happened to check a particular box on the Federal Postcard Application (FPCA) to request an absentee ballot that is irrelevant to determining residency. Such an "error" is "not material" to determining whether a person conclusively known to be a North Carolina resident satisfies the residency qualification.



**Image 1: FPCA Form Box 1**

81.     Griffin's challenge of UMOVA voters is premised solely on the fact that under Box 1, a voter has selected that they are "a U.S. Citizen living outside of the country, [and has] never lived in the United States." *See* Image 1, "1. Who are you? Pick one." However, his challenge assumes that every voter who has selected this checkbox did so accurately and has never in fact resided in North Carolina.

82.     But as the Board's notice explains, many of the challenged UMOVA voters *have* in fact resided in North Carolina, as reflected by their prior registrations and voting history. *See* ECF No. 61 at 4-5 ("Board Notice"). State and local election officials therefore may possess independent and conclusive evidence of a voter's prior North Carolina residence, but these voters may have "inadvertently indicated that they never lived in the United States" in Box 1. *Id.* at 4 n.6. Griffin's UMOVA Challenge nonetheless seeks to disenfranchise *bona fide* North Carolina residents for an immaterial error they made when completing their FPCA forms, without any opportunity to cure or present evidence of North Carolina residence.

83.     The Civil Rights Act bars disenfranchising lawful voters in this manner. Its materiality provision commands that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an *error or omission* on any record or paper relating to any application, registration, *or other act requisite to voting*, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphases added). But putting a checkmark next to the fourth box in Box 1 of the FPCA is necessarily an immaterial error where the applicant has demonstrated residing, registering, or voting in North Carolina for prior elections.

84.     In fact, nothing about the checkbox in Box 1 is even intended to provide election officials with information about a voter's eligibility to vote in a particular state; it concerns what

basis permits them to vote absentee. Guidance from the Federal Voting Assistance Program confirms this, making clear the checkbox is not even *required*. *See* Federal Voting Assistance Program, *FPCA: Registering and requesting your absentee ballot (North Carolina)*, https://www.fvap.gov/guide/chapter2/north-carolina (last visited May 1, 2025) (specifying instructions for filling out Section 1 of the FPCA form).

85. The checkboxes in Box 1 are therefore immaterial to determining an applicant's North Carolina residency and eligibility to participate in the election where election officials have in hand information that *confirms* that same voter's North Carolina residence.

## PRAYER FOR RELIEF

WHEREFORE, VoteVets Intervenors respectfully request that the Court enter a judgment in their favor providing the following relief:

(1) Declare that removing votes cast by voters targeted by Griffin's challenges violates those voters' substantive due process rights;

(2) Declare that removing votes cast by voters targeted by Griffin's challenges violates those voters' fundamental right to vote;

(3) Declare that removing votes cast by voters targeted by Griffin's challenges violates those voters' procedural due process rights;

(4) Declare that removing votes cast by voters targeted by Griffin's UMOVA Challenges violates those voters' rights under the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B);

(5) Declare that removing votes cast by voters targeted by Griffin's UMOVA Challenges violates those voters' rights under the National Voter Registration Act, 52 U.S.C. §§ 20507(c)(2)(A), 20507(b)(1);

(6) Permanently enjoin the State Board from discarding any votes cast by voters who have been challenged by Griffin's UMOVA Challenges;

(7) Order the Board to certify the results of the election as they stood at the time of its final formal count on December 10, 2024; and

(8) Grant VoteVets Intervenors such additional and further relief as this Court deems just and proper.

Dated: May 1, 2025                          Respectfully submitted,

                                            _____

                                            /s/ *Lalitha D. Madduri*
                                            Lalitha D. Madduri
                                            Christopher D. Dodge
                                            Tina Meng Morrison
                                            James J. Pinchak
                                            Julie Zuckerbrod
                                            ELIAS LAW GROUP LLP
                                            250 Massachusetts Ave, N.W.
                                            Suite 400
                                            Washington, D.C. 20001
                                            Telephone: (202) 968-4490
                                            lmadduri@elias.law
                                            cdodge@elias.law
                                            tmengmorrison@elias.law
                                            jpinchak@elias.law
                                            jzuckerbrod@elias.law

                                            Narendra K. Ghosh
                                            N.C. Bar No. 37649
                                            PATTERSON HARKAVY LLP
                                            100 Europa Drive, Suite 420
                                            Chapel Hill, NC 27217
                                            Telephone: (919) 942-5200
                                            nghosh@pathlaw.com

                                            *Madduri***
                                            Christopher D. Dodge*
                                            Tina Meng Morrison**
                                            James J. Pinchak**
                                            Makeba A.K. Rutahindurwa**
                                            Julie Zuckerbrod*
                                            ELIAS LAW GROUP LLP
                                            250 Massachusetts Ave, N.W., Suite 400
                                            Washington, D.C. 20001
                                            Telephone: (202) 968-4490
                                            lmadduri@elias.law
                                            cdodge@elias.law
                                            tmengmorrison@elias.law
                                            jpinchak@elias.law
                                            mrutahindurwa@elias.law
                                            jzuckerbrod@elias.law

*Participating via Notice of Special Appearance*
**Notice of Special Appearance Forthcoming*

Counsel for ~~Proposed~~ VoteVets Intervenors VoteVets Action Fund, the North Carolina Alliance for Retired Americans, ~~VoteVets Action Fund,~~ Tanya Webster-Durham, Sarah Smith, and Juanita Anderson

~~9~~