# Exhibit A

## NORTH CAROLINA COURT OF APPEALS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JEFFERSON GRIFFIN,

      Petitioner-Appellant,

v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS,

      Respondent-Appellee,

  and

ALLISON RIGGS,

      Intervenor-Respondent-
      Appellee.

From Wake County

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PETITION FOR WRIT OF MANDAMUS AND
ALTERNATIVE MOTION TO CLARIFY MANDATE**

**IMMEDIATE RULING REQUESTED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# INDEX

INDEX ................................................................................. i

TABLE OF AUTHORITIES ................................................... ii

INTRODUCTION ............................................................... 2

BACKGROUND.................................................................3

REASONS WHY THE WRIT SHOULD ISSUE OR
WHY THE COURT SHOULD CLARIFY THE
MANDATE ...............................................................5

I.    This Court Retains Jurisdiction to Enforce Its Own
Mandate.........................................................................5

II.    The State Board Has Announced That It Will Not
comply with This Court's Mandate. .............................. 6

    A.    The State Board is limiting the number of
overseas voters subject to a cure process...............7

    B.    The State Board is limiting the number of
Never Residents.................................................. 11

    C.    The State Board plans to give Never
Residents a "cure" opportunity........................... 15

CONCLUSION....................................................................19

VERIFICATION...................................................................21

CERTIFICATE OF SERVICE.............................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Collins v. Simms*,
 257 N.C. 1, 125 S.E.2d 298 (1962) .................................. 6

*D & W, Inc. v. City of Charlotte*,
 268 N.C. 720, 152 S.E.2d 199 (1966) ......................... 5, 17

*James v. Bartlett*, 3
 59 N.C. 260, 607 S.E.2d 638 (2005) .............................. 13

*Johnson v. Standard Sunco, Inc.*,
 111 N.C. App. 926, 435 S.E.2d 536 (1993) ...................... 6

*Murrill v. Murrill*,
 90 N.C. 120 (1884) ........................................................ 6

*Pue v. Hood*,
 222 N.C. 310, 22 S.E.2d 896 (1942) ............................... 6

*State v. Hasty*,
 181 N.C. App. 144, 639 S.E.2d 94 (2007) ....................... 6

*Tussey v. Owen*,
 147 N.C. 335, 61 S.E. 180 (1908) ................................... 6

**Statutes**

N.C. Gen. Stat. § 163-182.10 .................................................. 10

N.C. Gen. Stat. § 163-182.9 ................................................ 9, 10

**Treatises**

Elizabeth B. Scherer & Matthew N. Leerberg, *North Carolina Appellate Practice and Procedure* (2d ed. 2022) .............. 5, 6

## NORTH CAROLINA COURT OF APPEALS
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JEFFERSON GRIFFIN,

      Petitioner-Appellant,

v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS,

      Respondent-Appellee,

and

ALLISON RIGGS,

      Intervenor-Respondent-
      Appellee.

<u>From Wake County</u>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PETITION FOR WRIT OF MANDAMUS AND
## ALTERNATIVE MOTION TO CLARIFY MANDATE

## IMMEDIATE RULING REQUESTED
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pursuant to Rules 22 and 37 of the Rules of Appellate Procedure, Petitioner

Judge Griffin seeks a writ of mandamus from this Court, or, alternatively, an order

clarifying this Court's mandate.

## INTRODUCTION

After the Supreme Court of North Carolina issued its opinion, this case returned to federal court. The U.S. District Court for the Eastern District of North Carolina ordered the State Board of Elections to explain how it intended to comply with this Court's mandate. The State Board filed a notice explaining its intentions on 15 April 2025. In its notice, the Board explained that it intends to defy this Court's mandate rather than comply with it.

The State Board informed the federal court that it will violate this Court's mandate in several respects. First, the State Board will instruct only a single county to offer a cure process to overseas voters who failed to present identification—despite protests being filed in six counties. Second, the State Board will only address 266 Never Residents named in Judge Griffin's protests—despite this Court ordering county boards to remove all Never Residents. Third, the State Board has created an elaborate cure process for the Never Residents—even though this Court clearly forbade a cure process for Never Residents.

The Board's intended defiance requires immediate redress by this Court. This Court should issue a writ of mandamus to the State Board, ordering it to faithfully comply with the mandate. Procedurally, this Court could also enter an order

clarifying its mandate. Either way, this Court should leave the State Board no room to circumvent the Court's directions.

## BACKGROUND

On 4 April 2025, this Court issued its opinion in the case, in which it ruled that Judge Griffin had correctly identified three legal errors in the State Board's administration of the election. As a result, the Court directed the State Board to implement a 15-day cure process for voters with incomplete-registrations, to implement a 15-day cure process for overseas voters who did not provide photo identification, and to discount the votes of Never Residents. The Court set its mandate to issue on 7 April 2025.

On 6 April 2025, Appellees filed petitions for discretionary review and motions to stay the Court's mandate with the Supreme Court of North Carolina. On 7 April 2025, the Supreme Court stayed the mandate.

On 11 April 2025, the Supreme Court of North Carolina denied Appellees' petitions for discretionary review, dissolved the stay, and remanded the matter for further proceedings not inconsistent with the Supreme Court's order. The Supreme Court's order affirmed this Court's conclusion that the State Board had violated the law but ruled that voters with incomplete registrations should nonetheless be allowed

to vote in the election and it extended the cure period for overseas voters to 30 days. Otherwise, this Court's mandate remained in place.

On 11 April 2025, Justice Riggs filed a motion for a preliminary injunction with Chief Judge Richard E. Myers II of the U.S. District Court for the Eastern District of North Carolina. On 12 April 2025, Chief Judge Myers issued an order granting in part the request for injunctive relief. The order was as follows:

> Defendant North Carolina State Board of Elections is OR-DERED to proceed in accordance with the North Carolina Court of Appeals opinion, *Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025), as modified by the North Carolina Supreme Court in its April 11 Order, but SHALL NOT certify the results of the election, pending further order of this court.

On the same day, Chief Judge Myers ordered the State Board to file, on 15 April 2025, a "notice to the court of the scope of its remedial efforts, including the number of potentially affected voters and the counties in which those voters cast ballots."

On 15 April 2025, the State Board filed its notice. A copy of the notice is attached to this petition as Exhibit A (the "Notice").

## REASONS WHY THE WRIT SHOULD ISSUE OR WHY THE COURT SHOULD CLARIFY THE MANDATE

### I. This Court Retains Jurisdiction to Enforce Its Own Mandate.

An appellate court always retains jurisdiction to ensure that its orders are obeyed.

When an appellate court issues its mandate, the mandate is binding "and must be strictly followed without variation or departure. No judgment other than that directed or permitted by the appellate court may be entered." *D & W, Inc. v. City of Charlotte*, 268 N.C. 720, 722, 152 S.E.2d 199, 202 (1966). If the mandate is not strictly followed, the appellate court that issued the mandate "retains jurisdiction of the original cause in every case for the purpose of effectuating its mandate." *Id.* In other words, "[t]he issuance of the mandate from this Court [does] not exhaust its jurisdiction to enforce its orders." *Id.*; *see also* Elizabeth B. Scherer & Matthew N. Leerberg, *North Carolina Appellate Practice and Procedure* § 18.01 n.5 (2d ed. 2022) ("Of course, the issuance of the mandate does not divest the appellate court of all jurisdiction. The appellate court retains the ability to, for example, enforce the mandate itself.").

This Court "may issue any appropriate writ or take the necessary steps to compel obedience to its mandate." *D & W*, 268 N.C. at 722, 152 S.E.2d at 202. That is true whether the lower official's lack of compliance arises through

"insubordination, misinterpretation or inattention." *Id.* (quoting *Collins v. Simms*, 257 N.C. 1, 10, 125 S.E.2d 298, 304 (1962)).

When this failure to obey a mandate occurs, the remedy is mandamus. *See, e.g.*, *Tussey v. Owen*, 147 N.C. 335, 61 S.E. 180, 181 (1908); *Murrill v. Murrill*, 90 N.C. 120, 124 (1884); *State v. Hasty*, 181 N.C. App. 144, 146, 639 S.E.2d 94, 95 (2007); *Johnson v. Standard Sunco, Inc.*, 111 N.C. App. 926, 926, 435 S.E.2d 536, 537 (1993); *see also* Scherer & Leerberg, *supra*, § 22.02[2][g] ("Mandamus can be used to force a judicial officer to comply with an order of the appellate court. Likewise, mandamus is appropriate to enforce compliance with the mandate of the appellate court."). Mandamus is the exercise of this Court's "original and not appellate jurisdiction." *Pue v. Hood*, 222 N.C. 310, 22 S.E.2d 896, 898 (1942).

As explained below, the State Board has announced its intent to defy this Court's mandate. This Court, therefore, should order the Board to comply with the mandate.

## II. The State Board Has Announced That It Will Not comply with This Court's Mandate.

As revealed by the State Board's Notice to the federal court, the State Board is planning to disobey the Court's mandate. To be more specific, the Board plans to administer a cure process for overseas voters in only one county. The Board also intends to circumscribe the universe of ineligible Never Residents, even when this

Court ordered that all Never Residents be excluded. Lastly, the Board has devised a cure process that will permit ineligible Never Residents to vote in the election.

The Court should clarify its directions to the State Board so that the Board administers the actual remedy ordered by the Court.

## A. The State Board is limiting the number of overseas voters subject to a cure process.

The State Board informed the federal court that it will administer a cure process for only 1,409 overseas voters in Guildford County. Overseas voters in all other counties will have their votes counted, despite Judge Griffin having filed protests in five counties other than Guilford.

Judge Griffin filed protests challenging overseas voters in six counties in which a local election official confirmed that the county board accepted overseas ballots without requiring photo identification. Those counties were Guilford, Durham, Forsyth, Buncombe, Cumberland, and New Hanover. (Doc.Ex.I 349-58, 831-40, 1102-11, 1504-51, 1238-47, 2401-10). When the protests were originally filed, only one county (Guilford) had provided a list of such voters, and this list was included with the protest filed in Guilford County. (Doc.Ex.I 1504-51.) In the six filed protests, Judge Griffin stated that the lists had been requested and, "[o]nce the information is provided, we will supplement the protest." (*E.g.*, Doc.Ex.I 350.) Since filing the protests, Durham, Forsyth, and Buncombe counties have provided their lists as well,

and the lists were filed as supplements to Judge Griffin's protests. (Doc.Ex.I 3790-4042.)

In its federal court filing, the State Board announced that it has decided that only Guilford County should conduct a cure process for the 1,409 overseas voters identified in the list submitted with the Guilford County protest. Notice at 2. The Board's decision to conduct a cure process in just one county violates this Court's mandate.

The Court's instructions explicitly directed the State Board to have *multiple* counties conduct a cure process for the overseas voters who did not provide photo identification. The Court said that the State Board must

> immediately direct *the county boards* to expeditiously identify the military and overseas voters challenged under this protest and notify said voters of their failure to abide by the photo ID requirement or equivalent, to allow said voters fifteen (15) business days from the mailing of the notice to cure the defect, and upon verification, to include in the count of this challenged election the votes of those voters who timely cure their failure to abide by the photo ID requirement and to omit from the final count the votes of those voters who fail to timely cure their deficiencies.

Slip op. at 25 (emphasis added). Despite the Court making explicit that multiple "county boards" must conduct a cure process, the State Board has misread the Court's mandate as directing only a single county to conduct a cure process. The Court should correct the Board's misreading.

The State Board attempts to justify its misreading of the Court's explicit instructions by claiming that Judge Griffin only filed one "complete" protest in Guilford County. *See* Notice at 2 n.2. ("As indicated in the State Board's initial decision, only the Guilford County protest was complete by the deadline to file an election protest under state law."). The State Board's justification is baseless.

First, Judge Griffin filed protests in six counties before the statutory deadline set forth in N.C. Gen. Stat. § 163-182.9(b)(4). Indeed, the State Board's decision suggested timeliness concerns with protests filed in only three counties—Moore, Orange, and Richmond—but stopped short of ruling that any protests were untimely. (Doc.Ex.I 5373 n.4). In Judge Griffin's petition for judicial review that was filed with the Superior Court, Judge Griffin challenged the State Board's conclusion that any of his protests might be untimely. (Doc.Ex.II 269-71.) The State Board, in its arguments to the Superior Court, never contended that any of Judge Griffin's protests were actually untimely. (Doc.Ex.II 334-50). Therefore, the State Board has abandoned the argument that any protests were untimely.

Second, the six protests satisfied the statutory requirements when filed. Although Guilford County was the only protest that included a list of voters at the time of filing, the other protests nonetheless satisfied the filing requirements set forth in the General Statutes. To be clear, the election-protest statutes never discuss a

protest having to be "complete," much less define what constitutes being "complete." This is a new term that the State Board is trying to inject into the statutes.

Rather than requiring a protest to be "complete," section 163-182.10 explicitly states that a protest must merely be in "substantial compliance" with the filing requirements for election protests. Specifically, the statute says:

> The county board shall, as soon as possible after the protest is filed, meet to determine whether the protest *substantially complies* with G.S. 163-182.9 and whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred. If the board determines that one or both requirements are not met, the board shall dismiss the protest. The board shall notify both the protester and the State Board of Elections. The protester may file an amended protest or may appeal to the State Board. If the board determines that both requirements are met, it shall schedule a hearing.

N.C. Gen. Stat. § 163-182.10(a)(1) (emphasis added).

Section 163-182.9 sets forth the requirements of an election protest. Those requirements include that the protest be in writing, be signed by the protester, include the protester's information, state whether the protest concerns a tabulation issue or a different irregularity, request a remedy, and be filed by a certain deadline. *Id.* § 163-182.9(b). There is no requirement that the protest name every affected voter. Thus, there is no debate that Judge Griffin's six protests substantially complied with the statutory requirements.

Finally, the Board cannot claim that the protests were not "complete" because, absent the lists being attached, the protests failed to establish probable cause. This Court clearly ruled that the protests established probable cause. *See* slip op. at 16-19. The Board cannot, under the guise of claiming a protest was not "complete," evade this Court's holding that probable cause was met. Indeed, Judge Griffin asked the State Board to subpoena the county boards for the lists of these voters during the State Board proceedings. (Doc.Ex.I 3682-83.)

Therefore, Judge Griffin requests that the Court clarify its mandate to explicitly direct the State Board to instruct the "county boards," slip op. at 25, in Guilford, Durham, Forsyth, Buncombe, New Hanover, and Cumberland counties to conduct the 30-day cure process as required by this Court and modified by the Supreme Court.

**B.  The State Board is limiting the number of Never Residents.**

The State Board informed the federal court that there were only 266 Never Residents at issue. That very clearly contradicts this Court's mandate.

When Judge Griffin originally filed his protests, he only had data provided by the State Board. (*E.g.*, Doc.Ex.I 295-96, ¶¶ 10-12.) Based on the data provided by the State Board, Judge Griffin filed protests in 53 counties that had identifiable Never

Residents at the time. Those 53 protests listed a total of 266 Never Residents who had voted in the election.

Although Judge Griffin had received information from the State Board about Never Residents, the county boards had additional lists of Never Residents that the State Board failed to provide to Judge Griffin. (*E.g.*, Doc.Ex.I 296, ¶ 12 ("The NCSBE also explained that the spreadsheet provided was limited to overseas voters who submitted a ballot request through NCSBE's online system. Overseas voters who mailed in a ballot request would have done so to a county board of elections, and are thus not included in the information . . . .").) Therefore, Judge Griffin requested the Never Resident information from all 100 county boards. (Doc.Ex.I 3785-86.)

After filing the protests, some county boards began trickling in the requested information. Judge Griffin explained the following in his briefing to this Court:

> After filing the original protests, 35 counties responded to Judge Griffin's requests. Judge Griffin then supplemented 25 protests with this new data, which showed 138 additional Never Residents who voted in the election. Therefore, at least 405 Never Residents voted in the election.
>
> Since the Board rejected this protest, another five counties have produced records indicating an additional 111 Never Residents voted in the election, bringing the total 516. At this time, 60 counties have still not responded to public records requests on how many Never Residents voted in the election. It's possible that this irregularity changed the election's outcome, but because so many counties have yet to respond to public records requests, it is not certain. The final tally is an issue for the State Board to

> determine on remand, if this Court agrees with Judge Griffin on the legal merits of the protest.

Griffin Opening Br. at 8 n.2.[1]

In its federal court filing, the State Board announced that it has decided that it will address only the 266 Never Residents specifically named in original protests. Notice at 3. The Board's decision to ignore hundreds of additional Never Residents violates the Court's mandate.

There is no longer any doubt that Never Resident voting is unconstitutional. Slip op. at 32 ("[T]he challenged 'Never Resident' voters are ineligible to vote in non-federal North Carolina elections."). And their ineligibility to vote is not curable (unlike failing to provide a photo identification). *See id.* ("An absent person, who has never lived in North Carolina, cannot make North Carolina their domicile of choice."). To count the vote of even a single Never Resident violates the constitutional rights of all true residents. *James v. Bartlett*, 359 N.C. 260, 270, 607 S.E.2d 638, 644 (2005) ("To permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots . . . ."). Therefore, *all* Never Residents must be identified and excluded from the vote count.

---

**1**  Copies of supplements provided to the State Board are included in the administrative record. (Doc.Ex.I 4473-4561.)

That is what this Court said in its opinion, which the Supreme Court left standing. The Court's instructions clearly directed the State Board to have the county boards remove *all* Never Residents from the final vote count. In particular, the Court "remand[ed] the matter to the Board to direct the county boards to identify the votes from 'Never Residents' and remove them from the final count of the 2024 election for Supreme Court Seat 6." Slip op. at 36. Notably, the Court's instructions to the State Board were not limited to any particular number of Never Residents. The clear instruction was to identify the ballots of Never Residents and discount them.

As with the protests challenging overseas voters without photo identification, the protests filed by Judge Griffin substantially complied with the statutory requirements for filing a protest. In addition, this Court has already declared that the protests established probable cause. Thus, there is no basis for limiting the discounting of votes by Never Residents to only those Never Residents named in the lists attached to the protests that Judge Griffin filed.

Therefore, Judge Griffin respectfully asks the Court to clarify its mandate to explicitly direct the State Board to identify ballots cast by Never Residents in all 100 counties, and then to exclude those ballots from the vote total.

**C.    The State Board plans to give Never Residents a "cure" opportunity.**

The State Board is also defying the Court's mandate regarding the treatment of votes from Never Residents.

The Court's instructions clearly directed the State Board to have the county boards remove all Never Residents from the final vote count. Slip op. at 36 (holding that the Board must "direct the county boards to identify the votes from 'Never Residents' and remove them from the final count of the 2024 election for Supreme Court Seat 6"). While overseas voters who failed to provide photo identification were eligible to cure the defect, *see id.*, the Court clearly chose not to offer a cure to Never Residents.

The State Board, though, informed the federal court that it will implement a cure process for Never Residents. The Board detailed the process as follows:

> First, in order to ensure each of the voters challenged are accurately identified as falling within this category, the Board intends to instruct the county boards for these fifty-three counties to assemble and review the FPCA forms submitted by these 266 voters to confirm that they did check the fourth box on the form.
>
> Next, the county boards will review the voter's registration record and voter history record to ensure that the voter in question does not have a record of registering previously or voting previously under a claim of residency in the county. A prior registration form would show that the voter attested, under penalty of perjury, to an in-county residence in the past. A record of voting in-person or using the absentee voting procedures under Article

20 of Chapter 163 would similarly show that the challenged voter attested, under penalty of perjury, to having resided within the county during a prior election. In either case, such records would demonstrate that these voters do not fit within the category of "never residents" under the order of the Court of Appeals. If such records exist, voters thus will be removed from the list of affected voters.

Finally, for those that remain after the first two identification steps, the Board will instruct the county boards to inform these voters via a mailing (and, if possible, by email and telephone) that their votes were protested and North Carolina courts have ordered the State Board to discount their vote cast in the 2024 general election for North Carolina Supreme Court Associate Justice because state records indicate they informed the State that they never resided in North Carolina when they submitted their absentee ballot request form in the 2024 general election. The mailing will also inform the voter that this litigation is ongoing and that the voter's obligations may therefore be subject to change. In order to ensure these challenged voters were properly identified and are afforded due process as part of this identification, these voters will then be provided thirty days from the date of the mailing to submit a sworn affidavit stating that they have resided in the county and identifying their prior residence address. A template affidavit will be included with the mailing. Any such voters who provide the affidavit of in-state residence do not belong in this category and their votes will not be identified for removal.

Notice at 4-5 (footnotes omitted).

The State Board's planned treatment of Never Residents violates the Court's mandate in several respects.

First, the county boards will attempt to purge the Never Resident lists. After identifying Never Residents based on the Federal Post Card Application that they

submitted to receive a ballot for the 2024 election, the county boards will then take it upon themselves to look for old registration forms and voting records that might suggest that a Never Resident was a North Carolina resident all. As the Board makes clear, any Never Resident that has either a prior registration or in-person voting history "will be removed from the list of affected voters." Notice at 4.

This process was nowhere contemplated in the Court's mandate. The Court's mandate was to be "strictly followed without variation or departure. *D & W*, 268 N.C. at 722, 152 S.E.2d at 202. The Board was not given free rein to imagine other procedures.

Second, the purge process makes no sense. A voter is a Never Resident only if he submitted a Federal Post Card Application to receive a ballot for the 2024 election and checked "I am a U.S. citizen living outside of the county, and I have never lived in the United States." In submitting the application, the Never Resident is required to "swear or affirm, under penalty of perjury," that "[t]he information on this form is true, accurate, and complete to the best of my knowledge. I understand that a material misstatement of fact in completion of this document may constitute grounds for conviction of perjury."[2] Thus, the most recent declaration of the Never

---

**2**      (Doc.Ex.I 295-96, 300); Federal Post Card Application, *available at* https://www.fvap.gov/uploads/fvap/forms/fpca.pdf.

Resident—made under penalty of perjury—is that he has *never* lived in the United States. The voter's own declaration, made under penalty of perjury, is conclusive evidence of the voter's residency. The mandate didn't give the Board any authority to contradict the voter's declaration.

Third, for any Never Resident that is not removed by this unsanctioned purge process, the county boards will attempt to contact the Never Resident by mail, phone, and email. This action also appears to go beyond the scope of the Court's mandate. Although the Court could have required the boards to provide notice to these voters, the Court did not direct the boards to do so. That is because these ballots cannot be cured. As the Court explained, there's nothing someone can do to become a resident of North Carolina if he's never lived here in the first place. Slip op. at 32.

Fourth, the State Board will implement a cure process for the Never Residents. These voters will be given a "template affidavit" and invited to submit the affidavit within 30 days from the date of mailing. The affidavit invites the Never Resident to admit that he or she committed perjury when he previously declared under oath that he had never lived in the United States. Under the Board's plan, any voter who returns the affidavit "will not be identified for removal."

This cure process is a repudiation of this Court's mandate. This Court chose to create a cure process for overseas voters who failed to provide photo identification and clearly chose not to create a cure process for Never Residents.

The State Board's purge and cure process defies this Court's mandate. Judge Griffin therefore respectfully asks that the Court clarify its mandate and clearly direct the county boards to discount the votes of any overseas voters who submitted a Federal Post Card Application and marked on the application that they "have never lived in the United States." The Court should also make clear to the Board that it is not to contact these voters and not to offer them an opportunity to cure.

## CONCLUSION

In light of the State Board's Notice filed in federal court, Judge Griffin respectfully asks the Court to issue a writ of mandamus to the State Board that elaborates on the Court's mandate and orders the Board to comply with it or, in the alternative, to issue an order clarifying the Court's mandate, as described herein.

This the 16th day of April, 2025.

/s/ Craig D. Schauer
Craig D. Schauer
N.C. State Bar No. 41571
cschauer@dowlingfirm.com

N.C. R. App. P. 33(b) Certification: I certify that all of the attorneys listed below have authorized me to list their names on this document as if they had personally signed it.

W. Michael Dowling
N.C. State Bar No. 42790
mike@dowlingfirm.com
Troy D. Shelton
N.C. State Bar No. 48070
tshelton@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
Telephone: (919) 529-3351

Philip R. Thomas
N.C. State Bar No. 53751
pthomas@chalmersadams.com
Chalmers, Adams, Backer & Kaufman, PLLC
204 N Person Street
Raleigh, North Carolina 27601
Telephone: (919) 670-5185

*Counsel for the Honorable Jefferson Griffin*

# VERIFICATION

Pursuant to N.C. Gen. Stat. § 7A-98, counsel submits the following declaration:

I declare under penalty of perjury under the laws of North Carolina that the statements of fact in the foregoing document are true and correct to the best of my knowledge.

Executed on April 16, 2025.

_____

Craig D. Schauer

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was electronically filed

and served this day by email as follows:

Ryan Park
rpark@ncdoj.gov
Nick Brod
nbrod@ncdoj.gov
Terence Steed
tsteed@ncdoj.gov

*Counsel for State Board of Elections*

Raymond M. Bennett
ray.bennett@wbd-us.com
Samuel B. Hartzell
sam.hartzell@whd-us.com

*Counsel for the Hon. Allison Riggs*

This the 16th day of April, 2025.

/s/ Craig D. Schauer
Craig D. Schauer

# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| JUDGE JEFFERSON GRIFFIN, | |
| Plaintiff, | **STATE BOARD'S NOTICE OF REMEDIAL EFFORTS** |
| v. | **IN RESPONSE TO THE COURT'S APRIL 12, 2025 TEXT ONLY ORDER** |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | **Case No. 5:24-cv-00731-M** |
| Defendant, | |
| and | |
| ALLISON RIGGS, et al., | |
| Intervenor-Defendants. | |
| | |
| NORTH CAROLINA DEMOCRATIC PARTY, | |
| Plaintiff, | |
| v. | **Case No. 5:24-cv-00699-M** |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., | |
| Defendants. | |
| | |
| CARRIE CONLEY, et al., | |
| Plaintiffs, | |
| v. | **Case No. 5:25-cv-00193-M** |
| ALAN HIRSCH, et al, | |
| Defendants. | |

1

Defendant the North Carolina State Board of Elections respectfully submits this notice in response to this Court's April 12, 2025 order directing the Board to inform "the court of the scope of its remedial efforts, including the number of potentially affected voters and the counties in which those voters cast ballots." The State Board is aware of pending appeals concerning this Court's decision to require the State Board to implement the North Carolina state courts' orders while refraining from certifying any result of the election at issue in this case. Various parties argue that further remedial steps to execute the state courts' orders may, in and of themselves, implicate federal constitutional questions. However, pursuant to this Court's April 12 and April 15, 2025 orders, the State Board summarizes how it intends to approach this administrative remedial process unless and until directed to do otherwise by court order. The State Board will promptly report any substantive modifications to this Court or another court with jurisdiction at the time.

## I.    Identification of Affected Voters.

Pursuant to the North Carolina Court of Appeals Order, as modified by the North Carolina Supreme Court, the first step the State and county boards must take is to identify the challenged voters in the two categories of protests that remain.[1]

For Plaintiff Judge Griffin's protests concerning absentee ballots cast by military and overseas voters who did not submit a copy of a photo ID or an exception form with their ballots, these protests affect potentially up to 1,409 voters in Guilford County.[2]

---

[1] Certain of the voters referenced in Plaintiff's protests appear to have been listed several times. The figures below may therefore count the same voter multiple times. In addition, certain voters appear to be included within both categories of protests. These voters will receive both forms of notice.

[2] As indicated in the State Board's initial decision, only the Guilford County protest was complete by the deadline to file an election protest under state law.

2

In order to ensure each of the voters challenged are accurately identified as falling within this category, the Board intends to instruct the Guilford County Board of Elections to assemble and review the documentation submitted with the absentee ballots cast by each of these 1,409 voters, to confirm that these voters did not submit a copy of a photo ID or an exception form with their absentee ballots.[3] For those who did submit a photo ID or exception form when they voted, they will necessarily not fall within the category challenged and no further action will be required with respect to these voters. For those who did not submit such documentation, the Board will instruct the county board to provide notice to these voters as described below.

For Plaintiff's protests concerning absentee ballots cast by overseas voters who possibly checked the fourth box on question 1 of their federal Voter Registration and Absentee Ballot Request / Federal Post Card Application ("FPCA")[4] form that states, "I am a U.S. citizen living outside the country, I have never lived in the United States," these protests potentially affect up to 266 voters in fifty-three counties.[5]

---

[3] While the majority of military and overseas voters utilized the online portal to submit their absentee ballots in the election, some submitted ballots via email, mail, or fax. Because the online portal is not currently configured to accept attachments, only the voters within these latter subcategories may have submitted additional documentation, even though not required at the time.

[4] *See* FPCA Form, https://tinyurl.com/4rxkjvsx, last visited April 15, 2025.

[5] Alamance (one voter), Alleghany (one voter), Ashe (two voters), Avery (one voter), Brunswick (one voter), Buncombe (nine voters), Burke (two voters), Cabarrus (three voters), Caldwell (one voter), Carteret (two voters), Catawba (three voters), Cleveland (one voter), Columbus (one voter), Cumberland (six voters), Currituck (one voter), Dare (one voter), Davie (one voter), Duplin (one voter), Durham (twenty-three voters), Edgecombe (one voter), Forsyth (fifteen voters), Gaston (one voter), Guilford (fifteen voters), Halifax (one voter), Harnett (one voter), Henderson (seven voters), Iredell (seven voters), Jackson (one voter), Johnston (one voter), Lee (one voter), Lenoir (one voter), Lincoln (four voters), Madison (two voters), Mecklenburg (twenty-seven voters), Moore (eight voters), Nash (one voter), New Hanover (eight voters), Onslow (three voters), Orange (thirty-seven voters), Pender (one voter), Person (one voter), Pitt (two voters), Randolph (one voter), Robeson (one voter), Rutherford (one voter), Scotland (one

First, in order to ensure each of the voters challenged are accurately identified as falling within this category,[6] the Board intends to instruct the county boards for these fifty-three counties to assemble and review the FPCA forms submitted by these 266 voters to confirm that they did check the fourth box on the form.

Next, the county boards will review the voter's registration record and voter history record to ensure that the voter in question does not have a record of registering previously or voting previously under a claim of residency in the county. A prior registration form would show that the voter attested, under penalty of perjury, to an in-county residence in the past.[7] A record of voting in-person or using the absentee voting procedures under Article 20 of Chapter 163 would similarly show that the challenged voter attested, under penalty of perjury, to having resided within the county during a prior election. In either case, such records would demonstrate that these voters do not fit within the category of "never residents" under the order of the Court of Appeals. If such records exist, voters thus will be removed from the list of affected voters.

---

voter), Swain (one voter), Union (three voters), Vance (one voter), Wake (thirty-nine voters), Warren (one voter), Watauga (seven voters), and Wilson (three voters).

[6] Recent news reports and a sample internal review of the voter history of these voters indicates that some have resided in the state previously. *See* Bryan Anderson, *Longtime N.C. Voters May Have Their Ballots Wrongfully Tossed in Supreme Court Race*, The Assembly (Apr. 13, 2025), https://tinyurl.com/mpadw2zw; Judd Legum et al., *North Carolina Supreme Court throws out hundreds of ballots based on flawed data*, Popular Information (Apr. 15, 2025), https://tinyurl.com/y2wf44be; Paige Masten, *NC Supreme Court's ruling in Griffin case has some big, glaring problems*, The Charlotte Observer (Apr. 15, 2025, 10:18 AM), https://tinyurl.com/hnfzanjb. It is suspected that these voters were either incorrectly identified as never residents or inadvertently indicated that they never lived in the United States. Thus, these steps are necessary to ensure that the State Board is in compliance with the Court of Appeals order directing the State and county boards to identify the voters who it ruled are not eligible to vote under state law for failure to satisfy a residency requirement.

[7] *See* North Carolina Voter Registration Application Form, https://tinyurl.com/jjcnk9bc, last visited April 15, 2025.

Finally, for those that remain after the first two identification steps, the Board will instruct the county boards to inform these voters via a mailing (and, if possible, by email and telephone) that their votes were protested and North Carolina courts have ordered the State Board to discount their vote cast in the 2024 general election for North Carolina Supreme Court Associate Justice because state records indicate they informed the State that they never resided in North Carolina when they submitted their absentee ballot request form in the 2024 general election. The mailing will also inform the voter that this litigation is ongoing and that the voter's obligations may therefore be subject to change. In order to ensure these challenged voters were properly identified and are afforded due process as part of this identification, these voters will then be provided thirty days from the date of the mailing to submit a sworn affidavit stating that they have resided in the county and identifying their prior residence address. A template affidavit will be included with the mailing. Any such voters who provide the affidavit of in-state residence do not belong in this category and their votes will not be identified for removal.[8]

## II.    Notice to Affected Voters.

For challenged voters whose votes were challenged for having voted as overseas or military voters without meeting the photo ID requirement, the State Board will direct the county boards to prepare notices to these voters via a mailing (and, if possible, by email and telephone) about their need to submit a copy of their photo identification, or an affidavit referred to as a Photo ID Exception Form. For ease of administration, this mailing concerning the photo ID

---

[8] Under normal state election protest procedures, a voter challenged under an election protest would be guaranteed notice and an evidentiary hearing to contest the allegations of ineligibility in the protest. *See* N.C. Gen. Stat. § 163-182.10(b)–(c). The Court of Appeals order does not appear to permit this statutory process to play out. However, the State Board interprets the order's direction for the county board to "identify the votes from 'Never Residents'" to afford any such challenged voters an opportunity to demonstrate to the county board that their votes should not be so identified, because they are not, in fact, "Never Residents."

requirement will be sent to voters at the same time as the other mailing referenced above. A blank exception form will be included with this mailing, which is included with all absentee ballot packages and is part of the standard cure process for civilian absentee voters who need to cure a deficiency with their photo identification documentation.

These voters will specifically be notified that North Carolina state courts have ordered the State Board provide them notice that their vote cast in the 2024 general election for North Carolina Supreme Court Associate Justice will only count if, within thirty days of the date that the mailing referenced above was sent, these voters submit a copied photo ID or exception form. The mailing will also inform the voter that this litigation is ongoing and the voter's obligations are subject to change. Voters will be informed that copied IDs or exception forms can be submitted by mail, fax, or submitted electronically via an online portal or email.

The State Board has begun work with the vendor that maintains its online portal for processing military and overseas ballots to create a means by which voters may securely submit copies of photo IDs and exception forms online. So as to ensure as orderly a process as possible, and to avoid confusion, the State Board will not instruct the county boards to send out the notice to these voters until this portal is ready. The State Board anticipates the portal to be ready within a week of entering into a contract. Also, to avoid confusion regarding the deadline for a voter to respond, the State Board will instruct the county boards to send out all notices on the same date, so that all challenged voters will have to respond within the same thirty-day period.

### III.    Identifying Ballots With Votes That May Be Discounted.

For challenged overseas and military voters who voted without providing an ID or claiming an exception and who now submit a photo ID or exception form, the county board will

proceed under 08 N.C. Admin. Code 17 .0109 for the review of such photo ID documentation.[9] For any challenged military or overseas voters who, within thirty days of the notice being sent, fails to provide any photo ID documentation or who provides documentation that is not acceptable under 08 N.C. Admin. Code 17 .0109, the State Board will instruct the county board to retrieve their ballots for further action consistent with an order from this Court or another court with jurisdiction.

For challenged overseas voters who are identified as having never resided in North Carolina, the State Board will instruct the county board to retrieve their ballots for further action consistent with an order from this Court or another court with jurisdiction.

Until this Court or another court with jurisdiction directs the State Board to change the vote count after having identified the ballots as described above, the State Board will direct the county boards not to ascertain or discount the votes of any such ballots, and to not reveal to anyone how any such ballots were voted.

Should this Court require further information, the State Board stands ready to provide it upon request.

Respectfully submitted, this 15th day of April, 2025.

<div style="margin-left:40%">

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov
 North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for the State Board*

</div>

---

[9] With the exception of paragraph (d) of the Rule, as the Court of Appeals has now determined that provision is invalid.